IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| COURTNEY DRIVER, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>HOUSTON COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>*Defendants*. | Civil Action No. 5:25-cv-0025-MTT |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

## INTRODUCTION

Plaintiffs are private parties attempting to enforce § 2 of the Voting Rights Act of 1965 (VRA). They acknowledge that the text of § 2 contains no private right of action, but try to pluck a vaguely *implied* private right of action from numerous provisions of the VRA. If that doesn't work, they insist they can achieve the same effect by calling § 1983 into service. In the end, all of Plaintiffs' arguments ultimately fail and this Court should grant Defendants' Motion to Dismiss.

### I. There is no controlling precedent establishing a private right of action under § 2.

Plaintiffs' argument opens with the remarkable accusation that Defendants' thesis is "contrary to decades of binding precedent." Doc. 35, p. 10.[1] Yet to support this sweeping claim, Plaintiffs only cite cases that are non-binding or not precedent. This Court is in no way constrained by *binding* precedent on this issue.

Since 1965, the U.S. Supreme Court has consistently declined to decide whether § 2 confers a private right of action. *See, e.g. Mobile v. Bolden*, 446 U.S. 55, 60 (1980). Rather, it has simply assumed one exists because—despite the VRA's history—the question has not been squarely put before it. *See, e.g., Brnovich v. Democratic National Committee,* 594 U.S. 647, 690 (2021) (Gorsuch, J., concurring) ("Our cases have assumed—without deciding—that the [VRA] furnishes an implied cause of action under § 2" and noting that no party before the Court raised the issue). In contrast, Defendants here have put the question to this Court for consideration.

---

[1] References to page numbers from filings are to the blue ECF numbers.

1

Plaintiffs ask this Court to brush this threshold issue aside based on a long chain of uncritical assumptions and they do so principally by relying on *Morse v. Republican Party of Va.,* 517 U.S 186 (1996). But that reliance is misplaced.

First, and perhaps most crucially: the issue for consideration in *Morse* had nothing to do with whether § 2 contained a private right of action. Instead, the Court was focused on §10. *Id.* at 190. And that matters because "[n]ot all text within a judicial decision serves as precedent." *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 44 (2016). And Plaintiffs' argument rests on a patchwork compilation of dicta from multiple opinions.

Plaintiffs are correct that, in various opinions, five Justices in *Morse* noted that private § 2 claims have been heard by federal courts. For example, two Justices acknowledged that the courts have "entertained cases brought by private litigants to enforce § 2." 517 U.S. at 232. And three Justices considered it significant that analysis in other cases finding a private right of action would apply with "similar force" to § 2 and that "Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5." *Id.* at 240 (Breyer, J., concurring). But so what? These conclusory statements made in passing do not, as Plaintiffs suggest, form a "necessary and binding portion of the *Morse* holding." Doc. 35 at 11. To the contrary, they are exactly the kind of "[a]ssumptions and statements of beliefs about other issues [that] are not holdings, no matter how confident the court making them may sound." *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment ("Arkansas NAACP"),* 86 F.4th 1204, 1216 (8th Cir. 2023).

2

Second, the analysis behind these assumptions—to the extent there is any at all—is not persuasive. That is unsurprising "because the Supreme Court was deciding something else: the availability of a private right of action under § 10." *Id* at 1216. Plaintiffs attempt to explain this away by adhering to the Eleventh Circuit's history of deference to Supreme Court dicta. *See* Doc. 35 at 13 (quoting *Schwab v. Crosby,* 451 F.3d 1308, 1325 (11th Cir. 2006). But the very case Plaintiffs cite also acknowledges that such deference is appropriate only when it is "not enfeebled by any subsequent statement." *Schwab,* 451 F.3d at 1326 (quoting *McCoy v. Mass. Inst. of Tech.,* 950 F. 2d 13, 19 (1st Cir. 1991)). And the statements in *Morse* have been thoroughly enfeebled by subsequent decisions, including those that have reexamined and refined the analytical process for finding implied causes of action in federal courts. *See, e.g., Arkansas NAACP,* 86 F.4th at 1216. Further, key to the *Schwab* court's deference was that the dicta it relied on was not the "throw-away kind of dicta. It [was] well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions." 451 F. 3d at 1325. It is difficult to imagine a bigger contrast with that of the *Morse* court's conclusory statements and almost nonexistent analysis of § 2's provisions.[2]

