# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

|  |  |
|---|---|
| COURTNEY DRIVER, *et al.*,<br><br>   *Plaintiffs*,<br><br>      v.<br><br>HOUSTON COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>   *Defendants*. | Civil Action No. 5:25-cv-0025-MTT |

# DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ..........................................................................................................1

FACTUAL BACKGROUND ..........................................................................................3

    I.     Houston County Government ................................................................3
    II.    Plaintiffs' illustrative plans.....................................................................3

ARGUMENT AND CITATION OF AUTHORITIES.................................................6

    I.     Plaintiffs cannot establish the first *Gingles* precondition. ...................7
        A. Legal standard. ...................................................................................7
        B. The only valid remedy for Houston County is a four-district plan. .....................................................................................................8
        C. Dr. Cervas's sole four-district plan with a majority-Black district cannot be used as a remedy. .......................................................10
    II.    Plaintiffs cannot establish the second *Gingles* precondition.............13
        A. Legal standard. .................................................................................13
        B. Demonstrating the second *Gingles* precondition requires more than meeting the "separate electorates test." ...........................14
        C. Dr. Popick failed to adduce adequate evidence demonstrating cohesive bloc voting by Black residents of Houston County. 16

CONCLUSION...............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Alabama Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) .................................................................................... 11, 12

*Allen v. Milligan,*
    599 U.S. 1 (2023) ........................................................................................ 10, 11

*Alpha Phi Alpha Fraternity v. Raffensperger,*
    700 F. Supp. 3d 1136 (N.D. Ga. 2023) ............................................................ passim

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ............................................................................................ 1

*Brooks v. Miller,*
    158 F.3d 1230 (11th Cir. 1998) ........................................................................... 7

*Burton v. City of Belle Glade,*
    178 F.3d 1175 (11th Cir. 1999) ......................................................................... 7, 8

*Bush v. Vera,*
    517 U.S. 952 (1996) ...................................................................................... 11, 13

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................ 6

*Curling v. Raffensperger,*
    50 F.4th 1114 (11th Cir. 2022) ............................................................................ 2

*Davis v. Chiles,*
    139 F.3d 1414 (11th Cir. 1998) .......................................................................... 11

*Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs,*
    775 F.3d 1336 (11th Cir. 2015) ........................................................................... 7

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama,*
    992 F.3d 1299 (11th Cir. 2021) ........................................................................... 7

*Holder v. Hall,*
    512 U.S. 874 (1994) ......................................................................................... 8, 9

*Johnson v. De Grandy*,
  512 U.S. 997 (1994). ..................................................................................7

*Johnson v. DeSoto Cnty. Bd. of Comm'rs*,
  204 F.3d 1335 (11th Cir. 2000) ................................................................7

*Johnson v. Hamrick*,
  296 F.3d 1065 (11th Cir. 2002) ................................................................1

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ........................................................................10, 13, 14

*Marion v. DeKalb County, Ga.*
  821 F. Supp. 685 (N.D. Ga. 1993) .......................................................6, 12

*Miller v. Johnson*,
  515 U.S. 900 (1995) ................................................................................11

*Negron v. City of Miami Beach*,
  113 F.3d 1563 (11th Cir. 1997) ............................................................1, 7

*Nipper v. Smith*,
  39 F.3d 1494 (11th Cir. 1994) .......................................................1, 6, 7, 8

*Rose v. Sec'y of State of Georgia*,
  87 F.4th 469 (11th Cir. 2023) .........................................................8, 9, 10

*S. Christian Leadership Conference of Alabama v. Sessions*,
  56 F.3d 1281 (11th Cir. 1995) ................................................................12

*Solomon v. Liberty Cnty. Comm'rs*,
  221 F.3d 1218 (11th Cir. 2000) ..............................................................1

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ........................................................................passim

**Statutes**

1922 Ga. Laws Act No. 429 ............................................................................1

1990 Ga. Laws Act No. 712 ............................................................................8

52 U.S.C. § 10301 .......................................................................................1, 6

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................ 6

## INTRODUCTION

Houston County has elected its county commissioners on a countywide basis since voters were first able to choose commissioners in the 1920s. 1922 Ga. Laws Act No. 429 § 2. Black and Black-preferred candidates have succeeded on a countywide basis in past elections. But Plaintiffs ask this Court to force Houston County to switch from its countywide system to districted elections because they claim the current method of election results in "a denial or abridgement of the right . . . to vote on account of race or color," under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a). Now that discovery has concluded, Plaintiffs have failed to carry their burden on the required preconditions under *Thornburg v. Gingles*, 478 U.S. 30 (1986).

