**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

COURTNEY DRIVER, *et al.*,

    *Plaintiffs*,

      v.

HOUSTON COUNTY BOARD OF
ELECTIONS, *et al.*,

    *Defendants*.

Civil Action No. 5:25-cv-0025-MTT

**STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56, the following are the material facts to which Defendants contend there is no genuine dispute to be tried.

1.    Houston County has elected its county commissioners on a countywide basis since voters were first able to choose commissioners in the 1920s. 1922 Ga. Laws Act No. 429 § 2.

2.    Houston County has five commissioners, but they do not all have the same role in the county's government. Deposition of Chairman Dan Perdue (Perdue Dep.) at 17:2–19:24.

3.    For almost 30 years, the Commissioner elected to Post 1 has served as Chair and the full-time CEO of the County government. Perdue Dep. at 17:2–19:24, 32:17–20, 75:5–77:8.

4.      Plaintiffs employed a single expert to create a district plan for purposes of showing the existence of the first *Gingles* precondition, Dr. Jonathan Cervas. Cervas Report, attached as Ex. A, at ¶¶ 4–5.

5.      Dr. Cervas drew race- and party-blind maps, not relying on any racial or partisan data. Ex. A at ¶¶ 55–56.

6.      Dr. Cervas then turned on racial data to determine whether he had drawn a majority-Black district on either plan and found he had not. Ex. A at ¶ 57.

7.      Dr. Cervas then turned on racial shading information in his mapping program to locate Black individuals. Deposition of Jonathan Cervas (Cervas Dep.) at 60:2–61:14.

8.      Dr. Cervas then used that racial information to add Black individuals and move a district from having no single minority group as a majority of the district to the district containing a majority of Black individuals. Cervas Dep. at 60:2–61:14.

9.      This process resulted in a District 1 that was 49.997% Black voting age population on a four-district plan (Cervas MMD 4). Cervas Dep. at 110:21–111:5; 143:19–144:4; 146:2–23.

10.     After Defendants' expert pointed out the four-district plan did not contain a majority-Black district, Dr. Cervas consulted racial shading maps again. Cervas Dep. at 169:13–170:4

2

11.    Dr. Cervas then found two adjoining Census blocks with high Black percentages, added those to District 1, and pushed the district barely over 50% Black voting age population. Cervas Reply Report, attached as Ex. B, ¶¶ 14–15; Cervas Dep. at 169:13–170:4.

12.    Dr. Cervas did not identify any other race-neutral principles he followed when in the process of moving a race-blind district over 50% Black voting age population. Cervas Dep. at 60:2–61:14, 169:13–170:16.

13.    Dr. Cervas did not attempt any other methods of moving population in that district to bring it over 50% Black voting age population. Cervas Dep. at 60:2–61:14, 169:13–170:16.

14.    Dr. Cervas identified political subdivision boundaries, compactness, communities of interest, and equal population as the neutral criteria he applied. Cervas Dep. at 118:20–119:4.

15.    But the political subdivision boundaries he used were not Houston County's precincts, but Census County Divisions (CCDs) created by the Census. Cervas Dep. at 184:12–17

16.    Dr. Cervas was not aware of any plans for other Georgia counties that used CCDs as the building blocks of the plans. Cervas Dep. at 53:8–12.

17.    Dr. Cervas also did not consider municipal boundaries when drawing any of his plans. Cervas Dep. at 53:14–54:2.

18.     Dr. Cervas did not run any compactness scores on his districts, but instead relied on visual checks of compactness. Cervas Dep. at 54:3–55:13.

19.     Dr. Cervas only identified two possible communities of interest: Warner Robins Air Force Base and the CCDs. Cervas Dep. at 55:15–57:2, 94:12–21.

20.     In Houston County, the Georgia General Assembly determined that the Chair of the County Commission would be elected to Post 1 and be a full-time employee of the county as its CEO. 1990 Ga. Laws Act No. 712 (HB 1073).

21.     The Chairman's role is unique compared to every other member of the County Commission, who are part-time commissioners. Perdue Dep. at 18:16–19:24.

22.     Electing five members from districts could result in a situation where no elected member wishes to serve as the full-time chair. Perdue Dep. at 24:7–25.

