# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| **Courtney L. Driver**, et al., | Case No. 5:25-cv-00025-MTT |
| Plaintiffs, | Hon. Marc T. Treadwell |
| vs. | |
| **Houston County Board of Elections**, et al.**,** | |
| Defendants. | |

**Expert Report of Stephen J. Popick, Ph.D.**

**December 24, 2025**

# Table of Contents

I.    Introduction..................................................................................... 3

    A.    Scope of Project................................................................ 3

    B.    Summary of Conclusions ............................................... 3

II.   Professional Background and Experience ........................................ 4

III.  Racial Bloc Voting Analysis ........................................................... 6

    A.    Methodology...................................................................... 9

    1.    Statistical Techniques.................................................... 9

    2.    Data................................................................................... 14

    B.    Findings ............................................................................ 15

IV. Conclusions ...................................................................................... 21

Appendix A................................................................................................. 23

Appendix B................................................................................................. 28

## I.    Introduction

## A.    Scope of Project

I was retained by the plaintiffs' attorneys to determine whether voting in elections for the Houston County Commission is racially polarized.

## B.    Summary of Conclusions

My analysis of voting patterns in recent elections in Houston County has led me to conclude that voting in elections for the Houston County Commission is racially polarized: Black voters and White voters prefer different candidates.  Furthermore, the candidates preferred by Black voters consistently lose in these contests.

My analysis of seven general elections and one primary election between 2016 and 2024 reveals that Black voters exhibited clear preferences in both county commission elections and in county-wide exogenous elections held at the same time. Despite this cohesion, the Black-preferred candidates lost every single election due to bloc voting by White voters who comprised a majority of the electorate in these county-wide elections.

3

## II.    Professional Background and Experience

I have extensive experience in the statistical analysis of voting behavior. From 2006 to 2012, I served as the in-house statistician in the Voting Section of the Civil Rights Division of the United States Department of Justice. During that time, I analyzed thousands of elections in a wide variety of voting cases. My work was instrumental in successful cases brought under Section 2 of the Voting Rights Act, such as *United States v. Osceola County*,[1] *United States v. Village of Port Chester*,[2] and *United States v. Town of Lake Park*,[3] among others. I received multiple awards for my work at the Department of Justice, including a special commendation award for my work on incorporating newer methods of statistical analysis into the Department's regular analytics.

---

[1]    *United States v. Osceola County,* 475 F. Supp. 2d 1220 (M.D. Fla. 2006).

[2]    *United States v. Village of Port Chester,* 704 F. Supp. 2d 411 (S.D.N.Y. 2010).

[3]    *United States v. Town of Lake Park,* No. 09-cv-80507-MARRA, 2009 WL 10727593 (S.D. Fla. Oct. 26, 2009).

4

I also have served as an expert witness in *Whitest v. Crisp County School District*[4] and *Rose v Raffensperger*.[5]

I have presented and authored several published research papers. Most germane to the analysis of voting behavior is a 2010 article entitled "A Comparative Analysis of Small Area Population Estimation Methods" in the Journal of Cartography and Geographic Information Science. The research for this paper was conducted during my tenure at the Department of Justice to help inform the Department's methods of handling split precincts in voting-rights analyses.

I received a B.A. in Economics from the Georgia Institute of Technology, an M.A. in Economics from George Mason University, and a Ph.D. in Economics with concentrations in econometrics and urban economics from George Washington University.

---

[4]    *Whitest v. Crisp County School District*, No. 1:17-CV-109-LAG, 2021 WL 4483802 (M.D. Ga. Aug. 20, 2021).
[5]    *Rose v. Raffensperger*, 619 F. Supp. 3d 1241 (N.D. Ga. 2022).

I currently work as Lead for AI and Automation within the Division of Consumer Protection of the Federal Deposit Insurance Corporation. My CV is attached as Appendix B.

I am being compensated at a rate of $250 per hour for my work in this case. My compensation is not contingent on the content of any of my opinions in this case or its outcome.

I reserve the right to add to or change my opinions based on any new information, evidence, reports prepared by other experts, or testimony that becomes available during discovery, depositions, at trial, or otherwise.

## III.   Racial Bloc Voting Analysis

I understand that *Thornburg v. Gingles* is the leading case interpreting the 1982 Amendments to the Voting Rights Act.[6] In that case, the Supreme Court stated that the existence of racially polarized voting is essential to a vote-dilution claim under Section 2. "The purpose of inquiring into the existence of racially polarized voting is twofold: to

---

[6]   *Thornburg v. Gingles*, 478 U.S. 30 (1986).

ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates."[7] Racially polarized voting thus forms the basis of two of the three preconditions for a vote-dilution claim under the "results test" set forth in *Gingles*.[8]

Racially polarized voting, which is also known as "racial bloc voting,"[9] exists "where there is a consistent relationship between the race of the voter and the way in which the voter votes, … or to put it differently, where Black voters and white voters vote differently."[10] The

---

[7]   *Id.* at 56.

[8]   The "results test," the Supreme Court in Gingles explained, requires a plaintiff to demonstrate three threshold factors to establish a violation of Section 2:
• "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50.
• "Second, the minority group must be able to show that it is politically cohesive." *Id.* at 51.
• "Third, the minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed … —usually to defeat the minority's preferred candidate." *Id.*

[9]   The Supreme Court used the terms "racially polarized voting" and "racial bloc voting" interchangeably. *Id.* at 52 n.18.

[10]   *Id.* at 53 n.21 (internal quotation marks and brackets omitted).

test for determining whether Black and white voters "vote differently" is known as the "separate electorates test" and is satisfied when the results of an election "would have been different depending on whether it had been held among only the white voters or only the black voters."[11] Thus, if the statistical analysis undertaken here finds that Black voters and white voters, considered separately, would have elected different candidates, then I will conclude that voting is racially polarized.

To determine whether voting is racially polarized in this case, I analyzed all contested general elections for the Houston County Commission conducted between 2014 and 2024. There were two such contests, each of which included at least one Black candidate.  In addition, I analyzed 1 contested primary election for Houston County Commission and one contested special election for the Houston County Commission.  I also analyzed four contested elections for other countywide offices held at the same time as elections for the Houston County Commission.

---

[11]   *Id.* at 58 (internal quotation marks omitted).

