# EXHIBIT F

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

MACON DIVISION

* * * * * * * *

COURTNEY DRIVER, et al.,    *

    Plaintiffs                 *   Case No.

    vs.                         *   5:25-cv-0025-MTT

HOUSTON COUNTY BOARD OF      *

ELECTIONS, et al.,           *

    Defendants                 *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

JONATHAN CERVAS, PH.D.

March 18, 2026

Any reproduction of this transcript is prohibited

without authorization by the certifying agency.

Page 53

of reasons, including the fact that, as I described in my report, the plans that I initially did were race and party-blind.  If I had added precinct information, that adds partisanship information to the process, and I was ---  I was actually trying to avoid that, so ---.

BY ATTORNEY TYSON:

Q.    It's correct to say that you didn't consider precinct boundaries for any of the maps in this initial report.

Right?

A.    That's right.  In the map-drawing process.

Q.    Right.

And you also --- did you consider the boundaries of cities in Houston County when drawing the plans for this report?

A.    No.  And as I also write in the report, when I was asked to do this report, the federal government was shut down, so the census website was not operational, which made it a little bit difficult to even figure out what the right cities were.  So I had found that CCD file, which had names of what appeared to be cities like Warner Robins, and so I took that as if it were the city map.  It turns out that there's this alternative boundary map that Dr. Barber used, which I

Page 54

then --- in my response to him, I then downloaded that

and looked at it.

Q.    And in your reports, you did not report any

compactness scores.

    Right?

A.    I did not.

Q.    Did you use any metrics of compactness when you

were drawing these plans in this report?

A.    No.  Visual only.

Q.    And in DRA, you can click a tab and see

compactness scores.

    Right?

A.    That's correct.  Yeah.

Q.    But you never clicked that tab?

A.    Not --- I did this morning, actually, but not at

that time.  When you're making maps, it's --- I don't

think it's at all important to fixate on some

mathematical compactness score.  That would be bizarre

if somebody were to do that and actually might raise

questions about their motivations if they were

actually trying to, say, maximize compactness.

    I think it's more important to, again, not

arbitrarily divide communities and stuff like that.

As long as you're doing that, you're leading to ---

all of my maps are relatively compact.  Right?  Even

Page 55

after looking at those scores post facto, right,

they're relatively compact compared to many district

plans created around the country.  And you can use

that with visual inspection alone.

Q.    I always heard that called the eyeball test for

compactness.

A.    Yeah.

        ATTORNEY NEWMANN:

        Object to the form.

        THE WITNESS:

        My favorite --- my preferred term here

is the interocular test, as stated by my mentor, Dr.

Grofman.  It doesn't hit you between the eyes.

BY ATTORNEY TYSON:

Q.    And we talked about communities of interest as

well.

    For purposes of this report, how would you define

a community of interest?

A.    I only define one community, and it's not really a

definition of a ---.  Okay, let me go back.  I

actually defined two.  One actually is and one might

be.  The one that is are the CCDs.  I mean, that is

very clearly a community of interest.  People can

disagree about what the communities actually are, but

as --- as the census describes itself is an economic

Page 56

and statistical area.  You know, I have a def --- I have the actual quote from the census in my second report, which I don't have in front of me.  We can find that quote if you'd like.  But that's --- I would say that's a very legitimate community of interest, the political subdivisions established by the census, independent of me or anybody else.  So it's not anybody's subjective judgment.  They are --- and they're not done for political reasons, like some precincts might be done for political reasons because they might follow boundaries that are created by the legislature for political purposes.  These are completely apolitical, not racial, but they are statistical in nature.  So that's a real community of interest.

I also talk about the Air Force base.  Again, I have very limited information because the Census Bureau was not operational when I was drawing these plans.  But you could see when you look at the map that there's a large Air Force base.  And I've lived near Air Force bases in the past and have friends who are in the military and recognize that that might be a community of interest, but also recognizing that I don't know exactly where, say, officers live or enlisted people live around the base.  So it's

Page 57

somewhat limited in its utility, but it was the best I could do at the time.

Q.   And you did not consider the --- the locations of incumbents in drawing the plan.

Right?

A.   I was provided the incumbent information at some point, but they --- if I --- my recollection was --- so I would have liked to try to draw districts for each of the incumbents, because sometimes that's recognized as a traditional redistricting criteria. It's not always, and so it's not --- and it's certainly not in law anywhere to do that.  But sometimes it's a reasonable thing to do, especially when I've served as --- for courts, that you don't want to disrupt incumbency to the extent possible.

