# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

MACON DIVISION


COURTNEY DRIVER, et al.,

    Plaintiffs,

                            CIVIL ACTION FILE

    vs.

                            NO. 5:25-cv-0025-MTT

HOUSTON COUNTY BOARD OF

ELECTIONS, et al.,


    Defendants.


VIDEO DEPOSITION OF

STEPHEN J. POPICK, PhD

April 2, 2026

9:04 a.m.

TAKEN BY REMOTE VIDEOCONFERENCE

Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

Stephen J. Popick , Ph.D.                               April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 9

Q    In this here you say that following your deposition on March 13, 2026:  I discovered a minor error in my statistical code.  Correcting that error does not change my original finding of racially polarized voting, but it does materially change some of the individual estimates of White and Black support for particular candidates in particular elections.  I report the estimates in the tables that follow and in the appendix.

Is that right?

A    That's the footnote, correct.

Q    So you identify that there's a minor error in your statistical code.  Did you identify any other errors besides that one?

A    No, the subject of my corrected report was the correction of the error that I discovered.

Q    Okay.  So why don't we just kind of begin with you telling me what happened after your deposition on March 13 that led you to finding this error.

A    So, Bryan, it's sort of a standard practice for me, both going all the way back to DOJ to what I do for FDIC today and also any of the outside work that I'm hired to do is to always after a big meeting think about what I was asked, think

Page 10

about what the outcomes were, right, and reflect and take time to think if that motivates me to do any additional work.  So it's the same process that I've had for my whole career.

Q    Okay.  So no one came to talk to you and said, Dr. Popick, I think you made a mistake here?

A    Absolutely not.  The decision to issue a corrected report was mine and mine alone.

Q    Okay.  When you were doing this thought process where you reflected about what might need to be changed, what kind of led you to the realization that there was an error?

A    You asked questions on reliability, and so I noticed that I got a lot of questions on reliability, and so I stepped back, and I thought about why you might be asking those questions about reliability, just as I do pretty much for -- if it had been something else, sir, I would have done something else.

Q    Okay.  Did you make any other changes to your report aside from correcting the code and the accompanying sort of results in the tables?

A    I think I made some language changes because as I say in the footnote, right, the conclusion of racial polarization doesn't change,

Page 76

A    He does say that.

Q    Okay.  So, yeah, my question was, was your analysis criticized at least in part due to the breadth of your confidence intervals?

A    Yes, by Dr. Barber.  I disagree with some of the methods Dr. Barber used here, for the record.

Q    Okay.  And we can turn back to your corrected report that we were on.

A    Okay.

Q    And return to Table A1 on page 24.

A    Okay.

Q    Now, if I'm not mistaken, it appears that for every single election you analyzed under this iterative EI metric in your corrected report, the confidence intervals substantially widen under your analysis; is that right?

A    It does -- yeah.  I would say that's a general characterization.  The confidence intervals appear to cover a broader range of possibilities, and the point estimates appear to have moved to stronger elements -- a stronger claim of Black cohesion.

Q    Okay.  If we'll -- unfortunately we have to do this on a screen so we're popping back and forth, but if we go to your original report --

Stephen J. Popick , Ph.D.                          April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 80

Q    Low 40s on the top end?

A    Low -- yeah, low 40s, sure.

Q    In the context of the changes that you made to your code, what do these expanding confidence intervals tell you?

A    Well, I mean, what they tell me is that there's a larger range of possible values likely because of the fact that we have a limited number of precincts, right, and I'm drawing from the correct columns for the proportional vote totals now.

Q    Did it make you pause to consider -- excuse me.  Did the expanding confidence intervals give you any cause for concern regarding your analysis or methodology?

A    None at all, and here's why.  Under my original report I was clear in stating that I was considering the separate electorates test, right, did Black voters support Bob, and did White voters provide insufficient crossover support to get Bob elected, right.  They voted for Dave, right.

That pattern doesn't change here.  What we see is a larger set of possible values, but the most likely values we see increased for Black voters. Those are the point estimates.

So under the separate electorates test

Page 81

it's the same material finding, voting is racially polarized.

Q    Doesn't the larger set of possible values create more uncertainty around your analysis, though?

A    I would disagree with that because I use the separate electorates test.  Indeed, under my new set of -- my corrected set there is no longer an election where the confidence interval dips below 50 percent in any of the three methods that I use.

So, yes, we continue talking about EI, but I think it's also worth stepping back.  When you look at the report I choose to present one because I don't think anyone wants to have to read three tables side by side at one time in the report, but I choose that because that's sort of what my preferred model is, but the other two models are also informative on my conclusion of whether voting is racially polarized.

Q    Sure.  We've talked a bit about the limitations of those models given our sample -- given our election data that we have, right?

A    I have mentioned two limitations, correct, or two things that could cause some trouble, but I have a clear signal from all three models.

Page 83

samples.

Q    And -- sorry, go ahead.

A    I apologize.  I interrupted you, and I'm sorry for that.

Q    No problem.

A    Yes, I did increase them, and what I would say to this is it's just being more accurate.

Q    I might have covered this, but do you recall testifying in your first deposition that, quote, the uncertainty in the size of the confidence -- uncertainty appears in the size of the confidence interval around the point estimate; do you recall testifying to that?

A    That sounds right.

Q    So on the one hand you're saying more samples gives you more reliable results, but on the other hand you've now increased your samples, and you're getting increasingly uncertain figures?

A    I think that's conflating two different concepts.  And I don't think you're trying to trick me here, right, I think you're just trying to understand.

So when you increase the -- so the sample size, what that's going to do, right, is help identify what the correct answer is, the correct

Stephen J. Popick , Ph.D.                          April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 84

answer being both a point estimate and the confidence intervals, right.  And so that's a difference in saying what's the reliability.

I think I'm getting a very strong signal here that Black-aligned voters support different candidates, and that signal is saying there's a little bit more uncertainty in where these numbers lie because the range of possible values as you mentioned is higher, but, as I mentioned, the most likely outcome, right, that's increased.  That cohesion and also that drop in White support, right, both of those changes happened, right.

So that's your most likely answer, but the range of possible values around it, right, that accounts for a little bit more of that uncertainty.  But nowhere here does this give me any lack of confidence in saying the voting is racially polarized.

Q    So you feel that when those confidence intervals are established that somewhere within those confidence intervals is the true value?

A    I think that's the -- that's how it would be commonly understood.

Q    And a point estimate represents the most likely true value based on the analysis?

Stephen J. Popick , Ph.D.                          April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 85

A    I think that's a way to explain that to a lay audience, sure.  Yeah, that's how I've explained it here.

Q    Why -- if that's the case, why are your point estimates in your updated corrected code, why do they all fall outside your prior confidence intervals despite -- with the exception of one election of the eight?

A    Because I was drawing from the wrong column of data.

Q    That's your only explanation for why that might be?

A    Well, I said I made two changes.  One was to make it draw from the correct column of data, and two is to change the default parameters.  I can't tell you which one of those it was because, as I stated, I made the changes, got to an effective sample size that met the threshold in the literature, and then ran the sucker.  I didn't go back and run it 20 more times.

Q    You didn't check for chain convergence, right?

A    I used effective sample size to guide me on chain convergence.

Q    But effective sample size is not a