Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

MACON DIVISION

* * * * * * * *

COURTNEY DRIVER, et al.,      *

    Plaintiffs                *   Case No.

    vs.                       *   5:25-cv-0025-MTT

HOUSTON COUNTY BOARD OF       *

ELECTIONS, et al.,            *

    Defendants                *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

JONATHAN CERVAS, PH.D.

March 18, 2026

Any reproduction of this transcript is prohibited

without authorization by the certifying agency.

Page 2

VIDEOTAPED DEPOSITION

OF

JONATHAN CERVAS, PH.D., taken on behalf of the Defendants herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Gina Rodgers, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at Clark Hill, PLC, One Oxford Centre, 301 Grant Street, Pittsburgh, Pennsylvania, on Wednesday, March 18, 2026, beginning at 9:26 a.m.

Page 3

A P P E A R A N C E S


DAVID NEWMANN, ESQUIRE

Hogan Lovells US, LLP

1735 Market Street, 23rd Floor

Philadelphia, PA  19103-2929

       COUNSEL FOR PLAINTIFFS


BRYAN P. TYSON, ESQUIRE

BRYAN F. JACOUTOT, ESQUIRE

(via Zoom )

Clark Hill, PLC

3630 Peachtree Road NE

Suite 700

Atlanta, GA  30326

       COUNSEL FOR DEFENDANTS


ALSO PRESENT

CHAD NOEL, VIDEOGRAPHER

BRYAN SELLS

ARIELLE ANDERSON

DIANE LAROSS

GRACE THOMAS

STEFANIE MAN CHADHA

Page 4

INDEX


DISCUSSION AMONG PARTIES                              7 -    8

WITNESS: JONATHAN CERVAS, PH.D.

EXAMINATION

     By Attorney Tyson                             9 - 199

DISCUSSION AMONG PARTIES                         199 - 200

CERTIFICATE                                            201

Page 5

EXHIBIT PAGE

|  |  | PAGE |
| --- | --- | --- |
| NUMBER | DESCRIPTION | IDENTIFIED |

Defendants'

Exhibit  1 Expert Report                     12

Exhibit  2 Caliper Website                   42

Exhibit  3 Memorandum and Final Order,  44
          11/22/23

Exhibit  4 11/4/25 Municipal General    87
          Special Election

Exhibit  5 Map                               96

Exhibit  6 2020 Census Participant      96
          Statistical Areas Program,
          Quick Reference: Census
          County Divisions

Exhibit  7 Map                              122

Exhibit  8 Rebuttal Report                  160

Exhibit  9 Expert Report                    180

Exhibit 10 Dr. Barber's Second Report  196

Page 6

OBJECTION PAGE


ATTORNEY                                    PAGE

Newmann    18, 20, 25, 30, 33, 34, 35, 44, 52, 55, 58,

60, 63, 64, 67, 69, 70, 77, 78, 85, 88, 91, 95, 106,

110, 115, 119, 120, 125, 126, 127, 147, 156, 161,

164, 171, 175, 177, 182, 198

Page 7

S T I P U L A T I O N

---------------------------------------------------------

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification and filing are not waived.)

---------------------------------------------------------

P R O C E E D I N G S

---------------------------------------------------------

ON VIDEO

VIDEOGRAPHER:

Good morning.  We are going on the record at 9:26 a.m. on March 18, 2026.  Please note that the microphones are sensitive and may pick up whispering or private conversations.  Please mute your phones at this time.  And audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit Number One of the video recorded deposition of Jonathan Cervas, Ph.D., in the matter of Driver versus Houston County Board of Elections, et al, filed in the United States District Court for the Middle District of Georgia, Macon Division, Case No. 5:25-cv-0025-MTT.  The location of this deposition is at the Clark Hill Law Offices in

Page 8

Pittsburgh, Pennsylvania.

My name is Chad Noel, representing Veritext, and I am the videographer.  I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections in the proceedings, please state them at the time of your appearance.  Counsel and all presenting, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

ATTORNEY TYSON:

Good morning.  My name is Bryan Tyson. I represent the Houston County Defendants.

ATTORNEY NEWMANN:

Good morning.  My name is Dave Newmann with Hogan Lovells, representing the Plaintiffs, Courtney Driver and Michael Jones.

VIDEOGRAPHER:

At this time, will the Court Reporter please swear in the witness, and we can proceed?

COURT REPORTER:

Raise your right hand.

---

JONATHAN CERVAS, PH.D.,

Page 9

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

---

EXAMINATION

---

BY ATTORNEY TYSON:

Q.   Well, good morning, Dr. Cervas.  I know we met and talked for a few minutes here, but my name is Bryan Tyson.  I represent the Defendants in this case.  And I know you've probably been deposed before.

Right?

A.   Yes.

Q.   Okay.

So I know you know the ground rules, but I'll just go over them quickly so we're all on the same page. My goal today is not to confuse you.  Anyone who's been in a deposition with me knows that sometimes I get to the question mark and no one has any idea what I'm asking, including me.  If that happens, just let me know and I'll rephrase the question.

As we've talked about, too, speaking clearly and not over each other is going to be important for us to get a good transcript today.  We also can take as many breaks as you need to.  Just let me know when you need

Page 10

to do that.  My only request is we not take a break while a question is pending.

And so, what we'll do today is kind of work through your background, probably kind of an abbreviated way, and kind of work through those pieces and then go from there.

So can you go ahead and state your full name for the record, please?

A.    Jonathan Cervas.

Q.    And can you tell me just your business address?

A.    So at Carnegie Mellon, it's 5000 Forbes Avenue. My office is Posner Hall, 374, Pittsburgh, Pennsylvania 15213.

Q.    Great.

And do you have any medical condition or are you on any medication that would keep you from fully and truthfully participating in the deposition today?

A.    I'm not.

Q.    Okay.

Have you ever --- let's see.  Have you ever been involved in any election-related lawsuits as a party?

A.    As like a named party?

Q.    As a named party, yes.

A.    No.

Q.    I realized I was going to exclude being an amicus

Page 11

because I know you've served in that role, historically.

So can you tell me what you did to get ready for your deposition today?

A.    I spoke to Plaintiffs' Counsel briefly and I read through my expert report and the --- my --- I don't know what they're all called, rebuttal reports and --- I read through as many --- all the things that were filed where I either wrote it myself or Dr. Barber replied.

Q.    Great.

Have you talked about your testimony in the deposition with anybody besides an attorney that represents you?

A.    Can you repeat that again?

Q.    Sure.

Have you discussed your deposition with anybody else besides Mr. Newmann?

A.    Not --- just that I was coming.

Q.    Got it.

We have to let our family know those kind of details.

A.    Yeah.

Q.    So besides the documents you mentioned, your reports and Dr. Barber's reports, did you review any

Page 12

other documents to get ready for the deposition?

A.    No.

                            ---

(Whereupon, Defendants' Exhibit 1,

Expert Report, was marked for

identification.)

                            ---

BY ATTORNEY TYSON:

Q.    So let's do this.

    I have put in front of you what we've marked as

Plaintiff or as Defendants' Exhibit 1.

    And is this the expert report, the first one that

you've submitted in this case?

A.    Yes.

Q.    Okay.

    And so just to make the kind of background piece

easy, if you can turn to the back of that report to

your CV.

    And is the CV attached to your report current or

have you had any other changes since you submitted

this, that you're aware of?

A.    Under 2025, partisan gerrymandering, it says

coming soon.  It's come.

Q.    Okay.

A.    Other than that --- let me just briefly look.

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 13

Q.    Sure.

A.    I --- I think I noted at --- in one of my reports that I was an expert witness in another case that's not listed here, so I would --- it's still not listed there, so I need to update this to include that.  But I did inform and write about it.

Q.    Certainly.

A.    I have given a few more invited talks.  I think very much of the same that's already on there, talking to like classes, which I sometimes include.  Or maybe I don't include them here.  Other than that, this looks like it's up-to-date.

I have no more publications.  Unfortunately, not very much time.  And I don't see a place for conference presentations, but I gave a conference presentation last week, so there might be a place that I have that listed here that would need to be updated as well.

Q.    Okay.

And in terms of employment history, maybe starting at the beginning, on page one of your CV, you mentioned your employment at Carnegie Mellon.

Have you held any other jobs related to political campaigns or political organizations?

A.    No.

Page 14

Q.    Okay.

Have you done any work for any nonprofit organizations, as an employee?

A.    No.

Q.    And I know you've worked a lot with Dr. Grofman.

A.    Yes.

Q.    How did you first get connected with Dr. Grofman?

A.    Well, he was my Ph.D. advisor.

Q.    Okay.  Great.

And is there something in particular that got you started drawing maps with him?

A.    Like, this could be a long story or a short story.

Q.    The short story is fine.

A.    I would say that I took classes with Dr. Grofman. And I had already had some previous GIS experience. And when I let him know or I did some project that showed him that I had those skills, he asked me to join him on some federal court cases.  And they kind of --- that experience then spiraled into a whole career, I would say.

Q.    And what was your prior GIS experience that you had?

A.    In my Master's program, I had independently learned how to do mapping stuff.

Q.    Got it.

Page 15

So I've drawn some maps in my time, too.

So how did you get started on that process in your Master's program?

A.    I think at the time I was at UNLV, where I did my undergraduate.  I took some --- I decided to continue on in a Master's program, as I couldn't figure out what I wanted to do in my life.  And my advisor at that point suggested that I learn GIS skills because, in his view, he thought it might be like a good future opportunity.  He was right.  Thank you, Dr. Damore.

Q.    And what platform were you using to draw maps at that time period at UNLV?

A.    So the book that he had given me was about ArcGIS. So that --- it's just, I think, one of the more premier GIS softwares.  It wasn't actually about redistricting.  At that point, it was more about projects related to spatial politics.

Q.    Got it.

And so you used, I'm assuming, Esri products at that point, if it's ArcGIS.

A.    Yeah.  It was available to university students for free, so I was able to --- to use that.

Q.    Okay.

And so then, if I'm reading this right, you served as an assistant to Dr. Grofman in three cases.

Page 16

Is that right?

A.    Yes, that's right.

Q.    Okay.

And just generally, in your role as an assistant to Dr. Grofman, what were you doing as part of that for each case?

A.    I would say that the general --- like the most general way to say it is that I helped --- I drew the maps.  He did not have mapping experience, so he was sort of the brains and I was the technician.

Q.    Clicking in the parts of the districts?

A.    Yeah, that's --- I mean, I --- I don't want to sell myself short too much.  Particularly in the first case, it would have been much more.  But by the time we get to the third case, I could suggest things to him, and I think the whole time, I think that's probably true.

Q.    Okay.

A.    So --- but formally speaking, he was the Special Master, so he reported to the court.  I was his assistant.  And it's the same thing whenever I work as a Special Master, when I hire people.

Q.    Okay.

So then I believe you have three matters, plus one, where you've been retained directly as the

Page 17

Special Master or as the consultant.

Right?

A.    Can you --- can you list them out, maybe?

Q.    Sure.  Yeah.

Why don't we go to your report itself and go to page four.  So page four of Exhibit 1, in paragraph 16 you reference Harkenrider versus Hochul where you were appointed Special Master.

Is that right?

A.    That's correct.

Q.    And on the next page, paragraph 17, you were also consultant to the Pennsylvania Legislative Reapportionment Commission.

Right?

A.    That's right.

Q.    Okay.

And actually, this is what I was referencing initially.  Paragraph 18 references your role as Special Master in three different cases.

A.    Okay.

Let's clarify.

Q.    Uh-huh.

A.    So 18 is assistant to Special Master.  That's one of the three there.  Paragraph 15, which we skipped, is the third one that you're referring to.  And

Page 18

actually, in my mind, the Pennsylvania one would be the third one that I wasn't thinking about.  So, yes, Clarke versus Wisconsin Elections Commission was one, Harkenrider versus Hochul, two, and Pennsylvania Reapportionment Commission, three.

Q.    Three.  Great.

And so, then, in your role as an expert witness --- you've only been an expert witness in two cases, is that right, before this one?

A.    Three now.

ATTORNEY NEWMANN:

Object to the form.

ATTORNEY TYSON:

Oh, so sorry.

ATTORNEY NEWMANN:

That's okay.

BY ATTORNEY TYSON:

Q.    So can you tell me what those three cases are where you serve as an expert witness?

A.    Right.  So we were just on paragraph 18.  Oh, no, that's not expert witness.  I'm sorry, let's --- let me start over.  Now we can skip down to paragraph 20 and we can see New York Communities for Change versus Nassau County.  That was --- that was last year.  And then later in that same paragraph, Wygant versus Lee,

Page 19

which is about Tennessee state legislative redistricting.

And then most recently, I was an expert witness in a Missouri case, Wise versus State, I think is the name. I think we --- I have it listed somewhere in here.

Q. Yes, I'm aware of that one, too. So that's good. And for each of those cases where you served as an expert witness, those were all in state court.

Is that right?

A. Yeah, that's right.

Q. So is this the first case where you're serving as an expert witness in a federal court case?

A. Yeah, I guess that's right. I hadn't thought of it.

Q. Okay.

Is this also the first case where you served as an expert witness for a Section 2 of the Voting Rights Act case?

A. Yes. I don't think there were any Section 2 issues in --- there was definitely not in Missouri, the most recent case. The --- there may have been Section 2 issues in Tennessee, but they were not part of the litigation and --- but the New York Communities --- the New York Communities of Change versus Nassau

Page 20

County wasn't Section 2, but it was related.  It was related because it was under state law, constitutional law.

Q.   Right.

And that was --- and that was referencing the New York Voting Rights Act.

Is that right?

A.   That's right.

Q.   Okay.

So it would be correct to say, then, that you haven't offered an opinion about Gingles 1 maps in any federal case before this one.

Right?

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

As an expert witness.

BY ATTORNEY TYSON:

Q.   Certainly.

A.   In the capacity as an expert witness.

Q.   Yeah.

So then maybe, just so I can make sure I'm clear on that.  This is the first case where you're offering expert witness opinions regarding Gingles 1 in a federal court case.

Page 21

Right?

A.    Yes.

Q.    Okay.

Try to make sure we have that clear.  All right.

So how did you first hear about this case in Houston County?

A.    I think I received an email from Bryan Sells, asking if I would have a phone call about potentially being an expert witness in the case.

Q.    And did you know Mr. Sells before receiving that email?

A.    Yes.

Q.    And how did you know Mr. Sells?

A.    I was familiar with Sells because he was counsel for a different set of plaintiffs on the New York case.  So I didn't work with him at all there.  But he was there at trial, so I met him at trial.  And before that, I worked on a case, Wright vs. Sumter County, where he was counsel, though at that time I didn't have any communication with him at all because it was only in the remedial stage that I became involved in that.

And there is at some time period between all of that where I knew Mr. Sells through another case that he was working, but I didn't engage in that case.

Page 22

Q.   So let's talk a little bit about the role of an expert.

Is it your belief that an expert should be objective in offering opinions?

A.   Yeah.

Q.   And you are not being --- you're obviously being paid for your work in this case.  But as you indicate in paragraph 21, your compensation doesn't depend on the results or the opinions that you provide.

Right?

A.   That's correct.

Q.   Okay.

A.   These are my opinions and I would never write something on a document like this that I didn't believe.

Q.   And you're --- have you --- sorry.

To whom do you send your bills for the work on this case?

A.   Oh, I haven't yet done that.

Q.   Okay.

A.   So I'm going to ask David after we're done here.  It's a good question.  Thank you for bringing it up.

Q.   So obviously, if you have not billed, you have not been paid yet.

Right?

Jonathan Cervas , Ph.D.                          March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 23

A.    That's right.

Q.    Okay.

A.    I probably should have submitted an invoice, and that's my fault.

Q.    Do you have an estimate of how many hours you've spent on this --- on --- sorry.  Do you have an estimate of how many hours you've spent on this case so far?

A.    I should have anticipated that question and looked, but I did not, and I have not looked.  So I could give you a ballpark, but it would probably not be right.

Q.    And the $300 an hour rate that you're charging in this case, is that your standard rate or are you offering a discount to the Plaintiffs here?

A.    This is --- so I just worked another case as an expert witness and I also charged $300 in that case.

Q.    And so you're not offering the Plaintiffs an ex --- a discount in this case.

     Right?

A.    Well, my rates vary, so I have charged different rates for when I'm Special Master, so --- I think this is a reasonable rate for the type of work I'm being asked to do here.  There's no --- there was no discount.

Page 24

Q.    That --- that's all I was asking on that.

          VIDEOGRAPHER:

          I'm sorry to interrupt.  Counsel, if you could move your computer just a little bit, just a little back.  Yeah, that was fine.

          ATTORNEY TYSON:

          Good?

          VIDEOGRAPHER:

          So --- yeah, you're good.

          ATTORNEY TYSON:

          Okay.

          VIDEOGRAPHER:

          Thank you.

BY ATTORNEY TYSON:

Q.    All right.

     So let's start with Section 4 of your report, the data that you've relied on.  All the facts that you've relied on are listed in your reports.

     Is that right?

A.    I believe so.

Q.    Okay.

     Now, Plaintiffs' Counsel provided you with at least some facts or data involving this case.

     Is that right?

A.     Yes.  I received the voter file and election

Page 25

results.  I don't think anything else.

Q.    Got it.

     And did Plaintiffs' Counsel ask you to assume
anything that you relied on when you formed your
opinions in this case?

A.    For me to assume?  I don't --- I don't think so,
no.

Q.    Have you heard anything about the Plaintiffs'
depositions that took place last week?

A.    I --- I didn't --- I didn't know that there were
Plaintiffs' depositions last week, so no.

Q.    Easy enough.

     Now, the election data that you received from
Plaintiffs' Counsel, from looking at your replication
code, it looked like it was elections in 2020, 2022,
2024.

     Did you choose which elections or ask Plaintiffs'
Counsel which elections you wanted to look at?

A.    I asked ---.

     ATTORNEY NEWMANN:

     Sorry.  I just want to object to the
form, solely for purposes of clarifying that you can
review the report sections that he's referring to, to
refresh your recollection.

     Right?

Page 26

ATTORNEY TYSON:

Certainly, yes.

THE WITNESS:

Okay.

So I'm going to have to ask you to repeat the question now.

BY ATTORNEY TYSON:

Q.    Certainly.  Yes.

So maybe what I can do is do this.  If you turn to page nine of your report, you reported elections that occurred in 2024 in paragraph 36.

Right?

A.    Yes.

Q.    And elections that occurred in 2022 in paragraph 38.

Right?

A.    Yes.

Q.    And elections in 2022 primary in paragraph 41 and 42.

Right?

A.    Yes.

Q.    And my question is, did you review any other election results aside from those 2022 and 2024 results that you've reported here in preparing your report?

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 27

A.    I --- I don't recall.  I believe I have --- the way that the files are constructed, that there are like many, many, many.

I also recall that the election results were not exactly formatted easily, so I didn't do extra work.

Q.    Yes.

I'm familiar with how we report the election results in those files, so ---.

A.    I remember it being a little bit tedious.  Even finding the right elections were tedious.

Q.    Yes.  Okay.

I do want to also get some terminology down before we dig into the meat of your report.

A.    Yeah.

Q.    How would you define a majority black district?

A.    I actually have something in my mind I would like to clarify, too, just before we go on and I forget. You asked about depositions last week.  I don't know anything about depositions last week.  I was told about a deposition that happened yesterday.  Okay.  To just clarify that.

Q.    Okay.

A.    Okay.

Q.    And what were --- were you told just that a deposition took place yesterday?

Jonathan Cervas , Ph.D.                         March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 28

A.    Yes, and that there was a particular question that was asked.

Q.    Okay.

A.    But other than that, I don't know anything.  I don't even know who it was, but ---

Q.    Okay.

A.    --- but I just wanted to clarify that.

Q.    Did the question relate to the maps that you drew or some other part of your testimony?

A.    About the --- the voter file.

Q.    Okay.

Thank you for that.

A.    Okay.

And now I'm sorry that I now have not answered the question you actually asked me, and I should not do that.

Q.    You're fine.

Always clarify if something comes to mind for sure.

A.    Yeah.  I don't want it to linger, though, ---

Q.    Yes.

A.    --- you know, because you had asked the question about last week, but I didn't want for the record ---.

Q.    Yes.  So let's then get to terminology then.

So what is your definition of a majority black

Page 29

district?

A.    So, as I tell the students, this can get very confusing because people use lots of different terms. The way I have used majority black in my report is that the black population is greater than 50 percent.

Q.    And by black population, do you mean total black population or voting age black population?

A.    I think actually I've used it in multiple ways here in my report, because I've talked about different ways of measuring it.  So from --- like we might want to clarify it from the legal perspective versus sort of numeric perspective.  But --- so if we're just talking colloquially, it could be any of these things.

Q.    From a legal perspective, do you have an understanding of what a majority black district is for purposes of Section 2 of the Voting Rights Act?

A.    Yeah, I do have some understanding of what this means.  But in terms of like what the actual data that is required to prove that, I have --- I have a more vague understanding, because I understand that courts have relied on different datasets for this.  So --- but Bartlett vs. Strickland informs us that numeric majority means an absolute majority of the district must be majority.  You said black, so in this term black.

Page 30

Q.    And since you're referring to Bartlett vs. Strickland, is it your understanding that that is an absolute majority of voting age population in the district?

ATTORNEY NEWMANN:

Object to the form.  Seeks a legal opinion.

THE WITNESS:

Yeah, it depends on the legal context. So it depends on where you're at.  I've seen it be citizen voting age population.  I've seen it voting age population.  I've seen total population.  We may use voter registration or other kinds of measures. Right? So it's a legal --- like, it's for the courts to decide what the relevant measure is.  But the standard is majority black or majority ---.

BY ATTORNEY TYSON:

Q.    And what would be then your definition of a majority minority district?

A.    Right.  So again, these are --- in some ways, these are just terms that have no particular meaning or have lots of meaning, depending on how people define it.  So I read my report last night and I used the term majority minority at least once.  There I'm talking about anybody who does not classify as white

Page 31

alone.  And so, if the district is a majority of not white alone, then I'm referring to it as majority minority.

Other people use that term in other ways to mean districts where minorities have an opportunity to candidates or --- or other kinds of technical terms. So it's --- it can be very confusing and people can use these words differently.

Q.    Yes, which is why I'm trying to nail it down, just so we're all clear, which leads to my next question.

Do you have a definition of what a minority opportunity district is?

A.    Yes.  So now I think we're getting more into a legal framework, as I would think about it.  And so, here is a district where minority voters don't necessarily constitute a majority, but are sufficiently large to elect candidates of their choice.  So it incorporates election results and demographic results.

Q.    And then staying on that track, do you have a definition of what a coalition district is?

A.    Yeah.  I mean, it --- it's similar to the way I'm using majority minority as opposed to majority black or majority Hispanic.  It's more broad in that it means that all minority groups together can --- can

Page 32

join in coalition to elect candidates of choice.  For the purposes of Section 2, it requires more than just saying, are all the minorities, they have to be cohesive and some other things.  But that's the general premise.

Q.    Have you ever used the term an ability to elect district?

A.    Have I used it?  I'm sure I have.

Q.    Okay.

What would be the definition of an ability to elect district in your mind?

A.    I don't think it's any different than the definition I just gave for the other one.  Those to me are the same thing.  They're just different words.

Q.    Got it.  Makes sense.

A.    Again, other people might use them differently.  These are ---  I think we started this section of the deposition like these are technical terms, right, so people use terms differently, but ---.

Q.    Certainly.

In your work as a map drawer, historically, I'm sure you also have heard of the concept of race predominating in the drawing of a district plan.

Is that right?

A.    Yes.

Page 33

Q.    And what would be your definition of when race predominates in the creation of a district plan?

ATTORNEY NEWMANN:

Object to form.

THE WITNESS:

Well, I think predominance is a legal concept, and so I don't know what it means to predominate.  I have not --- I do not under --- I have not been made to understand.  I have not read any definition from the U.S. Supreme Court about what race predominance is.  They've made some suggestions about what it might look like in, like, Shaw vs. Reno.  We know what it is from Bethune-Hill.  I don't want to get too much into legal.  I'm not a lawyer, just, you know, for the record.  I was involved with Bethune-Hill, which is a case that went to the U.S. Supreme Court that was about race predominance.  There, it was about racial targets.  And so, setting targets is racial predominance.

---

(WHEREUPON, THERE WAS A BRIEF INTERRUPTION IN THE PROCEEDINGS.)

---

THE WITNESS:

That was fun.

Page 34

BY ATTORNEY TYSON:

Q. It was. Sorry about that. Okay.

So you mentioned racial targets in Bethune-Hill.

So when you're drawing a district plan, are you not trying to reach a particular racial threshold to avoid that concern?

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

What do you mean when I draw a district?

BY ATTORNEY TYSON;

Q. So you mentioned that in Bethune-Hill there was a problem with racial predominance by the use of racial targets.

Right?

A. Uh-huh.

Q. When you were drawing a map, do you use racial targets?

A. No.

Q. Okay.

I didn't expect you would.

When you draw --- when you drew the plans for this case, were you trying to draw as many majority black districts as you could on the MMD plans?

A. No.

Page 35

Q.     One terminology I left out as we were going through it, have you heard the term proportionality in reference to Section 2 cases?

A.     Yes.

Q.     And what is your definition of proportionality?

A.     Well, proportionality is a math concept.  Right?  I actually did this in class yesterday, so I'm very fresh.  Basically, it means that you get the same seat share for the same vote share.  That's the way I described it in class today.  I was talking about partisan in that case, but --- and you asked about race.

But in terms of race, it might be something like, if the black population of Georgia is 25 percent, then they would get one fourth of the seats.  That would be proportionality.

Q.     If a map drawer disregarded all traditional redistricting principles and was only looking at race in drawing a plan and population to try to reach an equal population, ---

A.     Uh-huh.

Q.     --- in your opinion, would that be racial predominance?

ATTORNEY NEWMANN:

Object to the form.  Incomplete hypo.

Jonathan Cervas , Ph.D.                          March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 36

THE WITNESS:

So let's understand the hypothetical. Let me try to make sure I understand your hypothetical. A map drawer comes in with no information other than total population and race, and they try to draw to a target?

BY ATTORNEY TYSON:

Q. Yes.

A. Well, then yes, that would be race-predominant because they're trying to target.

Q. In your belief, if a map drawer uses any traditional redistricting principles, is that map always not racially-predominant?

A. I don't think that would be in the articulation of the U.S. Supreme Court.

Q. Okay.

So one more overall question before we get into the specifics.

A. Your hypotheticals are hard, by the way,

Q. Did you use any generative artificial intelligence tools in preparing this report?

A. I may have used it for help with coding. That's typically what I use them for.

Q. Okay.

And which platform would you use for coding?

A.   I would --- ChatGPT.

Q.   Okay.

And do you recall which types of coding you would have used ChatGPT for?

A.   I use it to like help write functions.  There's no specific.  It's been very helpful for speeding up the purpose of writing functions and finding errors in code.

Q.   Okay.

But you can't identify any particular part of your report where you for sure used ChatGPT?

A.   No.

Q.   Okay.

And you didn't use ChatGPT to write any of the narrative of your report?

A.   No.

Q.   Okay.

As I found when I reread my report, there's a lot of typos, and you would not have that many typos if you use AI.

Q.   Happens to all of us.

A.   It's very embarrassing to me.  I'm sorry.

Q.   All right.

So in terms of the map drawing, did you personally draw all the maps in this case or did you have anybody

Page 38

assist you?

A.    I did them all myself.  I --- I --- in most cases I usually hire research assistants to help me, but in this case I did not.

Q.    Okay.

And sticking with your first reports, we'll get into the rebuttal reports a little bit later, but in this report, as I read it, there's five illustrative plans you've created, two that have five districts and three that have four districts.

Is that right?

And you're welcome to refer to your report.

A.    Yeah.  My recollection was there were three and three, but it depends on how you're counting them. One of them was the Board of Elections (sic) plan.  So if you're not counting that, then it would be two, three.

Q.    And that'd be the Board of Education plan?

A.    Board of Education.  Did I say election?

Q.    Yes.

A.    I did that --- there's a typo in the report at one point where I say Board of Elections.  It's very confusing.  There's a lot --- BOE is sort of the acronym.  It could be --- you know, E could be a lot of things, but Board of Education.  Yes.

Page 39

Q.    Yes.  And interestingly enough, the Chairman of the County Commission said they constantly have to refer to which BOE are we talking about in their commission meeting.  So you're not the only one who's in that place.

Have you ever looked at what principles the Georgia Legislature uses when it's drawing redistricting plans?

A.    I don't think I have.

Q.    Did you use any other software besides Dave's redistricting app to create or evaluate the plans, understanding that you did use some tools before and after?  But in terms of drawing and evaluating the metrics on the plans, did you use any software besides Dave's?

A.    Well, R, which is not really software, it's a platform.  It's like a language to write code.  So that's actually where I did most of the evaluation.

Q.    Okay.

So in terms of map drawing process, as I understand, you used R to do both disaggregation and data analysis?

A.    Yes.

Q.    And then you used Dave's to click in the districts?

Page 40

A.     Yes.

Q.     And then you used Mapshaper to create the images?

A.     That's right.

Q.     Any other software besides those three that you can think of that you used?

A.     No.

Q.     Are you familiar with Maptitude for redistricting?

A.     I am.

Q.     Is it your understanding that Maptitude is kind of the primary software used by governments in drawing redistricting plans?

A.     It certainly seems that way.  I don't know that that's historically true and I'm not sure it actually is true, but there certainly is a lot of people who use Maptitude.

Q.     Do you think Maptitude is an easy to use and accurate product?

A.     I haven't used it in a long time, partially because it's not as easy to use as Dave's.  In terms of accuracy, hard to evaluate it.  All software potentially has bugs.  If you've ever used a smartphone, you know that, as it updates constantly. But I have --- I think I have definitely found problems in Maptitude.  I know the people who own that software, and so I have a direct line of communication

Page 41

to them and I have pointed out things before.

Same thing with Dave's.  Like, they're --- it's software.  Right.  Software has bugs.

Q.    Yeah.

A.    So I wouldn't --- it's hard to evaluate whether it's most accurate or totally accurate.  Yeah, I don't really have an opinion on that.

Q.    Are you aware that you're still listed on the website for Caliper with testimonials about Maptitude ---?

A.    I'm not surprised.  I'm not surprised.  They're very --- they're very nice people and the software is very good.

Q.    Have you notified anybody at Caliper about the problems that you've identified with Maptitude?

A.    Again, I don't know that there are any problems. At some point --- there's a testimonial that I've given them which suggests that I've talked to them. Right?  I've had --- they've had me at their headquarters.  I've gone up and visited their headquarters.

So they've added --- after Bethune-Hill, Dr. Grofman, who you mentioned earlier, and I created a new measure of traditional edition criteria called fracking.  They added it to their software, and so we

Page 42

worked through the problems of that, too.  So it's

software.  You have to write code to do it.  And so to

be accurate, you have to get it right.

Q.    Got it.

Let me just go ahead and mark, so we have it clear

for the record, Exhibit 2, which is the ---

do you recognize this as the --- from the Caliper

website?

A.    Sure.

---

(Whereupon, Defendants' Exhibit 2,

Caliper Website, was marked for

identification.)

---

BY ATTORNEY TYSON:

Q.    And on the second page, the second item down,

there's a testimonial from you about Maptitude?

A.    Yes.

Q.    And the end of that calls Maptitude for

redistricting the all in one, easy to use, most

accurate product available.

Is that your quote?

A.    Yes.

Q.    Okay.

Do you still agree with that?

Page 43

A.   Again, as I just said, I don't know.  I can't ---
I don't know its accuracy.  First of all, I'll note
that my title on here is post-doctoral fellow.  And if
went back to my CV, it's been a while since I was a
post-doctoral fellow.  So this is an old quote.  So I
have no reason to believe it's not accurate.

You know, I don't know how much detail you want to
get into.  I just did another court case where there
was some data presented from Maptitude compared to DRA
and there were differences in how it calculated
compactness scores.  I don't know which one --- I
don't know which one is right.  I don't --- neither
might be wrong.  Right?  Compactness scores depend on
certain, you know --- so anyways, it's hard to
evaluate accuracy is the only thing.

Q.   Understood.

Is there a reason why you didn't use Maptitude in
this particular case and used Dave's instead?

A.   I haven't used Maptitude in a very long time for
any case.

Q.   Got it.

A.   So --- and at the time of this quote, by the way,
and there's no date on it, so I don't actually know
when it was, but over time DRA has gotten a lot
better.  And so at this time it may actually not have

Page 44

been as accurate.  Right?  So that quote was almost certainly accurate that it was the most accurate at the time.

Q.   At the time.

A.   But things have changed over time, so ---.

Q.   And Dave's Redistricting App is a free app.  Right?

A.   It doesn't cost any money for an individual to go on there and do a map.

Q.   Okay.

And you've been criticized in the past for using Dave's in cases.

Is that right?

A.   I ---.

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

I don't --- I don't know.

BY ATTORNEY TYSON:

Q.   Okay.

Let's take a look, then.

---

(Whereupon, Defendants' Exhibit 3, Memorandum and Final Order, 11/22/23, was marked for identification.)

Page 45

--

BY ATTORNEY TYSON:

Q.   I'm handing you what I've marked as Exhibit 3. This is the Memorandum and Final Order dated November 22nd in the Wygant vs. Lee case we talked about earlier.

Have you had occasion to review this Opinion?

A.   I don't think I've read it.

Q.   Okay.

If you could turn --- just so we're clear for the record, there's an initial Opinion that is three pages long.  Then there's an exhibit that is the separate Opinion of Chancellor Steven Maroney.

You see that?

A.   Okay.

So I have the first three pages here and then Exhibit A?

Q.   Yes.

And then if you could turn to page 12 of that. Okay.  So this section is titled Dr. Jonathan Cervas on page 12.

Do you see that?

A.   Yes, I like that title.

Q.   If you go down to the last paragraph, beginning there, it references that Cervas and Griggy --- am I

Page 46

pronouncing that correctly ---

A.    Yes.

Q.    --- utilized a free website redistricting tool known as Dave's Redistricting.  The state's expert, Sean Trende, whose testimony is detailed later in the Order, testified that Dave's is okay as a tool, but that Maptitude is the gold standard of redistricting software.

Do you recall hearing that testimony from Dr. Trende?

A.    Yeah, I think --- I believe that --- I was there at trial while he testified.

Q.    Do you agree that Maptitude is the gold standard even in 2023, when this Opinion came out?

A.    Again, like, consistent with what I said to Maptitude itself, right, it's a very accurate --- or at least it was a very accurate, you know, highly-regarded gold standard.  So I don't --- I have no reason to disagree with Dr. Trende.  I have no reason to disagree with my former self.

Although his quote that it's, quote, okay, is ironic since he uses DRA exclusively.  I don't think he's ever used Maptitude that I know of in any case he's ever worked, in every case I've ever worked with him.  And he used Dave's as Special Master for the

Page 47

State of Virginia, which I know factually because he worked with Dr. Rothman and I consulted with them.

Q.    If you could turn to the next page, page 13.  The first full paragraph starting the second sentence says, however, Cervas acknowledged elsewhere in his testimony that the repeated problems he encountered with non-contiguity in his maps stemmed from the use of the free Dave's software.

Is that accurate?

A.    Yeah, that's accurate.

Q.    And how did the use of Dave's software lead to non-contiguity problems for you?

A.    So as I sort of just indicated, DRA --- we use DRA to mean Dave's Redistricting, just for the record, so we're clear.  DRA is a nice shorthand.  Has improved substantially over time.

And the nice thing about knowing the people who build the software in both cases for me, I know the people at Maptitude and I know the people at Dave's, is I can email them or call them and say, hey, there's a problem in the software, do you think we can have that fixed?

In this case in Tennessee, the problem was actually more because the --- I want to say precincts, but it may have been --- it probably was precincts

Page 48

were themselves not contiguous.  And the way that DRA recognized that is that it recognized that any precinct itself was contiguous, whether or not it was.

And so, in Tennessee, the precincts were not --- or precincts or whatever the geography was, were not contiguous.  And so the software was not recognizing it correctly.

Subsequently, because I identified this issue, they actually --- they actually corrected that problem.  So now DRA is much better and doesn't have that issue anymore.

Q.    Okay.

We can set that aside, then.  All right.  So let's talk kind of high level map drawing process.  So obviously you've heard the term and used the term traditional redistricting principles.

What are some of the traditional redistricting principles that you are taking into account as you draw a plan?  And if you want to refer to paragraph 68, I know there's some listing of different principles there.

A.    Yeah.  I mean, there are --- there are many conceptual traditional redistricting principles.  I think the best definitions of what these are come from the National Conference of State Legislatures, who is

Page 49

an organization that is highly involved.  They provide information to legislatures about redistricting.  So I think they have a good way of sort of classifying these things.

So usually when I'm teaching this to my students, we start from sort of the most important criteria, which is required, which is having districts that are equal in size, which stems from the Constitution, the U.S. Constitution, and also compliance with the Federal Voting Rights Act, because it's federal law.

But then there are other sort of things that --- or have been at times recognized by the U.S. Supreme Court as important in redistricting, which is what is kind of referenced in traditional redistricting criteria, such as keeping political subdivisions intact when possible.  Of course that is somewhat traded off by equal population, and that's recognized by the U.S. Supreme Court.

Other things are things like drawing compact districts, keeping together communities of interest.  The list could go on and on.  People define these things differently.  So I'll leave it there.  There are other things that we could potentially add to the list.

Q.    Got it.

Page 50

And specifically for the maps that you've drawn in this report, obviously you were taking into account population equality.

Right?

A.    Yes.

Q.    And you were taking into account at least avoiding splitting census block groups where possible.

Is that right?

A.    Yeah, I built the maps --- so in DRA there's --- I don't know if you've ever --- you said you build maps, you may have use DRA.  So I don't know if I should explain it out for like the people who might read this or for just you, but there are options that you can build maps from.  You can build them from counties, which would not be useful when you're doing a county-level redistricting plan, because it would just create the whole county as one district.

There's an option for precincts, an option for blocks, and I think an option for cities.  I don't generally use the city ones because I think it uses census places.  There's like different definitions of what a city is.

I often, if I'm building a congressional plan, will use precincts or something like that because they're very large in scale.  They will cover like

Page 51

multiple counties, potentially.

Here in Houston County, the precinct default in DRA is actually not the precincts, it's the census block groups.  So that's the default in DRA.  And it makes sense, as a mapmaker, because there are, I think I read it in my second report, 108, let me just say approximately, census block groups in this county, whereas there are only 17 precincts.  And so you need to have --- in order to get equal population, you need to use a building block that's much smaller.  And so it makes a lot of sense to use the census block groups in this case, and so that was the default.  So that's what I used.

And I don't know whether the precincts are actually built into DRA or not.  It's not a toggle. Again, the default was census block groups.  So I would have had to manually add in the precincts to know where those boundaries were.

Q.    So you didn't have to manually add in the block groups.  You would have had to manually add in the precincts?

A.    I believe so.  I don't know it.  I don't know if you could toggle it somehow, but I don't --- I did not do it and I don't know if you can.

Q.    Got it.  Okay.

Page 52

You also referenced trying to avoid splitting census county divisions.

Is that also correct?

A.    That's correct, yes.

Q.    And you didn't report the number of split census county divisions on your plan in your report.

Right?

A.    I don't think I listed it in a table, but --- and I don't --- I actually don't recall whether it's in there or not.  But in most of the plans, I believe it only --- they only split one.  These are --- there's only three of these in the county, so it's --- it's useful as a --- as a community of interest, but not so useful as a data exercise, maybe.

Q.    And it would be correct to say that, in terms of priority, it was more important to avoid splitting block groups and census county divisions than to avoid splitting precincts for the maps in this report.

Right?

ATTORNEY NEWMANN:

Object --- object to the form.  Lacks foundation.  Mischaracterizes the ---.

THE WITNESS:

I don't know if it's more or less important.  Right?  I didn't do precincts for a number

Page 53

of reasons, including the fact that, as I described in my report, the plans that I initially did were race and party-blind.  If I had added precinct information, that adds partisanship information to the process, and I was ---  I was actually trying to avoid that, so ---.

BY ATTORNEY TYSON:

Q.    It's correct to say that you didn't consider precinct boundaries for any of the maps in this initial report.

    Right?

A.    That's right.  In the map-drawing process.

Q.    Right.

    And you also --- did you consider the boundaries of cities in Houston County when drawing the plans for this report?

A.    No.  And as I also write in the report, when I was asked to do this report, the federal government was shut down, so the census website was not operational, which made it a little bit difficult to even figure out what the right cities were.  So I had found that CCD file, which had names of what appeared to be cities like Warner Robins, and so I took that as if it were the city map.  It turns out that there's this alternative boundary map that Dr. Barber used, which I

Page 54

then --- in my response to him, I then downloaded that and looked at it.

Q.   And in your reports, you did not report any compactness scores.

Right?

A.   I did not.

Q.   Did you use any metrics of compactness when you were drawing these plans in this report?

A.   No.  Visual only.

Q.   And in DRA, you can click a tab and see compactness scores.

Right?

A.   That's correct.  Yeah.

Q.   But you never clicked that tab?

A.   Not --- I did this morning, actually, but not at that time.  When you're making maps, it's --- I don't think it's at all important to fixate on some mathematical compactness score.  That would be bizarre if somebody were to do that and actually might raise questions about their motivations if they were actually trying to, say, maximize compactness.

I think it's more important to, again, not arbitrarily divide communities and stuff like that. As long as you're doing that, you're leading to --- all of my maps are relatively compact.  Right?  Even

Page 55

after looking at those scores post facto, right, they're relatively compact compared to many district plans created around the country.  And you can use that with visual inspection alone.

Q.    I always heard that called the eyeball test for compactness.

A.    Yeah.

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

My favorite --- my preferred term here is the interocular test, as stated by my mentor, Dr. Grofman.  It doesn't hit you between the eyes.

BY ATTORNEY TYSON:

Q.    And we talked about communities of interest as well.

For purposes of this report, how would you define a community of interest?

A.    I only define one community, and it's not really a definition of a ---.  Okay, let me go back.  I actually defined two.  One actually is and one might be.  The one that is are the CCDs.  I mean, that is very clearly a community of interest.  People can disagree about what the communities actually are, but as --- as the census describes itself is an economic

Page 56

and statistical area.  You know, I have a def --- I have the actual quote from the census in my second report, which I don't have in front of me.  We can find that quote if you'd like.  But that's --- I would say that's a very legitimate community of interest, the political subdivisions established by the census, independent of me or anybody else.  So it's not anybody's subjective judgment.  They are --- and they're not done for political reasons, like some precincts might be done for political reasons because they might follow boundaries that are created by the legislature for political purposes.  These are completely apolitical, not racial, but they are statistical in nature.  So that's a real community of interest.

I also talk about the Air Force base.  Again, I have very limited information because the Census Bureau was not operational when I was drawing these plans.  But you could see when you look at the map that there's a large Air Force base.  And I've lived near Air Force bases in the past and have friends who are in the military and recognize that that might be a community of interest, but also recognizing that I don't know exactly where, say, officers live or enlisted people live around the base.  So it's

Page 57

somewhat limited in its utility, but it was the best I could do at the time.

Q.    And you did not consider the --- the locations of incumbents in drawing the plan.

Right?

A.    I was provided the incumbent information at some point, but they --- if I --- my recollection was --- so I would have liked to try to draw districts for each of the incumbents, because sometimes that's recognized as a traditional redistricting criteria. It's not always, and so it's not --- and it's certainly not in law anywhere to do that.  But sometimes it's a reasonable thing to do, especially when I've served as --- for courts, that you don't want to disrupt incumbency to the extent possible.

In this case, and I don't recall with any specificity, but the incumbents tended to live very close to each other.  And so I don't think it was possible to put them into each of their own districts. But I think I tried after the fact, again, post facto.

Q.    Okay.  Sorry.

ATTORNEY NEWMANN:

Bryan, whenever you're at a good stopping point, I could use a brief break.

ATTORNEY TYSON:

Page 58

Sure.

THE WITNESS:

Yeah.  I could use some water, too.

ATTORNEY TYSON:

Okay.  Great.  I'll take a break.

VIDEOGRAPHER:

Going off the video record at 10:18 a.m.

OFF VIDEO

                              ---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

                              ---

ON VIDEO

        VIDEOGRAPHER:

        Going back on the video record at 10:35

a.m.

BY ATTORNEY TYSON:

Q.    Dr. Cervas, before we took a break, we were

talking about different traditional redistricting

principles, as you'll recall.  And when you were

drawing the plans in your first report, Exhibit 1, you

did not consider the district cores of the existing

Board of Education districts.

    Is that right?

        ATTORNEY NEWMANN:

        Object to the form.

Jonathan Cervas , Ph.D.                        March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 59

THE WITNESS:

When I drew my --- the partisan-blind, race-blind ones?

BY ATTORNEY TYSON:

Q.    Yes.

A.    I found that map after.

Q.    Now, when you were drawing your illustrative plans for this case, did you ever shade the geography on the screen by racial makeup?

A.    When I was drawing which ones?

Q.    Any of the illustrative plans in this case.

A.    Yes, after --- not the race-party-blind ones. Those did not at all.  Only after drawing those plans did I turn that on.

Q.    Okay.

And so then sequence-wise, you would draw the race, party-blind plan, and then after you finish drawing that plan, you start a new plan with that race, party-blind plan as the template?

A.    Yeah, I made it --- so in DRA, you can make a copy.  But just to clarify, because the way you said it, I don't think is exactly right.  I drew both the race and party-blind plans first, made copies of those, and then made --- so it wasn't like made one, made one.

Page 60

Q.     Understood.  Thank you.

And so when you made the copy of the plan to draw then the MMD plan, you turned on racial shading on DRA?

A.     Correct.

Q.     Okay.

And what geography level were you shading by race when you did that?

A.     I don't know.  I think it's --- I think it's --- I don't know.  I don't know what it is.  Honestly, I don't know.

Q.     Okay.

I think they call it precinct, but I don't think they're actually precincts, because there's --- I don't think it is.

Q.     And when that racial shading was displayed, it would color the pieces of geography by the number of black voters in that district or the percentage of black voters in that area?

        ATTORNEY NEWMANN:

        Object to the form.

        THE WITNESS:

        Yeah, I don't know.  It's like a percentage.

BY ATTORNEY TYSON;

Page 61

Q.    And so then you had those visual features showing the racial makeup when you were drawing both MMD plans.

Right?

A.    That they'd be on?  I don't know if they were on all the time.  At some point, I looked at --- so I looked at where the black population actually lived. Because it was race-blind, party-blind, I had no idea where they lived.  Right.  I was just drawing literally, like, blind to those things.

Q.    But you relied on those --- that racial shading information to help you create the MMD plans.

Right?

A.    Correct.

Q.    Okay.

So let's then take Exhibit 1, and let's go back to paragraph four on page two.  And so paragraph four outlines what you were asked to do by Counsel for the Plaintiffs.

Right?

A.    Correct.

Q.    And you were asked to determine whether the minority population in Houston County was sufficiently numerous and geographically-compact to allow for the creation of a single member district plan, you

Page 62

referenced Gingles 1, configurations that will satisfy

the requirement of Thornburg vs. Gingles.

Right?

A.    Yes.

Q.    So I'm not asking for your legal opinion on this,

but in your own words can you explain to me your

understanding of what is required by the first prong

of Gingles?

A.    Sure.  I mean, I think it spells it out pretty

clearly in the text here.  Right?  Sufficiently

numerous here we mean that they make up a majority,

depending on whether you're talking about blacks alone

or coalition.  You mentioned the different things.  So

it depends on what you're looking at.  But minority

population, generally defined.

And geographically compact is just that --- that

you're not having to say reach around the whole larger

geography to connect desperate pieces of minority

voters.  And obviously the single member district is

--- you elect one member.

Q.    Is your understanding that Gingles 1 is concerned

with the compactness of the minority population or the

compactness of the district that's created?

ATTORNEY NEWMANN:

Objective to the form.  Seeks legal

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 63

conclusion.

THE WITNESS:

Yeah.  So my understanding of case law is that it's --- it has to do with the population itself.

BY ATTORNEY TYSON:

Q.    And did you reach your conclusions about whether Gingles 1 was met in this case based on the population of black voters in Houston County or a district I guess is my --- is my question?

ATTORNEY NEWMANN:

Object to the form.  I didn't get that.

BY ATTORNEY TYSON:

Q.    Let me just restate it to make it clear.  It'll help everybody.  In reaching your conclusions about Gingles 1 in this case, did you rely on the compactness of the district that you drew that is majority black, or did you rely on the compactness of the minority community in Houston County?

A.    The minority ---.

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

Minority community.

BY ATTORNEY TYSON:

Jonathan Cervas , Ph.D.                           March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 64

Q.    Paragraph five, you are also asked to look at other electoral systems and whether those can provide black voters with opportunities to elect candidates of choice.

Right?

A.    Correct.

Q.    Do you know, based on your experience, if a court has accepted an electoral system other than a single member district system to establish the first prong of Gingles?

ATTORNEY NEWMANN:

Object to the form.  Seeks legal conclusion.

THE WITNESS:

I have read about this in academic papers.

BY ATTORNEY TYSON:

Q.    Okay.

And what have you read?

A.    That municipalities have been --- as remedies, didn't ask to switch to different forms of government.

ATTORNEY JACAUTOT:

Can anyone in the room hear me?

ATTORNEY TYSON:

Yes.

Page 65

ATTORNEY NEWMANN:

Yes.

MS. ANDERSON:

I can hear you, Bryan.

MR. JACAUTOT:

No, I mean in the actual room.

ATTORNEY TYSON:

Yes.

ATTORNEY NEWMANN:

Yeah.

MR. JACAUTOT:

I'm trying to get the attention of the Court Reporter or the witness or Bryan Tyson or David Newmann.

ATTORNEY NEWMANN:

Yep.  Can you hear us, Bryan?

MR. JACAUTOT:

I suspect we are just all out.

THE WITNESS:

Do you hear me?

ATTORNEY TYSON:

I think he's on mute.

VIDEOGRAPHER:

Want to go off the record?

ATTORNEY TYSON:

Jonathan Cervas , Ph.D.                          March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 66

We'll go off the record, yeah.

VIDEOGRAPHER:

Going off the video record at 10:42 a.m.

OFF VIDEO

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

ON VIDEO

VIDEOGRAPHER:

Going back on the video record at 10:43 a.m.

BY ATTORNEY TYSON:

Q.   Dr. Cervas, we were talking about municipalities that had used alternative election systems that you've read about.

Do you know if any of those municipalities had alternative election systems ordered over their objection, or consented to those systems?

A.   I don't --- I don't know.

Q.   Okay.

And in paragraph six of your report, Exhibit 1, you indicated you were asked to prepare both four and five district electoral plans.

Were you --- did --- did you consider any other number of districts besides four or five?

Page 67

A.     I did not.

Q.     Do you have any understanding, apart from what you were told by counsel, about why four and five district plans would be useful in this case?

A.     I have no information at all, other than they asked me to do that.

Q.     And in terms of what you're not offering an opinion on, you're not offering any opinion on the second or third Gingles prongs.

       Right?

A.     That's correct.

Q.     And you're not offering an opinion on any of the senate factors?

A.     That's, I believe, correct.

Q.     Okay.

       And ultimately you're not offering an opinion on the equal openness of the political process in Houston County because you're only offering an opinion about Gingles 1.

       Is that right?

           ATTORNEY NEWMANN:

           Object to the form.  Seeks legal conclusion.

           THE WITNESS:

           I actually don't know.  I don't know.

Page 68

BY ATTORNEY TYSON:

Q.    Okay.

So maybe I can ask it this way.

Is it accurate to say that your reports and your opinions in this case are about Gingles 1?

A.    And the alternative systems.

Q.    Okay.

Is it your understanding that the alternative system opinions are not part of Gingles 1?

A.    My understanding is that remedies.

Q.    Thank you.  All right.

So let's turn to the preliminary conclusion section of your report.  And in paragraph seven, you're concluding that the black population is sufficiently numerous and geographically-compact and you say for the creation of one majority minority district out of either four or five.

Is that a reference to a majority black district?

A.    I didn't specify it there and I actually don't think there's a need to specify it.  It's really what is required under the Voting Rights Act is up to the court to decide, actually.  But in my report I lay out different options and different ways to think about it.

Q.    And in paragraph eight, you all, again, reference

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 69

a majority minority district.  And so you're not

offering an opinion about a majority black district

specifically.

Right?

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

Yeah, we should ---.

ATTORNEY NEWMANN:

Lacks foundation.

THE WITNESS:

Yeah, we should read the entire quote

there, just to clarify ---

BY ATTORNEY TYSON:

Q.    Okay.

A.    --- what you're --- I think you're asking.  It

says majority minority district can be drawn for

either a four or five district plan without relying on

race or partisan data.  So in the case of the two

plans that I do that are race and party-blind, right,

there we're talking about majority minorities, not

black, but include other minorities.

Q.    And thank you for that clarification.

So paragraph eight is really relating to those

majority nonwhite districts on the race and

Page 70

party-blind plans?

A.    That's all that paragraph eight is talking about.

Q.    Okay.

And maybe this would be a good helpful clarifying point.

Which of your illustrative plans are you offering as Gingles 1 plans?

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

I'm offering data and evidence.  It's for the court to decide which ones are probative for purposes of Gingles 1.  They all potentially could be if the court feels that they are, right, but it's a legal standard.

BY ATTORNEY TYSON:

Q.    Okay.  Great.  All right.

Going to paragraph nine, you reference the Board of Education plan that has one out of five districts with a single race black majority VAP.

Did you ever consider as part of your analysis whether that majority black district on the Board of Education plan is electing the candidate of choice of black voters?

A.    Yes.

Page 71

Q.    And is it?

A.    I would like to --- we can --- the data is in my report, so we don't need to guess about this.

Q.    Okay.

A.    So it will be on page --- one of the earlier pages of the ---.

Q.    It will be page 18.

A.    Right.  So on page 18, table three, election performance analysis, Board of Education five district plan.  Here it's District Four.  That's the district number.  Again, I found this after I built my --- my party-blind plans.  So I used district one for my majority minority district.  Here it's District Four.  And in the --- in the four elections in which I analyze the black candidate choice is winning, usually in overwhelming ways.

Q.    Did you ever look at Board of Education races to see if that district is electing the candidate of choice of black voters?

A.    I did not.

Q.    Let's jump back to paragraph 10.  You reference cumulative vote and rank choice voting as alternative election systems.

      Is that right?

A.    That's what it says there, yeah.

Page 72

Q.     Okay.

And you say mathematically would allow black voters an equal opportunity to elect candidates of their choice.

What do you mean by mathematically?

A.     So if we go to this section in the report, this is down near the end of the report, where I talk about the alternative systems, the different alternative systems.

Q.     Starting on page 29.

A.     Thank you.  Thank you.  I described the mathematical formula, right?  The Droop formula --- or Droop quota, I think it's called.  Trying to see where I actually list it.  So it's D-R-O-O-P.  And this is a mathematical formula that basically says if a population is sufficiently large, you know, that they --- as long as they are --- cohesively, that they'll elect candidates of choice.  It's just that simple.

Q.     Got it.

And so the reference to mathematical is really referring to that Droop quota and those calculations.

Right?

A.     That's right.

Q.     And you don't mention any other voting rules or alternative election systems and you're not offering

Page 73

any other alternative election systems as opinions in this case

Right?

A.    No, just the two that I have listed in this section here.

Q.    And maybe to preempt a question from later, cumulative vote and ranked choice voting can also be referred to as single nontransferable voting and single transferable voting.

Right?

A.    Single transferable vote is --- RCV is a form of. And cumulative vote was actually an error.  I didn't mean to write that, but --- but, yeah.

Q.    Okay.

So when you reference cumulative vote and ranked choice voting in paragraph ten, you're meaning to refer to single transferable vote and single nontransferable vote.

Right?

A.    That's right.

Q.    Okay.  Great.

A.    Again, embarrassed by the spelling errors.  And you'll notice the date on the bottom of the page when the report was filed was December 24th.

Q.    That was my Christmas reading when I got that,

Page 74

so ---.

A.    Well, it was my Christmas Eve preparation and my family was not so happy.

Q.    Well, let's move ahead to paragraph 23, just to work through the data pieces.  And we've already covered some of this, so I'm going to try not to duplicate.  You've decided described earlier getting the census data and the government was originally shut down.  You had to get that at some point.  But the data you downloaded from the Census API included population and race data.

Right?

A.    I --- yes, I think that --- that's definitely correct.  Yes.  Sorry.  I have to recall the code that I haven't looked at in very long time.

Q.    And again, I may be wrong about this, but my recollection is it was 2020 decennial count and not any ACS estimates.

Right?

A.    Yeah.  I don't believe --- the only ACS estimates I used was that which was built into DRA.

Q.    And you also downloaded TIGER data from the --- or the geographic data from the TIGER site as well?

A.    Yeah.  TIGER is an acronym.

Q.    And which geographic data do you recall, if you

Page 75

remember, downloading from the census on that?

A.    Well, the CCD file, the lines for the county divisions, block groups, the block group geography file.  There's numerous.  I don't know if I can list them all out.  I mean, it's not like laid out in the report.  At one point I downloaded, I think, the House districts I use as a map.  To make the map I had to download that.  That would be the purpose of downloading these things, is to actually use them for displaying maps.

Q.    Got it.

And so, even though DRA had the block groups already in there, the reason for downloading it was for the later Mapshaper work?

A.    Yeah.  And I'm not even sure when --- I just happen to know that one because I --- I looked at it this morning, because Dr. Barber talks about some of these things and I downloaded it just to see how closely my shapes actually do match the block groups, which is extremely closely.

Q.    And in terms of census racial categories, I believe --- I believe we're all in agreement that you used the any part black as the measurement of black population in Houston County,.

Is that right?

Page 76

A.    Yes.

Q.    And that just means that anyone who reported black alone or black in combination with any other racial identities is counted as black?

A.    If they identify as black, they're counted as black.

Q.    And again, just to be clear, someone could select white and black.  That person would be counted as black for purposes of the census analysis here.

Right?

A.    That's correct.

Q.    And did you ever look at single race black, people who report black alone and not in combination?

A.    Look at it in what form?

Q.    In analyzing any of your districting plans.

A.    I don't think I did that.

Q.    Okay.

You referenced you had a copy of the Houston voter registration file.

Do you know approximately when that file was generated?

A.    I --- I saw that I write that it's in a footnote that it's from 2025.  I can see it right here on page eight and Table 1.  Data is from 2025.  But I don't recall how I surmised that.

Jonathan Cervas , Ph.D.                          March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 77

Q.    And then you used ---.

A.    It certainly would have been no --- not later than 2025 because I analyzed this in 2025.

Q.    Certainly.

And then you used a process called Bayesian Improved Surname Geocoding to apply race for voters in the unknown and other categories.

Is that right?

A.    That's correct.

Q.    Okay.

And is it your understanding that a voter who checks other on a Georgia voter registration form could have checked black and chose to check other instead?

ATTORNEY NEWMANN:

Object to the form.  Lacks foundation.

THE WITNESS:

I actually think I need you to repeat the question ---

BY ATTORNEY TYSON:

Q.    Sure.

A.    --- or maybe differently.

Q.    Have you ever reviewed a Georgia voter registration form?

A.    Yes.

Page 78

Q.    Is there an option on there to check other as a racial identity?

A.    There is.

Q.    So if a voter checked other, they could have checked black but did not.

      Right?

           ATTORNEY NEWMANN:

           Object to the form, lack's foundation.

           THE WITNESS:

           If they selected other, they selected other.

BY ATTORNEY TYSON:

Q.    Okay.

      Now, in looking at your BISG process, it wasn't able to impute race to every record.

      Correct?

A.    Yes.  So Table 1 that we just looked at will have that data.

Q.    Okay.

      And so there are individuals where it could still not identify in the other or the unknown category on Table 1.

      Right?

A.    Correct.

Q.    Paragraph 26, back to that data section.  You say

Page 79

that you use the Census Bureau's geocoding tools to
assign voters to census blocks.

     What geocoding tools are you referencing there?

A.    It's called Census Geocoder, I believe.

Q.    So it's accurate to say for every voter, where you
had a record in the voter file, you knew their race
and what census block they were located in.

     Is that correct?

A.    Not every.

Q.    Okay.

A.    Not every.

Q.    But for a vast majority.  The geocoder doesn't
always know --- like, cannot always figure out where
somebody lives.

Q.    Okay.

     And do you recall, roughly, as a percentage basis,
how many records did not geocode?

A.    I don't recall.

Q.    Okay.

     What did you do with records that failed to
geocode?

A.    So you can still run BISG on nongeocoded names,
you just don't have the improved part of it.  Right?
You can still run a surname analysis on somebody's
last name only.  So that's what I would have done.  It

Page 80

just uses the geographic information to make an improved statistical probability.

Q.   Right.

And so, if five-and-a-half percent of the records didn't geocode, would that mean that the imputations for those five-and-a-half percent is not improved?

A.   It's not improved by the geography, but doesn't mean it's not accurate.  Some last names are, you know, highly reliably identified by race.

Q.   On paragraph 27, you indicate you used official election results from the Secretary of State.

Are those different files than the ones that you use that were provided by Plaintiffs' Counsel?

A.   Those --- I believe they're going to be the same, but there are some that are available --- like, I report some of the data from, I believe, the presidential election or some federal elections, which are available in many places.

Q.   You also used precinct boundary lines or, I'm sorry, you obtained precinct boundary lines from the Legislative and Congressional Reapportionment Office?

A.   Yes.

Q.   And those were both the 2022 and 2024 precincts Right?

A.   I think I have both of those, yes.

Page 81

Q.    Did you check to see if the precincts had changed between 2022 and 2024?

A.    I don't recall.

Q.    Okay.

Do you know when the last time Houston changed its precincts was?

A.    I don't know.

Q.    And did you ever load those precinct boundary lines into DRA?

A.    I do not think so, but I --- I don't recall.

Q.    Next, you reference in paragraph 29 disaggregating election results from precincts to census blocks.  The purpose --- is it accurate to say that the purpose of disaggregating from precincts to census blocks is so that you can obtain reports about political data below the precinct level?

A.    Yes.

Q.    And any reports based on disaggregated data is going to be an estimate if a precinct is split.

Right?

A.    Yes.

Q.    When you performed your disaggregation, did you --- you only used voting age population for weighting, you didn't consider racial or socioeconomic data.

Right?

Page 82

A.    That's correct.

Q.    Okay.  All right.

So then we reference DRA and using your illustrative maps for that.

Do you recall which data you uploaded into DRA to begin your drawing process?

A.    I didn't upload any data.

Q.    Okay.

A.    Let me rephrase.  There is --- if you consider the --- the CCD boundary lines data, then that's what I upload.  That's the only thing.

Q.    So the only data you added to DRA that was not already available was the CCD boundaries?

A.    Correct.

Q.    And when you exported data or maps from DRA, what formats did you use for that?

A.    I generally export a block equivalency file.  I don't --- there would be no other dates that I would have --- I don't think I did.  You could also do shapefiles.  I don't think I did them, though, because I created the shapefiles from the block equivalency files.

Q.    And then you referenced computing data analysis using the R statistical software.

Do you recall which analysis you computed using R?

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 83

A.    Yeah.  So let me see.  I would have to look at the code I --- I produced every piece of code that I wrote for this, literally every piece of code I wrote for this.  So I'd have to go back.  I don't have it in front of me.  It's just too hard to kind of remember.

Q.    That's fine.  All right.

So let's move through demographics, then.  So Section 5 of your report kind of gives the demographic background of Houston County.  And we've already referenced any part black.  And I think we've indicated in the footnote there on page seven that white refers to non-Hispanic white alone and not in combination.

Right?

A.    Yes.

Q.    So let's turn to Figure 1.  And every dot on Figure 1A represents one person, regardless of their age.

Correct?

A.    Age or race.

Q.    Age or race.  Okay.  Good clarification.

And B is any --- I'm sorry, one dot is one any part black person also regardless of age.

Right?

A.    That's right.

Page 84

Q.    Okay.

A.    Although I now see another kind of typo.  It says black voters, but it should be black people, black persons.

Q.    And that's in the note under Figure 1?

A.    Yeah.

Q.    Did you create Figure 1 before or after you drew your illustrative plans?

A.    This was only in preparation of a report, so it was probably months after.

Q.    Okay.

And then in paragraph 34 you note that there were 13 election precincts with varying sizes.

Right?

A.    Yeah.

Q.    And that population you're referencing there is total population, not the number of registered voters.

Right?

A.    I think that's right.

Q.    And looking at Table 1, which is your voter file racial breakdown, ---

A.    Uh-huh.

Q.    --- this includes all the people who had race imputed based on your BISG analysis.

Right?

Page 85

A.    Yes.

Q.    Okay.

A.    I believe so.

Q.    And just doing a quick comparison between Table 1 and paragraph 32, the --- looks like the white voting age population you report as 55.7 percent and the white voter registration race is 55.5 in Table 1.

    Right?

A.    That looks correct.

Q.    Okay.

    And then four for black voting age population is 32.4 percent in paragraph 32 and is 35.8 percent on the --- on Table 1.

    Right?

A.    Yeah, that --- that's correct.

Q.    Do you typically expect to see a difference of three points for one racial group and a difference of almost no points for the other racial group when you apply BISG?

    ATTORNEY NEWMANN:

    Object to the form.  Lacks foundation.

        THE WITNESS:

        I don't --- in terms of BISG, I don't know.

BY ATTORNEY TYSON:

Page 86

Q.    Okay.

A.    It probably is dependent upon the jurisdiction.

Q.    Let's move to our election section, then, in Section 6.  Looking at paragraph 36 and your other analyses here, it's fair to say that Houston County is generally a Republican county on a county-wide basis.

Right?

A.    It appears to be so.

Q.    And that's true federally and locally.

Right?

A.    Yeah.  I don't have a holistic view of this, but it appears to be.

Q.    And looking at the 2022 elections that you report in paragraph 38 and 39, you indicate that the Republican candidate prevailed in every statewide contest --- contested election in 2022 when looking just at Houston County.

Right?

A.    Correct.

Q.    Have you looked at the 2025 special elections that were statewide in Georgia and Houston County's election results?

A.    I don't think so.

Q.    Okay.

I'll hand you what I'll mark as Exhibit 4.

Page 87

---

(Whereupon, Defendants' Exhibit 4,

11/4/25 Municipal General Special

Election, was marked for

identification.)

---

BY ATTORNEY TYSON:

Q.    And do you recognize this general format of

election reporting from the Georgia Secretary of

State?

A.    Yeah, I mean, it's --- yeah.

Q.    And indicates November 4, 2025, Municipal General

Special Election and then it's a Georgia and Houston

County reference.

     Do you see that?

          ATTORNEY NEWMANN:

          Sorry, which page are you ---?

          ATTORNEY TYSON;

          I'm still on the first page.  Yeah.

BY ATTORNEY TYSON:

Q.    Do you see that?

A.    Yes.

Q.    And then turning to the next page --- this is the

only way I could really do this because the print

didn't really work very well --- indicates that, per

Page 88

PSC, of the votes cast in Houston County, the Democrats prevailed, with 56.61 percent of the vote.

Right?

A.    I don't know what this is, really.

Q.    Okay.

So you've never looked at whether Democrats have been successful in countywide elections in --- in Houston County.

Right?

ATTORNEY NEWMANN:

Object to the form.  Lacks foundation.

THE WITNESS:

Repeat that question.

BY ATTORNEY TYSON:

Q.    Have you ever looked at whether any Democrats have succeeded countywide in Houston County?

A.    Like, ever?

Q.    Ever?

A.    Oh, no, I have not done a whole historical analysis at all.

Q.    And you haven't done an analysis post 2024 either.

Correct?

A.    That's right.  I'm not sure these results would have happened whenever I did this.

Q.    We can set that aside, then.

Page 89

A.    Yeah.

Q.    Now, moving to the county elections in paragraphs 40 through 44, these were all partisan races.
    Right?

A.    I believe that's correct.

Q.    And Republicans won all of those countywide races.
    Correct?

A.    I think that's what I say, yes.

Q.    And looking at Figure 2 on page ten, you indicate challenger and black candidate of choice.  And you are relying on the --- what counsel told you based on another expert's analysis.
    Right?

A.    Relying on for what?

Q.    For who the black candidate of choice was.

A.    Correct.

Q.    In Figure 2, is the black candidate of choice always the Democratic candidate?

A.    I believe that that's correct if you go back.  Can I make a correction on this table?

Q.    Certainly.

A.    Noticed it this morning.  The numbers don't add up on that first column, Commission Post Four.  The challenger's numbers are incorrect.

Q.    Okay.

Jonathan Cervas , Ph.D.　　　　　　　　March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 90

A.　And we have --- it's correct in the text, so we can go back and find it.　And of course I saw this, found it, and then now have to find it again.　Post Four.

Q.　I believe paragraph 41 is what you're referencing there.

Is that right?

A.　Yeah.　Yes.　Thank you.

Q.　Okay.

A.　So we have --- is that correct?　Post Four?　Yes. 2022, special.

Q.　Looks like it was a special held in conjunction with the May primary.

A.　Yeah.　So the 17,361 is the correct number, but the --- the bottom number, the bottom row is incorrect.　It should be 9,966 and should be 36.5 percent.

Q.　Got it.　Thank you for that.

So in Figure 2, the challenger there would always be the Republican candidate in each of these races?

A.　I believe that that was correct.

Q.　Okay.

A.　Yes.

Q.　And so it would be accurate to replace the word challenger with Republican and black candidate of

Page 91

choice with Democrat for Figure 2.

Right?

ATTORNEY NEWMANN:

Object to the form.  Lacks foundation.

THE WITNESS:

I prefer this terminology, but you're free to rewrite it however you'd like.

BY ATTORNEY TYSON:

Q.    Is there a reason why you prefer using the terminology of challenger and black candidate of choice?

A.    There is.

Q.    And what's that?

A.    Because it's not guaranteed to be exactly the way you just said.  It's not always Democrat or Republican.  That's not what the law requires, and that's not what always happens.

Q.    Have you seen a situation in Georgia where the black candidate of choice was not a Democrat?

A.    I haven't really looked at this --- these questions in Georgia outside of this case.

Q.    Have you seen a situation in any state where the black candidate of choice was not a Democrat?

A.    There definitely are situations.

Q.    Okay.

Page 92

A.    I don't have anything specific for you.

Q.    Okay.

Do you recall any situation where the black candidate of choice in any state was a Republican?

A.    I don't have any specifics, but the bottom line is that it's possible.  And so I prefer to use these same terminologies.

Q.    Have you ever reviewed the expert report determining which candidate was the candidate of choice for these races?

A.    Have I reviewed?  I haven't reviewed any other extra reports besides Dr. Barber.

Q.    Moving to the election turnout piece.  It looks to me like, and I want to make sure I'm right about this, that for the 2022 election, black voters were 31-and-a-half percent of the electorate.

Is that right?

A.    What page are you on?

Q.    I'm sorry, I'm on page ten, paragraph 46.

A.    And then your question was?

Q.    Just --- just to clarify that, in that election, 31-and-a-half percent of the voters who voted identified as black.

Right?

A.    Correct.

Page 93

Q.    Okay.

And then for 2024, on paragraph 47, black voters made up 32 percent of the voters who voted in that election.

Right?

A.    Correct.

Q.    All right.

Well, let's move into district maps.  And again, we've covered some of these pieces.  So paragraph 50, you indicate you acquired the census data and you were curious as to what nested geography geographies may exist to provide for neutral boundary lines from political subdivisions or other communities of interest.

What does --- what do nested geographies refer to in that paragraph?

A.    So when you're --- when I'm working on a congressional case, a nested geography would be counties.  That's very typical because the scope of those.  It's different in the county level because they're much, much smaller.

And I just didn't know what existed in Georgia. Different states have different things.  In Pennsylvania here, where we are, we have townships, which are generally very small, and there'll be many

Page 94

of those in a county.  So I was trying to find what may exist from the county that would be useful for determining preexisting political subdivisions.

Q.    And those nested geographies could include block groups, census county divisions, precincts.

Is that right?

A.    Precincts, probably, but I wouldn't attest to that under oath.  But the other two, yes, they're part of the census.  Precincts are not part of the census hierarchy.  Census blocks and census block groups and census tracts and census counties are.

Q.    And then you reference other communities of interest.  And I think we've talked about the communities of interest you utilized were the CCDs and the Air Force base.

Right?

A.    Correct.

Q.    And there's no other communities of interest you're referring to in paragraph 50.

Right?

A.    I didn't identify any.

Q.    In your belief, can a racial group form a community of interest?

A.    In my belief, in my opinion and hypothetically?

ATTORNEY NEWMANN:

Page 95

Object to the form.

THE WITNESS:

I think a lot of people do define some racial groups that way.  I don't know that I have or do.  I think it's all dependent upon what you're looking at and who's defining it, and for what purpose.

BY ATTORNEY TYSON:

Q.    When you approached drawing the districting maps for this report, did you consider all black voters in Houston County to be a community of interest?

A.    I didn't consider black voters to be a community of interest.  I --- I used CCDs and that --- the Air Force --- the area around the Air Force base.

Q.    All right.

In paragraph 51, you discuss the census county divisions and the three that exist in Houston County.

Do you know how the Census Bureau goes about determining the boundaries of these three CCDs?

A.    I lay it out more in my second report.  I like quote from the census website about these things.  I don't work for the census, so you know, it's not in my purview.

Q.    Just so we have this for clarity purposes, let me mark what I'll hand you as Exhibit 5.

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 96

---

(Whereupon, Defendants' Exhibit 5, Map,

was marked for identification.)

---

BY ATTORNEY TYSON:

Q.    And this is a map you can see at the bottom from

data.census.gov.

Does this map represent the CCDs in Houston County

that you relied on in drawing your maps?

A.    Yes, I believe that's correct.

Q.    Okay.

And so, essentially, the kind of thick gray line

would be the county boundary and the thinner black

lines would be the CCD boundaries?

A.    Yeah.  Yes.

Q.    Great.

Put that one aside, then.

A.    Uh-huh.

---

(Whereupon, Defendants' Exhibit 6, 2020

Census Participant Statistical Areas

Program, Quick Reference: Census County

Divisions, was marked for

identification.)

--

Page 97

BY ATTORNEY TYSON:

And you also referenced that you quoted from the Census Bureau website.  So, again, just kind of making sure all of this is complete, I'll hand you what I've marked as Exhibit 6.

Is this a document you've seen before from the census about what census county divisions are?

A.    Yes, I think this is what I quoted from.

Q.    I thought it was.

Do you know if CCDs are used for any governmental purpose in Georgia?

A.    I don't know.

Q.    Do you know if the CCDs have any legal function in Georgia?

A.    I say in my report that these are not legal boundaries.  Whether Georgia uses them as legal boundaries, I don't know.

Q.    Okay.

In looking at the list of states there where CCDs exist, have you drawn maps in any state that used CCDs before your work in --- I guess in Wright and in Georgia, this case?

That was a terrible question.  Let me ask that again.

In your work as a map drawer, have you drawn any

Page 98

maps in states that use minor civil divisions instead of CCDs?

A.    CCDs exist where minor civil divisions don't exist.

Q.    Right.

So I'm asking, have you drawn maps in any ---? I'm sorry, third time will be the ---.

Have you drawn any maps where CCDs are used and minor civil divisions are not used besides this case and the Wright case?

A.    I'm really struggling with the question.

Q.    Okay.

A.    I think what you're asking me is, have I used either of these in any case?

Q.    What I'm trying to ask is have you ever used MCDs in drawing a map?

A.    I don't know the answer to that question.  The answer is probably yes, but I don't know.

Q.    Okay.

A.    Right.  Like, they are nested political subdivisions, so they are totally different.  It just depends on the state and the context, right.  Larger states, you might not need to use these because you can use --- or for larger districts, you use the county.  When you're talking about a county, you need

Page 99

something else smaller in order to constrain your map making.

Q.    And how many maps have you drawn for counties, specifically?

A.    Just --- as an expert witness, just --- no. Listen, I --- I shouldn't answer that so quickly.  The Navajo Nation case was one county.  The Nassau County case was one county.  The Wright vs. Sumter County case was one county.  I think that's --- I think that's all.

Q.    Okay, great.

And this case, obviously, too?

A.    And this case, yeah.  And I don't remember what --- again, it's different.  So they don't have CCDs in Utah, where the Navajo Nation case was.  They would have in the Wright County case, but I don't remember what we used.  It was a different context because it was remedial phase as opposed to having to start from scratch, as in this case.  So whether CCDs are what this legislature would use or not is --- no, my question is a neutral race, neutral boundaries.

Q.    So we can put that away as well.  Thank you.

Right, so then paragraph 52.  We're getting into the process that you used.  You created a template, you say, for a four district plan.

Page 100

Can you just describe briefly what a template for a four district plan involves?

A.    Yeah.  So make sure that race is turned off, hide all the partisan information, add in the CCD level, the CCD shapefile, and ensure that it's, you know, four district or five district, whatever it is.  So just set it all up and that way I can make copies of it to create more than one map.  I didn't know how many maps I would make.  I wasn't asked by Plaintiffs for any certain number of maps.  They actually didn't give me any direction at all, other than to create a four and five district plan.

Q.    And so, just in terms of sequence, then, you drew, if I recall what we've talked about, a four district partisan and race-blind plan first.

Right?

A.    Uh-huh.

Q.    That's a yes.

A.    Yes.

Q.    And then next you drew a five-district partisan and race-blind plan?

A.    Correct.

Q    And then next you drew a --- the four district MMD plan?

A.    I may have done the five one for --- I don't know

Page 101

which it was, but ---.

Q.    But in either case, as you've said, you had completed the race party-blind plans before the MMD plans?

A.    Yeah, because if --- once I've done one where I've looked at race, I can no longer claim to have been race-blind.  So I had to do it that way.

Q.    Okay.

And it's your recollection that there was no precinct display in DRA because the precincts, when you looked at Houston County, were the block groups.

Right?

A.    That's --- that's yes.

Q.    Now, in paragraph 53, where you reference not relying on race or partisan data, I understand you took efforts to hide those pieces of information on DRA while you were drawing.

What did you have visible as you were drawing the race party-blind plans in terms of data?

A.    Only the total --- on the left side of the DRA interface is the district number and the population. That's it.

Q.    And did you modify or --- let me start with this. Does DRA also display information about each piece of geography as you hover over it?

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 102

A.    You can hide that.

Q.    Okay.

And so you took steps to hide that as well?

A.    Yeah, I did not look at any of that stuff.

Q.    Okay.

A.    I really wanted to be race and party-blind.

Q.    And during the drawing process, you never selected the statistics, but ---?  I'm sorry.  During the drawing process for the race and party-blind plans, you never selected the statistics button on DRA to see what the statistics were.

A.    Correct.

Q.    So paragraph 54, you referenced the Air Force base in the northeastern part of the county.

And were you aware of the existence of Warner Robins Air Force Base prior to seeing it in DRA?

A.    I was not.

Q.    You reference at the end of paragraph 54 that you began by drawing a compact district in that area while maintaining the borders of the county subdivision.

Is that referring to the block groups as the county subdivision?

A.    No, the county subdivision would have been the CCD.

Q.    And did you use any methodology to determine how

Page 103

far the reach of the Air Force base might be in terms

of being a community of interest?

A.    No, I talked about this earlier.

Q.    So once you completed the maps, I want to make

sure I have the sequence right.  Because you say only

after I completed drawing did I look, in paragraph 55,

at the plan's demographic breakdown.  But that took

place only after you completed the task in paragraph

56?

A.    I believe so, yeah.

Q.    Okay.

Do you recall what demographics you looked at when

you looked at that information?

A.    What you just said.  I almost certainly just hit

the statistics tab.  It probably was that simple.

Q.    Okay.

A.    I probably would not have done the whole exercise

of going into R and doing that quite yet.

Q.    And so, when you completed the race and

party-blind plans, neither one of them had a single

majority black district on it.

Right?

A.    I don't think that's correct.

Q.    I'm referring only to the race and party-blind

plans.  That neither the 4 District nor 5 District

Page 104

race and party-blind plans had a majority black district?

A.    I just want to make sure.

Q.    Certainly, yeah.  So you're checking Table 4 on page 19?

A.    Well, okay.

Q.    And then Table 8 on page 26.

Is that right?

A.    Yeah.  I don't think I used any race in the creation of the Board of Education based four district plan.  That is majority black.  I don't --- I actually think I was blind on that as I may have been, but I may have known more about race because, at that point, it already looked, so I don't think that would count.

And --- yeah.  So I --- I --- yes, it appears to be correct.  The closest any of the plans get on the party-blind --- party race-blind one was 49.3 percent.

Q.    Okay.

And you've addressed one other question I had in terms of sequence, that you discovered the Board of Education plan after you completed drawing both the parties party-blind plans and the MMD plans.

Is that right?

A.    I won't --- I can't swear to it because I may have found it somewhere in between, but I think that's

correct.  My recollection was that I found it sort of arbitrarily when I was downloading the precinct boundaries.  That's my recollection.

Q.    Okay.

But in terms of sequence, the four district Board of Education plan you have in your report, was that the last plan you created?

A.    I think so.

Q.    Okay.

A.    Last plan for the first report.

Q.    For the first report, yes.  And to be clear, all these questions are only about the first report.  I know we have more maps to get to.  All right.

I wanted to ask also about footnote 4 on page 12. You say here I relied on the data in DRA, which calculated minority population using a different method, and I described above.

Do you know what DRA does differently than how you counted minority population?

A.    This is referring to CVAP.  So the paragraph you're referring to is 57, and it talks about CVAP. So I did --- so you mentioned earlier that I did not download CVAP information from the census.  I took it from DRA.

Q.    Got it.

Page 106

A.    That's all --- that's all that means.

Q.    Thank you.  That's very helpful.

I thought there was a different reference to any part black or white or those other numbers, but CVAP makes sense, so that's helpful.  All right.

So then we have paragraph 58, and you use the electoral performance as a proxy for minority voters of choice initially.

Is that right?

A.    Yes.

Q.    And so your shorthand method of determining who is the minority voter's candidate of choice was to see if Democrats prevailed?

A.    Very shorthand.  It's not nearly enough for this analysis, but it is, you know, generally true.

Q.    And in your experience in the political science realm, I'm assuming that seeing a majority non-white district resulting in Democrats being elected is something you would expect to see.

Right?

ATTORNEY NEWMANN:

Object to the form.  Calls for speculation.

THE WITNESS:

Yeah.  It's not always true.  Right.

Page 107

That's why you need to do the performance analysis as part of Gingles 1.

Q.    Do you know which elections are included in DRA, when you look at those election results?

A.    For Georgia?  It's different for every state.  It depends on what's available.  So I don't know.  You know, generally each president is available and Senate, but not always and not for everyone.

Q.    And did you look at the DRA overall partisanship number or was it specific elections, or do you recall?

A.    I --- you mean the composite?  Are you talking about the composite?

Q.    The composite.

A.    I don't generally use the composite ever.

Q.    Okay.

A.    So probably not.

Q.    Your practice would not have been to use the composite?

A.    That's right.

Q.    Then from a process perspective, you made adjustments to create single race majority black districts on each plan, which led to the MMD plans as later iterations of the race party-blind plans.  Right?

A.    Correct.

Page 108

Q.    In paragraph 59, you make a reference to having single race black majority districts.  The second sentence says this certainly would not be a requirement of a legislature to draw such a district for purposes of satisfying the Voting Rights Act.

What do you mean by that?

A.    I'm going to try to be short here, because it could be --- this is a lecture.  This is several lectures in class.  I mean that the legislature doesn't need to hit any kind of racial target.  We talked about that earlier.  Right?  Racial targets are --- you know, they're not necessary.  The only time you use --- the legislature should be using race is for the purpose of satisfying this compelling state interest.

A compelling state interest is to ensure equal opportunity for minority voters.  So the legislature could have stopped with my race-blind party-blind maps because they provide that equal opportunity.  But for the purpose of Gingles 1, one does need to hit a target, but the legislature need not do that.  That's all.

Q.    And ---.

A.    I should do that in class.  I could get through a lot more material.

Page 109

Q.   So --- so you said the legislature could stop with the race party-blind plans and you say because those provide an equal opportunity.

Is that because the candidate of choice of black voters can prevail in one of the districts on the race and party-blind plans?

A.   Right.  If the remedy for a violation of voting rights --- so things get confusing when you start talking about remedies versus what they can do in the first instance.  Like I feel like there's two different hats that are being worn by people here.  Like, the legislature need only to ensure compliance with the law.  Right?

So if the map as drawn party-blind, race-blind complies with the law, they don't need to do anything else.  That's all I'm saying, that they didn't --- they don't need --- they just need to provide an equal opportunity.

And if they can demonstrate that you've done that, which I think I have demonstrated and I don't think that Dr. Barber has argued against that premise.  He certainly hasn't here --- then that provides minority voters with an equal opportunity and, therefore, the legislature need not go any further, need not do anything else with race.

Page 110

Q.   And the later part of that sentence references for the purposes of demonstrating the strictest interpretations of what is required under Gingles 1.

What are you referring to the strictest interpretations there?

A.   Here I mean that you have to have a voting age population, a single race, so black, not a coalition, not all minority members, but the single race.  I think that's the strictest interpretation because I think arguably that's not actually what Bartlett versus Strickland is asking for.

Q.   And you'd agree, as Dr. Barber discussed, that ultimately none of the plans in Exhibit 1 had a single race black majority voting age population district on them?

ATTORNEY NEWMANN:

Object to the form.  Lack of foundation.

BY ATTORNEY TYSON:

Q.   That you drew.

A.   None of the race-blind, party-blind.

Q.   And none of the MMD plans --- I'm sorry.  You'd also agree that the four district MMD plan did not have a majority black voting age population district.

Right?

A.   I'm not sure how to answer this.  I thought it did

Page 111

at the time of producing this report.  Dr. Barber pointed out that it only did because of a rounding --- rounding up, that was short by ten voters or so.  But that was corrected in a substitute report.  But you're not talking about that, so ---.

Q.    And we'll get to that, yes.  Thank you.

Paragraph 60 references the preexisting single member district plan.  And you indicate you were surprised that the plan had a district with a higher black proportion than the districts you drew.

A.    Yeah.

Q.    Why were you surprised by that?

A.    Well, I don't know why I was surprised by it, but it certainly was shocking.  You know, it's not surprising that my race-blind and party-blind plans weren't particularly high because I had absolutely no idea where the black residents lived in the county.  But even after I created the districts that were over 50 percent, you have this plan that I found that actually is higher.  So it turns out that it was much easier to find black voters.  For whatever reason, the legislature chose to do it that way.  My process was very narrowly tailored and so clearly you can have districts that are much higher percentage than I even did.

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 112

Q.    Okay.

And you haven't looked any further at the demographics of the Board of Education members.

Right?

A.    The members?  I don't know.  I don't know anybody.

Q.    Okay.

Are you aware that there are two black members of the Board of Education who were elected countywide in Houston County?

A.    I think I may have seen their pic --- or seen pictures on the election website or something like that.  I don't know how they're elected, when they're elected, the circumstances of their --- I don't know any of that stuff.

Q.    And you don't know the race of the individual being elected from District 4 on the Board of Education plan.

Right?

A.    The actual person?  No, I don't.

Q.    Okay.

A.    And of course, the --- the race of the members is irrelevant to this whole exercise anyway, so --- and you know that.  But I will make sure I know that.

Q.    So paragraph 61 is where we transition then into the illustrative plans.

Page 113

Are you good at this point?  You want to keep going?  You want to take a break?

A.    I would love a restroom break.

Q.    Why don't we take a break here?

VIDEOGRAPHER:

Going off the video record at 11:38 a.m.

OFF VIDEO

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

ON VIDEO

VIDEOGRAPHER:

Going back on the video record at 11:48 a.m.  This begins Media Unit 2.

BY ATTORNEY TYSON:

Q.    Dr. Cervas, ready to move to the illustrative plans portion of your report.

And so, for this report, we have six plans total, correct, three and three?

A.    Think that's right.  Yeah, it's --- I include six total plans.

Q.    Okay.

There we go.  On page 14, in paragraph 62, you're discussing the very top of the page, you're blind to race and party plans.  You say, but because of my

Page 114

process for drawing these plans, they are plans that do not predominate racial considerations.

What do you mean by they do not predominate racial considerations?

A.    Well, I mean that it's not possible to predominate race if you don't use race.  Like, it's just an impossibility.

Q.    I thought that's what you meant, but I just wanted to make sure.  And then moving to paragraph 63, you're outlining what data you're including for each table.

Is the source of the district level population characteristics in the tables for each plan from DRA?

A.    No.

Q.    Okay.

What is the source of that data?

A.    That would be the Census Bureau API.

Q.    Okay.

And how do you go about taking your redistricting plan and getting district-by-district numbers from the Census API?

A.    I provided the R code that actually produces that, but it's simply aggregating the census blocks up to the district.

Q.    Got it.

So you basically take your block equivalency file

Page 115

and draw those calculations?

A.    You're very data-savvy.

Q.    I'm a little bit of a nerd on some of this stuff. Good news is we've covered some pieces of this, so --- all right.

Moving to 64, you reference the precinct level election results.  We've talked about disaggregation already.  And so, all of your political performance numbers like we talked about for each plan are also estimates on the district-by-district basis because it's using disaggregated political performance numbers.

Right?

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

There are going to be some precincts that are not split and those would --- some exactly the same.  So it's only those in which there are splits.

BY ATTORNEY TYSON:

Q.    Got it.

And that's a great clarification.  For any district where there is a split precinct on a plan, the political performance numbers are going to be at

Page 116

some level, an estimate.

Right?

A.    That's, I believe, correct.  Yeah.

Q.    All right.

So now I want to talk about the histograms that you have starting on paragraph 65.

Is it correct that a modal bin, M-O-D-A-L, space, B-I-N, just refers to the number of bars on the histogram?

A.    No, modal --- no, no, no.  The mode is the --- the bin has the largest share.

Q.    Okay.

And so, what would you call each of the bars in paragraph 53?

A.    Bin.

Q.    A bin.  Okay.  Right.  That's - okay.

A.    B-I-N.

Q.    B-I-N.

And based on your analysis here, you believe that you're underestimating Democratic performance in the districts that you've drawn.

Right?

A.    I don't have any good evidence that it's definitely doing that, but it very possibly is doing that.

Page 117

Q.    And in paragraph 66, you're talking about your ---
what I would call a reconstructed election analysis.

Is that a term that you would use for that as
well?

A.    I like that term.

Q.    Okay.

And for performing that analysis, you are showing
it from the perspective of Democrats.

What is --- why did you do it that way?

A.    That's just standard practice.

Q.    And in the four countywide elections you used in
paragraph 67, you didn't consider any nonpartisan or
primary contests.

Right?

A.    No, not for the purpose of this.

Q.    Okay.

So we start for our five district plans in
paragraph 68 with the ideal population size of each
district.

Right?

A.    Yes.

Q.    And you're drawing using a deviation of plus or
minus 5 percent, so a 10 percent total deviation.

Right?

A.    Correct.

Jonathan Cervas , Ph.D.                     March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 118

Q.    Do you know if Georgia legislative districts are drawn to a smaller deviation than plus or minus 5 percent?

A.    I don't know.

Q.    Do you know if Georgia counties use smaller population deviations than plus or minus 5 percent?

A.    I don't know.

Q.    Trying to find a place in my notes.

Oh, paragraph 68, you say the first map I present is not one that I drew, but rather one that was enacted by the legislature for use in Board of Education elections.

What is your basis for concluding the legislature drew those plans and not the Board of Education?

A.    I don't know if actually --- I asked Bryan Sells, and he said that the legislature draws the county maps, so that's contingent on that correct opinion, but it doesn't really matter.

Q.    Got it.

And so, in this paragraph 68, you reference neutral redistricting criteria there in the middle. And we've talked about political subdivision boundaries.  We've talked about the eyeball test for compactness.  We've talked about the two communities of interest that you identified.

Page 119

Are there any other neutral redistricting criteria you used in creating the five district plans that you drew that are not referenced in this paragraph?

A.    Equal population.  I can't think of anything else.

Q.    All right.

A.    It's not a complicated map.

Q.    And just briefly, on compactness, you would agree there's not a point where a district becomes objectively noncompact.

Right?

A.    A bright-line point?

ATTORNEY NEWMANN:

Objection, calls for speculation.  Calls for a legal conclusion.

THE WITNESS:

A bright-line test?  Not that I'm aware of.

BY ATTORNEY TYSON:

Q.    Okay.

And I believe we said earlier you did not use any compactness scores to determine compactness of your districts.

Right?

A.    No.

Q.    In footnote 6 on page 16, you indicate that black

voters would still be at an electoral disadvantage because white voters would be a numeric majority in four out of five districts.

Is that just pointing that out?  I mean, just so the reader is aware, or is there another issue you're raising with that footnote?

A.    There's no motivation.

ATTORNEY NEWMANN:

Object to the form.

THE WITNESS:

Sorry.  There's no motivation here.

BY ATTORNEY TYSON:

Q.    Okay.

Just pointing out that black voters would only have 20 percent of the districts, while white voters would have 80 percent of the districts while composing 52 percent of the VAP?

A.    Just the data.  And it's in a footnote.

Q.    And in drawing the five district plans, you weren't considering the role of the County Commission Chairman as the full-time CEO.

Right?

A.    Wasn't even aware of it.

Q.    Did you become aware of it after reading Dr. Barber's response to your report?

Page 121

A.    Correct.

Q.    Okay.

So let's move to our Board of Education plan.  And you said you located this plan, you believe, while downloading --- while downloading the precinct files, as you recall?

A.    That's my recollection.

Q.    Okay.

And we were both laughing about the title of Figure 4 should read Map of Board of Education Plan.

Right?

A.    Yes, as it does in the next table correctly.

Q.    As we discussed, BOE is ambiguous in terms of what it means.

So did you then import the BOE plan into Dave's Redistricting App to conduct an analysis on it?

A.    At some point, yes.  I don't recall the specifics.

Q.    Okay.

Do you recall if you used a block equivalency file to import it?

A.    Eventually, yes.  I think I actually tried to recreate it from a physical map, but eventually found a shapefile and was able to use that.  Yeah, that's the map I tried to create it from.

Q.    That's exactly what we're going to mark.

Page 122

---

(Whereupon, Defendants' Exhibit 7, Map,

was marked for identification.)

---

BY ATTORNEY TYSON:

Q.    So I'm going to hand you what we've marked as

Exhibit 7.

And is this the map you initially located that had

the Board of Education districts on it?

A.    This looks exactly like the map I initially

located.

Q.    And so your process was initially to try to

recreate this map in DRA, but eventually you were able

to import it.

Is that right?

A.    Right.  And notice at the bottom it says

Legislative and Congressional Reapportionment Office,

which was the website I got the shapefiles from.  It

also says Georgia General Assembly, which suggests

that it was the Georgia General Assembly that drew

this.

To answer your previous question, I may have asked

Bryan Sells that connection.

Q.    Understood.

A.    Also don't know why there's an empty space down

Page 123

here, assigned block.  And I believe that was also in the shapefile and I made a correction.

Q.   Okay.

A.   But just pointing that out that that is not possible because it may get done.

Q.   I don't know either.  I'll have to ask Ms. Wright, the director of the office, what --- what that's about, so ---.

A.   Not a criticism, just --- just noticed.

Q.   And then we can set that aside.

Back to page 17, Table 2.  This district, District 4, has a 53.7 percent black VAP.

Right?

A.   Correct.

Q.   And then on Table 3, on the next page over, you show that District 4 would consistently elect the Democratic candidate across all four elections in that table.

Right?

A.   I think we established that those are the Democrats.

Q.   Yep.

And you said you're not aware of any other members of the Board of Education who are elected countywide. You just were looking at the district plan.

Page 124

Is that right?

A.    Yeah.

Q.    Do you know or have you determined whether the Board of Education uses other principles like the locations of high schools or school attendance zones in creating its districts?

A.    It's very possible.  I don't know.

Q.    At the risk of looking at math on the fly, on Table 2, just looking at the total population numbers there, you didn't report any deviations for each of these districts.

Right?

A.    I did not, which was probably a mistake since there was an error in one of them.  I do show on footnote 5 what the range of the acceptable deviation under federal law, under --- under case law is.  And they're nowhere close to the edges of those. So they're well within the 5 percent% range.  Probably well within the 1 percent range.

Q.    And that was going to be my question.  Did you look at to see whether it was within that 1 percent range or not?

A.    Yeah, there's no reason not to get them closer.  I mean, legislature can make their own choices, but, you know, up to --- limiting by the law, but here I chose

Page 125

tighter deviations --- or they --- actually, they

chose tighter deviations.  This is their map.

Q.    Okay.

In paragraph 72, you say the Board of Education

plan with five districts represents a plan that fully

undilute --- that must mean undilutes the electoral

power of black voters in Houston County.

A.    Uh-huh.

Q.    What do you mean by fully undilute the electoral

power of black voters in Houston County?

A.    Yeah, I maybe not needed to use that kind of

language fully as potentially a legal conclusion.

Just that there is a district in which minority

members are able to elect candidates of their choice,

and it does so.  They do so in all four of the

elections in which I analyze.  So that's what I mean

by fully.

Q.    Got it.

And so black voters being able to elect their

candidate of choice in one of the five districts

represents an undiluted electoral plan.

Is that right?

        ATTORNEY NEWMANN:

        Object to the form.  Calls for a legal

conclusion.

Page 126

THE WITNESS:

Yeah.  If vote dilution is defined as minority voters not getting an equal opportunity to elect candidates of choice, this would remedy that violation, in my opinion.

BY ATTORNEY TYSON:

Q.   And so your use of the term fully undilute is synonymous with your understanding of equal opportunity to elect a candidate of choice?

ATTORNEY NEWMANN:

Objection.  Asked and answered.

THE WITNESS:

Yes.

BY ATTORNEY TYSON:

Q.   All right.

So moving to the race-blind plan, I believe you started with District One when you were drawing that plan.

Is that right?

A.   Yeah.  They used the heuristic of the Air Force base as sort of the guiding.

Q.   Understood.

And you never looked at the number of split precincts on the race party-blind plan.

Is that right?

A.    Until Dr. Barber did in his report.

Q.    Okay.

And you're aware that this plan splits the city of Warner Robins into multiple districts.

Right?

A.    I need Dr. Barber's report to do that.

Q.    Well, put it this way.  You'd rely on Dr. Barber's report regarding the city splits.

Is that right?

ATTORNEY NEWMANN:

Objection, lacks foundation.  Mischaracterizes the testimony.

THE WITNESS:

Would I rely on it?  If I was going to testify it, I would probably want to run it myself, but Dr. Barber is a reasonable person.  I don't think he would be lying about these things.

BY ATTORNEY TYSON:

Q.    You don't have any reason to doubt Dr. Barber's analysis of the city splits?

A.    I do not.

Q.    And I know you don't report total deviation in Table 4, but do you know if it's roughly plus or minus four points per deviation?

A.    I --- I don't know what --- we're doing math on

Page 128

the fly.  You have a pen.  I don't.  It's within the range.

Q.    Okay.

It's within the range.

A.    Well within the range.  And by the way, can be made closer by doing more splitting of the C --- CDs. But because I didn't do that, they are a little bit larger than they needed to be.

Q.    Understood.

And maybe just to short-circuit some of the elements for each map, in terms of traditional districting principles that you used in the creation of all the plans in this report, there are no other principles we haven't already discussed that you utilized in drafting the remaining plan in this report.

Right?

A.    Like explicitly?  Yeah.  I mean, my process is sort of built on the idea of just the whole thing. Even sitting here is a little bit awkward with you because you're asking me questions about like things that I just do innately.  I build plans based on history.  That's what I do for courts.  This is my whole career is to work for courts in doing neutral, using neutral criteria.  I don't necessarily think

Page 129

about it.  I just do it.

Q.    And going to Table 5, on the race and party-blind plan, black voters will be able to elect their candidate of choice in two of the four elections with one that's extremely close.

Is that right?

A.    Yes.

Q.    In the Board of Education plan, you said that that plan represented a plan that fully undiluted the electoral power of black voters in Houston County.

Does the race party-blind five district plan fully undilute the electoral power of black voters in Houston County?

A.    I'll let a court answer that question, but I think that it is a viable --- it's a viable plan.  Had the legislature chose to use this, I think it would have been viable.

Q.    So next ---.

ATTORNEY NEWMANN:

Sorry, I think there was --- it was unclear which plan you were referring to.  There was a mixture of DOE and MMD.

ATTORNEY TYSON:

Yes.  I'm happy to ask it again.

ATTORNEY NEWMANN:

Page 130

Can we just hear that read back, the last question and answer?  I want to make sure I tracked it.

COURT REPORTER:

You said that that plan represented a plan, undiluted electoral power of black voters county.  Does the race party-blind five district plan fully undilute the electoral power of Houston County?

ATTORNEY NEWMANN:

That's the question.

Then the answer?

COURT REPORTER:

Then the answer ---

ATTORNEY TYSON;

There's a lot of court term in that.

COURT REPORTER:

--- I'll let a court answer the question, but I think that it is a viable --- it's a viable plan that chose to use this, would have been viable.

ATTORNEY NEWMANN:

Okay.  Thank you.

BY ATTORNEY TYSON:

Q.    So Dr. Cervas, let's go to paragraph 77, the Cervas MMD5 plan.  And you indicate you drew this map

Page 131

in a race-conscious way like we've discussed.

Right?

A.    Correct.

Q.    And is it accurate to say that you moved population into and out of District 1 to make it a majority black district?

A.    I mean, there's no other way to do it.

Q.    So that would be correct?

A.    Yes.  Populations were shifted.

Q.    And as a result of those shifts, the black VAP in District 1 on the service MMD5 district plan is now 52 percent.

Right?

A.    Correct.

Q.    Was your process that after you made District 1 a majority black district, you then adjusted the remaining districts to equalize population?

A.    Probably doing it all simultaneously.

Q.    Okay.

So you're working on District 1, and basically you're working on all the districts at the same time.

Is that right?

A.    Yes, that's correct.  It looks like all --- all the districts have changed, at least some to some level.  So I've been doing it all at the same time.

Page 132

Q.    Okay.

And like we talked about, this is the plan where it required a later correction on the population for total population?

A.    Yeah, you can see it in the fourth row, first column, second column, total, where, I repeat, report the population totals.  And one is not the same as the other.  I should have noticed it at the time.

Q.    And is that --- is that error in part because you were using the census method for calculating these tables versus using DRA to calculate the tables?

A.    No, this is an error that was in part because I did not save the map correctly.  There's --- I think it was three census block groups that were not properly assigned to --- they were assigned to District 5.  They should have been assigned to District 4.

And when you simply take those whole blocks --- the whole thing, all block groups, they fix both those districts.  So one district is too high, one district is too low, but they're --- together, can be made equal.  And they're not --- they don't affect the District One, which is the one --- the district in which establishes Gingles 1, and, therefore, it's actually irrelevant.

Page 133

Q.    In DRA, if you click on the statistics tab, does it show you deviation as a column?

A.    There is one.  There is that.  Yeah.

Q.    And so did you just not check that for this particular plan?

A.    I honestly can't tell you what happened.  I thought --- it was correct when I exported the equivalency file.  It must not have updated correctly, and it was --- it's an honest mistake.

Q.    Certainly.

I'm not implying any bad faith.  I'm just trying to understand how it originated.

A.    Yeah.

Q.    And going to figure seven, on page 22, you have the electoral performance and this --- this plan will perform for black voters in all elections in District 1.

Right?

A.    That's correct.

Q.    And it looks like at least District 2 would be at least partially competitive in the 2024 elections with 46.5 and 49.1.

Do you agree?

A.    In terms of politics?  Yeah.  In terms of politics, yes.

Page 134

Q.    Okay.

Paragraph 80, you again offer the opinion that this plan, the MMD 5 District Plan, appears to fully ensure black voters can participate in elections with an undiluted vote.

And as we discussed earlier, does your reference to participation with an undiluted vote mean there is an equal opportunity to elect candidates of choice for black voters?

A.    That --- that's what I mean by that.   Correct.

Q.    Okay.

Let's go to the four district plans next.  And the reason you drew four district plans had nothing to do with the structure of Houston County government.  It's because you were asked to also create four district plans.

Correct?

A.    That's right.

Q.    Okay.

And the first plan you have here is the --- what you call the Board-of-Education-based plan.  And I believe, like we talked about, this was the last plan that you drew, as you recall.

Is that right?

A.    As I recall, yes.

Page 135

Q.    Okay.

And what was the process you used to create the Board-of-Education-based four district Plan?

A.    You know, you're asking me to recall something that happened a long time ago, so --- but my --- I believe what the problem --- so the issue with --- the task faced here is to equalize the populations of these districts, because you're going from a plus or minus something to a plus or minus that's larger because there's fewer districts.  So you have to shift --- you shift the populations from one of the districts into the other districts is basically the process.

And I don't completely recall, but I believe that I also turned the race off on this one and tried to do it as blind as can be, with the, you know, background knowledge now that I've seen where the demographics are.  So I can't be completely blind.

And so I wasn't going to define this as a blind plan.  It's just not.  It's just based on the Board of Education map.  And so it tries to queue closely to those district boundary lines, though not completely because of the population deviation changes.

Q.    In --- trying to figure out how to ask this.  In your drawing process, did you know District 4 was 50.8

Jonathan Cervas , Ph.D.                          March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 136

percent black on total population before you looked at the racial data?  I'm sorry, that's not what I'm asking.

Did you change the boundaries of District 4 after looking at the racial data for a draft district?

A.    I don't recall, but almost certainly not, because that's not my process.

Q.    Understood.

And so, looking at Table 7 on page 24, District Four under this plan has a black VAP of 47.2 percent.

Right?

A.    Correct.

Q.    And I know in paragraph 82 you referenced you didn't rely on racial data in making the adjustments.

Did you rely on any political data in making the adjustments?

A.    So first a clarification.  So now I don't have to guess.  I wrote it here I did not use any race.  So that's good rec --- you know, a good way to recall that.  I didn't think I did, because it wouldn't be my process.  And no, I still would not have had the partisan information.

And no, I had no objectives here at all other than to do this simple Gingles 1 analysis.  So no, I was not trying to achieve any kind of targets of any kind.

Page 137

Q.    Understood.

And Looking at Figure 9, the district plan elects the candidate of choice of black voters in District 4 in all four elections you analyzed.

Right?

A.    Yes.

Q.    And then in paragraph 85, you indicate that --- that last sentence, that black voters can clearly elect candidates of their choice with other minority voters or crossover white voters.

What do you mean by that?

A.    We established just a minute ago that this is not a black majority VAP district, which means that the majority of voters are not black.  And so they can still in this district elect their candidates of choice, which means they have to either be a majority of registered voters voting, so black majority voters, or they're being joined by non-black voters in selecting those candidates.  That's it.

Q.    Got it.

And you're not offering an opinion that District 4 is a coalition or a crossover district.

Right?

A.    Offering an opinion about it?  I don't know what you mean.

Page 138

Q.    Okay.

So for purposes of your report, you're not offering an opinion saying this particular plan is a co --- has a coalition district on it.

Right?

A.    Well, I mean that is the opinion.  That is what this is.  I'm not offering a legal opinion about whether that's required, right, but that's what it is.

Q.    Understood.

A.    So if the court were to decide that a coalition district is required, then this would actually meet the threshold of Gingles 1 under that criteria.

Q.    And would that also be true if the court decided a crossover district was required, it would meet that threshold as well?

A.    I can't imagine that being the case, since it's --- the Supreme Court has said that it can never be required.  So I don't think it's hypothetical or compressing.

Q.    Okay.

I'm going to try to get through one more plan and then break for lunch, if that works.

A.    Sounds good.

Q.    So let's go to the four district race plan party-blind plan.  And as we talked about, this is the

Page 139

first plan that you drew.

Right?

A.    That's --- that's how I recall it.

Q.    We've talked a lot about the drawing process.  I'm not going to retread those pieces.  Let's go to Table 8 on page 26.  And the race party-blind plan, the black VAP on that plan in District One is 45.6 percent?

A.    Correct.

Q.    Okay.

And the black preferred candidate from Figure 11 would win in three of the four elections that you analyzed.

Right?

A.    Yeah.  Narrow loss in the fourth one it looks like.

Q.    Okay.

So I wanted to ask about paragraph 89.  You indicate that this represents a plan in which what --- that gives black voters a nearly equal opportunity to elect candidates of their choice.

Is that right?  Did I read that ---?

A.    You read it correctly.

Q.    Okay.

So what I wanted to ask is on your MMD5 plan, in

Page 140

paragraph 80, you say that the success on that plan is what allows black voters to participate in elections with an undiluted vote.

A.     Uh-huh.

Q.     In your mind, is there a difference in an equal opportunity to elect candidates of their choice of language you're using on paragraph 89 and an undiluted vote in paragraph 80?

A.     In my mind, right.  So I --- it is clearly a difference in performance.  Whether the difference is legally significant is not a question I can answer.  I can just say that they win three out of four.  They win four out of four.  So I'm simply trying to --- like, the word fully is being used to identify a hundred percent.  And I'm using different language when it's not a hundred percent.  But again, these are really legal threshold questions, not --- like, I'm just presenting the data.

Q.     Understood.

A.     The words I'm using are just simply, you know, reflective of the fact that it's not a hundred percent.

        ATTORNEY TYSON:

        Got it.

        That's probably a good place for us to

Page 141

break for lunch.  Yeah.

THE WITNESS:

Cool.

VIDEOGRAPHER:

Going off the video record at 12:22 p.m.

OFF VIDEO

---

(WHEREUPON, A LUNCH BREAK WAS TAKEN.)

---

ON VIDEO

VIDEOGRAPHER:

Going back on the video record at 1:35 p.m.

BY ATTORNEY TYSON:

Q.    Dr. Cervas, hope you had a good lunch and we can go back on, starting with paragraph 90 of your report. It's on page 26.  And so the last plan we'll talk about for this report is the service MMD4 district plan.

A.    There's another typo.

Q.    Yes, the title says 5, but we know this is Section 4.

And I believe we talked about this, but in --- in creating the four-district plan your goal was to get the black voting age population percentage in District

Page 142

1 over 50 percent.

Right?

A.    The goal is to create a map that fulfills the requirements of Gingles 1.

Q.    And looking at Figure 12 on the next page, one of the changes that you made was to remove the Air Force base itself from District One and place it in District Three.

Right?

A.    Yeah.

Q.    Okay.

A.    Obviously, the Air Force base itself is concrete.

Q.    Certainly, yes.

A.    Not movable.

Q.    And you don't know what kind of access people who are not in the military have to the base itself.

Right?

A.    I have no certainty on that.

Q.    Okay.

So you don't know if someone could travel from the southern end of District 3 to the northern end of District 3 without leaving District 3?

A.    Like, on like a public available road.  I don't know.

Q.    Okay.

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 143

And up at the top --- you're referring back to Exhibit 7, is that ---?

A.    I'm just looking.

Q.    Up at the top, do you know how wide District 3 is between District 1 and that northern edge of the county?

A.    I don't have a scale.

Q.    Okay

If you don't know, that's fine.

Turning to page 28 and Table 9, District 1 is the second most underpopulated district on the MMD4 plan.

Right?

A.    Yeah.

Q.    And ---.

A.    There's only four districts, so it's kind of a weird way of phrasing it.  Right.  So ---

Q.    I take that.

A.    --- it's a middle district.

Q.    It's in the middle in terms of population, total population.  And we've talked a little bit about that the 50 percent on that side is not 50 percent.  It was rounded to that.

And I honestly can't remember.  Did you ever check the DRA statistics on this plan to see what the 49.97 percent ---?

Page 144

A.     They're the same.

Q.     Okay.

A.     Well, I think it --- I don't know how it displays, but the data itself is the same on that.

Q.     And for this plan, we also have in District 1, the candidate of choice of black voters wins in all four --- all four elections in District 1.

Right.

A.     Yeah, in Figure 13.  Yes.

Q.     Paragraph 93, you offer the opinion this plan satisfies the requirements under Gingles 1.  I believe this is the only plan where you made that statement about satisfying the requirements of Gingles 1.

Do you believe the other plans also satisfy the requirements of Gingles 1?

A.     We just like kind of go back to what we were talking about earlier about like language.  As we read these in this order, what we see is I've used different language in each of these conclusions, probably to be not repetitive, which may or may not be a good strategy.  It might be a good strategy when you're writing for an audience, but maybe not so good when I'm writing a legal opinion or legal --- yeah, legal opinion, opinion, legal document.  So I --- I wouldn't take anything from the differences in these

Page 145

words in these cases.  Right?  They're just like I wrote the things --- the same things differently.

All of the MMD plans were to --- believe to be satisfying Gingles 1.  Of course, even that statement itself is a legal conclusion.  Right?  Like as from a social science perspective, they seem to meet the requirements.  Legally, it's a different question.

Whether the other plans do or do not meet Gingles 1 is the same kind of legal conclusion.  So the --- we've now talked about four --- three, four different plans.

Q.   I think it's the sixth plan now, yes.

A.   Five different plans besides this and --- right. So whether the --- the race-blind party-blind plans satisfy the requirements of Gingles, I don't know. Right?  They --- under Dr. Barber's definition of only using BVAP with single race, they --- they wouldn't. But that is not --- like, that's his opinion and that is not a legal opinion and that is not necessarily the test.

So I've offered some other data, and that other data may allow those plans to be satisfied.  But --- but my opinion on this plan is that it does satisfy the requirements, as does a couple of the other ones, like with certainty, even under Dr. Barber's

Page 146

definition.

Q.    And that would be because the plans have a majority black VAP population and the black candidates of choice are able to succeed in the elections?

A.    Right.  And with this plan, right, we've now --- we haven't yet gotten to it.  I know you're going to. This is technically not a numeric majority by 15 voters, I believe, because of the rounding, it appears.

So if the requirement --- remember I defined the strictest requirement under Gingles, so that would be what we're talking about here, under the strictest requirements of Gingles.  But this plan is clearly above 50 percent in total black population.

Q.    And so then you would say that this plan does not satisfy the strictest interpretation of Gingles 1 because it doesn't have a majority black VAP district?

A.    As defined that way, right.  Because I think I show in my --- my second report that this district actually is majority of black registration.  So if the court were to accept that opinion that is probative data, then actually this would be --- still would be fulfilling.

Q.    Certainly.  Okay.

So let's go to paragraph 94.

Page 147

You summarize the conclusions and you say in the third sentence of paragraph 94 that three of the six plans create black majority VAP districts, and in these plans the black candidate of choice is successful in 100 percent of the contests.  And I'm assuming that's referencing the strictest interpretation of Gingles 1?

A.    I mean, we should just ---.

ATTORNEY NEWMANN:

Objection.  Sorry, I'm not seeing the Gingles 1.

ATTORNEY TYSON:

I'm asking based on his definition he gave from paragraph 93 if the third sentence is referencing compliance of those three plans with the strictest interpretation of Gingles 1 he described.

ATTORNEY NEWMANN:

I'm just not seeing the words compliance.

ATTORNEY TYSON:

It's not there.

ATTORNEY NEWMANN:

Okay, okay.

So I would just object.  Lacks foundation.

ATTORNEY TYSON:

Certainly.

THE WITNESS:

So I think we should be careful about this strictest interpretation.  That was words that I used.  I don't know the court is saying something like strictest or non-strictness.  So one interpretation, Dr. Barber's interpretation, is that a district must be 50 percent numerically above on black majority VAP.  So under his definition, three of the six meet that criteria, just to be very, you know, neat with our --- our definitions here.

BY ATTORNEY TYSON:

Q.   Understood.

So let's turn to Table 10 and political performance --- or I'm sorry, electoral performance summary.

And so essentially we can read this table as if it has a green box, the candidate of choice of black voters or the Democratic candidate succeeds.  If it has a red box, the Republican candidate succeeds.

A.   Yeah, with --- determinalistically.  So like this is either win or they don't win.  So we had one example where it was 49.9, but that would be a red X, right, even though it's basically a complete tossup.

Page 149

But I think it's a nice summary and I like the visual.

Q.    Yeah.

So let's move to the alternative electoral system part of your report.

And again, this is the --- you reference here again the term undiluted in paragraph 95.  Counsel asked me to analyze the potential for black voters to have undiluted under the alternative electoral systems or voting rules.

Is that an undiluted vote?

A.    Very embarrassing.  But yes, there's a number of typographical errors and undiluted vote would be the right phrase.

Q.    I'm not trying to embarrass you.  I'm trying to clarify what you're referring to.

A.    I know you're not trying to.  It's just naturally embarrassing, because there's so many of these and it's unfortunate, and I'm very sorry for that.

Q.    And so what methodology did you use to select single transferable vote and single nontransferable vote as the alternative election systems you analyzed?

A.    Those are the systems I was asked to analyze by Plaintiffs' Counsel.

Q.    Okay.

So Plaintiffs' Counsel specifically asked you to

Page 150

look at those two systems?

A.    That's right.

Q.    Okay.

And your conclusion there is, in 97, that you find that black voters will be able to consistently elect candidates of their choice under either single transferable vote or single nontransferable vote. That's the opinion you're offering?

A.    That's correct.

Q.    You also call each of these systems semi-proportional.

What do you mean by semi-proportional?

A.    This is a term of art like --- that people who have devised these systems use.  Truly proportional will be proportional representation.  And no, these are not proportional representation systems.

Q.    Got it.

So there --- that's the reference.  It's not proportional representation, but it is maybe on the road to proportional representation?

A.    I don't know that I would say that.

Q.    Okay.

A.    It's different.  Again, without trying to get into a lecture, proportional representation system, you're going to vote for a party.  Here you're voting for

Page 151

candidates.  So they're different systems.

Q.    Is it correct that the single transferable vote and single nontransferable vote systems would only work in Houston County to provide an opportunity for black voters if there was more than two candidates on the ballot?

A.    Yes.

Q.    Okay.

A.    Otherwise, you have an at-large system.  That's what we have now.  Yeah, we've established that black vote is not equal particularly under the at-large.

Q.    All right.

So let's start with paragraph 98 and single transferable vote.  You start with a reference to plurality elections where the candidate with the most votes wins.

Do you know of any Georgia jurisdictions that use plurality voting instead of majority voting?

A.    You --- are you talking about like a runoff election?

Q.    Just in general.

I mean, I took what you were saying in paragraph 98 to be --- that you're describing kind of a normative baseline of plurality elections.

A.    I'm just describing what a plurality election is.

Page 152

Q.    Understood.  That helps.  Thank you.

A.    Okay.

Q.    So try to get into this to make sure I'm being precise.  Single transferable vote is a system that allows voters to rank their candidates.

Right?

A.    That's exactly right.

Q.    Okay.

And I know you talked earlier about ranked choice voting and that's you said one type of single transferable vote?

A.    Well, there's many types of single --- there's many types of ranked choice voting.  Right?  It's a system of voting rules.  So basically the difference is going to be how candidates get eliminated, whether it's the candidate with the fewest first place votes or the candidate with the most last place votes. There's different ways of doing it.

Q.    Got it.

Do you know any jurisdictions in the United States that use single transferable voting for local elections?

A.    Do I know of any?  Yes.

Q.    Okay.

What are some examples?

Page 153

A.     New York City.  I don't have a list.

Q.     Okay.

A.     But that's an example.

Q.     Okay.

And didn't Arlington, Virginia move to ---?  Okay.

I didn't know if you were familiar with any of those.

A.     I should.  I have a friend who lives in Arlington.

Q.     Do you need to have multiple seats up for election for single transferable vote to work as an election system or can it work with just a single seat up for election?  And the reason --- I'll tell you the reason why I ask.

A.     Yeah.

Q.     In paragraph 100 you refer --- you discuss the --- in multi-seat elections, the bar for winning office is determined by how many positions are available.

A.     Well, that's why I paused.  Right?  So I need to understand the question you're asking.  You said --- just repeat the question.

Q.     Sure.

And it may not be a good question.

So my question is, does single transferable vote work only if there are multiple seats up for election?

A.     And I don't know what you mean by work, ---

Page 154

Q.    Okay.

A.    --- I think, is my ---.

Q.    Perfect.

So let's do this.  If Houston County used single transferable vote for County Commission races, would multiple County Commission seats need to be on the ballot at the same time to give black voters an opportunity to elect a candidate of choice?

A.    I want to be very careful with the answer here because the answer is maybe.  Right?  For the mathematical group formula, right, that needs two or more to guarantee.

But you just asked if it works.  I mean, whether black voters are able to elect their candidates under ranked choice voting with the single, that's actually possible, but it's not mathematically guaranteed.  So I just wanted --- that's the distinction.

Q.    Understood.

Are you aware of the work of Professor Nolan McCarty about the impact of ranked choice voting on minority voters?

A.    I don't --- I don't know it in detail.  I wrote an amicus brief once about ranked choice voting in Maine, where he wrote --- I think he was the expert in the case, but I don't think it was about minority voting.

Page 155

Q.    Okay.

A.    So I don't --- I don't know.

Q.    So you've not --- you don't recall reviewing any research about any adverse effects on black voters through the use of ranked choice voting?

A.    I'm aware that there is some competing evidence, but I don't think that those are related to the multi-candidate ones.  I think that's again related to only the single-candidate one.

Q.    Okay.

A.    But I'd want to review Dr. McCarty's work before my characterizing it.

Q.    Certainly.

And so, then to get to our Droop quota here, ---

A.    Uh-huh.

Q.    --- paragraph 103, it looks like the methodology to conclude that single transferable voting provides an equal opportunity for black voters is that if there are two open seats for the Commission, the Droop quota is basically the same percentage as the percentage of black voters in Houston County.

Is that right?

A.    Well, the black --- the black voters are a higher percentage than the Droop formula minimum.

Q.    Okay.

Page 156

And as long as the black voters are a higher percentage, then the Droop quota, single transferable voting would provide that equal opportunity to elect a candidate of choice?

A.    That's right.

Q.    I'm glad I got that phrase right.  I was concerned about getting that one right.

Do you know of any court that has ordered single transferable voting as a remedy in a Section 2 case over the objections of a jurisdiction?

ATTORNEY NEWMANN:

Objection to form.  Legal conclusion.

THE WITNESS:

Yeah, I don't know.

BY ATTORNEY TYSON:

Q.    Okay.

Do you know if the touchscreen voting system in Georgia can be programmed to offer single transferable voting as an option?

A.    I don't --- I don't --- I don't know.

Q.    So let's go to single nontransferable vote.  So again, make sure I got this right.  I don't read this as a ranking system of candidates.  It's a different method of voting that's not ranking a candidate.

Is that right?

Page 157

A. That's right. So transferable in the first one is that your vote transfers if the candidate gets eliminated. In single nontransferable, your vote never gets transferred, because you only cast one ballot.

Q. Okay.

And --- so I'm going to see if I can accurately describe in my head how this works. And you --- and check me and see.

If there are three seats up, each voter has three votes they can allocate? No? I'm already off. Okay. Can you walk me through single nontransferable vote as you've described it in your report?

A. Sorry to cut you off there. A voter only casts one ballot. They don't --- you're describing a different system where you cast the number of ballots for the number of candidates up. But here it doesn't matter how many candidates are up, you still only choose one.

So the hypothetical is that black voters are all going to choose the black candidate choice if they're cohesive, which is not an analysis that I've done, but I've been told that they are cohesive.

And then, because there's multiple winners, the candidate with the most votes will win the first seat

Page 158

and then those votes will be --- those voters' votes are gone.  And then it's how --- of the remaining votes, how many are for the next highest candidate and then that candidate wins.

So when there are two candidates, assuming cohesion, the first will go to the white voter candidate choice and the second one will go to the black voter candidate choice.

Q.   And so --- thank you for that.  And so, in that system, the candidates wouldn't be running for a numbered post, for example, they would just be running for County Commission.  Two seats are up and there's any number of candidates.  The two highest vote-getters essentially get the two seats that are up.

Is that a good way to explain it?

A.   I don't know.

Q.   Okay.

And I'm asking, just to understand, making sure I've got it in my head.

Let's go to Houston County Commission.  Let's say we have two County Commission seats up.  There's three candidates that are running, one of whom is the candidate of choice in the black community.

Is it correct that the highest vote-getter, which

Page 159

would be presumably the white candidate of choice, would get one of the two seats that is up, and then the black candid --- black voters' candidate of choice would get the second highest number of votes and get the second seat that is available, and the third candidate would be the loser in that race?

A.    As long as the black --- the black voters or the people who choose the black candidate of choice are more numerous than the --- the remaining amount for the third candidate.  But yes, assuming.  Right, there's some assumption here that the --- that they have over the --- the group quota.  Right?  That's, you know, that's critical.

Q.    Got it.

And so, the application of the Droop quota for both the single transferable vote and single nontransferable vote requires that the black population be greater than the Droop quota for that system --- for the system to consistently elect candidates of choice of the black community?

A.    So the --- the premise here is that if a group, cohesive group, is above the threshold of the quota, given a number of seats, then they have the opportunity to let candidates achieve at an equal opportunity.  It doesn't mean that they guarantee to

Page 160

do it.  Right?  They still have to vote for the candidate cohesively, but they have the same opportunity as all other voters, which is the requirement under the Voting Rights Act.

Q.    Okay.  Great.  Thank you.

A.    As I understand it.

Q.    And same additional questions.  I think these would be the same.

But you're not aware of any court in the country that has ordered a single nontransferable vote as a remedy in a Section 2 case.

Right?

A.    I'm not aware.

Q.    And you don't know if Georgia's touchscreen voting equipment can be programmed to conduct elections using single nontransferable vote?

A.    I don't know.

Q.    Okay.  Okay.

We can put the main report aside.

---

(Whereupon, Defendants' Exhibit 8, Rebuttal Report, was marked for identification.)

---

BY ATTORNEY TYSON:

Page 161

Q.   I'll hand you what I've marked as Exhibit 8, which is the rebuttal report.

A.   Oh, you're not even going to give me Barber's report first?

Q.   All right.

So the rebuttal report from February 6th, you were asked to evaluate Dr. Barber's report and respond.

Is that right?

A.   That's correct.

Q.   And this report is your full response to Dr. Barber's report?  You don't have any other responses to Dr. Barber's report that aren't included in this rebuttal report?

ATTORNEY NEWMANN:

Do you mean excluding whatever he testifies to today?

ATTORNEY TYSON:

Maybe let me ask it this way.

BY ATTORNEY TYSON:

Q.   You're not offering any opinions regarding Dr. Barber's report that are not contained in your original report or your --- and your rebuttal report.

Right?

A.   I'm not ---.

ATTORNEY NEWMANN:

Page 162

Object to the form.

THE WITNESS:

Yeah, I'm not sure how to answer this question.

BY ATTORNEY TYSON:

Q.   Okay.

A.   This represents the response to his first report.

Q.   Okay.

And so, in paragraph two, you indicate that most of Mr. Bar --- Dr. Barber's opinion are legal conclusions.  But you'd agree, we looked at earlier that you offered an opinion that maps satisfied the first precondition of Gingles.

Right?

A.   From a social science perspective.

Q.   Okay.

And so, in your --- in your understanding, you offered opinions about Gingles from a social science perspective, where Dr. Barber offered opinions about Gingles from a legal perspective?

A.   Not all related to Gingles, I don't think, but --- but, yes.

Q.   Okay.

Now, in paragraph three, you say that your race and party-blind plans, you did not include them to

Page 163

suggest they satisfy the first Gingles' precondition.
So just so I'm understanding kind of what we're
looking at, of the maps you offered to suggest that
they satisfied the first Gingles' precondition, that
was your MMD plans.

Right?

A.    And the BOE plan.

Q.    Okay.

And it's your understanding that a court could
order a non-majority black district as a remedy after
it finds a Section 2 violation?

A.    Oh, I know for a fact.  I've been --- I've done it
for courts.

Q.    In paragraph four you talk about --- well, why
don't I just skip ahead a little bit here.  In
paragraph seven you indicate that nothing in Dr.
Barber's report affects your conclusions about being
able to remedy vote dilution through either
districting plans or alternative voting rules.

Right?

A.    That's correct.

Q.    Are there any facts that you included in this
report that you --- actually, strike that.

Let me keep moving forward.  A lot of this we've
already talked about, so I'm trying to pare that down

Page 164

as we go.

So first you discuss in paragraph eight the responsibilities of the Chairman of the County Commission.  And I think we all agree that having one Commissioner function as CEO is the model that Houston is using for its government.

Right?

A.    What do you mean we all agree?

Q.    Do --- do all the parties agree?  Do you agree with Dr. Barber that that's the method of governing Houston County currently?

ATTORNEY NEWMANN:

Objection.  Lacks foundation.

THE WITNESS:

Yeah.  The truth is, I don't really know how they do this.  I read it in Dr. Barber's report.

BY ATTORNEY TYSON:

Q.    Understood.

So you haven't separately analyzed the governments of Houston County?

A.    That's right.  And I don't know the legal structure of it and whether courts can change it or all the things that he suggests.  Again, it's all --- they're all legal opinions about whether courts are able to make changes for these kinds of remedies.  I

Page 165

just simply don't know that.

Q.    Can you tell me what you mean when you say from --- in paragraph eight, from a social science perspective, leading aside this is primarily a legal question, a five district plan is fully compatible with having a full-time Chair and Chief Executive Officer?

A.    So what I mean --- you're asking what I mean?

Q.    Yes.

A.    Okay.

So what I think I mean here --- or what I mean here is that you could have five Commissioners be elected in any way, whether it's through ranked choice voting, whether it's through single nontransferable vote, or whether it's through districting scheme, where one of the members is given additional responsibilities or it's rotated or something else. Like there's a lot --- my imagination allows me to imagine lots of different ways for this to happen ---

Q.    Okay.

A.    --- without changing the structure of the government.

Q.    You also say at the end of that paragraph, in any event, in my experience, the county government's owed preferred intern --- own preferred internal structure

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 166

is not germane to any factor in traditional vote dilution analysis.

Tell me what you mean by that sentence.

A.     Yeah.  I mean, the vote dilution analysis is the three-part Gingles test.  And no --- no part of that test is there a component of the internal structure of the government.  That's all.

Q.     You can go to page three, the bottom of paragraph 11.  And again, I'm trying to pare down things we've already talked through.  The last sentence there, you indicate those plans would remedy the alleged violation if the county or this court were to adopt either one of them.  You haven't investigated whether Houston County is able to alter its method of election.

Right?

A.     I'm not sure what you mean.

Q.     Well, you said it would remedy the violation if the county were to adopt one of the plans.

Do you know if the county can adopt a different election method?

A.     So is this the --- related to the question you asked me earlier about whether the legislature drew the map or the county drew the map?

Q.     It is.

Page 167

A.     Okay.

I don't know.

Q.    I didn't think you did, but I just wanted to check on that front.

A.     If it's --- if it's incorrect here that the legislature has to do, it's interchangeable.

Q.    So going to paragraph 12, we've discussed the equal population requirements.  And on page four, Cervas MMD5A brings those --- that plan into population equality.

Right?

A.     Yeah, that's correct.

Q.    And how, methodologically, did you determine those three census block groups were in a district and could be moved over?

A.     Are you asking about the error?

Q.    The change from MMD5 to MMD5A, how did you locate the three blocks --- block groups, I'm sorry, that needed to move over?

A.      I don't recall explicitly, but I'm pretty sure that it matched the boundaries of the CCD, which is what I intended it to be in the first place.  So service MMD5A, as shown on page four, was actually the intention in the first place.  And I, for whatever reason, misassigned those three census blocks.

Page 168

Dr. Barber pointed it out.  I think he was correct, and I fixed it.

Q.   Going to paragraph 13, the next page, at the bottom of that paragraph, the last sentence says, I used race no more than necessary to determine whether a reasonably-configured majority black district could be drawn.

What do you mean by that sentence?

ATTORNEY NEWMANN:

And take your time to review the paragraph ---

BY ATTORNEY TYSON:

Q.   Oh sure, take ---.

ATTORNEY NEWMANN:

--- surrounding this.

---

(WHEREUPON, WITNESS REVIEWS DOCUMENT.)

---

THE WITNESS:

Right.  So we're starting with this base Cervas blind five as I termed it.  And it was not 50 percent plus one black majority VAP, the sort of air quotes here, strictest Gingles.  And so I use race in the most narrowly tailored way while still maintaining traditional addition criteria, creating a

Page 169

reasonably-configured district that now is black

majority, which satisfies the Bartlett vs. Strickland

sort of numerical majority standard.

BY ATTORNEY TYSON:

Q.    And my question is, how do you know it was the ---

it was a narrowly tailored use of race?

A.    How do I know?  Because I didn't use any race more

than necessary to do exactly that task.

Q.    So you used race to get over 50 percent and didn't

go farther than that?

A.    That's correct.

Q.    Okay.

      Then we'll move to paragraph 14 about MMD4, and

we've talked about this district was ten black

residents short of 50 percent.

      How did you go about locating the additional

census blocks that you placed into District 1?

A.    I don't recall exactly the process, but I think I

looked at Dr. Barber's map and saw that there was an

adjacent census block that was heavily black, and so I

added that.  And that was --- got it almost to 50

percent.  And there was another one, I added that, and

it was above 50 percent.  So again, narrowly tailored.

I did nothing more than was necessary to accomplish

the goal of creating the Gingles 1 map.

Page 170

Q.    And the map of Dr. Barber's you were looking at was the map of census blocks colored by race in his report?

A.    I think that's right.

Q.    Trying to find a quote in my outline.  Sorry.

Paragraph 14, there it is on page five, you indicate this can be easily corrected by reassigning three census blocks from District 3 into District 1. And then you make the statement, among other possible ways to increase the BVAP percentage.

What are the other possible ways you're referencing there?

A.    Well, I didn't explore any other possible ways.  I am assuming there are other possible ways because if it was that easy to do it, it must be easy to find other ones.

Q.    All right.

Let's move to voter registration, then.

Now, you didn't include voter registration rates by district in your first report.

Right?

A.    That's right.

Q.    Is it your understanding that courts utilize voter registration rates when analyzing the first prong of Gingles?

Page 171

ATTORNEY NEWMANN:

Object to the form.  Calls for a legal conclusion.

THE WITNESS:

I actually --- subsequent to writing my first report, I assigned a paper in my class, and in that paper was a paper from the Election Law Handbook, Oxford --- University of Oxford Handbook on Election Law.  And in that paper they described using other kinds of voter registration data to do Gingles 1, hence doing it here.

BY ATTORNEY TYSON:

Q.   Prior to assigning that paper, were you aware of courts using other data for Gingles 1?

A.    I don't know.  I don't have a strong history in --- in what courts have used for the different ways. I know that there is not a standard way of doing this.

I do have experience, by the way, in a case out of Georgia, where as the assistant to the Special Master, I used the Voter Registration Vote File to demonstrate points to the Judge about participation of minority members in different elections, which the Judge apparently found persuasive, because they ended up using that data to make changes to the election cycle in order to remedy the Section 2 violation there.

Page 172

So the short answer is yes.

Q.   And the reference to the Georgia case and the Judge you're referencing is the Wright case, where you assisted in the remedial process?

A.   That's correct.

Q.   In Table 5, the black percentage you're reporting includes the imputed race from your BISG analysis. Right?

A.   Absolutely.

Q.   Paragraph 17, you say all three sets of data demonstrate another important point that cannot be determined by the decennial census.  The black share of these districts, or at least the electorate, is increasing.

What does that paragraph mean?

A.   It means that we can look at --- over time, look at the history of turnout, and you can see that --- you don't see it in Table 5.  It's not in Table 5, okay, just to be clear.  But the dicentennial census is a one --- it happens every ten years.

So you could see like over time, but at ten-year stretches, if you look at the dicentennial census, whether the compositions of the electors are increasing or decreasing for different demographic groups.

Page 173

Using the Voter History File, you can show that the proportion of the share of black in these districts actually is increasing over time in subsequent elections.  So from, say, 2020 --- where the census was, 2022, 2024 and then presumably into the future potentially.  But anyways, the important point is that share is increasing.  I just simply was making that point.  I just found it interesting and I thought to include it.

Q.    Got it.

So moving next to the more compact Cervas MMD4 or MMD4B plan, you call this the more compact plan but don't report compactness scores.

Was that based on your interocular analysis of compactness?

A.    Yeah.  It's actually a little ironic that Dr. Barber points out that it's less compact than that in my opening report, even though I call it the more compact, in quotes.  Yeah.  What Dr. Barber wrote was that he was criticizing the sort of reverse C shape and the narrow --- I don't remember what word you used earlier to describe the very narrow area between Districts 1 and District 3.

And so I reshaped it so it was simply the eastern part of the county.  And it's hard to argue that it

Page 174

doesn't look more compact than the original, which is why I called it more compact.  That's again, interocular test.  So it's very ironic that on the compactness scores, it actually does --- it scores lower than the original one.

Q.    And the compactness of the plan changes not because District 1 changes, but because Districts 2, 3 and 4 change.

Right?

A.    I ---.

Q.    I thought you froze district one in place.

A.    I did freeze District 1 in place.

Q.    So you're referring back to Exhibit 1 and page 27, figure 12.

Is that right?

A.    Yeah.  Yeah, it does look like all three of the other --- I wanted to make sure.  District 1 does not change.  What I wanted to make sure was whether District 2, 3 and 4 all change.  And it looks like they all did.  The District 2 --- yeah, yeah, they all changed.

Q.    And in drawing the more compact MMD4 plan, did you still use census county divisions as communities of interest?

A.    Unfortunately, I don't have them superimposed over

Page 175

top.  And I just can't remember exactly what changes were made compared to that, but it looks like I no longer am using the one line the way I was.  Again, I don't --- I don't have it in front of me, so ---.

Q.   If you want to turn back to Exhibit 5, does that help you see whether figure three on Exhibit 8 is following CCDs?

A.   Almost certainly it follows.  It tracks it less closely than the other one did.  But of course there are tradeoffs in redistricting, and this demonstrates one of those such tradeoffs.

Q.   Moving to paragraph 20, there's a discussion of what I would call kind of the donut hole between District 2 and District 1.  If you want to refer back to Figure 3 --- either way.  And so you're looking --- you have in front of you Exhibit 1, page 27, and Exhibit 8, page eight.

Is that right?

A.   Yes.

Q.   So you see the little piece of District 2 that runs into the interior of District 1?

ATTORNEY NEWMANN:

Object to the form.  Lacks foundation.

THE WITNESS:

Yeah, I see it.  I see --- I see where

Page 176

your finger is pointing.

BY ATTORNEY TYSON:

Q.    Okay.

And just so we're clear, referring to the portion of District 2 that goes into District 1 on Exhibit 8, page eight, in Warner Robins and not the part of the north part of the county.

Are we together on that?

A.    Yes.

Q.    Okay.

And your response in paragraph 20 of Exhibit 8 is that your plan --- the area corresponds to census block groups.

Is that right?

A.    That's correct.

Q.    So is it your contention that census block groups are not split to create the piece of District 2 in that middle part of District 1 on MMD4?

A.    Not completely my contention.

Q.    Okay.

A.    The ones that stem directly from District 2 are unsplit.  The ones that are like at the border, they are split.  Otherwise, it would look really bizarre. That's just the way that the census built the geography.  I can't --- they can't do anything about

Page 177

that.  I actually cleaned it up quite a bit.

Q.    Okay.

Next page of Exhibit 8, you introduce a very famous congressional district in Figure 4, District 12 from North Carolina, the map challenged in Shaw vs. Reno.  Do you know if Shaw vs. Reno was a Section 2 case or a racial gerrymandering case?

A.    I know about Shaw.  I know a lot about Shaw.

Q.    And you remember it was a racial gerrymandering case.

Right?

A.    That's the ---.

ATTORNEY NEWMANN:

I'm just going to object.  It seeks a legal conclusion.

THE WITNESS:

As with most litigation, it's complicated.  It's not so simple.

BY ATTORNEY TYSON:

Q.    Okay.

A.    I believe it was a Section 2 case before it became a racial gerrymandering case.

Q.    My recollection is the state was defending on the basis of Section 2 against the racial gerrymander, but yes, there's some interplay there.

Jonathan Cervas , Ph.D.                              March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 178

A.    That's correct.  You're --- you're the attorney, so I'll trust you.

Q.    You're including this --- this district, obviously.  You're not saying that any district that's more compact than this is compact.

Right?

A.    Absolutely I'm not saying that.

Q.    Is there a reason why you chose this particular district in Figure 4 to include in your response?

A.    Well, you just called it very famous.  I think that's a fair enough reason to do it.  Also, the court struck this down as racially-predominant.  So if we're looking for an example of what race predominance might look like, this is an example of that.

Q.    Paragraph 21, you indicate that it's unclear why Dr. Bar --- I'm sorry.  It is not clear why Dr. Barber believes the three incorporated cities should be preserved.  And I believe we've covered you did not consider city boundaries when you were drawing your illustrative plans.

Right?

A.    That's correct.

Q.    Turning to the next page in Figure 5, you show the shape of city boundaries with an overlay of the state House districts.

Page 179

A.     Uh-huh.

Q.     And you've --- is it correct that you've included this particular map just to show that the cities have unusual boundaries in Houston County?

A.     That's among the reasons.  That's --- that certainly is, you know, demonstrated with this map.

Q.     And we've discussed you didn't report city splits on your --- any of your reports for your plans.

    Right?

A.     No, Dr. Barber did.

Q.     Okay.

    In past expert reports and amicus briefs, have you reported the compactness scores of districts?

A.     Yes.

Q.     Okay.

    Have you reported the number of split cities in past amicus briefs and expert reports?

A.     I've done that, yes.

Q.     Okay.

    Have you reported the number of split precincts in past expert reports and amicus briefs?

A.     I've done that, yeah.

Q.     Okay.

    But you didn't include any of those in your reports in this case.

Page 180

Right?

A.   Yeah.  Well, this is a county case, and I don't think I've ever --- I don't know that I would have --- not everything is the same, being that it's county, but there's no particular reason.  I mean, I will also refer back to the fact that it was December 24th when I was writing this report, so I have a lot of oversights. There wasn't a --- if you're asking me if there was a reason, there was no reason I didn't do it.  I just didn't do it.

Q.   Okay.

Let me ask you about one county expert report.

---

(Whereupon, Defendants' Exhibit 9,

Expert Report, Nassau County Litigation,

was marked for identification.)

---

BY ATTORNEY TYSON:

Q.   I'll hand you what I've marked as Exhibit 9.

And is this the export report that you filed in the Nassau County litigation?

A.   Yes, sir.

Q.   Okay.

If you turn --- there's not a page number, but the third physical page.

Page 181

A.   There's page numbers, top left.

Q.   Oh, there.

A.   No, on every other page.

Q.   Every other page.

A.   Maybe just not that one.

Q.   Let's start with page three, then.  This is one of the tables you included to --- for a county redistricting plan when you were drawing an illustrative plan.

Right?

A.   Yes.

Q.   And on that plan, you reported for the illustrative plan your overall population deviation.

Right?

A.   Correct.

Q.   You reported compactness scores?

A.   Yes.

Q.   You reported the splits of cities, towns, census-designated places and villages?

A.   Yes.

Q.   And census-designated places are different than census county divisions.

Right?

A.   That's correct.

Q.   You could turn to --- late in the document, to

Page 182

page 48.  And in Table 10 you reported compactness scores for individual districts as well.

Right?

A.    Correct.

Q.    And flipping over to page 52, you also reported compactness scores for individual districts on pages 52 and 53.

Right?

A.    Yes.

Q.    And then on page 55, 56 and 57 you cover the split of towns and cities in Nassau County.

Right?

A.    And villages.

Q.    And villages.

Those are all things you reported on an expert report for a county in a case involving redistricting.

Correct?

A.    Yeah.

ATTORNEY NEWMANN:

Object.  Go ahead.  Object to the form.

THE WITNESS:

Yes.  And there is very good reason for doing so.  And I first want to point out that this is very different, because, in this case we're looking at today, there's no --- there's no existing plan for

Page 183

comparison.  Here, we're comparing against an active plan.  So that's the number one reason.

And then in terms of cities, towns, villages, census-designated places, at least two of the three, the census-designated places are actually not, but the other two are actually in the New York Constitution as being required to protect.  So there's a reason to actually present those.

That's not the case here because my understanding is that there's no law requiring the preservations of any particular different kind.  So New York has very specific language about very specific kinds of jurisdictions, so that's why they're in here.

Again, didn't leave it out for any particular reason.  Just didn't do it because I don't have any comparison.  There's no comparison map, so there's no --- if I would have put compactness scores, we'd be comparing it to nothing, and it wouldn't be helpful to the court.

BY ATTORNEY TYSON:

Q.    And so you don't view the existing Board of Education map as a comparator map?

A.    I guess it could --- it could be.  It doesn't really help to compare it to the four district plan

Page 184

because we don't have that.  But, yeah, I mean, it could be a comparison.

But again, it would be --- the question would be --- there's not a challenge to the five district Board of Education map in this case.  If Plaintiffs' Counsel asked me to show why that map was not good for some reason, then I certainly would want to have those comparisons.  But I don't need to do that, because it's not part of this case.

Q.    Got it.  Okay.

So you can put that away as well.

Moving to paragraph 22 of Exhibit 8.  You indicate something we've talked about a lot, the CCDs are preserved to the extent practicable.

Are you aware of any plans for counties that use CCDs as the building blocks of the plan?

A.    I'm not aware.

Q.    Okay.

And when you drew the district plans for Nassau County, you didn't use the minor civil divisions as the building blocks for plans in that plan, did you?

A.    I have my actual floor right here.

Q.    Sorry to make you pull that back out.

A.    It's okay.  So every jurisdiction has different relevant subdivisions.  Right?  That's why I --- in my

Page 185

first opening, what I said, I went on the census website to look for what relevant subdivisions might exist.  I couldn't find anything else that covered the county except for the CCD, and it seemed not unreasonable to use it.  I'm not saying that that's what the county ought to use or that it's the only thing one can do.  But it is one thing that you can do.  And I think it's not unreasonable to use that as a starting base of a neutral plan.  And I stand by that.

Q.    So let's go to paragraph 23 of Exhibit 8.  You say that preservation of precincts is sometimes regarded as a traditional redistricting criterion.

Why do you say --- use the word sometimes there?

A.    Because I've seen it be explicitly rejected as a criterion.  And I'm not sure where people started to use precincts.  I don't use precincts in my work. I've not generally built plans from precincts unless it's --- like, unless it's in, like, a state constitution that we should.  So some --- some state constitutions require you to preserve these things.

In some places the precincts do not change over time, except at the dicentennial census.  So it all is contingent.  Some of those decisions are contingent on that.  I think one of the reasons why people like to

Page 186

do precincts, people who work in the space of ensemble analysis, which is a methodology that some experts use, is because it allows them to reconstruct the election results with ease.  But I don't know it to be the kind of traditional criteria like others, such as equal population or preservation of political subdivisions because precincts are sometimes politically-motivated. They have --- there's other --- they change very often, sometimes every election.

And so, trying to build them to the boundaries is --- doesn't make a lot of sense in some cases.  Here, there's just not that many of them.

Q.    In the third sentence of that paragraph 23 you also say, it is also not clear if a mapmaker should preserve the most recent precincts --- precincts that exist when the census data becomes available or if offered by the Census Bureau, the Census Bureau's boundary files referred to as voting tabulation districts.

Did you ever check to see if the precinct layers you downloaded for Houston County matched in 2022 and 2024 and the census VTDs?

A.    I never downloaded the VTD file.  I do --- I did download the 2022 and the 2024, and I --- either there was a consolidation of a precinct or a new pre --- I

Page 187

can't remember exactly.  There was some change.  There was some change.

You know that when you look at the voter --- the election file, they don't line up properly.  You have to be careful not to add things an incorrect way because you make mistakes, which I did.  I had to correct.

Q.    You have used ensemble analysis in Tennessee.
Is that right?

A.    I would say technically yes, but no.

Q.    Okay.
Help me understand that.

A.    Well, first of all, a student of mine ran the ensemble analysis, not me.  That was on the request of the Plaintiff's attorney in that case.  I was extremely hesitant to do it and regard that as not a good exercise.

Q.    And so, are you aware whether when that ensemble analysis was run in Tennessee it used precincts as the base?

A.    Yeah, that was the problem.  The precincts were hugely problematic and created errors in the ensemble, which is why I basically disavow myself of that thing.  We should not have run it with precincts.  We should have used census data.

Page 188

Q.    Okay.

So in paragraph 23, you also say, I did not rely on any partisan data when drawing these illustrative plans.  I therefore, did not use precinct boundaries.

Can you help me understand what you mean by connecting those two things?

A.    Right.  If I --- so if --- if I downloaded the precincts boundaries, which have election results tied to them, I would know what the election results were in each precinct, which would then make it drawing with them not blind to party.  Right?  So I simply was trying to avoid any --- like, any indicators of partisanship or race when drawing my plans, particularly the race-blind plans.  And so, I didn't download the precinct files until after the fact.

Q.    And then you downloaded them so you could create your reconstituted election analysis?

A.    Right.  In order to demonstrate the Gingles 1, you need to have the election results.  So at that point, I did.

Q.    In paragraph 24, you compare your number of precinct splits to the state House districts.

Do you know the deviation to which the state House districts in Georgia are drawn?

A.    Empirically, like what they actually are or what

Page 189

they're required to do by law?

Q.    What the range is on the plan?

A.    I don't know.

Q.    You also say, in paragraph 24, in the middle of that, but one should keep in mind that these precincts were created after the legislative districts.  That is, the precincts were created in response to the enacted legislative districts.

Is that how you understand precincts to work in Georgia?

A.    Well, what I understand is that they've changed since the creation of the districts, so they certainly have changed.

Q.    But you say in this paragraph they were created in response to the enacted districts.

Is it your understanding that counties change precincts based on the enacted districts after each redistricting?

A.    Typically, that's what states do.  I could be wrong about --- Georgia might operate differently than other states, but in other states I've worked that is certainly the case, including in remedy cases for Section 2 violations, they've changed precincts to align with the legislative maps, in my experience.

Q.    You also, along that line, at the bottom of 24,

indicate that precincts could be adjusted should a court impose a new map on the county.

Do you know the process by which counties adjust precincts in Georgia?

A.    I don't know about it in Georgia.  Like I just said, I know factually that courts have imposed new maps and that the counties have adjusted their precincts in response.

Q.    Paragraph 25, it looks like we found a point of agreement with Dr. Barber.

A.    I have a lot of agreement with Dr. Barber.  He's a fine scholar, but ---.

Q.    And that says, precinct boundaries were not treated as a constraint at all.  And as we've talked about, you were focused on block group boundaries and were not looking at precincts.  So you never had to face the choice of do I split a block group or do I split a precinct.

Right?

A.    That's exactly right.

Q.    Page 13 of Exhibit 8, you have Figure 6, the comparison of the current legislative boundaries in Houston County.  I didn't see where you discussed this figure anywhere in the report.

Is there a reason that you included it or what you

Page 191

were trying to show with that?

A.    Well, I don't have the excuse of it being Christmas Eve.  I thought I did discuss it, but it shows that --- what it shows is the precinct boundaries overlaid over the various maps.  And so what it shows is --- well, what it does show is that the precinct boundaries line up with the congressional districts.

So back to the thing that I said earlier about --- I can't remember the exact word, created in response to enacted legislative different --- like, we know that they follow that line very closely.  And that line would have almost certainly changed after the redistricting.  It also follows pretty closely some of the lines in the upper House, but less so in the lower House.

Q.    And looking at this, it appears to me that there are only two precinct splits on the upper House, the state Senate plan.

Can you tell or not?

A.    It's hard to tell, but I --- my recollection was that's correct.

Q.    Okay.

And I believe you said in paragraph 24 that the House plan --- the state House plan splits five

Page 192

precincts.

Is that right?

A.    That's what I say in paragraph 24, yeah.

Q.    And the fewest number of precinct splits on a plan you drew for Houston County was seven, right, setting aside the one we're about to get to on 5A?

A.    Yeah, that's what --- that's what I write in paragraph 17 --- or 24.  But I took this from Dr. Barber's report.  These numbers are calculated from his report.

Q.    So going to the next plan, the Cervas blind 5A, am I correct that you started for Cervas line 5A in paragraph 26 by combining Wellston Center and HHPC precincts?

A.    Yeah.  So this plan was a plan that was created with precincts instead of with census blocks.  And I started by combining those two, because they were almost exactly the right population.

Q.    And how did you go about drawing using precincts? Did you import them into Dave's?

A.    Yeah, as an overlay.

Q.    And so ---?

A.    That's my recollection.

Q.    And so, as an overlay would mean you're still going to click in other units of geography, but you

Page 193

could see where the boundaries of the precincts were?

A.    Yeah, I --- I --- I think that's right, but you can also change the precincts in DRA.  And so it may --- it may have --- again, this is now over a month and a half ago.  I may have switched the precinct to precincts and then built it that way.  But --- but I --- I don't --- yeah, I won't swear to it.

Q.    Understood.

So sitting here today, you can't remember whether you had to load them or whether they were already loaded?

A.    That's right.  It's kind of irrelevant.

Q.    Right.

A.    Because it's the same --- it would be the same outcome.

Q.    And you call this a race-blind plan, but you already were aware of the demographics of Houston County when you drew this plan.

Right?

A.    Yeah.  So it's nominally race-blind in the sense that I wasn't using race to build --- to combine the precincts, but now I have this background.  I'm sorry, I'm very --- hand gesturing here.  My brain can't unsee the things it's seen.

Q.    And in drawing this plan, you started with the

Page 194

northeastern precincts identified in paragraph 26 and then drew the rest of the plan around that.

Is that right?

A.    Actually, I don't really say that in paragraph 26. I think it's probably right, but I may have actually started with something else and led to there, but I don't --- I don't know.

Q.    Okay.

And that was my inference, so that could be incorrect as well.  Yeah.  And then Figure 7 is Cervas blind 5A.  And looking at Table 10 on page 15, this plan would also elect the candidate of choice for black voters in all four elections?

A.    Correct.

Q.    And it is 51.2 percent black VAP in District 1. Right?

A.    Correct.

Q.    And you have not drawn a four district plan that uses precinct boundaries to construct the plan?

A.    I didn't even intend to do this.  It was just offered by Barber as an idea.  I did it.  So that's what I did.  Not trying to overwhelm the court with all these plans.

Q.    So let's go to paragraph 30, and then I think we'll be at a good breakpoint here.  You comment about

Page 195

the maps that Dr. Barber showed that areas excluded or included in the changes that were made.  And you say those maps demonstrate how narrowly tailored adjustments can satisfy the demanding test of Gingles. And what you mean there is what we discussed earlier about narrow tailoring of only doing what's necessary to get to 50 percent plus 1 for black voters.

Right?

A.    Right.

Q.    That's a good point for a break, Dr. Cervas, if you want to.

A.    Yeah.

Q.    Okay.

A.    Thank you.

VIDEOGRAPHER:

Going off the video record at 2:44 p.m.

OFF VIDEO

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

ON VIDEO

VIDEOGRAPHER:

Going back on the video record at 2:56 p.m.

---

Jonathan Cervas , Ph.D.                              March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 196

        (Whereupon, Defendants' Exhibit 10, Dr.

        Barber's Second Report, was marked for

        identification.)

                        ---

BY ATTORNEY TYSON:

Q.    Dr. Cervas, I'm going to hand you what I marked as

Exhibit 10, which is Dr. Barber's, I don't know,

response report, rebuttal report.

A.    This is his second.  This is his second.

Q.    His second report.

    And I just want to ask you a few questions about

that, starting on page four, at Section 2.2.  Dr.

Barber indicates that you list three census blocks

that you move.  This is the first paragraph on page

four.  And that one of them was an unpopulated water

block on the eastern edge of the county.

    Is he right about that?  Have you looked at that?

A.    Oh, he's definitely right about it.  I don't

really know how it happened, but --- but he's right.

I don't think it makes any difference.  It wouldn't

affect the compactness score.

Q.    Okay.

    And the second sentence of that section, Dr.

Cervas added two adjacent census blocks that are 100

percent black voting age population.

Page 197

Do you agree with that as well?

A.    Yes.

Q.    And then this one is probably --- I think we've kind of already covered this.  Moving to Section 2.3 about the compactness scores, you agree with Dr. Barber that your more compact plan is less compact overall on Polsby-Popper and Reock.

Is that right?

A.    The --- sorry.  The data in Table 1, yeah, shows --- I mean, these numbers are like what we might call like within fudge.  They're basically the same.

Q.    Okay.

But you don't have a reason to dispute Table 1 in Dr. Barber's report?

A.    I didn't compare it myself, but there's no reason to believe that he's not accurate.

Q.    And are you aware that there is a parallel case challenging the Houston County Board of Commissioners elections called the Rozier case?

A.    No.

Q.    Okay.

Do you know who Mr. Fairfax is, as a map drawer? You heard that name before?

A.    Anthony Fairfax?  I know --- I don't know him personally, but I know his work.

Page 198

Q.    Okay.

Have you reviewed any maps that he drew for Houston County Commission?

ATTORNEY NEWMANN:

I'm going to object on the ground that's outside the scope of this case.

ATTORNEY TYSON:

I'm just asking if he knows or not.

ATTORNEY NEWMANN:

That's fine.

ATTORNEY TYSON:

Yeah.

BY ATTORNEY TYSON:

Q.    You may answer.

A.    No, but I'd like to.  I don't.  I don't.  I don't.

Q.    The last question for Dr. Barber's report here, page 11, Table 4.

Have you done any independent verification of Table 4 that Dr. Barber generated comparing the self-reported block percentages to the BISG imputed block percentages?

A.    I didn't compare the numbers directly, but I did sort of rerun it to inspect the argument, and I saw a consistency in between what I have and what he's reporting in terms of the differences between the data

Page 199

with the BISG and that without BISG.

Q.   So with that, Dr. Cervas, that concludes all the questions I have for you today.

A.   I'm not done yet.  Just kidding.

ATTORNEY NEWMANN:

No questions.

ATTORNEY TYSON:

Okay.

Thank you for your time.

VIDEOGRAPHER:

Great.  This concludes the testimony of Jonathan Cervas, Ph.D.  The total number of media units will be two and retained by Veritext.

OFF VIDEO

COURT REPORTER:

Are both parties going to want a copy of the transcript?

ATTORNEY TYSON:

E-transcript, yes.

COURT REPORTER:

E-transcript.  And also email?

THE WITNESS:

Sure.  Yeah.  I won't have an opportunity to look it over and sign?

ATTORNEY TYSON:

Page 200

Oh, yes.

COURT REPORTER:

That was my next question.  Read and sign?

ATTORNEY TYSON:

Read and sign.  And then I'll let you know on video.  I don't know right off now whether we're ordering that yet or not, so ---.

ATTORNEY NEWMANN:

I don't think so.

* * * * * * * *

VIDEOTAPED DEPOSITION CONCLUDED AT 3:00 P.M.

* * * * * * * *

Page 201

COMMONWEALTH OF PENNSYLVANIA   )

COUNTY OF ALLEGHENY              )

                    CERTIFICATE

    I, Gina Rodgers, a Notary Public in and for

the Commonwealth of Pennsylvania, do hereby certify:

    That the witness, Jonathan Cervas, Ph.D.,

whose testimony appears in the foregoing deposition,

was duly sworn by me on March 18, 2026 and that the

transcribed deposition of said witness is a true

record of the testimony given by said witness;

    That the proceeding is herein recorded fully

and accurately;

    That I am neither attorney nor counsel for,

nor related to any of the parties to the action in

which these depositions were taken, and further that I

am not a relative of any attorney or counsel employed

by the parties hereto, or financially interested in

this action.

Dated the 26th day of March, 2026


                <%23,Signature%>

                 Gina Rodgers,

                   Court Reporter

Page 202

Jonathan Cervas , Ph.D.


                          March 30, 2026

RE:    Driver, Courtney, Et Al. v. Houston County Board Of
         Elections, Et Al.
     3/18/2026, Jonathan Cervas , Ph.D. (#7906129)
     The above-referenced transcript is available for
review.
     Within the applicable timeframe, the witness should
read the testimony to verify its accuracy. If there are
any changes, the witness should note those with the
reason, on the attached Errata Sheet.
     The witness should sign the Acknowledgment of
Deponent and Errata and return to the deposing attorney.
Copies should be sent to all counsel, and to Veritext at
litsup-ga@veritext.com
 Return completed errata within 30 days from
receipt of testimony.
   If the witness fails to do so within the time
allotted, the transcript may be used as if signed.



               Yours,
               Veritext Legal Solutions

Page 203

Driver, Courtney, Et Al. v. Houston County Board Of Elections, Et Al.

Jonathan Cervas , Ph.D. (#7906129)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____     _____

Jonathan Cervas , Ph.D.                                Date

Page 204

Driver, Courtney, Et Al. v. Houston County Board Of Elections, Et Al.

Jonathan Cervas , Ph.D. (#7906129)

                    ACKNOWLEDGEMENT OF DEPONENT

     I, Jonathan Cervas , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____   _____

Jonathan Cervas , Ph.D.                                Date

*If notary is required

                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

                    _____ DAY OF _____, 20____.



                    _____

                    NOTARY PUBLIC

Jonathan Cervas , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 18, 2026

**[0025 - 2022]**

Page 1

| **0** | **10** 5:20 71:21 | 190:21 | **2** |
|---|---|---|---|
| **0025** 1:7 7:24 | 117:23 148:15 | **14** 113:23 | **2** 5:7 19:18,20 |
| | 182:1 194:11 | 169:13 170:6 | 19:23 20:1 |
| **1** | 196:1,7 | **147** 6:6 | 29:16 32:2 |
| **1** 5:6 12:4,11 | **100** 147:5 | **15** 17:24 146:7 | 35:3 42:6,11 |
| 17:6 20:11,24 | 153:15 196:24 | 194:11 | 89:9,17 90:19 |
| 58:20 61:16 | **103** 155:16 | **15213** 10:13 | 91:1 113:14 |
| 62:1,21 63:8 | **106** 6:5 | **156** 6:6 | 123:11 124:9 |
| 63:16 66:21 | **108** 51:6 | **16** 17:6 119:25 | 133:20 156:9 |
| 67:19 68:5,9 | **10:18** 58:7 | **160** 5:18 | 160:11 163:11 |
| 70:7,13 76:24 | **10:42** 66:3 | **161** 6:6 | 171:25 174:7 |
| 78:17,22 83:16 | **10:43** 66:11 | **164** 6:7 | 174:19,20 |
| 84:5,7,20 85:4 | **11** 139:11 | **17** 17:11 51:8 | 175:14,20 |
| 85:7,13 107:2 | 166:9 198:17 | 123:11 172:10 | 176:5,17,21 |
| 108:20 110:3 | **11/22/23** 5:9 | 192:8 | 177:6,21,24 |
| 110:13 124:19 | 44:24 | **17,361** 90:14 | 189:23 |
| 124:21 131:5 | **11/4/25** 5:10 | **171** 6:7 | **2.2.** 196:12 |
| 131:11,15,20 | 87:3 | **1735** 3:5 | **2.3** 197:4 |
| 132:24 133:17 | **110** 6:6 | **175** 6:7 | **20** 6:4 18:22 |
| 136:24 138:12 | **115** 6:6 | **177** 6:7 | 120:15 175:12 |
| 142:1,4 143:5 | **119** 6:6 | **18** 1:15 2:10 | 176:11 204:15 |
| 143:10 144:5,7 | **11:38** 113:6 | 6:4 7:13 17:18 | **200** 4:7 |
| 144:11,13,15 | **12** 5:6 45:19,21 | 17:23 18:20 | **201** 4:8 |
| 145:4,9 146:16 | 105:14 142:5 | 71:7,8 201:8 | **2020** 5:13 |
| 147:7,11,16 | 167:7 174:14 | **180** 5:19 | 25:15 74:17 |
| 169:17,25 | 177:4 | **182** 6:7 | 96:20 173:4 |
| 170:8 171:10 | **120** 6:6 | **19** 104:5 | **2022** 25:15 |
| 171:14 173:23 | **122** 5:17 | **19103-2929** 3:6 | 26:14,18,23 |
| 174:7,12,13,17 | **125** 6:6 | **196** 5:20 | 80:23 81:2 |
| 175:14,16,21 | **126** 6:6 | **198** 6:7 | 86:13,16 90:11 |
| 176:5,18 | **127** 6:6 | **199** 4:6,7 | 92:15 173:5 |
| 188:18 194:15 | **12:22** 141:5 | **1a** 83:17 | 186:21,24 |
| 195:7 197:9,13 | **13** 47:3 84:13 | | |
| | 144:9 168:3 | | |

Veritext Legal Solutions

800.808.4958

770.343.9696

**[2023 - 55.7]**                                                    Page 2

**2023** 46:14
**2024** 25:16
26:11,23 80:23
81:2 88:21
93:2 133:21
173:5 186:22
186:24
**2025** 12:22
76:23,24 77:3
77:3 86:20
87:12
**2026** 1:15 2:10
7:13 201:8,19
202:3
**21** 22:8 178:15
**22** 133:14
184:12
**22nd** 45:5
**23** 74:4 185:11
186:13 188:2
201:20
**23rd** 3:5
**24** 136:9
188:21 189:4
189:25 191:24
192:3,8
**24th** 73:24
180:6
**25** 6:4 35:14
190:9
**26** 78:25 104:7
139:6 141:17
192:13 194:1,4

**26th** 201:19
**27** 80:10
174:13 175:16
**28** 143:10
**29** 72:10 81:11
**2:44** 195:16
**2:56** 195:24

**3**

**3** 5:8 44:23
45:3 123:15
142:21,22,22
143:4 170:8
173:23 174:7
174:19 175:15
**3/18/2026**
202:5
**30** 6:4 194:24
202:3,16
**300** 23:13,17
**301** 2:9
**30326** 3:15
**31** 92:16,22
**32** 85:5,12 93:3
**32.4** 85:12
**33** 6:4
**34** 6:4 84:12
**35** 6:4
**35.8** 85:12
**36** 26:11 86:4
**36.5** 90:16
**3630** 3:13
**374** 10:12

**38** 26:15 86:14
**39** 86:14
**3:00** 200:12

**4**

**4** 5:10 24:16
86:25 87:2,12
103:25 104:4
105:14 112:16
121:10 123:12
123:16 127:23
132:17 135:25
136:4 137:3,21
141:22 174:8
174:19 177:4
178:9 198:17
198:19
**40** 89:3
**41** 26:18 90:5
**42** 5:7 26:19
**44** 5:8 6:4 89:3
**45.6** 139:7
**46** 92:19
**46.5** 133:22
**47** 93:2
**47.2** 136:10
**48** 182:1
**49.1.** 133:22
**49.3** 104:17
**49.9** 148:24
**49.97** 143:24

**5**

**5** 5:12 83:8
95:25 96:2
103:25 117:23
118:2,6 124:15
124:18 129:2
132:16 134:3
141:21 172:6
172:18,18
175:5 178:23
**50** 29:5 93:9
94:19 111:19
142:1 143:21
143:21 146:14
148:9 168:21
169:9,15,21,23
195:7
**50.8** 135:25
**5000** 10:11
**51** 95:16
**51.2** 194:15
**52** 6:4 99:23
120:17 131:11
182:5,7
**53** 101:14
116:14 182:7
**53.7** 123:12
**54** 102:13,18
**55** 6:4 103:6
182:10
**55.5** 85:7
**55.7** 85:6

Jonathan Cervas , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 18, 2026

**[56 - act]**

Page 3

**56**  103:9
182:10
**56.61**  88:2
**57**  105:21
182:10
**58**  6:4 106:6
**59**  108:1
**5:25**  1:7 7:24
**5a**  192:6,11,12
194:11

**6**

**6**  5:13 86:4
96:20 97:5
119:25 190:21
**60**  6:5 111:7
**61**  112:24
**62**  113:23
**63**  6:5 114:9
**64**  6:5 115:6
**65**  116:6
**66**  117:1
**67**  6:5 117:12
**68**  48:20
117:18 118:9
118:20
**69**  6:5
**6th**  161:6

**7**

**7**  4:3 5:17
122:2,7 136:9
143:2 194:10
**70**  6:5

**700**  3:14
**72**  125:4
**77**  6:5 130:24
**78**  6:5
**7906129**  202:5
203:2 204:2

**8**

**8**  4:3 5:18
104:7 139:6
160:21 161:1
175:6,17 176:5
176:11 177:3
184:12 185:11
190:21
**80**  120:16
134:2 140:1,8
**82**  136:13
**85**  6:5 137:7
**87**  5:10
**88**  6:5
**89**  139:18
140:7

**9**

**9**  4:6 5:19
137:2 143:10
180:14,19
**9,966**  90:16
**90**  141:16
**91**  6:5
**93**  144:10
147:14
**94**  146:25
147:2

**95**  6:5 149:6
**96**  5:12,13
**97**  150:4
**98**  151:13,23
**9:26**  2:11 7:13

**a**

**a.m.**  2:11 7:13
58:7,15 66:3
66:11 113:6,14
**abbreviated**
10:5
**ability**  32:6,10
**able**  15:22
78:15 121:23
122:13 125:14
125:19 129:3
146:4 150:5
154:14 163:18
164:25 166:14
**above**  105:17
146:14 148:9
159:22 169:23
202:6 204:7
**absolute**  29:23
30:3
**absolutely**
111:16 172:9
178:7
**academic**  64:15
**accept**  146:21
**acceptable**
124:15

**accepted**  64:8
**access**  142:15
**accomplish**
169:24
**account**  48:18
50:2,6
**accuracy**  40:20
43:2,15 202:9
**accurate**  40:17
41:6,6 42:3,21
43:6 44:1,2,2
46:16,17 47:9
47:10 68:4
79:5 80:8
81:13 90:24
131:4 197:16
**accurately**
157:7 201:12
**achieve**  136:25
159:24
**acknowledged**
47:5
**acknowledge...**
204:3
**acknowledg...**
202:12
**acquired**  93:10
**acronym**  38:24
74:24
**acs**  74:18,20
**act**  19:19 20:6
29:16 49:10
68:21 108:5
160:4

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[action - analysis]**                                          Page 4

**action** 8:4 201:14,18

**active** 183:1

**actual** 29:18 56:2 65:6 112:19 184:22

**actually** 15:15 17:17 18:1 27:16 28:15 29:8 35:7 39:18 40:13 43:23,25 47:24 48:9,9 51:3,15 52:9 53:5 54:15,19,21 55:21,21,24 60:14 61:7 67:25 68:19,22 72:14 73:12 75:9,19 77:18 100:10 104:11 110:10 111:20 114:21 118:15 121:21 125:1 132:25 138:11 146:20,22 154:15 163:23 167:23 171:5 173:3,16 174:4 177:1 183:5,6 183:8 188:25 194:4,5

**add** 49:23 51:17,19,20

89:22 100:4 187:5

**added** 41:22,25 53:3 82:12 169:21,22 196:24

**addition** 168:25

**additional** 160:7 165:16 169:16

**additions** 204:6

**address** 10:10

**addressed** 104:19

**adds** 53:4

**adjacent** 169:20 196:24

**adjust** 190:3

**adjusted** 131:16 190:1,7

**adjustments** 107:21 136:14 136:16 195:4

**adopt** 166:12 166:19,20

**adverse** 155:4

**advisor** 14:8 15:7

**affect** 132:22 196:21

**affects** 163:17

**affiliations** 8:10

**age** 29:7 30:3 30:11,12 81:23 83:18,20,21,23 85:6,11 110:6 110:14,23 141:25 196:25

**agency** 1:25

**aggregating** 114:22

**ago** 135:5 137:12 193:5

**agree** 7:17 42:25 46:13 110:12,22 119:7 133:23 162:11 164:4,8 164:9,9 197:1 197:5

**agreed** 7:3

**agreement** 75:22 190:10 190:11

**ahead** 10:7 42:5 74:4 163:15 182:20

**ai** 37:20

**air** 56:16,20,21 94:15 95:13,14 102:13,16 103:1 126:20 142:6,12 168:22

**al** 1:5,9 7:22 202:4,4 203:1

203:1 204:1,1

**align** 189:24

**alleged** 166:11

**allegheny** 201:2

**allocate** 157:11

**allotted** 202:19

**allow** 61:24 72:2 145:22

**allows** 140:2 152:5 165:18 186:3

**alter** 166:14

**alternative** 53:25 66:14,17 68:6,8 71:22 72:8,8,25 73:1 149:3,8,21 163:19

**ambiguous** 121:13

**amicus** 10:25 154:23 179:12 179:17,21

**amount** 159:9

**analyses** 86:5

**analysis** 39:22 70:21 71:9 76:9 79:24 82:23,25 84:24 88:20,21 89:12 106:15 107:1 116:19 117:2,7 121:16 127:20

**[analysis - assumption]** Page 5

| | | | |
|---|---|---|---|
| 136:24 157:22 166:2,4 172:7 173:14 186:2 187:8,14,19 188:17 | **anymore** 48:11 **anyway** 112:22 **anyways** 43:14 173:6 | **arbitrarily** 54:23 105:2 | 126:11 134:15 149:7,22,25 154:13 161:7 166:23 184:6 |
| **analyze** 71:15 125:16 149:7 149:22 | **apart** 67:2 **api** 74:10 114:16,20 | **arcgis** 15:13,20 **area** 56:1 60:19 95:14 102:19 173:22 176:12 | **asking** 9:20 21:8 24:1 62:5 69:16 98:6,13 110:11 128:21 |
| **analyzed** 77:3 137:4 139:13 149:21 164:19 | **apolitical** 56:13 **app** 39:11 44:6 44:6 121:16 | **areas** 5:14 96:21 195:1 | 135:4 136:3 147:13 153:19 158:19 165:8 |
| **analyzing** 76:15 170:24 | **apparently** 171:23 | **arguably** 110:10 **argue** 173:25 | 167:16 180:8 198:8 |
| **anderson** 3:21 65:3 | **appearance** 8:8 **appearances** 8:9 | **argued** 109:21 **argument** 198:23 | **assembly** 122:19,20 |
| **answer** 98:17 98:18 99:6 110:25 122:22 129:14 130:2 130:11,13,17 140:11 154:9 154:10 162:3 172:1 198:14 | **appeared** 53:22 **appears** 86:8 86:12 104:15 134:3 146:9 191:17 201:7 **appended** 204:7 | **arielle** 3:21 **arlington** 153:5 153:8 **art** 150:13 **articulation** 36:14 **artificial** 36:20 | **assign** 79:2 **assigned** 123:1 132:15,15,16 171:6 **assigning** 171:13 **assist** 38:1 |
| **answered** 28:14 126:11 | **applicable** 202:8 **application** 159:15 | **aside** 26:23 48:13 88:25 96:17 123:10 160:19 165:4 192:6 | **assistant** 15:25 16:4,21 17:23 171:19 |
| **anthony** 197:24 **anticipated** 23:9 | **apply** 77:6 85:19 **appointed** 17:8 **approached** 95:9 | **asked** 14:17 23:24 25:19 27:18 28:2,15 28:22 35:11 | **assistants** 38:3 **assisted** 172:4 **assume** 25:3,6 **assuming** 15:19 |
| **anybody** 11:13 11:17 30:25 37:25 41:14 56:7 112:5 | **approximately** 51:7 76:20 | 53:18 61:18,22 64:1 66:22 67:6 100:9 | 106:17 147:6 158:5 159:10 170:14 |
| **anybody's** 56:8 | | 118:15 122:22 | **assumption** 159:11 |

Jonathan Cervas , Ph.D.                     March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[atlanta - barber]**                                    Page 6

**atlanta** 3:15
**attached** 12:19
  202:11
**attendance**
  124:5
**attention** 65:12
**attest** 94:7
**attorney** 4:6
  6:3 8:11,12,15
  9:7 11:13 12:8
  18:11,13,15,17
  20:14,18 24:6
  24:10,14 25:20
  26:1,7 30:5,17
  33:3 34:1,7,11
  35:24 36:7
  42:15 44:15,19
  45:2 52:20
  53:7 55:8,14
  57:22,25 58:4
  58:16,24 59:4
  60:20,25 62:24
  63:6,11,13,21
  63:25 64:11,17
  64:22,24 65:1
  65:7,9,15,21,25
  66:12 67:21
  68:1 69:5,9,14
  70:8,16 77:15
  77:20 78:7,12
  85:20,25 87:7
  87:16,18,20
  88:10,14 91:3
  91:8 94:25

95:8 96:5 97:1
106:21 110:16
110:18 113:15
115:14,21
119:12,18
120:8,12 122:5
125:23 126:6
126:10,14
127:10,18
129:19,23,25
130:9,14,21,23
140:23 141:14
147:9,12,17,20
147:22 148:1
148:13 156:11
156:15 160:25
161:14,17,19
161:25 162:5
164:12,17
168:9,12,14
169:4 171:1,12
175:22 176:2
177:13,19
178:1 180:18
182:19 183:21
187:15 196:5
198:4,7,9,11,13
199:5,7,18,25
200:5,9 201:13
201:16 202:13
**audience**
  144:22
**audio** 7:16

**authorization**
  1:25
**available** 15:21
  42:21 80:15,18
  82:13 107:6,7
  142:23 153:17
  159:5 186:16
  202:6
**avenue** 10:11
**avoid** 34:6 52:1
  52:16,17 53:5
  188:12
**avoiding** 50:6
**aware** 12:21
  19:7 41:8
  102:15 112:7
  119:16 120:5
  120:23,24
  123:23 127:3
  154:19 155:6
  160:9,13
  171:13 184:15
  184:17 187:18
  193:17 197:17
**awkward**
  128:20

**b**

**b** 83:22 116:8
  116:17,18
**back** 12:17
  24:5 43:4
  55:20 58:14
  61:16 66:10

71:21 78:25
83:4 89:19
90:2 113:13
123:11 130:1
141:12,16
143:1 144:16
174:13 175:5
175:14 180:6
184:23 191:9
195:23
**background**
  10:4 12:16
  83:9 135:16
  193:22
**bad** 133:11
**ballot** 151:6
  154:7 157:5,15
**ballots** 157:16
**ballpark** 23:11
**bar** 153:16
  162:10 178:16
**barber** 11:9
  53:25 75:17
  92:12 109:21
  110:12 111:1
  127:1,16
  162:19 164:10
  168:1 173:17
  173:19 178:16
  179:10 190:10
  190:11 194:21
  195:1 196:13
  197:6 198:19

**barber's** 5:20 11:25 120:25 127:6,7,19 145:16,25 148:8 161:3,7 161:11,12,21 162:10 163:17 164:16 169:19 170:1 192:9 196:2,7 197:14 198:16

**bars** 116:8,13

**bartlett** 29:22 30:1 110:10 169:2

**base** 56:16,20 56:25 94:15 95:14 102:13 102:16 103:1 126:21 142:7 142:12,16 168:20 185:9 187:20

**based** 63:8 64:7 81:18 84:24 89:11 104:10 116:19 128:22 134:21 135:3 135:20 147:13 173:14 189:17

**baseline** 151:24

**bases** 56:21

**basically** 35:8 72:15 114:25

131:20 135:12 148:25 152:14 155:20 187:23 197:11

**basis** 79:16 86:6 115:10 118:13 177:24

**bayesian** 77:5

**began** 102:19

**beginning** 2:10 8:10 13:21 45:24

**begins** 113:14

**behalf** 2:4

**belief** 22:3 36:11 94:22,24

**believe** 16:24 22:15 24:20 27:1 43:6 46:11 51:22 52:10 67:14 74:20 75:22,22 79:4 80:14,16 85:3 89:5,19 90:5,21 96:10 103:10 116:3 116:19 119:20 121:4 123:1 126:16 134:22 135:6,14 141:23 144:11 144:14 145:3 146:8 177:21 178:18 191:24

197:16

**believes** 178:17

**best** 48:24 57:1

**bethune** 33:13 33:15 34:3,12 41:22

**better** 43:25 48:10

**billed** 22:23

**bills** 22:17

**bin** 116:7,11,15 116:16

**bisg** 78:14 79:22 84:24 85:19,23 172:7 198:20 199:1,1

**bit** 22:1 24:4 27:9 38:7 53:20 115:3 128:7,20 143:20 163:15 177:1

**bizarre** 54:18 176:23

**black** 27:15 28:25 29:4,5,6 29:6,7,15,24,25 30:16 31:23 34:23 35:14 60:18,19 61:7 63:9,18 64:3 68:14,18 69:2 69:22 70:20,22 70:24 71:15,19

72:2 75:23,23 76:2,3,4,5,6,8,9 76:12,13 77:13 78:5 83:10,23 84:3,3,3 85:11 89:10,15,17 90:25 91:10,19 91:23 92:3,15 92:23 93:2 95:10,12 96:13 103:21 104:1 104:11 106:4 107:21 108:2 109:4 110:7,14 110:23 111:10 111:17,21 112:7 119:25 120:14 123:12 125:7,10,19 129:3,10,12 130:6 131:6,10 131:16 133:16 134:4,9 136:1 136:10 137:3,8 137:13,14,17 137:18 139:7 139:11,20 140:2 141:25 144:6 146:3,3 146:14,17,20 147:3,4 148:9 148:19 149:7 150:5 151:5,10 154:7,14 155:4

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[black - bryan]**                                                    Page 8

155:18,21,23
155:23 156:1
157:20,21
158:8,24 159:3
159:3,7,7,8,17
159:20 163:10
168:6,22 169:1
169:14,20
172:6,12 173:2
194:13,15
195:7 196:25
**blacks**  62:12
**blind**  53:3 59:2
59:3,12,17,19
59:23 61:8,8
61:10 69:20
70:1 71:12
100:15,21
101:3,7,19
102:6,9 103:20
103:24 104:1
104:12,17,17
104:22 107:23
108:18,18
109:2,6,14,14
110:20,20
111:15,15
113:24 126:16
126:24 129:2
129:11 130:7
135:16,18,19
138:25 139:6
145:14,14
162:25 168:21

188:11,14
192:11 193:16
193:20 194:11
**block**  50:7 51:4
51:7,10,11,16
51:19 52:17
75:3,3,12,19
79:7 82:17,21
94:4,10 101:11
102:21 114:25
121:19 123:1
132:14,19
167:14,18
169:20 176:13
176:16 190:15
190:17 196:16
198:20,21
**blocks**  50:19
79:2 81:12,14
94:10 114:22
132:18 167:18
167:25 169:17
170:2,8 184:16
184:21 192:16
196:13,24
**board**  1:8 7:21
38:15,18,19,22
38:25 58:22
70:18,22 71:9
71:17 104:10
104:20 105:5
112:3,8,16
118:11,14
121:3,10 122:9

123:24 124:4
125:4 129:8
134:21 135:3
135:20 183:22
184:4 197:18
202:4 203:1
204:1
**boe**  38:23 39:3
121:13,15
163:7
**book**  15:13
**border**  176:22
**borders**  102:20
**bottom**  73:23
90:15,15 92:5
96:6 122:16
166:8 168:4
189:25
**boundaries**
51:18 53:9,14
56:11 82:13
95:19 96:14
97:16,17 99:21
105:3 118:23
136:4 167:21
178:19,24
179:4 186:10
188:4,8 190:13
190:15,22
191:5,7 193:1
194:19
**boundary**
53:25 80:19,20
81:8 82:10

93:12 96:13
135:22 186:18
**box**  148:19,21
**brain**  193:23
**brains**  16:10
**break**  10:1
57:24 58:5,10
58:17 66:6
113:2,3,4,9
138:22 141:1,8
195:10,19
**breakdown**
84:21 103:7
**breakpoint**
194:25
**breaks**  9:25
**brief**  33:21
57:24 154:23
**briefly**  11:5
12:25 100:1
119:7
**briefs**  179:12
179:17,21
**bright**  119:11
119:16
**bringing**  22:22
**brings**  167:9
**broad**  31:24
**bryan**  3:9,10
3:20 8:13 9:9
21:7 57:23
65:4,13,16
118:15 122:23

Jonathan Cervas , Ph.D.                March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**bugs** 40:21 41:3

**build** 47:18 50:10,14,14 128:22 186:10 193:21

**building** 50:23 51:10 184:16 184:21

**built** 50:9 51:15 71:11 74:21 128:19 176:24 185:18 193:6

**bureau** 56:18 95:18 97:3 114:16 186:17

**bureau's** 79:1 186:17

**business** 10:10

**button** 102:10

**bvap** 145:17 170:10

**c**

**c** 3:1 7:8 128:6 173:20

**calculate** 132:11

**calculated** 43:10 105:16 192:9

**calculating** 132:10

**calculations** 72:21 115:1

**caliper** 5:7 41:9 41:14 42:7,12

**call** 21:8 47:20 60:13 116:13 117:2 134:21 150:10 173:12 173:18 175:13 193:16 197:10

**called** 9:1 11:7 41:24 55:5 72:13 77:5 79:4 174:2 178:10 197:19

**calls** 42:19 106:22 119:13 119:13 125:24 171:2

**campaigns** 13:24

**candid** 159:3

**candidate** 70:23 71:15,18 86:15 89:10,15 89:17,18 90:20 90:25 91:10,19 91:23 92:4,9,9 106:12 109:4 123:17 125:20 126:9 129:4 137:3 139:11 144:6 147:4 148:19,20,21

151:15 152:16 152:17 154:8 155:8,9 156:4 156:24 157:2 157:21,25 158:3,4,7,8,24 159:1,3,6,8,10 160:2 194:12

**candidates** 31:6,17 32:1 64:3 72:3,18 125:14 126:4 134:8 137:9,15 137:19 139:21 140:6 146:3 150:6 151:1,5 152:5,15 154:14 156:23 157:17,18 158:5,10,13,23 159:20,24

**capacity** 20:20

**career** 14:20 128:24

**careful** 148:4 154:9 187:5

**carnegie** 10:11 13:22

**carolina** 177:5

**case** 1:6 7:24 9:10 12:13 13:3 16:6,14 16:15 19:4,12 19:13,17,19,22

20:12,23,25 21:5,9,16,18,24 21:25 22:7,18 23:7,14,16,17 23:19 24:23 25:5 33:16 34:23 35:11 37:25 38:4 43:8,18,20 45:5 46:23,24 47:23 51:12 57:16 59:8,11 63:3,8,16 67:4 68:5 69:19 73:2 91:21 93:18 97:22 98:9,10,14 99:7,8,9,12,13 99:15,16,19 101:2 124:16 138:16 154:25 156:9 160:11 171:18 172:2,3 177:7,7,10,21 177:22 179:25 180:2 182:16 182:24 183:9 184:5,9 187:15 189:22 197:17 197:19 198:6

**cases** 14:18 15:25 17:19 18:8,18 19:8 35:3 38:2

Jonathan Cervas , Ph.D.                          March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[cases - characteristics]**                          Page 10

44:12 47:18
145:1 186:11
189:22
**cast** 88:1 157:4
157:16
**casts** 157:14
**categories**
75:21 77:7
**category** 78:21
**ccd** 53:22 75:2
82:10,13 96:14
100:4,5 102:24
167:21 185:4
**ccds** 55:22
94:14 95:13,19
96:8 97:10,13
97:19,20 98:2
98:3,8 99:14
99:19 175:7
184:13,16
**cds** 128:6
**census** 5:13,15
50:7,21 51:3,7
51:11,16 52:2
52:5,17 53:19
55:25 56:2,6
56:17 74:8,10
75:1,21 76:9
79:1,2,4,7
81:12,14 93:10
94:5,9,9,10,10
94:11,11 95:16
95:18,21,22
96:21,22 97:3

97:7,7 105:23
114:16,20,22
132:10,14
167:14,25
169:17,20
170:2,8 172:12
172:19,22
173:5 174:23
176:12,16,24
181:19,21,22
183:4,5 185:1
185:23 186:16
186:17,17,22
187:25 192:16
196:13,24
**center** 192:13
**centre** 2:9
**ceo** 120:21
164:5
**certain** 43:14
100:10
**certainly** 13:7
20:19 26:2,8
32:20 40:12,14
44:2 57:12
77:2,4 89:21
103:14 104:4
108:3 109:22
111:14 133:10
136:6 142:13
146:24 148:2
155:13 175:8
179:6 184:7
189:12,22

191:13
**certainty**
142:18 145:25
**certificate** 4:8
201:3
**certification**
7:5
**certify** 201:5
**certifying** 1:25
**cervas** 1:14 2:4
4:4 7:20 8:25
9:8 10:9 45:20
45:25 47:5
58:17 66:13
113:16 130:24
130:25 141:15
167:9 168:21
173:11 192:11
192:12 194:10
195:10 196:6
196:24 199:2
199:12 201:6
202:1,5 203:2
203:24 204:2,4
204:12
**chad** 3:19 8:2
**chadha** 3:24
**chair** 165:6
**chairman** 39:1
120:21 164:3
**challenge** 184:4
**challenged**
177:5

**challenger**
89:10 90:19,25
91:10
**challenger's**
89:24
**challenging**
197:18
**chancellor**
45:13
**change** 18:23
19:25 136:4
164:22 167:17
174:8,18,19
185:22 186:9
187:1,2 189:16
193:3 203:4,7
203:10,13,16
203:19
**changed** 44:5
81:1,5 131:24
174:21 189:11
189:13,23
191:13
**changes** 12:20
135:23 142:6
164:25 171:24
174:6,7 175:1
195:2 202:10
204:6
**changing**
165:21
**characteristics**
114:12

**characterizing** 155:12

**charged** 23:17 23:21

**charging** 23:13

**chatgpt** 37:1,4 37:11,14

**check** 77:13 78:1 81:1 133:4 143:23 157:9 167:3 186:20

**checked** 77:13 78:4,5

**checking** 104:4

**checks** 77:12

**chief** 165:6

**choice** 31:18 32:1 64:4 70:23 71:15,19 71:22 72:4,18 73:7,16 89:10 89:15,17 91:1 91:11,19,23 92:4,10 106:8 106:12 109:4 125:14,20 126:4,9 129:4 134:8 137:3,9 137:16 139:21 140:6 144:6 146:4 147:4 148:19 150:6 152:9,13 154:8

154:15,20,23 155:5 156:4 157:21 158:7,8 158:24 159:1,3 159:8,20 165:13 190:17 194:12

**choices** 124:24

**choose** 25:17 157:19,21 159:8

**chose** 77:13 111:22 124:25 125:2 129:16 130:19 178:8

**christmas** 73:25 74:2 191:3

**circuit** 128:10

**circumstances** 112:13

**cities** 50:19 53:15,21,23 178:17 179:3 179:16 181:18 182:11 183:3

**citizen** 30:11

**city** 50:20,22 53:24 127:3,8 127:20 153:1 178:19,24 179:7

**civil** 2:5 98:1,3 98:9 184:20

**claim** 101:6

**clarification** 69:23 83:21 115:23 136:17

**clarify** 17:21 27:17,21 28:7 28:18 29:11 59:21 69:13 92:21 149:15

**clarifying** 25:22 70:4

**clarity** 95:24

**clark** 2:8 3:12 7:25

**clarke** 18:3

**class** 35:7,10 108:9,24 171:6

**classes** 13:10 14:14

**classify** 30:25

**classifying** 49:3

**cleaned** 177:1

**clear** 20:22 21:4 31:10 42:5 45:10 47:15 63:14 76:7 105:11 172:19 176:4 178:16 186:14

**clearly** 9:22 55:23 62:10 111:23 137:8 140:9 146:13

**click** 39:24 54:10 133:1 192:25

**clicked** 54:14

**clicking** 16:11

**close** 57:18 124:17 129:5

**closely** 75:19 75:20 135:21 175:9 191:12 191:14

**closer** 124:23 128:6

**closest** 104:16

**coalition** 31:21 32:1 62:13 110:7 137:22 138:4,10

**code** 25:15 37:8 39:17 42:2 74:14 83:2,2,3 114:21

**coding** 36:22 36:25 37:3

**cohesion** 158:6

**cohesive** 32:4 157:22,23 159:22

**cohesively** 72:17 160:2

**colloquially** 29:13

**color** 60:17

**[colored - concluded]**                                                Page 12

| | | | |
|---|---|---|---|
| **colored** 170:2 | 49:20 54:23 | **compare** | **compliance** |
| **column** 89:23 | 55:15,24 93:13 | 183:25 188:21 | 49:9 109:12 |
| 132:6,6 133:2 | 94:12,14,18 | 197:15 198:22 | 147:15,19 |
| **combination** | 118:24 174:23 | **compared** 43:9 | **complicated** |
| 76:3,13 83:13 | **community** | 55:2 175:2 | 119:6 177:18 |
| **combine** | 52:13 55:18,19 | **comparing** | **complies** |
| 193:21 | 55:23 56:5,14 | 183:1,19 | 109:15 |
| **combining** | 56:23 63:19,24 | 198:19 | **component** |
| 192:13,17 | 94:23 95:11,12 | **comparison** | 166:6 |
| **come** 12:23 | 103:2 158:24 | 85:4 183:1,17 | **composing** |
| 48:24 | 159:20 | 183:17 184:2 | 120:16 |
| **comes** 28:18 | **compact** 49:19 | 190:22 | **composite** |
| 36:4 | 54:25 55:2 | **comparisons** | 107:11,12,13 |
| **coming** 11:19 | 61:24 62:16 | 184:8 | 107:14,18 |
| 12:23 | 68:15 102:19 | **compatible** | **compositions** |
| **comment** | 173:11,12,17 | 165:5 | 172:23 |
| 194:25 | 173:19 174:1,2 | **compelling** | **compressing** |
| **commission** | 174:22 178:5,5 | 108:14,16 | 138:19 |
| 17:13 18:3,5 | 197:6,6 | **compensation** | **computed** |
| 39:2,4 89:23 | **compactness** | 22:8 | 82:25 |
| 120:20 154:5,6 | 43:11,13 54:4 | **competing** | **computer** 24:4 |
| 155:19 158:12 | 54:7,11,18,21 | 155:6 | **computing** |
| 158:21,22 | 55:6 62:22,23 | **competitive** | 82:23 |
| 164:4 198:3 | 63:17,18 | 133:21 | **concept** 32:22 |
| **commissioner** | 118:24 119:7 | **complete** 97:4 | 33:7 35:6 |
| 164:5 | 119:21,21 | 148:25 204:8 | **conceptual** |
| **commissioners** | 173:13,15 | **completed** | 48:23 |
| 165:12 197:18 | 174:4,6 179:13 | 101:3 103:4,6 | **concern** 34:6 |
| **commonwealth** | 181:16 182:1,6 | 103:8,19 | **concerned** |
| 2:8 201:1,5 | 183:18 196:21 | 104:21 202:16 | 62:21 156:6 |
| **communication** | 197:5 | **completely** | **conclude** |
| 21:20 40:25 | **comparator** | 56:13 135:14 | 155:17 |
| **communities** | 183:23 | 135:18,22 | **concluded** |
| 18:23 19:24,25 | | 176:19 | 200:12 |

**[concludes - correct]**                                    Page 13

**concludes**
 199:2,11
**concluding**
 68:14 118:13
**conclusion** 63:1
 64:13 67:23
 68:12 119:14
 125:12,25
 145:5,9 150:4
 156:12 171:3
 177:15
**conclusions**
 63:7,16 144:19
 147:1 162:11
 163:17
**concrete**
 142:12
**condition** 10:15
**conduct** 121:16
 160:15
**conference**
 13:15,15 48:25
**configurations**
 62:1
**configured**
 168:6 169:1
**confuse** 9:17
**confusing** 29:3
 31:7 38:23
 109:8
**congressional**
 50:23 80:21
 93:18 122:17
 177:4 191:7

**conjunction**
 90:12
**connect** 62:18
**connected** 14:7
**connecting**
 188:6
**connection**
 122:23
**conscious**
 131:1
**consented**
 66:18
**consider** 53:8
 53:14 57:3
 58:21 66:24
 70:21 81:24
 82:9 95:10,12
 117:12 178:19
**considerations**
 114:2,4
**considering**
 120:20
**consistency**
 198:24
**consistent**
 46:15
**consistently**
 123:16 150:5
 159:19
**consolidation**
 186:25
**constantly** 39:2
 40:22

**constitute**
 31:16
**constitution**
 49:8,9 183:7
 185:20
**constitutional**
 20:2
**constitutions**
 185:21
**constrain** 99:1
**constraint**
 190:14
**construct**
 194:19
**constructed**
 27:2
**consultant** 17:1
 17:12
**consulted** 47:2
**contained**
 161:21
**contention**
 176:16,19
**contest** 86:16
**contested** 86:16
**contests** 117:13
 147:5
**context** 30:9
 98:22 99:17
**contiguity** 47:7
 47:12
**contiguous**
 48:1,3,6

**contingent**
 118:17 185:24
 185:24
**continue** 7:17
 15:5
**conversations**
 7:15
**cool** 141:3
**copies** 59:23
 100:7 202:14
**copy** 59:21
 60:2 76:18
 199:16
**cores** 58:21
**correct** 17:10
 20:10 22:11
 52:3,4,15 53:8
 54:13 60:5
 61:14,21 64:6
 67:11,14 74:14
 76:11 77:9
 78:16,24 79:8
 82:1,14 83:19
 85:9,15 86:19
 88:22 89:5,7
 89:16,19 90:1
 90:10,14,21
 92:25 93:6
 94:17 96:10
 100:22 102:12
 103:23 104:16
 105:1 107:25
 113:19 116:3,7
 117:25 118:17

**[correct - courts]**                                                    Page 14

| | | | |
|---|---|---|---|
| 121:1 123:14 | 25:18 61:18 | 97:7 98:25,25 | **couple**  145:24 |
| 131:3,8,14,23 | 67:3 80:13 | 99:7,7,8,8,9,16 | **course**  49:16 |
| 133:7,19 | 89:11 149:6,23 | 101:11 102:14 | 90:2 112:21 |
| 134:10,17 | 149:25 184:5 | 102:20,22,23 | 145:4 175:9 |
| 136:12 139:9 | 201:13,16 | 111:17 112:9 | **court**  1:1 2:7 |
| 150:9 151:2 | 202:14 | 118:16 120:20 | 7:23 8:20,22 |
| 158:25 161:9 | **count**  74:17 | 125:7,10 | 14:18 16:20 |
| 163:21 167:12 | 104:14 | 129:10,13 | 19:9,13 20:25 |
| 168:2 169:11 | **counted**  76:4,5 | 130:7,8 134:14 | 33:10,17 36:15 |
| 172:5 176:15 | 76:8 105:19 | 143:6 151:4 | 43:8 49:13,18 |
| 178:1,22 179:2 | **counties**  50:15 | 154:4,5,6 | 64:7 65:13 |
| 181:15,24 | 51:1 93:19 | 155:21 158:12 | 68:22 70:12,14 |
| 182:4,17 187:7 | 94:11 99:3 | 158:21,22 | 129:14 130:4 |
| 191:22 192:12 | 118:5 184:15 | 164:3,11,20 | 130:12,15,16 |
| 194:14,17 | 189:16 190:3,7 | 165:24 166:12 | 130:17 138:10 |
| 204:8 | **counting**  38:14 | 166:14,19,20 | 138:13,17 |
| **corrected**  48:9 | 38:16 | 166:24 173:25 | 146:21 148:6 |
| 111:4 170:7 | **country**  55:3 | 174:23 176:7 | 156:8 160:9 |
| **correction** | 160:9 | 179:4 180:2,4 | 163:9 166:12 |
| 89:20 123:2 | **county**  1:8 5:16 | 180:12,15,21 | 178:11 183:20 |
| 132:3 | 7:21 8:14 | 181:7,22 | 190:2 194:22 |
| **corrections** | 18:24 20:1 | 182:11,16 | 199:15,20 |
| 204:6 | 21:6,18 39:2 | 184:20 185:4,6 | 200:2 201:22 |
| **correctly**  46:1 | 50:16,17 51:2 | 186:21 190:2 | **courtney**  1:5 |
| 48:7 121:12 | 51:7 52:2,6,12 | 190:23 192:5 | 8:18 202:4 |
| 132:13 133:8 | 52:17 53:15 | 193:18 196:16 | 203:1 204:1 |
| 139:23 | 61:23 63:9,19 | 197:18 198:3 | **courts**  29:20 |
| **corresponds** | 67:18 75:2,24 | 201:2 202:4 | 30:14 57:14 |
| 176:12 | 83:9 86:5,6,6 | 203:1 204:1 | 128:23,24 |
| **cost**  44:8 | 86:17 87:14 | **county's**  86:21 | 163:13 164:22 |
| **counsel**  3:7,16 | 88:1,8,16 89:2 | **countywide** | 164:24 170:23 |
| 7:4 8:8 11:5 | 93:20 94:1,2,5 | 88:7,16 89:6 | 171:14,16 |
| 21:14,19 24:3 | 95:11,16,17 | 112:8 117:11 | 190:6 |
| 24:22 25:3,14 | 96:8,13,22 | 123:24 | |

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[cover - defendants]**                                    Page 15

cover  50:25
  182:10
covered  74:6
  93:9 115:4
  178:18 185:3
  197:4
create  39:11
  40:2 50:17
  61:12 84:7
  100:8,11
  107:21 121:24
  134:15 135:2
  142:3 147:3
  176:17 188:16
created  38:9
  41:23 55:3
  56:11 62:23
  82:21 99:24
  105:7 111:18
  187:22 189:6,7
  189:14 191:10
  192:15
creating  119:2
  124:6 141:24
  168:25 169:25
creation  33:2
  61:25 68:16
  104:10 128:12
  189:12
criteria  41:24
  49:6,15 57:10
  118:21 119:1
  128:25 138:12
  148:11 168:25

186:5
criterion
  185:13,16
critical  159:13
criticism  123:9
criticized  44:11
criticizing
  173:20
crossover
  137:10,22
  138:14
cumulative
  71:22 73:7,12
  73:15
curious  93:11
current  12:19
  190:22
currently
  164:11
cut  157:14
cv  1:7 7:24
  12:18,19 13:21
  43:4
cvap  105:20,21
  105:23 106:4
cycle  171:24

**d**

d  4:1 7:8 72:14
  116:7
damore  15:10
data  24:17,23
  25:13 29:18
  39:22 43:9

52:14 69:19
  70:11 71:2
  74:5,8,10,11,22
  74:23,25 76:24
  78:18,25 80:16
  81:15,18,24
  82:5,7,10,12,15
  82:23 93:10
  101:15,19
  105:15 114:10
  114:15 115:2
  120:18 136:2,5
  136:14,15
  140:18 144:4
  145:21,22
  146:22 171:10
  171:14,24
  172:10 186:16
  187:25 188:3
  197:9 198:25
data.census.g...
  96:7
datasets  29:21
date  13:12
  43:23 73:23
  203:24 204:12
dated  45:4
  201:19
dates  82:18
dave  8:16
dave's  39:10,15
  39:24 40:19
  41:2 43:18
  44:6,12 46:4,6

46:25 47:8,11
  47:14,19
  121:15 192:20
david  3:3 22:21
  65:13
day  201:19
  204:15
days  202:16
december
  73:24 180:6
decennial
  74:17 172:12
decide  30:15
  68:22 70:12
  138:10
decided  15:5
  74:7 138:13
decisions
  185:24
declare  204:4
decreasing
  172:24
deemed  204:6
def  56:1
default  51:2,4
  51:12,16
defendants
  1:10 2:5 3:16
  5:5 8:14 9:10
  12:4,11 42:11
  44:23 87:2
  96:2,20 122:2
  160:21 180:14
  196:1

**[defending - different]**                                    Page 16

| | | | |
|---|---|---|---|
| **defending** 177:23 | 123:21 | **deposition** 1:13 | **determine** |
| **define** 27:15 | **demographic** | 2:2 7:20,25 | 61:22 102:25 |
| 30:23 49:21 | 31:19 83:8 | 9:18 10:17 | 119:21 167:13 |
| 55:17,19 95:3 | 103:7 172:24 | 11:4,13,17 | 168:5 |
| 135:19 | **demographics** | 12:1 27:20,25 | **determined** |
| **defined** 55:21 | 83:7 103:12 | 32:18 200:12 | 124:3 153:17 |
| 62:15 126:2 | 112:3 135:17 | 201:7,9 | 172:12 |
| 146:10,18 | 193:17 | **depositions** | **determining** |
| **defining** 95:6 | **demonstrate** | 25:9,11 27:18 | 92:9 94:3 |
| **definitely** 19:21 | 109:19 171:20 | 27:19 201:15 | 95:19 106:11 |
| 40:23 74:13 | 172:11 188:18 | **describe** 100:1 | **deviation** |
| 91:24 116:24 | 195:3 | 157:8 173:22 | 117:22,23 |
| 196:18 | **demonstrated** | **described** | 118:2 124:15 |
| **definition** | 109:20 179:6 | 35:10 53:1 | 127:22,24 |
| 28:25 30:18 | **demonstrates** | 72:11 74:7 | 133:2 135:23 |
| 31:11,21 32:10 | 175:10 | 105:17 147:16 | 181:13 188:23 |
| 32:13 33:1,10 | **demonstrating** | 157:13 171:9 | **deviations** |
| 35:5 55:20 | 110:2 | **describes** 55:25 | 118:6 124:10 |
| 145:16 146:1 | **depend** 22:8 | **describing** | 125:1,2 |
| 147:13 148:10 | 43:13 | 151:23,25 | **devised** 150:14 |
| **definitions** | **dependent** 86:2 | 157:15 | **diane** 3:22 |
| 48:24 50:21 | 95:5 | **description** 5:4 | **dicentennial** |
| 148:12 | **depending** | **designated** | 172:19,22 |
| **demanding** | 30:22 62:12 | 181:19,21 | 185:23 |
| 195:4 | **depends** 30:9 | 183:4,5 | **difference** |
| **democrat** 91:1 | 30:10 38:14 | **desperate** | 85:16,17 140:5 |
| 91:15,19,23 | 62:14 98:22 | 62:18 | 140:10,10 |
| **democratic** | 107:6 | **detail** 43:7 | 152:14 196:20 |
| 89:18 116:20 | **deponent** | 154:22 | **differences** |
| 123:17 148:20 | 202:13 204:3 | **detailed** 46:5 | 43:10 144:25 |
| **democrats** 88:2 | **deposed** 9:11 | **details** 11:22 | 198:25 |
| 88:6,15 106:13 | **deposing** | **determinalist...** | **different** 17:19 |
| 106:18 117:8 | 202:13 | 148:22 | 21:15 23:21 |
| | | | 29:3,9,21 |

Jonathan Cervas , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 18, 2026

**[different - district]**

Page 17

| | | | |
|---|---|---|---|
| 32:12,14 48:20 50:21 58:18 62:13 64:21 68:23,23 72:8 80:12 93:20,23 93:23 98:21 99:14,17 105:16 106:3 107:5 109:11 140:15 144:19 145:7,10,13 150:23 151:1 152:18 156:23 157:16 165:19 166:20 171:16 171:22 172:24 181:21 182:24 183:11 184:24 191:11 **differently** 31:8 32:16,19 49:22 77:22 105:18 145:2 189:20 **difficult** 53:20 **dig** 27:13 **dilution** 126:2 163:18 166:2,4 **direct** 40:25 **direction** 100:11 **directly** 16:25 176:21 198:22 **director** 123:7 | **disadvantage** 120:1 **disaggregated** 81:18 115:11 **disaggregating** 81:11,14 **disaggregation** 39:21 81:22 115:7 **disagree** 46:19 46:20 55:24 **disavow** 187:23 **discount** 23:15 23:19,25 **discovered** 104:20 **discuss** 95:16 153:15 164:2 191:3 **discussed** 11:17 110:12 121:13 128:14 131:1 134:6 167:7 179:7 190:23 195:5 **discussing** 113:24 **discussion** 4:3 4:7 175:12 **display** 101:10 101:24 **displayed** 60:16 | **displaying** 75:10 **displays** 144:3 **dispute** 197:13 **disregarded** 35:17 **disrupt** 57:15 **distinction** 154:17 **district** 1:1,2 7:22,23 27:15 29:1,15,23 30:4,19 31:1 31:12,15,21 32:7,11,23 33:2 34:4,10 50:17 55:2 58:21 60:18 61:25 62:19,23 63:9,17 64:9 66:23 67:3 68:17,18 69:1 69:2,17,18 70:22 71:9,10 71:10,12,13,13 71:18 93:8 99:25 100:2,6 100:6,12,14,20 100:23 101:21 102:19 103:21 103:25,25 104:2,10 105:5 106:18 108:4 110:14,22,23 | 111:8,9 112:16 114:11,19,19 114:23 115:10 115:10,24 117:17,19 119:2,8 120:19 123:11,11,16 123:25 125:13 126:17 129:11 130:7 131:5,6 131:11,11,15 131:16,20 132:16,17,20 132:20,23,23 133:16,20 134:3,12,13,15 135:3,22,25 136:4,5,9 137:2,3,13,15 137:21,22 138:4,11,14,24 139:7 141:18 141:24,25 142:7,7,21,22 142:22 143:4,5 143:10,11,18 144:5,7 146:17 146:19 148:8 163:10 165:5 167:14 168:6 169:1,14,17 170:8,8,20 173:23 174:7 174:11,12,17 |

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[district - drawer]**                                      Page 18

174:19,20
175:14,14,20
175:21 176:5,5
176:17,18,21
177:4,4 178:3
178:4,9 183:25
184:4,19
194:15,18
**districting**
  76:15 95:9
  128:12 163:19
  165:15
**districts** 16:11
  31:5 34:24
  38:9,10 39:25
  49:7,20 57:8
  57:19 58:22
  66:25 69:25
  70:19 75:7
  98:24 107:22
  108:2 109:5
  111:10,18,24
  116:21 118:1
  119:22 120:3
  120:15,16
  122:9 124:6,11
  125:5,20 127:4
  131:17,21,24
  132:20 135:8
  135:10,12,12
  143:15 147:3
  172:13 173:3
  173:23 174:7
  178:25 179:13

182:2,6 186:19
188:22,24
189:6,8,12,15
189:17 191:8
**divide** 54:23
**division** 1:3
  7:24
**divisions** 5:16
  52:2,6,17 75:3
  94:5 95:17
  96:23 97:7
  98:1,3,9
  174:23 181:22
  184:20
**doctoral** 43:3,5
**document**
  22:14 97:6
  144:24 168:17
  181:25
**documents**
  11:24 12:1
**doe** 129:22
**doing** 16:5
  50:15 54:24
  85:4 103:18
  116:24,24
  127:25 128:6
  128:24 131:18
  131:25 152:18
  171:11,17
  182:23 195:6
**donut** 175:13
**dot** 83:16,22

**doubt** 127:19
**download** 75:8
  105:23 186:24
  188:15
**downloaded**
  54:1 74:10,22
  75:6,18 186:21
  186:23 188:7
  188:16
**downloading**
  75:1,9,13
  105:2 121:5,5
**dr** 5:20 9:8
  11:9,25 14:5,7
  14:14 15:10,25
  16:5 41:22
  45:20 46:9,19
  47:2 53:25
  55:12 58:17
  66:13 75:17
  92:12 109:21
  110:12 111:1
  113:16 120:24
  127:1,6,7,16,19
  130:24 141:15
  145:16,25
  148:8 155:11
  161:7,10,12,20
  162:10,19
  163:16 164:10
  164:16 168:1
  169:19 170:1
  173:16,19
  178:16,16

179:10 190:10
190:11 192:8
195:1,10 196:1
196:6,7,12,23
197:5,13
198:16,19
199:2
**dra** 43:9,24
  46:22 47:13,13
  47:15 48:1,10
  50:9,11 51:3,4
  51:15 54:10
  59:20 60:4
  74:21 75:12
  81:9 82:3,5,12
  82:15 101:10
  101:17,20,24
  102:10,16
  105:15,18,24
  107:3,9 114:12
  122:13 132:11
  133:1 143:24
  193:3
**draft** 136:5
**drafting** 128:15
**draw** 15:11
  34:10,22,23
  36:6 37:25
  48:19 57:8
  59:16 60:2
  108:4 115:1
**drawer** 32:21
  35:17 36:4,11
  97:25 197:22

**[drawing - election]**                                         Page 19

| | | | |
|---|---|---|---|
| **drawing** 14:11 32:23 34:4,17 35:19 37:24 39:7,13,20 40:10 48:14 49:19 53:12,15 54:8 56:18 57:4 58:20 59:7,10,13,18 61:2,9 82:6 95:9 96:9 98:16 101:17 101:18 102:7,9 102:19 103:6 104:21 114:1 117:22 120:19 126:17 135:25 139:4 174:22 178:19 181:8 188:3,10,13 192:19 193:25 | 118:10,14 119:3 122:20 130:25 134:13 134:23 139:1 166:23,24 184:19 192:5 193:18 194:2 198:2 **driver** 1:5 7:21 8:18 202:4 203:1 204:1 **droop** 72:12,13 72:21 155:14 155:19,24 156:2 159:15 159:18 **duly** 9:2 201:8 **duplicate** 74:7 | **easier** 111:21 **easily** 27:5 170:7 **eastern** 173:24 196:16 **easy** 12:17 25:12 40:16,19 42:20 170:15 170:15 **economic** 55:25 **edge** 143:5 196:16 **edges** 124:17 **edition** 41:24 **education** 38:18,19,25 58:22 70:19,23 71:9,17 104:10 104:21 105:6 112:3,8,17 118:12,14 | **either** 11:9 68:17 69:18 88:21 98:14 101:2 123:6 137:16 148:23 150:6 163:18 166:13 175:15 186:24 **elect** 31:17 32:1 32:6,11 62:20 64:3 72:3,18 123:16 125:14 125:19 126:4,9 129:3 134:8 137:9,15 139:21 140:6 150:5 154:8,14 156:3 159:19 194:12 |
| **drawn** 15:1 50:1 69:17 97:20,25 98:6 98:8 99:3 109:14 116:21 118:2 168:7 188:24 194:18 **draws** 118:16 **drew** 16:8 28:8 34:22 59:2,22 63:17 84:7 100:13,20,23 110:19 111:10 | **e** <br> **e** 3:1,1 4:1 7:8,8 38:24 199:19 199:21 203:3,3 203:3 **earlier** 41:23 45:6 71:5 74:7 103:3 105:22 108:11 119:20 134:6 144:17 152:9 162:11 166:23 173:22 191:9 195:5 **ease** 186:4 | 121:3,10 122:9 123:24 124:4 125:4 129:8 134:21 135:3 135:21 183:23 184:5 **effects** 155:4 **efforts** 101:16 **eight** 68:25 69:24 70:2 76:24 164:2 165:3 175:17 176:6 | **elected** 106:18 112:8,12,13,16 123:24 165:13 **electing** 70:23 71:18 **election** 5:11 10:21 24:25 25:13 26:23 27:4,7 31:18 38:19 66:14,17 71:8,23 72:25 73:1 80:11,17 81:12 84:13 86:3,16,22 87:4,9,13 |

92:13,15,21
93:4 107:4
112:11 115:7
117:2 149:21
151:20,25
153:9,10,12,24
166:15,21
171:7,8,24
186:4,9 187:4
188:8,9,17,19
**elections** 1:9
7:22 18:3
25:15,17,18
26:10,14,18
27:10 38:15,22
71:14 80:17
86:13,20 88:7
89:2 107:3,10
117:11 118:12
123:17 125:16
129:4 133:16
133:21 134:4
137:4 139:12
140:2 144:7
146:4 151:15
151:24 152:22
153:16 160:15
171:22 173:4
194:13 197:19
202:4 203:1
204:1
**electoral** 64:2,8
66:23 106:7
120:1 125:6,9

125:21 129:10
129:12 130:6,8
133:15 148:16
149:3,8
**electorate**
92:16 172:13
**electors** 172:23
**elects** 137:2
**elements**
128:11
**eliminated**
152:15 157:3
**email** 21:7,11
47:20 199:21
**embarrass**
149:14
**embarrassed**
73:22
**embarrassing**
37:22 149:11
149:17
**empirically**
188:25
**employed**
201:16
**employee** 14:3
**employment**
13:20,22
**empty** 122:25
**enacted** 118:11
189:8,15,17
191:11
**encountered**
47:6

**ended** 171:23
**engage** 21:25
**enlisted** 56:25
**ensemble** 186:1
187:8,14,18,22
**ensure** 100:5
108:16 109:12
134:4
**entire** 69:12
**equal** 35:20
49:8,17 51:9
67:17 72:3
108:16,19
109:3,17,23
119:4 126:3,8
132:22 134:8
139:20 140:5
151:11 155:18
156:3 159:24
167:8 186:6
**equality** 50:3
167:10
**equalize** 131:17
135:7
**equipment**
160:15
**equivalency**
82:17,21
114:25 121:19
133:8
**errata** 202:11
202:13,16
**error** 73:12
124:14 132:9

132:12 167:16
**errors** 37:7
73:22 149:12
187:22
**especially**
57:13
**esquire** 3:3,9
3:10
**esri** 15:19
**essentially**
96:12 148:18
158:14
**establish** 64:9
**established**
56:6 123:20
137:12 151:10
**establishes**
132:24
**estimate** 23:5,7
81:19 116:1
**estimates** 74:18
74:20 115:10
**et** 1:5,9 7:22
202:4,4 203:1
203:1 204:1,1
**evaluate** 39:11
40:20 41:5
43:15 161:7
**evaluating**
39:13
**evaluation**
39:18
**eve** 74:2 191:3

Jonathan Cervas , Ph.D.                                March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[event - family]**                                              Page 21

**event**  165:24
**eventually**
  121:21,22
  122:13
**everybody**
  63:15
**evidence**  70:11
  116:23 155:6
**ex**  23:19
**exact**  191:10
**exactly**  27:5
  56:24 59:22
  91:14 115:18
  121:25 122:10
  152:7 169:8,18
  175:1 187:1
  190:20 192:18
**examination**
  4:5 9:5
**example**
  148:24 153:3
  158:11 178:13
  178:14
**examples**
  152:25
**except**  185:4,23
**exclude**  10:25
**excluded**  195:1
**excluding**
  161:15
**exclusively**
  46:22
**excuse**  191:2

**executive**  165:6
**exercise**  52:14
  103:17 112:22
  187:17
**exhibit**  5:1,6,7
  5:8,10,12,13,17
  5:18,19,20
  12:4,11 17:6
  42:6,11 44:23
  45:3,12,17
  58:20 61:16
  66:21 86:25
  87:2 95:25
  96:2,20 97:5
  110:13 122:2,7
  143:2 160:21
  161:1 174:13
  175:5,6,16,17
  176:5,11 177:3
  180:14,19
  184:12 185:11
  190:21 196:1,7
**exist**  93:12 94:2
  95:17 97:20
  98:3,4 185:3
  186:16
**existed**  93:22
**existence**
  102:15
**existing**  58:21
  182:25 183:22
**expect**  34:21
  85:16 106:19

**experience**
  14:15,19,21
  16:9 64:7
  106:16 165:24
  171:18 189:24
**expert**  5:6,19
  11:6 12:5,12
  13:3 18:7,8,19
  18:21 19:3,9
  19:13,18 20:17
  20:20,24 21:9
  22:2,3 23:17
  46:4 92:8 99:5
  154:24 179:12
  179:17,21
  180:12,15
  182:15
**expert's**  89:12
**experts**  186:2
**explain**  50:12
  62:6 158:16
**explicitly**
  128:18 167:20
  185:15
**explore**  170:13
**export**  82:17
  180:20
**exported**  82:15
  133:7
**extent**  57:15
  184:14
**extra**  27:5
  92:12

**extremely**
  75:20 129:5
  187:16
**eyeball**  55:5
  118:23
**eyes**  55:13

**f**

**f**  3:10
**face**  190:17
**faced**  135:7
**fact**  53:1 57:20
  140:21 163:12
  180:6 188:15
**facto**  55:1
  57:20
**factor**  166:1
**factors**  67:13
**facts**  24:17,23
  163:22
**factually**  47:1
  190:6
**failed**  79:20
**fails**  202:18
**fair**  86:5
  178:11
**fairfax**  197:22
  197:24
**faith**  133:11
**familiar**  21:14
  27:7 40:7
  153:6
**family**  11:21
  74:3

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[famous - form]**                                        Page 22

| | | | |
|---|---|---|---|
| **famous** 177:4 178:10 | 76:19,20 79:6 82:17 84:20 | 45:16 47:4 58:20 59:23 | **fixed** 47:22 168:2 |
| **far** 23:8 103:1 | 114:25 121:19 | 62:7 64:9 | **flipping** 182:5 |
| **farther** 169:10 | 133:8 171:20 | 87:19 89:23 | **floor** 3:5 |
| **fault** 23:4 | 173:1 186:23 | 100:15 105:10 | 184:22 |
| **favorite** 55:11 | 187:4 | 105:11,12 | **fly** 124:8 128:1 |
| **features** 61:1 | **filed** 7:22 11:9 | 109:10 118:9 | **focused** 190:15 |
| **february** 161:6 | 73:24 180:20 | 132:5 134:20 | **follow** 56:11 |
| **federal** 14:18 | **files** 27:2,8 | 136:17 139:1 | 191:12 |
| 19:13 20:12,25 | 80:12 82:22 | 152:16 157:1 | **following** 9:1 |
| 49:10,10 53:18 | 121:5 186:18 | 157:25 158:6 | 175:7 |
| 80:17 124:16 | 188:15 | 161:4 162:7,13 | **follows** 9:3 |
| **federally** 86:9 | **filing** 7:5 | 163:1,4 164:2 | 175:8 191:14 |
| **feel** 109:10 | **final** 5:8 44:24 | 167:22,24 | **footnote** 76:22 |
| **feels** 70:14 | 45:4 | 170:20,24 | 83:11 105:14 |
| **fellow** 43:3,5 | **financially** 8:4 | 171:6 182:23 | 119:25 120:6 |
| **fewer** 135:10 | 201:17 | 185:1 187:13 | 120:18 124:15 |
| **fewest** 152:16 | **find** 56:4 90:2,3 | 196:14 | **forbes** 10:11 |
| 192:4 | 94:1 111:21 | **five** 38:8,9 64:1 | **force** 56:16,20 |
| **figure** 15:6 | 118:8 150:4 | 66:23,25 67:3 | 56:21 94:15 |
| 53:20 79:13 | 170:5,15 185:3 | 68:17 69:18 | 95:14,14 |
| 83:16,17 84:5 | **finding** 27:10 | 70:19 71:9 | 102:13,16 |
| 84:7 89:9,17 | 37:7 | 80:4,6 100:6 | 103:1 126:20 |
| 90:19 91:1 | **finds** 163:11 | 100:12,20,25 | 142:6,12 |
| 121:10 133:14 | **fine** 14:13 24:5 | 117:17 119:2 | **foregoing** |
| 135:24 137:2 | 28:17 83:6 | 120:3,19 125:5 | 201:7 204:5 |
| 139:11 142:5 | 143:9 190:12 | 125:20 129:11 | **forget** 27:17 |
| 144:9 174:14 | 198:10 | 130:7 145:13 | **form** 18:12 |
| 175:6,15 177:4 | **finger** 176:1 | 165:5,12 | 20:15 25:22 |
| 178:9,23 | **finish** 59:17 | 168:21 170:6 | 30:6 33:4 34:8 |
| 190:21,24 | **first** 9:2 12:12 | 184:4 191:25 | 35:25 44:16 |
| 194:10 | 14:7 16:13 | **fix** 132:19 | 52:21 55:9 |
| **file** 24:25 28:10 | 19:12,17 20:23 | **fixate** 54:17 | 58:25 60:21 |
| 53:22 75:2,4 | 21:5 38:6 43:2 | | 62:25 63:12,22 |

Jonathan Cervas , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 18, 2026

**[form - geography]**

Page 23

64:12 67:22
69:6 70:9
73:11 76:14
77:12,16,24
78:8 85:21
88:11 91:4
94:22 95:1
106:22 110:17
115:15 120:9
125:24 156:12
162:1 171:2
175:23 182:20
**formally** 16:19
**format** 87:8
**formats** 82:16
**formatted** 27:5
**formed** 25:4
**former** 46:20
**forms** 64:21
**formula** 72:12
72:12,15
154:11 155:24
**forward** 163:24
**found** 37:18
40:23 53:21
59:6 71:11
90:3 104:25
105:1 111:19
121:22 171:23
173:8 190:9
**foundation**
52:22 69:10
77:16 78:8
85:21 88:11

91:4 110:17
127:11 147:25
164:13 175:23
**four** 17:6,6
38:10 61:17,17
66:22,25 67:3
68:17 69:18
71:10,13,14
85:11 89:23
90:4,10 99:25
100:2,6,12,14
100:23 104:10
105:5 110:22
117:11 120:3
123:17 125:15
127:24 129:4
134:12,13,15
135:3 136:10
137:4 138:24
139:12 140:12
140:13,13
141:24 143:15
144:6,7 145:10
145:10 163:14
167:8,23
183:25 194:13
194:18 196:12
196:15
**fourth** 35:15
132:5 139:15
**fracking** 41:25
**framework**
31:14

**free** 15:22 44:6
46:3 47:8 91:7
**freeze** 174:12
**fresh** 35:8
**friend** 153:8
**friends** 56:21
**front** 12:10
56:3 83:5
167:4 175:4,16
**froze** 174:11
**fudge** 197:11
**fulfilling**
146:23
**fulfills** 142:3
**full** 10:7 47:4
120:21 161:10
165:6
**fully** 10:16
125:5,9,12,17
126:7 129:9,11
130:8 134:3
140:14 165:5
201:11
**fun** 33:25
**function** 97:13
164:5
**functions** 37:5
37:7
**further** 109:24
112:2 201:15
**future** 15:9
173:6

**g**

**g** 7:8
**ga** 3:15 202:15
**general** 5:10
16:7,8 32:5
87:3,8,12
122:19,20
151:21
**generally** 16:4
50:20 62:15
82:17 86:6
93:25 106:15
107:7,14
185:18
**generated**
76:21 198:19
**generative**
36:20
**geocode** 79:17
79:21 80:5
**geocoder** 79:4
79:12
**geocoding** 77:6
79:1,3
**geographic**
74:23,25 80:1
**geographically**
61:24 62:16
68:15
**geographies**
93:11,15 94:4
**geography** 48:5
59:8 60:7,17

Jonathan Cervas , Ph.D.                         March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[geography - government]**                                    Page 24

| | | | |
|---|---|---|---|
| 62:18 75:3 80:7 93:11,18 101:25 176:25 192:25 | **gingles** 20:11 20:24 62:1,2,8 62:21 63:8,16 64:10 67:9,19 68:5,9 70:7,13 107:2 108:20 110:3 132:24 136:24 138:12 142:4 144:11 144:13,15 145:4,8,15 146:11,13,16 147:7,11,16 162:13,18,20 162:21 163:1,4 166:5 168:23 169:25 170:25 171:10,14 188:18 195:4 | 44:8 45:24 49:21 55:20 61:16 65:24 66:1 72:6 83:4 89:19 90:2 109:24 113:23 114:18 130:24 134:12 138:24 139:5 141:16 144:16 146:25 156:21 158:6,7 158:21 164:1 166:8 169:10 169:16 182:20 185:11 192:19 194:24 | 138:21 139:5 141:5,12 146:6 150:25 152:15 157:7,21 161:3 167:7 168:3 177:14 192:11 192:25 195:16 195:23 196:6 198:5 199:16 |
| **georgia** 1:2 7:23 35:14 39:7 77:12,23 86:21 87:9,13 91:18,21 93:22 97:11,14,16,22 107:5 118:1,5 122:19,20 151:17 156:18 171:19 172:2 188:24 189:10 189:20 190:4,5 | | | **gold** 46:7,13,18 |
| | | | **good** 7:12 8:13 8:16 9:8,24 15:9 19:7 22:22 24:7,9 41:13 49:3 57:23 70:4 83:21 113:1 115:4 116:23 136:19,19 138:23 140:25 141:15 144:21 144:21,22 153:22 158:16 182:22 184:6 187:17 194:25 195:10 |
| **georgia's** 160:14 | | **goal** 9:17 141:24 142:3 169:25 | |
| **germane** 166:1 | | **goes** 95:18 176:5 | |
| **gerrymander** 177:24 | **gis** 14:15,21 15:8,15 | **going** 7:12 9:23 10:25 22:21 26:5 35:1 58:7 58:14 66:3,10 70:18 74:6 80:14 81:19 103:18 108:7 113:2,6,13 115:17,25 121:25 122:6 124:20 127:14 129:2 133:14 135:8,19 | |
| **gerrymanderi...** 12:22 177:7,9 177:22 | **give** 23:11 100:11 154:7 161:3 | | |
| **gesturing** 193:23 | **given** 13:8 15:13 41:18 159:23 165:16 201:10 204:9 | | **gotten** 43:24 146:6 |
| **getter** 158:25 | | | |
| **getters** 158:14 | | | **governing** 164:10 |
| **getting** 31:13 74:7 99:23 114:19 126:3 156:7 | **gives** 83:8 139:20 | | |
| | **glad** 156:6 | | **government** 53:18 64:21 74:8 134:14 164:6 165:22 |
| **gina** 2:6 201:4 201:21 | **go** 7:18 9:16 10:6,7 17:5,5 27:17 42:5 | | |

Veritext Legal Solutions

800.808.4958                                                     770.343.9696

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[government - hire]**                                          Page 25

166:7
**government's** 165:24
**governmental** 97:10
**governments** 40:10 164:19
**grace** 3:23
**grant** 2:9
**gray** 96:12
**great** 10:14 11:11 14:9 18:6 58:5 70:17 73:21 96:16 99:11 115:23 160:5 199:11
**greater** 29:5 159:18
**green** 148:19
**griggy** 45:25
**grofman** 14:5,7 14:14 15:25 16:5 41:23 55:13
**ground** 9:15 198:5
**group** 75:3 85:17,18 94:22 154:11 159:12 159:21,22 190:15,17
**groups** 31:25 50:7 51:4,7,11

51:16,20 52:17 75:3,12,19 94:5,10 95:4 101:11 102:21 132:14,19 167:14,18 172:25 176:13 176:16
**guarantee** 154:12 159:25
**guaranteed** 91:14 154:16
**guess** 19:14 63:10 71:3 97:21 136:18 183:24
**guiding** 126:21

**h**

**h** 203:3
**half** 80:4,6 92:16,22 193:5
**hall** 10:12
**hand** 8:23 86:25 95:25 97:4 122:6 161:1 180:19 193:23 196:6
**handbook** 171:7,8
**handing** 45:3
**happen** 75:16 165:19

**happened** 27:20 88:24 133:6 135:5 196:19
**happens** 9:20 37:21 91:17 172:20
**happy** 74:3 129:24
**hard** 36:19 40:20 41:5 43:14 83:5 173:25 191:21
**harkenrider** 17:7 18:4
**hats** 109:11
**head** 157:8 158:20
**headquarters** 41:20,21
**hear** 21:5 64:23 65:4,16,20 130:1
**heard** 25:8 32:22 35:2 48:15 55:5 197:23
**hearing** 46:9
**heavily** 169:20
**held** 13:23 90:12
**help** 36:22 37:5 38:3 61:12 63:15 175:6

183:25 187:12 188:5
**helped** 16:8
**helpful** 37:6 70:4 106:2,5 183:20
**helps** 152:1
**hereto** 201:17 204:7
**hesitant** 187:16
**heuristic** 126:20
**hey** 47:20
**hhpc** 192:13
**hide** 100:3 101:16 102:1,3
**hierarchy** 94:10
**high** 48:14 111:16 124:5 132:20
**higher** 111:9,20 111:24 155:23 156:1
**highest** 158:3 158:13,25 159:4
**highly** 46:18 49:1 80:9
**hill** 2:8 3:12 7:25 33:13,16 34:3,12 41:22
**hire** 16:22 38:3

**hispanic** 31:24 83:12
**histogram** 116:9
**histograms** 116:5
**historical** 88:19
**historically** 11:2 32:21 40:13
**history** 13:20 128:23 171:15 172:17 173:1
**hit** 55:13 103:14 108:10 108:20
**hochul** 17:7 18:4
**hogan** 3:4 8:17
**hole** 175:13
**holistic** 86:11
**honest** 133:9
**honestly** 60:10 133:6 143:23
**hope** 141:15
**hour** 23:13
**hours** 23:5,7
**house** 75:6 178:25 188:22 188:23 191:15 191:16,18,25 191:25
**houston** 1:8 7:21 8:14 21:6

51:2 53:15 61:23 63:9,19 67:17 75:24 76:18 81:5 83:9 86:5,17 86:21 87:13 88:1,8,16 95:11,17 96:8 101:11 112:9 125:7,10 129:10,13 130:8 134:14 151:4 154:4 155:21 158:21 164:5,11,20 166:14 179:4 186:21 190:23 192:5 193:17 197:18 198:3 202:4 203:1 204:1
**hover** 101:25
**hugely** 187:22
**huh** 17:22 34:16 35:21 84:22 96:18 100:17 125:8 140:4 155:15 179:1
**hundred** 140:15,16,21
**hypo** 35:25
**hypothetical** 36:2,4 138:18

157:20
**hypothetically** 94:24
**hypotheticals** 36:19

**i**

**idea** 9:19 61:8 111:17 128:19 194:21
**ideal** 117:18
**identification** 12:6 42:13 44:25 87:5 96:3,24 122:3 160:23 180:16 196:3
**identified** 5:4 41:15 48:8 80:9 92:23 118:25 194:1
**identify** 37:10 76:5 78:21 94:21 140:14
**identities** 76:4
**identity** 78:2
**illustrative** 38:8 59:7,11 70:6 82:4 84:8 112:25 113:16 178:20 181:9 181:13 188:3
**images** 40:2

**imagination** 165:18
**imagine** 138:16 165:19
**impact** 154:20
**implying** 133:11
**import** 121:15 121:20 122:14 192:20
**important** 9:23 49:6,13 52:16 52:25 54:17,22 172:11 173:6
**impose** 190:2
**imposed** 190:6
**impossibility** 114:7
**improved** 47:15 77:6 79:23 80:2,6,7
**imputations** 80:5
**impute** 78:15
**imputed** 84:24 172:7 198:20
**include** 13:5,10 13:11 69:22 94:4 113:20 162:25 170:19 173:9 178:9 179:24
**included** 74:10 107:3 161:12

163:22 179:2 181:7 190:25 195:2

**includes** 84:23 172:7

**including** 8:8 9:20 53:1 114:10 178:3 189:22

**incomplete** 35:25

**incorporated** 178:17

**incorporates** 31:18

**incorrect** 89:24 90:16 167:5 187:5 194:10

**increase** 170:10

**increasing** 172:14,24 173:3,7

**incumbency** 57:15

**incumbent** 57:6

**incumbents** 57:4,9,17

**independent** 56:7 198:18

**independently** 14:23

**indicate** 22:7 80:10 86:14

89:9 93:10 111:8 119:25 130:25 137:7 139:19 162:9 163:16 166:11 170:7 178:15 184:12 190:1

**indicated** 47:13 66:22 83:11

**indicates** 87:12 87:25 196:13

**indicators** 188:12

**individual** 44:8 112:15 182:2,6

**individuals** 78:20

**inference** 194:9

**inform** 13:6

**information** 36:5 49:2 53:3 53:4 56:17 57:6 61:12 67:5 80:1 100:4 101:16 101:24 103:13 105:23 136:22

**informs** 29:22

**initial** 45:11 53:10

**initially** 17:18 53:2 106:8 122:8,10,12

**innately** 128:22

**inspect** 198:23

**inspection** 55:4

**instance** 109:10

**intact** 49:16

**intelligence** 36:20

**intend** 194:20

**intended** 167:22

**intention** 167:24

**interchangea...** 167:6

**interest** 49:20 52:13 55:15,18 55:23 56:5,15 56:23 93:14 94:13,14,18,23 95:11,13 103:2 108:15,16 118:25 174:24

**interested** 8:5 201:17

**interesting** 173:8

**interestingly** 39:1

**interface** 101:21

**interior** 175:21

**intern** 165:25

**internal** 165:25 166:6

**interocular** 55:12 173:14 174:3

**interplay** 177:25

**interpretation** 110:9 146:16 147:7,16 148:5 148:7,8

**interpretations** 110:3,5

**interrupt** 24:3

**interruption** 33:21

**introduce** 177:3

**investigated** 166:13

**invited** 13:8

**invoice** 23:3

**involved** 10:21 21:21 33:15 49:1

**involves** 100:2

**involving** 24:23 182:16

**ironic** 46:22 173:16 174:3

**irrelevant** 112:22 132:25 193:12

**issue** 48:8,11 120:5 135:6

Jonathan Cervas , Ph.D.                                      March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[issues - knows]**                                          Page 28

issues  19:21,23
it'll  63:15
item  42:16
iterations
  107:23

**j**

jacautot  64:22
  65:5,11,17
jacoutot  3:10
jobs  13:23
join  14:18 32:1
joined  137:18
jonathan  1:14
  2:4 4:4 7:20
  8:25 10:9
  45:20 199:12
  201:6 202:1,5
  203:2,24 204:2
  204:4,12
jones  8:18
judge  171:21
  171:22 172:3
judgment  56:8
jump  71:21
jurisdiction
  86:2 156:10
  184:24
jurisdictions
  151:17 152:20
  183:13

**k**

keep  10:16
  113:1 163:24
  189:5
keeping  49:15
  49:20
kidding  199:4
kind  10:3,4,5
  11:21 12:16
  14:18 40:9
  48:14 49:14
  83:5,8 84:2
  96:12 97:3
  108:10 125:11
  136:25,25
  142:15 143:15
  144:16 145:9
  151:23 163:2
  175:13 183:11
  186:5 193:12
  197:4
kinds  30:13
  31:6 164:25
  171:10 183:13
knew  21:24
  79:6
know  9:8,11,15
  9:15,21,25
  11:1,7,21 14:5
  14:16 21:10,13
  25:10 27:18
  28:4,5,22 33:7
  33:13,15 38:24

40:12,22,24
41:16 43:1,2,7
43:7,11,12,14
43:23 44:18
46:17,23 47:1
47:18,19 48:20
50:10,11 51:14
51:18,22,22,24
52:24 56:1,24
60:9,10,10,11
60:23 61:5
64:7 66:16,19
67:25,25 72:16
75:4,16 76:20
79:13 80:9
81:5,7 85:24
88:4 93:22
95:4,18,22
97:10,12,13,17
98:17,18 100:5
100:8,25
105:13,18
106:15 107:3,6
107:7 108:12
111:13,14
112:5,5,12,13
112:15,23,23
118:1,4,5,7,15
122:25 123:6
124:3,7,25
127:22,23,25
135:4,16,25
136:13,19
137:24 140:20

141:21 142:15
142:20,24
143:4,9 144:3
145:15 146:6
148:6,11
149:16 150:21
151:17 152:9
152:20,23
153:6,25
154:22 155:2
156:8,14,17,20
158:17 159:13
160:14,17
163:12 164:15
164:21 165:1
166:20 167:2
169:5,7 171:15
171:17 177:6,8
177:8 179:6
180:3 186:4
187:3 188:9,23
189:3 190:3,5
190:6 191:11
194:7 196:7,19
197:22,24,24
197:25 200:7,7
knowing  47:17
knowledge
  135:17
known  46:4
  104:13
knows  9:18
  198:8

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Jonathan Cervas , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 18, 2026

**[l - little]**

Page 29

| **l** | | | |
|---|---|---|---|

**l** 7:1 116:7
**lack** 110:17
**lack's** 78:8
**lacks** 52:21
69:10 77:16
85:21 88:11
91:4 127:11
147:24 164:13
175:23
**laid** 75:5
**language** 39:17
125:12 140:7
140:15 144:17
144:19 183:12
**large** 31:17
50:25 56:20
72:16 151:9,11
**larger** 62:17
98:22,24 128:8
135:9
**largest** 116:11
**laross** 3:22
**late** 181:25
**laughing** 121:9
**law** 7:25 20:2,3
49:10 57:12
63:3 91:16
109:13,15
124:16,16,25
171:7,9 183:10
189:1

**lawsuits** 10:21
**lawyer** 33:14
**lay** 68:22 95:20
**layers** 186:20
**lead** 47:11
**leading** 54:24
165:4
**leads** 31:10
**learn** 15:8
**learned** 14:24
**leave** 49:22
183:15
**leaving** 142:22
**lecture** 108:8
150:24
**lectures** 108:9
**led** 107:22
194:6
**lee** 18:25 45:5
**left** 35:1 101:20
181:1
**legal** 29:11,14
30:6,9,14
31:14 33:6,14
62:5,25 64:12
67:22 70:15
97:13,15,16
119:14 125:12
125:24 138:7
140:17 144:23
144:23,24,24
145:5,9,19
156:12 162:10
162:20 164:21

164:24 165:4
171:2 177:15
202:23
**legally** 140:11
145:7
**legislative**
17:12 19:1
80:21 118:1
122:17 189:6,8
189:24 190:22
191:11
**legislature** 39:7
56:12 99:20
108:4,9,13,17
108:21 109:1
109:12,24
111:22 118:11
118:13,16
124:24 129:16
166:23 167:6
**legislatures**
48:25 49:2
**legitimate** 56:5
**level** 48:14
50:16 60:7
81:16 93:20
100:4 114:11
115:6 116:1
131:25
**life** 15:7
**liked** 57:8
**limited** 56:17
57:1

**limiting** 124:25
**line** 40:25 92:5
96:12 119:11
119:16 175:3
187:4 189:25
191:7,12,13
192:12 203:4,7
203:10,13,16
203:19
**lines** 75:2 80:19
80:20 81:9
82:10 93:12
96:14 135:22
191:15
**linger** 28:20
**list** 17:3 49:21
49:24 72:14
75:4 97:19
153:1 196:13
**listed** 13:4,4,17
19:5 24:18
41:8 52:8 73:4
**listen** 99:6
**listing** 48:20
**literally** 61:10
83:3
**litigation** 19:24
177:17 180:15
180:21
**litsup** 202:15
**little** 22:1 24:4
24:5 27:9 38:7
53:20 115:3
128:7,20

Jonathan Cervas , Ph.D.                March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[little - majority]**                              Page 30

143:20 163:15
173:16 175:20
**live** 56:24,25
57:17
**lived** 56:20
61:7,9 111:17
**lives** 79:14
153:8
**llp** 3:4
**load** 81:8
193:10
**loaded** 193:11
**local** 152:21
**locally** 86:9
**locate** 167:17
**located** 79:7
121:4 122:8,11
**locating** 169:16
**location** 7:24
**locations** 57:3
124:5
**long** 14:12
40:18 43:19
45:12 54:24
72:17 74:15
135:5 156:1
159:7
**longer** 101:6
175:3
**look** 12:25
25:18 33:12
44:21 56:19
64:1 71:17
76:12,14 83:1

102:4 103:6
107:4,9 124:21
150:1 172:16
172:16,22
174:1,16
176:23 178:14
185:2 187:3
199:24
**looked** 23:10
23:10 25:15
39:6 54:2 61:6
61:7 74:15
75:16 78:17
86:20 88:6,15
91:20 101:6,11
103:12,13
104:14 112:2
126:23 136:1
162:11 169:19
196:17
**looking** 25:14
35:18 55:1
62:14 78:14
84:20 86:4,13
86:16 89:9
95:6 97:19
123:25 124:8,9
136:5,9 137:2
142:5 143:3
163:3 170:1
175:15 178:13
182:24 190:16
191:17 194:11

**looks** 13:12
85:5,9 90:12
92:13 122:10
131:23 133:20
139:15 155:16
174:19 175:2
190:9
**loser** 159:6
**loss** 139:15
**lot** 14:5 37:18
38:23,24 40:14
43:24 51:11
95:3 108:25
130:15 139:4
163:24 165:18
177:8 180:7
184:13 186:11
190:11
**lots** 29:3 30:22
165:19
**love** 113:3
**lovells** 3:4 8:17
**low** 132:21
**lower** 174:5
191:15
**lunch** 138:22
141:1,8,15
**lying** 127:17

**m**

**m** 116:7
**macon** 1:3 7:23
**made** 33:9,11
53:20 59:20,23

59:24,24,25
60:2 93:3
107:20 123:2
128:6 131:15
132:21 142:6
144:12 175:2
195:2 204:5
**main** 160:19
**maine** 154:23
**maintaining**
102:20 168:24
**majority** 27:15
28:25 29:4,15
29:23,23,24
30:3,16,16,19
30:24 31:1,2
31:16,23,23,24
34:23 62:11
63:18 68:16,18
69:1,2,17,21,25
70:20,22 71:13
79:12 103:21
104:1,11
106:17 107:21
108:2 110:14
110:23 120:2
131:6,16
137:13,14,16
137:17 146:3,7
146:17,20
147:3 148:9
151:18 163:10
168:6,22 169:2
169:3

**[make - mean]**                                                      Page 31

**make**  12:16
20:22 21:4
36:3 59:20
62:11 63:14
75:7 80:1
89:20 92:14
100:3,7,9
103:4 104:3
108:1 112:23
114:9 124:24
130:2 131:5
152:3 156:22
164:25 170:9
171:24 174:17
174:18 184:23
186:11 187:6
188:10
**makes**  32:15
51:5,11 106:5
196:20
**makeup**  59:9
61:2
**making**  54:16
97:3 99:2
136:14,15
158:19 173:8
**man**  3:24
**manually**  51:17
51:19,20
**map**  5:12,17
32:21 34:17
35:17 36:4,11
36:12 37:24
39:20 44:9

48:14 53:12,24
53:25 56:19
59:6 75:7,7
96:2,6,8 97:25
98:16 99:1
100:8 109:14
118:9 119:6
121:10,22,24
122:2,8,10,13
125:2 128:11
130:25 132:13
135:21 142:3
166:24,24
169:19,25
170:1,2 177:5
179:3,6 183:17
183:23,23
184:5,6 190:2
197:22
**mapmaker**
51:5 186:14
**mapping**  14:24
16:9
**maps**  14:11
15:1,11 16:9
20:11 28:8
37:25 47:7
50:1,9,11,14
52:18 53:9
54:16,25 75:10
82:4,15 93:8
95:9 96:9
97:20 98:1,6,8
99:3 100:9,10

103:4 105:13
108:18 118:17
162:12 163:3
189:24 190:7
191:5 195:1,3
198:2
**mapshaper**
40:2 75:14
**maptitude**  40:7
40:9,15,16,24
41:10,15 42:17
42:19 43:9,17
43:19 46:7,13
46:16,23 47:19
**march**  1:15
2:10 7:13
201:8,19 202:3
**mark**  9:19 42:5
86:25 95:25
121:25
**marked**  12:5
12:10 42:12
44:25 45:3
87:4 96:3,23
97:5 122:3,6
160:22 161:1
180:16,19
196:2,6
**market**  3:5
**maroney**  45:13
**master**  16:20
16:22 17:1,8
17:19,23 23:22
46:25 171:19

**master's**  14:23
15:3,6
**match**  75:19
**matched**
167:21 186:21
**material**
108:25
**math**  35:6
124:8 127:25
**mathematical**
54:18 72:12,15
72:20 154:11
**mathematically**
72:2,5 154:16
**matter**  7:21
118:18 157:18
**matters**  16:24
**maximize**
54:21
**mccarty**  154:20
**mccarty's**
155:11
**mcds**  98:15
**mean**  16:12
29:6 31:4,22
34:10 47:14
48:22 55:22
62:9,11 65:6
72:5 73:13
75:5 80:5,8
87:11 107:11
108:6,9 110:6
114:3,5 120:4
124:24 125:6,9

Jonathan Cervas , Ph.D.

March 18, 2026

Driver, Courtney, et al. v. Houston County Board o

**[mean - mmd5a]**

Page 32

| | | | |
|---|---|---|---|
| 125:16 128:18 131:7 134:7,10 137:11,25 138:6 147:8 150:12 151:22 153:25 154:13 159:25 161:15 164:8 165:2,8 165:8,11,11 166:3,4,17 168:8 172:15 180:5 184:1 188:5 192:24 195:5 197:10 **meaning** 30:21 30:22 73:16 **means** 29:18,23 31:25 33:7 35:8 76:2 106:1 121:14 137:13,16 172:16 **meant** 114:8 **measure** 30:15 41:24 **measurement** 75:23 **measures** 30:13 **measuring** 29:10 **meat** 27:13 **media** 7:19 113:14 199:12 | **medical** 10:15 **medication** 10:16 **meet** 138:11,14 145:6,8 148:10 **meeting** 39:4 **mellon** 10:11 13:22 **member** 61:25 62:19,20 64:9 111:8 **members** 110:8 112:3,5,7,21 123:23 125:14 165:16 171:22 **memorandum** 5:8 44:24 45:4 **mention** 72:24 **mentioned** 11:24 13:22 34:3,12 41:23 62:13 105:22 **mentor** 55:12 **met** 9:8 21:17 63:8 **method** 105:17 106:11 132:10 156:24 164:10 166:14,21 **methodologi...** 167:13 **methodology** 102:25 149:19 155:16 186:2 | **metrics** 39:14 54:7 **michael** 8:18 **microphones** 7:14 **middle** 1:2 7:23 118:21 143:18 143:19 176:18 189:4 **military** 56:22 142:16 **mind** 18:1 27:16 28:18 32:11 140:5,9 189:5 **mine** 187:13 **minimum** 155:24 **minor** 98:1,3,9 184:20 **minorities** 31:5 32:3 69:21,22 **minority** 30:19 30:24 31:3,11 31:15,23,25 61:23 62:14,18 62:22 63:19,20 63:24 68:16 69:1,17 71:13 105:16,19 106:7,12 108:17 109:22 110:8 125:13 126:3 137:9 | 154:21,25 171:21 **minus** 117:23 118:2,6 127:23 135:9,9 **minute** 137:12 **minutes** 9:9 **misassigned** 167:25 **mischaracteri...** 52:22 127:12 **missouri** 19:4 19:21 **mistake** 124:13 133:9 **mistakes** 187:6 **mixture** 129:22 **mmd** 34:24 60:3 61:2,12 100:23 101:3 104:22 107:22 110:21,22 129:22 134:3 145:3 163:5 **mmd4** 141:18 143:11 169:13 173:11 174:22 176:18 **mmd4b** 173:12 **mmd5** 130:25 131:11 139:25 167:17 **mmd5a** 167:9 167:17,23 |

**modal** 116:7,10
**mode** 116:10
**model** 164:5
**modify** 101:23
**money** 44:8
**month** 193:4
**months** 84:10
**morning** 7:12
8:13,16 9:8
54:15 75:17
89:22
**motivated**
186:8
**motivation**
120:7,11
**motivations**
54:20
**movable**
142:14
**move** 24:4 74:4
83:7 86:3 93:8
113:16 121:3
149:3 153:5
167:19 169:13
170:18 196:14
**moved** 131:4
167:15
**moving** 89:2
92:13 114:9
115:6 126:16
163:24 173:11
175:12 184:12
197:4

**mtt** 1:7 7:24
**multi** 153:16
155:8
**multiple** 29:8
51:1 127:4
153:9,24 154:6
157:24
**municipal** 5:10
87:3,12
**municipalities**
64:20 66:13,16
**mute** 7:15
65:22

### n

**n** 3:1 4:1 7:1,8
116:8,17,18
**nail** 31:9
**name** 8:2,13,16
9:9 10:7 19:5
79:25 197:23
**named** 10:22
10:23
**names** 53:22
79:22 80:8
**narrative** 37:15
**narrow** 139:15
173:21,22
195:6
**narrowly**
111:23 168:24
169:6,23 195:3
**nassau** 18:24
19:25 99:7

180:15,21
182:11 184:19
**nation** 99:7,15
**national** 48:25
**naturally**
149:16
**nature** 56:14
**navajo** 99:7,15
**ne** 3:13
**near** 56:21 72:7
**nearly** 106:14
139:20
**neat** 148:11
**necessarily**
31:16 128:25
145:19
**necessary**
108:12 168:5
169:8,24 195:6
204:6
**need** 9:25,25
13:5,17 51:8,9
68:20 71:3
77:18 98:23,25
107:1 108:10
108:20,21
109:12,15,17
109:17,24,24
127:6 153:9,18
154:6 184:8
188:19
**needed** 125:11
128:8 167:19

**needs** 154:11
**neither** 43:12
103:20,25
201:13
**nerd** 115:3
**nested** 93:11,15
93:18 94:4
98:20
**neutral** 93:12
99:21,21
118:21 119:1
128:24,25
185:9
**never** 22:13
54:14 88:6
102:7,10
126:23 138:17
157:4 186:23
190:16
**new** 18:23
19:24,25 20:5
21:15 41:24
59:18 153:1
183:6,12
186:25 190:2,6
**newmann** 3:3
6:4 8:15,16
11:18 18:11,15
20:14 25:20
30:5 33:3 34:7
35:24 44:15
52:20 55:8
57:22 58:24
60:20 62:24

Jonathan Cervas , Ph.D.                                     March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[newmann - objection]**                                      Page 34

63:11,21 64:11
65:1,9,14,15
67:21 69:5,9
70:8 77:15
78:7 85:20
87:16 88:10
91:3 94:25
106:21 110:16
115:14 119:12
120:8 125:23
126:10 127:10
129:19,25
130:9,21 147:9
147:17,22
156:11 161:14
161:25 164:12
168:9,14 171:1
175:22 177:13
182:19 198:4,9
199:5 200:9
**news** 115:4
**nice** 41:12
47:15,17 149:1
**night** 30:23
**nine** 26:10
70:18
**noel** 3:19 8:2
**nolan** 154:19
**nominally**
193:20
**non** 47:7,12
83:12 106:17
137:18 148:7
163:10

**noncompact**
119:9
**nongeocoded**
79:22
**nonpartisan**
117:12
**nonprofit** 14:2
**nontransfera...**
73:8,18 149:20
150:7 151:3
156:21 157:3
157:12 159:17
160:10,16
165:14
**nonwhite** 69:25
**normative**
151:24
**north** 176:7
177:5
**northeastern**
102:14 194:1
**northern**
142:21 143:5
**notary** 2:7
201:4 204:13
204:19
**note** 7:13 43:2
84:5,12 202:10
**noted** 13:2
204:7
**notes** 118:8
**notice** 73:23
122:16

**noticed** 89:22
123:9 132:8
**noticing** 8:11
**notified** 41:14
**november** 45:4
87:12
**number** 5:4
7:19 52:5,25
60:17 66:25
71:11 84:17
90:14,15
100:10 101:21
107:10 116:8
126:23 149:11
157:16,17
158:13 159:4
159:23 179:16
179:20 180:24
183:2 188:21
192:4 199:12
**numbered**
158:11
**numbers** 89:22
89:24 106:4
114:19 115:9
115:12,25
124:9 181:1
192:9 197:10
198:22
**numeric** 29:12
29:22 120:2
146:7
**numerical**
169:3

**numerically**
148:9
**numerous**
61:24 62:11
68:15 75:4
159:9

**o**

**o** 7:1,8 72:14
72:14 116:7
**oath** 94:8
**object** 18:12
20:15 25:21
30:6 33:4 34:8
35:25 44:16
52:21,21 55:9
58:25 60:21
63:12,22 64:12
67:22 69:6
70:9 77:16
78:8 85:21
88:11 91:4
95:1 106:22
110:17 115:15
120:9 125:24
147:24 162:1
171:2 175:23
177:14 182:20
182:20 198:5
**objection** 6:1
66:18 119:13
126:11 127:11
147:10 156:12
164:13

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[objections - ones]**                                        Page 35

| | | | |
|---|---|---|---|
| **objections** 8:6 156:10 | 123:7 153:16 | 68:2,7 69:15 | 146:24 147:23 |
| **objective** 22:4 62:25 | **officer** 165:7 | 70:3,17 71:4 | 147:23 149:24 |
| **objectively** 119:9 | **officers** 56:24 | 72:1 73:14,21 | 150:3,22 151:8 |
| **objectives** 136:23 | **offices** 7:25 | 76:17 77:10 | 152:2,8,24 |
| **obtain** 81:15 | **official** 80:10 | 78:13,19 79:10 | 153:2,4,5 |
| **obtained** 80:20 | **oh** 18:14,20 | 79:15,19 81:4 | 154:1 155:1,10 |
| **obviously** 22:6 | 22:19 88:19 | 82:2,8 83:21 | 155:25 156:16 |
| 22:23 48:15 | 118:9 161:3 | 84:1,11 85:2 | 157:6,11 |
| 50:2 62:19 | 163:12 168:13 | 85:10 86:1,24 | 158:18 160:5 |
| 99:12 142:12 | 181:2 196:18 | 88:5 89:25 | 160:18,18 |
| 178:4 | 200:1 | 90:9,22 91:25 | 162:6,8,16,23 |
| **occasion** 45:7 | **okay** 9:14 | 92:2 93:1 | 163:8 165:10 |
| **occurred** 26:11 | 10:19 12:15,24 | 96:11 97:18 | 165:20 167:1 |
| 26:14 | 13:19 14:1,9 | 98:12,19 99:11 | 169:12 172:19 |
| **offer** 134:2 | 15:23 16:3,18 | 101:8 102:2,5 | 176:3,10,20 |
| 144:10 156:18 | 16:23 17:16,20 | 103:11,16 | 177:2,20 |
| **offered** 20:11 | 18:16 19:16 | 104:6,18 105:4 | 179:11,15,19 |
| 145:21 162:12 | 20:9 21:3 | 105:9 107:15 | 179:23 180:11 |
| 162:18,19 | 22:12,20 23:2 | 112:1,6,20 | 180:23 184:10 |
| 163:3 186:17 | 24:11,21 26:4 | 113:22 114:14 | 184:18,24 |
| 194:21 | 27:11,20,22,23 | 114:17 116:12 | 187:11 188:1 |
| **offering** 20:23 | 28:3,6,11,13 | 116:16,16 | 191:23 194:8 |
| 22:4 23:15,18 | 32:9 34:2,20 | 117:6,16 | 195:13 196:22 |
| 67:7,8,12,16,18 | 36:16,24 37:2 | 119:19 120:13 | 197:12,21 |
| 69:2 70:6,11 | 37:9,13,17 | 121:2,8,18 | 198:1 199:8 |
| 72:25 137:21 | 38:5 39:19 | 123:3 125:3 | **old** 43:5 |
| 137:24 138:3,7 | 42:24 44:10,20 | 127:2 128:3 | **once** 30:24 |
| 150:8 161:20 | 45:9,15,20 | 130:22 131:19 | 101:5 103:4 |
| **office** 10:12 | 46:6,21 48:12 | 132:1 134:1,11 | 154:23 |
| 80:21 122:17 | 51:25 55:20 | 134:19 135:1 | **ones** 50:20 59:3 |
| | 57:21 58:5 | 138:1,20 | 59:10,12 70:12 |
| | 59:15 60:6,12 | 139:10,17,24 | 80:12 145:24 |
| | 61:15 64:18 | 142:11,19,25 | 155:8 170:16 |
| | 66:20 67:15 | 143:8 144:2 | 176:21,22 |

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[open - paper]**                                Page 36

| | | | |
|---|---|---|---|
| **open** 155:19 | 139:20 140:6 | **outlines** 61:18 | 26:10 42:16 |
| **opening** 173:18 | 151:4 154:8 | **outlining** | 45:19,21 47:3 |
| 185:1 | 155:18 156:3 | 114:10 | 47:3 61:17 |
| **openness** 67:17 | 159:24,25 | **outside** 91:21 | 71:5,7,8 72:10 |
| **operate** 189:20 | 160:3 199:24 | 198:6 | 73:23 76:23 |
| **operational** | **opposed** 31:23 | **overall** 36:17 | 83:11 87:17,19 |
| 53:19 56:18 | 99:18 | 107:9 181:13 | 87:23 89:9 |
| **opinion** 20:11 | **option** 50:18,18 | 197:7 | 92:18,19 104:5 |
| 30:7 35:22 | 50:19 78:1 | **overlaid** 191:5 | 104:7 105:14 |
| 41:7 45:7,11 | 156:19 | **overlay** 178:24 | 113:23,24 |
| 45:13 46:14 | **options** 50:13 | 192:21,24 | 119:25 123:11 |
| 62:5 67:8,8,12 | 68:23 | **oversights** | 123:15 133:14 |
| 67:16,18 69:2 | **order** 5:8 44:24 | 180:8 | 136:9 139:6 |
| 94:24 118:17 | 45:4 46:6 51:9 | **overwhelm** | 141:17 142:5 |
| 126:5 134:2 | 99:1 144:18 | 194:22 | 143:10 166:8 |
| 137:21,24 | 163:10 171:25 | **overwhelming** | 167:8,23 168:3 |
| 138:3,6,7 | 188:18 | 71:16 | 170:6 174:13 |
| 144:10,23,24 | **ordered** 66:17 | **owed** 165:24 | 175:16,17 |
| 144:24 145:18 | 156:8 160:10 | **own** 40:24 | 176:6 177:3 |
| 145:19,23 | **ordering** 200:8 | 57:19 62:6 | 178:23 180:24 |
| 146:21 150:8 | **organization** | 124:24 165:25 | 180:25 181:1,3 |
| 162:10,12 | 49:1 | **oxford** 2:9 | 181:4,6 182:1 |
| **opinions** 20:24 | **organizations** | 171:8,8 | 182:5,10 |
| 22:4,9,13 25:5 | 13:24 14:3 | **p** | 190:21 194:11 |
| 68:5,9 73:1 | **original** 161:22 | **p** 3:1,1,9 7:1,8 | 196:12,14 |
| 161:20 162:18 | 174:1,5 | 72:14 | 198:17 203:4,7 |
| 162:19 164:24 | **originally** 74:8 | **p.m.** 141:5,13 | 203:10,13,16 |
| **opportunities** | **originated** | 195:16,24 | 203:19 |
| 64:3 | 133:12 | 200:12 | **pages** 45:11,16 |
| **opportunity** | **ought** 185:6 | **pa** 3:6 | 71:5 182:6 |
| 15:10 31:5,12 | **outcome** 8:5 | **page** 5:1,3 6:1,3 | **paid** 22:7,24 |
| 72:3 108:17,19 | 193:15 | 9:16 13:21 | **paper** 171:6,7,7 |
| 109:3,18,23 | **outline** 170:5 | 17:6,6,11 | 171:9,13 |
| 126:3,9 134:8 | | | |

Veritext Legal Solutions
800.808.4958                                770.343.9696

**[papers - people]**

**papers** 64:16

**paragraph**
17:6,11,18,24
18:20,22,25
22:8 26:11,14
26:18 45:24
47:4 48:19
61:17,17 64:1
66:21 68:13,25
69:24 70:2,18
71:21 73:16
74:4 78:25
80:10 81:11
84:12 85:5,12
86:4,14 90:5
92:19 93:2,9
93:16 94:19
95:16 99:23
101:14 102:13
102:18 103:6,8
105:20 106:6
108:1 111:7
112:24 113:23
114:9 116:6,14
117:1,12,18
118:9,20 119:3
125:4 130:24
134:2 136:13
137:7 139:18
140:1,7,8
141:16 144:10
146:25 147:2
147:14 149:6
151:13,22

153:15 155:16
162:9,24
163:14,16
164:2 165:3,23
166:8 167:7
168:3,4,11
169:13 170:6
172:10,15
175:12 176:11
178:15 184:12
185:11 186:13
188:2,21 189:4
189:14 190:9
191:24 192:3,8
192:13 194:1,4
194:24 196:14

**paragraphs**
89:2

**parallel** 197:17

**pare** 163:25
166:9

**part** 16:5 19:23
28:9 37:10
68:9 70:21
75:23 79:23
83:10,23 94:8
94:9 102:14
106:4 107:2
110:1 132:9,12
149:4 166:5,5
173:25 176:6,7
176:18 184:9

**partially** 40:18
133:21

**participant**
5:13 96:21

**participate**
134:4 140:2

**participating**
10:17

**participation**
134:7 171:21

**particular**
14:10 28:1
30:21 34:5
37:10 43:18
133:5 138:3
178:8 179:3
180:5 183:11
183:16

**particularly**
16:13 111:16
151:11 188:14

**parties** 4:3,7
7:4,17 104:22
164:9 199:16
201:14,17

**partisan** 12:22
35:11 59:2
69:19 89:3
100:4,15,20
101:15 136:22
188:3

**partisanship**
53:4 107:9
188:13

**parts** 16:11

**party** 8:4 10:21
10:22,23 53:3
59:12,17,19,23
61:8 69:20
70:1 71:12
101:3,19 102:6
102:9 103:20
103:24 104:1
104:17,17,22
107:23 108:18
109:2,6,14
110:20 111:15
113:25 126:24
129:2,11 130:7
138:25 139:6
145:14 150:25
162:25 188:11

**past** 44:11
56:21 179:12
179:17,21

**paused** 153:18

**peachtree** 3:13

**pen** 128:1

**pending** 10:2

**pennsylvania**
2:8,10 8:1
10:13 17:12
18:1,4 93:24
201:1,5

**people** 16:22
29:3 30:22
31:4,7 32:16
32:19 40:14,24
41:12 47:17,19

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[people - plan]**                                                      Page 38

47:19 49:21
50:12 55:23
56:25 76:12
84:3,23 95:3
109:11 142:15
150:13 159:8
185:16,25
186:1
**percent**  29:5
35:14 80:4,6
85:6,12,12
88:2 90:17
92:16,22 93:3
104:17 111:19
117:23,23
118:3,6 120:15
120:16,17
123:12 124:18
124:19,21
131:12 136:1
136:10 139:8
140:15,16,22
142:1 143:21
143:21,25
146:14 147:5
148:9 168:22
169:9,15,22,23
194:15 195:7
196:25
**percentage**
60:18,24 79:16
111:24 141:25
155:20,20,24
156:2 170:10

172:6
**percentages**
198:20,21
**perfect**  154:3
**perform**  133:16
**performance**
71:9 106:7
107:1 115:8,11
115:25 116:20
133:15 140:10
148:16,16
**performed**
81:22
**performing**
117:7
**period**  15:12
21:23
**person**  76:8
83:17,23
112:19 127:16
**personally**
37:24 197:25
**persons**  84:4
**perspective**
29:11,12,14
107:20 117:8
145:6 162:15
162:19,20
165:4
**persuasive**
171:23
**ph.d.**  1:14 2:4
4:4 7:20 8:25
14:8 199:12

201:6 202:1,5
203:2,24 204:2
204:4,12
**phase**  99:18
**philadelphia**
3:6
**phone**  21:8
**phones**  7:16
**phrase**  149:13
156:6
**phrasing**
143:16
**physical**  121:22
180:25
**pic**  112:10
**pick**  7:14
**pictures**  112:11
**piece**  12:16
83:2,3 92:13
101:24 175:20
176:17
**pieces**  10:5
60:17 62:18
74:5 93:9
101:16 115:4
139:5
**pittsburgh**  2:9
8:1 10:12
**place**  7:17
13:14,16 25:9
27:25 39:5
103:8 118:8
140:25 142:7
152:16,17

167:22,24
174:11,12
**placed**  169:17
**places**  50:21
80:18 181:19
181:21 183:4,5
185:22
**plaintiff**  12:11
**plaintiff's**
187:15
**plaintiffs**  1:6
3:7 8:17 11:5
21:15 23:15,18
24:22 25:3,8
25:11,14,17
61:19 80:13
100:9 149:23
149:25 184:5
**plan**  32:23 33:2
34:4 35:19
38:15,18 48:19
50:16,23 52:6
57:4 59:17,18
59:18,19 60:2
60:3 61:25
69:18 70:19,23
71:10 99:25
100:2,12,15,21
100:24 104:11
104:21 105:6,7
105:10 107:22
110:22 111:8,9
111:19 112:17
114:12,19

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[plan - population]**                                    Page 39

| | | | |
|---|---|---|---|
| 115:9,24 121:3 | 194:2,12,18,19 | 166:19 178:20 | **points** 85:17,18 |
| 121:4,10,15 | 197:6 | 179:8 184:15 | 127:24 171:21 |
| 123:25 125:5,5 | **plan's** 103:7 | 184:19,21 | 173:17 |
| 125:21 126:16 | **plans** 34:22,24 | 185:18 188:4 | **political** 13:23 |
| 126:18,24 | 38:9 39:8,11 | 188:13,14 | 13:24 49:15 |
| 127:3 128:15 | 39:14 40:11 | 194:23 | 56:6,9,10,12 |
| 129:3,8,9,9,11 | 52:10 53:2,15 | **platform** 15:11 | 67:17 81:15 |
| 129:15,21 | 54:8 55:3 | 36:25 39:17 | 93:13 94:3 |
| 130:5,6,7,19,25 | 56:19 58:20 | **plc** 2:8 3:12 | 98:20 106:16 |
| 131:11 132:2 | 59:7,11,13,23 | **please** 7:13,15 | 115:8,11,25 |
| 133:5,15 134:3 | 61:3,12 66:23 | 8:7,21 10:8 | 118:22 136:15 |
| 134:3,20,21,22 | 67:4 69:20 | **plurality** | 148:15 186:6 |
| 135:3,20 | 70:1,6,7 71:12 | 151:15,18,24 | **politically** |
| 136:10 137:2 | 76:15 84:8 | 151:25 | 186:8 |
| 138:3,21,24,25 | 101:3,4,19 | **plus** 16:24 | **politics** 15:17 |
| 139:1,6,7,19,25 | 102:9 103:20 | 117:22 118:2,6 | 133:24,25 |
| 140:1 141:17 | 103:25 104:1 | 127:23 135:8,9 | **polsby** 197:7 |
| 141:19,24 | 104:16,22,22 | 168:22 195:7 | **popper** 197:7 |
| 143:11,24 | 107:22,23 | **point** 15:8,16 | **population** |
| 144:5,10,12 | 109:2,6 110:13 | 15:20 38:22 | 29:5,6,7,7 30:3 |
| 145:12,23 | 110:21 111:15 | 41:17 57:7,24 | 30:11,12,12 |
| 146:5,13,15 | 112:25 113:17 | 61:6 70:5 74:9 | 35:14,19,20 |
| 163:7 165:5 | 113:18,21,25 | 75:6 104:13 | 36:5 49:17 |
| 167:9 173:12 | 114:1,1 117:17 | 113:1 119:8,11 | 50:3 51:9 61:7 |
| 173:12 174:6 | 118:14 119:2 | 121:17 172:11 | 61:23 62:15,22 |
| 174:22 176:12 | 120:19 128:13 | 173:7,8 182:23 | 63:4,8 68:14 |
| 181:8,9,12,13 | 128:22 134:12 | 188:19 190:9 | 72:16 74:11 |
| 182:25 183:2 | 134:13,16 | 195:10 | 75:24 81:23 |
| 183:25 184:16 | 144:14 145:3,8 | **pointed** 41:1 | 84:16,17 85:6 |
| 184:21 185:9 | 145:11,13,14 | 111:2 168:1 | 85:11 101:21 |
| 189:2 191:19 | 145:22 146:2 | **pointing** 120:4 | 105:16,19 |
| 191:25,25 | 147:3,4,15 | 120:14 123:4 | 110:7,14,23 |
| 192:4,11,15,15 | 162:25 163:5 | 176:1 | 114:11 117:18 |
| 193:16,18,25 | 163:19 166:11 | | 118:6 119:4 |

Veritext Legal Solutions
800.808.4958                                                   770.343.9696

124:9 131:5,17
132:3,4,7
135:23 136:1
141:25 143:19
143:20 146:3
146:14 159:18
167:8,10
181:13 186:6
192:18 196:25
**populations**
131:9 135:7,11
**portion** 113:17
176:4
**positions**
153:17
**posner** 10:12
**possible** 49:16
50:7 57:15,19
92:6 114:5
123:5 124:7
154:16 170:9
170:11,13,14
**possibly** 116:24
**post** 43:3,5
55:1 57:20
88:21 89:23
90:3,10 158:11
**potential** 149:7
**potentially**
21:8 40:21
49:23 51:1
70:13 125:12
173:6

**power** 125:7,10
129:10,12
130:6,8
**practicable**
184:14
**practice** 107:17
117:10
**pre** 186:25
**precinct** 48:3
51:2 53:3,9
60:13 80:19,20
81:8,16,19
101:10 105:2
115:6,24 121:5
186:20,25
188:4,10,15,22
190:13,18
191:4,7,18
192:4 193:5
194:19
**precincts** 47:24
47:25 48:4,5
50:18,24 51:3
51:8,14,17,21
52:18,25 56:10
60:14 80:23
81:1,6,12,14
84:13 94:5,7,9
101:10 115:17
126:24 179:20
185:12,17,17
185:18,22
186:1,7,15,15
187:19,21,24

188:8 189:5,7
189:9,17,23
190:1,4,8,16
192:1,14,16,19
193:1,3,6,22
194:1
**precise** 152:4
**precondition**
162:13 163:1,4
**predominance**
33:6,11,17,19
34:13 35:23
178:13
**predominant**
36:9,13 178:12
**predominate**
33:8 114:2,3,5
**predominates**
33:2
**predominating**
32:23
**preempt** 73:6
**preexisting**
94:3 111:7
**prefer** 91:6,9
92:6
**preferred**
55:11 139:11
165:25,25
**preliminary**
68:12
**premier** 15:15
**premise** 32:5
109:21 159:21

**preparation**
74:2 84:9
**prepare** 66:22
**preparing**
26:24 36:21
**present** 3:18
118:9 183:8
**presentation**
13:16
**presentations**
13:15
**presented** 43:9
**presenting** 8:8
140:18
**preservation**
185:12 186:6
**preservations**
183:11
**preserve**
185:21 186:15
**preserved**
178:18 184:14
**president** 107:7
**presidential**
80:17
**presumably**
159:1 173:5
**pretty** 62:9
167:20 191:14
**prevail** 109:5
**prevailed** 86:15
88:2 106:13
**previous** 14:15
122:22

**[primarily - question]**                                    Page 41

| | | | |
|---|---|---|---|
| **primarily** 165:4 | **problematic** 187:22 | **program** 5:14 14:23 15:3,6 96:22 | **provides** 109:22 155:17 |
| **primary** 26:18 40:10 90:13 117:13 | **problems** 40:24 41:15,16 42:1 47:6,12 | **programmed** 156:18 160:15 | **proxy** 106:7 |
| **principles** 35:18 36:12 39:6 48:16,18 48:21,23 58:19 124:4 128:12 128:14 | **procedure** 2:6 **proceed** 8:21 **proceeding** 9:1 201:11 | **prohibited** 1:24 **project** 14:16 **projects** 15:17 **prong** 62:7 64:9 170:24 | **psc** 88:1 **public** 2:7 142:23 201:4 204:19 **publications** 13:13 |
| **print** 87:24 | **proceedings** 8:7 33:22 | **prongs** 67:9 **pronouncing** 46:1 | **pull** 184:23 **purpose** 37:7 75:8 81:13,13 95:7 97:11 108:14,20 117:15 |
| **prior** 14:21 102:16 171:13 | **process** 15:2 39:20 48:14 53:4,12 67:17 77:5 78:14 82:6 99:24 102:7,9 107:20 111:22 114:1 122:12 128:18 131:15 135:2 135:13,25 136:7,21 139:4 169:18 172:4 190:3 | **properly** 132:15 187:4 **proportion** 111:10 173:2 **proportional** 150:11,12,14 150:15,16,19 150:20,24 **proportionality** 35:2,5,6,16 **protect** 183:7 **prove** 29:19 | **purposes** 25:22 29:16 32:2 55:17 56:12 70:13 76:9 95:24 108:5 110:2 138:2 **pursuant** 2:5 **purview** 95:23 **put** 12:10 57:19 96:17 99:22 127:7 160:19 183:18 184:11 |
| **priority** 52:16 **private** 7:15 **probability** 80:2 **probably** 9:11 10:4 16:17 23:3,11 47:25 84:10 86:2 94:7 98:18 103:15,17 107:16 124:13 124:18 127:15 131:18 140:25 144:20 194:5 197:3 **probative** 70:12 146:21 **problem** 34:13 47:21,23 48:10 135:6 187:21 | **produced** 83:2 **produces** 114:21 **producing** 111:1 **product** 40:17 42:21 **products** 15:19 **professor** 154:19 | **provide** 22:9 49:1 64:2 93:12 108:19 109:3,17 151:4 156:3 **provided** 24:22 57:6 80:13 114:21 | **q** **question** 9:19 9:21 10:2 22:22 23:9 26:6,22 28:1,8 28:15,22 31:10 |

Jonathan Cervas , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 18, 2026

[question - read]

Page 42

36:17 63:10
73:6 77:19
88:13 92:20
97:23 98:11,17
99:21 104:19
122:22 124:20
129:14 130:2
130:10,18
140:11 145:7
153:19,20,22
153:23 162:4
165:5 166:22
169:5 184:3
198:16 200:3
**questions** 54:20
91:21 105:12
128:21 140:17
160:7 196:11
199:3,6
**queue** 135:21
**quick** 5:15 85:4
96:22
**quickly** 9:16
99:6
**quite** 103:18
177:1
**quota** 72:13,21
155:14,19
156:2 159:12
159:15,18,22
**quote** 42:22
43:5,22 44:1
46:21,21 56:2
56:4 69:12

95:21 170:5
**quoted** 97:2,8
**quotes** 168:23
173:19

**r**

**r** 3:1 7:8 39:16
39:21 72:14
82:24,25
103:18 114:21
203:3,3
**race** 32:22 33:1
33:10,17 35:12
35:13,18 36:5
36:9 53:2 59:3
59:12,17,19,23
60:7 61:8
69:19,20,25
70:20 74:11
76:12 77:6
78:15 79:6
80:9 83:20,21
84:23 85:7
99:21 100:3,15
100:21 101:3,6
101:7,15,19
102:6,9 103:19
103:24 104:1,9
104:13,17
107:21,23
108:2,13,18
109:2,5,14,25
110:7,8,14,20
111:15 112:15

112:21 113:25
114:6,6 126:16
126:24 129:2
129:11 130:7
131:1 135:15
136:18 138:24
139:6 145:14
145:17 159:6
162:24 168:5
168:23 169:6,7
169:9 170:2
172:7 178:13
188:13,14
193:16,20,21
**races** 71:17
89:3,6 90:20
92:10 154:5
**racial** 33:18,19
34:3,5,13,13,17
35:22 56:13
59:9 60:3,16
61:2,11 75:21
76:3 78:2
81:24 84:21
85:17,18 94:22
95:4 108:10,11
114:2,3 136:2
136:5,14 177:7
177:9,22,24
**racially** 36:13
178:12
**raise** 8:23
54:19

**raising** 120:6
**ran** 187:13
**range** 124:15
124:18,19,22
128:2,4,5
189:2
**rank** 71:22
152:5
**ranked** 73:7,15
152:9,13
154:15,20,23
155:5 165:13
**ranking** 156:23
156:24
**rate** 23:13,14
23:23
**rates** 23:21,22
170:19,24
**rather** 118:10
**rcv** 73:11
**reach** 34:5
35:19 62:17
63:7 103:1
**reaching** 63:15
**read** 11:5,8
30:23 33:9
38:8 45:8
50:13 51:6
64:15,19 66:15
69:12 121:10
130:1 139:22
139:23 144:17
148:18 156:22
164:16 200:3,6

Jonathan Cervas , Ph.D.                                       March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[read - reference]**                                               Page 43

202:9 204:5
**reader** 120:5
**reading** 7:4
  15:24 73:25
  120:24
**ready** 11:3 12:1
  113:16
**real** 56:14
**realized** 10:25
**really** 39:16
  41:7 55:19
  68:20 69:24
  72:20 87:24,25
  88:4 91:20
  98:11 102:6
  118:18 140:17
  164:15 176:23
  183:25 194:4
  196:19
**realm** 106:17
**reapportionm...**
  17:13 18:5
  80:21 122:17
**reason** 43:6,17
  46:19,20 75:13
  91:9 111:21
  124:23 127:19
  134:13 153:12
  153:12 167:25
  178:8,11 180:5
  180:9,9 182:22
  183:2,8,16
  184:7 190:25
  197:13,15

202:11 203:6,9
  203:12,15,18
  203:21
**reasonable**
  23:23 57:13
  127:16
**reasonably**
  168:6 169:1
**reasons** 53:1
  56:9,10 179:5
  185:25
**reassigning**
  170:7
**rebuttal** 5:18
  11:7 38:7
  160:22 161:2,6
  161:13,22
  196:8
**rec** 136:19
**recall** 27:1,4
  37:3 46:9 52:9
  57:16 58:19
  74:14,25 76:25
  79:16,18 81:3
  81:10 82:5,25
  92:3 100:14
  103:12 107:10
  121:6,17,19
  134:23,25
  135:4,14 136:6
  136:19 139:3
  155:3 167:20
  169:18

**receipt** 202:17
**received** 21:7
  24:25 25:13
**receiving** 21:10
**recent** 19:22
  186:15
**recently** 19:3
**recognize** 42:7
  56:22 87:8
**recognized**
  48:2,2 49:12
  49:17 57:10
**recognizing**
  48:6 56:23
**recollection**
  25:24 38:13
  57:7 74:17
  101:9 105:1,3
  121:7 177:23
  191:21 192:23
**reconstituted**
  188:17
**reconstruct**
  186:3
**reconstructed**
  117:2
**record** 7:13,18
  8:10 10:8
  28:23 33:15
  42:6 45:11
  47:14 58:7,14
  65:24 66:1,3
  66:10 78:15
  79:6 113:6,13

141:5,12
  195:16,23
  201:10
**recorded** 7:20
  201:11
**recording** 7:16
**records** 79:17
  79:20 80:4
**recreate** 121:22
  122:13
**red** 148:21,24
**redistricting**
  15:16 19:2
  35:18 36:12
  39:8,11 40:7
  40:11 42:20
  44:6 46:3,4,7
  47:14 48:16,17
  48:23 49:2,13
  49:14 50:16
  57:10 58:18
  114:18 118:21
  119:1 121:16
  175:10 181:8
  182:16 185:13
  189:18 191:14
**refer** 38:12
  39:3 48:19
  73:17 93:15
  153:15 175:14
  180:6
**reference** 5:15
  17:7 35:3
  68:18,25 70:18

| | | | |
|---|---|---|---|
| 71:21 72:20 73:15 81:11 82:3 87:14 94:12 96:22 101:14 102:18 106:3 108:1 115:6 118:20 134:6 149:5 150:18 151:14 172:2 | 149:15 174:13 176:4 | **relevant**  30:15 184:25 185:2 | 191:10 193:9 |
| | **refers**  83:12 116:8 | **reliably**  80:9 | **remotely**  8:9 |
| | **reflective** 140:21 | **relied**  24:17,18 25:4 29:21 61:11 96:9 105:15 | **remove**  142:6 |
| | **refresh**  25:24 | | **reno**  33:12 177:6,6 |
| | **regard**  187:16 | | **reock**  197:7 |
| | **regarded**  46:18 185:12 | **rely**  63:16,18 127:7,14 136:14,15 188:2 | **repeat**  11:15 26:6 77:18 88:13 132:6 153:20 |
| **referenced** 49:14 52:1 62:1 76:18 82:23 83:10 97:2 102:13 119:3 136:13 202:6 | **regarding** 20:24 127:8 161:20 | | **repeated**  47:6 |
| | **regardless** 83:17,23 | **relying**  69:18 89:11,14 101:15 | **repetitive** 144:20 |
| | **registered** 84:17 137:17 | **remaining** 128:15 131:17 158:2 159:9 | **rephrase**  9:21 82:9 |
| **references** 17:18 45:25 110:1 111:7 | **registration** 30:13 76:19 77:12,24 85:7 146:20 170:18 170:19,24 171:10,20 | | **replace**  90:24 |
| | | **remedial**  21:21 99:18 172:4 | **replication** 25:14 |
| | | **remedies**  64:20 68:10 109:9 164:25 | **replied**  11:10 |
| **referencing** 17:17 20:5 79:3 84:16 90:5 147:6,15 170:12 172:3 | | | **report**  5:6,18 5:19,20 11:6 12:5,12,17,19 17:5 24:16 25:23 26:10,25 27:7,13 29:4,9 30:23 36:21 37:11,15,18 38:8,12,21 50:2 51:6 52:5 52:6,18 53:2 53:10,16,17,18 54:3,8 55:17 56:3 58:20 66:21 68:13,22 |
| | **rejected**  185:15 | **remedy**  109:7 126:4 156:9 160:11 163:10 163:18 166:11 166:18 171:25 189:22 | |
| | **relate**  28:8 | | |
| **referred**  73:8 186:18 | **related**  8:3 10:21 13:23 15:17 20:1,2 155:7,8 162:21 166:22 201:14 | | |
| **referring**  17:25 25:23 30:1 31:2 72:21 94:19 102:21 103:24 105:20 105:21 110:4 129:21 143:1 | | **remember**  27:9 75:1 83:5 99:13,16 143:23 146:10 173:21 175:1 177:9 187:1 | |
| | **relating**  69:24 | | |
| | **relative**  201:16 | | |
| | **relatively**  54:25 55:2 | | |

| | | | |
|---|---|---|---|
| 71:3 72:6,7 | 182:1,5,15 | 92:4 148:21 | **respective** 7:4 |
| 73:24 75:6 | 198:20 | **republicans** | **respond** 161:7 |
| 76:13 80:16 | **reporter** 2:7 | 89:6 | **response** 54:1 |
| 83:8 84:9 85:6 | 8:20,22 65:13 | **request** 10:1 | 120:25 161:10 |
| 86:13 92:8 | 130:4,12,16 | 187:14 | 162:7 176:11 |
| 95:10,20 97:15 | 199:15,20 | **require** 185:21 | 178:9 189:7,15 |
| 105:6,10,11,12 | 200:2 201:22 | **required** 29:19 | 190:8 191:10 |
| 111:1,4 113:17 | **reporting** 87:9 | 49:7 62:7 | 196:8 |
| 113:18 120:25 | 172:6 198:25 | 68:21 110:3 | **responses** |
| 124:10 127:1,6 | **reports** 11:7,25 | 132:3 138:8,11 | 161:11 |
| 127:8,22 | 11:25 13:2 | 138:14,18 | **responsibilities** |
| 128:13,16 | 24:18 38:6,7 | 183:7 189:1 | 164:3 165:17 |
| 132:6 138:2 | 54:3 68:4 | 204:13 | **rest** 194:2 |
| 141:16,18 | 81:15,18 92:12 | **requirement** | **restate** 63:14 |
| 146:19 149:4 | 179:8,12,17,21 | 62:2 108:4 | **restroom** 113:3 |
| 157:13 160:19 | 179:25 | 146:10,11 | **result** 131:10 |
| 160:22 161:2,4 | **represent** 8:14 | 160:4 | **resulting** |
| 161:6,7,10,11 | 9:10 96:8 | **requirements** | 106:18 |
| 161:12,13,21 | **representation** | 142:4 144:11 | **results** 22:9 |
| 161:22,22 | 150:15,16,19 | 144:13,15 | 25:1 26:23,24 |
| 162:7 163:17 | 150:20,24 | 145:7,15,24 | 27:4,8 31:18 |
| 163:23 164:16 | **represented** | 146:13 167:8 | 31:19 80:11 |
| 170:3,20 171:6 | 129:9 130:5 | **requires** 32:2 | 81:12 86:22 |
| 173:13,18 | **representing** | 91:16 159:17 | 88:23 107:4 |
| 179:7 180:7,12 | 8:2,17 | **requiring** | 115:7 186:4 |
| 180:15,20 | **represents** | 183:10 | 188:8,9,19 |
| 182:16 190:24 | 11:14 83:17 | **reread** 37:18 | **retained** 16:25 |
| 192:9,10 196:2 | 125:5,21 | **rerun** 198:23 | 199:13 |
| 196:8,8,10 | 139:19 162:7 | **research** 38:3 | **retread** 139:5 |
| 197:14 198:16 | **reproduction** | 155:4 | **return** 202:13 |
| **reported** 16:20 | 1:24 | **reshaped** | 202:16 |
| 26:10,24 76:2 | **republican** | 173:24 | **reverse** 173:20 |
| 179:13,16,20 | 86:6,15 90:20 | **residents** | **review** 11:25 |
| 181:12,16,18 | 90:25 91:16 | 111:17 169:15 | 25:23 26:22 |

45:7 155:11
168:10 202:7
**reviewed** 77:23
  92:8,11,11
  198:2
**reviewing**
  155:3
**reviews** 168:17
**rewrite** 91:7
**right** 8:23 9:12
  15:10,24 16:1
  16:2 17:2,9,14
  17:15 18:9,20
  19:10,11,14
  20:4,7,8,13
  21:1,4 22:10
  22:25 23:1,12
  23:20 24:15,19
  24:24 25:25
  26:12,16,20
  27:10 30:14,20
  32:18,24 34:15
  35:6 37:23
  38:11 40:3
  41:3,19 42:3
  43:12,13 44:1
  44:7,13 46:16
  48:13 50:4,8
  52:7,19,25
  53:11,12,13,21
  54:5,12,25
  55:1 57:5
  58:23 59:22
  61:4,9,13,20

62:3,10 64:5
67:10,20 68:11
69:4,20 70:14
70:17 71:8,24
72:12,22,23
73:3,10,19,20
74:12,19 75:25
76:10,23 77:8
78:6,23 79:23
80:3,24 81:20
81:25 82:2
83:6,14,24,25
84:14,18,19,25
85:8,14 86:7
86:10,18 88:3
88:9,23 89:4
89:13 90:7
91:2 92:14,17
92:24 93:5,7
94:6,16,20
95:15 98:5,20
98:22 99:23
100:16 101:12
103:5,22 104:8
104:23 105:13
106:5,9,20,25
107:19,24
108:11 109:7
109:13 110:24
112:4,18
113:20 115:5
115:13 116:2,4
116:16,22
117:14,20,24

119:5,10,23
120:22 121:11
122:15,16
123:13,19
124:1,12
125:22 126:15
126:19,25
127:5,9 128:17
129:6 131:2,13
131:22 133:18
134:18,24
136:11 137:5
137:23 138:5,8
139:2,14,22
140:9 142:2,9
142:17 143:12
143:16 144:8
145:1,5,13,16
146:5,5,18
148:25 149:13
150:2 151:12
152:6,7,13
153:18 154:10
154:11 155:22
156:5,6,7,22,25
157:1 159:10
159:12 160:1
160:12 161:5,8
161:23 162:14
163:6,20 164:7
164:21 166:16
167:11 168:20
170:4,17,21,22
172:8 174:9,15

175:18 176:14
177:11 178:6
178:21 179:9
180:1 181:10
181:14,23
182:3,8,12
184:22,25
187:9 188:7,11
188:18 190:19
190:20 192:2,5
192:18 193:2
193:12,13,19
194:3,5,16
195:8,9 196:17
196:18,19
197:8 200:7
**rights** 19:18
  20:6 29:16
  49:10 68:21
  108:5 109:8
  160:4
**risk** 124:8
**road** 3:13
  142:23 150:20
**robins** 53:23
  102:16 127:4
  176:6
**rodgers** 2:7
  201:4,21
**role** 11:1 16:4
  17:18 18:7
  22:1 120:20
**room** 64:23
  65:6

Jonathan Cervas , Ph.D.                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[rotated - seen]**                                                    Page 47

| | | | |
|---|---|---|---|
| **rotated** 165:17 | **satisfying** | 181:16 182:2,6 | 177:6,21,24 |
| **rothman** 47:2 | 108:5,14 | 183:18 197:5 | 189:23 196:12 |
| **roughly** 79:16 | 144:13 145:4 | **scratch** 99:19 | 196:23 197:4 |
| 127:23 | **save** 132:13 | **screen** 59:9 | **sections** 25:23 |
| **rounded** | **savvy** 115:2 | **sealing** 7:5 | **see** 10:20 13:14 |
| 143:22 | **saw** 76:22 90:2 | **sean** 46:5 | 18:23 45:14,22 |
| **rounding** 111:2 | 169:19 198:23 | **seat** 35:8 | 54:10 56:19 |
| 111:3 146:8 | **saying** 32:3 | 153:11,16 | 71:18 72:13 |
| **row** 90:15 | 109:16 138:3 | 157:25 159:5 | 75:18 76:23 |
| 132:5 | 148:6 151:22 | **seats** 35:15 | 81:1 83:1 84:2 |
| **rozier** 197:19 | 178:4,7 185:5 | 153:9,24 154:6 | 85:16 87:15,21 |
| **rules** 2:5 9:15 | **says** 12:22 47:5 | 155:19 157:10 | 96:6 102:10 |
| 72:24 149:9 | 69:17 71:25 | 158:12,14,22 | 106:12,19 |
| 152:14 163:19 | 72:15 84:2 | 159:2,23 | 124:21 132:5 |
| **run** 79:22,24 | 108:3 122:16 | **second** 5:20 | 143:24 144:18 |
| 127:15 187:19 | 122:19 141:21 | 42:16,16 47:4 | 157:7,9 172:17 |
| 187:24 | 168:4 190:13 | 51:6 56:2 67:9 | 172:18,21 |
| **running** 158:10 | **scale** 50:25 | 95:20 108:2 | 175:6,20,25,25 |
| 158:11,23 | 143:7 | 132:6 143:11 | 175:25 186:20 |
| **runoff** 151:19 | **scheme** 165:15 | 146:19 158:7 | 190:23 193:1 |
| **runs** 175:21 | **scholar** 190:12 | 159:4,5 196:2 | **seeing** 102:16 |
| **s** | **school** 124:5 | 196:9,9,10,23 | 106:17 147:10 |
| | **schools** 124:5 | **secretary** 80:11 | 147:18 |
| **s** 3:1 7:1,8 | **science** 106:16 | 87:9 | **seeks** 30:6 |
| 203:3 | 145:6 162:15 | **section** 19:18 | 62:25 64:12 |
| **satisfied** 145:22 | 162:18 165:3 | 19:20,23 20:1 | 67:22 177:14 |
| 162:12 163:4 | **scope** 93:19 | 24:16 29:16 | **seem** 145:6 |
| **satisfies** 144:11 | 198:6 | 32:2,17 35:3 | **seemed** 185:4 |
| 169:2 | **score** 54:18 | 45:20 68:13 | **seems** 40:12 |
| **satisfy** 62:1 | 196:21 | 72:6 73:5 | **seen** 30:10,11 |
| 144:14 145:15 | **scores** 43:11,13 | 78:25 83:8 | 30:12 91:18,22 |
| 145:23 146:16 | 54:4,11 55:1 | 86:3,4 141:21 | 97:6 112:10,10 |
| 163:1 195:4 | 119:21 173:13 | 156:9 160:11 | 135:17 185:15 |
| | 174:4,4 179:13 | 163:11 171:25 | 193:24 |

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[select - single]**                                                    Page 48

| | | | |
|---|---|---|---|
| **select**  76:7 149:19 | **serve**  18:19 | **sheet**  202:11 | **signature** 201:20 |
| **selected**  78:10 78:10 102:7,10 | **served**  11:1 15:24 19:8,17 57:14 | **shift**  135:10,11 | **signed**  202:19 |
| **selecting** 137:19 | **service**  131:11 141:18 167:23 | **shifted**  131:9 | **significant** 140:11 |
| **self**  46:20 198:20 | **serving**  19:12 | **shifts**  131:10 | **signing**  7:5 |
| **sell**  16:13 | **set**  21:15 48:13 88:25 100:7 123:10 | **shocking** 111:14 | **similar**  31:22 |
| **sells**  3:20 21:7 21:10,13,14,24 118:15 122:23 | **sets**  172:10 | **short**  14:12,13 16:13 58:10 66:6 108:7 111:3 113:9 128:10 169:15 172:1 195:19 | **simple**  72:18 103:15 136:24 177:18 |
| **semi**  150:11,12 | **setting**  33:18 192:5 | **shorthand** 47:15 106:11 106:14 | **simply**  114:22 132:18 140:13 140:20 165:1 173:7,24 188:11 |
| **senate**  67:13 107:8 191:19 | **seven**  68:13 83:11 133:14 163:16 192:5 | **show**  123:16 124:14 133:2 146:19 173:1 178:23 179:3 184:6 191:1,6 | **simultaneously** 131:18 |
| **send**  22:17 | **several**  108:8 | **showed**  14:17 195:1 | **single**  61:25 62:19 64:8 70:20 73:8,9 73:11,17,17 76:12 103:20 107:21 108:2 110:7,8,13 111:7 145:17 149:20,20 150:6,7 151:2 151:3,13 152:4 152:10,12,21 153:10,11,23 154:4,15 155:9 155:17 156:2,8 156:18,21 157:3,12 |
| **sense**  32:15 51:5,11 106:5 186:11 193:20 | **shade**  59:8 | **showing**  61:1 117:7 | |
| **sensitive**  7:14 | **shading**  60:3,7 60:16 61:11 | **shown**  167:23 | |
| **sent**  202:14 | **shape**  173:20 178:24 | **shows**  191:4,4 191:6 197:9 | |
| **sentence**  47:4 108:3 110:1 137:8 147:2,14 166:3,10 168:4 168:8 186:13 196:23 | **shapefile**  100:5 121:23 123:2 | **shut**  53:19 74:8 | |
| | **shapefiles** 82:20,21 122:18 | **sic**  38:15 | |
| **separate**  45:12 | **shapes**  75:19 | **side**  101:20 143:21 | |
| **separately** 164:19 | **share**  35:9,9 116:11 172:12 173:2,7 | **sign**  199:24 200:4,6 202:12 | |
| **sequence**  59:16 100:13 103:5 104:20 105:5 | **shaw**  33:12 177:5,6,8,8 | | |

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[single - standard]**                                        Page 49

| | | | |
|---|---|---|---|
| 159:16,16 | **software** 39:10 | 197:9 | **specifics** 36:18 |
| 160:10,16 | 39:14,16 40:4 | **sort** 16:10 | 92:5 121:17 |
| 165:14 | 40:10,20,25 | 29:11 38:23 | **specify** 68:19 |
| **sir** 180:22 | 41:3,3,12,25 | 47:13 49:3,6 | 68:20 |
| **site** 74:23 | 42:2 46:8 47:8 | 49:11 105:1 | **speculation** |
| **sitting** 128:20 | 47:11,18,21 | 126:21 128:19 | 106:23 119:13 |
| 193:9 | 48:6 82:24 | 168:22 169:3 | **speeding** 37:6 |
| **situation** 91:18 | **softwares** | 173:20 198:23 | **spelling** 73:22 |
| 91:22 92:3 | 15:15 | **sounds** 138:23 | **spells** 62:9 |
| **situations** | **solely** 25:22 | **source** 114:11 | **spent** 23:6,7 |
| 91:24 | **solutions** | 114:15 | **spiraled** 14:19 |
| **six** 66:21 | 202:23 | **southern** | **split** 52:5,11 |
| 113:18,20 | **somebody** | 142:21 | 81:19 115:18 |
| 147:2 148:10 | 54:19 79:14 | **space** 116:7 | 115:24 126:23 |
| **sixth** 145:12 | **somebody's** | 122:25 186:1 | 176:17,23 |
| **size** 49:8 | 79:24 | **spatial** 15:17 | 179:16,20 |
| 117:18 | **somewhat** | **speaking** 9:22 | 182:10 190:17 |
| **sizes** 84:13 | 49:16 57:1 | 16:19 | 190:18 |
| **skills** 14:17 | **soon** 12:23 | **special** 5:11 | **splits** 115:20 |
| 15:8 | **sorry** 18:14,21 | 16:19,22 17:1 | 127:3,8,20 |
| **skip** 18:22 | 22:16 23:6 | 17:8,19,23 | 179:7 181:18 |
| 163:15 | 24:3 25:21 | 23:22 46:25 | 188:22 191:18 |
| **skipped** 17:24 | 28:14 34:2 | 86:20 87:3,13 | 191:25 192:4 |
| **small** 93:25 | 37:22 57:21 | 90:11,12 | **splitting** 50:7 |
| **smaller** 51:10 | 74:14 80:20 | 171:19 | 52:1,16,18 |
| 93:21 99:1 | 83:22 87:17 | **specific** 37:6 | 128:6 |
| 118:2,5 | 92:19 98:7 | 92:1 107:10 | **spoke** 11:5 |
| **smartphone** | 102:8 110:21 | 183:12,13 | **stage** 21:21 |
| 40:22 | 120:11 129:20 | **specifically** | **stand** 185:9 |
| **social** 145:6 | 136:2 147:10 | 50:1 69:3 99:4 | **standard** 23:14 |
| 162:15,18 | 148:16 149:18 | 149:25 | 30:16 46:7,13 |
| 165:3 | 157:14 167:18 | **specificity** | 46:18 70:15 |
| **socioeconomic** | 170:5 178:16 | 57:17 | 117:10 169:3 |
| 81:24 | 184:23 193:22 | | 171:17 |

Jonathan Cervas , Ph.D.                           March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[start - summary]**                                          Page 50

| | | | |
|---|---|---|---|
| **start** 18:22 24:16 49:6 59:18 99:18 101:23 109:8 117:17 151:13 151:14 181:6 | **states** 1:1 7:22 93:23 97:19 98:1,23 152:20 189:19,21,21 | 110:11 169:2 **strictest** 110:2 110:4,9 146:11 146:12,16 147:6,16 148:5 148:7 168:23 | **subscribed** 204:14 **subsequent** 171:5 173:4 **subsequently** 48:8 |
| **started** 14:11 15:2 32:17 126:17 185:16 192:12,17 193:25 194:6 | **statewide** 86:15 86:21 **statistical** 5:14 56:1,14 80:2 82:24 96:21 | **strictness** 148:7 **strike** 163:23 **strong** 171:15 **struck** 178:12 **structure** 134:14 164:22 165:21,25 166:6 | **substantially** 47:16 **substitute** 111:4 **succeed** 146:4 **succeeded** 88:16 |
| **starting** 13:20 47:4 72:10 116:6 141:16 168:20 185:9 196:12 | **statistics** 102:8 102:10,11 103:15 133:1 143:24 **staying** 31:20 | **struggling** 98:11 | **succeeds** 148:20,21 |
| **state** 8:7,9 10:7 19:1,4,9 20:2 47:1 48:25 80:11 87:10 91:22 92:4 97:20 98:22 107:5 108:14 108:16 177:23 178:24 185:19 185:20 188:22 188:23 191:19 191:25 | **stefanie** 3:24 **stem** 176:21 **stemmed** 47:7 **stems** 49:8 **steps** 102:3 **steven** 45:13 **sticking** 38:6 **stipulated** 7:3 **stop** 109:1 **stopped** 108:18 **stopping** 57:24 **story** 14:12,12 14:13 | **student** 187:13 **students** 15:21 29:2 49:5 **stuff** 14:24 54:23 102:4 112:14 115:3 **subdivision** 102:20,22,23 118:22 **subdivisions** 49:15 56:6 93:13 94:3 98:21 184:25 185:2 186:7 | **success** 140:1 **successful** 88:7 147:5 **sufficiently** 31:17 61:23 62:10 68:15 72:16 **suggest** 16:15 163:1,3 **suggested** 15:8 **suggestions** 33:11 **suggests** 41:18 122:19 164:23 |
| **state's** 46:4 **stated** 55:12 **statement** 144:12 145:4 170:9 | **strategy** 144:21 144:21 **street** 2:9 3:5 **stretches** 172:22 **strickland** 29:22 30:2 | **subjective** 56:8 **submitted** 12:13,20 23:3 | **suite** 3:14 **summarize** 147:1 **summary** 148:17 149:1 |

**sumter** 21:18 99:8
**superimposed** 174:25
**supreme** 33:10 33:16 36:15 49:12,18 138:17
**sure** 11:16 13:1 17:4 20:22 21:4 28:19 32:8,22 36:3 37:11 40:13 42:9 58:1 62:9 75:15 77:21 88:23 92:14 97:4 100:3 103:5 104:3 110:25 112:23 114:9 130:2 152:3 153:21 156:22 158:19 162:3 166:17 167:20 168:13 174:17,18 185:16 199:23
**surmised** 76:25
**surname** 77:6 79:24
**surprised** 41:11,11 111:9 111:12,13
**surprising** 111:15

**surrounding** 168:15
**suspect** 65:18
**swear** 8:21 104:24 193:7
**switch** 64:21
**switched** 193:5
**sworn** 9:2 201:8 204:14
**synonymous** 126:8
**system** 64:8,9 68:9 149:3 150:24 151:9 152:4,14 153:11 156:17 156:23 157:16 158:10 159:19 159:19
**systems** 64:2 66:14,17,18 68:6 71:23 72:8,9,25 73:1 149:8,21,22 150:1,10,14,16 151:1,3

**t**

**t** 7:1,1 203:3,3
**tab** 54:10,14 103:15 133:1
**table** 52:8 71:8 76:24 78:17,22 84:20 85:4,7

85:13 89:20 104:4,7 114:10 121:12 123:11 123:15,18 124:9 127:23 129:2 136:9 139:5 143:10 148:15,18 172:6,18,18 182:1 194:11 197:9,13 198:17,19
**tables** 114:12 132:11,11 181:7
**tabulation** 186:18
**tailored** 111:23 168:24 169:6 169:23 195:3
**tailoring** 195:6
**take** 7:17 9:24 10:1 44:21 58:5 61:16 113:2,4 114:25 132:18 143:17 144:25 168:10 168:13
**taken** 2:4,6 58:10 66:6 113:9 141:8 195:19 201:15
**talk** 22:1 48:14 56:16 72:7

116:5 141:17 163:14
**talked** 9:9,22 11:12 29:9 41:18 45:5 55:15 94:13 100:14 103:3 108:11 115:7,9 118:22,23,24 132:2 134:22 138:25 139:4 141:23 143:20 145:10 152:9 163:25 166:10 169:14 184:13 190:14
**talking** 13:9 29:13 30:25 35:10 39:3 58:18 62:12 66:13 69:21 70:2 98:25 107:11 109:9 111:5 117:1 144:17 146:12 151:19
**talks** 13:8 75:17 105:21
**target** 36:6,10 108:10,21
**targets** 33:18 33:18 34:3,14 34:18 108:11 136:25

**[task - think]** Page 52

| | | | |
|---|---|---|---|
| **task** 103:8 135:7 169:8 | **terminologies** 92:7 | 127:12 199:11 201:7,10 202:9 202:17 204:8 | 182:15 185:21 187:5 188:6 193:24 |
| **teaching** 49:5 | **terminology** 27:12 28:24 35:1 91:6,10 | **text** 62:10 90:1 | **think** 13:2,8 15:4,14 16:16 |
| **technical** 31:6 32:18 | **terms** 13:20 | **thank** 15:10 22:22 24:13 | 16:16 19:4,5 19:20 21:7 |
| **technically** 146:7 187:10 | 29:3,18 30:21 31:6 32:18,19 | 28:12 60:1 68:11 69:23 | 23:22 25:1,6 29:8 31:13,14 |
| **technician** 16:10 | 35:13 37:24 39:13,20 40:19 | 72:11,11 90:8 90:18 99:22 | 32:12,17 33:6 36:14 39:9 |
| **tedious** 27:9,10 | 52:15 67:7 | 106:2 111:6 | 40:5,16,23 |
| **tell** 10:10 11:3 18:18 29:2 | 75:21 85:23 100:13 101:19 | 130:22 152:1 158:9 160:5 | 45:8 46:11,22 47:21 48:24 |
| 133:6 153:12 165:2 166:3 | 103:1 104:20 105:5 121:13 | 195:14 199:9 | 49:3 50:19,20 51:5 52:8 |
| 191:20,21 | 128:11 133:24 | **that'd** 38:18 | 54:17,22 57:18 |
| **template** 59:19 99:24 100:1 | 133:24 143:19 183:3 198:25 | **thick** 96:12 | 57:20 59:22 60:9,9,13,13,15 |
| **ten** 73:16 89:9 92:19 111:3 | **terrible** 97:23 | **thing** 16:21 32:14 41:2 | 62:9 65:22 68:20,23 69:16 |
| 169:14 172:20 172:21 | **test** 55:5,12 118:23 119:16 | 43:15 47:17 57:13 82:11 | 72:13 74:13 75:6 76:16 |
| **tended** 57:17 | 145:20 166:5,6 174:3 195:4 | 128:19 132:19 185:7,7 187:23 | 77:18 80:25 81:10 82:19,20 |
| **tennessee** 19:1 19:23 47:23 | **testified** 9:2 46:6,12 | 191:9 | 83:10 84:19 86:23 89:8 |
| 48:4 187:8,19 | **testifies** 161:16 | **things** 11:8 16:15 29:13 | 94:13 95:3,5 97:8 98:13 |
| **term** 29:24 30:24 31:4 | **testify** 127:15 | 32:4 38:25 41:1 44:5 49:4 | 99:9,9 103:23 104:9,12,14,25 |
| 32:6 35:2 48:15,15 55:11 | **testimonial** 41:17 42:17 | 49:11,19,19,22 49:23 61:10 | 105:8 109:20 109:20 110:9 |
| 117:3,5 126:7 130:15 149:6 | **testimonials** 41:9 | 62:13 75:9,18 93:23 95:21 | 110:10 112:10 |
| 150:13 | **testimony** 11:12 28:9 | 109:8 127:17 128:21 145:2,2 | |
| **termed** 168:21 | 46:5,9 47:6 | 164:23 166:9 | |

**[think - tradeoffs]**                                                    Page 53

| | | | |
|---|---|---|---|
| 113:20 119:4 | 191:3 | 44:3,4,5 47:16 | 103:7 105:23 |
| 121:21 123:20 | **three** 15:25 | 54:16 57:2 | 151:22 192:8 |
| 127:16 128:25 | 16:24 17:19,24 | 61:6 74:15 | **tool** 46:3,6 |
| 129:14,16,20 | 18:5,6,10,18 | 81:5 98:7 | **tools** 36:21 |
| 130:18 132:13 | 38:10,13,14,17 | 108:12 111:1 | 39:12 79:1,3 |
| 136:20 138:18 | 40:4 45:11,16 | 120:21 131:21 | **top** 113:24 |
| 144:3 145:12 | 52:12 71:8 | 131:25 132:8 | 143:1,4 175:1 |
| 146:18 148:4 | 85:17 95:17,19 | 135:5 154:7 | 181:1 |
| 149:1 154:2,24 | 113:19,19 | 165:6 168:10 | **tossup** 148:25 |
| 154:25 155:7,8 | 132:14 139:12 | 172:16,21 | **total** 29:6 30:12 |
| 160:7 162:21 | 140:12 142:8 | 173:3 185:23 | 36:5 84:17 |
| 164:4 165:11 | 145:10 147:2 | 199:9 202:18 | 101:20 113:18 |
| 167:3 168:1 | 147:15 148:10 | **timeframe** | 113:21 117:23 |
| 169:18 170:4 | 157:10,10 | 202:8 | 124:9 127:22 |
| 178:10 180:3 | 158:22 162:24 | **times** 49:12 | 132:4,6 136:1 |
| 185:8,25 193:2 | 166:5,8 167:14 | **title** 43:3 45:23 | 143:19 146:14 |
| 194:5,24 | 167:18,25 | 121:9 141:21 | 199:12 |
| 196:20 197:3 | 170:8 172:10 | **titled** 45:20 | **totally** 41:6 |
| 200:10 | 174:16 175:6 | **today** 9:17,24 | 98:21 |
| **thinking** 18:2 | 178:17 181:6 | 10:3,17 11:4 | **totals** 132:7 |
| **thinner** 96:13 | 183:5 196:13 | 35:10 161:16 | **touchscreen** |
| **third** 16:15 | **threshold** 34:5 | 182:25 193:9 | 156:17 160:14 |
| 17:25 18:2 | 138:12,15 | 199:3 | **towns** 181:18 |
| 67:9 98:7 | 140:17 159:22 | **together** 31:25 | 182:11 183:3 |
| 147:2,14 159:5 | **tied** 188:8 | 49:20 132:21 | **townships** |
| 159:10 180:25 | **tiger** 74:22,23 | 176:8 | 93:24 |
| 186:13 | 74:24 | **toggle** 51:15,23 | **track** 31:20 |
| **thomas** 3:23 | **tighter** 125:1,2 | **told** 27:19,24 | **tracked** 130:3 |
| **thornburg** 62:2 | **time** 7:16 8:7 | 67:3 89:11 | **tracks** 175:8 |
| **thought** 15:9 | 8:20 13:14 | 157:23 | **tracts** 94:11 |
| 19:14 97:9 | 15:1,4,12 | **took** 14:14 15:5 | **traded** 49:17 |
| 106:3 110:25 | 16:14,16 21:19 | 25:9 27:25 | **tradeoffs** |
| 114:8 133:7 | 21:23 40:18 | 53:23 58:17 | 175:10,11 |
| 173:9 174:11 | 43:19,22,24,25 | 101:16 102:3 | |

Jonathan Cervas , Ph.D.

March 18, 2026

Driver, Courtney, et al. v. Houston County Board o

**[traditional - tyson]**

Page 54

| | | | |
|---|---|---|---|
| **traditional** 35:17 36:12 41:24 48:16,17 48:23 49:14 57:10 58:18 128:11 166:1 168:25 185:13 186:5 | **tried** 57:20 121:21,24 135:15 | 59:14 68:12 83:16 148:15 175:5 180:24 181:25 | **typo** 38:21 84:2 141:20 |
| | **tries** 135:21 | **turned** 60:3 100:3 135:15 | **typographical** 149:12 |
| **transcribed** 201:9 | **true** 16:17 40:13,14 86:9 106:15,25 138:13 201:9 204:8 | **turning** 87:23 143:10 178:23 | **typos** 37:19,19 |
| **transcript** 1:24 9:24 199:17,19 199:21 202:6 202:19 204:5,8 | **truly** 150:14 | **turnout** 92:13 172:17 | **tyson** 3:9 4:6 8:12,13 9:7,10 12:8 18:13,17 20:18 24:6,10 24:14 26:1,7 30:17 34:1,11 36:7 42:15 44:19 45:2 53:7 55:14 57:25 58:4,16 59:4 60:25 63:6,13,25 64:17,24 65:7 65:13,21,25 66:12 68:1 69:14 70:16 77:20 78:12 85:25 87:7,18 87:20 88:14 91:8 95:8 96:5 97:1 110:18 113:15 115:21 119:18 120:12 122:5 126:6,14 127:18 129:23 130:14,23 140:23 141:14 147:12,20 148:1,13 |
| **transferable** 73:9,11,17 149:20 150:7 151:2,14 152:4 152:11,21 153:10,23 154:5 155:17 156:2,9,18 157:1 159:16 | **trust** 178:2 | **turns** 53:24 111:20 | |
| | **truth** 164:15 | **two** 18:4,8 38:9 38:16 55:21 61:17 69:19 73:4 94:8 109:10 112:7 118:24 129:4 150:1 151:5 154:11 155:19 158:5,12,13,14 158:22 159:2 162:9 183:4,6 188:6 191:18 192:17 196:24 199:13 | |
| | **truthfully** 10:17 | | |
| | **try** 21:4 35:19 36:3,6 57:8 74:6 108:7 122:12 138:21 152:3 | | |
| | **trying** 31:9 34:5,23 36:10 52:1 53:5 54:21 65:12 72:13 94:1 98:15 118:8 133:11 135:24 136:25 140:13 149:14,14,16 150:23 163:25 166:9 170:5 186:10 188:12 191:1 194:22 | | |
| **transferred** 157:4 | | **type** 23:23 152:10 | |
| **transfers** 157:2 | | **types** 37:3 152:12,13 | |
| **transition** 112:24 | | | |
| **travel** 142:20 | | **typical** 93:19 | |
| **treated** 190:14 | | **typically** 36:23 85:16 189:19 | |
| **trende** 46:5,10 46:19 | | | |
| **trial** 21:17,17 46:12 | **turn** 12:17 26:9 45:10,19 47:3 | | |

Veritext Legal Solutions

Jonathan Cervas , Ph.D.                                     March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[tyson - use]**                                                    Page 55

| | | | |
|---|---|---|---|
| 156:15 160:25 161:17,19 162:5 164:17 168:12 169:4 171:12 176:2 177:19 180:18 183:21 196:5 198:7,11,13 199:7,18,25 200:5 | 149:8 150:6 151:11 154:14 160:4 | 164:18 193:8 | **updated** 13:17 133:8 |
| **u** | **underestimati...** 116:20 | **undilute** 125:6 125:9 126:7 129:12 130:8 | **updates** 40:22 |
| **u** 7:1 | **undergraduate** 15:5 | **undiluted** 125:21 129:9 130:6 134:5,7 140:3,7 149:6 149:8,10,12 | **upload** 82:7,11 |
| **u.s.** 33:10,16 36:15 49:9,12 49:18 | **underpopulat...** 143:11 | | **uploaded** 82:5 |
| **uh** 17:22 34:16 35:21 84:22 96:18 100:17 125:8 140:4 155:15 179:1 | **undersigned** 2:6 | **undilutes** 125:6 | **upper** 191:15 191:18 |
| **ultimately** 67:16 110:13 | **understand** 29:20 33:9 36:2,3 39:21 101:15 133:12 153:19 158:19 160:6 187:12 188:5 189:9,11 | **unfortunate** 149:18 | **use** 15:22 29:3 30:13 31:4,8 32:16,19 34:13 34:17 36:20,23 36:25 37:5,14 37:20 39:10,12 39:14 40:15,16 40:19 42:20 43:17 47:7,11 47:13 50:11,20 50:24 51:10,11 54:7 55:3 57:24 58:3 75:7,9 79:1 80:13 82:16 92:6 98:1,23 98:24,24 99:20 102:25 106:6 107:14,17 108:13 114:6 117:3 118:5,11 119:20 121:23 125:11 126:7 129:16 130:19 136:18 149:19 150:14 151:17 152:21 155:5 |
| **unclear** 129:21 178:15 | | **unfortunately** 13:13 174:25 | |
| **under** 12:22 20:2 33:8 68:21 84:5 94:8 110:3 124:16,16,16 136:10 138:12 144:11 145:16 145:25 146:11 146:12 148:10 | **understanding** 29:15,17,20 30:2 39:12 40:9 62:7,21 63:3 67:2 68:8 68:10 77:11 126:8 162:17 163:2,9 170:23 183:10 189:16 | **unit** 7:19 113:14 | |
| | | **united** 1:1 7:22 152:20 | |
| | | **units** 192:25 199:13 | |
| | | **university** 15:21 171:8 | |
| | | **unknown** 77:7 78:21 | |
| | | **unlv** 15:4,12 | |
| | | **unpopulated** 196:15 | |
| | **understood** 43:16 60:1 122:24 126:22 128:9 136:8 137:1 138:9 140:19 148:14 152:1 154:18 | **unreasonable** 185:5,8 | |
| | | **unsee** 193:24 | |
| | | **unsplit** 176:22 | |
| | | **unusual** 179:4 | |
| | | **update** 13:5 | |

Veritext Legal Solutions
800.808.4958                                                770.343.9696

Jonathan Cervas , Ph.D.

March 18, 2026

Driver, Courtney, et al. v. Houston County Board o

**[use - vote]**

Page 56

168:23 169:6,7
174:23 184:15
184:20 185:5,6
185:8,14,17,17
186:3 188:4
**used** 15:19 29:4
29:8 30:23
32:6,8 36:22
37:4,11 39:21
39:24 40:2,5
40:10,18,21
43:18,19 46:23
46:25 48:15
51:13 53:25
66:14 71:12
74:21 75:23
77:1,5 80:10
80:19 81:23
95:13 97:10,20
98:8,9,13,15
99:17,24 104:9
117:11 119:2
121:19 126:20
128:12 135:2
140:14 144:18
148:6 154:4
168:5 169:9
171:16,20
173:21 187:8
187:19,25
202:19
**useful** 50:15
52:13,14 67:4
94:2

**uses** 36:11 39:7
46:22 50:20
80:1 97:16
124:4 194:19
**using** 15:11
31:23 44:11
82:3,24,25
91:9 105:16
108:13 115:11
117:22 128:25
132:10,11
140:7,15,20
145:17 160:15
164:6 171:9,14
171:24 173:1
175:3 192:19
193:21
**usually** 38:3
49:5 71:15
**utah** 99:15
**utility** 57:1
**utilize** 170:23
**utilized** 46:3
94:14 128:15

**v**

**v** 202:4 203:1
204:1
**vague** 29:20
**vap** 70:20
120:17 123:12
131:10 136:10
137:13 139:7
146:3,17 147:3

148:9 168:22
194:15
**various** 191:5
**vary** 23:21
**varying** 84:13
**vast** 79:12
**verification**
198:18
**verify** 202:9
**veritext** 8:3
199:13 202:14
202:23
**veritext.com**
202:15
**versus** 7:21
17:7 18:3,4,23
18:25 19:4,25
29:11 109:9
110:11 132:11
**viable** 129:15
129:15,17
130:18,19,20
**video** 7:10,16
7:20 58:7,8,12
58:14 66:3,4,8
66:10 113:6,7
113:11,13
141:5,6,10,12
195:16,17,21
195:23 199:14
200:7
**videographer**
3:19 7:11 8:3
8:19 24:2,8,12

58:6,13 65:23
66:2,9 113:5
113:12 141:4
141:11 195:15
195:22 199:10
**videotaped**
1:13 2:2
200:12
**view** 15:9 86:11
183:22
**villages** 181:19
182:13,14
183:4
**violation** 109:7
126:5 163:11
166:12,18
171:25
**violations**
189:23
**virginia** 47:1
153:5
**visible** 101:18
**visited** 41:20
**visual** 54:9
55:4 61:1
149:1
**vote** 35:9 71:22
73:7,11,12,15
73:17,18 88:2
126:2 134:5,7
140:3,8 149:10
149:12,20,21
150:7,7,25
151:2,3,11,14

Jonathan Cervas , Ph.D.                              March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[vote - ways]**                                         Page 57

152:4,11
153:10,23
154:5 156:21
157:2,3,12
158:14,25
159:16,17
160:1,10,16
163:18 165:15
166:1,4 171:20
**voted** 92:22
93:3
**voter** 24:25
28:10 30:13
76:18 77:11,12
77:23 78:4
79:5,6 84:20
85:7 157:10,14
158:6,8 170:18
170:19,23
171:10,20
173:1 187:3
**voter's** 106:12
**voters** 31:15
60:18,19 62:19
63:9 64:3
70:24 71:19
72:3 77:6 79:2
84:3,17 92:15
92:22 93:2,3
95:10,12 106:7
108:17 109:5
109:23 111:3
111:21 120:1,2
120:14,15

125:7,10,19
126:3 129:3,10
129:12 130:6
133:16 134:4,9
137:3,8,10,10
137:14,17,17
137:18 139:20
140:2 144:6
146:8 148:20
149:7 150:5
151:5 152:5
154:7,14,21
155:4,18,21,23
156:1 157:20
158:1 159:3,7
160:3 194:13
195:7
**votes** 88:1
151:16 152:16
152:17 157:11
157:25 158:1,1
158:3 159:4
**voting** 19:18
20:6 29:7,16
30:3,11,11
49:10 68:21
71:22 72:24
73:7,8,9,16
81:23 85:5,11
108:5 109:7
110:6,14,23
137:17 141:25
149:9 150:25
151:18,18

152:10,13,14
152:21 154:15
154:20,23,25
155:5,17 156:3
156:9,17,19,24
160:4,14
163:19 165:14
186:18 196:25
**vs** 1:7 21:18
29:22 30:1
33:12 45:5
62:2 99:8
169:2 177:5,6
**vtd** 186:23
**vtds** 186:22

**w**

**waived** 7:6
**walk** 157:12
**want** 16:12
25:21 27:12
28:20,23 29:10
33:13 43:7
47:24 48:19
57:15 65:24
92:14 103:4
104:3 113:1,2
116:5 127:15
130:2 154:9
155:11 175:5
175:14 182:23
184:7 195:11
196:11 199:16

**wanted** 15:7
25:18 28:7
102:6 105:14
114:8 139:18
139:25 154:17
167:3 174:17
174:18
**warner** 53:23
102:15 127:4
176:6
**water** 58:3
196:15
**way** 10:5 16:8
27:2 29:4
31:22 35:9
36:19 40:12
43:22 48:1
49:3 59:21
68:3 87:24
91:14 95:4
100:7 101:7
111:22 117:9
127:7 128:5
131:1,7 136:19
143:16 146:18
158:16 161:18
165:13 168:24
171:17,18
175:3,15
176:24 187:5
193:6
**ways** 29:8,10
30:20 31:4
68:23 71:16

Jonathan Cervas , Ph.D.                                    March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[ways - wrote]**                                                    Page 58

| | | | |
|---|---|---|---|
| 152:18 165:19 170:10,11,13 170:14 171:16 | **went** 33:16 43:4 185:1 | 58:2 59:1 60:22 63:2,23 | 95:22 97:21,25 128:24 151:4 |
| **we've** 9:22 12:10 74:5 83:9,10 93:9 94:13 100:14 115:4,7 118:22 118:23,24 122:6 131:1 139:4 143:20 145:10 146:5 151:10 163:24 166:9 167:7 169:14 178:18 179:7 184:13 190:14 197:3 | **whispering** 7:15 **white** 30:25 31:2 76:8 83:12,12 85:5 85:7 106:4,17 120:2,15 137:10 158:6 159:1 **wide** 86:6 143:4 **win** 139:12 140:12,13 148:23,23 157:25 | 64:14 65:13,19 67:24 69:7,11 70:10 77:17 78:9 85:22 88:12 91:5 95:2 99:5 106:24 115:16 119:15 120:10 126:1,12 127:13 141:2 148:3 156:13 162:2 164:14 168:17,19 171:4 175:24 177:16 182:21 199:22 201:6,9 201:10 202:8 202:10,12,18 | 153:10,11,24 153:25 154:19 155:11 185:17 186:1 189:9 197:25 **worked** 14:5 21:18 23:16 42:1 46:24,24 47:2 189:21 **working** 21:25 93:17 131:20 131:21 **works** 138:22 154:13 157:8 **worn** 109:11 **wright** 21:18 |
| **website** 5:7 41:9 42:8,12 46:3 53:19 95:21 97:3 112:11 122:18 185:2 | **winners** 157:24 **winning** 71:15 153:16 **wins** 144:6 151:16 158:4 | **won** 89:6 **word** 90:24 140:14 173:21 185:14 191:10 | 97:21 98:10 99:8,16 123:7 172:3 **write** 13:6 22:13 37:5,14 39:17 42:2 |
| **wednesday** 2:10 | **wisconsin** 18:3 **wise** 19:4 59:16 | **words** 31:8 32:14 62:6 | 53:17 73:13 76:22 192:7 |
| **week** 13:16 25:9,11 27:18 27:19 28:23 | **witness** 4:4 8:21 9:1 13:3 18:7,8,19,21 | 140:20 145:1 147:18 148:5 | **writing** 37:7 144:22,23 |
| **weighting** 81:23 | 19:3,9,13,18 20:16,17,20,24 | **work** 10:3,5 14:2 16:21 | 171:5 180:7 |
| **weird** 143:16 | 21:9 23:17 | 21:16 22:7,17 | **wrong** 43:13 74:16 189:20 |
| **welcome** 38:12 | 26:3 30:8 33:5 33:24 34:9 | 23:23 27:5 | **wrote** 11:9 83:2 83:3 136:18 |
| **wellston** 192:13 | 36:1 44:17 52:23 55:10 | 32:21 74:5 75:14 87:25 | 145:2 154:22 |

Jonathan Cervas , Ph.D.                     March 18, 2026
Driver, Courtney, et al. v. Houston County Board o

**[wrote - zoom]**                                    Page 59

| | | z |
|---|---|---|
| 154:24 173:19 | 124:2,23 | |
| **wygant**  18:25 | 125:11 126:2 | **zones**  124:5 |
| 45:5 | 126:20 128:18 | **zoom**  3:11 |
| **x** | 132:5 133:3,13 | |
| **x**  4:1 148:24 | 133:24 139:15 | |
| **y** | 141:1 142:10 | |
| | 143:13 144:9 | |
| **yeah**  11:23 | 144:23 148:22 | |
| 15:21 16:12 | 149:2 151:10 | |
| 17:4 19:11,14 | 153:14 156:14 | |
| 20:21 22:5 | 162:3 164:15 | |
| 24:5,9 27:14 | 166:4 167:12 | |
| 28:20 29:17 | 173:16,19 | |
| 30:9 31:22 | 174:16,16,20 | |
| 38:13 41:4,6 | 174:20 175:25 | |
| 46:11 47:10 | 179:22 180:2 | |
| 48:22 50:9 | 182:18 184:1 | |
| 54:13 55:7 | 187:21 192:3,7 | |
| 58:3 59:20 | 192:15,21 | |
| 60:23 63:3 | 193:2,7,20 | |
| 65:10 66:1 | 194:10 195:12 | |
| 69:8,12 71:25 | 197:9 198:12 | |
| 73:13 74:20,24 | 199:23 | |
| 75:15 83:1 | **year**  18:24 | |
| 84:6,15 85:15 | 172:21 | |
| 86:11 87:11,11 | **years**  172:20 | |
| 87:19 89:1 | **yep**  65:16 | |
| 90:8,14 96:15 | 123:22 | |
| 99:13 100:3 | **yesterday** | |
| 101:5 102:4 | 27:20,25 35:7 | |
| 103:10 104:4,9 | **york**  18:23 | |
| 104:15 106:25 | 19:24,25 20:6 | |
| 111:11 113:20 | 21:15 153:1 | |
| 116:3 121:23 | 183:6,12 | |

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.