Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

COURTNEY DRIVER, et al.,

      Plaintiffs,

vs.                                    Civil Action No.
                                5:25-cv-0025-MTT

HOUSTON COUNTY BOARD OF
ELECTIONS, et al.,

      Defendants.

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JACQUELINE ROZIER, et al.,

      Plaintiffs,

vs.                                    Civil Action No.
                                5:25-cv-478-MTT

HOUSTON COUNTY BOARD OF
ELECTIONS, et al.,

      Defendants.

VIDEOTAPED DEPOSITION OF
DANIEL S. PERDUE
March 10, 2026
Commencing at 9:07 a.m.
Concluding at 1:32 p.m.

Houston County Board of Commissioners
200 Carl Vinson Parkway
Warner Robins, Georgia 31088

Reported by:  Janet S. Paris, CCR B-1835

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 2

APPEARANCES OF COUNSEL:

On Behalf of Plaintiffs:

SAMANTHA HEYWARD, Esq.
JULIE M. HOUK, Esq. (Appearing Remotely)
Lawyers' Committee for Civil Rights Under Law
1500 K Street
Suite 900
Washington, DC  20005
202.662.8600
Sheyward@lawyerscommittee.org

JOHN H. FLEMING, Esq.
John H. Fleming Law, LLC
1066 Springdale Rd., N.E.
Atlanta, Georgia 30306
404.285.5084
John@jhflaw.org
CARLOS ANDINO, Esq.
Southern Poverty Law Center
1101 17th St., NW
Suite 550
Washington, DC  20036
470.708.0554
Carlos.Andino@SPLCenter.org
On Behalf of Defendants:
BRYAN P. TYSON, Esq.
Clark Hill PLC
3630 Peachtree Road NE
Suite 700
Atlanta, Georgia  30326
678.370.4377
Btyson@clarkhill.com
Also Present:
Gerald Bowens
Legal Videographer

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 3

INDEX OF EXAMINATIONS

WITNESS:  DANIEL S. PERDUE

Page

Cross-Examination by Ms. Heyward                     8

Cross-Examination by Mr. Andino                     67

Direct Examination by Mr. Tyson                    141

Recross-Examination by Ms. Heyward                 147

Recross-Examination by Mr. Andino                  148

- - -

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 4

INDEX OF EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Houston County Ordinances Article I. Board of Commissioners | 22 |
| Exhibit 2 | 11/28/1990 Letter from John R. Dunne to Michael J. Long | 32 |
| Exhibit 3 | 12/24/1988 Houston Home Journal article | 35 |
| Exhibit 4 | Houston County Commissioners Meeting Notes, February 4, 2025 | 43 |
| Exhibit 5 | EEOC Report EEO-4, Reporting Year 2023 | 57 |

Page 5

(Whereupon, videotaping commenced.)

THE VIDEOGRAPHER:  Good morning.  We're going on record at 9:07 a.m.  This is Tuesday, March 10th.  Please note that the microphones are sensitive and may pick up whisperings and private conversations.  Please mute all cell phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off record.

This begins Media 1 in the video-recorded deposition of Dan Perdue taken by counsel in the matter of Courtney Driver vs. Houston County Board of Elections.  This is filed in the United States District Court for the Middle District of Macon -- of Macon -- of Georgia, Macon Division.  This is case number 5:25-CV-0025-MTT.  We're located -- this deposition is located at Houston County Board of Commissions office.

My name is Gerald Bowens, representing Veritext Legal Solutions.  I'm the videographer. I'm not authorized to administer an oath.  I'm not related to any parties in this action, nor am I financially interested in the outcome.  If there's any objection to the proceeding, please state them at the time of your appearance.

Page 6

Counsel and all present on Zoom will now state their appearance and affiliation for the record, beginning with the noticing attorney.

MS. HEYWARD:  Samantha Heyward with the Lawyers' Committee for Civil Rights Under Law, representing the National Association for the Advancement of Colored People Georgia State Conference.

MR. FLEMING:  John Fleming, John H. Fleming Law, LLC.  I am co-counsel with Samantha.

MR. TYSON:  We want to do the rest of the Lawyers' Committee people?

MS. HOUK:  Good morning.  This is, excuse me, Julie Houk online.  I represent the National Association for the Advancement of Colored People Georgia State Conference.  I'm with the Lawyers' Committee for Civil Rights Under Law.

MR. ROLLINS-BOYD:  Marlin David Rollins-Boyd.  I'm with the counsel for the Lawyers' Committee for Civil Rights Under Law representing the National Association for the Advancement of Colored People Georgia State Conference.  I am not making an appearance.  I'm just here observing today.

MR. ANDINO:  My name is Carlos Andino,

Page 7

representing the plaintiffs in the matter of Rozier, et al vs. Houston County Board of Elections, et al.

MR. TYSON:  Good morning.  Bryan Tyson on behalf of the witness and the defendants in the case.

THE VIDEOGRAPHER:  Thank you very much. Would the court reporter please introduce herself and swear the witness.

THE REPORTER:  My name is Jan Paris with Veritext Legal Solutions.  Please raise your right hand.

(Whereupon, the witness was duly sworn.)

THE VIDEOGRAPHER:  Thank you very much.  You may proceed.

* * *

Page 8

DANIEL S. PERDUE,

having been produced and first duly sworn,

testified as follows:

CROSS-EXAMINATION

BY MS. HEYWARD:

    Q   Can you please state your full name for the record?

    A   My name is Daniel Stephen Perdue.

    Q   What is your current address?

    A   My personal address is ███████████, Kathleen, Georgia █████.

    Q   And what is your current occupation?

    A   I'm the chairman of the Houston County Board of Commissioners.

    Q   And that is your official title?

    A   I think so, yes.

    Q   And how long have you held that position?

    A   I'm wrapping up my first term officially.  I took office in January 1st of 2023.

    Q   And are you on any medication right now that might keep you from fully answering the questions in this deposition?

    A   No.

    Q   Do you have any medical condition that could interfere with or prevent you from fully and truthfully

Page 9

answering the questions today?

A    No.

Q    Have you ever been deposed before?

A    No.

Q    Have you ever testified at trial before?

A    No.

Q    Have you been involved in any other court proceedings?

A    I was summoned as a juror once and dismissed. And then I was present at the hearing that we had before Judge Treadwell.  And we have certainly considered legal matters in our executive sessions as a member of the Board of Commissioners.

Q    I'll start today with some basic instructions. I'll be asking you questions today and your testimony will be taken by the court reporter.  Do you understand that?

A    Yes.

Q    You were sworn in by the court reporter.  Do you understand that you are under oath today?

A    Yes.

Q    That means you will have to give a truthful and complete answer to each question.  I will try to make my questions clear and understandable.  If I ask you a question that you don't -- and you don't understand it, please ask me to rephrase it and I will try to do that.

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 10

If you don't understand a question, please ask me rather than your counsel for clarifications, definitions or explanations of any words, questions, or documents presented during the course of the deposition.  If I -- if you answer it, a question, I'll assume you understand it.

The court reporter will record everything you say verbatim, so please let me finish my questions completely before answering and I will do my best to let you give your answer completely before I ask the next question so we have a clear record.  You will need to give verbal responses so that the court reporter can take them down, so please say yes or no instead of nodding or shaking your head.  Do you understand?

A    Yes, ma'am.

Q    Your counsel may object at various points.  If they make an objection, please go ahead and answer the question that has been objected to unless your counsel instructs you not to answer.  Do you understand?

A    Yes, ma'am.

Q    If at any time you need to take a break, just let me know and we'll go off the record.  I only ask that if a question is pending, you answer that question first. Do you understand?

A    Yes, ma'am.

Q    Sometimes you'll remember things later in the

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 11

day and if that happens, please let me know what's on your mind and we'll add it to the record.  Will you do that?

A    Yes, ma'am.

Q    Sometimes after we've been talking for a while you'll realize a prior answer was not entirely accurate and if you realize that, will you met let me know so we can correct the record?

A    Yes, ma'am.

Q    Do you have any questions?

A    No, ma'am.

Q    Carlos will also be asking questions after I'm finished.  And he will go through the same sort of brief instructions at the top.

A    Sounds good.

Q    All right.  Did you bring anything with you to today's deposition?

A    I was on my way to work this morning and realized I did not have my wallet and thought that my ID may be required.  So I have my wallet and my watch and that's about it.

Q    What did you do to prepare for this deposition?

A    I read the expert reports in the case and I talked to my attorney.

Q    Did you speak with any commissioners in preparation?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 12

A    No.

Q    Which of the expert reports did you review?

A    I reviewed, I believe six of the original expert reports in the Driver case, which included, I believe, four expert, you know, original expert reports that were generated by the experts in that case.  I then also read Dr. Barber's rebuttals to those expert reports serving as our expert.

And then I think there were sort of counter, what I would call counter rebuttals.  The Rozier's expert I believe submitted some, a report and maps on Friday night. I did not fully read that report, but I did observe the maps in that report.

Q    Okay.  And did any of the documents that you reviewed refresh your recollection on any issues in this case?

A    Not particularly.

Q    Okay.

THE VIDEOGRAPHER:  Real quick.  Are you on -- 'cause the court reporter just crashed. We're going to go off record.  We're going off the record at 9:15 a.m.

(Off the Record)

THE VIDEOGRAPHER:  We're going back on the record at the 9:27 a.m.

Daniel S. Perdue                               March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 13

BY MS. HEYWARD:

Q    How long have you lived in Houston County?

A    I've lived in Houston County my entire life apart from a short stint where I lived in Atlanta to attend college.

Q    What job did you hold before your current position as chair?

A    Small businessowner.

Q    Was it in -- it was in Houston County?

A    The majority of my work, yes.

Q    Did you run for any office before Board of Commissioner?

A    No.

Q    When did you decide to first run for the Board?

A    Deciding to run for the Board?

Q    Yes, sir.

A    I ran for a part-time post commissioner position in the election that was 2020.  Deciding to run for that position, late 2019 or early 2020.  I would not be able to put a precise time on that.

Q    And when did you first decide to run for the current chair seat?

A    Early 2022.

Q    Why did you decide to run for office?

A    I'm a person of faith, and so I feel like by and

Page 14

large, I feel like I was doing God's will.  I know that is a trite response amongst politicians.  I've become increasingly more involved in civic activities beginning many years ago with participating in a --

(Zoom echo feedback)

Participating in a --

Testing 1, 2.  Testing 1, 2.

Okay.  Participating in a leadership program put on by the Perry Area Chamber of Commerce.  I then served on the executive committee at that Chamber and then was chair of the board of the Chamber.  During that time I was asked to serve on the planning and zoning here.  And then as Commissioner Thompson was preparing to retire from his service as the board, I was asked if I would be interested in running for that seat.

Q   Did you quit your previous positions before chair to run for the Board of Commissioners?

A   I quit them once I became chair.  Does that -- is that answering your question?

Q   Yes.

A   Okay.  So I would not say that I ceased operations of those businesses while running to be chair, but once I assumed the job, I did lay those responsibilities aside.

Q   In 2020, what post was it that you ran for?

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 15

A    Post 4.

Q    In your first race, who was your opponent?

A    I did not have opposition in my first race.

Q    What was the nature of your small business?

A    Two very different things.  My education and background is in computers and technology.  So a degree in information systems, and that was, the majority of my professional work was in and around that type of work.  So I owned a consulting business that would consult with small and medium sized businesses around their, all sorts of technology needs, whether it be websites and digital marketing or problems with a Zoom call, for example.  And then I also owned and operated, my brother and I owned and I was the operating partner of a blackberry farm in Houston County.

Q    And now, sorry, going back to the question about the opponent.  That was in 2020 you did not have an opponent?

A    In 2020 I did not have an opponent in that election, either in the primary or the general.

Q    Okay.  And then in 2022?

A    I did not have an opponent either in the primary or the general in that election.

Q    When you campaigned for the first 2020 election, did you go to Warner Robins during your campaign?

Daniel S. Perdue                                  March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 16

A    I did not do a lot of campaigning in the 2020 election because I did not have an opponent.

Q    What about in the 2022 election?

A    Once again, I did not have an opponent, so I did not -- I think in total between both of those, I maybe had one campaign event.

Q    How many elections in total have you run for in Houston County?

A    I have gone through two election cycles; one as a post commissioner, one as running for the chairman.  I have recently qualified without opposition for the chairman again.  So we're in another election cycle currently.

Q    In any of your elections have you sought endorsements from members of the Black community in Houston County?

A    Yes.

Q    Who?

A    Currently on my website there's an endorsement from Chris Davis, who is a retired colonel at Robins Air Force Base and serves on the Development Authority of Houston County.  I have always tried to reach out to the African-American community and get support.

Q    Did you have any other elected positions either in Houston County or outside of Houston County before the Board of Commissioners?

Page 17

A    No.

Q    Now, what does the Board of Commissioners in Houston County do?

A    In my mind the two primary roles of the Board of Commissioners in Houston County revolve around public safety and infrastructure needs in Houston County.  It is -- the primary way through which we support public safety endeavors is through funding.  We are not the sheriff's office.  I joke frequently that the first thing they tell you within the first 15 minutes of newly elected county commissioner training is you're not the boss of the sheriff or quite frankly, any other elected official.  And if that's why you ran for county commission, to be able to boss the Sheriff around, you've got the wrong job.

And so we -- the primary support for public safety comes through funding the sheriff's budget requests and then largely the Commission also supports infrastructure needs in Houston County.  So those are the two primary jobs and tasks that I believe the Houston County Commission serves.

In general, we're the legislative body for the local government of Houston County.  We do not oversee the school system.  We don't oversee other constitutional officers, even if we do help set the budget for those offices.  We don't -- our power and our jurisdiction is

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 18

limited within city boundaries and municipal boundaries. We can certainly pass codes that apply in the unincorporated areas of Houston County, but those codes would not apply within city municipalities many times. That's the role of the Board of Commissioners in my opinion.

Q    And what is the current composition of the Board?

A    Would you like names?

Q    Yes.

A    Okay.  Sure.  Post 1 is occupied by myself. Post 2 is occupied by Shane Gotwalls.  Post 3 is occupied by Commissioner Gail Robinson.  Post 4 is occupied by Tal Talton.  That was the post that I previously occupied.  And Post 5 is occupied by Mark Byrd.

Q    Now, what does, specifically does your role of chair entail?

A    So the role of chair in Houston County is a full-time elected role.  I say, you know, for simplified purposes, I'm essentially the chief executive officer of Houston County.  It is a more than 40-hour-a-week job operating the business of Houston County.

Q    And how does that differ from the roles of the other Board of Commissioner members?

A    The other roles are part-time roles.  We are

Daniel S. Perdue                        March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 19

compensated differently.  I'm compensated at a full-time level.  They are compensated at a part-time level.  When Commissioner Talton asked me how much time at one of those part-time roles would consume when he was considering running, I said, It will consume all the time that you will give it, which is the case.

You can turn, you can certainly turn those things into full-time job jobs if you would like, as a lot of part-time elected roles.  But in our case, all four of those people are not retired.  They have active jobs and those roles are part-time.  So for lack of a better analogy, they sort of act as the legislative body.  In our meetings, I do not vote unless there is a tie.  And I act as the executive body.

Q    Do -- in your day-to-day, do you handle different subject matter areas than the part-time Board of Commissioner members?

A    Handle?  I would say no.  We all handle the same amount, the same types of subject matters.  A lot of the decisions that I make then go before the Board of Commission with a recommendation from staff to act in a certain way legislatively.  So we handle the same types of issues.  I am frequently more in-depth on the issues than they are.

Q    So you mentioned the priority -- priority

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 20

concerns are public safety, safety and infrastructure

needs.  So does the Board handle matters regarding

transportation?

        A     Yes.

        Q     Roads?

        A     Yes.

        Q     Traffic control?

        A     We set speed limits.

        Q     Conditions of county buildings?

        A     We approve as a Board projects to improve or

renovate county buildings, yes.

        Q     Funding of county offices?

        A     We approve a budget.

        Q     Budgets for which offices?

        A     Say that again?

        Q     Budgets for which offices?

        A     We approve the county's overall budget.  So any

county official is contained within that budget.  There are

certainly different funds within that budget that may apply

to different of those offices in different ways.  So, you

know.  But most of the constitutional officers are

contained within the general fund budget.

        Q     Are there commissions or task force --

task forces that operate underneath the Board of

Commissioners?

Page 21

A    Yes.

Q    Do individual civilians, residents serve on those boards or commissioners themselves?

A    I cannot think of an instance -- okay.  It varies.  Typically the boards where a commissioner will serve it is almost in an ex officio fashion, whereas it is expected that a commissioner will fill that role.  In most cases where we are proactively appointing people to boards, we are appointing nonelected individuals to those boards.

Good examples of boards like that would be zoning appeals, planning and zoning, the tax assessors board.  We appoint those positions and have traditionally not appointed commissioners to those boards, although I'm not sure there's anything legally that would prevent us from doing so.

Other boards, such as the board of health, Board of Public Health, the Hospital Authority, traditionally elected members have served in the roles that are represented from Houston County on those boards.  Middle Georgia Regional Commission has a mix as well.

Q    And how does the Board decide who is appointed to the different commissions?

A    We listen to people and take their interest, if they are interested in serving.  Personal conversations about interest in serving and -- I have been surprised at

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 22

how challenging it is to find someone who is interested in serving on those boards many times.

Q    Are there any Black residents on these boards?

A    Yes, ma'am.

Q    Do you have names of who?

A    At our most recent meeting we appointed two Black residents to the boards, one to Zoning and Appeals, and one to the Planning Commission.  Their names are Tony Loudin and Ivan Jones.  I know Steve Williams has served on the Planning Commission traditionally.  I believe there are African-Americans of the Zoning and Appeals Commission as well that have served.

Q    I'd like to pivot back to the structure of the Commiss- -- the Board of Commissioners.  Are you familiar with how the chair role on the Board of Commissioners was established?

A    Not particularly.

Q    I'd like to introduce Plaintiff's Exhibit Number 1, the Houston County Ordinances, Article I.

             (Whereupon, Plaintiff's Exhibit No. 1 was
              marked for identification.)

A    I'm sorry.  My nose itches like crazy.  Thank you.  Okay.

Q    Are you familiar with these ordinances?

A    I have read them in the past.  To say I'm

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 23

familiar with them might be an overstatement.

Q    Are you aware that Georgia has 159 counties?

A    Yes.

Q    Are you familiar with any other county Board of Commissioners within the state of Georgia?

A    Yes.

Q    Are you aware whether each of the other Board of Commission- -- Commissioners in Georgia are elected via an at-large system?

A    There's 159 counties in Georgia and there are probably 150 different methods whereby the Board of Commissioners is elected, governed.  We, for example, have sole commissioners.  That would certainly be an at-large election.  Two of those are local in the community.  I have not done any research particularly on the at-large issue and how many may elect all of their commissioners at-large. But I know there's a lot of different means and methods, not of electing, but of governing once those people are elected.

I know a lot of chairmen, it is selected amongst the body once the commission is elected.  There's just a lot of different ways that a commission operates in the state of Georgia because it's not particularly firm in the constitution how that commission should be made up and how it should operate.

Page 24

Q    Are you aware of any boards of commissions that are elected via single member districts?

A    Yes.

Q    And are you aware that prior to 1990, Houston County did not elect its chair via at-large elections?

A    Yes.

Q    If the chairman position were elected via a method other than at-large elections, would you agree that the function of the chair would not change?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  I think it would be challenging to elect a chair other than an at-large method.  As I talked about in considering how I reached the decision to run for chair, I was at a point in my life where I could set aside the small businesses that I had and take on a full-time role.  The other commissioners were not.

I think if the chair were, for example, elected amongst its peers, an election of five to select the chair, you could quite possibly wind up with a situation where no one wanted to be chair, where they all wanted a part-time position, but no one wanted to be the chair.  I think it is vitally important that the chair is elected at-large.

Page 25

BY MS. HEYWARD:

Q   I will pivot back to Board business as a whole. How does the Board solicit community feedback?

A   The primary way we solicit community feedback is by having one of the most open public comment periods I know of in any public board meeting.  We do hear from the community there.  I will also say that none of us are particularly difficult to reach or secretive with our contact information.  And people can e-mail us.  People can call us.  We have on occasion had town halls about particular issues to solicit feedback on those particular issues as well.

Q   And who makes the agenda for public meetings?

A   I establish the agenda for public meetings.

Q   And for closed meetings?

A   I probably do that in consultation with the county attorney to ensure that -- you're calling them closed meetings.  In my mind the only closed meetings we have are executive sessions which most often exist inside of our regular meetings.  And he would ensure that the subject matters that are covered there apply with the -- comply with Georgia's Open Meetings Records Act.

Q   And --

A   I didn't say that correctly, but I think you know what I mean.  The Open Meetings Act, the Sunshine

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 26

Laws.

Q    I understand.

A    Yes.

Q    How do you and the Board decide what matters are taken up?

A    So it would be -- a lot of them are just matters of course.  If we need to buy a vehicle, we are taking up that matter and buying the vehicle.  A lot of times that's not for us.  It may be for the sheriff's office or for another office in the county.  If we need to hire someone and there is a desire to hire them at a step above A, based on their experience, that's a Board approval item.  There's other matters like approving large contracts or approving intergovernmental agreements for things that we would like to accomplish within the community.

From watching our meetings, it can seem like the criticism has frequently been that the Board is just a rubber stamp.  I would push back on that idea and I would say that a lot of work has gone into those agenda items to get them to a place where the majority of the Board is going to feel like they're a good idea.

Q    And are all the Board of Commission meeting minutes published online?

A    Minutes?

Q    Yes.

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 27

A    As far as I know.  I'm not responsible for that publishing, but if we -- now I think there's probably a time limited nature to that.  I don't think we go back 20 or 30 years with online minutes, but I think our minutes are published online in typically a timely fashion for recent meetings.

Q    Do you know who is responsible for that?

A    My assistant, Dawn, after she types the minutes and they're reviewed by a few staff members, sends them to, I believe, Christine in MIS, who then publishes those minutes.

Q    Do you solicit community feedback on certain county matters?

A    Yes.

Q    How do you solicit such feedback?

A    I can certainly talk to community members and say, How do you feel about this or that?  At some times we've had meetings of key stakeholders in an issue.  And in other times we have had wide open town halls where, on particular issues, where people have come and shared.

Q    And how do community members express their concerns to you?

A    I get lots of e-mails.  I get many phone calls. I have a lot of face-to-face conversations about community concerns in addition to public comment periods at our

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 28

meetings and town halls or forums where we listen.

Q    And the -- apart from the public forums, these face-to-face conversations are happening privately?

A    Typically.

Q    Do you receive invitations from individuals to speak on county matters at events?

A    I do.

Q    How do you decide which ones to attend?

A    Primarily by looking at my calendar and seeing if I'm able to attend.  If I receive an invitation to come present on, for example, the latest happenings in the county, I generally try to take advantage of those opportunities if my calendar allows.

Q    How well attended are those meetings?

A    It varies depending on the group who is hosting. I'm not often promoting those things.  It's a -- nor do I sort of have a time when I'm saying, Y'all come and listen to me speak about those things.  It's typically, for example, a chamber group or a civic club that is saying we're going to have -- everything good?  Okay.  All right.

We're going to have myself come and speak.  Why don't you come listen to him.  So I typically leave the promotion of those things up to him -- up to them.  And I guess back to your question of how well attended are they? It can vary widely, from 20 people being in the room to 200

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 29

people being in the room.

Q    Pivoting now to the method of elections.  The
Board of Commissioners are elected all via at-large
elections, correct?

A    Yes, ma'am.

Q    Do you know when that method of elections was
introduced?

A    It is my understanding that the Board of
Commissioners has been elected at-large since Houston
County had commissioners.

Q    Do you know when that would -- what year that
would have been established?

A    Early 1900s in the Board of Commissioners.  I
can, you know, look right here and see there's 1922 on this
page.

Q    Is it your understanding that the at-large
method of elections have gone through any changes in
format?

A    I understand that there were residency
requirements and that was changed in the early 1970s.

Q    Are you familiar with the Voting Rights Act?

A    Only as it relates to this case.

Q    If I represent to you that the Voting Rights Act
was passed in 1965, would you have reason to disagree?

A    I would not.

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 30

Q    What were race relations like in Houston County in 1970?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  Based on expert reports, I can say that Houston County was experiencing some level of racial turmoil in the early 1970s.

BY MS. HEYWARD:

Q    Do you know why the current iteration of the at-large method was chosen in 1970?

A    I only know what I've read in the expert reports.

Q    And what have you read in the expert reports?

A    The expert reports seemed to conclude that the residency requirements were removed in response to the general racial turmoil of the time and in response to the Civil Rights Act.

Q    And what was -- what is the current justification for the at-large system?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  I believe the current justification for the at-large system is primarily this is always how county commissioners have been elected in Houston County, and this is

Page 31

what we believe is most effective for delivering

services and public safety to the citizens of

Houston County.

BY MS. HEYWARD:

Q    And do you know what -- the original

justification for numbered posts?

A    No.

Q    And are you aware of any justification for

numbered posts currently?

A    Other than that's the way it's been done, no,

ma'am.

Q    Are you familiar with the concept of pre-

clearance under Section 5 of the Voting Rights Act?

A    Very surface level understanding of what pre-

clearance may be.

Q    If I represent to you that Section 5 pre-

clearance required jurisdictions with histories of

discrimination to submit challenges -- excuse me, to submit

changes in election laws or district maps to the federal

government for approval before implementation, would you

have reason to disagree?

A    No, ma'am.

Q    With that understanding, do you know if the

shift to the current system was pre-cleared before it went

into effect?

Page 32

A    As I understand, the system was changed in the early 1970s.  It was then later discovered that that change was not pre-cleared and the Board of Commissioners at that time went out to the Department of Justice and got, I guess, post-clearance for that change.

Q    I would like to introduce Plaintiff's Exhibit Number 2.

(Whereupon, Plaintiff's Exhibit No. 2 was marked for identification.)

Are you familiar with this document?

A    This is probably the first time I've seen it.

Q    Do you have any understanding as to why the Board of Commissioners at-large system as estab- -- as changed in 1970 was not submitted for pre-clearance until 1990?

A    I do not.

Q    It was in 1990 that the full-time chairman position for the Board of Commissioners was established in its current form, correct?

A    I believe so, yes, ma'am.

Q    Now, your father, Sonny Perdue, was involved in Houston County politics, correct?

A    At what time?

Q    In the late 1980s to 1990s.

A    The way he would say it, because I've heard him

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 33

say it many times, is when some of the members of the county government came and asked him to serve on Planning and Zoning, they asked him if he had any political ambition and he said, No.  And they said, Good.  With this job you won't need any.  So he served on the Planning and Zoning Commission during that time prior to running for state legislature.

Q    To your knowledge, did he have any involvement with the local bill that established the current chairmanship position in its current form?

A    Not that I know of.

Q    Are you aware of any discussions by the Board of Commissioners or the community about changing how elections were conducted prior to the Department of Justice's lawsuit in January 2025?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  Will you ask that question again, please?

BY MS. HEYWARD:

Q    Yes.  Are you aware of any discussions by the Board of Commissioners or the Houston County community about changing the at-large election -- method of elections prior to the DOJ's lawsuit in 2025?

A    When I ran for the commission, I knew that there

Page 34

was a desire by some community members that the Board of Commissioners not be elected in an at-large fashion.

Q    Are you aware of any studies or research on voting trends within Houston County?

A    I'm aware that they exist.  I have not studied them intensively other than the expert reports.

Q    Okay.

A    And I'm not sure that I would characterize the expert reports as getting into trends so much as snapshots of individual elections.

Q    Okay.  Are you aware of any petitions or advocacy amongst Houston County members seeking single member districts in previous decades?

A    Previous to 20- --

Q    Previous to 2020 -- previous to the 2020s.

A    Petitions or advocacy?

Q    Yes.

A    Am I aware of any petitions or advocacy prior to 2020s?

Q    Yes.

A    Regarding this issue?

Q    Yes.

A    No.

Q    Are you aware of any studies or committees dedicated to investigating redistricting the Board of

Page 35

Commissioners at any time?

A    Only, only what has happened in this case.

(Whereupon, Plaintiff's Exhibit Number 3 was marked for identification.)

Q    I'd like to introduce Plaintiff's Exhibit Number 3.  Do you have any prior knowledge of the events discussed in the article "Panel Votes Not to Rush District Plan"?

A    No, ma'am.

Q    Does the Board of Commissioners retain records going back to 1990?

A    Yes, ma'am.

Q    Does the Board of Commissioners have an archive?

A    Yes, ma'am.

Q    Are you aware of how far the records go back in said archive?

A    Some records more than a hundred years.

Q    Do you know who Mr. Houston Porter is?

A    I do.

Q    If I represent that this person is Black, do you have any reason to disagree?

A    Not at all.

Q    Are you aware of when he served on the county Board of Commissioners?

A    It would be tough for me to recall the exact dates, but I'm aware of the time frame certainly.

Page 36

Q    Have any Black persons served on the Board of Commissioners since he served?

A    No, ma'am.

Q    Do you know about general time frame of how many years that is?

A    Oh, more than 30 years, I would say.

Q    Pivoting to other past candidates for Board of Commissioners.  Do you know who Arthur Head is?

A    I have a passing knowledge of who Mr. Head is, yes.

Q    Do you have any reason to believe he was not qualified to be elected to the Houston County Board of Commissioners?

A    No, ma'am.

Q    Do you know who Ronald Wayne Ragan is or Ragan?

A    I do not know Mr. Ragan.

Q    Do you know who Gordon Hicks is?

A    I do not know Mr. Hicks.

Q    Do you know who Keith McCants is?

A    I know of Mr. McCants.

Q    Do you have any reason to believe he was not qualified to be elected to the Houston County Board of Commissioners?

A    Yes, ma'am.

Q    What is that reason?

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 37

A    I do not believe that he had residency established in Houston County for long enough to be qualified to run for that seat.

Q    Do you know who Steve Williams is?

A    Yes, ma'am.

Q    Do you have any reason to believe he was not qualified to be elected to the Houston County Board of Commissioners?

A    No.

Q    Do you know who Jackie Rozier is?

A    Yes, ma'am.

Q    Do you have any reason to believe she was not qualified to be elected to the Houston County Board of Commissioners?

A    No, ma'am.

Q    Have you taken part in any meetings with the Houston County community regarding redistricting prior to the 2025 DOJ complaint but since your time in office?

A    Multiple community members, no.  I've had brief conversations with Dr. Rutha Jackson when she came by my office for a different purpose, about her desire to pursue a districted system, and I had a brief conversation with Mr. Houston Porter about his pursuit of a lawsuit.  But I would say in general, community meetings, no.  Those were individual conversations.

Daniel S. Perdue                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 38

Q    Any other individual level meetings that you can recall?

A    Prior to the DOJ's action?

Q    Yes.

A    That was your question, right?

Q    Yes.

A    Not that I can recall.

Q    Where did these individual meetings occur?

A    So for Dr. Jackson it was in my office right here.  It was a brief comment about, you know, You know we'd like districted elections.  For Mr. Porter, it was at his home.

Q    And how many meetings with each individual?

A    One.

Q    And were Jackson and Porter the only people attending their respective meetings?

A    For Commissioner Porter, yes.  For Dr. Jackson, no.  There were other people in the room to talk about a different issue.

Q    That issue was unrelated?

A    Very unrelated.

Q    Were the meetings transcribed?

A    No, ma'am.

Q    Did you take notes?

A    With Commissioner Porter, no, I did not.  I

Page 39

would not be able to say whether I took notes in the meeting with Dr. Jackson.  If I did take notes, it would not have been about this subject.  It would have been about the original meeting subject.

Q    In either meeting was the potential for single member districting plans discussed?

A    Did we discuss plans?

Q    Yes.

A    No, ma'am.

Q    What did they say in favor of changing the election system?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  For Dr. Jackson, it was, again, at the conclusion of a meeting about a very different subject.  And it was largely, you know, We would like a districted representation system. We did not really further drill down on the issue or I did not explore her reasons for wanting that system.

For Commissioner Porter, he just said -- I think he just sort of let me know that there were community members who were pursuing a lawsuit.

BY MS. HEYWARD:

Q    Have you taken part in any meetings with the

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 40

Houston County community regarding redistricting in the time since the January 2025 DOJ complaint?

A    Yes, ma'am.

Q    Who were these meetings with?

A    We're talking about community members as a whole?

Q    Yes.

A    Okay.  So shortly after the complaint, Dr. Jackson reached out to me and asked to put together a meeting of primarily African-American community members at a church, First Baptist Garmon Street, I believe.  And, you know, there were probably more than 100 people there where we discussed this.  I sort of laid out my understanding of Gingles at that time.  I think that's the correct pronunciation.  Also, since then I've individually met -- well, I've met as a pair with Chef Weldon and Jonathan Johnson and with Ms. Rozier and Dr. Jackson, one meeting on each of those.

Q    Let's start with the First Baptist Church meeting.  When did Dr. Jackson reach out to you regarding this?

A    That would be very difficult for me to say.  It was sometime after the lawsuit was actually filed.

Q    And how long did you -- how long were you there at the First Baptist Church?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 41

A     Looking back, I would estimate around an hour.

Q     Did you give a speech?

A     I talked.  I would hesitate to call it a speech.

Q     What did you talk about?

A     I talked about the lawsuit that had been filed against the county and my understanding of how these lawsuits typically go based on Gingles.

Q     In addition to speaking in front of the church, did you speak to any individuals at the church?

A     I'm sure I did.

Q     Did you follow up afterwards with the -- Dr. Jackson, who invited you?

A     She followed up with me afterwards and sort of asked if I would be willing to do another meeting like that.

Q     Did you do another meeting?

A     No, ma'am.

Q     Did the county complete an internal investigation?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  I think our experts' reports would show that we have certainly looked at a lot of data considering, in this case and our coming to our own conclusions.

Daniel S. Perdue                                     March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 42

BY MS. HEYWARD:

Q    Outside of the expert reports, did you share these results with anyone else?

A    No, ma'am.

Q    Have you received any communications from constituents about the county's investigation into the matter?