---

[2] In a closing footnote, Plaintiffs also rely on a handful of other Supreme Court cases that considered the claims of private plaintiffs under § 2. *See, e.g.*, Doc. 35 at 11 n.3. In all those cases, the courts failed to engage with an analysis of § 2 to determine whether a private right of action exists and likewise proceeded under the same faulty assumption that numerous courts have made over the years. The point here is that Defendants—unlike the parties in the cases presented by Plaintiffs—now expressly challenge that assumption. And this Court is not bound by thinly reasoned and inapposite procedural circumstances of those cases.

Third, like the Supreme Court cases Plaintiffs cite, the Eleventh Circuit cases are similarly thin on analysis and are not binding on this Court. Plaintiffs acknowledge that one of the cases they rely on plainly "is not controlling because the judgment was ultimately vacated as moot[.]" Doc. 35 at 12, n. 4. (quoting *Georgia State Conf. of the NAACP v. Georgia ("Georgia NAACP")* 2023 WL 7093025, at *7 (N.D. Ga. Oct. 26, 2023)). The other cases they cite fare no better.

In *Lewis v. Governor of Ala.,* 896 F.3d 1282 (11th Cir. 2018) *vacated and reheard en banc at* 944 F.3d 1287 (11th Cir. 2019), a panel of the Eleventh Circuit concluded that "Congress 'clearly intended' § 2 to be enforceable by private action[.]" 896 F.3d at 1293. But to arrive there the panel leaned entirely on the Supreme Court dicta in *Morse,* which did not decide the issue—as Justice Gorsuch explained. And in any event, whether § 2 provided an implied private right of action was not even at part of the case. To the contrary, the defendants *conceded* and themselves relied on the premise "that the statute… provides an *implied* right of action[.]" 896 F.3d at 1293. (emphasis original). What was at issue was whether Congress abrogated state sovereign immunity in creating an implied right of action, which does not help Plaintiffs here. Further, the holding in *Lewis* was vacated by the *en banc* Eleventh Circuit. That is enough to render the decision non-binding even if it was directly on point here, which it is not. *See, e.g., Corp. Mgmt. Advisors, Inc. v. Artjen Complexus, Inc.,* 561 F.3d 1294, 1295 n.1 (11th Cir. 2009).

The other case at the Eleventh Circuit relied on by Plaintiffs, *Ford v. Strange,* is unreported and therefore non-binding on this Court. 580 F. App'x 701 (11th Cir.

4

2014); *see also* 11th Cir. R. 36-2. And that case contained *even less* analysis than the others. Indeed, in a footnote, the court relied exclusively on *Morse* for the proposition that "[a] *majority* of the Supreme Court has indicated that section 2 of the Voting Rights Act contains an implied private right of action." *Id.* at 705, n. 6 (emphasis added). That statement is not only non-binding, it is entirely unpersuasive.

Finally, having no precedent which binds this Court, Plaintiffs cite a handful of single judge and three-judge district court decisions in their final attempt to etch an implied private right of action onto § 2. Doc. 35 at 13. Some of these cases are reported and some are unreported. But regardless, none bind this Court. And while some of the cases undertake a deeper analysis than that undertaken by the appellate courts examined thus far, they all ultimately fail to persuade.