Section 2 requires this Court to "conduct an intensely local appraisal of the design and impact of a voting system." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) (quoting *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997)). And any alleged deprivation of the right to vote "must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994) (en banc)); *accord Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 706 (2021) (Section 2 asks whether an election law interacts with conditions

"to *cause* race-based inequality in voting opportunity") (Kagan, J, dissenting) (emphasis added). And the default position is this Court's non-involvement, because "the Constitution charges States, not federal courts, with designing election rules." *Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022).

While there are many reasons why Plaintiffs' claims fail the required "intensely local appraisal," in this case, two are clear and do not require this Court to weigh evidence. First, the map proposed by Plaintiffs does not meet the first precondition of *Gingles*, because it improperly prioritized race in its design and thus cannot be implemented as a remedy. Plaintiffs' expert admitted drawing a race-blind plan, turning on racial shading information, then relying on that racial information to bring a non-majority-Black district over 50%, carefully adding Black voters to achieve that goal. He admits he could not identify communities of interest or other race-neutral factors that drove the creation of the districts, instead focusing on uniting Black voters to achieve a racial goal. This is unconstitutional racial gerrymandering, meaning Plaintiffs do not present a valid remedy.

Second, Plaintiffs cannot show the second precondition of *Gingles* is met because Plaintiffs' statistical expert failed in his analysis to present sufficient evidence of cohesive racial bloc voting in Houston County. Indeed, the methodology used to show racially polarized voting patterns was so flawed that Plaintiffs' expert had to completely redo his analysis following his deposition with

counsel for Houston County. His purportedly "corrected" report only served to further muddy the waters. Without reliable evidence of voting patterns based on race, Plaintiffs cannot carry their burden on these prongs either.

As discussed below, after discovery, the evidence presented by Plaintiffs on these two *Gingles* preconditions is insufficient to create a disputed material fact that could allow this case to continue. This Court should grant judgment as a matter of law to Defendants.

## FACTUAL BACKGROUND

### I.    Houston County government.

Houston County has five commissioners, but they do not all have the same role in the county's government. Deposition of Chairman Daniel Perdue (Perdue Dep.) at 17:2–19:24. For almost 30 years, the Commissioner elected to Post 1 has served as Chair and the full-time CEO of the County government. Perdue Dep. at 17:2–19:24, 32:17–20, 75:5–77:8.

### II.    Plaintiffs' illustrative plans.

Plaintiffs employed a single expert to create a district plan for purposes of showing the existence of the first *Gingles* precondition, Dr. Jonathan Cervas. Cervas Report, attached as Ex. A, at ¶¶ 4–5. Dr. Cervas followed a particular process to create plans with majority-Black districts. First, he drew race- and party-blind maps, not relying on any racial or partisan data. Ex. A at ¶¶ 55–56. Second,

he then turned on racial data to determine whether he had drawn a majority-Black district on either plan and found he had not. Ex. A at ¶ 57. Third, he turned on racial shading information in his mapping program to locate Black individuals, then used that racial information to add Black individuals and move a district from having no single minority group as a majority of the district to the district containing a majority of Black individuals. Deposition of Jonathan Cervas (Cervas Dep.) at 60:2–61:14. This process resulted in a District 1 that was 52.0% Black voting age population (VAP) on a five-district plan (Cervas MMD 5) and a District 1 that was 49.997% Black VAP on a four-district plan (Cervas MMD 4).[1] Cervas Dep. at 110:21–111:5; 143:19–144:4; 146:2–23.