23.     Houston County has unique interests in ensuring it maintains an elected CEO of its government. Perdue Dep. at 117:19–119:5.

24.     Dr. Cervas has proposed one four-district plan with a single majority-Black voting age population district, which is Cervas MMD 4a. Ex. B at ¶¶ 14–16.

25.     Dr. Cervas used race up until the point he achieved his goal of going over 50% in District 1 and then stopped drawing the district after that. Cervas Dep. at 169:5–11, 194:24–195:9.

4

26.     Dr. Cervas provides no evidence of the compactness of the community beyond drawing the district and recognizes the dispersion of Black voters in Houston County due to the lack of homogenous precincts. *See* Ex. A at ¶ 65.

27.     Dr. Cervas did not provide any "empirical measures" of compactness of the districts. *APA*, 700 F. Supp. 3d at 1255; Cervas Dep. at 54:3–55:13.

28.     Plaintiffs offer Dr. Popick as an expert "to determine whether voting in elections for the Houston County Commission is racially polarized." Report of Stephen Popick (Dec. 24, 2025) (Popick Rep.), attached as Ex. C at 3.

29.     Dr. Popick conducted statistical analyses attempting to predict the relative vote shares of white and Black voters for particular candidates. *Id.*

30.     Dr. Popick admitted in his first deposition that he steadfastly avoided opining on the degree of black cohesion in his analysis because he didn't think the question mattered. Deposition of Stephen Popick (Mar. 13, 2026) (Popick 3-13 Dep.) at 117:17–119:14.

31.     Instead, Dr. Popick limited his conclusions to whether "either [white voters or black voters] bloc voted, you know, separately for a candidate of choice, right?" *Id.* at 119:7–9.

32.    After his initial deposition, Dr. Popick "reflect[ed]" on his results and then unilaterally put forth a different statistical analysis. Deposition of Stephen Popick (Apr. 2, 2026) (Popick 4-2 Dep.) at 9:17–10:8.

33.    Dr. Popick repeatedly characterized Iterative Ecological Inference (Iterative EI) as the "most reliable" model given the data constraints presented by a smaller jurisdiction like Houston County. Popick 3-13 Dep. at 123:14–20.

34.    The confidence intervals for each of Dr. Popick's reports show the potential range for possible estimates, which were unusually wide in Dr. Popick's original report. Popick 4-2 Dep. at 76:2–6.

35.    Dr. Popick originally indicated that the confidence intervals for the percentage of Black support in the 2016 and 2020 elections for Post 5 ranged from 76.7% to 90.4% in 2016 and 51.1% to 64.5% in 2020. Ex. C, Table A1 at 24.

36.    But in the later "corrected" analysis, these unusually wide confidence intervals got even larger in all eight elections where Dr. Popick used Iterative EI. Popick 4-2 Dep. at 76:12–17.

37.    The ranges for the confidence intervals for the percentage of Black support in the 2016 and 2020 elections for Post 5 changed to 60.3% to 95.7% in 2016 and 58% to 96.7% in 2020. Corrected Report of Stephen Popick, attached as Ex. D, Table A1 at 24.

38. Dr. Popick agreed that an increase in confidence interval breadth meant an increase in the uncertainty around the accuracy of his estimates. Popick 3-13 Dep. at 72:8–14.

39. In seven out of eight elections analyzed by Dr. Popick, the "corrected" report produced point estimates outside of the confidence interval range of the original report. Popick 4-2 Dep. at 84:24–85:20.

40. Dr. Popick explained that although his new analysis contains "a larger set of possible values," the "most likely values we see increased for black voters. Those are the point estimates. So under the separate electorates test it's the same material finding, voting is racially polarized." Popick 4-2 Dep. at 80:12-81:2.

41. Widening confidence intervals increase *uncertainty* around the accuracy of those new point estimates. Popick 4-2 Dep. at 83:8–84:18.

Respectfully submitted this 24th day of April, 2026.

/s/Bryan P. Tyson
Bryan P. Tyson
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**Clark Hill PLC**

7

3630 Peachtree Road NE
Suite 700
Atlanta, Georgia 30326
678.370.4377 (phone)

*Counsel for Defendants*

8