8

The Houston County Commission is a five-member body elected in staggered at-large contests for four-year terms.  Each member is elected to a numbered post, with the commissioner elected to Post 1 serving as the chair.  Elections for the Houston County Commission are held in November of even-numbered years and are preceded by partisan primaries in May.  If no candidate obtains a majority in a primary or the general election, the top two finishers advance to a runoff election four weeks later. Voters may cast one vote for a candidate running for election to each numbered post.

## A.    Methodology

### 1.    Statistical Techniques

The voting patterns of White and Black voters must be estimated using statistical techniques because direct information on how individuals have voted is not available – the race of the voter is not, of course, obtainable from a secret ballot.

I rely on two widely accepted and complementary statistical approaches to analyze whether racially polarized voting exists. One of these approaches (ecological regression) was relied upon by the Supreme

Court in *Gingles*, while the second approach (ecological inference) was developed after *Gingles*.[12]  I rely on both approaches, instead of just one, to bolster the strength of my conclusions.

**Ecological Regression (ER)** – Developed by Leo Goodman in the 1950s, ecological regression applies a standard statistical estimation technique of linear regression that takes precinct-level data on the racial composition of voter turnout and votes cast for candidates to determine whether voting is racially polarized.[13] For my analysis here, I use Bayesian linear regression, a standard linear regression technique.

**Ecological Inference (EI)** – The second technique, ecological inference, was developed by Harvard Professor Gary King in the mid-1990s. King developed ecological inference to "[combine] and [extend] the approaches [of Leo Goodman and Duncan and David].  His method now seems to dominate substantive research in academia, private industry, and in voting-rights ligation, where it was used in most American states

---

[12]  I would also typically rely on a third approach (homogeneous precinct analysis) that was used in *Gingles*, but there are no racially homogeneous precincts in Houston County.

[13]  Goodman, L. "Ecological regressions and behavior of individuals." American Sociological Review (1953).

in the redistricting period following the 2000 Census" as well as subsequent Censuses.[14],[15] Ecological inference incorporates both Duncan's method of bounds and maximum likelihood statistics, both standard measures, to produce estimates of voting behavior by race.

Both the academic literature and case law are clear: under reasonable assumptions, these analytic methodologies produce reliable estimates of group-level voting behavior.[16] The use of confidence intervals along with point estimates provides courts with context on the possible range of voter behavior. Analyses with more precincts, or those that have a larger dispersion of racial demographics at the precinct-level, will have smaller confidence intervals.

---

[14]  King, G., Rosen, O., & M. Tanner "Ecological Inference: New Methodological Strategies" (2004) Cambridge University Press. Available at : https://gking.harvard.edu/sites/g/files/omnuum7116/files/gking/files/ei intro.pdf"

[15]  Duncan, O & Davis, B. (1953). "An alternative to ecological correlation." American Sociological Review, 18, 665–666.

[16]  Collingwood, L., Oskooii, K., Garcia-Rios, S., & Barreto, M. (2016). "eiCompare: Comparing Ecological Inference Estimates across EI and EI:R×C." *The R Journal* 8(2): 92-110

In conducting my analysis for this case, I also relied on Plescia and De Sio's 2017 article in the Journal of Quality and Quantity,[17] which found that the reliability of EI methods can be improved by rolling up votes for candidates (or rolloff) where this is less than 5% of total turnout.[18] Therefore, for my analyses, I combine candidates (or rolloff) if their vote percentage is below 5% of total turnout, until columns for voter behavior (rollups) are each over 5% of total turnout.[19] As an example, in the 2024 general election for Houston County Clerk, the election data shows that Childers received 55% of the vote, Anderson

---

[17]   Plescia, Carolina and Lorenzo De Sio. "An evaluation of the performance and suitability of R × C methods for ecological inference with known true values." Journal of Quality and Quantity  (2018). Article available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5847155/

[18]   In addition, I confirmed this practice as consistent with current approaches used by political scientists to estimate voter behavior through conversations with Loren Collingwood, a political science professor at University of California – Riverside and author of several statistical software packages that implement ecological inference and ecological regression methods.

[19]   Plescio & De Sio at 673. In addition, I confirmed this practice as consistent with current approaches used by political scientists to estimate voter behavior through conversations with Loren Collingwood, a political science professor and author of several statistical software packages that implement ecological inference and ecological regression methods.

received 42% of the vote, and the remaining 2.8% of voters did not vote in this contest (rolloff). Since the roll off is below 5% of total votes in Houston County, I combine the votes Childers received in each precinct with rolloff. Doing this isolates Black and White voter support for Anderson, the Black candidate in the election, and allows for direct examination of Black voter cohesion, and White voter crossover, for Anderson.[20]

EI methods typically require a reasonable amount of variation in precinct-level demographics. In Houston County, the small number of precincts, the lack of homogeneous precincts and the inclusion of only one majority-Black, but not super majority Black, precinct means ecological inference methods may have wider confidence intervals and be subject to more variation between EI model runs. Compared to EI RxC, iterative ecological inference reduces the total number of estimates of interest (as does ER), but also includes both Duncan's methods of bounds and non-linear estimation (which ER does not). Iterative ecological

---

[20] I have relied on this methodology in my prior expert reports, and my results were accepted by the courts in each instance, see footnotes 1-4 as examples.

13

inference is best suited for the kind of data available in Houston County, with ecological regression an important check.  I have consistently used the above methodologies in my expert reports as well as during my tenure at the United States Department of Justice, Civil Rights Division, Voting Rights Section. For my statistical analysis, I estimated voting behavior with all three methodologies and report results from all three methods (ER, Iterative EI, and EI RxC) in the appendix.

## 2.    Data

In order to carry out my racial bloc voting analysis, I relied on data from the Georgia Legislative and Congressional Reapportionment Office, the Georgia Secretary of State and election results from the Houston County Board of Elections. Specifically, I relied on reapportionment files from the Reapportionment Office for general elections conducted between 2016 and 2024.[21] These files combine precinct-level election results and precinct-level turnout by race. I also obtained voter history files and election data from the Secretary of State to determine turnout

---

[21]  There were no contested elections for County Commission or county-wide offices in 2014.

by race to analyze a 2022 primary. I created aggregated racial group turnout totals by summing each racial group's respective categories of female, male, and unknown gender.

The precinct data for each of the elections reveals that there are no homogeneous White or Black precincts, and that turnout range from 16% to 66% Black for general elections and 0% to 13% Black for the 2022 Republican primary election.