In this case, and I don't recall with any specificity, but the incumbents tended to live very close to each other.  And so I don't think it was possible to put them into each of their own districts. But I think I tried after the fact, again, post facto.

Q.   Okay.  Sorry.

ATTORNEY NEWMANN:

Bryan, whenever you're at a good stopping point, I could use a brief break.

ATTORNEY TYSON:

Page 60

Q.    Understood.  Thank you.

And so when you made the copy of the plan to draw then the MMD plan, you turned on racial shading on DRA?

A.    Correct.

Q.    Okay.

And what geography level were you shading by race when you did that?

A.    I don't know.  I think it's --- I think it's --- I don't know.  I don't know what it is.  Honestly, I don't know.

Q.    Okay.

I think they call it precinct, but I don't think they're actually precincts, because there's --- I don't think it is.

Q.    And when that racial shading was displayed, it would color the pieces of geography by the number of black voters in that district or the percentage of black voters in that area?

            ATTORNEY NEWMANN:

            Object to the form.

            THE WITNESS:

            Yeah, I don't know.  It's like a percentage.

BY ATTORNEY TYSON;

Page 61

Q.    And so then you had those visual features showing
the racial makeup when you were drawing both MMD
plans.

     Right?

A.    That they'd be on?  I don't know if they were on
all the time.  At some point, I looked at --- so I
looked at where the black population actually lived.
Because it was race-blind, party-blind, I had no idea
where they lived.  Right.  I was just drawing
literally, like, blind to those things.

Q.    But you relied on those --- that racial shading
information to help you create the MMD plans.

     Right?

A.    Correct.

Q.    Okay.

     So let's then take Exhibit 1, and let's go back to
paragraph four on page two.  And so paragraph four
outlines what you were asked to do by Counsel for the
Plaintiffs.

     Right?

A.    Correct.

Q.    And you were asked to determine whether the
minority population in Houston County was sufficiently
numerous and geographically-compact to allow for the
creation of a single member district plan, you

Page 94

of those in a county.  So I was trying to find what may exist from the county that would be useful for determining preexisting political subdivisions.

Q.    And those nested geographies could include block groups, census county divisions, precincts.

Is that right?

A.    Precincts, probably, but I wouldn't attest to that under oath.  But the other two, yes, they're part of the census.  Precincts are not part of the census hierarchy.  Census blocks and census block groups and census tracts and census counties are.

Q.    And then you reference other communities of interest.  And I think we've talked about the communities of interest you utilized were the CCDs and the Air Force base.

Right?

A.    Correct.

Q.    And there's no other communities of interest you're referring to in paragraph 50.

Right?

A.    I didn't identify any.

Q.    In your belief, can a racial group form a community of interest?

A.    In my belief, in my opinion and hypothetically?

ATTORNEY NEWMANN:

Page 110

Q.    And the later part of that sentence references for the purposes of demonstrating the strictest interpretations of what is required under Gingles 1.

What are you referring to the strictest interpretations there?

A.    Here I mean that you have to have a voting age population, a single race, so black, not a coalition, not all minority members, but the single race.  I think that's the strictest interpretation because I think arguably that's not actually what Bartlett versus Strickland is asking for.

Q.    And you'd agree, as Dr. Barber discussed, that ultimately none of the plans in Exhibit 1 had a single race black majority voting age population district on them?

ATTORNEY NEWMANN:

Object to the form.  Lack of foundation.

BY ATTORNEY TYSON:

Q.    That you drew.

A.    None of the race-blind, party-blind.

Q.    And none of the MMD plans --- I'm sorry.  You'd also agree that the four district MMD plan did not have a majority black voting age population district.

Right?

A.    I'm not sure how to answer this.  I thought it did

Page 111

at the time of producing this report.  Dr. Barber pointed out that it only did because of a rounding --- rounding up, that was short by ten voters or so.  But that was corrected in a substitute report.  But you're not talking about that, so ---.

Q.    And we'll get to that, yes.  Thank you.

Paragraph 60 references the preexisting single member district plan.  And you indicate you were surprised that the plan had a district with a higher black proportion than the districts you drew.

A.    Yeah.

Q.    Why were you surprised by that?

A.    Well, I don't know why I was surprised by it, but it certainly was shocking.  You know, it's not surprising that my race-blind and party-blind plans weren't particularly high because I had absolutely no idea where the black residents lived in the county. But even after I created the districts that were over 50 percent, you have this plan that I found that actually is higher.  So it turns out that it was much easier to find black voters.  For whatever reason, the legislature chose to do it that way.  My process was very narrowly tailored and so clearly you can have districts that are much higher percentage than I even did.