A    Yes, ma'am.

Q    What sort of communications?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  Requests to see if we've compiled data.

BY MS. HEYWARD:

Q    And were you able to respond to their questions?

A    No, ma'am.

Q    I'd like to ask about the meeting with Chef Weldon and Jonathan Johnson.

A    Okay.

Q    Where did this meeting occur?

A    In my office.

Q    And it was just one meeting?

A    Yes, ma'am.

Q    Did you take notes?

A    Not that I remember.

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 43

Q    Did you discuss the potential for single member districting?

A    I listened to them advocate on behalf of single member districts.

Q    And you mentioned one other meeting with, smaller meeting with individuals?

A    Dr. Jackson and Ms. Jackie Rozier.

Q    And where did that meeting occur?

A    My office.

Q    Did you take notes?

A    Not that I recall.

Q    Did they speak in favor of changing the election system?

A    Yes, ma'am.

Q    At public County Board of Commission meetings since January 2025, have individuals in Houston County spoken in favor of redistricting?

A    Yes, ma'am.

Q    I will introduce Plaintiff's Exhibit 4.

        (Whereupon, Plaintiff's Exhibit No. 4 was

         marked for identification.)

     Do you recall this meeting?

A    I certainly recognize -- I mean, it would be tough for me to remember the exact details of this meeting without looking at the minutes, but I certainly know that

Page 44

there was a meeting on February 4th, 2025, yes.

Q    And do you recall this county resident speaking in favor of single member districts?

A    That would be on page 477, maybe fourth or fifth paragraph down?

Q    Yeah.  Daryl Vinson?

A    Yeah.  Vinings?

Q    Vinings.  Excuse me.

A    That's all right.  Yes, ma'am.  Yes, ma'am.

Q    Do you agree that the commission should do its best to address the needs and concerns of the county in an effective and responsible way?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  Say the question again, please.

BY MS. HEYWARD:

Q    Do you agree that the commission should do its best to address the needs and concerns of the county in an effective and responsible way?

A    Yes.

MR. TYSON:  Same objection.

BY MS. HEYWARD:

Q    Would you agree that that includes the needs and concerns of all citizens of Houston County, including Black

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 45

citizens?

A    I would.

Q    Do you agree that the commission would be better able to address the needs and concerns of Black citizens of Houston County if there were at least one Black commissioner in the room when the commission made decisions?

A    Ask that question again, please.

Q    Do you agree that the commission would be better able to address the needs and concerns of Black citizens of Houston County if there were at least one Black commissioner in the room when the commissioners made decisions?

A    Yes.

Q    Do you believe at-large elections are most effective for the safety and infrastructure needs of Houston County?

A    I do.

Q    Why?

A    As we talked about a few moments ago, there's a lot of different methods for selecting county commissioners.  There's a lot of different representation styles within Georgia.  At many of the ACCG meetings that I have been to, you hear horror stories about how very quickly a commissioner who represents a district in a

Page 46

county can become only concerned about that district.  And in my mind, all five of the members of the commission are concerned about what is good for the entire county, to include every resident in the county.

Q    Do you take notes during county commission meetings?

A    Frequently, yes, ma'am.

Q    Do you retain those notes?

A    I do.

Q    Do you have a system that retains these notes, like an archive?

A    So traditionally what I will do is I use an iPad and an Apple Pencil and I have the agenda on my iPad.  And I will sometimes scribble notes out beside agenda items.  I certainly indicate who made the motion, who made the second and if the vote was unanimous or not and what the vote was for, to approve, to disapprove.  Once I close that PDF on my iPad, the changes are synched to One Drive.

Q    Are there separate workshop or work sessions where commissioners work outside of issues outside of the public Board of Commissioner meetings?

A    No, ma'am.

Q    Are there workshop or work session meetings that are also open to the public, but outside of the evening meetings?

Daniel S. Perdue                                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 47

A    Well, we have two meetings a month.

Q    Yes.

A    One is in the morning and one is in the evening.

Q    Okay.

A    Those are our only public meetings.  We do not have workshops, work sessions, and we are -- everyone is educated on the Open Meetings requirements and our commission follows those requirements.

Q    Are you aware if other commissioners take notes during county commission meetings?

A    Yes, ma'am.

Q    Do you know what happens to those notes?

A    No, ma'am.

Q    Are you aware of any county-wide elections that occur in single member districts as opposed to an at-large only system?

MR. TYSON:  Object to form.  You can answer.

THE WITNESS:  Say that again.

BY MS. HEYWARD:

Q    Are you aware of any county-wide elections that occur in single member districts as opposed to under only an at-large system?

MR. TYSON:  Same objection.

THE WITNESS:  I'm struggling to understand.  Because we, as I understand it, single member

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 48

district most often refers to a district plan like has been talked about extensively in this.  And then you're also using sort of county-wide single member district.  So would you say that is equivalent to what Houston County is doing currently, county-wide single member districts?

BY MS. HEYWARD:

Q    I'll rephrase the question.

A    Okay.  All right.

Q    Are you aware of the method of elections for the Houston County Board of Education?

A    I am.

Q    And what is your understanding of that election system?

A    It has five districts and two at-large posts.

Q    And those districts are single member districts?

A    Those districts are single member districts, yes, ma'am.

Q    Are you aware that there is a Black majority district under the Board of Education system?

A    Yes, ma'am.

Q    Are you aware that Black candidates have been elected to the Board of Education?

A    Yes, ma'am.

Q    Turning to other election systems within the

Page 49

county.  Are you aware of what election system is used for the City of Warner Robins City Council?

A    I do not have as deep an understanding of that, but I believe that they use a district plus at-large system.

Q    Are you aware of the racial makeup of the Warner Robins City Council?

A    I am.

Q    What is it?

A    Let's see here.  You have Mayor LaRhonda Patrick, who serves as the mayor of Warner Robins.  She's African-American.  You have Mr. Clifford Holmes, Mr. Derrick Mack, and Mr. Larry Curtis, who are all African-Americans.  You then have Mr. Charlie Bibb and Mr. Keith Lauritsen, who are white candidates and Mr. Kevin Lashley, who is a white candidate.

Q    Are you aware of the election system used for the City of Perry City Council?

A    They have -- I believe that they actually have multi-member districts, if I'm not mistaken.  And I don't know if they have any at-large districts or not.

Q    Are you aware of the racial makeup of the Perry City Council?

A    I am.

Q    And what is it?

Page 50

A    It is currently one African-American candidate, Reverend Willie King.  And the rest of the members currently on the Perry City Council are white.  Prior to the 2024 election, Ms. Phyllis Bynum-Grace also served on the Perry City Council and she was an African-American.

Q    What do you attribute to Warner Robins and Perry's ability to elect Black candidates to their city councils?

A    Quality candidates.

Q    Briefly returning to the County Commission.  Do you know what areas of the county the current county commissioners live in?

A    Areas, yes.

Q    Do any live in Warner Robins?

A    Within the city limits of Warner Robins?

Q    Yes.

A    No, I don't think so.

Q    What concerns have the residents of the north side of the county raised with the county commission?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  They have raised concerns about lack of sidewalks, lack of grocery stores, better code enforcement, general lack of investment in infrastructure.  I would say that

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 51

about sums it up.

BY MS. HEYWARD:

Q    And what actions has the County Commission taken in response to these concerns?

A    We did a couple of rounds of code enforcement in that area.  I did a ride-around one day with Dr. Jackson in the area so she could point out areas of concern about code enforcement.  We've applied for a -- applied twice for a Georgia Outdoor Stewardship Grant to establish a park in that area.  In addition to that we are trying to acquire properties in that area to close the gaps on our, some previously acquired property through the REPI and Abatement Program to get that area in a state in which a developer would be interested in redevelopment.

Q    And is the north side of the county a majority Black area?

A    I think a portion of the north side of the county is a majority Black area based on -- that understanding for me is based on the expert reports that I read.

Q    Prior to reading the expert reports, did you have any understanding of the demographics of Houston County?

A    Yes.

Q    What was your understanding of the demographics

Page 52

of the county?

A    Very surface level statistics regarding race, age, those sorts of things.

Q    How often do you go to the north of the county on commission business?

A    What are you defining as the north of the county?

Q    The north side that we just spoke about.  The areas per se that you rode around with with Dr. Jackson.

A    Frequently.

Q    Have there been Board of Commissioner votes on funding for this portion of the county?

A    Yes.

Q    What were the results of those votes?

A    Unanimous.

Q    Unanimous for the funding?

A    Uh-huh (affirmatively).

MR. TYSON:  Yes?

THE WITNESS:  Yes.  I'm sorry.  Yes.

BY MS. HEYWARD:

Q    Thank you.  Turning to positions that the Board of Commissioners appoint in the county.  Do you seek any advice from the Black community on appointments?

A    Yes.

Q    Who do you consult with?

Daniel S. Perdue                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 53

A    Most often members of the Black community who would be interested in serving in those positions.

Q    Where do you go to find those members of the Black community who would be interested?

A    In my personal relationships.

Q    Do you talk with people who represent Black majority neighborhoods?

A    When I talk to someone, generally I don't think about or know the neighborhood that they come from most often.

Q    Do you consult with any Black ministers in the county?

A    I have.

Q    Who?

A    I've been to lunch a few times with Bishop Harvey Bee and Daryl Vinings has joined us on a couple of occasions.  Possibly one occasion.  It would be tough for me to say exactly.  I have gone to breakfast, I would estimate a half dozen times with Dr. Daryl Vinings.

Q    Do you consult with any Black business owners in the county?

A    Businessmen?  Yes.  I don't know that they own their business.

Q    Any Black community organizers within the county?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 54

A    I believe I've listed some previously that I met with and listened to.

Q    And that would include?

A    Dr. Rutha Jackson, Jonathan Johnson.

Q    Beyond Board of Commissioner meetings that everyone is involved in, when the Commission is considering projects that involve Warner Robins or Black communities in the county, is there outreach to Black churches or other Black groups?

A    Ask that question again.

Q    Beyond having Board of Commission meetings where everyone is involved, when the Commission is considering projects that involve Warner Robins or Black communities in the county, is there outreach to Black churches or other Black groups?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  I would say yes because there's outreach to all, all people.

BY MS. HEYWARD:

Q    Do you host community forums?

A    Occasionally.

Q    Have you reached out to the NAACP?

A    No, ma'am.

Q    What about appointments that impact the area

Veritext Legal Solutions
800.808.4958                                      770.343.9696

Daniel S. Perdue                          March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 55

around the Air Force base?  Similar meetings with communities around the Air Force base?

        A    Will you restate the entire question, please?

        Q    Yes, I apologize.  Yeah.  So when you're considering appointments that impact the area around the Air Force base, do you have meetings outside of general Board of Commissioner meetings involving members of the community around the Air Force base?

        A    I cannot recall during my time of service a time when we have tried to have a meeting with members of the community around the Air Force base specifically.  We did have a town hall on the Georgia Outdoor Stewardship Grant Program that I've referenced a couple of times that would, would have entailed members from, as you say, the north side of the county.

                Can we pause for a potty break?

                THE VIDEOGRAPHER:  Going off the record at 10:39 a.m.

                (Whereupon, a break was taken.)

                THE VIDEOGRAPHER:  We're going back on the record at 10:45 a.m.

BY MS. HEYWARD:

        Q    Now going back to the First Baptist Street meeting.  You mentioned you talked about your understanding of Gingles.

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 56

A    Thank you.

Q    And what is your understanding of what Gingles requires to show a violation of the Voting Rights Act?

A    That there exists the ability to draw a majority Black single member district, that Black voters generally vote as a block and that white voters do the same.

Q    Then you mentioned that you read the expert reports.  In your reading of the reports, was there anything the experts got wrong in your experience?

A    I'm not a statistician and I am not a cartographer, so I think the experts and myself may reach different conclusions.  And I'm sure I've read things where I disagreed with their conclusions, but in terms of a, of the data analysis, I can't say whether they got it right or wrong.

Q    And what about outside of the data analysis?

A    Certainly there were parts of their conclusions that I disagreed with.

Q    What parts of their conclusions?

A    I believe one of them said that a majority vote requirement is a -- I forget the phrase, but essentially used to disadvantage Black voters.  And I would disagree with that.  I think most elections in Georgia require a majority vote requirement.  There were -- in the history case, there seemed to be a lot of emphasis on educational

Page 57

disparities.  And I'll point out again that the Houston County Board of Commissioners does not oversee the Board of Education.  But I would also be curious to see examples where a districted system has fixed those educational disparities.

I think there also needs to be an understanding of the experts of just how limited in Georgia the role of the Board of Commissioners is and that we don't oversee cities.  We don't oversee the sheriff's office or any other constitutional office.  But it's a very limited scope role. Those are some examples.  I'm sure if I were presented with the reports and given an opportunity to review them again, I could think of more examples that I disagree with.

Q    Understood.  I'm now going to turn to some Equal Opportunity -- Equal Employment Opportunity Commission data.  I'd like to introduce Plaintiff's Exhibit Number 5.

(Whereupon, Plaintiff's Exhibit No. 5 was marked for identification.)

A    This is a long and fairly dense report.  Is there any particular page or area that you would like me to spend more time reading and focusing on?

Q    That is true.  It is long and dense.  I think particularly the graphs for Functions 1, 2, and 4 are going to be of particular interest.

A    Okay.

Daniel S. Perdue                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 58

Q    Do you have any prior knowledge of this document?

A    No, ma'am.

Q    Do you know who prepares it?

A    I would assume Mr. Ken Carter in our HR department, but I -- that is merely an assumption.

Q    Does the Board of Commissioners play a role in hiring decisions in the county?

A    Only in very particular circumstances.

Q    What are those circumstances?

A    Department head level positions.  So department heads under the Board of Commissioners, i.e., they're not reporting to another elected official or appointed position, but they are reporting to the Board of Commissioners.  We, those department heads serve at the pleasure of the Commission.  In addition to that, anyone who is hired at a step, as I said earlier, a step greater than A has to be approved by the Board of Commissioners.

Q    So which department heads are under the Board of Commissioners?

A    First two in the organizational chart would be the Director of Administration and the Director of Operations.  Under the Director of Administration you have accounting, purchasing, planning and zoning, and building inspection.  You have some relation to the Board of

Page 59

Elections there.

Under the Director of Operations you have the utilities superintendent and the director of water distribution and the director of water treatment.  You have a director of roads and bridges, a director of public buildings.  Also the fire chief is under the Director of Operations.  His HEMA role -- it's one person, but his HEMA role is actually under the Director of Administration.  I could quite possibly be missing some, some of them.

Q    And now which positions are hired at a step greater than A?

A    Positions are not hired at a step greater than A.  People are hired at a step greater than A.  And so when we are looking to hire someone, personnel department will evaluate their resume.  And if they are bringing in a certain level of experience to the role that justifies paying them at a higher level, he will make that recommendation to the Board of Commissioners.  It frequently does not go above level E.  It would be really extraordinary to go higher than that.  Although in certain cases I'm sure we have if the person had a vast professional experience.

And then we've started one additional thing where we make personnel decisions and that would be approving steps for individuals who go out and essentially

Page 60

get professional certifications, education or training that would increase their value as an employee to the county, whether or not that would be required for their job.  So for example, at our last meeting we had three individuals who had gone out and gotten their CDL and they all received a step grade, a step increase.

Q    In your time as commissioner are there examples of people who have met the level of experience in order to be hired at a step grade higher than A?

A    Yes.

Q    How many?

A    Oh, that would be very difficult.  I do not recall.  We have, every month we would have one or two, maybe even three or four.

Q    In the positions --

A    On average.

Q    Understood.  In the positions that the Board of Commissioners has power over hiring, does the county make efforts to diversify recruiting for any of these jobs?

A    I think our recruiting is fairly standard and we post on lots of job boards.  We use an automated recruiting system, I believe it's called Hirebridge, that posts the job in lots of different places and tries to ensure that our jobs are as widely seen as possible.

One thing that I, I have not been in favor of

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 61

generally, I'm not saying it never happens, but generally I have not been in favor of advertising jobs as internal hires only.  That is a change that I feel like I made when I came in, is that we, all of our jobs are now internal and external and we're going to see what kind of candidates we can get for those jobs.

Q    Since being on the Board of Commissioners has the county been sued for employment discrimination?

A    I do not know.

Q    Now I'm going to turn to a number of just follow-up questions about things that we've discussed over the course of the deposition.

For notes that you have taken during the commissioners' meeting you said that these were uploaded to the cloud, correct?

A    Yes, ma'am.  My own personal One Drive folder.

Q    And so you are solely responsible for retaining those documents?

A    Yes, ma'am.

Q    When discussing the potentials of the responsiveness of a Black commissioner, I understand that you stated that a -- when the discussions of the needs of the Black community were mentioned, a Black commissioner could be helpful in the room.  If so, how so?

MR. TYSON:  Object to the form.  You can

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 62

answer.

THE WITNESS:  I believe members of the Black community would feel like they were heard better if there were an African-American member of the Commission at those times in which they might be raising issues which they believe to be of particular interest to members of the Black community.

BY MS. HEYWARD:

Q   In terms of the current at-large system versus single member districting plans, do you believe that the school board plan is less effective because not every position is at-large?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  I believe that the school board has different interests in their method of election than the county commission might have.

BY MS. HEYWARD:

Q   What are their interests?

A   I could not say.

Q   Going back to your campaigns, you say there wasn't much campaigning.  Did you hold any campaign events?

A   I did.

Q   Where were those held?

Page 63

A    I know that I held one event at the Go Fish Center in Perry.  I may have held one more event, but I honestly cannot remember if I did or not.

Q    Do you know who attended?

A    It would be difficult for me to recall a complete list of attendees at this point.

Q    And what was the purpose of the event?

A    Fundraiser.

Q    How much time do you spend doing any constituent casework or outreach to the Houston County Black community?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  When constituent casework comes in, I typically do not know if the individual is Black or not.

BY MS. HEYWARD:

Q    But once -- do you know their race once you've begun working on their casework?

A    Typically most of that work occurs over e-mail, phone, working with department heads on how to resolve their case.  So many times, no, I do not.  I mean, of course if we have a face-to-face interaction, I would or if the constituent attends a commission meeting to bring up their concern, I would, but that's not the way most of our constituent services work happens.

Page 64

Q   Going back to Gingles, is it possible to draw a Black majority district in the, for the Board of Commissioners?

A   It is.

Q   And is it your understanding that Black voters generally vote for Black candidates and white candidates do the same?

A   Can you ask that question again?

Q   Excuse me, yes.  Is it your understanding that Black voters generally vote for Black candidates and white voters do the same?

A   I believe that racially polarized voting is present in Houston County, although I would struggle to say the exact causes for that.

Q   At the First Baptist Church meeting when you spoke about the DOJ lawsuit, at that time did you express your opinion on whether the at-large method of election is more effective?

A   What do you mean when you say effective?

Q   So prior in this deposition you have expressed that the at-large method of elections for the Board of Commissioners better serves Houston County; is that correct?

A   I think I -- what I have said is that it would avoid situations where a commissioner is only concerned

Daniel S. Perdue                                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 65

about their district.

Q    At the First Baptist meeting did you express any opinions about at-large election methods?

A    I believe that I did.

Q    What opinions did you express?

A    I believe I said essentially what I said in this deposition, that we have concerns that a districted system may result in situations where a commissioner is only concerned about their district.

Q    Did you meet privately with any members of the white community of Houston County about the DOJ lawsuit?

A    Can you -- I have not had any meetings regarding the DOJ lawsuit intentionally with members of the white community.  I have occasionally in passing had a comment from a white community member about the DOJ lawsuit and whether or not they believe districted representation is best.  Those have been far rarer than my meetings with members of the African-American community.

Q    And what were the opinions expressed by these individuals?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  That at-large representation was the best way to serve the members and citizens of Houston County.

Daniel S. Perdue                                          March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 66

BY MS. HEYWARD:

Q    And these comments happened outside of Board of Commission meetings?

A    Yes, ma'am.

Q    Where did they occur?

A    As, I could not say where every single one of them occurred, but in situations as it, very much in passing as in we're leaving a meeting and someone says, you know, I think how we're doing it currently is best.

Q    When you said that there was racial turmoil in the 1970s, what did you mean by that?

A    I think, you know, based on my reading of history and the expert reports, I can see that many people objected to, for example, integration and things like that and wanted to -- there were obviously protests and things like that.

Q    Do you have any memories of Houston County in the 1970s?

A    I was born in 1981.

Q    From your understanding of the 1970s turmoil, was there any focus regarding the Board of Commissioners and the fact that there had been no Black Board of Commissioners elected?

MR. TYSON:  Object to the form.  You can answer.

Daniel S. Perdue                                 March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 67

THE WITNESS:  Not that I know of.

MS. HEYWARD:  I believe that wraps up my questioning.  We'll hand it over to Carlos.

MR. ANDINO:  Let's go off the record.

THE VIDEOGRAPHER:  Okay.  We're going off record at 11:08 a.m.

(Off the Record)

THE VIDEOGRAPHER:  We're back on record at 11:14 a.m.

CROSS-EXAMINATION

BY MR. ANDINO:

Q    Thank you.  Mr. Perdue, as I stated earlier, my name is Carlos Andino.  I represent the plaintiffs in the Rozier action.  You're familiar with that action, correct?

A    Yes, sir.

Q    All right.  I have a number of questions that are going to follow up on topics that were mentioned by my colleague.  I'm going to try my best not to repeat topics that have already been discussed, but there will be overlap, just so you know.  All right?  Otherwise, the instructions are the same.  Verbal answers.  Don't over speak each other and so forth.  All right?

A    Yes, sir.

Q    Great.  Earlier you talked about how in the first election you ran, that was for Post 4; is that right?

Page 68

A    Yes, sir.

Q    All right.  And could you describe to me what your responsibilities under Post 4 once were?

A    So traditionally how we handled the posts is that we sort of divide departments underneath the posts. So part of my responsibilities as Post 4 were really to, primarily around public works.  And so one of the great things that I got to do there was Mr. Robbie Dunbar brought me down for a day and essentially rode me all around the county and introduced me to a lot of his department heads. He was the Director of Operations, which was our public works branch.  Introduced me to a lot of his department heads and a lot of people doing that work.  Gave me a full notebook that essentially listed their cell phone numbers and anything like that.

So I think Houston County has, as I understand it, a very different model and understanding of the role of the post commissioner.  I know in a lot of places commissioners in general only talk to a county manager and then the county manager talks to staff.  Or in a lot of places post commissioners may only talk to the chairman and the chairman talks to staff.  Here, our post commissioners can reach out to any member of our team that they would like to and try to get questions asked, answered.

I think another part of my role as Post 4 was I

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 69

was considered the liaison to the City of Perry, for example. So we sort of assigned each one of the commissioners to a city in that way as well.

Q    Okay.  So the departments that are assigned to different posts, do those carry over with the post position or the individual who comes into the role as the post?

A    I think generally they're assigned to the post.

Q    Assigned to the post.  Okay.

Now, what happens in a situation when a member of the Board receives a complaint or issue related to a department supervised by a different post?

A    They still try to address that complaint or issue.

Q    Okay.  So there's no transfer of that issue in any way to the separate post that oversees that department?

MR. TYSON:  I'll object to the form.  You can answer.

THE WITNESS:  There certainly could be.  But I think for the large part, you know, if Commissioner Byrd or Commissioner Robinson, if a constituent reaches out to them, they are going to try to get the answer for that constituent.  It doesn't matter if they, quote, don't oversee, end quote, the specific department that that issue may apply to.

Page 70

BY MR. ANDINO:

Q    Okay.  And what if it's a more long-term constituent concern or project?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  Ask a complete question for me, please.

BY MR. ANDINO:

Q    Sure.

A    Yeah.

Q    If a member of Post 1 -- I don't know what department Post 1 oversees, but I don't think --

A    I don't either, off the top of my head.

Q    Let's say a member of Post 1 receives a request to build a new public works project, to fund a new public works project.  Does that request, that sort of long-term project go to Post 4, the candidate under Post 4, or does it stay with the Post 1?

A    Okay.  So I would say in that case, I mean, we have a five-year capital plan, and probably what that commissioner would say is we have a five-year capital plan. That project is either in or is not in that five-year capital plan.  But when the next capital plan is established or when the next funding mechanism for that capital planning is done, I will certainly put your input

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 71

into that capital plan.

And so I guess where I was struggling with your previous -- I mean, when we talk about long-term constituent, we generally try to not make constituent issues long term.  We try to solve them as possible.

Q    Okay.  Now you talked about how posts also oversee certain cities.  Example, Post 4 oversees Perry.

A    We do not oversee cities.  We are the liaison to that city.

Q    Liaison.  Are you a liaison for community concerns as well?

A    Certainly.

Q    Okay.  Now, in the same situation when a community concern comes up about a city.  If somebody outside of Post 4 raises a concern about Perry, does that go to the Post 4 commissioner?

A    No.

Q    No.  Okay.  Who --

A    I would say it is really important to note -- again, I corrected you earlier.  We do not oversee cities. And if someone raises a concern about a city, we are quick to say, that's a city issue and you need to address it with the city.  We do not try to manage the cities or tell the cities what to do.  That is not the role of those commissioners.

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 72

Q    So what is the role of a liaison to a city?

A    Very minor.  It would just be, you know, if the mayor wants to meet with a commissioner other than the chairman, they could meet with that commissioner.

Q    Okay.  And what types of topics may be covered in such a meeting?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  Primarily infrastructure demands.

BY MR. ANDINO:

Q    Which post oversees Warner Robins?  Or not oversees.  My apologies.  Which post is a liaison to Warner Robins?

A    I believe that would be Post 5, currently held by Commissioner Byrd.  I have to say though, I mean, it might have changed sometime in the last few years and I may be inaccurate about that.

Q    Understood.  Earlier you talked how you hosted, when initially campaigning for Post 4, you hosted one campaign event; is that correct?

A    Truthfully, I cannot remember whether my campaign event was for my campaign as a Post 4 commissioner or my campaign as chairman.  I know that I hosted at least one campaign event.  I could not tell you if I hosted maybe

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 73

one more or which campaign.  My memory fails me.  I'm sorry.

Q    That's all right.  Besides campaign events, did you do any other type of outreach to voters as part of your campaigns?

A    Not really.  Because after qualifying I did not have opposition.  That's sad to say, but once you realize you don't have opposition, certainly people knew I was running when I shook their hands or talked to people.  I would say, Yeah, I'm on the ballot.  Please vote for me.  'Cause you still like to have votes even if you don't have opposition.  But there was not, there did not need to be a proactive full-fledged campaign.

Q    Understood.  So when did you make the move from Post 4 to Post 1?

A    So I only served a year and just a few months of my Post 4 term because I had to resign that position to run for chairman.  So towards the end of the first year of active service in that Post 4 role, Chairman Stalnaker began to talk about retirement.  And I, then I think I, as he solidified those plans, I'm pretty sure I reached out to County Attorney Tom Hall and asked, you know, If I were to run for chairman, what would I need to do?  Could I serve out the remainder of this year?  Could I, you know, how does that work?  And he said, No, you have to, you have to

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 74

resign your position either prior to or essentially when you qualify to run for a different position.

Q    And then when you ran for that position, the chair, that was for Post 1, correct?

A    Yes.

Q    Earlier you mentioned that you believed it was pivotally important that the chair be elected at-large; is that correct?

A    Say that word again.

Q    Pivotally important, you said.

A    I don't know that I used the word pivotally important, but I believe it is very important that the chair be elected countywide, yes, sir.

Q    And why do you believe that's important or very important?

A    Again, I set the agenda.  I am involved far deeper in the weeds than the majority of the commission with determining how dollars are spent.  And if that role were elected via district, I think there would be a lot of scrutiny, rightfully so, in anytime there were a project in that district.  And the chairman could very easily favor his district, whether knowingly or subconsciously.

Q    Understood.  Now, earlier you mentioned you were aware that the chair was not always an at-large elected position; is that correct?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 75

A    I disagree with that.  I think what I, what I --
I think what I said is that the chair was not always a
full-time position.  I believe that commissioners in
Houston County have always been elected at-large.

Q    But the chair position specifically, that has
always been elected at-large from your understanding?

A    The method for selection of the chair has
changed.  So prior to it changing into a full-time chair
position, it was selected from amongst the members.  You
did not run countywide for the chair position, but the
chair was elected at-large.

Q    Understood.

A    Okay.

Q    And do you have any reason to believe that that
system for electing -- or selecting the chair was
ineffective?

A    Which system?

Q    The system, the prior to 1990 system where it
was selected amongst the members.

A    I believe that the role of the chair was
significantly different during that time.

Q    Could you explain?

A    Houston County is a significantly larger county
than it was prior to 1990.  We did not have a full-time
chair prior to 1990.  You had five part-time commissioners

Page 76

that elected a chair from amongst themselves.  At least that's my understanding.  So the chair was not a chief executive of the county.  The county clerk or other people did more day-to-day work without guidance from the chair.

Q    Okay.  And just so I understand, what allowed the county chair to become, or the commission chair to become a chief executive was the ability to become a full-time elected official; is that right?

A    I believe the legislation that was presented in the record earlier is what made that change.

Q    I understand.  I'm talking about the ability to perform the duties of, as you currently understand the role of chair.

A    Ask the question again, please, sir.

Q    Was the change from part-time to full-time elected official the mechanism that allowed the commission chair to perform its duties, its full duties now currently envisioned?

A    Okay.  Let's walk through that question piece by piece.  Okay?

Q    Yeah.

A    All right.  I'm sorry.  I'm really trying to hang in there with you.

Q    That's okay.

A    Okay.

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 77

Q    The county chair position changed from a part-time elected role to a full-time elected role; is that correct?

A    That's my belief, yes, sir.

Q    Okay.  Prior to that change, the responsibilities of the chair were less substantial than they currently are?

A    Certainly.

Q    Okay.  Was part of the reason why the responsibilities of the chair position enlarged because of the transfer from part-time to full-time elected official?

A    I can't really speak to why that change was made.  But the way you're asking the question, it's sort of like the tail wagging the dog in my opinion.  Like someone wanted a full-time role so they expanded the role or did they want a more expansive role of the chairman and they realized they -- I don't know.  I was not involved in that decision to make that change.

Q    Understood.  You understand the commission election system in Houston County to be staggered, correct?

A    Yes.

Q    Do you believe that this is the most effective system, the staggered system the most effective system for elected officials in Houston County?

MR. TYSON:  Object to the form.  You can

Daniel S. Perdue                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 78

answer.

THE WITNESS:  To -- you would possibly have to define effective for me, what you mean by effective in terms of electing those officials.  I believe a staggered or a non-staggered system would be effective in electing officials, but I think in most governments with multi-member bodies like we have, a staggered system is beneficial for the body because even if there's some desire to change the makeup of the commission, there's some overlap in terms.

And it is, I believe you'll see it in a lot of places.  For example, the U.S. Senate where, you know, they have six-year terms, but not everybody runs at the same time.  There is a desire to be a somewhat moderating force on the possible will of the electorate.

BY MR. ANDINO:

Q   Okay.  Can you describe why you believe that desire exists for a moderating force on the desires of the electorate?

A   Can I describe?  Again, I think the framers of the constitution recognized that an electorate can be fickle sometimes.  And so they certainly established a framework whereby there would be staggered elections in

Daniel S. Perdue                                   March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 79

that way.  At least that's my understanding of U.S. history.  I'm not exactly sure if the framers did that or if it came later.

But it's beneficial not to have an entirely new commission every four years.  I think Houston County has benefited from relative stability in those positions.  And prior to when I ran in 2020, every member of that commission, save the chairman, had more than 20 years of experience before they began to retire.  And the chairman had 38 years of employment experience with Houston County prior to his service as chairman.  He retired after 12 years of being chairman.

Q   Do you believe that a staggered election system helps incumbents remain in office?

A   No.

Q   And you asked me this question.  I'm going to ask you this.  What do you believe makes an election system effective?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  I would -- so it depends on -- there are a lot of words in that question that we would need to define, right?  So when we say the words "election system," are we talking about the actual hardware and software that runs our

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 80

elections in Houston County?  Are we talking about the method whereby we select our representatives?  I think what you're asking is the more macro level question.  And so I would say what makes an election -- ask it again for me, please.

BY MR. ANDINO:

Q   What makes an election system effective?

A   I'm taking some time.  This is a very philosophical question --

Q   That's okay.

A   -- in my mind.

Q   Uh-huh (affirmatively).

A   An election system is effective when the will of the citizens is represented in their governance.

Q   Is it all right if I frame that as a goal of an election system just for our -- both our understandings?

A   Sure.

Q   Okay.  Do you believe that the staggered election system in Houston County accomplishes that goal?

A   So I just want to make sure we're on the same page about what a staggered system means.

Q   Yes.

A   That means every commissioner serve a four-year term, but some are elected on what I call the governor cycle and some are elected on the presidential cycle.

Veritext Legal Solutions
800.808.4958                                        770.343.9696

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 81

That's what we're talking about when we say staggered elections, correct?

Q    Yes, sir.

A    Okay.  And then your question was, do I believe the staggered system accomplishes that goal?

Q    Yes, sir.

A    I absolutely do.

Q    All right.  Earlier you mentioned that prior to the 2025 DOJ lawsuit, you were aware of some community members wishing to change the at-large election system in Houston County; is that right?

A    Yes, sir.

Q    Who were these community members?

A    As I stated earlier, Dr. Rutha Jackson had relayed her desire to do that, and as I met with and talked to Dr. Houston Porter at his home on one occasion, he relayed his, you know, his efforts to advance a lawsuit regarding this issue.

Q    I just want to temporally frame.  When did those conversations take place?

A    It would be very difficult for me to say off the top of my head when those conversations took place.  I would say probably in the first couple of years of this term of me being chairman, which is my first term.

Q    Okay.  Remind me, when did that start?

Daniel S. Perdue                                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 82

A    2023 officially.  January 1st.  So sometime in 2023 or 2024.  Prior to any notice from the Department of Justice.

Q    Understood.  So I'm going to focus on 2023 and 2024 only.  In those years, those two conversations that you had were the only conversations you had with community members regarding changing the at-large election system?