## II. There is no private right of action to enforce § 2.

Defendants already explained in their substantive arguments why no private right of action exists to enforce § 2. In response to Plaintiffs' counterarguments, three points stand out: (1) it is questionable whether § 2 *confers* a right on a class of persons. That is fatal to finding an implied right of action. But even if it did (2) nothing in § 2 or the VRA suggests the creation of a private remedy available to § 2 litigants. Finally, (3) nothing in the legislative history of the VRA can overcome the lack of textual support for Plaintiffs' theory.

### A. The text and structure of the VRA do not indicate that § 2 confers a private right.

Plaintiffs acknowledge that implying a private right of action requires that § 2 "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff

5

in the case." Doc. 35 at 15 (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677, 702–03 n. 13 (1979)). To locate this purportedly explicit conferral of rights, Plaintiffs focus on the fact that the statute prohibits jurisdictions from infringing on "the right of any citizen of the United States to vote on account of race or color." *Id.* (quoting 52 U.S.C. § 10301(a)). And they lean heavily on the part of subsection (b) that refers to "members of a class of citizens protected by subsection (a)." *Id.* (quoting 52 U.S.C. § 10301(b)). But in doing so, they gloss over *the focus of the statute itself*.

Subsection (a) of § 2 is aimed squarely at governments. It proscribes specific government conduct, declaring that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure, **shall be imposed or applied by any State or political subdivision**," in a manner that denies voting rights on account of race or color. 52 U.S.C. § 10301(a) (emphasis added). That proscription extends to conduct by a government "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." *Id.* But that does nothing to confer a right on any class of citizens. Instead, it merely reinforces a preexisting right held by all citizens. And even the reference to that right flows from the statute's proscription on *government conduct* "that results in" the denial of the right to vote.

The right to vote free from discrimination on account of race or color is enshrined elsewhere: specifically, the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Thus, "[f]ar from displaying congressional intent to create new rights," subsection (a) of § 2 merely prevents states and political subdivisions from impinging on "rights already created by [the Constitution]." *Alexander v. Sandoval,*

6

532 U.S. 275, 289 (2001). And subsection (b) provides no work around. That provision is entirely concerned with what the *evidentiary standard* is to establish a violation of the preexisting right to vote. While that standard is different from what may be required under a purely constitutional claim, *see Bolden*, 446 U.S. at 60, it does not explicitly confer a right of any kind.[3] And in the broader context of § 2, it is not sufficient to overcome the clear focus of the statute on the conduct of governments.

### B.    Section 2 does not create a private remedy

To find an implied private right of action, the Court must determine whether § 2 "displays an intent to create not just a private right, but also a private remedy." *Sandoval,* 532 U.S. at 286–87. Because they cannot rely on the text of § 2 for such a remedy, Plaintiffs lean exclusively on §§ 3 and 14. They claim the addition of the "aggrieved person" language in § 3 and the fact that § 14 allows for the recovery of attorney fees by a "prevailing party" creates the necessary indicia of a private remedy within the VRA that can apparently be applied to § 2 claims. Doc. 35 at 17–18. But neither of these provisions goes that far.

First, as Defendants already explained, the aggrieved-person language in § 3 was added to assist in the private prosecution of "a proceeding under any statute" instituted to enforce the voting guarantees of the fourteenth amendment that *already* contained a private right of action. *See* Doc. 29-1 at 7–8. But this language did not *create* a cause of action to enforce those voting guarantees, it merely provided private

---

[3] This is also why *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) is irrelevant because it relied on provisions of the Civil Rights Act separate from the VRA.

parties with access to certain forms of relief for *existing* causes of action that they might not otherwise have had access to. *Id.*

Second, Plaintiffs' reliance on the § 14 fee-shifting provisions is even less persuasive. They say language allowing a "prevailing party" to recover attorney fees "necessarily refers to a private litigant, not the United States, and the Attorney General does not collect attorneys' fees." Doc. 35 at 18 (quoting *Morse,* 517 U.S. at 234 (internal quotations omitted)). Not so. There are many parties that would recover attorneys' fees under this provision apart from private litigants including wrongly accused states and political subdivisions targeted by an unsuccessful § 2 claim. *See, e.g.*, *Ark. NAACP,* 86 F.4th at 1213 n.4 (discussing how prevailing party language in § 14(e) "presumably includes states and political subdivisions, rather than 'aggrieved person[s],' which at least focuses on individuals[.]"). And this makes sense.