After Defendants' expert pointed out the four-district plan did not contain a majority-Black district, Dr. Cervas consulted racial shading maps again and found two adjoining Census blocks with high Black percentages, added those to District 1, and pushed the district barely over 50% Black VAP. Cervas Reply Report, attached as Ex. B, ¶¶ 14–15; Cervas Dep. at 169:13–170:4. Dr. Cervas did not identify any other race-neutral principles he followed when in the process of

---

[1] As discussed further below, the only valid remedial districting plan for Houston County is a four-district plan, given the unique nature and government interests in the role of the Chairman of the County Commission as the county's full-time CEO.

4

moving a race-blind district over 50% Black VAP and did not attempt any other methods of moving population in that district to bring it over 50% Black VAP. Cervas Dep. at 60:2–61:14, 169:13–170:16.

Besides ensuring the district was over 50% Black VAP and had the required overall population, Dr. Cervas did not consistently follow any other traditional redistricting principles in creating the majority-Black district on the four-district plan. He identified political subdivision boundaries, compactness, communities of interest, and equal population as the neutral criteria he applied. Cervas Dep. at 118:20–119:4. But the political subdivision boundaries he used were not Houston County's precincts, but Census County Divisions (CCDs) created by the Census, and he was not aware of any plans for other Georgia counties that used CCDs as the building blocks of the plans. Cervas Dep. at 184:12–17 (used CCDs), 53:8–12 (did not consider precincts). Dr. Cervas also did not consider municipal boundaries when drawing any of his plans. Cervas Dep. at 53:14–54:2. He did not run any compactness scores on his districts, but instead relied on visual checks of compactness. Cervas Dep. at 54:3–55:13. Dr. Cervas only identified two possible communities of interest: Warner Robins Air Force Base and (again) the CCDs. Cervas Dep. at 55:15–57:2, 94:12–21.

## ARGUMENT AND CITATION OF AUTHORITIES

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb County, Ga.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993).

Section 2 of the Voting Rights Act (VRA) prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of vote dilution is established through a "totality of the circumstances" analysis, *id*. at (b), but a plaintiff must first satisfy the *Gingles* preconditions. 478 U.S. at 30.

In order to show a Section 2 violation, the Eleventh Circuit has explained:

plaintiffs in vote dilution cases must establish as a threshold matter: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group is "politically cohesive"; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate.

*Nipper*, 39 F.3d at 1510 (quoting *Gingles*, 478 U.S. at 50–51). Only after establishing the three preconditions does a court begin a review of the so-called "Senate

6

Factors" to assess the totality of the circumstances. *Id*. at 1512; *Gingles*, 478 U.S. at 79; *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).

Failure to establish one of the *Gingles* preconditions is fatal to a Section 2 claim because each of the three prongs is required.[2] *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998); *Negron*, 113 F.3d at 1567. And while these preconditions are necessary to proving a Section 2 claim, they are not sufficient. *De Grandy*, 512 U.S. at 1011.

## I.    Plaintiffs cannot establish the first *Gingles* precondition.

### A.    Legal standard.

The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F.3d at 1530-31; *see also Burton*, 178 F.3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."); *Rose v.*

---

[2] The required weighing of evidence regarding the totality of the circumstances is why Section 2 claims normally "are resolved pursuant to a bench trial." *Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs*, 775 F.3d 1336, 1343 (11th Cir. 2015). The exception is when a plaintiff cannot carry their burden on the initial *Gingles* preconditions, when cases can be resolved at summary judgment in favor of defendants. *See, e.g., Burton*, 178 F.3d at 1197 (affirming grant of summary judgment to defendants on vote-dilution claim); *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1328 (11th Cir. 2021) (affirming grant of summary judgment to defendants on vote-denial claim).

7

*Sec'y of State of Georgia*, 87 F.4th 469, 482 (11th Cir. 2023) ("We must be mindful that '[i]mplicit in this first *Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new system.'" (quoting *Nipper*, 39 F.3d at 1531)).

Whatever plan is used to demonstrate the violation of the first prong of *Gingles* must also be a remedy that can be imposed by the Court. *Nipper*, 39 F.3d at 1530-31; *see also Rose*, 87 F.4th at 480 (remedy must be "viable"). In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be implemented as a proper remedy, then the plaintiff has failed to meet its evidentiary burden. *Nipper*, 39 F.3d at 1530-31; *Burton*, 178 F.3d at 1199.