## B.    Findings

Between 2014 and 2024, there were seven general elections for the Houston County Commission or other county-wide offices elected at the same time as members of the Houston County Commission. In addition, there was a contested Republican primary for the Post 2 county commission seat in 2022 as well as a contested special election for Post 4. I analyzed all of these elections to determine the voting patterns of Black and White voters, and all of these contests were racially polarized. For brevity, I discuss estimates only for White and Black voters. For the sake of clarity, and because all of the statistical methods and robustness checks produced substantively identical results, I present only the

15

results of my iterative EI analyses. The full results of my analyses, including ecological regression, ecological inference RxC, and confidence intervals for estimates are set forth in Appendix A.[22]

Table 1 summarizes my analyses of these elections for the Black-preferred candidates.  I include the Post 4 County Commission seat in 2022 as it was a special election, not a primary. For the sake of clarity, and because all of the statistical methods and robustness checks produced substantively identical results, I present only the results of my iterative EI analyses in this table. I chose to present this methodology because it is best suited to the small number of precincts and lack of racially homogeneous precincts in Houston County.

---

[22]  I do not report voting estimates for Other (non-Black, non-White) voters. When this group of voters was over 5% of total voters, I did include that group in the estimation.  However, because of their very low proportion of total voters, and the lack of variation in their composition of turnout across precincts in these contests, I do not report these results.

**Table 1: Summary of Election Analyses (Black-Preferred Candidate)**

| Election | Black-Preferred Candidate | Race of Candidate | % Black Support | % White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | Hicks | Black | 83.6 | 3.2 | LOST |
| 2020 CC Post 5 | McCants | Black | 56.1 | 25.0 | LOST |
| 2020 District Attorney | Williams | Black | 63.0 | 35.1 | LOST |
| 2020 Clerk | Anderson | Black | 64.1 | 32.6 | LOST |
| 2022 CC Post 4 | Rozier | Black | 75.1 | 10.5 | LOST |
| 2022 CC Post 2 | Riley | White | 62.4 | 33.9 | LOST |
| 2024 Sheriff | Harris | Black | 72.9 | 37.8 | LOST |
| 2024 Clerk | Anderson | Black | 59.0 | 31.3 | LOST |

As can be clearly seen in Table 1, iterative EI results find that Black voters as a group are cohesive around a single candidate of choice, and White voters as a group fail to provide sufficient crossover voting to elect the Black-preferred candidate in every election. The degree of racial polarization is lower compared to ER estimates (see Appendix A), but this is not surprising given the small number of precincts and lack of homogeneous black precincts.[23] I also include Table 2, which shows the

---

[23] In my experience, both EI and EI RxC produce estimates for cohesion and crossover at noticeably lower levels (compared to ecological regression) when there is a lack of homogeneous precincts or where the number of precincts is limited. If there was misalignment (i.e. ER, EI, and EI RxC estimates showing clear differences in preferences among voters of the same racial group), I would investigate further. Here, regardless of what estimation technique is used, the conclusion is the same for both black and white voter (as a group) preference.

iterative EI results from Table 1 applied to White voters where I show the outcome for the White-preferred candidate.[24]

**Table 2: Summary of Election Analyses (White-Preferred Candidate)**

| Election | White Preferred Candidate | Race of Candidate | % Black Support | % White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | McMichael | White | 16.4 | 96.8 | WON |
| 2020 CC Post 5 | Byrd | White | 43.9 | 75.0 | WON |
| 2020 District Attorney | Hartwig | White | 37.0 | 64.9 | WON |
| 2020 Clerk | Sullivan | White | 35.9 | 67.4 | WON |
| 2022 CC Post 4 | Talton | White | 24.9 | 89.5 | WON |
| 2022 CC Post 2 | Gottwals | White | 37.6 | 66.1 | WON |
| 2024 Sheriff | Moulton | White | 27.1 | 62.2 | WON |
| 2024 Clerk | Childers | White | 41.0 | 68.7 | WON |

In 2016, there was one contested county-level contest, the election for Post 5 between McMichael and Hicks. This contest was racially polarized. The overwhelming majority of Black voters—more than 83 percent – cast their votes for Hicks. Hicks was defeated by McMichael who was the candidate preferred by the overwhelming majority of White voters.

In 2020, there was one contested county-level county commissioner contest, the election for Post 5 between McCants and Byrd. This contest

---

[24] For simplicity, I netted out the iterative EI estimates of Black and White voter support for the black-preferred candidate from total Black and White turnout respectively.

18

was racially polarized.  The majority of Black voters cast their voters for McCants.  McCants was defeated by Byrd who was the candidate preferred by the overwhelming majority of white voters.

In 2020, there were also two contested county-level contests for District Attorney and Clerk of Superior Court.  Both elections were racially polarized.  The majority of Black voters cast their votes for Williams and Anderson. However, both Williams and  Anderson were defeated by Hartwig and Sullivan respectively who were the candidates preferred by the majority of White voters.

In the 2022 Special election, there was one contested county-level contest, the election for county commissioner Post 4 between Talton and Rozier.  This contest was racially polarized.   The majority of Black voters cast their votes for Rozier.  Rozier was defeated by Talton who was the candidate preferred by the majority of White voters.

In the 2022 General election, there was one contested county-level contest, the election for county commissioner Post 2 between Gottwais and Riley.  This contest was racially polarized.   The majority of Black voters cast their votes for Riley.  Riley was defeated by Gottwais who was the candidate preferred by the majority of White voters.

19

Lastly, in 2024, there were two contested county-level contests for Sheriff and Clerk of Superior Court.  Both elections were racially polarized.   The majority of Black voters cast their votes for Harris and Anderson. However, both Harris and Anderson were defeated by Moulton and Childers respectively who were the candidates preferred by the majority of White voters. Both contests were racially polarized.

The pattern across all eight elections (general and special) is consistent with EI. Black voters as a group demonstrate cohesion, with support levels for their preferred candidates ranging from 56.1% to 83.6%. Meanwhile, white voters as a group consistently reject these same candidates, with support levels ranging from only 3.2% to 37.8%.

In addition to these seven general elections, there was a contested 2022 Republican Primary election for County Commissioner District 2 between Gottwais, Ivestor, and Williams. *See* Table 3. Williams is a Black candidate and Gottwais and Ivestor are White candidates. Neither Black or any other racial group composed 5% of the total electorate on their own. However, ecological inference shows that Williams received 26% support from White voters.