Page 118

Q.    Do you know if Georgia legislative districts are drawn to a smaller deviation than plus or minus 5 percent?

A.    I don't know.

Q.    Do you know if Georgia counties use smaller population deviations than plus or minus 5 percent?

A.    I don't know.

Q.    Trying to find a place in my notes.

Oh, paragraph 68, you say the first map I present is not one that I drew, but rather one that was enacted by the legislature for use in Board of Education elections.

What is your basis for concluding the legislature drew those plans and not the Board of Education?

A.    I don't know if actually --- I asked Bryan Sells, and he said that the legislature draws the county maps, so that's contingent on that correct opinion, but it doesn't really matter.

Q.    Got it.

And so, in this paragraph 68, you reference neutral redistricting criteria there in the middle. And we've talked about political subdivision boundaries.  We've talked about the eyeball test for compactness.  We've talked about the two communities of interest that you identified.

Page 119

Are there any other neutral redistricting criteria you used in creating the five district plans that you drew that are not referenced in this paragraph?

A.   Equal population.  I can't think of anything else.

Q.   All right.

A.   It's not a complicated map.

Q.   And just briefly, on compactness, you would agree there's not a point where a district becomes objectively noncompact.

Right?

A.   A bright-line point?

ATTORNEY NEWMANN:

Objection, calls for speculation.  Calls for a legal conclusion.

THE WITNESS:

A bright-line test?  Not that I'm aware of.

BY ATTORNEY TYSON:

Q.   Okay.

And I believe we said earlier you did not use any compactness scores to determine compactness of your districts.

Right?

A.   No.

Q.   In footnote 6 on page 16, you indicate that black

Page 143

And up at the top --- you're referring back to Exhibit 7, is that ---?

A.    I'm just looking.

Q.    Up at the top, do you know how wide District 3 is between District 1 and that northern edge of the county?

A.    I don't have a scale.

Q.    Okay

If you don't know, that's fine.

Turning to page 28 and Table 9, District 1 is the second most underpopulated district on the MMD4 plan.

Right?

A.    Yeah.

Q.    And ---.

A.    There's only four districts, so it's kind of a weird way of phrasing it.  Right.  So ---

Q.    I take that.

A.    --- it's a middle district.

Q.    It's in the middle in terms of population, total population.  And we've talked a little bit about that the 50 percent on that side is not 50 percent.  It was rounded to that.

And I honestly can't remember.  Did you ever check the DRA statistics on this plan to see what the 49.97 percent ---?

Page 144

A.     They're the same.

Q.     Okay.

A.     Well, I think it --- I don't know how it displays, but the data itself is the same on that.

Q.     And for this plan, we also have in District 1, the candidate of choice of black voters wins in all four --- all four elections in District 1.

       Right.

A.     Yeah, in Figure 13.  Yes.

Q.     Paragraph 93, you offer the opinion this plan satisfies the requirements under Gingles 1.  I believe this is the only plan where you made that statement about satisfying the requirements of Gingles 1.

       Do you believe the other plans also satisfy the requirements of Gingles 1?

A.     We just like kind of go back to what we were talking about earlier about like language.  As we read these in this order, what we see is I've used different language in each of these conclusions, probably to be not repetitive, which may or may not be a good strategy.  It might be a good strategy when you're writing for an audience, but maybe not so good when I'm writing a legal opinion or legal --- yeah, legal opinion, opinion, legal document.  So I --- I wouldn't take anything from the differences in these

Page 146

definition.

Q.    And that would be because the plans have a majority black VAP population and the black candidates of choice are able to succeed in the elections?

A.    Right.  And with this plan, right, we've now --- we haven't yet gotten to it.  I know you're going to.  This is technically not a numeric majority by 15 voters, I believe, because of the rounding, it appears.

So if the requirement --- remember I defined the strictest requirement under Gingles, so that would be what we're talking about here, under the strictest requirements of Gingles.  But this plan is clearly above 50 percent in total black population.

Q.    And so then you would say that this plan does not satisfy the strictest interpretation of Gingles 1 because it doesn't have a majority black VAP district?

A.    As defined that way, right.  Because I think I show in my --- my second report that this district actually is majority of black registration.  So if the court were to accept that opinion that is probative data, then actually this would be --- still would be fulfilling.