A    It would be very difficult for me to speak that definitively and say those were absolutely the only conversations.  Those are the only conversations that I can recall regarding it.

Q    Was there any official response from you or the Board as a whole in regard, in response to those requests?

A    No, ma'am -- no, sir.

Q    Can you remind us, what did Dr. Jackson say in her meeting with you regarding changing the at-large system?

MR. TYSON:  Object to the form.  You can answer.

THE WITNESS:  It would be very difficult for me to quote her directly.  But I believe, you know, the message that she was relaying was that there were members of the Black community who would prefer a districted election system.

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 83

BY MR. ANDINO:

Q    Okay.  You mentioned that was not the original subject of that meeting, correct?

A    Correct.

Q    What was the original meeting, subject of that meeting?

A    Electric vehicle charging.

Q    And who else was in attendance at that meeting?

A    There were two other individuals.  I could certainly look up their names in my contacts, but I cannot remember their names right now.

Q    Understood.  And then your meeting with Mr. Porter related to the same, not the electric vehicles, but the at-large system.  There was no one else involved in that conversation, correct?

A    Not that I remember.

Q    Okay.

A    I believe it was just he and I in his home.

Q    Earlier we talked or you talked about the meeting at the First Baptist Church after the DOJ lawsuit. You did not participate in any other public meetings related to the DOJ lawsuit after that meeting, correct?

A    I was asked a question regarding the DOJ lawsuit in the County's Eggs and Issues, which is a chamber meeting, prior.  So while that was not a public meeting

Page 84

specifically about the DOJ lawsuit, I was asked a question at the County's Eggs and Issues breakfast.  Not the County's Eggs and Issues.  The county is the subject matter.  It is a Chamber Eggs and Issues breakfast.  I was asked a question about the DOJ lawsuit.  Not a public meeting about the DOJ lawsuit, but I did speak publicly about the DOJ lawsuit at that time.

Q    What was the question you were asked at that meeting?

MR. TYSON:  Object to the form.

THE WITNESS:  It would be difficult for me to quote the direct question, but I think it was just sort of, What is this lawsuit?  Give us an update about it.  What's going on kind of thing.

It was a very -- introduction to the lawsuit.

BY MR. ANDINO:

Q    Was this meeting recorded or were notes taken of this meeting?

A    At the chamber meeting?

Q    Yes, sir.

A    I believe it was.  I believe it was recorded.  I don't think notes were taken.

Q    Do you know who would be in possession of that recording?

A    You could ask Ms. April Bragg, who is the CEO

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 85

and President of the Robins Regional Chamber of Commerce.

Q    Okay.  Were you invited to any other meetings besides the First Baptist Church meeting related to the DOJ lawsuit?

A    I believe I said that Dr. Jackson wanted to have a follow-up meeting and I declined.

Q    And why did you decline?

A    Talking to counsel and knowing that we were under a lawsuit.  In my opinion, once a lawsuit is filed, most of the back and forth happens within the context of a courtroom or a deposition or negotiation between counsel. I did not feel that it would be productive to once again speak publicly about the lawsuit.  I can say that my counsel probably did not want me to speak the first time publicly about the lawsuit, as you probably wouldn't want your clients to.

Q    All right.  Earlier we were talking about the single member election system for the Board of Education. You said you were familiar with that system, correct?

A    The single member district.  I have a very surface level understanding of their election system.

Q    Do you have any understanding as to why that election system was adopted?

A    No.

Q    Earlier we talked about the number of

Page 86

African-American or Black candidates or elected officials in Warner Robins.  And you mentioned the term quality candidate.  How do you define a quality candidate?

A   I think that's a candidate that has a lot of personal connections within our community.  They have demonstrated a desire to serve our community in ways that are not just the Commission.  And they have a certain level of knowledge about county business that would lead them to bring a well-informed perspective to the table.

Q   Would you consider Jackie Rozier to be a quality candidate when she was running for a Commission seat?

A   I had never heard of Ms. Rozier prior to her running for a Commission seat.  I'm not saying that I know everyone in this community, but I know a lot of people in this community.  And I think Ms. Jackie is a wonderful person, a person of faith.  I admire how she conducted the campaign.  I think she ran a good campaign.  I do not think that she was an individual who could be successful in a campaign.

Q   And why do you think she was an individual who could not be successful in a campaign?

A   I don't think that she had been involved in other community organizations that would expose her to community leadership in a way that would have other people trust her with that sort of leadership role.  Not to say

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 87

she's untrustworthy.  She absolutely is.

Q    Understood.  When you say other community organizations, what types of organizations are you referring to?

A    I think, you know, chambers of commerce, civic organizations, things like that.

Q    Okay.  And you mentioned would connect her to community leaders.  What type of community leaders are you referring to?

A    I think a broad spectrum of people from business, faith, nonprofit, volunteer communities across Houston County in a broad geographic and field.

Q    Okay.  Let's talk about that broad geographic field you're talking about.  Are you -- can you define what you mean by broad geographic field?

A    I think what I mean by broad geographic field is not people from just one part of Houston County.

Q    Okay.  Do you believe that the majority of Ms. Rozier's connections were in Warner Robins?

A    I do not know.  As I stated, I did not know her prior to her election and so I would not know where the majority of her connections were.

Q    Okay.  But you believe she did not have broad geographic connections?

A    Correct.

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 88

Q    Okay.  What was, what's your basis for believing that?

A    That's my personal opinion.

Q    Okay.  Respectfully, what is your personal opinion based on?

A    All of Mrs. Rozier's advocacy has been focused on the north end of Houston County, which is completely respectable and okay.  I have not seen her reach out to community members or citizens in other parts of Houston County intentionally.  And if you're going to advocate for one part of the county, oftentimes people in other parts of the county can feel like you don't care about them.

Q    You said that her decision was intentional to focus on the north end, you said, of the county?

A    Did I say it was intentional?

Q    I could have it read back on the record.  I'll ask it this way:  Do you believe her desire to reach out to one part of the county, the north end, was intentional?

A    I don't know that she only tried to reach out to the north end of the county.  I can tell you in her, most of her public statements she advocates for the north end of the county.  So I am sure that she tried to reach out to other parts of Houston County.

Q    Uh-huh (affirmatively).

A    She ran a good campaign.  But again, if a lot of

Page 89

your public statements are only about one part of Houston County, people in other parts of Houston County can feel left behind.  This also gets back to the previous questions that I answered as what are you defining as the north end of Houston County.  If you were to draw a line across the geographic middle of Houston County, it would pass very close to Perry.  But when people talk about the north end of Houston County, typically they're talking about the extreme north end of Houston County.

Q    I used the word north end of Houston County because you did.  So how do you define the north end of Houston County?

A    Depends on who I'm talking to.

Q    Could you elaborate?

A    So if Ms. Rozier comes to me and says, I'd like to talk about the north end of Houston County, I know what she is talking about because I know where she lives and I know that she's talking about the Dunbar Road area, the Elberta Road area, those sorts of areas.  I've been there and seen where she lives.  Again, did a drive-through of that area with Dr. Jackson, largely based on a list generated from Ms. Rozier.

Other people, if they say the north end of Houston County, they may mean anything above Highway 96.

Q    Okay.  When you say other people, could you --

Daniel S. Perdue                                          March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 90

like what types of other people?

     A    Well, for a long time in this county, and thankfully this has largely gone away.  Highway 96 was this just sort of dividing line.  And if you were a Perry person, you didn't go to Warner Robins for things.  If you were a Warner Robins person, you didn't go to Perry for things.  So there's some, you know, old school people who they still think that way.  And when they talk about the north end of Houston County, they are talking about anything north of Highway 96.

     Q    Gotcha.  Do you know why these old school people wouldn't go to Warner Robins?  These old school Perry people wouldn't go to Warner Robins?

     A    I have no idea.  There's lots of great things in Warner Robins.

     Q    Understood.  Now, you said that one of the reasons you did not believe Ms. Rozier ran a good campaign -- not a good campaign, but would not be elected was because she didn't make connections, organizations like the Chamber of Commerce and other civic organizations; is that right?

     A    I believe so.  Yes, sir.

     Q    How would advocacy focus on the north end of Houston County not lead to connections with the Chamber of Commerce?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 91

MR. TYSON:  Object to the form.

THE WITNESS:  You would have to ask that to the Chamber of Commerce.

BY MR. ANDINO:

Q    Okay.  Based off of your understanding, where does the Chamber of Commerce geographically focus the majority of its time?

A    I would not know.

Q    Based off your recollection, what is the racial makeup of the Chamber of Commerce?

A    Based on the meetings that I have been at, it is diverse.

Q    Are there the leadership roles within the Chamber of Commerce?

A    There are.

Q    Okay.  How many roles?

A    I could not tell you.  And I will point out there are multiple chambers of commerce in Houston County.  There's two.  There's a Robins Regional Chamber of Commerce and the Perry Area Chamber of Commerce.

Q    Okay.  Do you believe that Ms. Rozier made contact with the Robins Area Chamber of Commerce?

A    Based on her advocacy for the north end of town, if she made contact with the Chamber of Commerce, I imagine it would be the Robins Regional Chamber of Commerce.

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 92

Q    Okay.  And you said you don't believe that she made contact with a chamber of commerce.  You believe that to be the Perry Chamber of Commerce?

A    I don't think I ever said that she did not make contact with the Chamber of Commerce.

Q    Okay.

A    I said that she, I did not believe that she was actively involved in the Chamber of Commerce.

Q    Okay.

A    So I attend enough Chamber functions that I see the frequent fliers, for lack of a better term.  And I can tell you I don't know that I've ever seen Ms. Rozier in a Chamber of Commerce event.  Not saying that we haven't attended a Chamber of Commerce, but in my mind she's not a frequent flyer there.

Q    And you would consider yourself to be an active member of the Chamber of Commerce?

A    No, I would not.

Q    No?  Okay.  But you're in an elected office despite not being an active member; is that right?

A    Correct.

Q    And again, just to clarify, when you talk about attending Chamber of Commerce meetings, which Chamber of Commerce?

A    Either.

Daniel S. Perdue                                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 93

Q     Either?  Okay.

A     I will say I have previously been very active in the Chamber of Commerce.  As I said, I served on the Perry Area Chamber of Commerce Board of Directors, eventually was their chairman.

Q     Okay.  That's Perry specifically.  Not the Robins?

A     Not the Robins Chamber.  I did attend events at the Robins Regional Chamber.  And then I also helped lead the Perry Youth Leadership Class for the Perry Area Chamber of Commerce.

Q     Okay.  Gotcha.  And despite being an active member and very aware of the Perry Chamber of Commerce, you do not have an idea of the racial makeup of the Chamber of Commerce of Perry?

MR. TYSON:  Object to the form.

THE WITNESS:  Are you talking about statistically or is my impression that it is a diverse chamber?

BY MR. ANDINO:

Q     I'm talking impression-wise, what do you believe to be the racial composition of --

A     I believe both of our chambers in Houston County are diverse.

Q     Okay.  How do you define diverse?

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 94

A    That there is a good mix of people in the room when those chambers get together.

Q    Okay.  When you say a good mix of people, can you give me some general percentiles?

A    That there are both male -- no, I cannot give you general percentiles.  I am not looking around the room counting people and counting people of different race.  I cannot give you general percentiles.

Q    Don't worry.  That's not what I was asking.  I was asking in your opinion when you say there's a good mix of people, what does that look like percentile makeup of people?

MR. TYSON:  Object to the form.

THE WITNESS:  Ask the question again.

BY MR. ANDINO:

Q    How do you define, if you can, in terms of percentile, a good mix of people?

MR. TYSON:  Object to the form.

THE WITNESS:  I believe the people in the room are reflective of the mix in our community.

BY MR. ANDINO:

Q    Okay.  Can you describe to me your impression of the mix of your community?

A    We are a diverse community.

Q    Could you be a little more specific, please?

Daniel S. Perdue                     March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 95

A    We have both white people and Black people and Asians and Latinos.  We have males and females.  We are a diverse community.  We have a significant minority population in Houston County.

Q    All right.  And how do you define significant minority population?

A    I would struggle to put an exact percentage on it without having recently looked at statistics.

Q    That's all right.

A    I can tell you I know that we are greater than 30 percent African-American in Houston County.

Q    Understood.  Thank you.  Earlier you talked about relying on personal relationships when considering Black individuals for board positions or appointments; is that right?

A    I believe so, yes, sir.

Q    Okay.  What personal relationships do you rely upon?

A    Friendships.  People I go to church with. People that I have served on other boards with or people that I've previously done business with.

Q    Okay.

A    But primarily friendships.

Q    And then last couple of questions before we take a break here.  We talked about the racial turmoil in the

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 96

1970s in Houston County earlier.  When, in your opinion, did the racial turmoil end in Houston County?

A    I do not know.

Q    Do you have any idea of any factors that led to the end of racial turmoil in Houston County?

A    When Dr. Jackson shared at our Commission meeting regarding Black History Month, which she was invited to do I believe in 2024, she shared her perspective on some of the things that helped advance racial harmony. So I have certainly heard her perspective on what some of those items were.  And that would be members of the community, all races working together for what is best for the community.

MR. ANDINO:  Okay.  I've been asking you a lot of questions.  Why don't we take a five-minute break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Okay.  We're going off record at 11:59 a.m.

(Whereupon, a break was taken.)

THE VIDEOGRAPHER:   Going back on record at 12:07 p.m.

BY MR. ANDINO:

Q    All right.  Mr. Perdue, I promise I won't take up too much more time.

Daniel S. Perdue                                     March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 97

We were talking a little bit about racial turmoil before the break.  Are you aware of any incidents of racial discrimination in Houston County in the last 20 years?

A    Yes.

Q    Okay.  What incidents are those?

A    There have been several.  Some of them were indicated in the expert's report and I will also say there was a very unfortunate video of a man who had been a coach in some of the recent, you know, local leads and whatnot, who was using racial epithets in a hotel room in Atlanta and that got a lot of coverage locally as well.

Q    Okay.  Besides that incident, I'm going to ask about, you mentioned the expert reports.  Do you remember any specific incidents of racial discrimination you read or know of?

A    From the expert reports?

Q    From the expert reports or just your general knowledge in the last 20 years?

A    Well, certainly I think, you know, that the expert reports mentioned the case of the high school baseball players, I think it was, dressing up in attire to mimic KKK.  I was aware of that.  I don't think I would be able to say I was aware of it when it happened because I think it got press and coverage and came to public light far later than it happened, if that makes sense.  But when

Daniel S. Perdue                           March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 98

it came into public light, I was aware of that incident. And then there are other occasional incidences that are much less significant.

Q    And apologies since I don't live here in Houston County.  Can you tell me about some of those occasional incidents?

A    I would not be able to tell you about them from my memory.

Q    Okay.

A    But there are, those are really the two big ones that -- the one that was in the expert reports and the one I did recall from memory that stand out in my mind.  I just don't want to say that there have been no other incidents --

Q    Sure.

A    -- of racial discrimination in Houston County. I would say one, now talking, one other unfortunate incident was a gentleman, I believe gentleman who painted racist slurs on a car and parked it at the Galleria Mall.

Q    Gotcha.  Now, did any of these incidents occur while you were on the Board?

A    Yes.

Q    Okay.  During your time on the Board, what has been any, if any, reaction from the Board to these incidents?

Daniel S. Perdue                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 99

A    I spoke directly to the incident involving the gentleman using racial epithets and recorded in his hotel room who was a coach in my commissioner comments.

Q    Okay.  If you don't mind me asking, what did you say in your commissioner comments?

A    I think that I said that -- you would have to look back at minutes to get my exact comments, of course. But I think that I said that those comments were reprehensible and not representative of who we are in Houston County.

Q    Okay.  Besides those commission comments, any other actions by the Board related to these incidents of racial discrimination?

A    I believe when the, when the incident with the car happened, I -- some commissioner may have made a comment about that incident as well.

Q    Okay.

A    And addressed it.

Q    Okay.  Anything else you can recall?

A    Not off the top of my head.

Q    All right.  Talking about the high school incident in particular, does the Board of Commissions have any type of oversight or responsibility over the high schools?

A    No.

Page 100

Q    No?  Okay.  That's entirely left to --

A    The Board of Education.

Q    Okay.  So besides those public comments we talked about -- actually, I apologize.  I might be confused.  Did the Commission make any public comments related to the high school incident?

A    Not that I'm aware of.

Q    Okay.  All right.  Earlier we talked, or you talked a little bit about responsiveness to community concerns.  I'm going to name four ways that you get community concerns and you can let me know if this is accurate.  You can receive community concerns or constituent concerns from town halls, e-mails, phone calls, or public comments at meetings.  Is that right?

A    Those are four ways that we receive community concerns certainly.

Q    All right.  Any other ways that you receive --

A    Sure.  Face-to-face conversations, Facebook comments, as much as we try to avoid it.

Q    Okay.

A    Any, I would say any communication method you can think of, we probably are willing to receive community concerns there.

Q    And besides you commissioners yourselves, who else in your office receives community or constituent

Page 101

concerns?

A    Our public e-mails that are listed on the website go first to a gentleman in my office named Jake Cox.

Q    Okay.

A    And he will often try to work with staff first, while also looping in the commissioner who was e-mailed publicly to let them know about the concern.  He will, he will loop them in and also initiate a conversation with staff, the staff member that he feels like can most readily address that concern.

Q    Okay.  Is it ever the case where a constituent concern goes immediately onto a monthly meeting agenda?

A    I would say only through the case of -- only through the case of public comments.  But the word immediately is doing a lot of work there.

Q    Can you just describe to me the general process of a constituent concern making it onto a meeting agenda?  It doesn't have to be immediate, just generally how it makes it onto a meeting agenda.

A    So for example, a recent case would be the predominance of liquor stores in Houston County and the pace at which we were receiving new applications for liquor stores.  That's not a technical term.  It's officially a license to sell alcohol for consumption off premises.  But

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 102

that's a liquor store.

Q    Yeah.

A    So, I mean, that sort of concern bubbled up, I would say over months.  And Commissioner Robinson was really pushing for a moratorium on liquor stores so that we could consider our code of ordinances.  So she continued to do that.  I said, Please reach out to Tom Hall and y'all prepare a moratorium.

And you know, I think in large part that was not in response to a town hall.  And it was really not in response to that many public comments that we had received at meetings.  It was response to lots of personal individual conversations that the commission had with constituents.

And so he prepared that moratorium, we put the moratorium on the agenda, and we undertook that moratorium to give us time to update our code of ordinances regarding this.

Q    Okay.  So beyond a commissioner placing an item from a constituent on an agenda, are there any other ways that items from a constituent gets on a meeting agenda?

A    I would say there's no way that items get on a meeting agenda other than placed there by a commissioner.

Q    Okay.

A    I would say it's the role of the chairman to

Daniel S. Perdue                        March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 103

establish the agenda for Houston County Board of Commissioners.

Q    So when someone -- if you could just walk -- we just talked about this a little bit, but you can walk me through it.  When someone submits a public comment or constituent concern, how is that, if at all, officially recorded?

A    If they do so in an official fashion, then it's recorded in the minutes of the meeting.  Town halls are not recorded and we do not take minutes at town halls.  That's an open conversation.

And then on this case in particular, I received a host of e-mails.  I think someone underwent an e-mail writing campaign.  And of course I saved all those e-mails because I knew it was related to an active legal case.

Q    Okay.  Do you or anyone on the Commission keep any type of formal or informal track, tracker of constituent concerns?

A    No.

Q    When you receive a constituent concern, do you track it at all geographically?

A    No.

Q    And when responding to a constituent concern, is that tracked or saved in any type of way?

A    I would say the majority of our response there

Page 104

happens through e-mail and follow-up and oftentimes, you know, so certainly those e-mails are saved.

Q    Okay.  How about -- let me ask you this.  Is there a formal system for lodging complaints to the Commission, whether that's related to Commission business or employees of the Commission?

A    There are various formal systems for lodging employee -- complaints about employees.  We have a formal process if someone would like to complain about an employee.  We know that there are employees who get more complaints than others just as the nature of their work.  For example, it's going to be really difficult for a citizen to complain about a member of our accounting team.  But it would be really easy for a citizen to complain about our building inspection team.  So certainly there are, you know, formal processes for review there handled by our personnel department.

Q    Okay.

A    But in general, you know, a complaint or an issue comes in and we try to handle it in a timely fashion no matter how it's generated or how it comes to us.

Q    Gotcha.  And do you know who tracks or maintains those complaints?

A    You know, again, I said there's no formal system for tracking the progress of those.  Most of it happens

Daniel S. Perdue                     March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 105

through e-mail.  And I would say it's really anyone who is involved in the conversation can track those.

Q    Gotcha.  I want to talk a little bit about how the Commission performs its duties.  One of the areas that the Commission has responsibilities in is transportation and infrastructure; is that right?

A    Yes.

Q    Okay.  Could you describe to me what exactly the Commission does related to infrastructure or -- yeah, infrastructure?

A    Specifically transportation infrastructure or all infrastructure?

Q    Let's focus on transportation infrastructure.

A    Primarily we decide on road projects.  We are mainly responsible for maintaining the roads that are in the county's jurisdiction, Unincorporated Houston County.

Q    Okay.

A    If they are not also a state highway.

Q    Does the Commission have any type of process for prioritizing transportation infrastructure projects?

A    The Commission?

Q    Yes.

A    No.  I would say in general the prioritization comes from our engineering department as they look at traffic counts and they see which roads are becoming more

Daniel S. Perdue                                        March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 106

damaged.  You know, in our SPLOST process, certainly I work alongside the mayors to determine what may be a, qualifies a county wide transportation project, but after that, the money is distributed to the municipalities in the county based on a population share.  And those, those, the county then uses that money to address typically unincorporated areas in Houston County and the cities use that to address places within the city limits.

Q    Gotcha.  When it comes to these transportation infrastructure projects, does the Commission track them in any way, the countywide ones that they're involved in?

A    Yes.

Q    Okay.  Do you track geographically where they occur?

A    We have not traditionally, no.

Q    Okay.  Do you mind me asking why not?

A    I think there's a real strong belief that our SPLOST and infrastructure dollars are spent in the areas of greatest need, no matter where they may be in the county.

Q    Okay.  Is one of those areas of greatest need the north end that we talked about earlier as defined by when you're talking to Ms. Rozier, for example?

A    Well, we certainly have projects, infrastructure projects that have happened in the north end.  So going back to my previous comments, then I would say yes, it is

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 107

an area of greatest need because the projects are happening there.

Q    Okay.  And does the Commission make any determinations as to the fairness of which infrastructure projects are dispersed across geographic areas?

A    How would you judge fairness there?

Q    What would you describe fairness to be?

MR. TYSON:  Object to the form.

THE WITNESS:  Oh, that's a very -- I'm not a philosopher, so that is a, that's a very big question.  You know, I think primarily the way that we determine, again, we look at areas of greatest need.  We do that through, yes, we listen to citizen complaints, but a lot of those decisions are, again, back to public safety and engineering or traffic count, traffic data type decisions to drive where those projects go.

I think we do have a sense that projects are happening in a very diverse geographic area of Houston County for various reasons.

BY MR. ANDINO:

Q    Okay.  Can you give me an example of an infrastructure, transportation infrastructure project that occurred based off of community concerns?

MR. TYSON:  Object to the form.

Page 108

THE WITNESS:  I really can't because most of them are heavily informed by engineering decisions.  We, we -- if we repaved every road that we got a complaint about needed to be repaved, we would not have any money and everybody would be riding on fresh asphalt.  And I am very proud of how our engineering staff measures the needs in our community.

I will say, you know, they are, they do listen to complaints.  And when they get a complaint, they go out and evaluate that road and make sure there's eyes on that road.  But a lot of people think their roads are in worse shape than they are.  And a lot of people don't realize how bad some of the roads in Houston County are.  And those worst roads rise to the top of the list.

BY MR. ANDINO:

Q    Okay.  Now, have you received complaints or concerns related to disparities in infrastructure, transportation infrastructure projects in the northern end of the county?  Again, defining how Ms. Rozier put it.

A    Yes.

Q    Okay.  Has the Commission changed any resources or strategy related to the north end, transportation projects related to the north end of the county?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 109

A    Probably six months ago I received a call from someone that says, You really need to look at North Houston Lake Road.  It is in rough shape.  And very shortly thereafter I went out and rode North Houston Lake Road and I agreed it was in rough shape.

I then called my engineering department and I framed the conversation like I do virtually all of these conversations.  I'm not telling you that this road needs to be at the top of the list.  But I want this road evaluated alongside all of our other roads.  And I think we have an understanding that when I call them about a road, it's not to say, Pave this road or widen this road.  It is, Do we have data?  I try to make data-driven decisionmaking.  Do we have data on this road?  What are your thoughts about this road?  And I'll say North Houston Lake Road was added to the elevated project list the following year.

Q    Gotcha.  How frequently would you say you engage in that type of activity of receiving a community complaint about an infrastructure, transportation infrastructure issue, going out, viewing it yourself and then reporting back to your engineering folks?

A    That whole process --

Q    Yeah.

A    -- not very frequently.  'Cause oftentimes I will go out and look at the road and say, I'm sorry.  This

Page 110

just does not rise to the level of need that, that I know exists in Houston County.

Q    Uh-huh (affirmatively).

A    I'll say at the start of that process, someone complains about a road and I go out and look at it, at least once a month.

Q    Okay.  And when you reach out to the engineering department when you believe that there's an issue, do you do that by e-mail?  How do you do that?

A    Typically by phone.

Q    By phone.  Okay.  Do you take any notes of your conversations with the engineering department?

A    No.

Q    All right.  So a similar a line of questioning, but related to health-related programs or funds.  Does the Commission have any role in relation to health-related programs or funding?

A    Certainly we help fund the Department of Public Health here and, but a lot of the dollars that we have spent in the last, I'd say since I've been on the Commission, in the last four to five years have been capital investment in health-related projects.

Q    How do you make the decisions to engage in those capital investments?

A    Primarily through partners at the Department of

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 111

Public Health at what is now Emory Healthcare Warner Robins or Emory Healthcare Perry.  I'll say one exception to the, to the capital is we significantly increased our funding for EMS service in Houston County in order to get Emory Healthcare to remain the EMS provider there as they went through a transition from Houston Healthcare to Emory Healthcare.

Q    Okay.  Are community concerns or constituent concerns a part of that process at all?

A    Concerns around EMS service was a significant part of the reason that I felt comfortable dramatically increasing our investment in EMS service.

Q    Have you received complaints from the north end of the county related to disparities in healthcare-related projects or funding?

A    I think, you know, as we've entered this case, certainly we have, we have heard complaints along disparities of providing access to a myriad of services. And I'm sure at one point those would have included healthcare services.  But I will say, under no circumstances is the Houston County Board of Commissioners -- this sort of goes back to the sheriff's office and other things.  We are not a healthcare business.  We are not in the business of providing healthcare to people.  We sometimes help support organizations that are in that

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 112

business within those organizations, largely making decisions about how those funds are spent.

Q    Have you as a commission helped any specific organizations focused on services to the north end of the county?

A    Have we found an organization that is specifically focused on serving healthcare needs in the north end of the county?

Q    It could be focused on serving there or just increasing services that already exist there.

A    I think we have helped Houston Healthcare prior to its transition to Emory.  They got $2 million of our ARPA Funds we sent their way.  I certainly think Houston Healthcare provides services to the residents in the north end of Houston County.  I'm confident that our EMS service goes all over Houston County, to include the north end.  So I'm confident that we have increased investment in our EMS service which has benefitted citizens in the north end of Houston County.  And I know that the Department of Public Health, who we fund, has endeavored to serve residents all over Houston County, to include the north end of Houston County.

Q    Okay.  Just so I understand correctly, all those services that you just talked about are countywide services?

Daniel S. Perdue                           March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 113

A    Correct.

Q    And none of them are particularly focused on increasing services to the northern end?

A    We have not supported any organization which has, you know, has listed as its focus increasing services to the north end of Houston County.

Q    Okay.  And then on the education side, are you -- does -- I think you said this before.  But does the Commission have any role in determining education programs, projects or funding related to education in the county?

A    We have, we partner with the Board of Education from a funding standpoint on some projects, but generally don't determine how those dollars are spent down in the weeds and certainly don't get into programming decisions.

Q    Okay.  And have you received any complaints, constituents' concerns about disparities of education programs in the north end of the county?

A    Not that I can recall.  I think most people know that those should be directed towards the Board of Education.

Q    Okay.  While we're on the topic of the Board of Education, is there a chief executive similar to yourself on the Board of Education?

A    No.

Q    Okay.

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 114

A    The chief executive of the Board of Education would be the superintendent of schools and he is hired by the elected members of that board.

Q    Do you --

A    He serves as an ex officio member of the Board, but truthfully, I don't believe he has voting privileges on the Board.

Q    Okay.

A    Couldn't say for sure.

Q    And do you have any opinion of whether the Board of Education is ineffective or less effective because it lacks a chief executive role?

MR. TYSON:  Object to the form.

THE WITNESS:  Do I have any opinion of that?

BY MR. ANDINO:

Q    (Nodding affirmatively.)

A    I have often thought that some decisions would be made differently if the chief executive were an elected. In fact, my great uncle was an elected superintendent in Houston County schools for a long time.  And I understand the reasons why the superintendents are no longer elected, but are professional staff that is typically hired with the previous education experience.  But I've, I've often contemplated how that role might be different if it, if it were still elected or if it went back to an elected role.

Page 115

Q    Okay.  When you say different, do you think it would be better or worse with --

A    I think there would be, there are way too many factors.  And even in my own mind I have not determined whether it would be better or worse.

Q    Okay.  And why do you think it would be different with the chief executive that was elected, though?

A    Because I can see that in my own role as chief executive of Houston County, I consider things differently because I'm elected.

Q    And when you say you consider things differently, do you mind elaborating?

A    I'll give you an example.  Frequently in our discussions with public works department heads and staff members, in my discussions with them, you know, they have said, We think we need to do X, Y and Z with the rates that are happening.  And I've looked at them and said, You must not like working with me very much because that would very quickly get me unelected.

And so I think there are, there are things that I, you know, if I were setting the agenda and I were not in elected role, but I was in merely a professional role, if I was an employee who was setting the agenda for the Houston County Board of Commissioners, I have every belief in the

Page 116

world that there would be different things on the agenda.

Q Speaking of that sort of like employee role of chief executive, are you aware of other boards of commissions in other counties that have that type of role where they don't have an elected chief executive?

A Well, I know, I'm sure there are other boards of commissioners where the chairman is elected and essentially operates as the -- I say I'm sure. Again, there's 159 counties and there's probably 150 different ways to do this because it's not laid out explicitly in the Georgia constitution.

But I know there, I believe that there are other elected full-time chairman roles in Georgia. Could be wrong, but that's what I believe. I know in some counties because I've seen it, that every commissioner is a full-time role.

Q But does, again, let's focus on the chief here. In the example of a nonelected county manager.

A Uh-huh (affirmatively).

Q You're familiar with certain counties having county managers, right?

A I am, yes.

Q Those county managers, in your understanding, do they often have management experience or educational backgrounds in public administration?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 117

A    Sometimes.

Q    Okay.  Could you remind me what your educational background is?

A    I have a bachelor's in information -- I have a bachelor's of science in information systems.

Q    Okay.  Beyond serving as chair and serving as a commissioner, what experience do you have in public administration?

A    Very little.

Q    You mind just going into some detail?

A    I would say almost none.  So my prior public experience, I have worked in large governmental organizations.  I've seen it from, I would say the employee side of the things both in my time at Middle Georgia Technical College, which is now Central Georgia Technical College, and Fort Valley State University.  But I do not, I would not in any way say that I'm qualified as a public administrator.

Q    I understand.  Neither am I.  And these counties that you're aware of with county managers, would you say that their governments are less efficient or less productive than a county with an elected chief executive?

MR. TYSON:  Object to form.

THE WITNESS:  I have heard stories from, I talked a little while ago about how in our case,

Daniel S. Perdue                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 118

you know, I don't object to.  In fact, I encourage each of our commissioners to reach out to any employee of Houston County that they would like to, to interact with that department head or employee or try to get to the bottom of the situation or try to provide better constituent services or try to get trash picked up on the side of the road.

I know that our department heads have been responsive to individual commissioners without me getting involved, which I think is phenomenal.  I know of at least some cases where a county manager believes that they are the sole conduit for information to flow to and from the Board of Commissioners.  I don't think that that would serve the citizens of Houston County in the best way.

BY MR. ANDINO:

Q    Would you mind just telling me why you don't believe that?

A    I think we have five elected leaders of this government.  Each one of them has different connections, different people they talk to, different areas of the county that they may frequent more or less.  And I think it really, if all of that is narrowed down to a, going through

Page 119

a single person, I think it creates a bottleneck.  And then that own individual person can determine whether or not it's -- they think it's the right decision.  It's another layer of obstruction between citizens and their elected leadership.

Q    And what are your feelings on like a mixed system, where you have some seats that are at-large and some seats that are district based?

A    For Houston County in particular?

Q    For Houston County, yes.

A    It is my understanding that typically in working towards a resolution of a Section 2 case, that adding seats to the Board of Commissioners or adding seats to the governing body, changing the number of governing body, is typically not allowed in settling those suits.

Q    I understand the Section 2.  I'm trying to just understand your opinion with a mixed system.  Is that more effective or less effective than a system based only on single district members?

MR. TYSON:  Object to the form.

THE WITNESS:  Are you saying currently we have a single district?  I'm sorry.

BY MR. ANDINO:

Q    That's okay.  That's okay.  I can clarify.  Actually, you know what?  I've taken up a lot of time.

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 120

Let's move on.  It's not that important.

I want to talk about elections again.  You talked about your campaign for chair in your Post 4 seat. Generally speaking in your experience, how much does it cost to run a campaign for a commission seat?

A    Again, both of mine have been unopposed.  I can tell you in preparing for this most recent election, I called a political consultant and he said, you know, if you're opposed you need to get ready to spend about a hundred thousand dollars.  I don't think anyone has ever spent that on a commission seat in Houston County.  He makes money when I spend money.  So he wants to see those spending dollars as high as possible.