While the VRA is a prophylactic measure to ensure "equal openness" in elections across the country, it upends the usual balance of power between the states and the federal government in elections. *See, e.g., Shelby Cty. v. Holder,* 570 U.S. 529, 542–45 (2013). This departure often comes at great cost to state and local jurisdictions whether through the defense of § 2 cases or through the now-discarded preclearance regime under §§ 4 and 5. It is unsurprising, then, that Congress would devise a way to ensure state and local jurisdictions are adequately compensated for the expenses of litigation wrongly instituted by the United States and did so in § 14. The existence of this path does not mean Congress intended to create a private right of action.

### C. The legislative history of § 2 cannot create an implied private cause of action when one is otherwise absent in the text.

Plaintiffs unsurprisingly rely extensively on "legislative history" to buttress their fledgling arguments around the text and structure of the VRA. They quote all manner of congressional reports hoping to elevate the views of a committee—or more likely a few select members of a committee and their staff—over the text of what Congress actually passed. Doc. 35 at 18–21. But "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs.*, Inc., 545 U.S. 546, 568 (2005). If there is any value to legislative history, it is to explain ambiguous text, not to create provisions out of whole cloth. But here, "the legislative history does not complete the statutory story. Rather, it tells a different story, one not reflected in the text of anything Congress passed." *Ark. NAACP,* 86 F.4th at 1214. This Court should not rely on it.

### III. Plaintiffs cannot salvage their claims through § 1983.

Finally, Plaintiffs seek to use §1983 to save their claims, but the arguments are insufficient.

First, Defendants' motion to dismiss challenged the existence of a private right of action under § 2. And that includes, as identified with more particularity above, the lack of any rights-creating language within § 2. As the Eighth Circuit explained in a recent decision, that should end the inquiry. *Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 713 (8th Cir. 2025). But the scope and intricacy of the comprehensive remedial scheme set forth throughout the entirety of the VRA creates an additional and independent reason for declining to apply § 1983.

9

Second, Plaintiffs' response artificially narrows the standard the Supreme Court has articulated for § 1983 preclusion so that is available only where the "statute required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies under the statute's enforcement scheme before suing under its dedicated right of action." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 189–90 (2023) (quotations omitted). But that case did not create a rule eliminating § 1983's implicit preclusion in all other circumstances. Instead, it explained that a § 1983 claim could be precluded in circumstances where a statutory scheme evinced a "careful congressional tailoring that § 1983 actions would distort." *Id.* at 190 (cleaned up). Thus, the mere fact that private enforcement is *possible* within a structure does not mean it is *compatible* with § 1983 actions.

The VRA alters the careful balancing of state and federal power in the context of elections. U.S. Const. Art. I, Sec. IV. Thus, it makes sense that Congress would have "carefully tailored" who can sue and for what purpose by primarily placing that authority within the wisdom and discretion of the Attorney General of the United States. The interlocking provisions of the VRA ensure that the statutory purpose of attaining "equal openness" in election processes throughout the country are carefully balanced against the rights of states to control their own elections. And that is precisely the kind of careful congressional tailoring that § 1983 actions "would distort." *Talevski*, 599 U.S. at 190 (cleaned up). Thus, without an implied private right action and with the presence of comprehensive remedial scheme, Plaintiffs are precluded from using § 1983 to advance their claims in this case.

Respectfully submitted this 10th day of June, 2025.

/s/ *Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**Clark Hill PLC**
3630 Peachtree Road NE
Suite 550
Atlanta, Georgia 30326
678.370.4377 (phone)

*Counsel for Defendants*