### B.     The only valid remedy for Houston County is a four-district plan.

When considering whether a proper remedy exists for alleged vote dilution, there must be a reasonable alternative benchmark, so a court cannot alter the size of the governing body of a jurisdiction as part of a Section 2 remedy. *Holder v. Hall*, 512 U.S. 874, 885 (1994). And remedies have to exist within the confines of existing state models of government. *Rose*, 87 F.4th at 480–81 (citing *Nipper*, 39 F.3d at 1531). This interest should be assessed early in a case. *Id*. at 481–82.

In Houston County, the Georgia General Assembly determined that the Chair of the County Commission would be elected to Post 1 and be a full-time employee of the county as its CEO. 1990 Ga. Laws Act No. 712 (HB 1073). That role

8

is unique compared to every other member of the County Commission, who are part-time commissioners. Perdue Dep. at 18:16–19:24.

Plaintiffs' proposed five-member district map would require altering the form of government for Houston County in ways that this Court cannot undertake—in other words, requiring five commission districts would "fundamentally change the [Commission's ] structure." *Rose*, 87 F.4th at 482. As the Chairman explained, electing five members from districts could result in a situation where no elected member wishes to serve as the full-time chair. Perdue Dep. at 24:7–25. That necessarily means that Houston County would have to add a sixth at-large member, changing the size of government in violation of *Hall*, 512 U.S. at 885, or alter the legislature's chosen form of government of an elected full-time administrator with a hired county administrator, which would not address the unique interests in Houston County, Perdue Dep. at 117:19–119:5. In either event, a five-district plan is not available as a viable remedy because it would require fundamental changes to Houston's form of government.

Plaintiffs have also offered a four-district plan, which, if implemented with an at-large chair that still serves as the full-time CEO, could maintain the existing form of government. As a result, the only valid potential remedy this Court can consider is a four-district plan.

### C.    Dr. Cervas's sole four-district plan with a majority-Black district cannot be used as a remedy.

Dr. Cervas has proposed one four-district plan with a single majority-Black VAP district, which is Cervas MMD 4a. Ex. B at ¶¶ 14–16. One district must contain at least 50% Black VAP for purposes of complying with the first *Gingles* precondition,[3] *Alpha Phi Alpha Fraternity v. Raffensperger*, 700 F. Supp. 3d 1136, 1212, 1253–54 (N.D. Ga. 2023) (using 50% BVAP as standard), so on the surface, this plan appears to establish compliance with the first precondition, but the Court's analysis does not end there.

This Court must consider the geographic compactness of the Black population, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433–34 (2006) (*LULAC*), and it must consider whether it can order the proposed plan as a remedy, *Rose*, 87 F.4th at 480–81. One of the factors to determine the appropriateness of the plan as a potential remedy is ensuring that an illustrative plan is "reasonably configured," which means that it "comports with traditional districting criteria." *Allen v. Milligan*, 599 U.S. 1, 19–20 (2023). In other words, the proposed remedy must not subordinate traditional redistricting principles to

---

[3] While Plaintiffs claim they could utilize "alternative election methods" as a remedy under the first *Gingles* precondition, there is no Eleventh Circuit precedent supporting this approach. All the contested cases regarding at-large elections involve district-based remedies.

10

racial considerations substantially more than is reasonably necessary to avoid liability under Section 2. *Davis v. Chiles*, 139 F.3d 1414, 1424 (11th Cir. 1998).

Unlike mapdrawers who testify that they consider a variety of non-racial factors when drawing plans, Dr. Cervas freely admitted to using racial shading and then relying on that information when drawing his plan. *See Miller v. Johnson*, 515 U.S. 900, 925 (1995) (use of racial shading in district maps); *Allen*, 599 U.S. at 20 (identifying multiple traditional principles); *APA*, 700 F. Supp. 3d at 1211, 1227 (N.D. Ga. 2023) (mapdrawer testifying racial information was only one factor); *id.* at 1261 (noting mapdrawer expressly disclaimed that race predominated). And a mapdrawer engages in racial predominance when he subordinates traditional principles like "'compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests,' . . . incumbency protection, and political affiliation," to "racial considerations." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (quoting *Miller*, 515 U.S. at 916 and citing *Bush v. Vera*, 517 U.S. 952, 964, 968 (1996)).