20

**Table 3: Summary of Primary Election Analysis**

| Election | Candidate | Race of Candidate | % White Support | Outcome |
|---|---|---|---|---|
| 2022 CC Post 2 | Williams | Black | 25.0 | LOST |

## IV.    Conclusions

My analysis shows clear and consistent racially polarized voting in Houston County elections from 2016 through 2024.

- There were eight general/special elections for the Houston County Commission or other county-wide offices elected in November of even-numbered years.
- Voting was racially polarized in all eight of these contests, with Black voters and white voters supporting different candidates.
- In a single Republican primary, voting was not racially polarized, but the Black candidate did not win.
- Black voters as a group were cohesive in all eight general/special elections.
- White voters as a group yielded insufficient crossover votes to elect the Black-preferred candidates in every general election analyzed.

This pattern of racial polarization is consistent. In all of the general elections for Houston County offices held between 2016 and 2024 that I analyzed, Black and White voters supported different candidates, and the Black-preferred candidate lost in each election.

21

**Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct**.

Executed on December 24, 2025

_____

Stephen J. Popick, Ph.D.

# Appendix A

**Table A1: Summary of Iterative EI Analyses (Black-Preferred Candidate)**

| Election | Black-Preferred Candidate | Race of Candidate | % Black Support | % White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | Hicks | Black | 83.6 | 3.2 | LOST |
| | | | [76.7 90.4] | [1.5 6.6] | |
| 2020 CC Post 5 | McCants | Black | 56.1 | 25.0 | LOST |
| | | | [51.1 64.5] | [22.7 28.4] | |
| 2020 District Attorney | Williams | Black | 63.0 | 35.1 | LOST |
| | | | [57.0 68.9] | [32.4 38.0] | |
| 2020 Clerk | Anderson | Black | 64.1 | 32.6 | LOST |
| | | | [58.7 69.8] | [29.2 35.9] | |
| 2022 CC Post 2 | Riley | White | 62.4 | 33.9 | LOST |
| | | | [57.9 68.2] | [30.4 36.4] | |
| 2022 CC Post 4 | Rozier | Black | 75.1 | 10.5 | LOST |
| | | | [67.5 82.3] | [4.0 16.3] | |
| 2024 Sheriff | Harris | Black | 72.9 | 37.8 | LOST |
| | | | [64.6 77.2] | [31.2 44.9] | |
| 2024 Clerk | Anderson | Black | 59.0 | 31.3 | LOST |
| | | | [55.2 62.5] | [28.7 33.1] | |

**Table A2: Summary of ER Analyses (Black-Preferred Candidate)**

| Election | Black-Preferred Candidate | Race of Candidate | % Black Support | % White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | Hicks | Black | 98.7 | 6.2 | LOST |
| | | | [91.0 106.3] | [-1.7 13.8] | |
| 2020 CC Post 5 | McCants | Black | 101.4 | 3.8 | LOST |
| | | | [92.7 110.2] | [-5.0 12.6] | |
| 2020 District Attorney | Williams | Black | 100.0 | 15.3 | LOST |
| | | | [93.6 1.064] | [8.9 21.7] | |
| 2020 Clerk | Anderson | Black | 101.7 | 3.9 | LOST |
| | | | [93.3 110.1] | [-4.5 12.3] | |
| 2022 CC Post 2 | Riley | White | 102.6 | 1.7 | LOST |
| | | | [91.1 114.0] | [-9.8 13.2] | |
| 2022 CC Post 4 | Rozier | Black | 96.6 | 2.4 | LOST |
| | | | [80.1 102.5] | [-9.0 13.4] | |
| 2024 Clerk | Anderson | Black | 98.9 | 3.5 | LOST |
| | | | [89.4 108.4] | [-6.0 12.9] | |
| 2024 Sheriff | Harris | Black | 96.9 | 0.5 | LOST |
| | | | [87.2 106.6] | [-9.2 10.1] | |

24

**Table A3: Summary of EI RxC Analyses (Black-Preferred Candidate)**

| Election | Black Preferred Candidate | Race of Candidate | Black Support | White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | Hicks | Black | 52.1 | 24.6 | LOST |
|  |  |  | [49.8 54.4] | [23.3 25.5] |  |
| 2020 CC Post 5 | McCants | Black | 61.8 | 28.4 | LOST |
|  |  |  | [56.1 68.7] | [24.7 30.6] |  |
| 2020 District Attorney | Williams | Black | 68.3 | 36.8 | LOST |
|  |  |  | [63.1 72.2] | [34.2 28.8] |  |
| 2020 Clerk | Anderson | Black | 67.3 | 26.0 | LOST |
|  |  |  | [60.3 73.2] | [21.8 36.5] |  |
| 2022 CC Post 2 | Riley | White | 60.4 | 30.5 | LOST |
|  |  |  | [53.1 68.2] | [22.0 36.5] |  |
| 2022 CC Post 4 Post4 | Rozier | Black | 81.8 | 14.8 | LOST |
|  |  |  | [75.7 92.7] | [6.3 19.6] |  |
| 2024 Clerk | Anderson | Black | 65.1 | 31.7 | LOST |
|  |  |  | [56.7 75.4] | [28.2 34.6] |  |
| 2024 Sheriff | Harris | Black | 55.8 | 29.7 | LOST |
|  |  |  | [52.6 59.0] | [26.1 32.7] |  |

**Table A4: Summary of Primary Election Analyses**

| Election | Method | % White Support | Outcome |
|---|---|---|---|
| 2022 CC Post 2 | ER | 14 | LOST |
| 2022 CC Post 2 | ER RxC | 24 | LOST |
| 2022 CC Post 2 | EI Iterative | 25 | LOST |

**Table B1: Summary of Iterative EI Analyses (White-Preferred Candidate)**

| Election | White-Preferred Candidate | Race of Candidate | % Black Support | % White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | McMichael | White | 16.4 | 96.8 | WON |
| | | | [9.6 23.3] | [93.4 98.5] | |
| 2020 CC Post 5 | Byrd | White | 43.9 | 75.0 | WON |
| | | | [35.5 48.9] | [71.6 77.3] | |
| 2020 District Attorney | Hartwig | White | 37.0 | 64.9 | WON |
| | | | [31.1 43.0] | [62.0 67.6] | |
| 2020 Clerk | Sullivan | White | 35.9 | 67.4 | WON |
| | | | [30.2 41.3] | [64.1 70.8] | |
| 2022 CC Post 2 | Gottwals | White | 37.6 | 66.1 | WON |
| | | | [31.8 42.1] | [63.6 69.6] | |
| 2022 CC Post 4 | Talton | White | 24.9 | 89.5 | WON |
| | | | [17.7 32.5] | [83.7 96.0] | |
| 2024 Sheriff | Moulton | White | 27.1 | 62.2 | WON |
| | | | [22.8 35.4] | [55.1 68.8] | |
| 2024 Clerk | Childers | White | 41.0 | 68.7 | WON |
| | | | [37.5 44.8] | [66.9 71.3] | |