Q.    Certainly.  Okay.

So let's go to paragraph 94.

Page 169

reasonably-configured district that now is black majority, which satisfies the Bartlett vs. Strickland sort of numerical majority standard.

BY ATTORNEY TYSON:

Q.    And my question is, how do you know it was the --- it was a narrowly tailored use of race?

A.    How do I know?  Because I didn't use any race more than necessary to do exactly that task.

Q.    So you used race to get over 50 percent and didn't go farther than that?

A.    That's correct.

Q.    Okay.

Then we'll move to paragraph 14 about MMD4, and we've talked about this district was ten black residents short of 50 percent.

How did you go about locating the additional census blocks that you placed into District 1?

A.    I don't recall exactly the process, but I think I looked at Dr. Barber's map and saw that there was an adjacent census block that was heavily black, and so I added that.  And that was --- got it almost to 50 percent.  And there was another one, I added that, and it was above 50 percent.  So again, narrowly tailored. I did nothing more than was necessary to accomplish the goal of creating the Gingles 1 map.

Page 170

Q.    And the map of Dr. Barber's you were looking at was the map of census blocks colored by race in his report?

A.    I think that's right.

Q.    Trying to find a quote in my outline.  Sorry.

Paragraph 14, there it is on page five, you indicate this can be easily corrected by reassigning three census blocks from District 3 into District 1. And then you make the statement, among other possible ways to increase the BVAP percentage.

What are the other possible ways you're referencing there?

A.    Well, I didn't explore any other possible ways.  I am assuming there are other possible ways because if it was that easy to do it, it must be easy to find other ones.

Q.    All right.

Let's move to voter registration, then.

Now, you didn't include voter registration rates by district in your first report.

Right?

A.    That's right.

Q.    Is it your understanding that courts utilize voter registration rates when analyzing the first prong of Gingles?

Page 184

because we don't have that.  But, yeah, I mean, it could be a comparison.

But again, it would be --- the question would be --- there's not a challenge to the five district Board of Education map in this case.  If Plaintiffs' Counsel asked me to show why that map was not good for some reason, then I certainly would want to have those comparisons.  But I don't need to do that, because it's not part of this case.

Q.   Got it.  Okay.

So you can put that away as well.

Moving to paragraph 22 of Exhibit 8.  You indicate something we've talked about a lot, the CCDs are preserved to the extent practicable.

Are you aware of any plans for counties that use CCDs as the building blocks of the plan?

A.   I'm not aware.

Q.   Okay.

And when you drew the district plans for Nassau County, you didn't use the minor civil divisions as the building blocks for plans in that plan, did you?

A.   I have my actual floor right here.

Q.   Sorry to make you pull that back out.

A.   It's okay.  So every jurisdiction has different relevant subdivisions.  Right?  That's why I --- in my

Page 194

northeastern precincts identified in paragraph 26 and then drew the rest of the plan around that.

Is that right?

A.   Actually, I don't really say that in paragraph 26. I think it's probably right, but I may have actually started with something else and led to there, but I don't --- I don't know.

Q.   Okay.

And that was my inference, so that could be incorrect as well.  Yeah.  And then Figure 7 is Cervas blind 5A.  And looking at Table 10 on page 15, this plan would also elect the candidate of choice for black voters in all four elections?

A.   Correct.

Q.   And it is 51.2 percent black VAP in District 1. Right?

A.   Correct.

Q.   And you have not drawn a four district plan that uses precinct boundaries to construct the plan?

A.   I didn't even intend to do this.  It was just offered by Barber as an idea.  I did it.  So that's what I did.  Not trying to overwhelm the court with all these plans.

Q.   So let's go to paragraph 30, and then I think we'll be at a good breakpoint here.  You comment about

Page 195

the maps that Dr. Barber showed that areas excluded or included in the changes that were made.  And you say those maps demonstrate how narrowly tailored adjustments can satisfy the demanding test of Gingles. And what you mean there is what we discussed earlier about narrow tailoring of only doing what's necessary to get to 50 percent plus 1 for black voters.

Right?

A.    Right.

Q.    That's a good point for a break, Dr. Cervas, if you want to.

A.    Yeah.

Q.    Okay.

A.    Thank you.

VIDEOGRAPHER:

Going off the video record at 2:44 p.m.

OFF VIDEO

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

ON VIDEO

VIDEOGRAPHER:

Going back on the video record at 2:56 p.m.

---