I think in Commissioner Byrd's case, I don't know, but I think he spent in the neighborhood of tens of thousands of dollars to run his contested campaign at the same time that I was running my Post 4 campaign.

Q    Okay.  And then earlier you talked about running events in order to receive donations.  Who do donations typically come from in Houston County for commissioners?

A    All sorts of people.

Q    Okay.  Individuals?

A    Yes.  I don't believe we're, could not say for sure, but yes.  Greater than 95 percent individuals.  To my knowledge, there's not lobbyists or large corporations down

Page 121

here writing a whole bunch of campaign checks.

Q    All right.  No PACs?

A    No, not that I know of.

Q    No major civic organizations?

A    I don't believe I have ever received a campaign donation from a major civic organization.  I would be unable to say that any -- I don't review disclosure reports in my free time.  So I would not say that no one has, but I can say in general my sense is that most campaign donations in Houston County from local races come from individuals.

Q    Okay.  And when it came to your election in particular, where did the majority of your donations come from?

A    I believe they came from individuals.

Q    Okay.  Any characteristics, general characteristics of the majority of those individuals, geographically, racially, economic wise?  Any idea of who typically made those donations to you?

MR. TYSON:  Object to form.

THE WITNESS:  I would have no data on the geographic.  I have not done an analysis there.  But I can tell you as we talked about racially polarized voting, I would imagine that the majority of my donors to my campaign were individuals who were white.

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 122

BY MR. ANDINO:

Q    Any reason why you believe that's the case?

A    I have no beliefs about that.

Q    Are there any endorsements that are common during a commission race?

A    Not that I know of.

Q    Okay.

A    Can I modify that ever so slightly?

Q    Sure.

A    I believe that certainly in the case of myself and Commissioner Byrd, when we ran for Post 4 and 5, we sought and received the endorsements of the outgoing members of those seats since they were retiring rather than opposed.  Myself, when I ran for chairman, I sought the endorsement and received the endorsement of Chairman Stalnaker.  But I would say, those are the typical endorsements that are sought.  There are, I'm unaware of any, you know, You really need this, X, Y, Z organization to be elected in Houston County.

Q    Okay.  You said you read the expert reports in both the Driver and you skimmed the Rozier expert report?

A    I would not even say that I skimmed the Rozier report.  I would say that I looked at the maps or at least one map from the Rozier report.

Q    Is it your understanding that the purpose of

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 123

those maps is a potential remedy in this lawsuit?

A    Yes.

Q    What entity from your understanding here in Houston County administers county elections?

A    The Board of Elections.

Q    Okay.  And how does, if at all, does the Commission interact with the Board of Elections?

A    So primarily we appoint some members of the Board of Elections.  Others are appointed by parties.  We acknowledge those appointments so we take them up at our meeting to acknowledge those appointments, but we don't make those.  We also interact with the Board of Elections. You know, I will frequently talk to Ms. Presswood about legislative issues that are coming on and she will ask me to advocate on behalf of the interest of the Board of Elections and those people who run elections in order to possibly impact legislation to essentially make it easier to run elections in Houston County.

We certainly fund the Board of Elections.  And I believe Ms. Presswood asked me for an additional employee for the Board of Elections in one of her budget requests, which was approved.  So in some ways it acts like a department of the county.  In other ways, it is overseen by a board.  And that would be the Board of Elections.

Q    Now, if a court order required a move from

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 124

at-large districts to single member districts, what involvement at all would the commission have in making that transition?

MR. TYSON:  Object to the form.

THE WITNESS:  I assume that we would have to accept and acknowledge that consent decree or that court order.  And I assume that we would have to approve and possibly ask the legislature to enact the things that would comply with that consent decree.  But all of that is mere speculation on my part.

BY MR. ANDINO:

Q    Okay.  Is the Commission at all involved in the planning around election deadlines, ballot printing, poll worker recruitment, coordination of the polls themselves?

A    You're talking about the members of the Board of Commission there?

Q    Uh-huh (affirmatively).

A    No.  That is handled either by the Board of Elections or by professional staff within the Board of Elections.

Q    Okay.  Turning back to the DOJ lawsuit that was filed in early 2025, do you recall that the Commission made a statement, a public statement related to that lawsuit?

A    I believe we did.  Yes, sir.

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 125

Q    Okay.  Do you recall what was said in that statement?

A    I certainly could not quote it word for word, but I believe we acknowledged the fact that the lawsuit had been required, said that we would work through the process of the lawsuit and certainly comply with any legal outcomes that came about as a result of the lawsuit.

Q    Okay.  Do you recall that statement also saying that the Commission would immediately begin its own investigation?

A    Yes, sir.

Q    Okay.  Did the Commission engage in an investigation?

A    Yes.

Q    Okay.  Has it or is that investigation concluded?

A    I would say our expert reports in some ways are the conclusion to that investigation, but in other ways the investigation is still ongoing.  Largely that investigation involved hiring counsel to respond to the lawsuit in coming to our conclusions.

Q    Besides the publication of these expert reports, were there any other steps that Commission took related to this investigation?

MR. TYSON:  I'll just object to the extent

Page 126

that it requires you to disclose communications with counsel.  If you have other things you can talk about, you're free to do that.

THE WITNESS:  Ask the question again, please.  And don't object this time.  I'm going to forget the question.

MR. ANDINO:  I'll include his objection in my question.

BY MR. ANDINO:

Q    Besides the publication of expert reports and communications with counsel, did the commission conduct any other steps or actions related to this investigation?

A    As a corporate body, I would say no.

Q    Are you aware of any candidates that have run --

A    Can I change that answer slightly?

Q    Yep.

A    While I don't think this would be included in communication with counsel, but counsel was present.  I mean, we met with the DOJ in early January, maybe mid-January of 2025 to sort of get a sense of their conclusions, get a sense of the map that they had drawn, and myself, Commissioner Gotwalls, Mr. Tyson and Mr. Hall -- were you there, Tom -- were all there.

Q    Okay.  Do you remember you said, correct me if

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 127

I'm wrong -- you said you guys talked about the map the DOJ had proposed?

        A     Yes.

        Q     Okay.  Did you guys talk at all about the feasibility of that map?

        A     I'll need a little information about what you mean in terms of feasibility of a map.

        Q     Did you talk at all about whether that map could work for Houston County?

        A     No.

        Q     Did you talk about any logistics or information related to making such map applicable to Houston County -- applicable to a Houston County election?

        A     We talked very briefly --

        Q     Uh-huh (affirmatively).

        A     -- about the statistics related to, in particular, District 1 in that map, which would be the majority Black district.  But did not really talk about anything beyond that related to their map.

        Q     What did you talk about related to those statistics?

        A     What the percentage of majority Black population in that district was.

        Q     Okay.  And do you recall what percentage that was?

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 128

A    I believe that the DOJ presented both a five member and a four -- five district and a four district plan.  And in the case of the five district plan, I believe it was in the neighborhood of 54 percent.  And in the four district plan, I believe that the majority Black district was just over 50 percent, like 50 point something percent. But I don't believe, I believe that was, you know, since this level population.

Q    Okay.  And did anybody who was a part of the Houston County government have any reaction to the statistics?

A    No.

Q    All right.  The question I was going to ask is, thinking of the last 10 years of elections to the extent that you remember elections in Houston County, are you aware of any messaging directly related to race or about Black residents, Warner Robins or the north side of the county?

A    Ask that question again, please.

Q    Sure.  For elections in the last 10 years that you're aware of, are you aware of any messaging directly referencing race, Black residents in Warner Robins or the north side of the county?

MR. TYSON:  Object to form.

THE WITNESS:  So we've got -- there's a

Daniel S. Perdue                               March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 129

comma in between all of those --

MR. ANDINO:  I'll go through them one by one.

THE WITNESS:  -- including the Oxford comma before the or?

BY MR. ANDINO:

Q    I'll go one by one.  Are you aware of any campaigns in the last 10 years with direct messaging related to race?

A    No.

Q    Okay.  Any messaging directly related to Black residents?

A    No.

Q    Any messaging directly related to Warner Robins?

A    On the Houston County Board of Commissioners?

Q    Yes.

A    No.

Q    Any messaging directly related to the north side of the county?

A    While I did not particularly pay attention to her campaign messaging, I would imagine that Ms. Rozier's campaign messaging included messaging around the north end of Houston County.

Q    Okay.

A    That would be characteristic of what I know of

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 130

Ms. Rozier.

Q    Understood.  Generally speaking, when you're witnessing an election, what type of messaging do you pay attention to?

A    Messaging around how government dollars will be spent.  In our area, messaging around support for Robins Air Force Base.  Those are the two primary areas for local elections I would be paying attention to.

Q    And are you aware of any complaints made against a candidate for commission that were racially charged?

MR. TYSON:  Object to form.

THE WITNESS:  When you say complaints, formal complaints filed with the Board of Elections that were racially charged against a member of the Commission?

BY MR. ANDINO:

Q    Formal or informal, but related that were provided to the Commission or you in your official capacity?

A    That someone in some way made a complaint about someone who was running for Commission that was racially charged?

Q    Yes.

A    Not that I'm aware of.

Q    Any complaints in general related to racial

Page 131

appeals or race related to a candidate's campaign?

MR. TYSON:  Object to form.

THE WITNESS:  No.

MR. ANDINO:  I apologize.  This is taking longer than I expected.

THE WITNESS:  That's all right.  We're good.

MR. ANDINO:  Can we take another five-minute break?

THE WITNESS:  If you need it, yeah.

THE VIDEOGRAPHER:  We're going to go off record at 12:58 p.m.

(Whereupon, a break was taken.)

THE VIDEOGRAPHER:  Going back on record at 1:03 p.m.

BY MR. ANDINO:

Q    All right.  Mr. Perdue, I think earlier you talked about how the Board of Commissioners has paid staff; is that right?

A    The Board of Commissioners has an employee who, employees base that works on behalf of the Board of Commissioners.  But to say the Board of Commissioners has a paid staff, I think seems like those staff members are waiting around to hear what to do from individual members of the Commission, which is not typically the case.

Q    Okay.  So where do they typically get their job

Page 132

duties and responsibilities?

A     From their job description.

Q     Okay.  And who supervises those employees?

A     There's no member of the Commission other than myself that is involved in day-to-day supervision of employees.

Q     Okay.  Just generally speaking, what positions are we talking about?

A     If I said that there was a paid staff that worked on behalf of the Board of Commissioners, what I was talking about was generally the entire employee base that is under the purview of the Board of Commissioners.  While we certainly have members of my office, my assistant, Mr. Cox, Mr. Dunbar, who work more closely with the Board of Commissioners, it's not like they are staff.  Or if I used the word staff, I probably misspoke or implied things that were not the case there based on the word staff.

There are regular employees of Houston County who have a full job duty that they could fill up their day.  But when a member of the Board of Commissioners calls, they certainly respond.  I would say that would be all of the employees of the Houston County Board of Commissioners who are not answering to a different constitutional officer or appointed official.

Q     Okay.  Talking about that category of people,

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 133

how many employees would you say that is?

A     That are --

Q     That are -- I'll clarify.

A     Thank you.  Yeah.

Q     That are serving at the request of the Board of Commissioners but are not assigned to another office or board that they're mainly getting their responsibilities from?

A     I would say maybe in the neighborhood of 300.

Q     Okay.  How many individual employees' sole job responsibilities are related to duties assigned by the Board of Commissioners?

A     Again, you know, everybody who's employed here has a job description that they can do.  I am the only member of the Board of Commissioners who, who is involved in the day-to-day operations here in Houston County.  It's not to say the others can't insert themselves in day-to-day operations.  We encourage that.  But regularly I'm the only one involved.  So when you say -- what was the question again?  How many --

Q     How many employees' job responsibilities are only dedicated to serving the Board of Commissioners?

A     Zero.

Q     Zero.  Okay.  Besides yourself?

A     I would say even zero including myself.  Because

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 134

we don't serve the Board of Commissioners.  We serve citizens.

Q   Okay.  How many employees' complete job description is encompassed by responsibilities related to the Board of Commissioners?

A   Possibly only one.  My assistant.

Q   Okay.

A   The Board of Commissioners -- I mean, I could answer that question by saying 300 and something as well.  So that, that's where I'm trying to understand the nature of your question.  It's not like that we have a -- we don't have a single person committed to constituent services and their only job is to work on constituent services.  We, again, if you were to say how many, how many people in Houston County's employ only work for the members of the Board of Commission, I would say the closest answer is zero or one, one being my assistant.  But even she has additional projects and tasks and responsibilities that aren't necessarily related to assisting me.  In some other way, you know, all of those employees who work for our department heads and things like that, work on behalf of the Board of Commissioners.

Q   Okay.

A   Does it make sense how I'm trying to interpret your question?

Daniel S. Perdue                        March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 135

Q    I get what you're saying.  Let me just try a different path.

A    Okay.

Q    All right.  Besides yourself, do any other commissioners have hiring authority for Houston County?

A    We talked about the Board of Commissioners approving department heads when they're hired because they answer to the Board of Commissioners.  And we talked about the Board of Commissioners approving irregular step hiring and irregular step promotion so that, so their hiring authority only extends to those levels.

Q    Okay.  So individually none of those commissioners have authority to hire?

A    Certainly not.

Q    Do you have authority to hire any employees?

A    No.

Q    Okay.  Who hired your assistant?

A    She was here when I took the job.

Q    Okay.  Do you know who hired her prior to you taking the job?

A    I do not.  It's possible that she was hired by Chairman Stalnaker.

Q    If somebody wanted to terminate her, who would that official be?

A    Me.

Page 136

Q    How many --

A    But I will say she's not a department head, so she would have the regular right of review and everything else that any normal employee would have who is not a department head in Houston County.  Does that make sense?

Q    That makes sense.

A    So certainly I could walk in one day and say I think we should fire my assistant.  The question that our personnel director is going to ask me is, Show me her last evaluations and show me how you wrote her up and show me that you have gone through the proper steps.  That you didn't just wake up on the wrong side of the bed this morning and decide that you wanted a new assistant.

Q    That makes sense.

A    She would follow under the normal employee program that we have because she's not a department head.

Q    Understood.  And that's a good clarifying point. I'm only talking for this line of questions about normal employees.

A    Okay.

Q    Okay?  So when normal employees, how many do you have authority to terminate?

A    Who are not department heads?

Q    Yeah.

A    In some ways, all of them.  In other ways, none

Daniel S. Perdue                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 137

of them.  Because again, we have a process for handling employee terminations.  We don't just -- I'm not saying that this process is followed all the time, but in general I let the department heads manage their departments.  And I can tell you there are certain employees of department heads that have been very -- they've let me know their opinion.  And I've said, That's okay.  That's not my employee.  That is their employee.  Does that make sense?

So in general I could come in here at any point and say, That person needs to be fired.  I would receive a lot of very good professional advice that I should not do that.  And I would endeavor to follow that advice.  But I also have the authority to say, Have you written that employee up?  Don't you think you need to write that employee up?  But that is handled at the department head level.

Q    Okay.  Does the Board of Commissioners have any unpaid staff?

A    In some ways the members of our commissions and boards could be considered unpaid staff, but in general, I would say no.  We don't have unpaid staff that is at our beck and call.

Q    And does the Board of Commissions publicly post job openings?

A    Yes.

Daniel S. Perdue                                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 138

Q    Okay.  Who is in charge of those job openings, posting those job openings?

A    Our personnel department.

Q    Okay.  Is your personnel department also involved in the hiring of individuals for those positions?

A    They are.

Q    And could you give me the official title of that personnel department?

A    Of the department?

Q    Yes.

A    I believe it's called the personnel department. If there's a more official title, I would not know it.

Q    All right.  I want to turn your attention back to Plaintiff's Exhibit 5.  This was the EEO reports that we're taking a look at.  Let's look at Function 1, page -- let's look at page 3 of the packet that I gave you here. You see at the top of the page "job category" on the left side of the column, right?

A    Okay.  I do.  Yes.

Q    And if you follow along that column, that row I guess it would be called, a row, to the right you'll see male, female, white, Black or African-American, Asian.  You see those categories?

A    I do.

Q    Okay.  Now if you look down a little further on

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 139

the page, do you see a box labeled 65, full -- total full-time?

A    I do.

Q    Okay.  And you see following along the right side there, there are numbers related to those boxes, right?

A    Yes, sir.

Q    Would you have any reason to disagree with me if I told you that those numbers represent the number of employees in the categories listed above?

A    I would not.

Q    Okay.  This Function 1, the financial administration, slash, general control, do you generally have an understanding of who these employees are?  Or what -- I'll rephrase my question.  I withdraw that.

Do you generally understand the job categories that are contained within this function?

A    It would be very difficult for me to go job by job in Houston County and tell you whether I believed it fit in that function or not.

Q    These bottom line numbers, are you aware of the disparities generally of employees within this function?

MR. TYSON:  Object to form.

THE WITNESS:  As I said previously, today is the first time that I've seen this report, so I

Daniel S. Perdue                                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 140

would say no, I am not aware of any disparity.

BY MR. ANDINO:

Q    Okay.  Are you generally -- do you have an understanding of what the demographic makeup, the racial demographic makeup of county employees are here in Houston County?

A    No, I do not.

Q    Who within the county government, if you know, has the responsibility to ensure equal opportunity employments, employment opportunities?

A    Our personnel department.

Q    Okay.  Any specific individual?

A    I would say Mr. Ken Carter.  He's the, he's our department head.

Q    And is that the same individual who is responsible for considering promotions of individuals?

A    No.  I would say in general all department heads can consider promotions of individuals.  But promotion is an interesting word in our context.  We have a merit system and so our, our, you know, you are promoted when a job above you comes open and you apply for that job.  That's what I would call a promotion in Houston County.

That does not mean that's the only time that you might receive a pay raise.  Ideally in our system, if there are funds available, any employee who is performing as

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 141

expected under our merit system receives a pay raise every single year of 4 percent.

Q    That's a pretty good percentage.

MR. ANDINO:  That is all my questions.

THE WITNESS:  Okay.

MR. ANDINO:  All right.

MR. TYSON:  All right.  I have a few more questions.

THE WITNESS:  Okay.

DIRECT EXAMINATION

BY MR. TYSON:

Q    So let me just start real quick, Mr. Chairman, with Exhibit 5.  If you can turn one more page over from the page you were looking at with Mr. Andino, right here.

A    Okay.

Q    In Function 1, do you see Section E, departments/agencies included in this function report?

A    Yes.

Q    And it lists the various departments?

A    I do now.

Q    Are all of those departments under direct supervisory control for hiring and firing of the Commission?

A    No, sir.

Q    And so this function would include categories of

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 142

offices over which the Commission exercises no authority?

A   The term I like to use, Mr. Tyson, is purview. I say that some of our employees are under the purview of the Board of Commission.  That's not a legal term.  It is just the term I have taken to to say that I cannot walk in the tax commissioner's office and tell those employees what to do, but I can walk into roads and bridges and tell those employees what to do.  I'm not the direct supervisor of roads and bridges.  We have a department head, but if I call one of those employees, he's going to be responsive to me.

Q   Earlier you were asked about if there was a majority Black district on the Board of Education plan. You can put Exhibit 5 away.  We're finished with that.

Do you recall questions about the Board of Education districts?

A   I recall that question, yes, sir.

Q   Do you know if the majority Black district on the Board of Education plan is currently electing a Black member of the Board of Education?

A   It's not.  Jon Nichols currently represents that district.

Q   And you were asked about Black candidates that have been elected to the Board of Education.  From what geographic area were those Black candidates elected to the

Page 143

Board of Education?

A    Currently the two Black members of the Board of Education are Mr. Jackson and Mr. Ivory, and both of those are at-large representatives of the Board of Education.

Q    So they're elected countywide for those roles?

A    They are.

Q    You were asked about the different expert reports and whether you disagreed with anything that you read in the expert reports.  Do you recall those questions?

A    I do.

Q    Did you, in looking at the various maps that were in both the Dozier and Rozier expert reports, did you agree or disagree with the map drawers about a reliance on precincts or boundaries of districts?

A    I think it is important to preserve as much as possible precinct boundaries because I do not think that precincts are created in any way more than communities of interest.  And so I think a district drawn based as closely on precinct boundaries will most fairly represent communities of interest.

Q    Do you recall in looking at those maps the use of the Air Force base in a way that you would disagree with on the districting plan?

A    I do.

Q    And what was that?

Daniel S. Perdue                                          March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 144

A    So I believe that in one of Mr., probably Dr. Cervas's maps, he essentially drew a district that was both north and south of Robins Air Force Base.  And the only way to get from one end of that district to the other, if you were not on Robins Air Force Base, was certainly on the border of Robins Air Force Base.  I believe he used Highway 247 as the district line there.

I think it's important to note of the two things I view as the primary responsibility of the Houston County Board of Commissioners, we generally don't provide those in due course on Robins Air Force Base.  We do not provide infrastructure to Robins Air Force Base.  We do not provide public safety unless specifically asked to within the confines of Robins Air Force Base.  They have their own infrastructure systems.  They have their own public safety systems.

Q    Do commissioners have regular access to the property on Robins Air Force Base?

A    They do not.

Q    In the maps that you reviewed there were five district plans.  Do you think a five-district plan is a feasible map system for Houston County?

A    I think a five-district plan would significantly change the governance of Houston County.  Therefore, I do not believe it is a feasible plan for Houston County.

Daniel S. Perdue                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 145

Q    You were asked about your view of the Gingles factors.  Do you recall those questions?

A    I do.

Q    Do you recall whether there is a totality of the circumstances, senate factor test included, in the Gingles test?

A    I cannot recall if there, the senate factors are within the Gingles test or a separate test of their own.  But I'm also someone acquainted with the senate factors.

Q    And is it your -- do you have an understanding whether senate factors are a part of a Section 2 case?

A    I believe they've typically been considered as part of Section 2.

Q    You were asked about racial discrimination in Houston County in the last 20 years.  Do you recall those questions?

A    I do.

Q    Are you aware of any official action taken by the Houston County Board of Commissioners that was racially discriminatory in the last 20 years?

A    I am not.

Q    You were asked about Ms. Rozier and her run for office.  Did Ms. Rozier run as a Republican?

A    I believe she qualified as an Independent.  It was a special election and so I'm, I'm -- honestly, I'm not

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 146

a hundred percent acquainted with exactly the qualification methods in a special election.  I know that she was listed on the ballot as an Independent.

Q    Do you have a personal belief of whether her decision to not run as a Republican affected the election results in the race she ran in?

A    I do.

Q    And what is that?

A    I believe Republicans in Houston County have a better chance of winning.

Q    You were also asked about the Board of Elections process and the things that the Board of Elections does. Do you recall those questions?

A    I do.

Q    Is it your understanding that qualifying is complete for the 2026 election cycle for Board of Commissioners?

A    It is.

Q    And do you know when the primaries are going to be held for the 2026 Board of Commissioner elections?

A    May 19th, I believe.  Possibly May 9th.  For some reason -- that's confused in my head, but I believe it's May 19th.

MR. TYSON:  Okay.  That's all the questions I have.

Page 147

THE WITNESS:  All right.

MR. TYSON:  They may ask some additional ones based on my questions.

MS. HEYWARD:  I think we're going to take a short five-minute break and come back for...

MR. TYSON:  Sure.  That's fine.

THE VIDEOGRAPHER:  Okay.  We're going off the record at 1:25 p.m.

(Whereupon, a break was taken.)

THE VIDEOGRAPHER:  We're going back on record at 1:30 p.m.

                    RECROSS-EXAMINATION

BY MS. HEYWARD:

    Q    Now, Mr. Perdue, you just answered that a five district plan would not be feasible, but would a four district plan with a chair position be feasible?

    A    I believe so.

    Q    And you also responded that there is no current Black individual representing the majority Black single member district on the Board of Elections currently --

    MR. FLEMING:  Education.

BY MS. HEYWARD:

    Q    Excuse me.  Thank you.  The Board of Education currently.  Thank you.  Too close of words.

    A    We often have to clarify what we mean when we

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 148

say BOE.

Q    But has that district been previously represented by a Black individual?

A    It has.

Q    And who was the last Black individual?

A    I'm not familiar enough with the history of the Board of Education to answer that question.

MS. HEYWARD:  Okay.  Those were my only two.

MR. ANDINO:  I have one.  Sorry.

RECROSS-EXAMINATION

BY MR. ANDINO:

Q    Mr. Perdue, you said that you believe a four member district map could be feasible.  Why do you believe that?

A    I've re- -- so, you know, my answers about a five district plan being unfeasible were related to the government structure of Houston County and its, and its full-time chair nature.  I believe that is vitally important.  And it's my understanding in Section 2 cases typically that the method and management of the government is not altered.

So I believe that a four -- you could do a four member plan with a single at-large district that would not change the method and management of the government.  That's what I assume was being asked about feasibility and how my

Page 149

answers were structured.

MR. ANDINO:  Okay.  Thank you.

MR. TYSON:  No other questions for me.

THE VIDEOGRAPHER:  Okay.  We're going off record at 1:32 p.m.

(Off the video record)

THE REPORTER:  Can I get your orders, please?

MR. TYSON:  So we'll do a transcript.  We'll let you know about video, but we'll go ahead and order a transcript.  An E-transcript is fine.

THE REPORTER:  An E-tran?

MR. TYSON:  Yes, ma'am.

THE REPORTER:  Okay.  And --

MS. HEYWARD:  And we'll do a video and transcript.

THE REPORTER:  Okay.

MR. ANDINO:  Just do a transcript.

(Deposition concluded at 1:32 p.m.)

Page 150

                              DISCLOSURE

STATE OF GEORGIA:

COUNTY OF HOUSTON:


          Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

          Combs Court Reporting, Inc. was contacted by the party taking the deposition to provide court reporting services for this deposition and there is no contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b) or Article 7.C of the Rules and regulations of the Board for the taking of this deposition.

          There is no contract to provide reporting services between Combs Court Reporting, Inc. or any person with whom Combs Court Reporting, Inc. has a principal and agency relationship, nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action.  Normal and customary rates will be charged and a financial discount will not be given to any party in this litigation.


                              Janet S. Paris, CCR
                              Certificate No. B-1835

Page 151

CERTIFICATE

STATE OF GEORGIA:

GEORGIA, HOUSTON COUNTY:

I, Janet S. Paris, Certified Court Reporter, State of Georgia, Certificate No. B-1835, CERTIFY that acting in such capacity, I reported the testimony herein, and on the foregoing pages have transcribed a true and correct transcript thereof.

I FURTHER CERTIFY that I am not counsel for, nor am I related to any party in the above case; nor am I interested in the event or outcome.

WITNESS my hand and official seal as Certified Court Reporter, State of Georgia, Certificate No. B-1835, this 31st day of March, 2026.

Janet S. Paris, CCR

Certificate No. B-1835

Page 152

Bryan P. Tyson, Esq.

Btyson@clarkhill.com

                    April 1, 2026

RE: Driver, Courtney, Et Al. v. Houston County Board Of

Elections, Et Al.

    3/10/2026, Daniel S. Perdue (#7943052)

    The above-referenced transcript is available for

review.

    Within the applicable timeframe, the witness should

read the testimony to verify its accuracy. If there are

any changes, the witness should note those with the

reason, on the attached Errata Sheet.

    The witness should sign the Acknowledgment of

Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at

cs-southeast@veritext.com.

    Return completed errata within 30 days from

receipt of testimony.

    If the witness fails to do so within the time

allotted, the transcript may be used as if signed.

              Yours,

              Veritext Legal Solutions

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 153

Driver, Courtney, Et Al. v. Houston County Board Of Elections,

Et Al.

Daniel S. Perdue (#7943052)

                    E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Daniel S. Perdue                        Date

Page 154

Driver, Courtney, Et Al. v. Houston County Board Of Elections, Et Al.

Daniel S. Perdue (#7943052)

ACKNOWLEDGEMENT OF DEPONENT

I, Daniel S. Perdue, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

Daniel S. Perdue                    Date

*If notary is required

                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

                    _____ DAY OF _____, 20____.



                    _____

                    NOTARY PUBLIC

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[0025 - 4]**

Page 1

**0**

**0025**  1:5 5:16

**1**

**1**  4:3 5:10 14:7
  14:7 18:11
  22:19,20 57:23
  70:11,12,14,18
  73:15 74:4
  127:17 138:15
  139:12 141:16
  152:3
**10**  1:19 128:14
  128:20 129:8
**10.b**  150:4
**100**  40:12
**1066**  2:8
**10:39**  55:18
**10:45**  55:21
**10th**  5:4
**11/28/1990**  4:4
**1101**  2:12
**11662**  150:15
  151:20
**11:08**  67:6
**11:14**  67:9
**11:59**  96:19
**12**  79:11
**12/24/1988**  4:6
**12:07**  96:22
**12:58**  131:11
**141**  3:6
**147**  3:7

**148**  3:8
**15**  17:10
**15-14-37**  150:7
**150**  23:11
  116:9
**1500**  2:4
**159**  23:2,10
  116:8
**17th**  2:12
**1835**  1:23
  150:16 151:6
  151:14,21
**1900s**  29:13
**1922**  29:14
**1965**  29:24
**1970**  30:2,10
  32:14
**1970s**  29:20
  30:7 32:2
  66:11,18,20
  96:1
**1980s**  32:24
**1981**  66:19
**1990**  24:4
  32:15,17 35:10
  75:18,24,25
**1990s**  32:24
**19th**  146:21,23
**1:03**  131:14
**1:25**  147:8
**1:30**  147:11
**1:32**  1:20 149:5
  149:19

**1st**  8:19 82:1

**2**

**2**  4:4 14:7,7
  18:12 32:7,8
  57:23 112:12
  119:12,16
  145:11,13
  148:19
**20**  27:3 28:25
  34:14 79:8
  97:3,18 145:15
  145:20 154:15
**200**  1:22 28:25
**20005**  2:5
**20036**  2:13
**2019**  13:19
**202.662.8600**
  2:6
**2020**  13:18,19
  14:25 15:17,19
  15:24 16:1
  34:15 79:7
**2020s**  34:15,19
**2022**  13:23
  15:21 16:3
**2023**  4:8 8:19
  82:1,2,4
**2024**  50:4 82:2
  82:5 96:8
**2025**  4:7 33:15
  33:24 37:18
  40:2 43:16
  44:1 81:9

124:23 126:21
**2026**  1:19
  146:16,20
  151:15 152:3
**219**  8:10
**22**  4:3
**247**  144:7

**3**

**3**  4:6 18:12
  35:3,6 138:16
**3/10/2026**
  152:5
**30**  27:4 36:6
  95:11 152:16
**300**  133:9
  134:9
**30306**  2:9
**30326**  2:18
**31047**  8:11
**31088**  1:22
**31st**  151:15
**32**  4:4
**35**  4:6
**3630**  2:17
**38**  79:10

**4**

**4**  4:7,7,8 15:1
  18:13 43:19,20
  57:23 67:25
  68:3,6,25
  70:17,17 71:7
  71:15,16 72:20
  72:23 73:15,17

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[4 - address]**

Page 2

73:19 120:3,17
122:11 141:2
**40**  18:21
**404.285.5084**
2:9
**43**  4:7
**470.708.0554**
2:13
**477**  44:4
**478**  1:13
**4th**  44:1

**5**

**5**  4:8 18:15
31:13,16 57:16
57:17 72:15
122:11 138:14
141:13 142:14
**50**  128:6,6
**54**  128:4
**550**  2:12
**57**  4:8
**5:25**  1:5,13
5:16

**6**

**65**  139:1
**67**  3:5
**678.370.4377**
2:18

**7**

**7.c**  150:8
**700**  2:17

**7943052**  152:5
153:2 154:2

**8**

**8**  3:4

**9**

**900**  2:5
**95**  120:24
**96**  89:24 90:3
90:10
**9:07**  1:20 5:3
**9:15**  12:22
**9:27**  12:25
**9th**  146:21

**a**

**a.m.**  1:20 5:3
12:22,25 55:18
55:21 67:6,9
96:19
**abatement**
51:12
**ability**  50:7
56:4 76:7,11
**able**  13:19
17:13 28:10
39:1 42:15
45:4,10 97:23
98:7
**above**  26:11
59:19 89:24
139:10 140:21
151:11 152:6
154:7

**absolutely**  81:7
82:9 87:1
**accept**  124:6
**access**  111:18
144:17
**accg**  45:23
**accomplish**
26:15
**accomplishes**
80:19 81:5
**accounting**
58:24 104:13
**accuracy**  152:9
**accurate**  11:5
100:12
**acknowledge**
123:10,11
124:6
**acknowledged**
125:4
**acknowledge...**
154:3
**acknowledg...**
152:12
**acquainted**
145:9 146:1
**acquire**  51:10
**acquired**  51:12
**act**  19:12,13,21
25:22,25 29:21
29:23 30:17
31:13 56:3
**acting**  151:7

**action**  1:5,13
5:22 38:3
67:14,14
145:18 150:10
150:11,11,11
150:12,12
**actions**  51:3
99:12 126:12
**active**  19:10
73:19 92:16,20
93:2,12 103:15
**actively**  92:8
**activities**  14:3
**activity**  109:18
**acts**  123:22
**actual**  79:25
**actually**  40:23
49:19 59:8
100:4 119:25
**add**  11:2
**added**  109:15
**adding**  119:12
119:13
**addition**  27:25
41:8 51:10
58:16
**additional**
59:23 123:20
134:18 147:2
**additions**  154:6
**address**  8:9,10
44:11,19 45:4
45:10 69:12
71:22 101:11