That is exactly what Dr. Cervas did when he drew Cervas MMD 4a. His goal was to achieve a district over 50% Black VAP on the four-district plan. He did not rely on the county's precincts, city boundaries, a community of interest besides the Air Force Base, or compactness scores in drawing the four-district plan. Cervas Dep. at 53:8–12 (did not consider precincts), 53:14–54:2 (city boundaries), 54:3–

11

55:13 (no compactness scores), 55:15–57:2, 94:12–21 (only one community of interest that is not a CCD). In fact, Dr. Cervas explained that he used race up until the point he achieved his goal of going over 50% in District 1 and then stopped drawing the district after that. Cervas Dep. at 169:5–11, 194:24–195:9. Thus, Dr. Cervas's testimony demonstrates that he freely used race as the primary consideration in creating District 1 on his Cervas MMD4a plan. These concessions are dispositive. The Court cannot order Dr. Cervas' illustrative plan as a remedy because it violates the U.S. Constitution. *Alabama Legislative Black Caucus*, 575 U.S. at 272. Because Plaintiffs' proposed four-district plan fails to establish the existence of the first *Gingles* precondition, and, because Plaintiffs have not presented a valid remedy in discovery, *S. Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1297 (11th Cir. 1995), Defendants are entitled to judgment as a matter of law on that basis alone.

Additionally, Plaintiffs have presented no evidence of the geographic compactness of the Black community in the illustrative plan aside from the fact that Dr. Cervas drew a district that was slightly majority-Black. This absence of evidence similarly supports a grant of summary judgment to Defendants. *Marion*, 821 F. Supp. at 687. The Supreme Court requires that the size and geographic compactness portions of the first *Gingles* prong relate to the community, not to any potential district created by a plaintiff: "The first *Gingles* condition refers to *the*

12

*compactness of the minority population*, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433 (emphasis added) (quoting *Vera*, 517 U.S. at 997). In this case, Dr. Cervas provides no evidence of the compactness of the community beyond drawing the district and recognizes the dispersion of Black voters in Houston County due to the lack of homogenous precincts. *See* Ex. A at ¶ 65. Dr. Cervas also did not provide any "empirical measures" of compactness of the districts either. *APA*, 700 F. Supp. 3d at 1255; Cervas Dep. at 54:3–55:13.

Because "there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates," *LULAC*, 548 U.S. at 433, this Court cannot assume that the Black population in Houston County is geographically compact and Plaintiffs have provided no evidence beyond one four-district commission plan. Without evidence of the first *Gingles* precondition, Plaintiffs' claims fail as a matter of law.

## II.    Plaintiffs cannot establish the second *Gingles* precondition.

### A.    Legal standard.

The second *Gingles* precondition requires that "the minority group must be able to show that it is politically cohesive." 478 U.S. at 51. This is necessary because "[i]f the minority group is not politically cohesive, it cannot be said that the [challenged] electoral structure thwarts distinctive minority group interests." *Id.*

13

And plaintiffs "may not 'assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls.'" *APA,* 700 F. Supp. 3d at 1258 (quoting *LULAC,* 548 U.S. at 433). Thus, under *Gingles,* "the results test does not assume the existence of racial bloc voting; plaintiffs must prove it." 478 U.S. at 46.

### B. Demonstrating the second *Gingles* precondition requires more than meeting the "separate electorates test."

Plaintiffs provided the report of Dr. Stephen Popick as their evidence of the second and third *Gingles* preconditions. But the statistical analysis Dr. Popick provided is uncertain at best and his report does not establish the existence of the second Gingles precondition in Houston County.[4]

Plaintiffs offer Dr. Popick as an expert "to determine whether voting in elections for the Houston County Commission is racially polarized." Report of Stephen Popick (Dec. 24, 2025) (Popick Rep.), attached as Ex. C at 3. Dr. Popick conducted statistical analyses attempting to predict the relative vote shares of white and Black voters for candidates. *Id.* This is a familiar technique, and one that courts routinely accept, but Dr. Popick incorrectly relied on the "separate electorates test" in reaching his conclusions, while failing to consider the impact of the analysis specifically as it relates to the second *Gingles* threshold factor.