**Table B2: Summary of ER Analyses (White-Preferred Candidate)**

| Election | White-Preferred Candidate | Race of Candidate | % Black Support | % White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | McMichael | White | 1.3 | 93.8 | WON |
| | | | [-6.3 8.9] | [88.8 98.8] | |
| 2020 CC Post 5 | Byrd | White | -1.4 | 96.2 | WON |
| | | | [-10.2 7.3] | [87.5 105.0] | |
| 2020 District Attorney | Hartwig | White | 0.0 | 84.7 | WON |
| | | | [-6.4 6.4] | [78.3 91.1] | |
| 2020 Clerk | Sullivan | White | -1.7 | 96.1 | WON |
| | | | [-10.1 6.7] | [87.7 104.5] | |
| 2022 CC Post 2 | Gottwals | White | -2.6 | 98.3 | WON |
| | | | [-14.0 8.90] | [86.8 109.8] | |
| 2022 CC Post 4 | Talton | White | 2.3 | 105.4 | WON |
| | | | [-8.9 14.3] | [94.2 116.6] | |
| 2024 Sheriff | Moulton | White | 3.1 | 99.5 | WON |
| | | | [-6.6 12.8] | [89.9 109.2] | |
| 2024 Clerk | Childers | White | 1.1 | 96.6 | WON |
| | | | [-8.4 10.6] | [87.1 106.0] | |

26

**Table B3: Summary of EI RxC Analyses (White-Preferred Candidate)**

| Election | White-Preferred Candidate | Race of Candidate | % Black Support | % White Support | Outcome |
|---|---|---|---|---|---|
| 2016 CC Post 5 | McMichael | White | 47.9 | 75.4 | WON |
|  |  |  | [45.6 50.2] | [74.5 76.7] |  |
| 2020 CC Post 5 | Byrd | White | 38.2 | 71.6 | WON |
|  |  |  | [31.3 43.9] | [69.4 75.3] |  |
| 2020 District attorney | Hartwig | White | 31.7 | 63.2 | WON |
|  |  |  | [27.8 36.9] | [61.2 65.8] |  |
| 2020 Clerk | Sullivan | White | 32.7 | 74.0 | WON |
|  |  |  | [26.8 39.7] | [70.8 78.2] |  |
| 2022 CC Post 2 | Gottwals | White | 39.6 | 69.5 | WON |
|  |  |  | [31.8 46.9] | [63.5 78.0] |  |
| 2022 CC Post 4 | Talton | White | 18.2 | 85.2 | WON |
|  |  |  | [7.3 24.3] | [80.4 93.7] |  |
| 2024 Sheriff | Moulton | White | 44.2 | 70.3 | WON |
|  |  |  | [41.0 47.4] | [67.3 73.9] |  |
| 2024 Clerk | Childers | White | 34.9 | 68.3 | WON |
|  |  |  | [24.6 43.3] | [65.4 71.8] |  |

**Table C1: Turnout Demographics by Precinct (Percentage Black)**

| Precinct | 2016 General | 2020 General | 2022 R Primary | 2022 General | 2024 General |
|---|---|---|---|---|---|
| ANNX | 16 | 19 | 2 | 20 | 21 |
| BMS | 16 | 19 | 2 | 20 | 18 |
| CENT | 23 | 27 | 4 | 20 | 22 |
| CGTC | 20 | 22 | 3 | 20 | 22 |
| FMMS | 28 | 30 | 5 | 32 | 33 |
| HAFS | 17 | 14 | 6 | 19 | 19 |
| HCTC | 27 | 32 | 3 | 30 | 32 |
| HEFS | 33 | 33 | 1 | 27 | 23 |
| HHPC | 36 | 36 | 4 | 36 | 38 |
| MCMS | 23 | 23 |  | 25 | 25 |
| MILL | 20 |  |  |  |  |
| NHSC |  |  | 3 | 27 | 25 |
| NSES | 23 | 24 |  |  | 25 |
| PEC |  |  |  |  | 30 |
| RECR | 66 | 66 |  |  |  |
| ROZR | 25 | 25 | 2 | 22 | 20 |
| TMS | 40 | 42 | 4 | 42 | 43 |
| TWPK | 17 | 17 | 1 | 17 | 31 |
| VFW |  |  |  |  | 37 |
| VHS | 17 | 20 | 2 | 22 | 21 |
| WELL |  |  | 13 | 68 | 66 |

27

# Appendix B

# Stephen Joseph Popick, PhD

FDIC Senior Financial Economist and

2018 Congressional Fellow

505A East Windsor Ave Alexandria, VA 22301 US

stephenpopick@gmail.com

571-224-5114

**Expertise:**

PhD in Economics in fields of econometrics and urban/regional economics.  3 years of direct management experience supervising a staff of 10 economists, statisticians, and analysts. Recognized as Manager of the Year. Over 1 year of management experience as Acting Chief / Section Coordinator in Research branch of Division of Consumer Protection (DCP) organizing and directing the work of the Section to achieve DCP and FDIC objectives. Recognized as Manager of the Year.  Three years serving as Division's expert economist on mortgage and housing policy issues.  Banking fellow, U.S. Senator Jack Reed. Sixteen years of experience in performing economic analysis on subjects including banking, housing, local labor markets, anti-trust, and voting. Ten years of experience in overseeing complex analytic projects, including the development of custom regression models to assess bank compliance with applicable laws, sophisticated empirical studies of supervisory methods such as examination scheduling, fair lending analytic methodology, and the development of predictive statistical models which improved accuracy of statistical estimates, increase efficient use of personnel resources, and streamline communication of statistical results. Significant responsibility for DCP policy implementing BISG methodology in fair lending casework.  Developer of numerous fair lending tools for DCP Exams staff and sampling methods for fair lending consult work. Member of several interagency working groups related to fair lending, appraisal bias, HMDA, etc.  Serve on internal FDIC working groups such as Digital Currency Working Group and the Wholesale Retail Working Group,

**Education:**

| | | | |
|---|---|---|---|
| George Washington University | Doctorate, Economics | Washington, DC | Aug 2016 |
| George Mason University | Master's, Economics | Fairfax, VA | May 2006 |
| Georgia Institute of Technology | Bachelor's, Economics | Atlanta, GA | May 2003 |

1

Northwestern Causal Inference Workshop and Advanced Workshop Aug 2012 & Aug 2013

**Experience:**

**Federal Deposit Insurance Corporation**                           **(2012 - present)**

**Lead, Technology and Tools**                       **(Jul 2025–present)**

Lead development of AI analytics and automation solutions for Division of Consumer Protection. I identify opportunities to transform our on and offsite products to help inform examiners and leadership. My team develops technological solutions in response to examination and examiner needs.