[address - answered]                              Page 3

| | | | |
|---|---|---|---|
| 106:6,7 | affiliation  6:2 | ahead  10:16 | 70:1,8 72:11 |
| addressed | affirmatively | 149:10 | 78:18 80:6 |
| 99:18 | 52:17 80:12 | air  16:19 55:1,2 | 83:1 84:16 |
| administer | 88:24 110:3 | 55:6,8,11 | 91:4 93:20 |
| 5:21 | 114:16 116:19 | 130:7 143:22 | 94:15,21 96:14 |
| administers | 124:18 127:15 | 144:3,5,6,11,12 | 96:23 107:21 |
| 123:4 | african  16:22 | 144:14,18 | 108:17 114:15 |
| administration | 22:11 40:10 | al  1:3,6,11,14 | 118:18 119:23 |
| 58:22,23 59:8 | 49:12,14 50:1 | 7:2,3 152:4,4 | 122:1 124:12 |
| 116:25 117:8 | 50:5 62:4 | 153:1,1 154:1 | 126:7,9 129:2 |
| 139:13 | 65:18 86:1 | 154:1 | 129:6 130:16 |
| administrator | 95:11 138:22 | alcohol  101:25 | 131:4,7,15 |
| 117:18 | age  52:3 | allotted  152:19 | 140:2 141:4,6 |
| admire  86:16 | agencies | allowed  76:5 | 141:14 148:9 |
| adopted  85:23 | 141:17 | 76:16 119:15 | 148:11 149:2 |
| advance  81:17 | agency  150:10 | allows  28:13 | 149:18 |
| 96:9 | agenda  25:13 | alongside  106:2 | answer  9:22 |
| advancement | 25:14 26:19 | 109:10 | 10:5,9,16,18,22 |
| 6:7,15,22 | 46:13,14 74:16 | altered  148:21 | 11:5 24:11 |
| advantage | 101:13,18,20 | ambition  33:3 | 30:4,21 33:17 |
| 28:12 | 102:16,20,21 | american  16:22 | 39:13 41:21 |
| advertising | 102:23 103:1 | 40:10 49:12 | 42:11 44:14 |
| 61:2 | 115:22,24 | 50:1,5 62:4 | 47:17 50:21 |
| advice  52:23 | 116:1 | 65:18 86:1 | 54:17 62:1,15 |
| 137:11,12 | agent  150:11 | 95:11 138:22 | 63:12 65:22 |
| advocacy  34:12 | ago  14:4 45:20 | americans | 66:25 69:17,22 |
| 34:16,18 88:6 | 109:1 117:25 | 22:11 49:14 | 70:5 72:8 78:1 |
| 90:23 91:23 | agree  5:8 24:8 | amount  19:19 | 79:20 82:19 |
| advocate  43:3 | 44:10,18,24 | analogy  19:12 | 126:16 134:9 |
| 88:10 123:15 | 45:3,9 143:13 | analysis  56:14 | 134:16 135:8 |
| advocates | agreed  109:5 | 56:16 121:21 | 148:7 |
| 88:21 | agreements | andino  2:11 3:5 | answered |
| affected  146:5 | 26:14 | 3:8 6:25,25 | 68:24 89:4 |
| | | 67:4,11,13 | 147:14 |

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[answering - attention]**                                          Page 4

| | | | |
|---|---|---|---|
| **answering** 8:21 9:1 10:8 14:19 132:23 | **appointed** 21:13,21 22:6 58:13 123:9 132:24 | 51:7 52:9 89:19 105:4 106:7,18,20 107:5,12 118:23 130:7 | 133:11 **assistant** 27:8 132:13 134:6 134:17 135:17 136:8,13 |
| **answers** 67:21 148:15 149:1 | **appointing** 21:8,9 | **arpa** 112:13 | **assisting** 134:19 |
| **anybody** 128:9 | **appointments** 52:23 54:25 55:5 95:14 123:10,11 | **arthur** 36:8 | **association** 6:6 6:15,21 |
| **anytime** 74:20 | | **article** 4:3,6 22:19 35:7 150:4,7 | **assume** 10:5 58:5 124:5,7 148:25 |
| **apart** 13:4 28:2 | | | |
| **apologies** 72:13 98:4 | **approval** 26:12 31:20 | **asian** 138:22 **asians** 95:2 | **assumed** 14:23 **assumption** 58:6 |
| **apologize** 55:4 100:4 131:4 | **approve** 20:10 20:13,17 46:17 124:8 | **aside** 14:24 24:16 | **atlanta** 2:9,18 13:4 97:10 |
| **appeals** 21:11 22:7,11 131:1 | **approved** 58:18 123:22 | **asked** 14:11,14 19:3 33:2,3 40:9 41:14 | **attached** 152:11 |
| **appearance** 5:25 6:2,23 | **approving** 26:13,13 59:25 135:7,9 | 68:24 73:22 79:16 83:23 84:1,5,8 | **attend** 13:4 28:8,10 92:10 93:8 |
| **appearances** 2:1 | **april** 84:25 152:3 | 123:20 142:12 142:23 143:7 | **attendance** 83:8 |
| **appearing** 2:3 | **archive** 35:12 35:15 46:11 | 144:13 145:1 145:14,22 | **attended** 28:14 28:24 63:4 92:14 |
| **appended** 154:7 | **area** 14:9 51:6 51:7,10,11,13 51:16,18 54:25 55:5 57:20 89:18,19,21 91:20,22 93:4 93:10 107:1,19 130:6 142:25 | 146:11 148:25 | |
| **apple** 46:13 | | **asking** 9:15 11:11 77:13 80:3 94:9,10 96:14 99:4 106:16 | **attendees** 63:6 **attending** 38:16 92:23 |
| **applicable** 127:12,13 152:8 | | | |
| **applications** 101:23 | | | |
| **applied** 51:8,8 | | | **attends** 63:23 |
| **apply** 18:2,4 20:19 25:21 69:25 140:21 | | **asphalt** 108:6 **assessors** 21:11 | **attention** 129:20 130:4,8 138:13 |
| **appoint** 21:12 52:22 123:8 | **areas** 18:3 19:16 50:11,13 | **assigned** 69:2,4 69:7,8 133:6 | |

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

[attire - believe]

Page 5

attire 97:21
attorney 6:3
  11:23 25:17
  73:22 150:10
  150:11 152:13
attribute 50:6
audio 5:7
authority 16:20
  21:17 135:5,11
  135:13,15
  136:22 137:13
  142:1
authorized
  5:21
automated
  60:21
available
  140:25 152:6
average 60:16
avoid 64:25
  100:19
aware 23:2,7
  24:1,4 31:8
  33:12,21 34:3
  34:5,11,18,24
  35:14,22,25
  47:9,14,20
  48:10,19,22
  49:1,6,17,22
  74:24 81:9
  93:13 97:2,22
  97:23 98:1
  100:7 116:3
  117:20 126:14

128:16,21,21
129:7 130:9,24
139:21 140:1
145:18

**b**

b 1:23 150:7,16
  151:6,14,21
bachelor's
  117:4,5
back 12:24
  15:16 22:13
  25:2 26:18
  27:3 28:24
  35:10,14 41:1
  55:20,23 62:22
  64:1 67:8
  85:10 88:16
  89:3 96:21
  99:7 106:25
  107:15 109:21
  111:22 114:25
  124:22 131:13
  138:13 147:5
  147:10
background
  15:6 117:3
backgrounds
  116:25
bad 108:15
ballot 73:10
  124:14 146:3
baptist 40:11
  40:19,25 55:23

64:15 65:2
83:20 85:3
barber's 12:7
base 16:20 55:1
  55:2,6,8,11
  130:7 131:20
  132:11 143:22
  144:3,5,6,11,12
  144:14,18
baseball 97:21
based 26:11
  30:5 41:7
  51:18,19 66:12
  88:5 89:21
  91:5,9,11,23
  106:5 107:24
  119:8,18
  132:17 143:18
  147:3
basic 9:14
basis 88:1
beck 137:22
becoming
  105:25
bed 136:12
bee 53:16
began 73:20
  79:9
beginning 6:3
  14:3
begins 5:10
begun 63:18
behalf 2:2,15
  7:5 43:3

123:15 131:20
132:10 134:21
belief 77:4
  106:17 115:25
  146:4
beliefs 122:3
believe 12:3,4
  12:11 17:19
  22:10 27:10
  30:22 31:1
  32:20 36:11,21
  37:1,6,12
  40:11 45:15
  49:4,19 54:1
  56:20 60:22
  62:2,6,11,16
  64:12 65:4,6
  65:16 67:2
  72:15 74:12,14
  75:3,14,20
  76:9 77:22
  78:5,12,19
  79:13,17 80:18
  81:4 82:21
  83:18 84:21,21
  85:5 87:18,23
  88:17 90:17,22
  91:21 92:1,2,7
  93:21,23 94:19
  95:16 96:8
  98:18 99:14
  110:8 114:6
  116:12,14
  118:20 120:23

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[believe - body]**                                      Page 6

| | | | |
|---|---|---|---|
| 121:5,14 122:2 | **bill** 33:9 | 13:15 14:11,14 | 115:25 118:14 |
| 122:10 123:20 | **bishop** 53:15 | 14:17 16:25 | 119:13 123:5,7 |
| 124:25 125:4 | **bit** 97:1 100:9 | 17:2,4 18:5,8 | 123:9,12,15,19 |
| 128:1,3,5,7,7 | 103:4 105:3 | 18:24 19:16,20 | 123:21,24,24 |
| 138:11 144:1,6 | **black** 16:14 | 20:2,10,24 | 124:16,19,20 |
| 144:25 145:12 | 22:3,7 35:19 | 21:11,16,16,21 | 129:15 130:13 |
| 145:24 146:9 | 36:1 44:25 | 22:14,15 23:4 | 131:17,19,20 |
| 146:21,22 | 45:4,5,10,11 | 23:7,11 25:2,3 | 131:21 132:10 |
| 147:17 148:12 | 48:19,22 50:7 | 25:6 26:4,12 | 132:12,14,20 |
| 148:13,18,22 | 51:16,18 52:23 | 26:17,20,22 | 132:22 133:5,7 |
| **believed** 74:6 | 53:1,4,6,11,20 | 29:3,8,13 32:3 | 133:12,15,22 |
| 139:19 | 53:24 54:7,8,9 | 32:13,18 33:12 | 134:1,5,8,16,22 |
| **believes** 118:13 | 54:13,14,15 | 33:22 34:1,25 | 135:6,8,9 |
| **believing** 88:1 | 56:5,5,22 | 35:9,12,23 | 137:17,23 |
| **beneficial** 78:8 | 61:21,23,23 | 36:1,7,12,22 | 142:4,13,15,19 |
| 79:4 | 62:2,7 63:10 | 37:7,13 43:15 | 142:20,24 |
| **benefited** 79:6 | 63:15 64:2,5,6 | 46:21 48:11,20 | 143:1,2,4 |
| **benefitted** | 64:10,10 66:22 | 48:23 52:11,21 | 144:10 145:19 |
| 112:18 | 82:23 86:1 | 54:5,11 55:7 | 146:11,12,16 |
| **best** 10:8 44:11 | 95:1,14 96:7 | 57:2,2,8 58:7 | 146:20 147:20 |
| 44:19 65:17,24 | 127:18,22 | 58:12,14,18,19 | 147:23 148:7 |
| 66:9 67:18 | 128:5,17,22 | 58:25 59:18 | 150:5,8 152:4 |
| 96:12 118:16 | 129:11 138:22 | 60:17 61:7 | 153:1 154:1 |
| **better** 19:11 | 142:13,18,19 | 62:12,17 64:2 | **boards** 21:3,5,8 |
| 45:3,9 50:24 | 142:23,25 | 64:21 66:2,21 | 21:9,10,13,16 |
| 62:3 64:22 | 143:2 147:19 | 66:22 69:10 | 21:19 22:2,3,7 |
| 92:11 115:2,5 | 147:19 148:3,5 | 82:13 85:18 | 24:1 60:21 |
| 118:6 146:10 | **blackberry** | 93:4 95:14 | 95:20 116:3,6 |
| **beyond** 54:5,11 | 15:14 | 98:21,23,24 | 137:20 |
| 102:19 117:6 | **block** 56:6 | 99:12,22 100:2 | **bodies** 78:7 |
| 127:19 | **board** 1:6,14 | 103:1 111:21 | **body** 17:21 |
| **bibb** 49:14 | 1:21 4:3 5:12 | 113:11,19,21 | 19:12,14 23:21 |
| **big** 98:10 | 5:17 7:2 8:13 | 113:23 114:1,3 | 78:9 119:14,14 |
| 107:10 | 9:12 13:11,14 | 114:5,7,10 | 126:13 |

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

[boe - carlos]                                              Page 7

| | | | |
|---|---|---|---|
| **boe** 148:1 | **bringing** 59:15 | **businessowner** 13:8 | 121:1,5,9,24 |
| **border** 144:6 | **broad** 87:10,12 | **buy** 26:7 | 129:21,22 |
| **born** 66:19 | 87:13,15,16,23 | **buying** 26:8 | 131:1 |
| **boss** 17:11,14 | **brother** 15:13 | **bynum** 50:4 | **campaigned** |
| **bottleneck** 119:1 | **brought** 68:8 | **byrd** 18:15 | 15:24 |
| **bottom** 118:5 | **bryan** 2:16 7:4 | 69:20 72:16 | **campaigning** |
| 139:21 | 152:1 | 122:11 | 16:1 62:23 |
| **boundaries** | **btyson** 2:19 | **byrd's** 120:14 | 72:20 |
| 18:1,1 143:14 | 152:2 | **c** | **campaigns** |
| 143:16,19 | **bubbled** 102:3 | | 62:22 73:5 |
| **bowens** 2:21 | **budget** 17:16 | **calendar** 28:9 | 129:8 |
| 5:19 | 17:24 20:13,17 | 28:13 | **candidate** |
| **box** 139:1 | 20:18,19,22 | **call** 12:10 | 49:16 50:1 |
| **boxes** 139:5 | 123:21 | 15:12 25:10 | 70:17 86:3,3,4 |
| **boyd** 6:18,19 | **budgets** 20:14 | 41:3 80:24 | 86:11 130:10 |
| **bragg** 84:25 | 20:16 | 109:1,11 | **candidate's** |
| **branch** 68:12 | **build** 70:15 | 137:22 140:22 | 131:1 |
| **break** 10:20 | **building** 58:24 | 142:10 | **candidates** |
| 55:16,19 95:25 | 104:15 | **called** 60:22 | 36:7 48:22 |
| 96:16,20 97:2 | **buildings** 20:9 | 109:6 120:8 | 49:15 50:7,9 |
| 131:8,12 147:5 | 20:11 59:6 | 138:11,21 | 61:5 64:6,6,10 |
| 147:9 | **bunch** 121:1 | **calling** 25:17 | 86:1 126:14 |
| **breakfast** | **business** 15:4,9 | **calls** 27:23 | 142:23,25 |
| 53:18 84:2,4 | 18:22 25:2 | 100:13 132:20 | **capacity** |
| **bridges** 59:5 | 52:5 53:20,23 | **campaign** | 130:19 151:7 |
| 142:7,9 | 86:8 87:11 | 15:25 16:6 | **capital** 70:20 |
| **brief** 11:12 | 95:21 104:5 | 62:23 72:21,23 | 70:21,23,23,25 |
| 37:19,22 38:10 | 111:23,24 | 72:23,24,25 | 71:1 110:22,24 |
| **briefly** 50:10 | 112:1 | 73:1,3,13 | 111:3 |
| 127:14 | **businesses** | 86:17,17,19,21 | **car** 98:19 99:15 |
| **bring** 11:15 | 14:22 15:10 | 88:25 90:18,18 | **care** 88:12 |
| 63:23 86:9 | 24:17 | 103:14 120:3,5 | **carl** 1:22 |
| | **businessmen** | 120:16,17 | **carlos** 2:11 |
| | 53:22 | | 6:25 11:11 |

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[carlos - changed]**                                                Page 8

| | | | |
|---|---|---|---|
| 67:3,13 | **causes** 64:14 | **certificate** | **chairmanship** |
| **carlos.andino** | **ccr** 1:23 150:16 | 150:16 151:1,6 | 33:10 |
| 2:14 | 151:20 | 151:14,21 | **chairmen** 23:20 |
| **carry** 69:5 | **cdl** 60:5 | **certifications** | **challenges** |
| **carter** 58:5 | **ceased** 14:21 | 60:1 | 31:18 |
| 140:13 | **cell** 5:6 68:14 | **certified** 151:5 | **challenging** |
| **cartographer** | **center** 2:11 | 151:13 | 22:1 24:13 |
| 56:11 | 63:2 | **certify** 151:6,10 | **chamber** 14:9 |
| **case** 5:16 7:6 | **central** 117:15 | **cervas's** 144:2 | 14:10,11 28:19 |
| 11:22 12:4,6 | **ceo** 84:25 | **chair** 13:7,22 | 83:24 84:4,19 |
| 12:16 19:6,9 | **certain** 19:22 | 14:10,17,18,22 | 85:1 90:20,24 |
| 29:22 35:2 | 27:12 59:16,20 | 18:17,18 22:15 | 91:3,6,10,14,19 |
| 41:24 56:25 | 71:7 86:7 | 24:5,9,13,15,19 | 91:20,22,24,25 |
| 63:21 70:19 | 116:20 137:5 | 24:21,22,24,25 | 92:2,3,5,8,10 |
| 97:20 101:12 | **certainly** 9:11 | 74:4,7,13,24 | 92:13,14,17,23 |
| 101:14,15,21 | 18:2 19:7 | 75:2,5,7,8,10 | 92:23 93:3,4,8 |
| 103:12,15 | 20:19 23:13 | 75:11,15,20,25 | 93:9,10,13,14 |
| 111:16 117:25 | 27:16 35:25 | 76:1,2,4,6,6,13 | 93:19 |
| 119:12 120:14 | 41:23 43:23,25 | 76:17 77:1,6 | **chambers** 87:5 |
| 122:2,10 128:3 | 46:15 56:17 | 77:10 117:6 | 91:18 93:23 |
| 131:24 132:17 | 69:18 70:25 | 120:3 147:16 | 94:2 |
| 145:11 151:11 | 71:12 73:8 | 148:18 | **chance** 146:10 |
| **cases** 21:8 | 77:8 78:24 | **chairman** 8:13 | **change** 24:9 |
| 59:21 118:12 | 83:10 96:10 | 16:10,11 24:7 | 32:2,5 61:3 |
| 148:19 | 97:19 100:16 | 32:17 68:21,22 | 76:10,15 77:5 |
| **casework** 63:10 | 104:2,15 106:1 | 72:4,24 73:18 | 77:12,18 78:10 |
| 63:13,18 | 106:23 110:18 | 73:19,23 74:21 | 81:10 126:16 |
| **categories** | 111:17 112:13 | 77:16 79:8,9 | 144:24 148:24 |
| 138:23 139:10 | 113:14 122:10 | 79:11,12 81:24 | 153:4,7,10,13 |
| 139:16 141:25 | 123:19 125:3,6 | 93:5 102:25 | 153:16,19 |
| **category** | 132:13,21 | 116:7,13 | **changed** 29:20 |
| 132:25 138:17 | 135:14 136:7 | 122:14,15 | 32:1,14 72:17 |
| **cause** 12:20 | 144:5 | 135:22 141:12 | 75:8 77:1 |
| 73:11 109:24 | | | 108:23 |

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

[changes - comment]

Page 9

changes 29:17 31:19 46:18 152:10 154:6
changing 33:13 33:23 39:10 43:12 75:8 82:7,16 119:14
characteristic 129:25
characteristics 121:15,16
characterize 34:8
charge 138:1
charged 130:10 130:14,22 150:12
charging 83:7
charlie 49:14
chart 58:21
checks 121:1
chef 40:16 42:17
chief 18:20 59:6 76:2,7 113:22 114:1 114:12,18 115:7,9 116:3 116:5,17 117:22
chosen 30:10
chris 16:19
christine 27:10

church 40:11 40:19,25 41:8 41:9 64:15 83:20 85:3 95:19
churches 54:8 54:14
circumstances 58:9,10 111:21 145:5
cities 57:9 71:7 71:8,20,23,24 106:7
citizen 104:13 104:14 107:14
citizens 31:2 44:25 45:1,4 45:10 65:24 80:14 88:9 112:18 118:16 119:4 134:2
city 18:1,4 49:2 49:2,7,18,18,23 50:3,5,7,15 69:1,3 71:9,14 71:21,22,23 72:1 106:8
civic 14:3 28:19 87:5 90:20 121:4,6
civil 1:5,13 2:4 6:5,17,20 30:17

civilians 21:2
clarifications 10:2
clarify 92:22 119:24 133:3 147:25
clarifying 136:17
clark 2:16
clarkhill.com 2:19 152:2
class 93:10
clear 9:23 10:10
clearance 31:13,15,17 32:5,14
cleared 31:24 32:3
clerk 76:3
clients 85:16
clifford 49:12
close 46:17 51:11 89:7 147:24
closed 25:15,18 25:18
closely 132:14 143:18
closest 134:16
cloud 61:15
club 28:19
coach 97:8 99:3

code 50:24 51:5 51:7 102:6,17
codes 18:2,3
colleague 67:18
college 13:5 117:15,16
colonel 16:19
colored 6:7,15 6:22
column 138:18 138:20
combs 150:6,9 150:10
come 27:20 28:10,17,21,22 53:9 120:20 121:10,12 137:9 147:5
comes 17:16 63:14 69:6 71:14 89:15 104:20,21 105:24 106:9 140:21
comfortable 111:11
coming 41:24 123:14 125:20
comma 129:1,4
commenced 5:1
commencing 1:20
comment 25:5 27:25 38:10

Daniel S. Perdue                                     March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[comment - communities]**                                    Page 10

| | | | |
|---|---|---|---|
| 65:14 99:16 103:5 | 86:13 96:6 99:11 100:5 102:13 103:16 104:5,5,6 105:4,5,9,19,21 106:10 107:3 108:23 110:16 110:21 112:3 113:9 120:5,11 122:5 123:7 124:2,13,17,23 125:9,12,23 126:11 130:10 130:15,18,21 131:24 132:4 134:16 141:23 142:1,4 | 117:7 120:14 122:11 126:23 146:20 | 120:20 129:15 131:17,19,21 131:21 132:10 132:12,15,20 132:22 133:6 133:12,15,22 134:1,5,8,22 135:5,6,8,9,13 137:17 144:10 144:17 145:19 146:17 |
| **comments**  66:2 99:3,5,7,8,11 100:3,5,14,19 101:15 102:11 106:25 | | **commissioner's** 142:6 | **commissions** 5:18 20:23 21:22 24:1 99:22 116:4 137:19,23 |
| **commerce**  14:9 85:1 87:5 90:20,25 91:3 91:6,10,14,18 91:19,20,22,24 91:25 92:2,3,5 92:8,13,14,17 92:23,24 93:3 93:4,11,13,15 | | **commissioners** 1:21 4:3,7 8:14 9:13 11:24 14:17 16:25 17:2,5 18:5 20:25 21:3,13 22:14,15 23:5 23:8,12,13,16 24:18 29:3,9 29:10,13 30:24 32:3,13,18 33:13,22 34:2 35:1,9,12,23 36:2,8,13,23 37:8,14 45:12 45:22 46:20 47:9 50:12 52:22 57:2,8 58:7,12,15,18 58:20 59:18 60:18 61:7,14 64:3,22 66:21 66:23 68:19,21 68:22 69:3 71:25 75:3,25 100:24 103:2 111:21 115:25 116:7 118:2,10 118:15 119:13 | **committed** 134:12 |
| **commiss**  22:14 | | | **committee**  2:4 6:5,12,17,20 14:10 |
| **commission** 17:13,17,20 19:21 21:20 22:8,10,11 23:8,21,22,24 26:22 33:6,25 43:15 44:10,18 45:3,6,9 46:2,5 47:8,10 50:10 50:19 51:3 52:5 54:6,11 54:12 57:15 58:16 62:5,18 63:23 66:3 74:17 76:6,16 77:19 78:10 79:5,8 86:7,11 | **commissioner** 13:12,17 14:13 16:10 17:11 18:13,24 19:3 19:17 21:5,7 38:17,25 39:21 45:6,12,25 46:21 52:11 54:5 55:7 60:7 61:21,23 64:25 65:8 68:18 69:20,20 70:21 71:16 72:3,4 72:16,23 80:23 99:3,5,15 101:7 102:4,19 102:23 116:15 | | **committees** 34:24 |
| | | | **common**  122:4 |
| | | | **communication** 100:21 126:19 |
| | | | **communicati...** 42:5,9 126:1 126:11 |
| | | | **communities** 54:7,13 55:2 87:11 143:17 143:20 |

Veritext Legal Solutions
800.808.4958                                                        770.343.9696

**[community - constitution]**

**community** 16:14,22 23:14 25:3,4,7 26:15 27:12,16,21,24 33:13,22 34:1 37:17,19,24 39:23 40:1,5 40:10 52:23 53:1,4,24 54:21 55:8,11 61:23 62:3,8 63:10 65:11,14 65:15,18 71:10 71:14 81:9,13 82:6,23 86:5,6 86:14,15,23,24 87:2,8,8 88:9 94:20,23,24 95:3 96:12,13 100:9,11,12,15 100:22,25 107:24 108:8 109:18 111:8

**compensated** 19:1,1,2

**compiled** 42:13

**complain** 104:9 104:13,14

**complains** 110:5

**complaint** 37:18 40:2,8 69:10,12 104:19 108:4

108:11 109:18 130:20

**complaints** 104:4,8,11,23 107:14 108:10 108:18 111:13 111:17 113:15 130:9,12,13,25

**complete** 9:22 41:18 63:6 70:6 134:3 146:16 154:8

**completed** 152:16

**completely** 10:8,9 88:7

**comply** 25:22 124:9 125:6

**composition** 18:7 93:22

**computers** 15:6

**concept** 31:12

**concern** 51:7 63:24 70:3 71:14,15,21 101:8,11,13,18 102:3 103:6,20 103:23

**concerned** 46:1 46:3 64:25 65:9

**concerns** 20:1 27:22,25 44:11 44:19,25 45:4

45:10 50:18,22 51:4 65:7 71:11 100:10 100:11,12,13 100:16,23 101:1 103:18 107:24 108:19 111:8,9,10 113:16

**conclude** 30:14

**concluded** 125:16 149:19

**concluding** 1:20

**conclusion** 39:15 125:18

**conclusions** 41:25 56:12,13 56:17,19 125:21 126:22

**condition** 8:24

**conditions** 20:9

**conduct** 126:11

**conducted** 33:14 86:16

**conduit** 118:13

**conference** 6:8 6:16,23

**confident** 112:15,17

**confines** 144:14

**confused** 100:5 146:22

**connect** 87:7

**connections** 86:5 87:19,22 87:24 90:19,24 118:22

**consent** 124:6,9

**consider** 86:10 92:16 102:6 115:10,12 140:18

**considered** 9:11 69:1 137:20 145:12

**considering** 19:4 24:14 41:24 54:6,12 55:5 95:13 140:16

**constituent** 63:9,13,23,25 69:21,22 70:3 71:4,4 100:13 100:25 101:12 101:18 102:20 102:21 103:6 103:18,20,23 111:8 118:6 134:12,13

**constituents** 42:6 102:14 113:16

**constitution** 23:24 78:23 116:11

**[constitutional - county]** Page 12

**constitutional**
17:23 20:21
57:10 132:23
**consult** 15:9
52:25 53:11,20
**consultant**
120:8
**consultation**
25:16
**consulting** 15:9
**consume** 19:4,5
**consumption**
101:25
**contact** 25:9
91:22,24 92:2
92:5
**contacted**
150:6
**contacts** 83:10
**contained**
20:18,22
139:17
**contemplated**
114:24
**contested**
120:16
**context** 85:10
140:19
**continue** 5:8
**continued**
102:6
**contract** 150:7
150:9

**contracts** 26:13
**control** 20:7
139:13 141:22
**conversation**
37:22 83:15
101:9 103:11
105:2 109:7
**conversations**
5:6 21:24
27:24 28:3
37:20,25 81:20
81:22 82:5,6
82:10,10
100:18 102:13
109:8 110:12
**coordination**
124:15
**copies** 152:14
**corporate**
126:13
**corporations**
120:25
**correct** 11:7
29:4 32:19,22
40:14 61:15
64:23 67:14
72:21 74:4,8
74:25 77:3,20
81:2 83:3,4,15
83:22 85:19
87:25 92:21
113:1 126:25
151:9 154:8

**corrected** 71:20
**corrections**
154:6
**correctly** 25:24
112:23
**cost** 120:5
**council** 49:2,7
49:18,23 50:3
50:5 150:5
**councils** 50:8
**counsel** 2:1
5:11 6:1,10,19
10:2,15,17
85:8,11,14
125:20 126:2
126:11,19,19
151:10 152:14
**count** 107:16
**counter** 12:9,10
**counties** 23:2
23:10 116:4,9
116:14,20
117:19
**counting** 94:7,7
**counts** 105:25
**county** 1:6,14
1:21 4:3,7 5:12
5:17 7:2 8:13
13:2,3,9 15:15
16:8,15,21,24
16:24 17:3,5,6
17:11,13,18,20
17:22 18:3,18
18:21,22 20:9

20:11,12,18
21:19 22:19
23:4 24:5
25:17 26:10
27:13 28:6,12
29:10 30:1,6
30:24,25 31:3
32:22 33:2,22
34:4,12 35:22
36:12,22 37:2
37:7,13,17
40:1 41:6,18
43:15,16 44:2
44:11,19,25
45:5,11,17,21
46:1,3,4,5
47:10,14,20
48:3,5,6,11
49:1 50:10,11
50:11,19,19
51:3,15,18,23
52:1,4,7,12,22
53:12,21,25
54:8,14 55:15
57:2 58:8 60:2
60:18 61:8
62:18 63:10
64:13,22 65:11
65:25 66:17
68:10,16,19,20
73:22 75:4,23
75:23 76:3,3,6
77:1,20,24
79:5,10 80:1

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[county - day]**

Page 13

80:19 81:11
84:3 86:8
87:12,17 88:7
88:10,11,12,14
88:18,20,22,23
89:2,2,5,6,8,9
89:10,12,16,24
90:2,9,24
91:18 93:23
95:4,11 96:1,2
96:5 97:3 98:5
98:16 99:10
101:22 103:1
105:16 106:3,4
106:5,7,19
107:20 108:15
108:21,25
110:2 111:4,14
111:21 112:5,8
112:15,16,19
112:21,22
113:6,10,17
114:20 115:10
115:25 116:18
116:21,23
117:20,22
118:3,12,16,24
119:9,10
120:11,20
121:10 122:19
123:4,4,18,23
127:9,12,13
128:10,15,18
128:23 129:15

129:19,23
132:18,22
133:16 135:5
136:5 139:19
140:5,6,8,22
144:9,22,24,25
145:15,19
146:9 148:17
150:3 151:3
152:4 153:1
154:1
**county's** 20:17
42:6 83:24
84:2,3 105:16
134:15
**countywide**
74:13 75:10
106:11 112:24
143:5
**couple** 51:5
53:16 55:13
81:23 95:24
**course** 10:4
26:7 61:12
63:22 99:7
103:14 144:11
**court** 1:1,9
5:14 7:8 9:7,16
9:18 10:6,11
12:20 123:25
124:7 150:5,6
150:6,9,10
151:5,14

**courtney** 1:3
5:12 152:4
153:1 154:1
**courtroom**
85:11
**coverage** 97:11
97:24
**covered** 25:21
72:5
**cox** 101:4
132:14
**crashed** 12:20
**crazy** 22:22
**created** 143:17
**creates** 119:1
**criticism** 26:17
**cross** 3:4,5 8:4
67:10
**cs** 152:15
**curious** 57:3
**current** 8:9,12
13:6,22 18:7
30:9,18,22
31:24 32:19
33:9,10 50:11
62:10 147:18
**currently** 16:12
16:18 31:9
48:6 50:1,3
66:9 72:15
76:12,17 77:7
119:21 142:19
142:21 143:2
147:20,24

**curtis** 49:13
**customary**
150:12
**cv** 1:5,13 5:16
**cycle** 16:12
80:25,25
146:16
**cycles** 16:9

**d**

**damaged** 106:1
**dan** 5:11
**daniel** 1:18 3:2
8:1,8 152:5
153:2,24 154:2
154:4,12
**daryl** 44:6
53:16,19
**data** 41:24
42:13 56:14,16
57:16 107:16
109:13,13,14
121:20
**date** 153:24
154:12
**dates** 35:25
**david** 6:18
**davis** 16:19
**dawn** 27:8
**day** 11:1 19:15
19:15 51:6
68:9 76:4,4
132:5,5,19
133:16,16,17

Daniel S. Perdue                                March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[day - different]**                                    Page 14

133:17 136:7
151:15 154:15
**days** 152:16
**dc** 2:5,13
**deadlines**
124:14
**decades** 34:13
**decide** 13:14,21
13:24 21:21
26:4 28:8
105:14 136:13
**deciding** 13:15
13:18
**decision** 24:15
77:18 88:13
119:3 146:5
**decisionmaki...**
109:13
**decisions** 19:20
45:7,13 58:8
59:24 107:15
107:17 108:3
110:23 112:2
113:14 114:17
**declare** 154:4
**decline** 85:7
**declined** 85:6
**decree** 124:6,10
**dedicated**
34:25 133:22
**deemed** 154:6
**deep** 49:3
**deeper** 74:17

**defendants** 1:7
1:15 2:15 7:5
**define** 78:3
79:23 86:3
87:14 89:11
93:25 94:16
95:5
**defined** 106:21
**defining** 52:6
89:4 108:21
**definitions** 10:2
**definitively**
82:9
**degree** 15:6
**delivering** 31:1
**demands** 72:10
**demographic**
140:4,5
**demographics**
51:22,25
**demonstrated**
86:6
**dense** 57:19,22
**department**
32:4 33:14
58:6,11,11,15
58:19 59:14
63:20 68:10,12
69:11,15,24
70:12 82:2
104:17 105:24
109:6 110:8,12
110:18,25
112:19 115:15

118:4,9 123:23
134:21 135:7
136:2,5,16,23
137:4,5,15
138:3,4,8,9,11
140:11,14,17
142:9
**departments**
68:5 69:4
137:4 141:17
141:19,21
**depending**
28:15
**depends** 79:21
89:13
**deponent**
152:13 154:3
**deposed** 9:3
**deposing**
152:13
**deposition** 1:17
5:11,17 8:22
10:4 11:16,21
61:12 64:20
65:7 85:11
149:19 150:6,7
150:8
**depth** 19:23
**derrick** 49:13
**describe** 68:2
78:19,22 94:22
101:17 105:8
107:7