---

[4] Defendants are also filing a motion to exclude Dr. Popick's testimony.

The separate electorates test is straightforward. It asks only whether "black voters and white voters vote differently." *Gingles,* 478 U.S. at 53 n. 21. The Supreme Court adopted this standard for "racially polarized" or "racial bloc" voting. *Id.* But that alone is not enough, because the Court further explained that "legally significant" racial bloc voting is what matters for the second and third preconditions. *Id.* at 55–61. And that means "the *degree* of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Id.* at 55–56. This is critically important for two reasons.

First, the concept of "legally significant" racially polarized voting supports the proposition that the *degree* of cohesion matters for determining whether the second *Gingles* precondition is satisfied. And second, that the ultimate degree necessary is case-specific, and even district-specific. Thus, "[t]he purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles,* 478 U.S. at 56. As to the first question, a "showing that a *significant* number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Id.* (emphasis added). But in a two-person election contest—which were the only ones Dr. Popick analyzed in his principal reports—Black

15

voters do not have an additional choice and a strict "separate electorates test" inquiry collapses a two-part question into the wrong question of whether Black and white voters vote differently.

If courts and experts rely *exclusively* on the separate electorates test, the second and third *Gingles* preconditions are no longer distinct inquiries but are unified into a single question: Do Black and white voters prefer different candidates? The *Gingles* preconditions demand more and the Supreme Court expressly rejected that approach. *See id.* at 55 ("According to the United States, the District Court adopted a standard under which legally significant racial bloc voting is deemed to exist whenever 'the results of the individual election would have been different depending upon whether it had been held among only the white voters or only the black voters in the election.'…We read the District Court opinion differently."). Dr. Popick failed to produce adequate evidence demonstrating cohesive bloc voting by Black residents of Houston County.

Dr. Popick admitted in his first deposition that he steadfastly avoided opining on the degree of black cohesion in his analysis because he didn't think the question mattered. Deposition of Stephen Popick (Mar. 13, 2026) (Popick 3-13 Dep.) at 117:17–119:14. Instead, he limited his conclusions to whether "either [white voters or black voters] bloc voted, you know, separately for a candidate of choice, right?" *Id.* at 119:7–9. And because his analysis in his first report revealed

16

all but one election where point estimates and confidence intervals showed a majority of black voters selecting a candidate that the majority of white voters opposed, Dr. Popick concluded that the second and third *Gingles* preconditions were satisfied. When he submitted his "corrected" report, Dr. Popick doubled down on that conclusion because the point estimates of black voter cohesion moved higher. But both reports reveal that Dr. Popick overstated the results of his analysis and it cannot support the second *Gingles* precondition.

> 1. *Dr. Popick's initial report and the corrected report conflict with one another rendering both analyses substantively unreliable.*

After his initial deposition, Dr. Popick "reflect[ed]" on his results and then unilaterally put forth a different statistical analysis. Deposition of Stephen Popick (Apr. 2, 2026) (Popick 4-2 Dep.) at 9:17–10:8. Although Dr. Popick referred to the corrected report as only containing a "minor statistical error," the resulting changes to his calculations dramatically change the substance of Dr. Popick's analysis.