**Assistant Director / Chief**                          **(Sept 2022–Jul 2025)**

**Acting Chief / Section Coordinator**                 **(Dec 2016–Aug 2017)**

                                                   **(Aug 2019–Nov 2019)**

                                                   **(July 2022–Sep 2022 )**

*I have demonstrated strong organizational skills and attention to detail necessary to manage a dynamic analytic program within the bounds of applicable policies and procedures during my tenure as Acting Chief.*

1. Led team of 10 economists, statisticians, and analysts. Worked with colleagues in DCP Exams, DCP Policy, and Legal as appropriate to progress consultation work forward.

2. Maintained professional standards to foster a professional team environment that promotes collegiality, engagement, critical thought, and productivity by regularly meeting one on one with staff on a biweekly basis to understand important work updates, understand where staff thought I could assist, identify bottlenecks and issues staff may be experiencing (internal or external) and work to resolve them (whether by reaching out to managers of other work units, suggest appropriate staff training opportunities, or working with DIT for technical issues etc.)

3. Responsible for achieving 100% compliance with internal policy and procedures on time-lines and deliverables during a time of highly increased consultation activity.

4. Ensured analysis work product met appropriate standards by reviewing data, methods, and written reports.

5. Provided DCP Senior management with accurate, up-to-date status reports on examination caseload, key case developments,

6. Promptly read, reviewed, and provided feedback and guidance to staff on dozens of statistical consultation memorandums related to fair lending analysis and UDAP examination consultation work, which includes data and model guidance and reviewing staff memorandums of research findings.

2

*I have demonstrated the ability to direct and inspire confidence in professional analytic staff, and to coach them to set and meet goals and solve problems in a timely manner;*

7. Worked to identify and assist section staff to improve existing analytic capabilities both within DCP (Community Affairs reporting project, Fair Lending Scoping and Conclusions (FLSC) Tableau tool) and outside DCP (DRR Tableau Reporting Tool). Worked in management capacity to ensure those resources were available, whether they are technological, knowledge-based, or person-based.

8. Identified projects for junior staff, including staff interns, which contributed to the success of the DCP mission, and assisted junior staff in identifying and learning the appropriate software, such as DCP's FLSC tool and an Fair Lending Wiz Tool in Excel to assist examiners in determining appropriate target and control counts and differences measures.

9. Initiated review of existing bank branch research tools, resulting in completion of a major improvement in analytic capability on an ESRI mapping platform to inform staff on bank branching patterns and consequences of bank branch closure.

*I have consistently shown a successful track record of articulating complex analytical concepts and findings to both technical and non-technical audiences, including researchers, analysts, senior executives, community-based organizations and bankers;*

10. Acted as subject matter expert for FDIC during interagency (Federal Reserve, OCC, CFPB, FDIC) effort to develop shared implementation, guidance, and standards related to the 2015 Home Mortgage Disclosure Act Final Rule. Directly responsible for driving compromise and agreement between agency economists on 'key fields' determination.

11. Developed rapid-fire on-the-fly exhibits distilling complex calculations related to compliance risk to assist Division Director and Senior management to inform their decision to approve final outcomes of consultations (i.e. referral to Department of Justice)

12. Briefed DCP Legal on a bi-weekly basis on status of fair lending consultations breaking down where the statistical analysis was in the process and the findings in a non-technical matter.

*Knowledge of strategies to promote diversity and inclusion and the ability to apply them in a professional context;*

13. Integral member of Division DEI effort around improving fair lending program, specifically concerning analytic methodological improvements which could be made

**3**

to better identify, address, and mediate consumer harm with respect to protected classes.

14. Managed Expression of Interest and job postings and hiring interviews for various positions with diverse hires including minority applications, veteran's status applicants, etc.  As a staff economist, participated in numerous job interview panels for the agency for economist, financial analyst, and economic analyst jobs, again with hires representing a diverse mix of backgrounds and demographics.

15. Regularly organize and manage award process for DCP HQ Employee of the Year.

16. Regular training and outreach programs in my role as NTEU Chapter 207 Steward.

*Ability to develop and maintain a network of professional contacts;*

17. Regularly attend internal and interagency conferences and meetings, academic and technical conferences, to develop and maintain professional contacts.

18. Maintain regular communication with staff at federal financial regulatory agencies and federal supervisory agencies, including FDIC, Fed Board, Fed Banks, OCC, CFPB, NCUA, HUD, FHA,VA, Freddie Mac, SEC, DOJ, etc.

19. Maintain regular communication with economic experts from private sector firms such as Redfin, Zillow, American Banker, Housing Wire, and outside policy think tanks such as Urban Institute, Brookings Institute, etc.

**Senior Financial Economist**                                              **(2012 - present)**

*Knowledge of depositor and consumer protection, compliance, community reinvestment, and fair lending laws; and the examination and enforcement programs, polices and processes through which compliance with these laws are overseen;*

Primary economist assisting DCP policy regarding GAO audit concerning HMDA reporting exemptions for certain data fields, such as credit score, pursuant to the 2018 S.2155 "Economic Growth, Regulatory Relief, and Consumer Protection Act."

20. Assessed GAO documentation and research on reporters subject to the exemption, identifying key assumptions GAO was making in its analysis and identifying how differences in assumptions made by GAO and FDIC might lead to different findings.

21. Produced numerous reports under often very tight timelines to answer questions posed by the GAO, which required both internal and external briefings. GAO noted that my research contribution helped GAO have an improved understanding of the limitations of current HMDA data in assessing partial exemption eligibility and compliance.

4

Responsible for assessing fair lending concerns for interdivisional project reviewing use of AI/ML by financial institutions and third party providers for the Retail Emerging Technology Working Group.