**description** 4:2
132:2 133:14
134:4
**desire** 26:11
34:1 37:21
78:9,16,20
81:15 86:6
88:17
**desires** 78:20
**despite** 92:20
93:12
**detail** 117:10
**details** 43:24
**determinations**
107:4
**determine**
106:2 107:12
113:13 119:2
**determined**
115:4
**determining**
74:18 113:9
**developer**
51:13
**development**
16:20
**differ** 18:23
**different** 15:5
19:16 20:19,20
20:20 21:22
23:11,17,22
37:21 38:19
39:16 45:21,22
56:12 60:23

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

[different - dollars]                                          Page 15

| | | | |
|---|---|---|---|
| 62:17 68:17 69:5,11 74:2 75:21 94:7 114:24 115:1,7 116:1,9 118:22 118:23,23 132:23 135:2 143:7 | 75:1 139:8 143:13,22 | **disparity** 140:1 **dispersed** 107:5 **distributed** 106:4 **distribution** 59:4 | 48:17,17 49:20 49:21 124:1,1 142:16 143:14 |
| **differently** 19:1 114:18 115:10 115:13 | **disagreed** 56:13,18 143:8 **disapprove** 46:17 **disclose** 126:1 **disclosure** 121:7 150:1,5 **discount** 150:13 | **district** 1:1,1,9 1:9 5:14,14 31:19 35:7 45:25 46:1 48:1,1,4,20 49:4 56:5 64:2 65:1,9 74:19 | **diverse** 91:12 93:19,24,25 94:24 95:3 107:19 **diversify** 60:19 **divide** 68:5 **dividing** 90:4 **division** 1:2,10 5:15 |
| **difficult** 25:8 40:22 60:12 63:5 81:21 82:8,20 84:11 104:12 139:18 | **discovered** 32:2 **discrimination** 31:18 61:8 97:3,14 98:16 99:13 145:14 | 74:21,22 85:20 119:8,19,22 127:17,18,23 128:2,2,3,5,5 142:13,18,22 143:18 144:2,4 144:7,21,21,23 147:15,16,20 148:2,13,16,23 | **document** 32:10 58:2 **documents** 10:3 12:14 61:18 |
| **digital** 15:11 **direct** 3:6 84:12 129:8 141:10 141:21 142:8 | **discriminatory** 145:20 **discuss** 39:7 43:1 | | **dog** 77:14 **doing** 14:1 21:15 48:5 63:9 66:9 68:13 101:16 |
| **directed** 113:19 **directly** 82:21 99:1 128:16,21 129:11,14,18 | **discussed** 35:6 39:6 40:13 61:11 67:19 **discussing** 61:20 | **districted** 37:22 38:11 39:17 57:4 65:7,16 82:24 **districting** 39:6 | **doj** 37:18 40:2 64:16 65:11,13 65:15 81:9 83:20,22,23 84:1,5,6,7 85:3 124:22 126:20 127:1 128:1 |
| **director** 58:22 58:22,23 59:2 59:3,4,5,5,6,8 68:11 136:9 | **discussions** 33:12,21 61:22 115:15,16 **dismissed** 9:9 | 43:2 62:11 143:23 | |
| **directors** 93:4 **disadvantage** 56:22 | **disparities** 57:1 57:5 108:19 111:14,18 | **districts** 24:2 34:13 43:4 44:3 47:15,21 | **doj's** 33:24 38:3 **dollars** 74:18 106:18 110:19 |
| **disagree** 29:24 31:21 35:20 56:22 57:13 | 113:16 139:22 | 48:6,15,16,16 | 113:13 120:10 |

Veritext Legal Solutions
800.808.4958                                              770.343.9696

**[dollars - elected]**

120:13,16 130:5

**donation** 121:6

**donations** 120:19,19 121:9,12,18

**donors** 121:24

**dozen** 53:19

**dozier** 143:12

**dr** 12:7 37:20 38:9,17 39:2 39:14 40:8,17 40:20 41:11 43:7 51:6 52:9 53:19 54:4 81:14,16 82:15 85:5 89:21 96:6 144:1

**dramatically** 111:11

**draw** 56:4 64:1 89:5

**drawers** 143:13

**drawn** 126:22 143:18

**dressing** 97:21

**drew** 144:2

**drill** 39:18

**drive** 8:10 46:18 61:16 89:20 107:17

**driven** 109:13

**driver** 1:3 5:12 12:4 122:21

152:4 153:1 154:1

**due** 144:11

**duly** 7:13 8:2

**dunbar** 68:8 89:18 132:14

**dunne** 4:4

**duties** 76:12,17 76:17 105:4 132:1 133:11

**duty** 132:19

**e**

**e** 25:9 27:23 59:19 63:19 100:13 101:2,7 103:13,13,14 104:1,2 105:1 110:9 141:16 149:11,12 153:3,3,3

**earlier** 58:17 67:12,24 71:20 72:19 74:6,23 76:10 81:8,14 83:19 85:17,25 95:12 96:1 100:8 106:21 120:18 131:16 142:12

**early** 13:19,23 29:13,20 30:7 32:2 124:23 126:20

**easier** 123:17

**easily** 74:21

**easy** 104:14

**echo** 14:5

**economic** 121:17

**educated** 47:7

**education** 15:5 48:11,20,23 57:3 60:1 85:18 100:2 113:7,9,10,11 113:16,20,22 113:23 114:1 114:11,23 142:13,16,19 142:20,24 143:1,3,4 147:21,23 148:7

**educational** 56:25 57:4 116:24 117:2

**eeo** 4:8 138:14

**eeoc** 4:8

**effect** 31:25

**effective** 31:1 44:12,20 45:16 62:12 64:18,19 77:22,23 78:3 78:4,6 79:18 80:7,13 114:11 119:18,18

**efficient** 117:21

**efforts** 60:19 81:17

**eggs** 83:24 84:2 84:3,4

**either** 15:20,22 16:23 39:5 70:13,22 74:1 92:25 93:1 124:19

**elaborate** 89:14

**elaborating** 115:13

**elberta** 89:19

**elect** 23:16 24:5 24:13 50:7

**elected** 16:23 17:10,12 18:19 19:9 21:18 23:8,12,19,21 24:2,7,20,25 29:3,9 30:25 34:2 36:12,22 37:7,13 48:23 58:13 66:23 74:7,13,19,24 75:4,6,11 76:1 76:8,16 77:2,2 77:11,24 80:24 80:25 86:1 90:18 92:19 114:3,18,19,21 114:25,25 115:7,11,23

Daniel S. Perdue                                      March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[elected - esq]**                                           Page 17

116:5,7,13
117:22 118:21
119:4 122:19
142:24,25
143:5
**electing** 23:18
75:15 78:4,6
142:19
**election** 13:18
15:20,23,24
16:2,3,9,12
23:14 24:20
31:19 33:23
39:11 43:12
48:13,25 49:1
49:17 50:4
62:18 64:17
65:3 67:25
77:20 79:13,17
79:24 80:5,7
80:13,16,19
81:10 82:7,24
85:18,21,23
87:21 120:7
121:11 124:14
127:13 130:3
145:25 146:2,5
146:16
**elections** 1:6,14
5:13 7:3 16:7
16:13 24:5,8
29:2,4,6,17
33:13,23 34:10
38:11 45:15

47:14,20 48:10
56:23 59:1
64:21 78:25
80:1 81:2
120:2 123:4,5
123:7,9,12,16
123:16,18,19
123:21,24
124:20,21
128:14,15,20
130:8,14
146:11,12,20
147:20 152:4
153:1 154:1
**electorate**
78:17,21,23
**electric** 83:7,13
**elevated** 109:16
**emory** 111:1,2
111:4,6 112:12
**emphasis** 56:25
**employ** 134:15
**employed**
133:13
**employee** 60:2
104:8,10
115:24 116:2
117:13 118:3,5
123:20 131:19
132:11 136:4
136:15 137:2,8
137:8,14,15
140:25

**employees**
104:6,8,10
131:20 132:3,6
132:18,22
133:1,10,21
134:3,20
135:15 136:19
136:21 137:5
139:10,14,22
140:5 142:3,6
142:8,10
**employment**
57:15 61:8
79:10 140:10
**employments**
140:10
**ems** 111:4,5,10
111:12 112:15
112:17
**enact** 124:8
**encompassed**
134:4
**encourage**
118:1 133:18
**endeavor**
137:12
**endeavored**
112:20
**endeavors** 17:8
**endorsement**
16:18 122:15
122:15
**endorsements**
16:14 122:4,12

122:17
**enforcement**
50:24 51:5,8
**engage** 109:17
110:23 125:12
**engineering**
105:24 107:16
108:2,7 109:6
109:21 110:7
110:12
**enlarged** 77:10
**ensure** 25:17
25:20 60:23
140:9
**entail** 18:17
**entailed** 55:14
**entered** 111:16
**entire** 13:3 46:3
55:3 132:11
**entirely** 11:5
79:4 100:1
**entity** 123:3
**envisioned**
76:18
**epithets** 97:10
99:2
**equal** 57:14,15
140:9
**equivalent** 48:5
**errata** 152:11
152:13,16
**esq** 2:3,3,7,11
2:16 152:1

**[essentially - external]**                    Page 18

**essentially**
18:20 56:21
59:25 65:6
68:9,14 74:1
116:7 123:17
144:2
**estab** 32:13
**establish** 25:14
51:9 103:1
**established**
22:16 29:12
32:18 33:9
37:2 70:24
78:24
**estimate** 41:1
53:19
**et** 1:3,6,11,14
7:2,3 152:4,4
153:1,1 154:1
154:1
**evaluate** 59:15
108:11
**evaluated**
109:9
**evaluations**
136:10
**evening** 46:24
47:3
**event** 16:6 63:1
63:2,7 72:21
72:23,25 92:13
151:12
**events** 28:6
35:6 62:23

73:3 93:8
120:19
**eventually** 93:4
**everybody**
78:15 108:5
133:13
**ex** 21:6 114:5
**exact** 35:24
43:24 64:14
95:7 99:7
**exactly** 53:18
79:2 105:8
146:1
**examination**
3:4,5,6,7,8 8:4
67:10 141:10
147:12 148:10
**examinations**
3:1
**example** 15:12
23:12 24:19
28:11,19 60:4
66:14 69:2
71:7 78:13
101:21 104:12
106:22 107:22
115:14 116:18
**examples** 21:10
57:3,11,13
60:7
**exception**
111:2
**excuse** 6:13
31:18 44:8

64:9 147:23
**executive** 9:12
14:10 18:20
19:14 25:19
76:3,7 113:22
114:1,12,18
115:7,10 116:3
116:5 117:22
**exercises** 142:1
**exhibit** 4:3,4,6
4:7,8 22:18,20
32:6,8 35:3,5
43:19,20 57:16
57:17 138:14
141:13 142:14
**exhibits** 4:1
**exist** 25:19 34:5
112:10
**exists** 56:4
78:20 110:2
**expanded**
77:15
**expansive**
77:16
**expected** 21:7
131:5 141:1
**experience**
26:12 56:9
59:16,22 60:8
79:9,10 114:23
116:24 117:7
117:12 120:4
**experiencing**
30:6

**expert** 11:22
12:2,3,5,5,7,8
12:10 30:5,11
30:13,14 34:6
34:9 42:2
51:19,21 56:7
66:13 97:13,16
97:17,20 98:11
122:20,21
125:17,22
126:10 143:7,9
143:12
**expert's** 97:7
**experts** 12:6
41:22 56:9,11
57:7
**explain** 75:22
**explanations**
10:3
**explicitly**
116:10
**explore** 39:19
**expose** 86:23
**express** 27:21
64:16 65:2,5
**expressed**
64:20 65:19
**extends** 135:11
**extensively**
48:2
**extent** 125:25
128:14
**external** 61:5

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

[extraordinary - follow]

extraordinary 59:20

extreme 89:9

eyes 108:12

**f**

face 27:24,24 28:3,3 63:22 63:22 100:18 100:18

facebook 100:18

fact 66:22 114:19 118:1 125:4

factor 145:5

factors 96:4 115:4 145:2,7 145:9,11

fails 73:1 152:18

fairly 57:19 60:20 143:19

fairness 107:4 107:6,7

faith 13:25 86:16 87:11

familiar 22:14 22:24 23:1,4 29:21 31:12 32:10 67:14 85:19 116:20 148:6

far 27:1 35:14 65:17 74:16 97:25

farm 15:14

fashion 21:6 27:5 34:2 103:8 104:20

father 32:21

favor 39:10 43:12,17 44:3 60:25 61:2 74:21

feasibility 127:5,7 148:25

feasible 144:22 144:25 147:15 147:16 148:13

february 4:7 44:1

federal 31:19

feedback 14:5 25:3,4,11 27:12,15

feel 13:25 14:1 26:21 27:17 61:3 62:3 85:12 88:12 89:2

feelings 119:6

feels 101:10

felt 111:11

female 138:22

females 95:2

fickle 78:24

field 87:12,14 87:15,16

fifth 44:4

filed 5:13 40:23 41:5 85:9 124:23 130:13

fill 21:7 132:19

financial 139:12 150:11 150:12,13

financially 5:23

find 22:1 53:3

fine 147:6 149:11

finish 10:7

finished 11:12 142:14

fire 59:6 136:8

fired 137:10

firing 141:22

firm 23:23

first 8:2,18 10:22 13:14,21 15:2,3,24 17:9 17:10 32:11 40:11,19,25 55:23 58:21 64:15 65:2 67:25 73:18 81:23,24 83:20 85:3,14 101:3 101:6 139:25

fish 63:1

fit 139:20

five 24:20 46:2 48:15 70:20,21 70:22 75:25 96:15 110:21 118:21 128:1,2 128:3 131:7 144:20,21,23 147:5,14 148:16

fixed 57:4

fledged 73:13

fleming 2:7,8 6:9,9,9 147:21

fliers 92:11

flow 118:14

flyer 92:15

focus 66:21 82:4 88:14 90:23 91:6 105:13 113:5 116:17

focused 88:6 112:4,7,9 113:2

focusing 57:21

folder 61:16

folks 109:21

follow 41:11 61:11 67:17 85:6 104:1 136:15 137:12 138:20

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

**[followed - generally]**

Page 20

**followed** 41:13
137:3
**following**
109:16 139:4
150:5
**follows** 8:3
47:8
**force** 16:20
20:23 55:1,2,6
55:8,11 78:16
78:20 130:7
143:22 144:3,5
144:6,11,12,14
144:18
**forces** 20:24
**foregoing**
151:8 154:5
**forget** 56:21
126:6
**form** 24:10
30:3,20 32:19
33:10,16 39:12
41:20 42:10
44:13 47:17
50:20 54:16
61:25 62:14
63:11 65:21
66:24 69:16
70:4 72:7
77:25 79:19
82:18 84:10
91:1 93:16
94:13,18 107:8
107:25 114:13

117:23 119:20
121:19 124:4
128:24 130:11
131:2 139:23
**formal** 103:17
104:4,7,8,16,24
130:13,17
**format** 29:18
**fort** 117:16
**forth** 67:22
85:10
**forums** 28:1,2
54:21
**found** 112:6
**four** 12:4 19:9
60:14 79:5
80:23 100:10
100:15 110:21
128:2,2,4
147:15 148:12
148:22,22
**fourth** 44:4
**frame** 35:25
36:4 80:15
81:19
**framed** 109:7
**framers** 78:22
79:2
**framework**
78:25
**frankly** 17:12
**free** 121:8
126:3

**frequent** 92:11
92:15 118:24
**frequently** 17:9
19:23 26:17
46:7 52:10
59:19 109:17
109:24 115:14
123:13
**fresh** 108:6
**friday** 12:11
**friendships**
95:19,23
**front** 41:8
**full** 8:6 18:19
19:1,8 24:18
32:17 68:13
73:13 75:3,8
75:24 76:8,15
76:17 77:2,11
77:15 116:13
116:16 132:19
139:1,2 148:18
**fully** 8:21,25
12:12
**function** 24:9
138:15 139:12
139:17,20,22
141:16,17,25
**functions** 57:23
92:10
**fund** 20:22
70:15 110:18
112:20 123:19

**funding** 17:8
17:16 20:12
52:12,16 70:24
110:17 111:3
111:15 113:10
113:12
**fundraiser** 63:8
**funds** 20:19
110:15 112:2
112:13 140:25
**further** 39:18
138:25 151:10

**g**

**gail** 18:13
**galleria** 98:19
**gaps** 51:11
**garmon** 40:11
**general** 15:20
15:23 17:21
20:22 30:16
36:4 37:24
50:24 55:6
68:19 94:4,6,8
97:17 101:17
104:19 105:23
121:9,15
130:25 137:3,9
137:20 139:13
140:17
**generally** 28:12
53:8 56:5 61:1
61:1 64:6,10
69:7 71:4

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[generally - group]**                                    Page 21

| | | | |
|---|---|---|---|
| 101:19 113:12 120:4 130:2 132:7,11 139:13,16,22 140:3 144:10 | **gingles** 40:14 41:7 55:25 56:2 64:1 145:1,5,8 | 35:10 55:17,20 55:23 57:14,23 61:5,10 62:22 64:1 67:5,17 | **governance** 80:14 144:24 |
| **generated** 12:6 89:22 104:21 | **give** 9:21 10:9 10:10 19:6 | 67:18 69:21 79:16 82:4 | **governed** 23:12 **governing** 23:18 119:14 |
| **gentleman** 98:18,18 99:2 101:3 | 41:2 84:13 94:4,5,8 102:17 107:22 | 84:14 88:10 96:18,21 97:12 100:10 104:12 | 119:14 **government** 17:22 31:20 |
| **geographic** 87:12,13,15,16 87:24 89:6 | 115:14 138:7 **given** 57:12 150:13 154:9 | 106:24 109:20 117:10 118:25 126:5 128:13 | 33:2 118:22 128:10 130:5 140:8 148:17 |
| 107:5,19 121:21 142:25 | **go** 5:9 10:16,21 11:12 12:21 | 131:10,13 136:9 142:10 | 148:20,24 **governmental** |
| **geographically** 91:6 103:21 106:13 121:17 | 15:25 19:20 27:3 35:14 41:7 52:4 53:3 | 146:19 147:4,7 147:10 149:4 **good** 5:2 6:13 | 117:12 **governments** 78:7 117:21 |
| **georgia** 1:1,9 1:22 2:9,18 | 59:19,20,25 63:1 67:4 70:17 71:16 | 7:4 11:14 21:10 26:21 | **governor** 80:24 **grace** 50:4 |
| 5:15 6:7,16,22 8:11 21:20 | 90:5,6,12,13 95:19 101:3 | 28:20 33:4 46:3 86:17 | **grade** 60:6,9 **grant** 51:9 |
| 23:2,5,8,10,23 45:23 51:9 | 107:17 108:11 109:25 110:5 | 88:25 90:17,18 94:1,3,10,17 | 55:12 **graphs** 57:23 |
| 55:12 56:23 57:7 116:10,13 | 129:2,7 131:10 139:18 149:10 | 131:6 136:17 137:11 141:3 | **great** 67:24 68:7 90:14 |
| 117:14,15 150:2,5 151:2 | **goal** 80:15,19 81:5 | **gordon** 36:17 **gotcha** 90:11 | 114:19 **greater** 58:17 |
| 151:3,6,14 **georgia's** 25:22 | **god's** 14:1 **goes** 101:13 | 93:12 98:20 104:22 105:3 | 59:11,12,13 95:10 120:24 |
| **gerald** 2:21 5:19 | 111:22 112:16 **going** 5:3 12:21 | 106:9 109:17 **gotten** 60:5 | **greatest** 106:19 106:20 107:1 |
| **getting** 34:9 118:11 133:7 | 12:21,24 15:16 26:21 28:20,21 | **gotwalls** 18:12 126:23 | 107:13 **grocery** 50:23 **group** 28:15,19 |

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

[groups - honestly]

Page 22

**groups** 54:9,15
**guess** 28:24
  32:5 71:2
  138:21
**guidance** 76:4
**guys** 127:1,4

**h**

**h** 2:7,8 6:9
  153:3
**half** 53:19
**hall** 55:12
  73:22 102:7,10
  126:24
**halls** 25:10
  27:19 28:1
  100:13 103:9
  103:10
**hand** 7:12 67:3
  151:13
**handle** 19:15
  19:18,18,22
  20:2 104:20
**handled** 68:4
  104:16 124:19
  137:15
**handling** 137:1
**hands** 73:9
**hang** 76:23
**happened** 35:2
  66:2 97:23,25
  99:15 106:24
**happening** 28:3
  107:1,19

115:18
**happenings**
  28:11
**happens** 11:1
  47:12 61:1
  63:25 69:9
  85:10 104:1,25
**hardware**
  79:25
**harmony** 96:9
**harvey** 53:16
**head** 10:13
  36:8,9 58:11
  70:13 81:22
  99:20 118:4
  136:2,5,16
  137:15 140:14
  142:9 146:22
**heads** 58:12,15
  58:19 63:20
  68:10,13
  115:15 118:9
  134:21 135:7
  136:23 137:4,6
  140:17
**health** 21:16,17
  110:15,16,19
  110:22 111:1
  112:20
**healthcare**
  111:1,2,5,6,7
  111:14,20,23
  111:24 112:7
  112:11,14

**hear** 25:6 45:24
  131:23
**heard** 32:25
  62:3 86:12
  96:10 111:17
  117:24
**hearing** 9:10
**heavily** 108:2
**held** 8:17 62:25
  63:1,2 72:15
  146:20
**help** 17:24
  110:18 111:25
**helped** 93:9
  96:9 112:3,11
**helpful** 61:24
**helps** 79:14
**hema** 59:7,7
**hereto** 154:7
**hesitate** 41:3
**heyward** 2:3
  3:4,7 6:4,4 8:5
  13:1 25:1 30:8
  31:4 33:20
  39:24 42:1,14
  44:17,23 47:19
  48:7 51:2
  52:20 54:20
  55:22 62:9,19
  63:16 66:1
  67:2 147:4,13
  147:22 148:8
  149:15

**hicks** 36:17,18
**high** 97:20
  99:21,23 100:6
  120:13
**higher** 59:17,20
  60:9
**highway** 89:24
  90:3,10 105:18
  144:6
**hill** 2:16
**hire** 26:10,11
  59:14 135:13
  135:15
**hirebridge**
  60:22
**hired** 58:17
  59:10,12,13
  60:9 114:2,22
  135:7,17,19,21
**hires** 61:3
**hiring** 58:8
  60:18 125:20
  135:5,9,10
  138:5 141:22
**histories** 31:17
**history** 56:24
  66:13 79:2
  96:7 148:6
**hold** 13:6 62:23
**holmes** 49:12
**home** 4:6 38:12
  81:16 83:18
**honestly** 63:3
  145:25

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

[horror - includes]

Page 23

| | | | |
|---|---|---|---|
| **horror** 45:24 | 65:11,25 66:17 | 139:19 140:5 | **impact** 54:25 |
| **hospital** 21:17 | 68:16 75:4,23 | 140:22 144:9 | 55:5 123:17 |
| **host** 54:21 | 77:20,24 79:5 | 144:22,24,25 | **implementati...** |
| 103:13 | 79:10 80:1,19 | 145:15,19 | 31:20 |
| **hosted** 72:19 | 81:11,16 87:12 | 146:9 148:17 | **implied** 132:16 |
| 72:20,24,25 | 87:17 88:7,9 | 150:3 151:3 | **important** |
| **hosting** 28:15 | 88:23 89:1,2,5 | 152:4 153:1 | 24:25 71:19 |
| **hotel** 97:10 | 89:6,8,9,10,12 | 154:1 | 74:7,10,12,12 |
| 99:2 | 89:16,24 90:9 | **hr** 58:5 | 74:14,15 120:1 |
| **houk** 2:3 6:13 | 90:24 91:18 | **huh** 52:17 | 143:15 144:8 |
| 6:14 | 93:23 95:4,11 | 80:12 88:24 | 148:19 |
| **hour** 18:21 | 96:1,2,5 97:3 | 110:3 116:19 | **impression** |
| 41:1 | 98:4,16 99:10 | 124:18 127:15 | 93:18,21 94:22 |
| **houston** 1:6,14 | 101:22 103:1 | **hundred** 35:16 | **improve** 20:10 |
| 1:21 4:3,6,7 | 105:16 106:7 | 120:10 146:1 | **inaccurate** |
| 5:12,17 7:2 | 107:20 108:15 | | 72:18 |
| 8:10,13 13:2,3 | 109:2,4,15 | **i** | **incidences** 98:2 |
| 13:9 15:14 | 110:2 111:4,6 | | **incident** 97:12 |
| 16:8,14,21,24 | 111:21 112:11 | **i.e.** 58:12 | 98:1,18 99:1 |
| 16:24 17:3,5,6 | 112:13,15,16 | **idea** 26:18,21 | 99:14,16,22 |
| 17:18,19,22 | 112:19,21,21 | 90:14 93:14 | 100:6 |
| 18:3,18,21,22 | 113:6 114:20 | 96:4 121:17 | **incidents** 97:2 |
| 21:19 22:19 | 115:10,24 | **ideally** 140:24 | 97:5,14 98:6 |
| 24:4 29:9 30:1 | 118:3,16 119:9 | **identification** | 98:14,20,25 |
| 30:6,25 31:3 | 119:10 120:11 | 22:21 32:9 | 99:12 |
| 32:22 33:22 | 120:20 121:10 | 35:4 43:21 | **include** 46:4 |
| 34:4,12 35:17 | 122:19 123:4 | 57:18 | 54:3 112:16,21 |
| 36:12,22 37:2 | 123:18 127:9 | **imagine** 91:24 | 126:7 141:25 |
| 37:7,13,17,23 | 127:12,13 | 121:23 129:21 | **included** 12:4 |
| 40:1 43:16 | 128:10,15 | **immediate** | 111:19 126:18 |
| 44:25 45:5,11 | 129:15,23 | 101:19 | 129:22 141:17 |
| 45:17 48:5,11 | 132:18,22 | **immediately** | 145:5 |
| 51:22 57:1 | 133:16 134:15 | 101:13,16 | **includes** 44:24 |
| 63:10 64:13,22 | 135:5 136:5 | 125:9 | |

Veritext Legal Solutions

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

[including - involved]

Page 24

| | | | |
|---|---|---|---|
| **including** 44:25 129:4 133:25 | 120:22,24 121:10,14,16 121:25 138:5 140:16,18 | **instructions** 9:14 11:13 67:21 | **interpret** 134:24 |
| **increase** 60:2,6 | **ineffective** 75:16 114:11 | **instructs** 10:18 | **introduce** 7:8 22:18 32:6 35:5 43:19 57:16 |
| **increased** 111:3 112:17 | **informal** 103:17 130:17 | **integration** 66:14 | **introduced** 29:7 68:10,12 |
| **increasing** 111:12 112:10 113:3,5 | **information** 15:7 25:9 117:4,5 118:14 127:6,11 | **intensively** 34:6 | **introduction** 84:15 |
| **increasingly** 14:3 | **informed** 86:9 108:2 | **intentional** 88:13,15,18 | **investigating** 34:25 |
| **incumbents** 79:14 | **infrastructure** 17:6,18 20:1 45:16 50:25 72:9 105:6,9 105:10,11,12 105:13,20 106:10,18,23 107:4,23,23 108:19,20 109:19,19 144:12,15 | **intentionally** 65:13 88:10 | **investigation** 41:19 42:6 125:10,13,15 125:18,19,19 125:24 126:12 |
| **independent** 145:24 146:3 | | **interact** 118:4 123:7,12 | |
| **index** 3:1 4:1 | | **interaction** 63:22 | **investment** 50:25 110:22 111:12 112:17 |
| **indicate** 46:15 | | **interest** 21:23 21:25 57:24 62:7 123:15 143:18,20 150:11,12 | |
| **indicated** 97:7 | | | **investments** 110:24 |
| **individual** 21:2 34:10 37:25 38:1,8,13 63:15 69:6 86:18,20 102:13 118:10 119:2 131:23 133:10 140:12 140:15 147:19 148:3,5 | | **interested** 5:23 14:14 21:24 22:1 51:14 53:2,4 151:12 | **invitation** 28:10 |
| | | | **invitations** 28:5 |
| | **initially** 72:20 | **interesting** 140:19 | **invited** 41:12 85:2 96:8 |
| | **initiate** 101:9 | **interests** 62:17 62:20 | **involve** 54:7,13 |
| **individually** 40:15 135:12 | **input** 70:25 | | **involved** 9:7 14:3 32:21 54:6,12 74:16 77:17 83:14 86:22 92:8 105:2 106:11 |
| | **insert** 133:17 | **interfere** 8:25 | |
| **individuals** 21:9 28:5 41:9 43:6,16 59:25 60:4 65:20 83:9 95:14 | **inside** 25:19 | **intergovernm...** 26:14 | |
| | **inspection** 58:25 104:15 | **internal** 41:18 61:2,4 | |
| | **instance** 21:4 | | |

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[involved - know]**

Page 25

118:11 124:13
125:20 132:5
133:15,19
138:5
**involvement**
33:8 124:2
**involving** 55:7
99:1
**ipad** 46:12,13
46:18
**irregular** 135:9
135:10
**issue** 23:15
27:18 34:21
38:19,20 39:18
69:10,13,14,24
71:22 81:18
104:20 109:20
110:8
**issues** 12:15
19:23,23 25:11
25:12 27:20
46:20 62:6
71:5 83:24
84:2,3,4
123:14
**itches** 22:22
**item** 26:12
102:19
**items** 26:19
46:14 96:11
102:21,22
**iteration** 30:9

**ivan** 22:9
**ivory** 143:3

**j**

**j** 4:5
**jackie** 37:10
43:7 86:10,15
**jackson** 37:20
38:9,15,17
39:2,14 40:9
40:17,20 41:12
43:7 51:6 52:9
54:4 81:14
82:15 85:5
89:21 96:6
143:3
**jacqueline** 1:11
**jake** 101:3
**jan** 7:10
**janet** 1:23
150:16 151:5
151:20
**january** 8:19
33:15 40:2
43:16 82:1
126:20,21
**jhflaw.org** 2:10
**job** 13:6 14:23
17:14 18:21
19:8 33:4 60:3
60:21,23
131:25 132:2
132:19 133:10
133:14,21

134:3,13
135:18,20
137:24 138:1,2
138:17 139:16
139:18,19
140:20,21
**jobs** 17:19 19:8
19:10 60:19,24
61:2,4,6
**john** 2:7,8,10
4:4 6:9,9
**johnson** 40:17
42:18 54:4
**joined** 53:16
**joke** 17:9
**jon** 142:21
**jonathan** 40:16
42:18 54:4
**jones** 22:9
**journal** 4:6
**judge** 9:11
107:6
**judicial** 150:5
**julie** 2:3 6:14
**jurisdiction**
17:25 105:16
**jurisdictions**
31:17
**juror** 9:9
**justice** 32:4
82:3
**justice's** 33:14
**justification**
30:19,23 31:6

31:8
**justifies** 59:16

**k**

**k** 2:4
**kathleen** 8:11
**keep** 8:21
103:16
**keith** 36:19
49:15
**ken** 58:5
140:13
**kevin** 49:15
**key** 27:18
**kind** 61:5 84:14
**king** 50:2
**kkk** 97:22
**knew** 33:25
73:8 103:15
**know** 10:21
11:1,6 12:5
14:1 18:19
20:21 22:9
23:17,20 25:6
25:25 27:1,7
29:6,11,14
30:9,11 31:5
31:23 33:11
35:17 36:4,8
36:15,16,17,18
36:19,20 37:4
37:10 38:10,10
39:16,22 40:12
43:25 47:12

Case 5:25-cv-00025-MTT   Document 66   Filed 04/24/26   Page 180 of 204

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

[know - legislatively]

Page 26

49:21 50:11 53:9,22 58:4 61:9 63:1,4,14 63:17 66:9,12 67:1,20 68:18 69:19 70:11 72:2,24 73:22 73:24 74:11 77:17 78:14 81:17 82:22 84:23 86:13,14 87:5,20,20,21 88:19 89:16,17 89:18 90:7,11 91:8 92:12 95:10 96:3 97:9,15,19 100:11 101:8 102:9 104:2,10 104:16,19,22 104:24 106:1 107:11 108:9 110:1 111:16 112:19 113:5 113:18 115:16 115:22 116:6 116:12,14 118:1,9,12 119:25 120:8 120:15 121:3 122:6,18 123:13 128:7 129:25 133:13 134:20 135:19

137:6 138:12 140:8,20 142:18 146:2 146:19 148:15 149:10

**knowing** 85:8

**knowingly** 74:22

**knowledge** 33:8 35:6 36:9 58:1 86:8 97:18 120:25

**l**

**labeled** 139:1

**lack** 19:11 50:23,23,24 92:11

**lacks** 114:12

**laid** 40:13 116:10

**lake** 109:3,4,15

**large** 14:1 23:9 23:13,15,16 24:5,8,14,25 26:13 29:3,9 29:16 30:10,19 30:23 32:13 33:23 34:2 45:15 47:15,22 48:15 49:4,21 62:10,13 64:17 64:21 65:3,23 69:19 74:7,24

75:4,6,11 81:10 82:7,16 83:14 102:9 117:12 119:7 120:25 124:1 143:4 148:23

**largely** 17:17 39:16 89:21 90:3 112:1 125:19

**larger** 75:23

**larhonda** 49:10

**larry** 49:13

**lashley** 49:16

**late** 13:19 32:24

**latest** 28:11

**latinos** 95:2

**lauritsen** 49:15

**law** 2:4,8,11 6:5,10,17,20 150:10,11

**laws** 26:1 31:19

**lawsuit** 33:14 33:24 37:23 39:23 40:23 41:5 64:16 65:11,13,15 81:9,17 83:20 83:22,23 84:1 84:5,6,7,13,15 85:4,9,9,13,15 123:1 124:22 124:24 125:4,6