Both reports included three different types of statistical models designed to show cohesion among Black and white voters: Ecological Regression; Iterative Ecological Inference; and Ecological Inference RxC.[5] Dr. Popick repeatedly

---

[5] Because of ballot secrecy, courts cannot know exactly which voters prefer which candidate, so "[c]ourts generally rely on statistical analyses to estimate the

characterized Iterative Ecological Inference (Iterative EI) as the "most reliable" model given the data constraints presented by a smaller jurisdiction like Houston County. Popick 3-13 Dep. at 123:14–20. Notwithstanding this characterization, the Iterative EI model results swung wildly both within each report and across the two reports. The confidence intervals for each report show the potential range for possible estimates, which were unusually wide in Dr. Popick's original report. Popick 4-2 Dep. at 76:2–6. For example, Dr. Popick originally indicated that the confidence intervals for the percentage of Black support in the 2016 and 2020 elections for Post 5 ranged from 76.7% to 90.4% in 2016 and 51.1% to 64.5% in 2020. Ex. C, Table A1 at 24. But in the later "corrected" analysis, these unusually wide confidence intervals got even larger in all eight elections where Dr. Popick used Iterative EI. Popick 4-2 Dep. at 76:12–17. For example, the ranges for the confidence intervals for the percentage of Black support in the 2016 and 2020 elections for Post 5 changed to as low as 60.3% and as high as 95.7% in 2016 and 58% to 96.7% in 2020. Corrected Report of Stephen Popick, attached as Ex. D, Table A1 at 24. Dr. Popick agreed that an increase in confidence interval breadth meant an increase in the uncertainty around the accuracy of his estimates. Popick 3-13 Dep. at 72:8–14. Not only that, in seven out of eight elections analyzed by Dr. Popick, the

---

proportion of each racial group that voted for each candidate." *APA*, 700 F. Supp. 3d at 1264; *see also id*. at 1242–43 (describing various methods).

18

"corrected" report produced point estimates outside of the confidence interval range of the original report—further demonstrating a lack of evidence of cohesion. Popick 4-2 Dep. at 84:24–85:20.

      2.    *The corrected report cannot establish the degree of cohesion of black voters in Houston County.*

The increasing uncertainty around the figures presented by Dr. Popick in his "corrected" report undermines, rather than supports, Plaintiffs' claim that Houston County voting patterns satisfy the second *Gingles* precondition. Dr. Popick insists his "corrected" report only further reinforces his conclusion that voting is racially polarized in Houston County. He explained that although his new analysis contains "a larger set of possible values," the "most likely values we see increased for black voters. Those are the point estimates. So under the separate electorates test it's the same material finding, voting is racially polarized." Popick 4-2 Dep. at 80:12-81:2. That gets the test backwards.

While Dr. Popick's point estimates increase the *appearance* of cohesion among black voters in the analysis he provides, he admits that widening confidence intervals increase *uncertainty* around the accuracy of those new point estimates. Popick 4-2 Dep. at 83:8–84:18. And his reliance solely on the purported accuracy of his point estimates in this environment is even more dubious considering the new point estimates for Black voter behavior all exist *outside* the confidence intervals of his original analysis. This Court cannot determine from Dr.

19

Popick's reports where the correct level of Black support for candidates is located within the realm of possibilities contemplated by the wide confidence intervals he includes.

Plaintiffs must demonstrate not only that voting in Houston County is racially polarized, but that Black voters form a *cohesive* voting bloc—not just that white and Black voters vote differently. Dr. Popick's analysis cannot demonstrate what is required. As a result, Defendants are entitled to judgment as a matter of law on the second *Gingles* precondition.

## CONCLUSION

At the close of discovery, Plaintiffs have failed to carry their burden. Plaintiffs' mapping expert only presented one potentially valid remedy of a four-district plan with a majority-Black district, but drew it as a racial gerrymander. This Court cannot order it as a remedy and Defendants are entitled to judgment as a matter of law on the first *Gingles* precondition.

Plaintiffs' statistical expert used the wrong test and only concluded that Black and white voters prefer different candidates. Because the separate electorates test is not the right standard and Plaintiffs have not shown the necessary cohesion by Black voters, Defendants are entitled to judgment as a matter of law on the second *Gingles* precondition.

This Court should grant summary judgment to Defendants.

20

Respectfully submitted this 24th day of April, 2026.

/s/Bryan P. Tyson
Bryan P. Tyson
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**Clark Hill PLC**
3630 Peachtree Road NE
Suite 700
Atlanta, Georgia 30326
678.370.4377 (phone)

*Counsel for Defendants*

21