22. A key contribution of mine was to bring additional case specific knowledge of AI / ML examination and incorporate these experiences into our findings to recommendations for how FDIC can assess supervision and compliance risk today and what steps / resources may be needed as AI / ML reaches broader adoption and maturity in the next few years.

Primary economist responsible for annual HMDA research presentations, identifying trends and findings important to policy and examination responsibilities to a generalized audience of technical and non-technical experts.

23. Early in the COVID Pandemic in 2020, at the request of senior management I identified FDIC supervised institutions at highest financial risk due to loss of servicing revenue arising from mortgage moratoriums in response to economic shutdowns.

24. For the 2020 Annual Analysis presentation, identified trends in mortgage market using non-HMDA data and correctly predicted mortgage originations would catch up by end of 2020 to pre-2020 expectations.

Provide subject matter expertise for annual HMDA analysis assessing compliance risk in pricing and underwriting of mortgage loans to proactively screen regulated banks to determine banks with highest risk, including developing, maintaining, updating, and estimating models to assess compliance with fair lending laws and regulations.

> *I have consistent track record of demonstrating knowledge of supervisory analytical methods as they apply to fair lending, estimation of consumer restitution, and other consumer protection matters;*

I provide econometric subject matter expertise regarding fair lending regression modeling decisions to senior and junior staff. Primary statistical expert on approximately 5-10 fair lending consults per year since 2012 resulting in multiple DOJ referrals.

Key member of DEI team responsible for development and deployment of BISG for fair lending analytics.

Developed gender robustness check methodology as standard practice for gender-related fair lending consult work.

25. Most recent fair lending DOJ referral related to underwriting in an indirect auto consult submitted to DOJ in 5/22.

5

I have developed and implemented a number of tools and analytic frameworks for DCP:

26. Fair Lending Scoping and Conclusions Trend and Scoping tool in Tableau for use by regional and headquarters staff to identify examinations trend and assist with selecting exams for inclusion in audits and horizontal reviews. Effort recognized for outstanding initiative taken to identify and respond to the need for enhanced management insight into DCP's fair lending supervisory activities through the development of an interactive, Tableau-based resource to provide managers with the ability to identify trends and easily conduct detailed reviews of facts and circumstances associated with such trends.

27. Supported implementation of new Fair Lending tools for DCP Examiners by quickly developing, under significant time pressure, software tools to facilitate importing of data into Fair Lending Wiz. Developed such tools to assist DCP Examiners with data collection, greatly enhancing examiner efficiency through automating to the greatest extent possible the process of preparing data for analysis.

28. Updated DCP tools to use updated HMDA data per the 2015 HMDA Final Rule.

29. Regularly review and provide subject matter expertise and recommend changes to internal DCP Tableau Redlining Report.

I regularly develop and estimate models to assess compliance with fair lending using state of the art analytic and econometric techniques, including linear regression, logit regression, and alternatives to standard models of the error term using multiple software platforms including SAS, Stata, and R.  Further, I report these estimates in clear, concise memorandums to economists and non-economists to fully explain the results of the analysis, and meet with DCP Exam, Analytics, Policy, and Legal staff to review and succinctly answer questions regarding work performed.

> *I have demonstrated commitment to supervisory strategies to promote diversity and inclusion and the ability to apply them in a professional context;*

Lead statistical expert on DEI task force to study and recommend use of BISG in fair lending analytics, a 2021 DCP Strategic Plan objective.  Reviewed outside research and developed simulation model to test BISG methodologies to develop final recommendation.

30. Intradivisional team reviewed use of BISG for non-HMDA data, engaging in detailed discussions with various internal stakeholders including WO/RO Fair Lending Examination Specialists, Research, Policy, as well as the Legal Division.  To support this work, I reviewed numerous studies using BISG from government researchers, academics, and private business, completed additional analysis using the BISG simulation model I built, and evaluated potential methods of implementation. I also spoke with numerous outside FDIC government agency economists about the use of BISG.  Further, I evaluated industry documents on use of BISG in fair lending, software packages that implemented BISG to determine how BISG is being used outside. We delivered a policy and methodology recommendation based on my work to DCP Senior management in September 2021 with the policy approved in December 2021 with anticipated rollout April 2022. DCP Senior management accepted recommended methodology.

31. Adopting BISG, particularly the careful and well-studied approach recommended by the team, represents a massive step forward in DCP in assessing fair lending risk in non-HMDA data, and

**6**

particularly represents an opportunity to ensure that African American applicants/borrowers are evaluated similarly as we do for other minority groups (e.g. Hispanic). This is consistent with the FDIC's efforts to promote diversity, equity, and inclusion by improving its supervisory capabilities to identify and pursue discrimination against prohibited basis individuals, including African-Americans.

32. Division Director approved methodology implementation which began in Q1 2022.

**Ability to foster a professional team environment that promotes collegiality, engagement, critical thought, and productivity**

33. See Acting Chief summary on pages 2 and 3

**Ability to direct and inspire confidence in professional analytic staff, and to coach them to set and meet goals and solve problems in a timely manner;**

34. See Acting Chief summary on pages 2 and 3

*Ability to anticipate and develop plans to mitigate strategic and operational risks and otherwise manage complex empirical projects involving multiple personnel, resulting in authoritative findings and conclusions;*

Led statistical analysis and informed DCP management inside and outside DCP Analytics branch on numerous policy related items, including :

35. Forecasting the expected number of HMDA Reporters for 2020 HMDA reporting,

36. Produced a report on race-based appraisal bias in residential real estate, highlighting recent and relevant research on the topic and identifying potential impacts and policy options for Division Director.

37. Provided subject matter expertise and analysis on casework regarding Community Reinvestment Act, and Servicemembers Civil Relief Act consultations.

38. Lead on impact study on interchange fees from Debit Card Interchange Rule.

*Ability to develop and maintain a network of professional contacts;*

39. Regularly attend the Joint Fair Lending Task Force meetings to continuously review banking and financial developments as they relate to depositor and consumer protection, including fair lending and UDAP.

40. For other experience in maintaining a network, see Acting Chief summary on pages 2 and 3

7

*Ability to articulate complex analytical concepts and findings to both technical and non-technical audiences, including researchers, analysts, senior executives, community-based organizations and bankers;*

Developed from idea to submission a research paper using expanded HMDA data and identifying that lending differences remain post credit factor controls particularly for Black and Hispanic applicants compared to white applicants.