125:7,20

**lawsuits** 41:7

**lawyers** 2:4 6:5 6:12,16,20

**lawyerscom...** 2:6

**lay** 14:23

**layer** 119:4

**lead** 86:8 90:24 93:9

**leaders** 87:8,8 118:21

**leadership** 14:8 86:24,25 91:13 93:10 119:5

**leads** 97:9

**leave** 28:22

**leaving** 66:8

**led** 96:4

**left** 89:3 100:1 138:17

**legal** 2:21 5:20 7:11 9:11 103:15 125:6 142:4 152:23

**legally** 21:14

**legislation** 76:9 123:17

**legislative** 17:21 19:12 123:14

**legislatively** 19:22

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

**[legislature - made]**

Page 27

**legislature**  33:7 124:8

**letter**  4:4

**level**  19:2,2 30:7 31:14 38:1 52:2 58:11 59:16,17 59:19 60:8 80:3 85:21 86:7 110:1 128:8 137:16

**levels**  135:11

**liaison**  69:1 71:8,10,10 72:1,13

**license**  101:25

**life**  13:3 24:16

**light**  97:24 98:1

**limited**  18:1 27:3 57:7,10

**limits**  20:8 50:15 106:8

**line**  89:5 90:4 110:14 136:18 139:21 144:7 153:4,7,10,13 153:16,19

**liquor**  101:22 101:23 102:1,5

**list**  63:6 89:21 108:16 109:9 109:16

**listed**  54:1 68:14 101:2

113:5 139:10 146:2

**listen**  21:23 28:1,17,22 107:13 108:10

**listened**  43:3 54:2

**lists**  141:19

**litigation** 150:13

**little**  94:25 97:1 100:9 103:4 105:3 117:9,25 127:6 138:25

**live**  50:12,14 98:4

**lived**  13:2,3,4

**lives**  89:17,20

**llc**  2:8 6:10

**lobbyists** 120:25

**local**  17:22 23:14 33:9 97:9 121:10 130:7

**locally**  97:11

**located**  5:16,17

**lodging**  104:4,7

**logistics**  127:11

**long**  4:5 8:17 13:2 37:2 40:24,24 57:19 57:22 70:2,16 71:3,5 90:2

114:20

**longer**  114:21 131:5

**look**  29:14 83:10 94:11 99:7 105:24 107:12 109:2 109:25 110:5 138:15,15,16 138:25

**looked**  41:23 95:8 115:18 122:23

**looking**  28:9 41:1 43:25 59:14 94:6 141:14 143:11 143:21

**loop**  101:9

**looping**  101:7

**lot**  16:1 19:8,19 23:17,20,22 26:6,8,19 27:24 41:23 45:21,22 56:25 68:10,12,13,18 68:20 74:19 78:12 79:22 86:4,14 88:25 96:15 97:11 101:16 107:14 108:12,14 110:19 119:25 137:11

**lots**  27:23 60:21,23 90:14 102:12

**loudin**  22:9

**lunch**  53:15

**m**

**m**  2:3

**ma'am**  10:14 10:19,24 11:3 11:8,10 22:4 29:5 31:11,22 32:20 35:8,11 35:13 36:3,14 36:24 37:5,11 37:15 38:23 39:9 40:3 41:17 42:4,8 42:16,23 43:14 43:18 44:9,9 46:7,22 47:11 47:13 48:18,21 48:24 54:24 58:3 61:16,19 66:4 82:14 149:13

**mack**  49:13

**macon**  1:2,10 5:14,15,15

**macro**  80:3

**made**  23:24 45:6,12 46:15 46:15 61:3 76:10 77:13

Daniel S. Perdue                                          March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[made - meeting]**                                          Page 28

91:21,24 92:2
99:15 114:18
121:18 124:23
130:9,20 154:5
**mail** 25:9 63:19
103:13 104:1
105:1 110:9
**mailed** 101:7
**mails** 27:23
100:13 101:2
103:13,14
104:2
**maintaining**
105:15
**maintains**
104:22
**major** 121:4,6
**majority** 13:10
15:7 26:20
48:19 51:15,18
53:7 56:4,20
56:24 64:2
74:17 87:18,22
91:7 103:25
121:12,16,24
127:18,22
128:5 142:13
142:18 147:19
**make** 9:22
10:16 19:20
59:17,24 60:18
71:4 73:14
77:18 80:20
90:19 92:4

100:5 107:3
108:12 109:13
110:23 123:12
123:17 134:24
136:5 137:8
150:5
**makes** 25:13
79:17 80:4,7
97:25 101:20
120:12 136:6
136:14
**makeup** 49:6
49:22 78:10
91:10 93:14
94:11 140:4,5
**making** 6:23
101:18 112:1
124:2 127:12
**male** 94:5
138:22
**males** 95:2
**mall** 98:19
**man** 97:8
**manage** 71:23
137:4
**management**
116:24 148:20
148:24
**manager** 68:19
68:20 116:18
118:12
**managers**
116:21,23
117:20

**map** 122:24
126:22 127:1,5
127:7,8,12,17
127:19 143:13
144:22 148:13
**maps** 12:11,13
31:19 122:23
123:1 143:11
143:21 144:2
144:20
**march** 1:19 5:4
151:15
**mark** 18:15
**marked** 22:21
32:9 35:4
43:21 57:18
**marketing**
15:12
**marlin** 6:18
**matter** 5:12 7:1
19:16 26:8
42:7 69:23
84:4 104:21
106:19
**matters** 9:12
19:19 20:2
25:21 26:4,6
26:13 27:13
28:6
**mayor** 49:10,11
72:3
**mayors** 106:2
**mccants** 36:19
36:20

**mean** 25:25
43:23 63:21
64:19 66:11
70:19 71:3
72:16 78:3
87:15,16 89:24
102:3 126:20
127:7 134:8
140:23 147:25
**means** 9:21
23:17 80:21,23
**measures** 108:7
**mechanism**
70:24 76:16
**media** 5:10
**medical** 8:24
**medication**
8:20
**medium** 15:10
**meet** 65:10
72:3,4
**meeting** 4:7
22:6 25:6
26:22 39:2,4,5
39:15 40:10,17
40:20 41:14,16
42:17,20,22
43:5,6,8,22,24
44:1 55:10,24
60:4 61:14
63:23 64:15
65:2 66:8 72:6
82:16 83:3,5,6
83:8,12,20,22

Daniel S. Perdue                                              March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[meeting - model]**                                        Page 29

| | | | |
|---|---|---|---|
| 83:25,25 84:6 | 92:20 93:13 | 61:23 67:17 | **middle**  1:1,9 |
| 84:9,17,18,19 | 101:10 104:13 | 74:6,23 81:8 | 5:14 21:19 |
| 85:3,6 96:7 | 114:5 124:1 | 83:2 86:2 87:7 | 89:6 117:14 |
| 101:13,18,20 | 128:2 130:15 | 97:13,20 | **million**  112:12 |
| 102:21,23 | 132:4,20 | **mere**  124:10 | **mimic**  97:22 |
| 103:9 123:11 | 133:15 142:20 | **merely**  58:6 | **mind**  11:2 17:4 |
| **meetings**  19:13 | 147:20 148:13 | 115:23 | 25:18 46:2 |
| 25:13,14,15,18 | 148:23 | **merit**  140:19 | 80:11 92:14 |
| 25:18,20,22,25 | **members**  16:14 | 141:1 | 98:12 99:4 |
| 26:16 27:6,18 | 18:24 19:17 | **message**  82:22 | 106:16 115:4 |
| 28:1,14 37:16 | 21:18 27:9,16 | **messaging** | 115:13 117:10 |
| 37:24 38:1,8 | 27:21 33:1 | 128:16,21 | 118:19 |
| 38:13,16,22 | 34:1,12 37:19 | 129:8,11,14,18 | **mine**  120:6 |
| 39:25 40:4 | 39:23 40:5,10 | 129:21,22,22 | **ministers**  53:11 |
| 43:15 45:23 | 46:2 50:2 53:1 | 130:3,5,6 | **minor**  72:2 |
| 46:6,21,23,25 | 53:3 55:7,10 | **met**  11:6 40:15 | **minority**  95:3,6 |
| 47:1,5,7,10 | 55:14 62:2,7 | 40:16 54:1 | **minute**  96:15 |
| 54:5,11 55:1,6 | 65:10,13,18,24 | 60:8 81:15 | 131:7 147:5 |
| 55:7 65:12,17 | 75:9,19 81:10 | 126:20 | **minutes**  17:10 |
| 66:3 83:21 | 81:13 82:7,23 | **method**  24:8,14 | 26:23,24 27:4 |
| 85:2 91:11 | 88:9 96:11 | 29:2,6,17 | 27:4,8,11 |
| 92:23 100:14 | 114:3 115:16 | 30:10 33:23 | 43:25 99:7 |
| 102:12 | 119:19 122:13 | 48:10 62:17 | 103:9,10 |
| **member**  9:12 | 123:8 124:16 | 64:17,21 75:7 | **mis**  27:10 |
| 24:2 34:13 | 131:22,23 | 80:2 100:21 | **missing**  59:9 |
| 39:6 43:1,4 | 132:13 134:15 | 148:20,24 | **misspoke** |
| 44:3 47:15,21 | 137:19 143:2 | **methods**  23:11 | 132:16 |
| 47:25 48:4,6 | **memories** | 23:17 45:21 | **mistaken**  49:20 |
| 48:16,17 49:20 | 66:17 | 65:3 146:2 | **mix**  21:20 94:1 |
| 56:5 62:4,11 | **memory**  73:1 | **michael**  4:5 | 94:3,10,17,20 |
| 65:15 68:23 | 98:8,12 | **microphones** | 94:23 |
| 69:9 70:11,14 | **mentioned** | 5:4 | **mixed**  119:6,17 |
| 78:7 79:7 | 19:25 43:5 | **mid**  126:20 | **model**  68:17 |
| 85:18,20 92:17 | 55:24 56:7 | | |

Veritext Legal Solutions

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[moderating - notes]**

Page 30

**moderating**
78:16,20
**modify** 122:8
**moments** 45:20
**money** 106:4,6
108:5 120:12
120:12
**month** 47:1
60:13 96:7
110:6
**monthly**
101:13
**months** 73:16
102:4 109:1
**moratorium**
102:5,8,15,16
102:16
**morning** 5:2
6:13 7:4 11:17
47:3 136:13
**motion** 46:15
**move** 73:14
120:1 123:25
**mtt** 1:5,13 5:16
**multi** 49:20
78:7
**multiple** 37:19
91:18
**municipal** 18:1
**municipalities**
18:4 106:4
**mute** 5:6
**myriad** 111:18

**n**

**n.e.** 2:8
**naacp** 54:23
**name** 5:19 6:25
7:10 8:6,8
67:13 100:10
**named** 101:3
**names** 18:9
22:5,8 83:10
83:11
**narrowed**
118:25
**national** 6:6,14
6:21
**nature** 15:4
27:3 104:11
134:10 148:18
**ne** 2:17
**necessarily**
134:19
**necessary**
154:6
**need** 10:10,20
26:7,10 33:5
71:22 73:12,23
79:23 106:19
106:20 107:1
107:13 109:2
110:1 115:17
120:9 122:18
127:6 131:9
137:14

**needed** 108:4
**needs** 15:11
17:6,18 20:2
44:11,19,24
45:4,10,16
57:6 61:22
108:8 109:8
112:7 137:10
**negotiation**
85:11
**neighborhood**
53:9 120:15
128:4 133:9
**neighborhoods**
53:7
**neither** 117:19
**never** 61:1
86:12
**new** 70:15,15
79:4 101:23
136:13
**newly** 17:10
**nichols** 142:21
**night** 12:11
**nodding** 10:12
114:16
**non** 78:5
**nonelected**
21:9 116:18
**nonprofit**
87:11
**normal** 136:4
136:15,18,21
150:12

**north** 50:18
51:15,17 52:4
52:6,8 55:14
88:7,14,18,20
88:21 89:4,7,9
89:10,11,16,23
90:9,10,23
91:23 106:21
106:24 108:24
108:25 109:2,4
109:15 111:13
112:4,8,14,16
112:18,21
113:6,17
128:17,23
129:18,22
144:3
**northern**
108:20 113:3
**nose** 22:22
**notary** 154:13
154:19
**note** 5:4 71:19
144:8 152:10
**notebook** 68:14
**noted** 154:7
**notes** 4:7 38:24
39:1,2 42:24
43:10 46:5,8
46:10,14 47:9
47:12 61:13
84:17,22
110:11

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[notice - okay]**

Page 31

notice 82:2
noticing 6:3
number 4:2
5:16 22:18
32:7 35:3,5
57:16 61:10
67:16 85:25
119:14 139:9
numbered 31:6
31:9
numbers 68:14
139:5,9,21
nw 2:12

**o**

o.c.g.a. 150:7
oath 5:21 9:19
object 10:15
24:10 30:3,20
33:16 39:12
41:20 42:10
44:13 47:17
50:20 54:16
61:25 62:14
63:11 65:21
66:24 69:16
70:4 72:7
77:25 79:19
82:18 84:10
91:1 93:16
94:13,18 107:8
107:25 114:13
117:23 118:1
119:20 121:19

124:4 125:25
126:5 128:24
130:11 131:2
139:23
objected 10:17
66:14
objection 5:24
10:16 44:22
47:23 126:7
observe 12:12
observing 6:24
obstruction
119:4
obviously
66:15
occasion 25:10
53:17 81:16
occasional 98:2
98:5
occasionally
54:22 65:14
occasions 53:17
occupation
8:12
occupied 18:11
18:12,12,13,14
18:15
occur 38:8
42:20 43:8
47:15,21 66:5
98:20 106:14
occurred 66:7
107:24

occurs 63:19
office 5:18 8:19
13:11,24 17:9
26:9,10 37:18
37:21 38:9
42:21 43:9
57:9,10 79:14
92:19 100:25
101:3 111:22
132:13 133:6
142:6 145:23
officer 18:20
132:23
officers 17:24
20:21
offices 17:25
20:12,14,16,20
142:1
official 8:15
17:12 20:18
58:13 76:8,16
77:11 82:12
103:8 130:18
132:24 135:24
138:7,12
145:18 151:13
officially 8:18
82:1 101:24
103:6
officials 77:24
78:4,6 86:1
officio 21:6
114:5

oftentimes
88:11 104:1
109:24
oh 36:6 60:12
107:9
okay 12:14,18
14:8,21 15:21
18:11 21:4
22:23 28:20
34:7,11 40:8
42:19 47:4
48:9 57:25
67:5 69:4,8,14
70:2,19 71:6
71:13,18 72:5
75:13 76:5,19
76:20,24,25
77:5,9 78:19
80:10,18 81:4
81:25 83:2,17
85:2 87:7,13
87:18,23 88:1
88:4,8 89:25
91:5,16,21
92:1,6,9,19
93:1,6,12,25
94:3,22 95:17
95:22 96:14,17
96:18 97:5,12
98:9,23 99:4
99:11,17,19
100:1,3,8,20
101:5,12
102:19,24

Daniel S. Perdue                                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[okay - oversees]**                                          Page 32

| | | | |
|---|---|---|---|
| 103:16 104:3 104:18 105:8 105:17 106:13 106:16,20 107:3,22 108:18,23 110:7,11 111:8 112:23 113:7 113:15,21,25 114:8 115:1,6 117:2,6 119:24 119:24 120:18 120:22 121:11 121:15 122:7 122:20 123:6 124:13,22 125:1,8,12,15 126:25 127:4 127:24 128:9 129:11,24 131:25 132:3,7 132:25 133:10 133:24 134:3,7 134:23 135:3 135:12,17,19 136:20,21 137:7,17 138:1 138:4,19,25 139:4,12 140:3 140:12 141:5,9 141:15 146:24 147:7 148:8 149:2,4,14,17 | **old** 90:7,11,12 **once** 9:9 14:18 14:23 16:4 23:18,21 46:17 63:17,17 68:3 73:7 85:9,12 110:6 **ones** 28:8 98:10 106:11 147:3 **ongoing** 125:19 **online** 6:14 26:23 27:4,5 **open** 25:5,22 25:25 27:19 46:24 47:7 103:11 140:21 **openings** 137:24 138:1,2 **operate** 20:24 23:25 **operated** 15:13 **operates** 23:22 116:8 **operating** 15:14 18:22 **operations** 14:22 58:23 59:2,7 68:11 133:16,18 **opinion** 18:6 64:17 77:14 85:9 88:3,5 94:10 96:1 114:10,14 | 119:17 137:7 **opinions** 65:3,5 65:19 **opponent** 15:2 15:17,18,19,22 16:2,4 **opportunities** 28:13 140:10 **opportunity** 57:12,15,15 140:9 **opposed** 47:15 47:21 120:9 122:14 **opposition** 15:3 16:11 73:7,8 73:12 **order** 60:8 111:4 120:19 123:16,25 124:7 149:11 **orders** 149:7 **ordinances** 4:3 22:19,24 102:6 102:17 **organization** 112:6 113:4 121:6 122:18 **organizational** 58:21 **organizations** 86:23 87:3,3,6 90:19,20 111:25 112:1,4 | 117:13 121:4 **organizers** 53:24 **original** 12:3,5 31:5 39:4 83:2 83:5 **outcome** 5:23 151:12 **outcomes** 125:6 **outdoor** 51:9 55:12 **outgoing** 122:12 **outreach** 54:8 54:14,19 63:10 73:4 **outside** 16:24 42:2 46:20,20 46:24 55:6 56:16 66:2 71:15 **overall** 20:17 **overlap** 67:20 78:11 **oversee** 17:22 17:23 57:2,8,9 69:23 71:7,8 71:20 **overseen** 123:23 **oversees** 69:15 70:12 71:7 72:12,13 |

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

[oversight - percentile]

Page 33

oversight  99:23
overstatement
  23:1
own  41:25
  53:22 61:16
  115:4,9 119:2
  125:9 144:14
  144:15 145:8
owned  15:9,13
  15:13
owners  53:20
oxford  129:4

**p**

p  2:16 152:1
p.m.  1:20 96:22
  131:11,14
  147:8,11 149:5
  149:19
pace  101:23
packet  138:16
pacs  121:2
page  3:3 4:2
  29:15 44:4
  57:20 80:21
  138:15,16,17
  139:1 141:13
  141:14 153:4,7
  153:10,13,16
  153:19
pages  151:8
paid  131:17,22
  132:9

painted  98:18
pair  40:16
panel  35:7
paragraph
  44:5
paris  1:23 7:10
  150:16 151:5
  151:20
park  51:9
parked  98:19
parkway  1:22
part  13:17
  18:25 19:2,4,9
  19:11,16 24:23
  37:16 39:25
  68:6,25 69:19
  73:4 75:25
  76:15 77:2,9
  77:11 87:17
  88:11,18 89:1
  102:9 111:9,11
  124:11 128:9
  145:11,13
participate
  83:21
participating
  14:4,6,8
particular
  25:11,11 27:20
  57:20,24 58:9
  62:7 99:22
  103:12 119:9
  121:12 127:17

particularly
  12:17 22:17
  23:15,23 25:8
  57:23 113:2
  129:20
parties  5:8,22
  123:9
partner  15:14
  113:11
partners
  110:25
parts  56:17,19
  88:9,11,23
  89:2
party  150:6,10
  150:11,12,12
  150:13 151:11
pass  18:2 89:6
passed  29:24
passing  36:9
  65:14 66:8
past  22:25 36:7
path  135:2
patrick  49:11
pause  55:16
pave  109:12
pay  129:20
  130:3 140:24
  141:1
paying  59:17
  130:8
pdf  46:17
peachtree  2:17

peers  24:20
pencil  46:13
pending  10:22
people  6:7,12
  6:15,22 19:10
  21:8,23 23:18
  25:9,9 27:20
  28:25 29:1
  38:15,18 40:12
  53:6 54:19
  59:13 60:8
  66:13 68:13
  73:8,9 76:3
  86:14,24 87:10
  87:17 88:11
  89:2,7,23,25
  90:1,7,11,13
  94:1,3,7,7,11
  94:12,17,19
  95:1,1,19,20,20
  108:13,14
  111:24 113:18
  118:23 120:21
  123:16 132:25
  134:14
percent  95:11
  120:24 128:4,6
  128:6 141:2
  146:1
percentage
  95:7 127:22,24
  141:3
percentile
  94:11,17

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

**[percentiles - porter]**

Page 34

**percentiles** 94:4,6,8

**perdue** 1:18 3:2 5:11 8:1,8 32:21 67:12 96:24 131:16 147:14 148:12 152:5 153:2,24 154:2,4,12

**perform** 76:12 76:17

**performing** 140:25

**performs** 105:4

**periods** 25:5 27:25

**perry** 14:9 49:18,22 50:3 50:5 63:2 69:1 71:7,15 89:7 90:4,6,12 91:20 92:3 93:3,6,10,10,13 93:15 111:2

**perry's** 50:7

**person** 13:25 35:19 59:7,21 86:16,16 90:5 90:6 119:1,2 134:12 137:10 150:9

**personal** 8:10 21:24 53:5 61:16 86:5

88:3,4 95:13 95:17 102:12 146:4

**personnel** 59:14,24 104:17 136:9 138:3,4,8,11 140:11

**persons** 36:1

**perspective** 86:9 96:8,10

**petitions** 34:11 34:16,18

**phenomenal** 118:11

**philosopher** 107:10

**philosophical** 80:9

**phone** 27:23 63:20 68:14 100:13 110:10 110:11

**phones** 5:6

**phrase** 56:21

**phyllis** 50:4

**pick** 5:5

**picked** 118:7

**piece** 76:19,20

**pivot** 22:13 25:2

**pivotally** 74:7 74:10,11

**pivoting** 29:2 36:7

**place** 5:8 26:20 81:20,22

**placed** 102:23

**places** 60:23 68:18,21 78:13 106:8

**placing** 102:19

**plaintiff's** 22:18,20 32:6 32:8 35:3,5 43:19,20 57:16 57:17 138:14

**plaintiffs** 1:4 1:12 2:2 7:1 67:13

**plan** 35:7 48:1 62:12 70:20,21 70:23,23 71:1 128:3,3,5 142:13,19 143:23 144:21 144:23,25 147:15,16 148:16,23

**planning** 14:12 21:11 22:8,10 33:2,5 58:24 70:25 124:14

**plans** 39:6,7 62:11 73:21 144:21

**play** 58:7

**players** 97:21

**plc** 2:16

**please** 5:4,6,24 7:8,11 8:6 9:25 10:1,7,12,16 11:1 33:19 44:16 45:8 55:3 70:7 73:10 76:14 80:5 94:25 102:7 126:5 128:19 149:8

**pleasure** 58:16

**plus** 49:4

**point** 24:16 51:7 57:1 63:6 91:17 111:19 128:6 136:17 137:9

**points** 10:15

**polarized** 64:12 121:23

**political** 33:3 120:8

**politicians** 14:2

**politics** 32:22

**poll** 124:14

**polls** 124:15

**population** 95:4,6 106:5 127:22 128:8

**porter** 35:17 37:23 38:11,15

**[porter - prior]**                                        Page 35

38:17,25 39:21 81:16 83:13

**portion** 51:17 52:12

**position** 8:17 13:7,17,19 24:7,23 32:18 33:10 58:14 62:13 69:5 73:17 74:1,2,3 74:25 75:3,5,9 75:10 77:1,10 147:16

**positions** 14:16 16:23 21:12 52:21 53:2 58:11 59:10,12 60:15,17 79:6 95:14 132:7 138:5

**possession** 84:23

**possible** 60:24 64:1 71:5 78:17 120:13 135:21 143:16

**possibly** 24:21 53:17 59:9 78:2 123:17 124:8 134:6 146:21

**post** 13:17 14:25 15:1 16:10 18:11,12

18:12,13,14,15 32:5 60:21 67:25 68:3,6 68:18,21,22,25 69:5,6,7,8,11 69:15 70:11,12 70:14,17,17,18 71:7,15,16 72:12,13,15,20 72:23 73:15,15 73:17,19 74:4 120:3,17 122:11 137:23

**posting** 138:2

**posts** 31:6,9 48:15 60:22 68:4,5 69:5 71:6

**potential** 39:5 43:1 123:1

**potentials** 61:20

**potty** 55:16

**poverty** 2:11

**power** 17:25 60:18

**pre** 31:12,14,16 31:24 32:3,14

**precinct** 143:16 143:19

**precincts** 143:14,17

**precise** 13:20

**predominance** 101:22

**prefer** 82:24

**premises** 101:25

**preparation** 11:25

**prepare** 11:21 102:8

**prepared** 102:15

**prepares** 58:4

**preparing** 14:13 120:7

**present** 2:20 6:1 9:10 28:11 64:13 126:19

**presented** 10:4 57:11 76:9 128:1

**preserve** 143:15

**president** 85:1

**presidential** 80:25

**press** 97:24

**presswood** 123:13,20

**pretty** 73:21 141:3

**prevent** 8:25 21:14

**previous** 14:16 34:13,14,15,15

71:3 89:3 106:25 114:23

**previously** 18:14 51:12 54:1 93:2 95:21 139:24 148:2

**primaries** 146:19

**primarily** 28:9 30:24 40:10 68:7 72:9 95:23 105:14 107:11 110:25 123:8

**primary** 15:20 15:22 17:4,7 17:15,19 25:4 130:7 144:9

**principal** 150:10

**printing** 124:14

**prior** 11:5 24:4 33:6,14,24 34:18 35:6 37:17 38:3 50:3 51:21 58:1 64:20 74:1 75:8,18 75:24,25 77:5 79:7,11 81:8 82:2 83:25 86:12 87:21 112:11 117:11

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

**[prior - pursuant]**

Page 36

| | | | |
|---|---|---|---|
| 135:19 | 146:12 | 113:10,12 | 21:17 25:5,6 |
| **prioritization** | **processes** | 134:18 | 25:13,14 27:25 |
| 105:23 | 104:16 | **promise** 96:24 | 28:2 31:2 |
| **prioritizing** | **produced** 8:2 | **promoted** | 43:15 46:21,24 |
| 105:20 | **productive** | 140:20 | 47:5 59:5 68:7 |
| **priority** 19:25 | 85:12 117:22 | **promoting** | 68:11 70:15,15 |
| 19:25 | **professional** | 28:16 | 83:21,25 84:5 |
| **private** 5:5 | 15:8 59:22 | **promotion** | 88:21 89:1 |
| **privately** 28:3 | 60:1 114:22 | 28:23 135:10 | 97:24 98:1 |
| 65:10 | 115:23 124:20 | 140:18,22 | 100:3,5,14 |
| **privileges** | 137:11 | **promotions** | 101:2,15 |
| 114:6 | **program** 14:8 | 140:16,18 | 102:11 103:5 |
| **proactive** 73:13 | 51:13 55:13 | **pronunciation** | 107:15 110:18 |
| **proactively** | 136:16 | 40:15 | 111:1 112:19 |
| 21:8 | **programming** | **proper** 136:11 | 115:15 116:25 |
| **probably** 23:11 | 113:14 | **properties** | 117:7,11,17 |
| 25:16 27:2 | **programs** | 51:11 | 124:24 144:13 |
| 32:11 40:12 | 110:15,17 | **property** 51:12 | 144:15 154:19 |
| 70:20 81:23 | 113:9,17 | 144:18 | **publication** |
| 85:14,15 | **progress** | **proposed** 127:2 | 125:22 126:10 |
| 100:22 109:1 | 104:25 | **protests** 66:15 | **publicly** 84:6 |
| 116:9 132:16 | **prohibited** | **proud** 108:7 | 85:13,15 101:8 |
| 144:1 | 150:7 | **provide** 118:6 | 137:23 |
| **problems** 15:12 | **project** 70:3,15 | 144:10,11,12 | **published** |
| **proceed** 7:15 | 70:16,17,22 | 150:6,9 | 26:23 27:5 |
| **proceeding** | 74:20 106:3 | **provided** | **publishes** 27:10 |
| 5:24 | 107:23 109:16 | 130:18 | **publishing** 27:2 |
| **proceedings** | **projects** 20:10 | **provider** 111:5 | **purchasing** |
| 9:8 | 54:7,13 105:14 | **provides** | 58:24 |
| **process** 101:17 | 105:20 106:10 | 112:14 | **purpose** 37:21 |
| 104:9 105:19 | 106:23,24 | **providing** | 63:7 122:25 |
| 106:1 109:22 | 107:1,5,17,18 | 111:18,24 | **purposes** 18:20 |
| 110:4 111:9 | 108:20,25 | **public** 17:5,7 | **pursuant** 150:4 |
| 125:5 137:1,3 | 110:22 111:15 | 17:15 20:1 | |

**pursue** 37:21
**pursuing** 39:23
**pursuit** 37:23
**purview** 132:12
  142:2,3
**push** 26:18
**pushing** 102:5
**put** 13:20 14:8
  40:9 70:25
  95:7 102:15
  108:21 142:14

**q**

**qualification**
  146:1
**qualified** 16:11
  36:12,22 37:3
  37:7,13 117:17
  145:24
**qualifies** 106:2
**qualify** 74:2
**qualifying** 73:6
  146:15
**quality** 50:9
  86:2,3,10
**question** 9:22
  9:24 10:1,5,10
  10:17,22,22
  14:19 15:16
  28:24 33:18
  38:5 44:15
  45:8 48:8
  54:10 55:3
  64:8 70:6

76:14,19 77:13
79:16,22 80:4
80:9 81:4
83:23 84:1,5,8
84:12 94:14
107:11 126:4,6
126:8 128:13
128:19 133:19
134:9,11,25
136:8 139:15
142:17 148:7
**questioning**
  67:3 110:14
**questions** 8:21
  9:1,15,23 10:3
  10:7 11:9,11
  42:15 61:11
  67:16 68:24
  89:3 95:24
  96:15 136:18
  141:4,8 142:15
  143:9 145:2,16
  146:13,24
  147:3 149:3
**quick** 12:19
  71:21 141:12
**quickly** 45:25
  115:20
**quit** 14:16,18
**quite** 17:12
  24:21 59:9
**quote** 69:23,24
  82:21 84:12
  125:3

**r**

**r** 4:4 153:3,3
**race** 15:2,3
  30:1 52:2
  63:17 94:7
  122:5 128:16
  128:22 129:9
  131:1 146:6
**races** 96:12
  121:10
**racial** 30:7,16
  49:6,22 66:10
  91:9 93:14,22
  95:25 96:2,5,9
  97:1,2,10,14
  98:16 99:2,13
  130:25 140:4
  145:14
**racially** 64:12
  121:17,22
  130:10,14,21
  145:19
**racist** 98:19
**ragan** 36:15,15
  36:16
**raise** 7:11
  140:24 141:1
**raised** 50:19,22
**raises** 71:15,21
**raising** 62:6
**ran** 13:17
  14:25 17:13
  33:25 67:25

74:3 79:7
86:17 88:25
90:17 122:11
122:14 146:6
**rarer** 65:17
**rates** 115:17
  150:12
**rather** 10:2
  122:13
**rd** 2:8
**reach** 16:21
  25:8 40:20
  56:11 68:23
  88:8,17,19,22
  102:7 110:7
  118:2
**reached** 24:15
  40:9 54:23
  73:21
**reaches** 69:21
**reaction** 98:24
  128:10
**read** 11:22 12:6
  12:12 22:25
  30:11,13 51:20
  56:7,12 88:16
  97:14 122:20
  143:9 152:9
  154:5
**readily** 101:10
**reading** 51:21
  56:8 57:21
  66:12

**[ready - related]**

| | | | |
|---|---|---|---|
| **ready** 120:9 | 63:5 82:11 | **recollection** | **referencing** |
| **real** 12:19 | 98:12 99:19 | 12:15 91:9 | 128:22 |
| 106:17 141:12 | 113:18 124:23 | **recommendat...** | **referring** 87:4 |
| **realize** 11:5,6 | 125:1,8 127:24 | 19:21 59:18 | 87:9 |
| 73:7 108:14 | 142:15,17 | **record** 5:3,9 | **refers** 48:1 |
| **realized** 11:18 | 143:9,21 145:2 | 6:3 8:7 10:6,10 | **reflective** 94:20 |
| 77:17 | 145:4,7,15 | 10:21 11:2,7 | **refresh** 12:15 |
| **really** 39:18 | 146:13 | 12:21,22,23,25 | **regard** 82:13 |
| 59:19 68:6 | **receipt** 152:17 | 55:17,21 67:4 | **regarding** 20:2 |
| 71:19 73:6 | **receive** 28:5,10 | 67:6,7,8 76:10 | 34:21 37:17 |
| 76:22 77:12 | 100:12,15,17 | 88:16 96:19,21 | 40:1,20 52:2 |
| 98:10 102:5,10 | 100:22 103:20 | 131:11,13 | 65:12 66:21 |
| 104:12,14 | 120:19 137:10 | 147:8,11 149:5 | 81:18 82:7,11 |
| 105:1 108:1 | 140:24 | 149:6 | 82:16 83:23 |
| 109:2 118:25 | **received** 42:5 | **recorded** 5:10 | 96:7 102:17 |
| 122:18 127:18 | 60:5 102:11 | 84:17,21 99:2 | **regional** 21:20 |
| **reason** 29:24 | 103:12 108:18 | 103:7,9,10 | 85:1 91:19,25 |
| 31:21 35:20 | 109:1 111:13 | **recording** 5:7 | 93:9 |
| 36:11,21,25 | 113:15 121:5 | 84:24 | **regular** 25:20 |
| 37:6,12 75:14 | 122:12,15 | **records** 25:22 | 132:18 136:3 |
| 77:9 111:11 | **receives** 69:10 | 35:9,14,16 | 144:17 |
| 122:2 139:8 | 70:14 100:25 | **recross** 3:7,8 | **regularly** |
| 146:22 152:11 | 141:1 | 147:12 148:10 | 133:18 |
| 153:6,9,12,15 | **receiving** | **recruiting** | **regulations** |
| 153:18,21 | 101:23 109:18 | 60:19,20,21 | 150:5,8 |
| **reasons** 39:19 | **recent** 22:6 | **recruitment** | **related** 5:22 |
| 90:17 107:20 | 27:6 97:9 | 124:15 | 69:10 83:13,22 |
| 114:21 | 101:21 120:7 | **redevelopment** | 85:3 99:12 |
| **rebuttals** 12:7 | **recently** 16:11 | 51:14 | 100:6 103:15 |
| 12:10 | 95:8 | **redistricting** | 104:5 105:9 |
| **recall** 35:24 | **recognize** | 34:25 37:17 | 108:19,24,25 |
| 38:2,7 43:11 | 43:23 | 40:1 43:17 | 110:15,15,16 |
| 43:22 44:2 | **recognized** | **referenced** | 110:22 111:14 |
| 55:9 60:13 | 78:23 | 55:13 152:6 | 111:14 113:10 |