41. In particular, my research identifies that lending differences are higher among applicants in lower credit score ranges, a unique and new contribution to research in this area. I am unaware of similar work done by DCP leveraging multiple years of HMDA data and our own specific expertise regarding HMDA data for an external presentation and paper.

Responsible for analyzing and presenting internal studies and external research related to Covid-19 and Banking to a variety of technical and non-technical audiences, including presentations to FDIC staff which of varying sizes up to 1,200 attendees.

42. Briefed Board Member Gruenberg on status of mortgage market and impact on FDIC supervised institutions in May 2020. Division Director Pearce formally recognized quality of contribution and appropriateness of briefing documents I prepared.

43. Monitored the mortgage market paying particular attention to forbearance activity by borrowers and status of foreclosure and eviction moratoriums. I identified data points available from call report data for briefing documents to DCP Senior management including a very fast turnout request in August regarding the potential impact of the forbearance expirations in September 2021.

44. In addition to providing a comprehensive set of measurements for institutions with assets in excess of $1 billion, the analysis also embedded a framework for identifying specific institutions as outliers. This analysis was elevated to Exams for supervisory attention and has been used to brief a member of the FDIC Board of Directors as well as Division leadership. The analysis itself was conducted with relatively little guidance and on a rapid timeline in response to external reports highlighting possible concerns in the area.

Strong organizational skills and attention to detail necessary to manage a dynamic analytic program within the bounds of applicable policies and procedures; and

*I have well-developed interpersonal communication and negotiation skills necessary to coordinate work with other managers.*

Led research project on DCP internal operations regarding examination frequency to resolve an urgent problem where the amount of expected examiner hours needed to complete the scheduled examinations was far greater than the actual examiner hours available.

45. Based on my research, FDIC Senior management approved new examination frequency guidelines which allowed DCP to more effectively manage bank examinations without overburdening bank examiners.

8

UDAP:

- Responsible for developing sound estimates of consumer harm for a UDAP case that resulted in the largest UDAP settlement in history (at the time) on an interagency basis (with CFPB) on identifying consumer harm and restitution which ultimately resulted in over 200 million dollars in restitution to approximately 4 million individuals.

- Produced on the fly restitution estimates through a UDAP case concerning the improper sale of add-on products, improperly charging interest to consumers, and failing to provide to consumer contractually mandated payment options, resulting in over 3 million dollars in restitution to affected consumers.

- On a UDAP case involving a 3rd party product offered by a FDIC-regulated bank, developed innovative visualizations using Tableau to demonstrate consumer harm with respect to the line of credit / savings product.  Further, the team was awarded the 2012 Champion of Corporate culture by Chairman Marty Gruenberg for its work.

**FDIC Capitol Hill Fellow – Georgetown Government Affairs Institute**

**Office of U.S. Senator Jack Reed**                                                              **(Dec 2017 - Nov 2018)**

Drafted 3 bills relating to emerging issues in the areas of mortgage servicing, new financial assets, and consumer financial stability and financial inclusion.

Subject matter expert for staff on matters concerning banking regulation, including Community Reinvestment Act, HMDA, SIFI threshold, and impact of major banking legislation such as S.2155, the Economic Growth and Regulatory Relief Act of 2018.

Served as a specialist for issues relating to depositor and consumer, including fair lending, unfair and deceptive acts and practices (UDAP), community development, and financial inclusion topics.

Completed policy analysis on various subject matters under exceptionally time-limited circumstances to inform staff and assist with vote recommendations.

**United States Department of Justice**                                                              **(2006-2012)**

**Senior Statistician - Civil Rights Division**

Subject matter expert on impact of Voter ID laws, redistricting proposals, estimation of voter behavior, polling location change.

**9**

Modernized statistical analysis procedures in use by DOJ

Work with trial team assessing external expert reports, including identifying relevant questions, weaknesses of analysis by opposing counsel.

Provide technical expertise and advice to Housing and Civil Enforcement economists regarding improvements to econometric models

**Publications:**

"Climate Preferences, Obesity, and Unobserved Heterogeneity in Cities" with Anthony Yezer, Review of Regional Studies, November 2017

"A Comparative Analysis of Small Area Population Estimation Methods" with Sarah Brinegar, Cartographic and Geographic Information Sciences, November 2010

**Working Papers:**

"Spatial Sorting of High Skill Workers: Do Housing Costs Matter?" Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2514847

"Did Minority Applicants Experience Worse Lending Outcomes in the Mortgage Market?

A Study Using 2020 Expanded HMDA Data" Forthcoming to DIR CFR Working Paper Series.

"Analyzing Performance of the BISG Proxy using Synthetic Data" with Gregory Lyons. Internal FDIC presentation for senior management decisioning.

**Presentations:**

| | |
|---|---|
| 2016 Tableau Conference | 2016 Federal Financials Workshop |
| 2016 AREUEA National Conference | 2015 AREUEA International Conference |
| 2015 AREUEA National Conference | 2014 American Economic Association |
| 2014 North American Regional Science Conference | |

**Conferences Attended:**

Regular attendee of the American Economic Associations Annual Meetings, the conferences of the American Real Estate and Urban Economic Association, Stata, Tableau, the FDIC Consumer

**10**

Research Symposium, the CFPB Research Conference, and Brookings Institution seminars. Previously attended American Political Science Association Conferences.

## FDIC Awards

Manager of the Year (2024)
Sustained Superior Initiative (2021)
Sustained Superior Initiative and Outstanding Accomplishment (2020)
Chairman's Innovation and Creativity Award – nominee (2016)
Champion of Corporate Culture (2012)
Mission Achievement Award (2013, 2016, 2017, 2021, 2022)
Star Award (2012, 2015(x2), 2021(x2))

## Special Skills

Web-data scraping, statistical programming in multiple languages and platforms (R, SQL, Tableau, SAS, Stata, VBA).

## Expert Witness Testimony

Whitest v Crisp County School District, US District Court, Middle District of Georgia, Albany Division

Rose v Raffensperger, US District Court, Northern District of Georgia, Atlanta Division

## References

| Name | Employer | Phone | Email |
|---|---|---|---|
| Tara Oxley | FDIC | (202) 294-1971 | Toxley@fdic.gov |
| Keith Ernst | FDIC | (202) 898-3849 | Kernst@fdic.gov |
| Lariece Brown | Freddie Mac | (571)-382-1787 | Lariece_brown@freddiemac.com |

11