Daniel S. Perdue                    March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[related - resources]**                    Page 39

124:24 125:23
126:12 127:12
127:16,19,20
128:16 129:9
129:11,14,18
130:17,25
131:1 133:11
134:4,19 139:5
148:16 151:11
**relates** 29:22
**relation** 58:25
110:16
**relations** 30:1
**relationship**
150:10
**relationships**
53:5 95:13,17
**relative** 79:6
**relayed** 81:15
81:17
**relaying** 82:22
**reliance** 143:13
**rely** 95:17
**relying** 95:13
**remain** 79:14
111:5
**remainder**
73:24
**remedy** 123:1
**remember**
10:25 42:25
43:24 63:3
72:22 83:11,16
97:13 126:25

128:15
**remind** 81:25
82:15 117:2
**remotely** 2:3
**removed** 30:15
**renovate** 20:11
**repaved** 108:3
108:5
**repeat** 67:18
**rephrase** 9:25
48:8 139:15
**repi** 51:12
**report** 4:8
12:11,12,13
57:19 97:7
122:21,23,24
139:25 141:17
**reported** 1:23
151:7
**reporter** 7:8,10
9:16,18 10:6
10:11 12:20
149:7,12,14,17
151:5,14
**reporting** 4:8
58:13,14
109:20 150:5,6
150:6,9,9,10
**reports** 11:22
12:2,4,5,7 30:5
30:12,13,14
34:6,9 41:22
42:2 51:19,21
56:8,8 57:12

66:13 97:13,16
97:17,20 98:11
121:7 122:20
125:17,22
126:10 138:14
143:8,9,12
**reprehensible**
99:9
**represent** 6:14
29:23 31:16
35:19 53:6
67:13 139:9
143:19
**representation**
39:17 45:22
65:16,23
**representative**
99:9
**representatives**
80:2 143:4
**represented**
21:19 80:14
148:3
**representing**
5:19 6:6,21 7:1
147:19
**represents**
45:25 142:21
**republican**
145:23 146:5
**republicans**
146:9
**request** 70:14
70:16 133:5

**requests** 17:16
42:12 82:13
123:21
**require** 56:23
**required** 11:19
31:17 60:3
123:25 125:5
154:13
**requirement**
56:21,24
**requirements**
29:20 30:15
47:7,8
**requires** 56:3
126:1
**research** 23:15
34:3
**residency**
29:19 30:15
37:1
**resident** 44:2
46:4
**residents** 21:2
22:3,7 50:18
112:14,20
128:17,22
129:12
**resign** 73:17
74:1
**resolution**
119:12
**resolve** 63:20
**resources**
108:23

Veritext Legal Solutions
800.808.4958                                      770.343.9696

**[respectable - role]**                                    Page 40

| | | | |
|---|---|---|---|
| **respectable** 88:8 | **responsiveness** 61:21 100:9 | **ride** 51:6 | 105:14 108:3 |
| **respectfully** 88:4 | **rest** 6:11 50:2 | **riding** 108:6 | 108:11,12 |
| **respective** 38:16 | **restate** 55:3 | **right** 7:11 8:20 | 109:3,4,8,9,11 |
| **respond** 42:15 | **result** 65:8 | 11:15 28:20 | 109:12,12,14 |
| 125:20 132:21 | 125:7 | 29:14 38:5,9 | 109:15,15,25 |
| **responded** 147:18 | **results** 42:3 | 44:9 48:9 | 110:5 118:8 |
| **responding** 103:23 | 52:14 146:6 | 56:14 67:16,20 | **roads** 20:5 59:5 |
| **response** 14:2 | **resume** 59:15 | 67:22,25 68:2 | 105:15,25 |
| 30:15,16 51:4 | **retain** 35:9 | 73:3 76:8,22 | 108:13,15,16 |
| 82:12,13 | 46:8 | 79:23 80:15 | 109:10 142:7,9 |
| 102:10,11,12 | **retaining** 61:17 | 81:8,11 83:11 | **robbie** 68:8 |
| 103:25 | **retains** 46:10 | 85:17 90:21 | **robins** 1:22 |
| **responses** 10:11 | **retire** 14:13 | 92:20 95:5,9 | 15:25 16:19 |
| **responsibilities** | 79:9 | 95:15 96:24 | 49:2,7,11 50:6 |
| 14:24 68:3,6 | **retired** 16:19 | 99:21 100:8,14 | 50:14,15 54:7 |
| 77:6,10 105:5 | 19:10 79:11 | 100:17 105:6 | 54:13 72:12,14 |
| 132:1 133:7,11 | **retirement** 73:20 | 110:14 116:21 | 85:1 86:2 |
| 133:21 134:4 | **retiring** 122:13 | 119:3 121:2 | 87:19 90:5,6 |
| 134:18 | **return** 152:13 | 128:13 131:6 | 90:12,13,15 |
| **responsibility** | 152:16 | 131:16,18 | 91:19,22,25 |
| 99:23 140:9 | **returning** 50:10 | 135:4 136:3 | 93:7,8,9 111:1 |
| 144:9 | **reverend** 50:2 | 138:13,18,21 | 128:17,22 |
| **responsible** | **review** 12:2 | 139:4,6 141:6 | 129:14 130:6 |
| 27:1,7 44:12 | 57:12 104:16 | 141:7,14 147:1 | 144:3,5,6,11,12 |
| 44:20 61:17 | 121:7 136:3 | **rightfully** 74:20 | 144:14,18 |
| 105:15 140:16 | 152:7 | **rights** 2:4 6:5 | **robinson** 18:13 |
| **responsive** | **reviewed** 12:3 | 6:17,20 29:21 | 69:20 102:4 |
| 118:10 142:10 | 12:15 27:9 | 29:23 30:17 | **rode** 52:9 68:9 |
| | 144:20 | 31:13 56:3 | 109:4 |
| | **revolve** 17:5 | **rise** 108:16 | **role** 18:5,16,18 |
| | | 110:1 | 18:19 21:7 |
| | | **road** 2:17 | 22:15 24:18 |
| | | 89:18,19 | 57:7,10 58:7 |
| | | | 59:7,8,16 |

**[role - selected]**

68:17,25 69:6
71:24 72:1
73:19 74:18
75:20 76:12
77:2,2,15,15,16
86:25 102:25
110:16 113:9
114:12,24,25
115:9,23,23
116:2,4,16
**roles** 17:4
18:23,25,25
19:4,9,11
21:18 91:13,16
116:13 143:5
**rollins** 6:18,19
**ronald** 36:15
**room** 28:25
29:1 38:18
45:6,12 61:24
94:1,6,20
97:10 99:3
**rough** 109:3,5
**rounds** 51:5
**row** 138:20,21
**rozier** 1:11 7:2
37:10 40:17
43:7 67:14
86:10,12 89:15
89:22 90:17
91:21 92:12
106:22 108:21
122:21,22,24
130:1 143:12

145:22,23
**rozier's** 12:10
87:19 88:6
129:21
**rubber** 26:18
**rules** 150:4,8
**run** 13:11,14
13:15,18,21,24
14:17 16:7
24:15 37:3
73:17,23 74:2
75:10 120:5,16
123:16,18
126:15 145:22
145:23 146:5
**running** 14:15
14:22 16:10
19:5 33:6 73:9
86:11,13
120:17,18
130:21
**runs** 78:15
79:25
**rush** 35:7
**rutha** 37:20
54:4 81:14

**s**

**s** 1:18,23 3:2
8:1 150:16
151:5,20 152:5
153:2,3,24
154:2,4,12

**sad** 73:7
**safety** 17:6,8,16
20:1,1 31:2
45:16 107:15
144:13,15
**samantha** 2:3
6:4,10
**save** 79:8
**saved** 103:14
103:24 104:2
**saying** 28:17,19
61:1 86:13
92:13 119:21
125:8 134:9
135:1 137:2
**says** 66:8 89:15
109:2
**school** 17:23
62:12,16 90:7
90:11,12 97:20
99:21 100:6
**schools** 99:24
114:2,20
**science** 117:5
**scope** 57:10
**scribble** 46:14
**scrutiny** 74:20
**se** 52:9
**seal** 151:13
**seat** 13:22
14:15 37:3
86:11,13 120:3
120:5,11

**seats** 119:7,8
119:12,13
122:13
**second** 46:15
**secretive** 25:8
**section** 31:13
31:16 119:12
119:16 141:16
145:11,13
148:19
**see** 29:14 42:12
49:10 57:3
61:5 66:13
78:12 92:10
105:25 115:9
120:12 138:17
138:21,23
139:1,4 141:16
**seeing** 28:9
**seek** 52:22
**seeking** 34:12
**seem** 26:16
**seemed** 30:14
56:25
**seems** 131:22
**seen** 32:11
60:24 88:8
89:20 92:12
116:15 117:13
139:25
**select** 24:21
80:2
**selected** 23:20
75:9,19

**[selecting - sized]**                    Page 42

| | | | |
|---|---|---|---|
| **selecting** 45:21 75:15 | 79:11 111:4,10 111:12 112:15 112:18 | **sheet** 152:11 | **similar** 55:1 110:14 113:22 |
| **selection** 75:7 | **services** 31:2 | **sheriff** 17:12,14 | **simplified** 18:19 |
| **sell** 101:25 | 63:25 111:18 | **sheriff's** 17:9 17:16 26:9 | **single** 24:2 |
| **senate** 78:13 145:5,7,9,11 | 111:20 112:4 112:10,14,24 | 57:9 111:22 | 34:12 39:5 43:1,3 44:3 |
| **sends** 27:9 | 112:25 113:3,5 | **sheyward** 2:6 | 47:15,21,25 |
| **sense** 97:25 107:18 121:9 | 118:7 134:12 134:13 150:7,9 | **shift** 31:24 | 48:3,6,16,17 56:5 62:11 |
| 126:21,22 134:24 136:5,6 | **serving** 12:7 | **shook** 73:9 | 66:6 85:18,20 |
| 136:14 137:8 | 21:24,25 22:2 | **short** 13:4 147:5 | 119:1,19,22 124:1 134:12 |
| **sensitive** 5:5 | 53:2 112:7,9 117:6,6 133:5 | **shortly** 40:8 109:3 | 141:2 147:19 148:23 |
| **sent** 112:13 152:14 | 133:22 | **show** 41:23 | **sir** 13:16 67:15 67:23 68:1 |
| **separate** 46:19 69:15 145:8 | **session** 46:23 **sessions** 9:12 | 56:3 136:9,10 136:10 | 74:13 76:14 77:4 81:3,6,12 |
| **serve** 14:12 21:2,6 33:2 | 25:19 46:19 47:6 | **side** 50:19 51:15,17 52:8 | 82:14 84:20 90:22 95:16 |
| 58:15 65:24 73:23 80:23 | **set** 17:24 20:8 24:16 74:16 | 55:15 113:7 117:14 118:7 | 124:25 125:11 139:7 141:24 |
| 86:6 112:20 118:16 134:1,1 | **setting** 115:22 115:24 | 128:17,23 129:18 136:12 | 142:17 |
| **served** 14:9 21:18 22:9,12 | **settling** 119:15 **several** 97:6 | 138:18 139:5 **sidewalks** 50:23 | **situation** 24:22 69:9 71:13 118:6 |
| 33:5 35:22 36:1,2 50:4 | **shaking** 10:12 **shane** 18:12 | **sign** 152:12 **signature** | **situations** 64:25 65:8 66:7 |
| 73:16 93:3 95:20 | **shape** 108:13 109:3,5 | 150:15 151:20 **signed** 152:19 | **six** 12:3 78:14 109:1 |
| **serves** 16:20 17:20 49:11 | **share** 42:2 106:5 | **significant** 95:3 95:5 98:3 | **sized** 15:10 |
| 64:22 114:5 | **shared** 27:20 96:6,8 | 111:10 **significantly** | |
| **service** 14:14 55:9 73:19 | | 75:21,23 111:3 144:23 | |

Daniel S. Perdue                          March 10, 2026
Driver, Courtney, et al. v. Houston County Board o

**[skimmed - states]**                                    Page 43

**skimmed** 122:21,22
**slash** 139:13
**slightly** 122:8 126:16
**slurs** 98:19
**small** 13:8 15:4 15:9 24:17
**smaller** 43:6
**snapshots** 34:9
**software** 79:25
**sole** 23:13 118:13 133:10
**solely** 61:17
**solicit** 25:3,4,11 27:12,15
**solidified** 73:21
**solutions** 5:20 7:11 152:23
**solve** 71:5
**somebody** 71:14 135:23
**somewhat** 78:16
**sonny** 32:21
**sorry** 15:16 22:22 52:19 73:2 76:22 109:25 119:22 148:9
**sort** 11:12 12:9 19:12 28:17 39:22 40:13 41:13 42:9

48:3 68:5 69:2 70:16 77:13 84:13 86:25 90:4 102:3 111:22 116:2 126:21
**sorts** 15:10 52:3 89:19 120:21
**sought** 16:13 122:12,14,17
**sounds** 11:14
**south** 144:3
**southeast** 152:15
**southern** 2:11
**speak** 11:24 28:6,18,21 41:9 43:12 67:22 77:12 82:8 84:6 85:13,14
**speaking** 41:8 44:2 116:2 120:4 130:2 132:7
**special** 145:25 146:2
**specific** 69:24 94:25 97:14 112:3 140:12
**specifically** 18:16 55:11 75:5 84:1 93:6

105:11 112:7 144:13
**spectrum** 87:10
**speculation** 124:10
**speech** 41:2,3
**speed** 20:8
**spend** 57:21 63:9 120:9,12
**spending** 120:13
**spent** 74:18 106:18 110:20 112:2 113:13 120:11,15 130:6
**splcenter.org** 2:14
**splost** 106:1,18
**spoke** 52:8 64:16 99:1
**spoken** 43:17
**springdale** 2:8
**st** 2:12
**stability** 79:6
**staff** 19:21 27:9 68:20,22 101:6 101:10,10 108:7 114:22 115:15 124:20 131:17,22,22 132:9,15,16,17 137:18,20,21

**staggered** 77:20,23 78:5 78:5,8,25 79:13 80:18,21 81:1,5
**stakeholders** 27:18
**stalnaker** 73:19 122:16 135:22
**stamp** 26:18
**stand** 98:12
**standard** 60:20
**standpoint** 113:12
**start** 9:14 40:19 81:25 110:4 141:12
**started** 59:23
**state** 5:24 6:2,7 6:16,22 8:6 23:5,23 33:6 51:13 105:18 117:16 150:2 151:2,6,14
**stated** 61:22 67:12 81:14 87:20
**statement** 124:24,24 125:2,8
**statements** 88:21 89:1
**states** 1:1,9 5:13

Daniel S. Perdue

March 10, 2026

Driver, Courtney, et al. v. Houston County Board o

## [statistically - t]

Page 44

| statistically 93:18 | structured 149:1 | superintende... 114:21 | swear 7:9 |
|---|---|---|---|

**statistically** 93:18
**statistician** 56:10
**statistics** 52:2 95:8 127:16,21 128:11
**stay** 70:18
**step** 26:11 58:17,17 59:10 59:12,13 60:6 60:6,9 135:9 135:10
**stephen** 8:8
**steps** 59:25 125:23 126:12 136:11
**steve** 22:9 37:4
**stewardship** 51:9 55:12
**stint** 13:4
**store** 102:1
**stores** 50:23 101:22,24 102:5
**stories** 45:24 117:24
**strategy** 108:24
**street** 2:4 40:11 55:23
**strong** 106:17
**structure** 22:13 148:17

**structured** 149:1
**struggle** 64:13 95:7
**struggling** 47:24 71:2
**studied** 34:5
**studies** 34:3,24
**styles** 45:23
**subconsciously** 74:22
**subject** 19:16 19:19 25:21 39:3,4,16 83:3 83:5 84:3
**submit** 31:18 31:18
**submits** 103:5
**submitted** 12:11 32:14
**subscribed** 154:14
**substantial** 77:6
**successful** 86:18,21
**sued** 61:8
**suite** 2:5,12,17
**suits** 119:15
**summoned** 9:9
**sums** 51:1
**sunshine** 25:25
**superintendent** 59:3 114:2,19

**superintende...** 114:21
**supervised** 69:11
**supervises** 132:3
**supervision** 132:5
**supervisor** 142:8
**supervisory** 141:22
**support** 16:22 17:7,15 111:25 130:6
**supported** 113:4
**supports** 17:17
**sure** 18:11 21:14 34:8 41:10 56:12 57:11 59:21 70:9 73:21 79:2 80:17,20 88:22 98:15 100:18 108:12 111:19 114:9 116:6,8 120:24 122:9 128:20 147:6
**surface** 31:14 52:2 85:21
**surprised** 21:25

**swear** 7:9
**sworn** 7:13 8:2 9:18 154:14
**synched** 46:18
**system** 17:23 23:9 30:19,23 31:24 32:1,13 37:22 39:11,17 39:20 43:13 46:10 47:16,22 48:14,20 49:1 49:5,17 57:4 60:22 62:10 65:7 75:15,17 75:18,18 77:20 77:23,23,23 78:5,8 79:13 79:17,24 80:7 80:13,16,19,21 81:5,10 82:7 82:17,24 83:14 85:18,19,21,23 104:4,24 119:7 119:17,18 140:19,24 141:1 144:22
**systems** 15:7 48:25 104:7 117:5 144:15 144:16

**t**

**t** 153:3,3

**[table - think]**    Page 45

| | | | |
|---|---|---|---|
| **table** 86:9 | **talked** 11:23 | **technical** | **testimony** 9:15 |
| **tail** 77:14 | 24:14 41:3,5 | 101:24 117:15 | 151:7 152:9,17 |
| **take** 5:8 10:11 | 45:20 48:2 | 117:15 | 154:8 |
| 10:20 21:23 | 55:24 67:24 | **technology** | **testing** 14:7,7 |
| 24:17 28:12 | 71:6 72:19 | 15:6,11 | **thank** 7:7,14 |
| 38:24 39:2 | 73:9 81:15 | **tell** 17:10 71:23 | 22:22 52:21 |
| 42:24 43:10 | 83:19,19 85:25 | 72:25 88:20 | 56:1 67:12 |
| 46:5 47:9 | 95:12,25 100:4 | 91:17 92:12 | 95:12 133:4 |
| 81:20 95:24 | 100:8,9 103:4 | 95:10 98:5,7 | 147:23,24 |
| 96:15,24 | 106:21 112:24 | 120:7 121:22 | 149:2 |
| 103:10 110:11 | 117:25 120:3 | 137:5 139:19 | **thankfully** 90:3 |
| 123:10 131:7 | 120:18 121:22 | 142:6,7 | **thereof** 151:9 |
| 147:4 | 127:1,14 | **telling** 109:8 | **thing** 17:9 |
| **taken** 5:11 9:16 | 131:17 135:6,8 | 118:19 | 59:23 60:25 |
| 26:5 37:16 | **talking** 11:4 | **temporally** | 84:14 |
| 39:25 51:3 | 40:5 76:11 | 81:19 | **things** 10:25 |
| 55:19 61:13 | 79:24 80:1 | **tens** 120:15 | 15:5 19:7 |
| 84:17,22 96:20 | 81:1 85:8,17 | **term** 8:18 70:2 | 26:14 28:16,18 |
| 119:25 131:12 | 87:14 89:8,13 | 70:16 71:3,5 | 28:23 52:3 |
| 142:5 145:18 | 89:17,18 90:9 | 73:17 80:24 | 56:12 61:11 |
| 147:9 | 93:17,21 97:1 | 81:24,24 86:2 | 66:14,15 68:8 |
| **tal** 18:13 | 98:17 99:21 | 92:11 101:24 | 87:6 90:5,7,14 |
| **talk** 27:16 | 106:22 124:16 | 142:2,4,5 | 96:9 111:23 |
| 38:18 41:4 | 132:8,11,25 | **terminate** | 115:10,12,21 |
| 53:6,8 68:19 | 136:18 | 135:23 136:22 | 116:1 117:14 |
| 68:21 71:3 | **talks** 68:20,22 | **terminations** | 124:9 126:2 |
| 73:20 87:13 | **talton** 18:14 | 137:2 | 132:16 134:21 |
| 89:7,16 90:8 | 19:3 | **terms** 56:13 | 144:8 146:12 |
| 92:22 105:3 | **task** 20:23,24 | 62:10 78:4,11 | **think** 8:16 12:9 |
| 118:23 120:2 | **tasks** 17:19 | 78:14 94:16 | 16:5 21:4 |
| 123:13 126:3 | 134:18 | 127:7 | 24:12,19,24 |
| 127:4,8,11,18 | **tax** 21:11 142:6 | **test** 145:5,6,8,8 | 25:24 27:2,3,4 |
| 127:20 | **team** 68:23 | **testified** 8:3 9:5 | 39:22 40:14 |
| | 104:13,15 | | 41:22 50:17 |

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o
March 10, 2026

**[think - tran]**

Page 46

51:17 53:8 56:11,23 57:6 57:13,22 60:20 64:24 66:9,12 68:16,25 69:7 69:19 70:12 73:20 74:19 75:1,2 78:7,22 79:5 80:3 84:12,22 86:4 86:15,17,17,20 86:22 87:5,10 87:16 90:8 92:4 97:19,21 97:22,24 99:6 99:8 100:22 102:9 103:13 106:17 107:11 107:18 108:13 109:10 111:16 112:11,13 113:8,18 115:1 115:3,6,17,21 118:11,15,21 118:24 119:1,3 120:10,14,15 126:18 131:16 131:22 136:8 137:14 143:15 143:16,18 144:8,21,23 147:4

**thinking** 128:14

**thompson** 14:13

**thought** 11:18 114:17

**thoughts** 109:14

**thousand** 120:10

**thousands** 120:16

**three** 60:4,14

**tie** 19:13

**time** 5:7,25 10:20 13:17,20 14:11 18:19,25 19:1,2,3,4,5,8,9 19:11,16 24:18 24:23 27:3 28:17 30:16 32:4,11,17,23 33:6 35:1,25 36:4 37:18 40:2,14 55:9,9 57:21 60:7 63:9 64:16 75:3,8,21,24,25 76:8,15,15 77:2,2,11,11,15 78:15 80:8 84:7 85:14 90:2 91:7 96:25 98:23 102:17 114:20 116:13,16

117:14 119:25 120:17 121:8 126:5 137:3 139:2,25 140:23 148:18 152:18

**timeframe** 152:8

**timely** 27:5 104:20

**times** 18:4 22:2 26:8 27:17,19 33:1 53:15,19 55:13 62:5 63:21

**title** 8:15 138:7 138:12

**today** 6:24 9:1 9:14,15,19 139:24

**today's** 11:16

**together** 40:9 94:2 96:12

**told** 139:9

**tom** 73:22 102:7 126:24

**tony** 22:8

**took** 8:19 39:1 81:22 125:23 135:18

**top** 11:13 70:13 81:22 99:20 108:16 109:9 138:17

**topic** 113:21

**topics** 67:17,18 72:5

**total** 16:5,7 139:1

**totality** 145:4

**tough** 35:24 43:24 53:17

**towards** 73:18 113:19 119:12

**town** 25:10 27:19 28:1 55:12 91:23 100:13 102:10 103:9,10

**track** 103:17,21 105:2 106:10 106:13

**tracked** 103:24

**tracker** 103:17

**tracking** 104:25

**tracks** 104:22

**traditionally** 21:12,17 22:10 46:12 68:4 106:15

**traffic** 20:7 105:25 107:16 107:16

**training** 17:11 60:1

**tran** 149:12

[transcribed - understand]    Page 47

**transcribed** 38:22 151:8

**transcript** 149:9,11,11,16 149:18 151:9 152:6,19 154:5 154:8

**transfer** 69:14 77:11

**transition** 111:6 112:12 124:3

**transportation** 20:3 105:5,11 105:13,20 106:3,9 107:23 108:20,24 109:19

**trash** 118:7

**treadwell** 9:11

**treatment** 59:4

**trends** 34:4,9

**trial** 9:5

**tried** 16:21 55:10 88:19,22

**tries** 60:23

**trite** 14:2

**true** 57:22 151:8 154:8

**trust** 86:25

**truthful** 9:21

**truthfully** 8:25 72:22 114:6

**try** 9:22,25 28:12 67:18 68:24 69:12,22 71:4,5,23 100:19 101:6 104:20 109:13 118:5,6,7 135:1

**trying** 51:10 76:22 119:16 134:10,24

**tuesday** 5:3

**turmoil** 30:7,16 66:10,20 95:25 96:2,5 97:1

**turn** 19:7,7 57:14 61:10 138:13 141:13

**turning** 48:25 52:21 124:22

**twice** 51:8

**two** 15:5 16:9 17:4,19 22:6 23:14 47:1 48:15 58:21 60:13 82:5 83:9 91:19 98:10 130:7 143:2 144:8 148:8

**type** 15:8 73:4 87:8 99:23 103:17,24 105:19 107:16

109:18 116:4 130:3

**types** 19:19,22 27:8 72:5 87:3 90:1

**typical** 122:16

**typically** 21:5 27:5 28:4,18 28:22 41:7 63:14,19 89:8 106:6 110:10 114:22 119:11 119:15 120:20 121:18 131:24 131:25 145:12 148:20

**tyson** 2:16 3:6 6:11 7:4,4 24:10 30:3,20 33:16 39:12 41:20 42:10 44:13,22 47:17 47:23 50:20 52:18 54:16 61:25 62:14 63:11 65:21 66:24 69:16 70:4 72:7 77:25 79:19 82:18 84:10 91:1 93:16 94:13,18 107:8 107:25 114:13 117:23 119:20

121:19 124:4 125:25 126:23 128:24 130:11 131:2 139:23 141:7,11 142:2 146:24 147:2,6 149:3,9,13 152:1

**u**

**u.s.** 78:13 79:1

**uh** 52:17 80:12 88:24 110:3 116:19 124:18 127:15

**unable** 121:7

**unanimous** 46:16 52:15,16

**unaware** 122:17

**uncle** 114:19

**under** 2:4 6:5 6:17,20 9:19 31:13 47:21 48:20 58:12,19 58:23 59:2,6,8 68:3 70:17 85:9 111:20 132:12 136:15 141:1,21 142:3

**underneath** 20:24 68:5

**understand** 9:16,19,24

**[understand - voters]**                    Page 48

10:1,5,13,18,23 26:2 29:19 32:1 47:24,25 61:21 68:16 76:5,11,12 77:19 112:23 114:20 117:19 119:16,17 134:10 139:16

**understandable** 9:23

**understanding** 29:8,16 31:14 31:23 32:12 40:13 41:6 48:13 49:3 51:19,22,25 55:24 56:2 57:6 64:5,9 66:20 68:17 75:6 76:2 79:1 85:21,22 91:5 109:11 116:23 119:11 122:25 123:3 139:14 140:4 145:10 146:15 148:19

**understandings** 80:16

**understood** 57:14 60:17 72:19 73:14 74:23 75:12 77:19 82:4

83:12 87:2 90:16 95:12 130:2 136:17

**undertook** 102:16

**underwent** 103:13

**unelected** 115:20

**unfeasible** 148:16

**unfortunate** 97:8 98:17

**unincorporated** 18:3 105:16 106:6

**united** 1:1,9 5:13

**university** 117:16

**unopposed** 120:6

**unpaid** 137:18 137:20,21

**unrelated** 38:20,21

**untrustworthy** 87:1

**update** 84:14 102:17

**uploaded** 61:14

**use** 46:12 49:4 60:21 106:7 142:2 143:21

**used** 49:1,17 56:22 74:11 89:10 132:16 144:6 152:19

**uses** 106:6

**using** 48:3 97:10 99:2

**utilities** 59:3

**v**

**v** 152:4 153:1 154:1

**valley** 117:16

**value** 60:2

**varies** 21:5 28:15

**various** 10:15 104:7 107:20 141:19 143:11

**vary** 28:25

**vast** 59:21

**vehicle** 26:7,8 83:7

**vehicles** 83:13

**verbal** 10:11 67:21

**verbatim** 10:7

**verify** 152:9

**veritext** 5:20 7:11 152:14,23

**veritext.com.** 152:15

**versus** 62:10

**video** 5:7,10 97:8 149:6,10 149:15

**videographer** 2:21 5:2,20 7:7 7:14 12:19,24 55:17,20 67:5 67:8 96:18,21 131:10,13 147:7,10 149:4

**videotaped** 1:17

**videotaping** 5:1

**view** 144:9 145:1

**viewing** 109:20

**vinings** 44:7,8 53:16,19

**vinson** 1:22 44:6

**violation** 56:3

**virtually** 109:7

**vitally** 24:24 148:18

**volunteer** 87:11

**vote** 19:13 46:16,16 56:6 56:20,24 64:6 64:10 73:10

**voters** 56:5,6 56:22 64:5,10 64:11 73:4

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[votes - witness]**

Page 49

**votes** 35:7 52:11,14 73:11
**voting** 29:21,23 31:13 34:4 56:3 64:12 114:6 121:23
**vs** 1:5,13 5:12 7:2

**w**

**wagging** 77:14
**waiting** 131:23
**wake** 136:12
**walk** 76:19 103:3,4 136:7 142:5,7
**wallet** 11:18,19
**want** 6:11 77:16 80:20 81:19 85:14,15 98:13 105:3 109:9 120:2 138:13
**wanted** 24:22 24:23,24 66:15 77:15 85:5 135:23 136:13
**wanting** 39:19
**wants** 72:3 120:12
**warner** 1:22 15:25 49:2,6 49:11 50:6,14 50:15 54:7,13

72:12,13 86:2 87:19 90:5,6 90:12,13,15 111:1 128:17 128:22 129:14
**washington** 2:5 2:13
**watch** 11:19
**watching** 26:16
**water** 59:3,4
**way** 11:17 17:7 19:22 25:4 31:10 32:25 44:12,20 63:24 65:24 69:3,15 77:13 79:1 86:24 88:17 90:8 102:22 103:24 106:11 107:11 112:13 115:3 117:17 118:17 130:20 134:20 143:17 143:22 144:3
**wayne** 36:15
**ways** 20:20 23:22 86:6 100:10,15,17 102:20 116:9 123:22,23 125:17,18 136:25,25 137:19

**we've** 11:4 27:18 42:12 51:8 59:23 61:11 111:16 128:25
**website** 16:18 101:3
**websites** 15:11
**weeds** 74:17 113:14
**week** 18:21
**weldon** 40:16 42:18
**went** 31:24 32:4 109:4 111:5 114:25
**whatnot** 97:9
**whisperings** 5:5
**white** 49:15,16 50:3 56:6 64:6 64:10 65:11,13 65:15 95:1 121:25 138:22
**wide** 27:19 47:14,20 48:3 48:6 106:3
**widely** 28:25 60:24
**widen** 109:12
**williams** 22:9 37:4
**willie** 50:2

**willing** 41:14 100:22
**wind** 24:21
**winning** 146:10
**wise** 93:21 121:17
**wishing** 81:10
**withdraw** 139:15
**witness** 3:2 7:5 7:9,13 24:12 30:5,22 33:18 39:14 41:22 42:12 44:15 47:18,24 50:22 52:19 54:18 62:2,16 63:13 65:23 67:1 69:18 70:6 72:9 78:2 79:21 82:20 84:11 91:2 93:17 94:14,19 96:17 107:9 108:1 114:14 117:24 119:21 121:20 124:5 126:4 128:25 129:4 130:12 131:3,6,9 139:24 141:5,9 147:1 151:13 152:8,10,12,18

Daniel S. Perdue
Driver, Courtney, et al. v. Houston County Board o

March 10, 2026

**[witnessing - zoom]**

Page 50

| | | |
|---|---|---|
| **witnessing** 130:3 | **workshops** 47:6 | 73:16,18,24 78:14 80:23 109:16 141:2 |
| **wonderful** 86:15 | **world** 116:1 | **years** 14:4 27:4 35:16 36:5,6 |
| **word** 74:9,11 89:10 101:15 125:3,3 132:16 132:17 140:19 | **worry** 94:9 **worse** 108:13 115:2,5 **worst** 108:16 | 72:17 79:5,8 79:10,12 81:23 82:5 97:3,18 110:21 128:14 |
| **words** 10:3 79:22,24 147:24 | **wrapping** 8:18 **wraps** 67:2 **write** 137:14 | 128:20 129:8 145:15,20 |
| **work** 11:17 13:10 15:8,8 26:19 46:19,20 46:23 47:6 63:19,25 68:13 73:25 76:4 101:6,16 104:11 106:1 125:5 127:9 132:14 134:13 134:15,20,21 | **writing** 103:14 121:1 **written** 137:13 **wrong** 17:14 56:9,15 116:14 127:1 136:12 **wrote** 136:10 | **yep** 126:17 **youth** 93:10 |

| | |
|---|---|
| **x** | |
| **x** 115:17 122:18 | |

| | |
|---|---|
| **y** | |
| **y** 115:17 122:18 | |

**z**

**z** 115:17 122:18
**zero** 133:23,24 133:25 134:16
**zoning** 14:12 21:10,11 22:7 22:11 33:3,5 58:24
**zoom** 6:1 14:5 15:12

**worked** 117:12 132:10
**worker** 124:15
**working** 63:18 63:20 96:12 115:19 119:11
**works** 68:7,12 70:15,16 115:15 131:20
**workshop** 46:19,23

**y'all** 28:17 102:7
**yeah** 44:6,7 55:4 70:10 73:10 76:21 102:2 105:9 109:23 131:9 133:4 136:24
**year** 4:8 29:11 70:20,21,22