Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

MACON DIVISION

_____

)Civil Action No.

COURTNEY DRIVER, et al.,   )5:25-cv-0025-MTT

)

Plaintiffs,           )

)

v.                        )

)

HOUSTON COUNTY BOARD OF    )

ELECTIONS, et al.,         )

)

Defendants.           )

_____)

VIDEOTAPED REMOTE DEPOSITION OF

STEPHEN J. POPICK, Ph.D.

March 13, 2026

10:01 a.m.

Reported by:  Lindsey Russo

Job No. 7906093

Page 2

Videotaped Remote Deposition of Stephen Popick,

Ph.D. held through:

Veritext Legal Solutions

1250 I Street, N.W.

Washington, D.C.

Pursuant to Notice, when were present on behalf

of the respective parties:

Stephen J. Popick , Ph.D.                          March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 3

APPEARANCES:

On behalf of the Plaintiffs:

BRYAN L. SELLS, ESQUIRE

BRYAN SELLS LAW OFFICE, LLC

PO Box 5493

Atlanta, Georgia 31107

bryan@bryansellslaw.com


CARLOS ANDINO, ESQUIRE

SOUTHERN POVERTY LAW CENTER

1101 17th Street, N.W.

Washington, D.C. 20036

carlos.andino@splcenter.org


On behalf of the Defendants:

BRYAN F. JACOUTOT, ESQUIRE

BRYAN P. TYSON, ESQUIRE

CLARK HILL PLC

3630 Peachtree Road, N.E., Suite 700

Atlanta, Georgia 30326

bjacoutot@clarkhill.com

btyson@clarkhill.com

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 4

APPEARANCES (Continued):

Also Present:

Diane LaRoss, Clark Hill PLC

Marlin David Rollins-Boyd, Lawyers' Committee

for Civil Rights Under Law

Michael Barber, Expert

Stefanie Mann Chadha, Clark Hill PLC

Samantha Heyward, Lawyers' Committee for Civil

Rights Under Law

Warren Brey, Videographer

Page 5

I N D E X

EXAMINATION OF STEPHEN POPICK                        PAGE

BY MR. JACOUTOT                                         11

EXHIBITS

Exhibit HB1 Deposition Notice                          16

Exhibit HB2 Popick Expert Report                       16

Exhibit HB3 Barber Expert Report                       17

Exhibit HB4 Popick Expert Rebuttal Report  18

Exhibit HB5 Barber Expert Report                       19
            Houston 2026

Exhibit HB6 U.S. v. OSCEOLA                             39
            COUNTY, FLORIDA

Exhibit HB7 U.S. v. VILLAGE OF                          49
            PORT CHESTER

Exhibit HB8 United States v. Town                      58
            of Lake Park, Florida

Exhibit HB9 Popick Report Code                         78

Page 6

P R O C E E D I N G S

(10:01 a.m.)

THE VIDEOGRAPHER:  Good morning. We're going on the record at 10:01 a.m. on March 13, 2026.

This is Media Unit 1 of the video-recorded deposition of Dr. Stephen J. Popick, Ph.D., taken by counsel for the defendant in the matter of Courtney Driver, et al., versus Houston County Board of Elections, et al., filed in the U.S. District Court for the Middle District of Georgia, Macon Division, Case Number 5:25-cv-0025-MTT.

This deposition is being held as a Zoom videoconference.

My name is Warren Brey representing Veritext Legal Solutions.  I'm the videographer.  The court reporter is Lindsey Russo from the firm of Veritext Legal

Page 7

Solutions.

Counsel, please introduce yourselves for the record.

MR. JACOUTOT:  Do the plaintiffs want to go first?

MR. SELLS:  Sure.  I'm happy to.

For the record, this is Bryan Sells, B-R-Y-A-N S-E-L-L-S.  I am counsel for the plaintiffs in the Driver versus Houston County matter.

MR. JACOUTOT:  And my name is Bryan Jacoutot.  Bryan is spelled B-R-Y-A-N.  Counsel for the Houston County defendants in this matter.

MR. ANDINO:  Name is Carlos Andino, represent -- representation for the plaintiffs in the matter of Rozier versus Houston County Board of Elections.

MS. HEYWARD:  Samantha Heyward with the Lawyers' Committee for Civil Rights Under Law representing the National Association for Advancement of Colored People, Georgia State

Page 8

Conference.

MR. ROLLINS-BOYD:  Marlin David Rollins-Boyd with counsel for the Lawyers' Committee for Civil Rights Under Law for the National Association for the Advancement of Colored People, Georgia State Conference.  Not making an appearance, just observing.

MR. JACOUTOT:  And does anyone else on Zoom want to make an appearance for the record, or if not, I'll assume silence is no.

THE VIDEOGRAPHER:  And hearing no others, Court Reporter, please swear in the witness.

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.

The parties further agree that if

Page 9

the witness is testifying from a state where I am not a notary, that the witness may be sworn in by an out-of-state notary.

If any party has an objection to this manner of reporting, please state it now.

(Pause.)

THE COURT REPORTER:  Hearing none, we can proceed, and I will swear in the witness.

STEPHEN J. POPICK, PH.D., being first duly sworn, to tell the truth, the whole truth, and nothing but the truth, testified as follows:

MR. JACOUTOT:  Thank you.

And because the -- as the court reporter mentioned, this is being taken by Zoom, I just want to let everyone know that every now and then -- this is one of the reasons why I was trying to get the broader conference room going before we started.  But every now and then, this computer kind of -- if I lean back a little bit when I'm speaking, it

Page 10

fades in and out, gets a little fuzzy.  So if that happens, please feel free to interrupt me, stop me right away because I don't want you all to have to struggle to hear what I'm saying any more than you otherwise would when I'm speaking normally.

So with that in mind, this will be the deposition of Dr. Stephen Popick taken by the defendants in this action for the purposes of discovery and all purposes allowed under the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

All objections, except those going to the form of the question and the responsiveness of the answer, are reserved until trial or first use of the deposition.

Are those stipulations agreeable to counsel?

MR. SELLS:  Yes, they are.

MR. ANDINO:  On behalf of Rozier plaintiffs, yes, they are.

MR. JACOUTOT:  Great.  And, Bryan,

Page 11

how do you wish to handle the signature?

MR. SELLS:  Dr. Popick will read and sign, please.

MR. JACOUTOT:  Okay.

EXAMINATION BY COUNSEL FOR DEFENDANTS

BY MR. JACOUTOT:

Q.    So as I mentioned earlier, my name is Bryan Jacoutot, and I represent the Houston County defendants.

Dr. Popick, the purpose here is not to confuse you during this deposition, so if I ask a question you don't understand, can we agree that you will let me know and I'll try to rephrase it?

A.    Yes.

Q.    And as the court reporter mentioned, this is all being taken via Zoom, so especially in these circumstances, please do your best to speak clearly and loudly enough so that she can hear.  I see that you've got a headset on, which is a good start and doing a little bit better than I am already.

Page 12

A.   How is my microphone right now?

Q.   It's great.  I hear you perfectly.

A.   Okay.

Q.   So be sure to say yes and no when you respond to the questions, as opposed to uh-huh or uh-uh or nodding your head.  The record -- makes it a lot easier to make the record when you respond audibly in that fashion.

A.   Yeah.

Q.   If at any time you need a break, just let me know.  The only thing that I would ask is that if I have a question pending to you, that you complete your response to that question before we go ahead and go off the record.  Is that agreeable?

A.   I agree with that.

Q.   Okay.  So I'm going to mark a few depositions just to -- or, actually, I'll start here with the notice of deposition, and then we'll go into a few questions about it.

And still getting my bearings on

Page 13

Exhibit Share, but I think I should be able to introduce these fairly quickly.

A.    I would just like -- for the record, for the videographer, the monitor that has my camera is this monitor here.  If you see me turned over to this side, this is the monitor that has the Exhibit Share on it.

THE VIDEOGRAPHER:  No problem.

BY MR. JACOUTOT:

Q.    Okay.  Stamp, introduce exhibit.

Okay.  So now in the Exhibit Share, it should be -- your notice of deposition should be populating.  And just let me know when it's open and that you've had a chance to click on it.

A.    I'm sorry, Bryan.  You broke up right there.

Q.    Just let me know when the exhibit has populated and you've had a chance to click on it.

A.    I -- I can see the exhibit right here.

Page 14

Q.    Okay.  And did you receive that exhibit ahead of this deposition?

A.    I think I did.  I -- I will note that it clearly is in the wrong location.

Q.    Right.  And so where is your current location?

A.    I am currently located at my residence, which is 505 A, East Windsor, W-I-N-D-S-O-R, Avenue in Alexandria, Virginia 22301.

Q.    Great.  And would you please state your full name for the record.

A.    Stephen Joseph Popick.

Q.    Okay.  Are you on any medication or have any medical condition that might keep you from fully and truthfully participating in this deposition today?

A.    No.

Q.    Have you ever been arrested?

A.    No.

Q.    Convicted of any crime?

A.    No.

Page 15

Q.    Have you or your family member ever -- ever filed any prior litigation related to voting rights?

A.    I do not file litigation --

Q.    Okay.

A.    -- neither anybody else.

Q.    Okay.  Before this deposition, did you discuss this case with anyone?

A.    I would have discussed the case in the preparation of my expert reports.

Q.    And who might you have had those conversations with when you were preparing your reports?

A.    I obviously would've been asking questions of the counsel that retained me, which, in this case, is the counsel represented by Mr. Sells over there and others.

        I have not had any interaction I'm aware of with the Rozier case.  I am simply retained in the Driver case.

Q.    Okay.  And I think in your report you mentioned having discussions with Lauren

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 16

Collingwood?

A.    So that was -- those were discussions that occurred during the Rose and Raffensperger case several years ago, and so those were my references for those discussions.

Q.    Okay.  And did you discuss this deposition with anyone besides your counsel?

A.    No.

Q.    Okay.  Now I'm going to introduce a handful of exhibits.  They're basically just the reports, so give me one moment.

A.    Okay.

(Exhibit HB1 & HB2 were marked for identification.)

BY MR. JACOUTOT:

Q.    So, first, I'm marking as Exhibit HB2 and HB -- the prefix there is for Houston Board.

A.    Uh-huh.

Q.    -- that is your principal expert report in this case; is that right?

A.    Yes.

Page 17

Q.    Okay.  I next will introduce your --
or excuse me -- our response expert's report as
Exhibit 3.

(Exhibit HB3 was marked for
identification.)

BY MR. JACOUTOT:

Q.    Let me know when it comes over on
your end.

A.    Okay.  Maybe it was this other one
here.  Sorry.  Ah, okay.  I see the Barber
report.

Q.    Okay.

A.    I have gone through that.  I see the
map and discussion on BISG and then the expert
rebuttal.

Q.    Perfect.  And that --

A.    (Inaudible.)

Q.    That is Exhibit 4, and that's your
expert rebuttal report sort of in reply to
Barber's responsive report; is that right?

A.    The rebuttal report I'm looking at
right now.  I'm trying to locate in the Barber

Page 18

report where he has critiques of my report.  I do not see those.

(Exhibit HB4 was marked for identification.)

BY MR. JACOUTOT:

Q.    In the Barber report?

A.    That is correct, yes.  I see -- in HB3 I see a discussion about Cervas MMD and others, municipalities, BISG, and voter registration.  It --

Q.    Okay.

A.    -- does not appear to be a report responsive to my report.

Q.    Okay.  It might've been the wrong one then.

MR. SELLS:  Yeah, Bryan.  I think HB3 is Barber's surreply.

MR. JACOUTOT:  Ah, okay.  Do you mind if we go off the record for just one second so I can locate the correct report?

MR. SELLS:  Not at all.

THE VIDEOGRAPHER:  We're now off the

Page 19

record at 10:13 a.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  We're now back on the record at 10:19 a.m.

You may proceed.

(Exhibit HB5 was marked for identification.)

BY MR. JACOUTOT:

Q.    Dr. Popick, while we were off the record, I uploaded in Exhibit Share a new exhibit, HB5 Barber report.  Is this the principal report that your rebuttal report replies to?

A.    Yes.

Q.    Okay.  Great.

And did you review these documents to prepare for your deposition today?

A.    I reviewed HB2, HB4, and HB5.

Q.    Great.  Did you review anything else to prepare for your deposition today?

A.    I don't recall, nothing else.

Q.    Okay.  So if we can go to your

Page 20

principal report, which is --

A.    (Inaudible.)

Q.    Yeah, HB2.

A.    Okay.

Q.    I want to start with your CV where you discuss your educational background.  So if you scroll down --

A.    Sure.

Q.    -- to the -- to the first page of Appendix B, which is Page 28 overall in the document, and I just want to be clear.  So in May 2003, you graduated with a -- your undergrad degree in economics?

A.    Correct.

Q.    And that was from the Georgia Institute of Technology?

A.    Yes.

Q.    And then you went to George Mason University with -- did you go immediately after graduating, or did you have any time in between?

A.    Immediately upon graduating Georgia

Page 21

Tech.  I think I took a summer off.

Q.    Okay.  And while you were at George Mason, did you work any part-time or full-time jobs?

A.    I became employed with the U.S. Department of Justice, and I accepted an offer in 2003.  Late 2003 I joined the Department of Justice, I think, in January of 2004.

Q.    Okay.  And I see here on your resume, if we scroll down -- where is that?  If you scroll down to overall Document Page 37 -- it's Page 9 of your resume -- I see you have U.S. Department of Justice here on your -- on your resume, but it begins in the year 2006. Is that a typo, or am I missing something?

A.    Not a typo.  There -- the resume was -- CV was already exceedingly long, and so the experience that I had from 2004 through 2006 was in the Antitrust Division of the United States Department of Justice.

Q.    Okay.  2004 to 2006 was Antitrust Division.

Page 22

And what kind of work did that entail?

A.   Economic analysis, statistical analysis, data analysis.

Q.   For the statistical analysis portion of that work, did you do any of the ecological regression or ecological inference work that you did for the purposes of this case?

A.   One of the techniques would have been regression, which is one of the techniques I use in this case here.

Q.   Okay.  But no ecological inference?

A.   That would not be an issue when we deal with businesses.

Q.   Okay.  So that's a no then?

A.   (No audible response.)

Q.   Okay.  I'm sorry.  Can you just say it a little louder for the record because I didn't -- I kind of got a nod.

A.   I did not use ecological inference as a part of my job in the -- the Antitrust Division.

Page 23

Q.    Okay.  And did you ever do -- during this time period with the Antitrust Division, did you ever do any voting rights work?

A.    No.

Q.    So when did you make the move over at DOJ from antitrust to voting rights, like month?

A.    It was -- I took a contract position in January or so of 2006 to fill a vacancy within the Department of Justice, Civil Rights Division.  I was outside the government on a government contract on that period until approximately six months later when I was hired as the full-time statistical expert for the Civil Rights Division, Voting Rights Section.

Q.    Okay.  So the full-time position in -- in the Voting Rights Division -- I guess six months would have been June about?

A.    My full-time position there, yes. For the record, I was full-time as a consultant for the voting rights section during -- from January to June.

Page 24

Q.    Okay.  Great.  And -- okay.

We can go back up to your education here on Page 29 of the overall document.

A.    Okay.

Q.    So you finished your work -- your master's in economics at George Mason in May of 2006 and -- is that right?

A.    Correct.

Q.    And then you began your full-time work at DOJ in the Civil Rights Division in June 2006?

A.    Again, just for the record, I was a consultant full-time.  I was employed by DOJ Antitrust full-time starting in 2004.

I was employed as a consultant for DOJ's voting rights section from January to June approximately in 2006.

And then I reentered government employment full-time in June 2006 or thereabouts.

Q.    Okay.  And so when you were the consultant from June to -- to -- January to

Page 25

June 2006, were you no longer with the Antitrust Division?

A.    That is correct.

Q.    Okay.  Great.

And then there's a bit of a gap in time of -- for -- between your master's and your doctorate in economics.  I know you were at the DOJ from 2006 to 2012; is that right?

A.    Yes, I was.

Q.    And so what were you -- and you moved -- or excuse me.  What did you do after your -- your time at DOJ?

A.    Do -- sorry.  I want you to -- I would like you to restate.  Do you mean post-2012?  Post-2006?  I just want to be clear.

Q.    Yeah.  So post-2012.

A.    Okay.  Now, in 2012, I joined the Federal Deposit Insurance Corporation where I have been since.

Q.    Okay.  And while you were at the FDIC, you sort of achieved your -- your

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 26

doctorate in economics; is that right?

A.    I started my doctorate in economics while I was employed in the voting rights section in 2008, and I completed it in 2016.

Q.    Okay.  Perfect.  Thank you.

All right.  Now, we're still on your principal report, and we're on Appendix B.  Can we go to Page 11 of the appendix.

A.    Yes, I'm there.

Q.    Now, there you list two cases where you were an expert witness; is that right?

A.    Yes.

Q.    The first one is Whitest Versus Crisp County School District in the Middle District of Georgia; is that right?

A.    That's what it says, yep.

Q.    Did you testify in that case?

A.    I recall writing an expert report in that case.  I do not believe I was called to testify in that case.

Q.    Did you give a deposition in that case?

Page 27

A.    I don't believe so, but I'm not sure.

Q.    Okay.  So the next case is Rose versus Raffensperger.

A.    Mm-hmm.

Q.    I was actually counsel on that case, so I do recall that one, and I do recall you --

A.    (Inaudible.)

Q.    I do recall you testifying in that case, right?

A.    Yes.  I believe you were examining me.

Q.    Yes.  I think we -- yeah.  My colleague did one deposition of you, and then I did another, and then I examined you at trial; is that right?

A.    That seems right, yeah.

Q.    Okay.  Now, you've never testified on behalf of a jurisdiction that was defending a Section 2 case; is that right?

A.    That's correct.

Q.    Okay.  So your expert testimony has

Page 28

been exclusively on behalf of plaintiffs challenging jurisdictions under Section 2?

A.   Those are the folks that have hired me so far.

Q.   Okay.  So turning to this case, how did you first hear about this case?

A.   I was approached and requested by Mr. Sells there to be an expert.

Q.   Okay.  And Mr. Sells was also the attorney in Whitest; is that right?

A.   Correct, yes.  Correct.

Q.   Did -- did he engage you for that matter as well?

A.   I can't recall specifically who engaged me initially in that matter.  That's one of the older matters, but I -- he was a counsel in that case.

Q.   Okay.  And then Mr. Sells was also counsel in Rose; is that right?

A.   Yes, I believe that's correct.

Q.   We've been -- we've all been together too long, I think.

Page 29

A.     Too many Bryans I'm dealing with.
Too many Bryans.

Q.     Yeah.  And so did he engage you for
Rose?

A.     Yes.

Q.     Okay.  So turning back to this case,
what were you told you were being hired for?

A.     I was being hired to ascertain
whether voting was racially polarized and used
in Houston County -- County Commission
Elections.

Q.     And were you told what, if anything,
plaintiffs wanted to prove in this case?

A.     Aside from the obvious, which was
for me to determine if voting is racially
polarized, that is the extent of -- of what I
need to know.

Q.     Okay.  Now, you indicate you're
being compensated at, I think, a rate of $250
per hour?

A.     Correct.

Q.     Okay.  Have you been paid in this

Page 30

case yet?

    A.   I believe so.  For part of my work on this case, yes.

    Q.   And about how much have you billed so far?

    A.   Oh, I couldn't tell you.  I haven't submitted a bill yet for -- I think I billed for my initial work on the case.  I don't believe I've billed yet for the rebuttal report or this testimony and those items.

    Q.   Okay.  And to what entity have you sent your bills thus far?

    A.   I think I've sent them through Mr. Sells.

    Q.   Okay.

    A.   I don't know -- I can't tell you which one -- which entity paid me.

    Q.   Okay.  What is your ordinarily [sic] hourly rate for a government entity that hires you?

    A.   For a government entity, do you mean -- I'm sorry.  I'm -- I'm -- I

Page 31

don't -- I don't quite get that question.

Q.    What --

A.    I'm employed by the U.S. government today.  Is that your question?

Q.    No.  No.  So let me rephrase.

Have you been hired by a government entity to perform the nature -- the type of work that you're performing in this case, expert work?

A.    Well -- well, when I was the expert for the Department of Justice, Voting Rights Section, yes.  But that was a very long time ago, so the rate that I was paid then, you know, adjusted for inflation is probably not the same nor --

Q.    Yeah.

A.    -- accounted for my experience.

Q.    Okay.  And you say -- you characterized yourself as an expert witness in those cases.  Is that right, or is that just expert work that you provided?

A.    When I was at DOJ, I -- I served as

Page 32

the in-house expert for analyzing all voting-related cases during that time.  So, in essence, I would claim that I was the in-house physical expert for voting cases.

Q.   Okay.  Regarding the data you used in forming your opinions in this case, am I correct that you listed all such facts and data either in your reports or in the replication data that you sent over accompanying each report?

A.   I believe so, yes.

Q.   Did plaintiffs' counsel provide you with any facts or data that is not listed in your reports and that you considered in -- in forming your opinions in this case?

A.   Nothing that I considered in forming my opinions on this case.

Q.   Okay.  Did plaintiffs' counsel tell you to assume anything that you relied on when forming your opinions in this case?

A.   No.

Q.   Okay.  I think I've got the

Page 33

formulaic questions out of the way.  So if we can go up to Page 3 of your report here.

A.    Sure.

Q.    So you touched on this earlier, but on Page 3, you define the scope of your report as -- as being retained by plaintiffs' attorneys to determine whether voting in elections for Houston County Commission is racially polarized; is that right?

A.    Correct.

Q.    I want to spend a little time understanding your definition of "racially polarized" in this context.  So if you scroll to Page 6 to 7 of this report, kind of at the bottom of Page 6.

A.    Okay.

Q.    You quote the Supreme Court case of Thornburg v.  Gingles here in the last -- or Gingles.  I never know if it's Gingles or Gingles, by the way.  Everybody seems to have a different pronunciation, so I'll pause there, and I'll start my line of questioning now.

Page 34

You quote the Supreme Court case of Thornburg v. Gingles saying that, quote: The purpose of inquiring into the existence of racially polarized voting is twofold: To ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates; is that right?

A. That's the quote.

Q. So then your inquiry into racial polarization is to determine whether Gingles threshold factors 2 and 3 are satisfied; is that fair?

A. Yes. I believe that's what I said in the report, yep.

Q. And you mentioned also on the following page, Page 8, the separate electorates test. Do you see that?

A. Yes.

Q. And you say that this test is satisfied, quote -- or if, quote, an election

Page 35

would have been different depending on whether it had been held among only the white voters or only the Black voters?

A.    Correct.

Q.    Do I have that right?

A.    Correct.

Q.    And that's a direct quote from Gingles, right?

A.    Correct.

Q.    So for purposes of your analysis, is it fair to say that you will find racially polarized voting whenever the separate electorates test is satisfied?

A.    Yes, because that's the test I'm running it on.

Q.    So -- and as a corollary -- as a corollary of that, is it fair to say that when the separate electorates test is satisfied, you will conclude that Gingles 2 and 3 are satisfied?

A.    Yes.

Q.    And that's true regardless of the

Page 36

degree of cohesion of the electorate that you examine?

A.    Yes.

Q.    Okay.  So your report that is limited to examining racially polarized voting uses the definition we've just discussed; is that fair?

A.    Yes.

Q.    And you're not opining on Gingles 1?

A.    I did not do any analysis of mapping to understand the districts that were drawn as a potential remedy.  So no.  I -- I only looked at Gingles 2 and 3 in this report.

Q.    Okay.  And you're not opining on any of the senate factors that are mentioned in the Gingles case, are you?

A.    I don't think explicitly.  I think you can -- some of my report will cover some of those factors, but specifically it is Gingles -- it is -- I believe there's some senate factors there that my report informs on, but I'm primarily focused in on the racial

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 37

polarization.

Q.   And Senate Factor 2 mentions racial polarization, correct?  Or -- and if you don't know off the top of your head, that's fine.

A.   I think that's right, yes.

Q.   Do you -- and, you know, as part of your analysis, do you feel that the Senate Factor 2, racial polarization inquiry, is one in the same as the Gingles factors 2 and 3, racial polarization inquiry?

A.   I'd have to give that a little bit more thought.  I didn't cover that in my report so...

Q.   Okay.  No problem.

All right.  I'm going to -- scroll back up to Page 4.

A.   Okay.

Q.   And this covers --

A.   All right.

Q.   -- your professional background and experience; is that right?

A.   With DOJ, correct.

Page 38

Q.    Okay.  And we talked about this already, but here you discuss that you served as a statistician for the voting rights -- excuse me -- a statistician for the voting section of the Civil Rights Section of the United States Department of Justice; is that right?

A.    Voting Right Section, Civil Rights Division, yes.

Q.    Civil Rights Division, thank you.

And you state that you've analyzed thousands of elections in a wide variety of voting cases; is that right?

A.    That is correct.

Q.    But you point to three specific examples here, correct?

A.    That is correct.

Q.    Why did you select these cases in particular?

A.    These cases were high profile.  They were public, and they represent a -- they are representative of the sorts of cases that I

Page 39

participated in.

Q.    Okay.  And you characterize your work in these cases as, quote, instrumental and successful cases brought under Section 2 of the Voting Rights Act?

A.    Yes, I did.

Q.    Okay.  So I want to take a look at the first one, which is -- and forgive me if I mispronounce the defendant here -- United States versus Osceola County?

A.    Osceola.

Q.    Osceola County, and that is 475 F. Supp. 2D 1220, Middle District of Florida, 2006, correct?

A.    Right.

Q.    All right.  I am going to mark that case as Exhibit HB6.  Just give me one moment.

(Exhibit HB6 was marked for identification.)

BY MR. JACOUTOT:

Q.    Okay.  And let me know when you've had a chance to pull that up.

Page 40

A.    I can see that report.

Q.    Okay.  And you see at the bottom of the first page here it has the case caption. Is that the -- the case that you worked on and are referencing here?

A.    Looks correct to me.

Q.    And you can even see -- hopefully, your screen is bigger than mine.  You can see the case cite here, 475 F. Supp. 2D 1220.

A.    Barely, but yes.

Q.    Okay.  And this case was handed down -- the opinion handed down October 18, 2006; is that right?

A.    That sounds right.

Q.    Okay.  So this would've been pretty early in your tenure -- quite early in your tenure at the Civil Rights Section; is that right -- Civil Rights Division?

A.    It is.

Q.    Do you recall when this case was argued?

A.    I know that I did work on this case

Page 41

in 2006.  It was the -- I literally was put right in on this case the very first time that I -- that I was there.

Q.   Okay.  So you don't -- but you don't recall when the --

A.   I --

Q.   -- the argument of this case happened?

A.   I -- I don't.

Q.   Okay.  Do you recall if you worked on it while discovery was active in the litigation?

A.   I recall that I performed analysis that then led to our attorneys and other staff members conducting additional work and additional research on the ground in Osceola County.

Q.   Do you recall when that analysis would have been?

A.   That analysis -- I believe that analysis occurred in the early part of my consulting contract.

Page 42

Q.    But you don't know if that analysis occurred during the discovery period, sitting here today?

A.    I am not a lawyer, nor was I asked to be a lawyer.  I would be asked to do analysis to help understand data that we had received from Osceola County and perform, you know, various sorts of statistical analyses on that matter.

Q.    Okay.

A.    So I'd like to be more helpful, but I cannot.

Q.    Okay.  If you could scroll down -- if you follow the page numbers on the page, scroll down to 1232, which corresponds with Page 13 of the document.

A.    Okay.  I'm there.

Q.    And if you see here, it -- this kind of middle of the way through the page, it says: "Bullet Point Number 1:  Senate Report Factor Number 2" --

A.    Yes, I see that.

Page 43

Q.    -- "Racial Polarization."

A.    I see that.

Q.    Okay.  It says -- if you -- if you actually go right over to the next column, it starts with "Dr. Arrington"?

A.    Yes.

Q.    There it says:  "Dr. Arrington found that most elections in the county are ethnically polarized and that the degree of polarization is extraordinarily high."

       Do you see that?

A.    That seems to be his quote.  Yep, see it.

Q.    So did Dr. Arrington perform the racial polarization analysis in this case?

A.    I think it is helpful to understand the role of the in-house statistical expert for the DOJ Voting Rights Section, Civil Rights Division.

       It is my responsibility -- or at least when I was in that position, it was my responsibility to take in the request of the

Page 44

attorneys, to identify the data we would need to run the analysis, run the RBV analysis, and inform our attorneys about the results of that analysis.

The attorneys would then make a decision whether to -- whether to pursue the case, and if they were to pursue the case, they would retain an outside expert.

Then, during the course of that case, I would then be assisting those attorneys in helping to understand opposing counsel's expert report and other such requests like that.  I remained -- I did not assist the outside counsel in their report.

Q.    But -- okay.  That's -- that's helpful.

So you said that when you were kind of in this role part of what you would do is analyze the data, present that data to Department of Justice attorneys, and they would decide sort of whether to pursue the case using outside experts?

Page 45

A.    No, not quite correct there.

Q.    Okay.  Go -- do --

A.    They would decide, based on my internal expert review, whether they wanted to pursue the case and whether to retain outside counsel.  That review would go all the way up to at least the assistant attorney general for civil rights.

Q.    Okay.

A.    But I believe in 2006 that assistant attorney general was a Republican, because I was under the Bush administration.

Then I worked under Democrat administration, the Obama administration later.  Same process.

Q.    Okay.  So if you started work as a -- a full-time contract -- or excuse me -- full-time consultant early in 2006, and this opinion is handed down in October 2006, is it fair to say that your work would not have been involved in the capacity that you just described where DOJ attorneys decide whether or

Page 46

not to pursue an action based on your work?

A.    I -- I do not believe that is correct.

Q.    Well, wouldn't the action have already been filed by the time you started?

A.    First off, I might have my dates wrong.  I need to go back and see when I started my consulting business.  I'm sorry.  My outside -- my -- my outside government consulting contract, right.  I'd like to look at that.  It could have started in late 2005, right.  That's an approximate timeline.

Q.    Okay.  What --

A.    Number -- number two, the work that I did on that case was materially relevant to our pursuit of that case in trial.

Q.    In what way?

A.    I'm sorry.  I'm hesitating here because a lot of that is internal work product, but I performed an analysis on Osceola County's -- the opposing counsel -- not opposing counsel.

Page 47

We were -- I was asked to look at whether or not the population changes in Osceola County would allow drawing of a remedial district, right.

Q.   Okay.

A.   And so that involved doing analysis of census data, property records data, and other items.

Q.   (Inaudible.)

A.   That is -- because this would -- yeah.

Q.   Did it involve using ecological inference analysis?

A.   The initial part of my work, that did not, but that involved statistical analysis.

Q.   Okay.  But not the kind of analysis that you did for purposes of this case, right?

A.   I believe I did ecological analysis as a part of that case, but the specific thing that I was talking about was not ecological analysis.  It was statistical analysis.

Page 48

Q.    Statistical analysis.

And it's fair to say, though, that the court itself relied upon the opinions of Dr. Arrington for purposes of racial polarization in this case and not -- does that -- I'll just stop right there, yeah.

A.    It is -- it was the policy of the United States Justice Department, Civil Rights Division to always hire outside counsel when pursuing cases.

It was also the policy of the division to rely on their internal expert to help them understand whether they should bring a case and to conduct additional analyses to support that case.

Q.    Okay.  Given that the court relied on Dr. Arrington's racial polarization analysis in this action, is it fair to say that characterizing your role as instrumental goes a little beyond what your contributions were to this particular matter?

A.    I disagree completely.

Page 49

Q.    Okay.  The next case you present is United States versus Village of Port Chester. Oh, I'm sorry.  I'm going to instruct you to go back to HB2, and we were on Page 4 of your report.  And just let me know when you're there.

A.    I'm on HB2, Footnote 2.

Q.    Perfect.  Thank you.

And that is United States versus Village of Port Chester, case citation 704 F. Supp. 2d 411, Southern District of New York, 2010; is that right?

A.    Correct.

Q.    I'm going to mark that case as an additional exhibit.

(Exhibit HB7 was marked for identification.)

BY MR. JACOUTOT:

Q.    And just let me know when that comes up on your end.

A.    I can see it.

Q.    Okay.  And can you confirm that the

Page 50

case you cite in your report is this case that I've added as Exhibit HB7?

A.    Yep, that is the case.

Q.    Okay.  And, you know, consistent with our discussion about your role in the Osceola County case, it's true that your name does not appear anywhere in the court's discussion of racial polarization; is that correct?

A.    Consistent with the fact that I was the in-house expert for DOJ and, per policy, I did not testify in court, yes.

Q.    Okay.  If I can direct your attention to Page 427 of this opinion.

A.    Okay.  I'm there.

Q.    And the portion of subsection that reads:  "Second Gingles precondition:  The minority group must be politically cohesive and vote as a bloc."

Do you see that?

A.    I do.

Q.    So the court there talks about the

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 51

plaintiffs' expert, which includes the Department of Justice, as Dr. Lisa Handley on this subject, right?

A.    Yes.

Q.    And so is it fair to say that you were not the primary individual in this case to run the racial polarization analysis for plaintiffs?

A.    I disagree with that, with that statement.  Again, per DOJ policy, the attorneys came to me with a case.

I identified the data and the elections that we would need to run.  I ran that analysis, both -- you know, all sorts of different methods of ecological inference, ran other analyses to support the -- the case, produced my briefs and my reports to senior management.

And senior management then determined that they would pursue that case. To the extent that the court would rely upon expert report, they would've relied on Dr.

Page 52

Handley's.

Q.    Okay.

A.    But I disagree with the conjection [sic] that my work was not critical to the case.

Q.    Well, so I -- I asked it somewhat differently than that.  I said, is it fair to say that you were not the primary person to run the racial polarization analysis for plaintiffs?

A.    Then I will say I disagree with that.  I was, in fact, the first person that plaintiffs would have asked to run that analysis because that was our policy of how we did our work.

Q.    But as you mentioned, the court would've relied on Dr. Handley's opinion and not yours, correct?

A.    Per our DOJ policy, yes.

Q.    Okay.  And in this case, did -- did you work with Dr. Handley at all or was your work entirely separate from hers?

Page 53

A.    So as I stated in my response on Osceola, my job would have been initially to run the statistical analyses, the ecological analyses, et cetera, to help senior management determine if we were to bring a case.

When we determined to bring a case, my role would shift to helping understand opposing expert's case, you know, reports and engage on that.  As a part of understanding opposing expert reports, right, part of that would involve consulting with Dr. Handley. However, Dr. Handley's reports are independent of mine and independent of my work.

That's how we handled every case.

Q.    Mm-hmm.  Independent such that it'd be fair to say that Dr. Handley did not rely on your statistical analysis in forming her opinions?

A.    Dr. Handley wrote her own expert report.

Q.    Okay.

A.    It did not surprise me that her

Page 54

opinions agreed with mine.

Q.    You said you ran ecological inference analysis for this particular case; is that right?

A.    That is correct.

Q.    What -- if you recall, what kind of ecological inference did you run?

A.    I believe at this time the -- the primary method of ecological inference were -- there were two.  One was the standard Goodman equation, the ecological regression that we're all familiar with.  The second would have been Gary King's ecological inference and sort of his original formulation of that.

I further recall using Gary King's programs and code that he had written and using those pieces to then put together -- because back in the day, you had to do a lot of work to put all these things together.  It wasn't like today when you can ask your AI to do it.  So I did a lot of work adjusting what he did to get the data that we had.

Page 55

Q.    Just as an aside on that, because I know you do AI work for the FDIC now according to your resume; is that right?

A.    Is this on the record, or is this an off-the-record question?

Q.    This -- this can be on the record. I think it's applicable somewhat.

A.    Okay.

Q.    How have you found the -- like, an AI tool like Claude in helping you code?

A.    Two things.  Number one, I do not use Claude or any AI-assisted technology when it comes to expert witness testimony.

Q.    Okay.

A.    I want to be clear on that.

Q.    Good to know.

A.    Two, in my nonexpert witness roles, whatnot, I have found Claude code to be extremely useful.

Q.    Interesting.  Okay.  Yeah, I was just curious.  Thanks for that.  It's obviously a hot topic these days, so you got kind of a

Page 56

very cutting-edge role over there.

A.    I would say it is, fairly cutting edge.

Also we do not use Claude at FDIC, right?  So let's just --

Q.    Yeah, I was assuming --

A.    I want to be perfectly clear with everything going on.  I use OpenAI and Gemini and all the other stuff so...

Q.    Yeah.  So I guess I -- I should follow up.  You mentioned you didn't use Claude for purposes of your expert report.  Did you use any other AI tool --

A.    I do not use -- I do not use AI for my expert witness reports --

Q.    Okay.  Thank you.

A.    -- for analyses or whatever.

Q.    Yeah.  Okay.  Now I have lost my page.  Hold on.

Oh, okay.  So we were talking about the types of ecological inference analysis you did in the Village of Port Chester case; is

Page 57

that right?

A.    Correct.  That was correct, yes.

Q.    Did you do homogenous precinct analysis in that case?

A.    That would have been another technique that we could have deployed.  I'd have to go back and look.  I can't because, you know, that's a DOJ work product.  If there were homogenous precincts, then we would have checked our results and used that as well.

Q.    Okay.  And the village of -- yeah, Village of Port Chester was -- do you recall the size of the jurisdiction you examined?

A.    You know, I can't recall the exact size of the number of precincts.  I didn't review that case in preparation for this.

Q.    Okay.  Okay.

So, finally, we'll turn to the last one there, the -- if you want to -- excuse me -- go back over to HB2.

A.    Okay.  I can do that.

Q.    United States versus Town Lake Park

Page 58

is the final one, and that is -- you just have a Westlaw site, so it's an unpublished case; is that right?

A.    I guess that's the cite that I have. I believe this case was -- was settled or -- or found.

Q.    Okay.  And, obviously, in your role in that case, you would not have given any testimony or had the court rely on any of your opinions; is that right?

A.    I would not have given testimony. My opinions would have been relied upon by United States Department of Justice senior officials to determine if they wanted to pursue the case.

Q.    Okay.  And I'm just going to pull up that document that you have cited there just to finalize this DOJ portion.

A.    Okay.

(Exhibit HB8 was marked for identification.)

BY MR. JACOUTOT:

Page 59

Q.    Okay.  And it should be on your end now as Exhibit HB8.

A.    I can see Exhibit HB8.

Q.    And is this the -- the Westlaw case citation that you reference in your report?

A.    Sure looks like it.

Q.    Okay.  Now, this is entitled -- if you see here in the middle of the page kind of in big, bold letters, it says:  "Consent Judgment and Decree"; is that right?

A.    Yes.

Q.    And that means that the parties consented to this outcome; is that correct?

A.    I am not a lawyer, so I would take your word on that.

Q.    Okay.  And just -- just so you don't have to, I'll direct you to the bottom of Page 2 where the decree says, quote:  Therefore, with the consent of the parties, it is hereby ordered, adjudged, and decreed.

A.    Sure.  Okay.  Great.  Sorry.  It's really tiny text.  Okay.  And I have glasses

Page 60

on.

Q.    Yeah.  No.  I'm struggling over here too on this laptop screen.

A.    Okay.

Q.    So if we can just scroll up a bit to Point 7 -- I mean, there's a zoom button too if you -- because it is a little -- it is pretty small.

A.    I already had it zoomed.

Q.    Oh.  Well, I'll just direct you to Point 7 on Page 2.  The font in blue, it says: "The parties therefore stipulate that the United States can establish the second and third Gingles factors."

A.    I see that.

Q.    So that means that the defendants in this case did not challenge the racial polarization contention of the plaintiff's experts, right?

A.    That would be correct.

Q.    And because they stipulated to it, the court did not have any occasion to analyze

Page 61

the quality of the statistical evidence before;
is that right?

A.   I would assume it to not review any
statistical evidence.

Q.   Okay.  And do you -- was your role
in this case similar to -- to the -- the two
cases we just spoke of?

A.   Same procedure, same rules, do
the -- you know, to summarize:  Be asked to
perform -- or be asked to analyze elections,
determine racial polarization.  Did that
entirely using various methods.  Reported up
all the way through the chain, and they decided
to move forward.

Q.   Okay.  For any three of these DOJ
cases that you cite here, did any party ever
challenge the statistical methodology undertook
in your analysis?

A.   You know, well, the -- okay.  Did
any party challenge me?  No, because I was not
the testifying expert in any of these cases.

Q.   Okay.  That's -- that's a good

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 62

enough answer for me.

Now, if we can go back to HB2, and we'll scroll down to Page 5.  We talked about this a little bit already, but you state here that, quote:  I have also served as an expert witness in Whitest versus Crisp County School District and Rose versus Raffensperger; is that right?

A.    Correct.

Q.    Now, in Whitest, were you ever qualified as an expert before the court?

A.    I don't believe I was qualified because I do not believe that that one -- I don't recall it going to court.

Q.    And the -- the conclusions from your report were actually stipulated to by the defendants in that case too, right?

A.    I'll take your word on that one. That seems right.

Q.    Saves me one exhibit I have to show you, so thank you.

A.    Thank god.

Page 63

Q.    So you mentioned that -- because this was stipulated to, that the court did not have occasion to assess your qualifications; is that right?

A.    I believe that's correct in Whitest verus Crisp County.

Q.    Right.  Did it have occasion at any point to assess the credibility of your analysis?

A.    I don't know.

Q.    Do you recall the -- the size of the jurisdiction that Crisp County was?

A.    Relatively small.

Q.    Okay.  Would you compare it to the size of Houston County, or would it be larger than that?

A.    I have not done that comparison.  So per my standard, if it's not something I performed in the course of writing my expert report, I'm not really going to offer an opinion on that.

Q.    Okay.  Now, the last case is Rose

Page 64

versus Raffensperger.  And, again, that was one we were all on.  That analysis was a statewide contest, right?

A.  It was -- it was -- it was involving the public service commission, which is a statewide-elected office.

Q.  Okay.  So in your report here, you've offered five sort of example cases of your experience, and we've discussed them all; is that right?

A.  Seems that way, yep.

Q.  And the three cases from your time at DOJ, you were not the expert that the court relied upon, correct?

A.  I was the expert that DOJ relied upon to bring the case to court, but I was not testifying in court.  That is correct.

Q.  Okay.  Then you have two cases where you were specifically offered as an expert witness, which we just discussed.  The first is Whitest; is that right?

A.  Mm-hmm.

Page 65

Q.    And your results there were stipulated to by the parties, correct?

A.    Yes.

Q.    And then -- and then the final case, Rose versus Raffensperger, we had a statewide election, right?

A.    We did have a statewide contest that was at the heart of the matter, correct.

Q.    Do you know how many ballots were cast in the elections you analyzed in Rose?

A.    Quite a lot.

Q.    Would you say it's in the millions?

A.    Seems right.

Q.    Do you know how many voters cast a ballot in the elections you analyzed in Houston County?

A.    Not millions.

Q.    Fair to say --

A.    A hundred thousand in a general election, give or take, tens of thousands.

Q.    Okay.  So while we're still here on Page 5, I want to direct your attention to the

Page 66

academic article you reference --

A.    Yep.

Q.    -- the 2010 piece entitled:  "A Comparative Analysis of Small Area Population Estimation Methods" in the Journal of Cartography and Geographic Information Science?

A.    Mm-hmm.

Q.    Now, this is the only academic article you've authored involving voting rights; is that right?

A.    Article, correct.  Yes.

Q.    And you have a coauthor here too, correct?

A.    I do.

Q.    Do you recall the division of labor that went into that article?

A.    Yes, I do.

Q.    How did the -- how was the labor divided?

A.    I performed the vast bulk of the analysis -- statistical analysis for that piece.  I believe that Dr. Brinegar did a lot

Page 67

of the writing.

Q.    Okay.  Good to know.

And did that article have anything to do with ecological inference?

A.    It does in a -- it does, but it's indirect.

Q.    How so?

A.    When we have split precincts, we need to know how to split that population up in order to do analysis, right?  And so you can't do ecological inference or ecological regression or anything else if you don't account for the split precincts.

And so in those contests and jurisdictions where we did have split precincts, we would have to do that work first before we could proceed on to doing ecological inference or ecological regression or a host of other things that we might do.

Q.    Okay.  Does this article mention ecological inference or ecological regression?

A.    I don't believe so, no.

Page 68

Q.　Okay.　So on Page 6, just one down --

A.　I'm here.

Q.　-- you begin your narrative discussion of racially polarized voting; is that fair?

A.　Yep.　Yep, I can see that.

Q.　And I think we sufficiently discussed kind of your parameters for that definition, so I don't need to go into it in too much detail here.

A.　Okay.

Q.　So you begin on Page 9 with discussing your methodology, about halfway through.

A.　Great.　Yes, I do.

Q.　And on Page 10, you reference the two methods that you used in this case, correct?

A.　Correct.

Q.　And I see ecological regression and ecological inference; is that right?

Page 69

A.    Correct.

Q.    Ecological inference is -- contains both iterative EI and EI RxC; is that right?

A.    Correct, yes.

Q.    Okay.  And what I don't see here -- and you kind of allude to it in your report, but I don't see the homogenous precinct analysis.  Can you just explain for the record why that is?

A.    Because there are no homogenous precincts.

Q.    Okay.  Is that given the small number -- well, let me ask you this:  How many precincts are in Houston County?

A.    Depending on the election and the year of the election, about 15, 16 or so.

Q.    So given -- is that a small number of precincts, or is that kind of typical with what you -- you see in your work?

A.    I saw cases like that all the time when I was at the DOJ.

Q.    Did you see cases like that at the

Page 70

DOJ when they had both small number of precincts like that and no homogenous precincts?

A.    Oh, yes.

Q.    Okay.  Does the lack of homogenous precincts in -- in addition to a small number of precincts create any additional uncertainty regarding the accuracy of the estimates that you present in your report?

A.    It would increase the confidence intervals, the ballots that I would report for each method, but outside of those intervals, no.

Q.    I want to make sure I get my terminology right because I -- I do kind of struggle with this when I'm trying to explain it to someone who's actually in the field, when I am not.

So what I -- what I view as uncertainty would be much larger confidence intervals -- excuse me.

I view uncertainty as much larger

Page 71

confidence intervals in a given estimate.  So the -- the more tight your confidence intervals are, the more certain you can be of your point estimate.  Is that a fair description?

A.   Yes, that's a fair description, although I would say --

Q.   Okay.

A.   -- the more certain you can be that the actual truth is somewhere in that confidence interval range, right?  And so if you -- if you have less uncertainty, your confidence intervals were smaller, so you have a smaller range of where that truth is.

Q.   Mm-hmm.  But I guess the point is then, from your perspective, you still remain the -- you have the same degree of certainty that the correct answer is somewhere within the confidence intervals, even though they're larger, as you would with tight confidence intervals?

A.   I mean, if you have a confidence interval that's 70 to 80, I believe the answer

Page 72

lies between 70 and 80.  If your confidence

interval is 75 to 80, I believe the answer is

between 75 and 80.

Q.    Okay.  And you have the same degree

of certainty regardless of that size?

A.    Correct.  Yes, because it's the same

95 percent confidence interval.

Q.    Right.  But the uncertainty appears

in the accuracy of your point estimate, I

suppose, when the confidence intervals are

broader?

A.    No, that's not quite correct.  The

uncertainty appears in the size of the

confidence interval around the estimate.

Q.    Okay.  So --

A.    The point estimate is the point

estimate.  The confidence interval is what sort

of accounts for that uncertainty.

Q.    Okay.  Yeah, that's fair.

But as you mentioned, the lack of

homogenous precincts and the small number of

precincts together produce greater confidence

Page 73

intervals, right?

A.    That could definitely have that effect.

Q.    So if you scroll down to Page 11 --

A.    Okay.

Q.    -- you state -- in the first full paragraph there, you state:  "Both the academic literature and case law are clear:  Under reasonable assumptions, these analytic methods" -- in parentheses you're referring to EI and ER?

A.    Yes.

Q.    "These analytical methodologies produce reliable estimates of group-level voting behavior"; is that right?

A.    Yes.

Q.    First, what are those reasonable assumptions?

A.    I mean, in -- in general, you know, we're talking that the voter behavior is consistent.  We are talking about the election that we are looking at is an election that has,

Stephen J. Popick , Ph.D.                                March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

Page 74

I would call it, standard rules, a standard setup, and the -- the -- the data that is there is accurate and reliable.  Those would be the standard setups.

You know, obviously, under regression, there are assumptions on linear regression, right, that are built in.  Those assumptions are -- they're standard.

And then there are assumptions that are built into any ecological regression -- ecological inference program, right, that the literature has been very clear on, these are the assumptions that are made.

I'm trying not to go into the tacky details.

Q.    Okay.  Do you change your -- now, you mentioned these reasonable assumptions.  Do you ever alter those assumptions, you know, on an election-by-election basis in a given analysis?

A.    I do not.  I have not found reason to justify changing the baseline assumptions

Page 75

that are built into these models.

Q.    And so you never even would adjust the assumptions on a -- like, a comprehensive report basis.  So, like, you basically have a -- sorry.  I'm doing a compound question, so I'm going to object to myself.

A.    Sustained.

Q.    This is -- I get a little compoundy when we start talking in the weeds, so I apologize for that.  I'll try to keep it to a minimum.

But you won't change these reasonable assumptions even on a report-by-report basis, right?

A.    I would absolutely not change them within a given report.  If I had a reason to suspect that an assumption does not hold, right, or would need to be changed, I would make that decision on a report-by-report basis.

I have not encountered a fact pattern in which I believe that those assumptions did not hold.

Page 76

Q.    Okay.  That's -- that's what I was looking for.

MR. JACOUTOT:  Okay.  We've been going for about an hour and 20 minutes.  Would you all be interested in a ten-minute break?

MR. SELLS:  Yes, please.

THE WITNESS:  That's fine with me.

MR. JACOUTOT:  Okay.  And, you know, just you know, since we're hitting -- it's 11:20.  Do you all anticipate wanting a lunch break?  I do think I would go, you know, a little -- pretty deep into lunch if we just go straight through.

THE WITNESS:  Can you define "deep"?  Are we talking 12:30?

MR. JACOUTOT:  No.  I think it would be a little more than that.  I think it would be like -- it's always hard for me to guess because sometimes they go quick, sometimes they don't.  But I would say maybe 1:30 deep if we go through.

THE WITNESS:  I definitely would

Page 77

need a lunch break.  Otherwise, I will be hangry.

MR. JACOUTOT:  We don't want that. So, yeah, how about we take a break now, just like a ten-minute break.  Then we'll go till a little after noon, and we'll take a shorter lunch break since everybody's kind of in their homes.

MR. SELLS:  Yeah.

MR. JACOUTOT:  And I'm sorry.  We can go off the record.

THE VIDEOGRAPHER:  We're now off the record at 11:20 a.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  We're now back on the record at 11:31 a.m.

You may proceed.

BY MR. JACOUTOT:

Q.   Okay.  Welcome back, Dr. Popick. You understand you're still under oath?

A.   Yep.

Q.   Okay.  I am going to direct your

Page 78

attention to what's being marked Exhibit HB9,
and it should populate in your Veritext file
there.

        A.    Okay.

              (Exhibit HB9 was marked for
identification.)

              BY MR. JACOUTOT:

        Q.    Just let me know when it is.

        A.    I see it.

        Q.    Okay.  So I'll represent to you that
this is your R code file, which has been
provided to us by counsel as part of your
report's replication data?

        A.    Yep.

        Q.    Now, I'm not a programmer or
anything, so I opened this file in Notepad and
then copy-pasted it into Word and added these
line numbers for ease of navigation for the
purposes of this deposition.

              They may be different if you
actually open it up in like an R software.  I
just don't have access to that.

Page 79

          A.    Okay.  I'm not opening anything up
in any other program so...

          Q.    Okay.  So, yeah.  Let's just --

          A.    It is what it is.

          Q.    We'll both go off of this.

          But if you -- I guess if you
compared the line numbers, they may not
perfectly match up, but the code is all in
exactly the same order?

          A.    Okay.  So the only alteration was
line numbers?

          Q.    Yeah.  Yeah.  And that's really just
so I can say, go to Line X while we're talking
about it.

          A.    Okay.  No problem.

          Q.    And so just take a quick look.  You
don't have to look at everything, but, you
know, just so that you're sufficiently
comfortable that this is in fact the code that
you used.  And once you are, I can go ahead and
just start my line of questioning.

          A.    Yeah, looks like it.  Yeah, I'm

Page 80

good.

Q.   Okay.  So this is part of the replication file that was sent to us, and so is it fair to say that this is the code you ran to produce the various ecological inference and regression analyses in your report?

A.   Yes.

Q.   And "running the code" is the right terminology for this replication --

A.   Sure.

Q.   -- code?

Okay.  So if someone else ran the code, that actually would reproduce or replicate the results that you have in your report?

A.   It would run the analysis.  Let's be mindful that ecological inference methods are simulation based, and so it would be incredibly surprising for someone else to run this -- this code and get the exact same output.  They will get similar output but not exactly the same. That would be my expectation.

Page 81

Q.    Okay.  So we wouldn't be able to just get the same numbers that you got?

A.    There are deterministic items.  If I can make an example, I'm looking on Line 162.

Q.    Okay.

A.    You see it says, sum and some stuff in parentheses?

Q.    Mm-hmm.

A.    So that should get you the same answer every time.  I'm asking for it to sum up the number of Black persons, you know, in the jurisdiction form for that election.

Q.    Okay.

A.    When you get to any of the EI estimates, those are simulation based.  Those are not necessarily going to get the same result when you run them because --

Q.    Okay.

A.    -- they're a simulation.

Q.    Okay.  What -- what about them -- what about them -- how do I phrase this?

           What about the simulation-based

Page 82

nature of EI analysis kind of prevents you from, you know, getting the same result?

A.    Well, let's -- let me try to think about it in a way that, I think, could explain it for -- for most of the folks here in the room that aren't number geeks like me, right?

Q.    Yes, please do.

A.    So the classic ecological inference problem is this:  You know row totals.  You know how many people showed up in the precinct and voted, right?

Q.    Mm-hmm.

A.    Okay.  And you might know the number of Black people who showed up and voted or the number of white people that showed up and voted, right?  And so then we know the total number of people who voted, right?

And then in the column, right -- think of it as a database.  We know by precinct how many votes Bob and Dave got each.

Q.    Mm-hmm.

A.    Right?  What we do not know is what

Page 83

happens out inside those rows and columns.  We only observe the row and the column totals.

Q.    Mm-hmm.

A.    So ecological regression and ecological inference are methods to identify probable estimates of what those voters, you know, did during the election.

So how did Black voters vote for Bob?  How did white -- you know, white -- white voters vote for Dave, et cetera, et cetera.  We can't know how people voted because the ballot is secret.

Q.    Mm-hmm.

A.    In order to do this, you have to run some sort of estimation strategy.  Originally, you had the ecological regression approach, which is a linear regression, right?  That should be the same every time.  It's not a simulation.  It's the same thing.

In a simulation, you're -- you're attempting to give it a starting parameter, and then it will work itself and try to find a

Page 84

solution.

So you might have started it the same way every time, and you will get slightly different answers, or at least that's how it should work.

Q.   Okay.  Okay.  Great.  Thank you for that.  That's -- that's helpful.  I think I got most of it.

So I'd like to -- well, hold on. Oh, aside from the replication code that you've provided us, did you run any other code for purposes of your analysis?

A.   I think you're -- there are two documents that I believe I sent over.  One was this.

The other would have been work on voter demographics coming from state voter files to allow me to do analysis of elections where we didn't have, say, precinct -- precinct-level numbers from the secretary of state on voter turnout by race.

Q.   Okay.  Would that have been for both

Page 85

reports then or for just -- just the initial one?

A.    I believe it would've been for both because I believe my initial report did analyze a Republican primary that was contested, and I did not have primary turnout by race figures for that.  That was not a November general election.

Q.    Okay.  Great.

And anything else other than that?

A.    That's all that I can recall.

Q.    Okay.  All right.

Now I'm going to direct your attention to the top and just kind of walk through some of these packages and libraries and --

A.    Right.  You -- you want to have pain; you go for it.

Q.    Yeah, that's why I did it before lunch, rather than after.  I don't know if we would've been able to do it.

So my first question is:  Have you

Page 86

ever used any of these library programs before?

A.    Absolutely.

Q.    Okay.  And Line 4 references eiPack?

A.    Mm-hmm.

Q.    You've used that one before?

A.    Yeah.

Q.    Do you know if -- or, I guess, do you know if this package has been updated in any way since your time at DOJ?

A.    Well, to be clear, this package didn't exist when I was at DOJ.

Q.    Oh, really?

A.    Ecological inference, the methods have changed over time.

Q.    Okay.  So then -- I guess then if it didn't exist, you didn't use it at DOJ?

A.    I -- so I believe that the authors of eiPack are colleagues with or worked with Gary King.

Q.    Mm-hmm.

A.    So I've utilized EI.  EiPack and EI, right, they are -- the basis, the foundational

Page 87

literature is Gary King's own work that he published.

Q.    Mm-hmm.

A.    And then over time as computing programming languages became more robust, allowed for more things -- and, you know, this thing called compute that we read all the time about in AI, right, our computers got better. They got -- they got more capacity to do things.

Q.    Mm-hmm.

A.    So you can change your program to do different things.

Q.    Okay.  So then I guess the -- this eiPack, which, again, wasn't in existence, I guess, during DOJ -- or excuse me.  Strike that.  I'm just going to rephrase that whole question.

Is it fair to say that you didn't use eiPack at DOJ?

A.    It did not exist.

Q.    Okay.  So that's a yes, I did not

Page 88

use it?

A.    Yep.

Q.    Okay.

A.    But I do want to -- for clarity, eiPack, right, is going to rely upon code and work that Gary King did right, in his works that I then used, right.  So I think it's a misnomer to say I didn't use anything from eiPack.  I think in actuality, right, a lot of what eiPack has would have been built from what Gary King had built.

Q.    Okay.  Okay.  That's fair.

But, obviously, since it's been updated, since the original Gary King EI software --

A.    Sure.

Q.    -- it's got aspects of it that you didn't use in your time at DOJ?

A.    Sure, yeah.  Every update, sure.

Q.    Okay.  Great.

Would you have used eiPack during the Whitest case?

Page 89

A.    I believe so, yes.

Q.    Okay.  And --

A.    And then --

Q.    -- also during Rose?

A.    And then in Rose, I was using eiCompare.  I'm using eiPack and EI -- eiCompare, let me be clear, is a RAPPOR program that uses preexisting programs, like EI and eiPack and others like that, to make it easier for an end user to get around.

eiCompare allows you to specify one set of model.  In other words, this is the election, this is my data file, these are the candidates, and these are the racial groups, right.  And then it will go and produce for you a table that will conduct ecological regression analysis, ecological inference analysis, and do homogenous precinct analysis, and produce out for you a table --

Q.    Mm-hmm.

A.    -- that combines all of them.

I'm using -- I'm using this here,

Page 90

and I am a contributor on EI -- on eiCompare.
I wrote upon one of the packages for it with
Loren Collingwood.  One of the components of
the package, I should say.  That's -- that's
fair.

The -- at the time we were doing
this analysis, the eiCompare package was under
an update and a review, which is standard.
Whenever you update a package, it goes through
a review, and so it just wasn't available for
the run here.

Q.    Okay.

A.    So I just went back and got the
subcomponents and ran my analysis that way.

Q.    Okay.  Great.

MR. JACOUTOT:  And just to -- you
know, so everyone is aware, our expert, who was
not on earlier, he's joined.  He was -- I
forgot to send him the link to the deposition.
So Dr. Barber is on.  He's observing.  I just
didn't want anyone to think we sneakily put him
on the videoconference without telling anybody.

Page 91

BY MR. JACOUTOT:

Q.    Okay.  So thank you for that explanation.

A.    Sure.

Q.    And I'm just going through my notes here.

A.    Okay.

Q.    All right.  So within this eiPack, is it fair to say that you used a few different commands to estimate turnout rates and vote share?

A.    Yes.  I called different commands.

Q.    The first one that I could see -- and I might be wrong.  It might've done something sooner.  But the first one that I could see is on Line 99 for county commission district -- or excuse me -- Post 5 in 2016; is that right?

A.    Okay.  Okay.  Yes.

Q.    So that -- that corresponds with 2016 County Commission Post 5 in your report, right?

Page 92

A.    Yes.

Q.    Okay.  So going through some of these commands, first, I see on Line 125 -- I see ei.reg.

A.    Mm-hmm.

Q.    Can -- I believe that's probably related to the regression analysis, but can you explain what that is?

A.    Yes, it is related to -- to the regression analysis.  There I'm telling the program that I want to look at the vote shares that McMichael, Hicks, and what is called roll-off, that is the -- if a hundred voters showed up to vote and there were 95 votes for McMichael and Hicks and 5 people didn't vote, right, that would be roll-off, right, because they chose not to vote.

Then I want it to say, the racial groups here are Black, white, and other, and then the last item there is the database that I'm pulling from where the data is.

Q.    Okay.  Okay.  That all makes sense.

Page 93

The one right below it on 126,
"erres," can you explain what that's doing?

A.   So that's running the code and
putting the output into a data frame that then
I can pull out the elements of the regression
analysis for reporting purposes.

Q.   Okay.  Were these lines of code that
you ran when you were at DOJ?

A.   So when I was at DOJ, right, I
believe EI, again, had just come out.  In
fact -- didn't ask this, but I was the person
that helped -- that motivated DOJ to start
adopting ecological inference and using it.
Prior to that, it was ecological regression and
homogenous precinct analysis.

I don't believe that the R program
was there at that time.  I'd have to go back
and look at King's work, but again, I think a
lot of King's work and the models that we had
at the time and the code that we had at the
time are the linchpin, the beginnings, you
know, the stuff that built the R programs that

Page 94

we have today.

Q.   Okay.  But I guess then this particular sort of command line wouldn't have been in those older versions?

A.   That's hard for me to say.  It's been such a long time since I've been there.  You know, I'd have to remember -- you know, we had R, and I think there was a command line version in R that would run ecological inference from at that point in time.  But I haven't had a reason to go back and review King's handbook yet.  I mean, that was such a long time ago.

Q.   I think it was -- was it 1997 or something?

A.   '86, I want to say, but yeah, close enough.

Q.   Okay.  All right.

On line -- and I'm just going to go through these only once for each, just so you know, so that --

A.   Oh, thank god.

Page 95

Q.    We're not going to have to do this for everything.

A.    Oh, thank you.

Q.    I didn't want to keep you all day.

A.    I appreciate that.

Q.    So on Line 132, we have your comment here --

A.    Yep.

Q.    -- saying EI -- and when you have that -- that pound symbol, that's like a comment, right, and it's --

A.    Correct, yes.  That's just a comment.

Q.    Okay.

A.    I did that to help anyone that was trying to read it, like you, know what's going on.

Q.    Well, without them, I -- I'm already -- I'm lost with them, but without them, I'd be complete -- completely hopeless, so appreciate that.

So on Line 132, this begins your ER

Page 96

RxC analysis; is that right?

A.    Correct.  Correct.

Q.    Okay.  And immediately below on Line 134, we see the EI -- "eires" command, which is different from the erres command we just looked at on 126; is that right?

A.    Yes.

Q.    And what's the -- what's the purpose of that command?

A.    Again, it's doing the same thing that we did with ecological regression.  It's going to run the analysis, right, specified in the parentheses, and it's going to store those results into that data frame.

Q.    Okay.  Would that have been -- again, just kind of sticking with this -- your time at DOJ, would this have been an available command during your time at DOJ?

A.    I think that we've covered this.  I can't recall what the program language that we had would've looked like in R back then in 2006 and '07 and whatnot.  So probably not.  The

Page 97

lines -- the lines would be different.

Q.   Okay.  Yeah, (inaudible) repetitive, but I do want to get the record, I guess, because, you know, if it's -- I see erres, and you go, oh, I never used that.  And then I see, eires.  You're -- oh, of course, I used that.

I don't know the difference, so I just got to ask the --

A.   So erres, again, for clarity's sake -- I'm always happy to be clear -- that's doing ecological regression.

And then this one here, this eires, that's now storing the values for the EI RxC.

Q.   Okay.  Great.  Thank you.

Right next to that, we have ei.md.bayes, and can you just explain for me what that does?

And just with the -- the thought in mind that we're only going to do this like one time for each of these.  We're not going to go down your whole line of code here and do this for each one.

Page 98

A.    So -- so the EI -- that -- that is the procedure -- the estimation procedure that would be called.  So it's just a standard multinomial Dirichlet-Bayesian simulation model.

Q.    Okay.  Is that really -- is that, like, what runs the actual EI analysis, so to speak?

A.    I think that's fine to say.

Q.    Okay.

A.    And there's a whole bunch of stuff in there, right, that tells you the candidates --

Q.    Yeah.

A.    -- the racial groups, everything, and then the parameters.  And those are the basic parameters that are always there.

Q.    Okay.  Okay.  So, yeah, I can see we got McMichael, Hicks, roll-off.  Makes sense. Black, white, other.  Makes sense.

At the end here, it says: "Covariant equals null"; is that right?

Page 99

A.      Mm-hmm.

Q.    Can you -- is that a parameter that you're referring to?

A.     It is a parameter.  You could, if you wanted to, put in some other explanatory variable.  Some folks do that in other regressions.  Because in this case we're only interested in how racial groups voted, people in different racial groups, then we don't -- we don't have a need for that.

Q.    Okay.  Would -- would another variable be like a number or a word?

A.     It would be a word because it would be representing a column of data --

Q.     Okay.

A.     -- that you'd be wanting to call it. Like -- I don't know -- weather, you know.

Q.     Okay.  Would that change the EI analysis undertaken here?

A.     Well, it would, yes, if you had -- if you had a covariable.  That's --

Q.     That's true.

Page 100

A.    -- another variable.  It's like if you're -- if you're running a regression and you're trying to explain Y with X and then you added another variable called Z, right, that changes your predictions on the effect of X, and obviously, you have now predictions on the effect of Z.

Q.    Okay.  And the next one, "total equals null," is that similar to the covariant?

A.    The next one there is tune list equals null, start list equals null.  Those are parameters that you could put in, if you wanted to, but they're not necessary.

Q.    Oh, wait.  Hold on.  I'm sorry.  I'm seeing something different.  Are you on Line 134, 135?

A.    I am on line -- oh, I am so sorry. I went on Line 137.  My apologies, yes.

Q.    Okay.

A.    Yes.  So --

Q.    Okay.  And then, you know -- excuse me.  I'm going to take you through this

Page 101

indented portion.  We'll just do it once, and then we'll be done.

But can you tell me what lamda1 is?

A.    So I'm going to have to go back to my -- to the manual there.  When I ran this -- the -- the EI -- sorry.  I just -- for some reason, my web browser just decided to do something stupid.

Those are the standard variables that you find in the eires help pack, right, the standard values.  And so those are what's listed.  Those govern sort of like where it sort of has its starting point, like its starting guessing point, how it does its simulation and its guesses, and things like that.

Q.    Okay.

A.    So because I'm not changing anything in the standard setup, I take those values as given.

Q.    Okay.  So that actually helps streamline things, I think, for me because my

Page 102

question -- my question was the -- like,

lambda -- all these parameters are essentially

preloaded then?

          A.    Yes.

          Q.    Okay.  And so your -- your decision

on all of the -- the figures here, whether it's

lambda1 equals 4 or lambda2 equals 2 or, you

know, tune list equals null, burnin equals

1,000.  These are all just, you know, preloaded

figures?

          A.    The standard preloaded figures.

          Q.    Okay.  Great.

              For -- for these lambda parameters,

did they -- when you said you had to go back to

the manual, is that sort of what you had to do

for all of these to kind of explain --

          A.    If --

          Q.    -- what they actually mean?

          A.    If I saw anything in my initial

analysis of the data, right, I think it's

important to state that I run it and I live

with the result.

Page 103

Q.    Mm-hmm.

A.    Right?  So before I run it, I inspect the data and I ask myself questions: Do I see anything here that might be nonstandard, that might make me think, maybe this isn't the right setup?  Right?  Maybe a standard setup isn't right, right?  That's where I would do that work.

When I don't see anything, as I think I stated this before, right, that I just take the standard parameters as given.

Q.    Okay. Okay.  That's good.  That streamlined things, so that's good.

A.    That's good.

Q.    Don't have to go through each one individually.

A.    Thank god.

Q.    Well, I'd tell you, you know, it's your job, right?  Don't you love it?

A.    I'm more thinking about the poor attorneys that are on the line with you.

Q.    That is true.

Page 104

A.    Do you really want -- do you really want to get into the weeds on econometric discussions?  No, probably not.

Q.    Not with such an audience anyway.

Okay.  So I had a question here on -- on Line 166 where it looks like we start the iterative EI analysis; is that right?

A.    Line 166, yes.

Q.    I don't see that same sort of indented portion of the code that we see in a lot of these other ones there.  Is there a reason for that?

A.    Yes.  So the first thing that I'm doing here is I'm setting up the iterative process.  So when we run EI RxC, we are looking at what all three candidates, right, in that sense, and Hicks, McMichael, roll-off and all three racial groups, Black, white, other.  So you have a matrix -- an RxC matrix of nine.

Here for iterative, right, I am collapsing these groups together, so I want to -- I want to analyze, for example,

Page 105

Black, and that's going to be the subject that I'm interested in, and then everyone else, I've collapsed a category -- I've collapsed two down to one.

And you see I do the same thing for the other one, right?  So I have a -- if I'm looking at white, I have a collapsed category of Black and other.  If I'm looking at Black, I have a collapsed category of white and other, right?  And you see that I do this for the candidate to go from Hicks, McMichael, and roll-off to Hicks and McMichael and roll-off.

Q.    Okay.  I think I get that.

And so then it just wouldn't -- that's just like the initial part before you do the EI point estimate analysis?

A.    Yeah.  To do iterative EI, yes.

Q.    Okay.  And, like you said, EI RxC is going to be a little bit more -- is one larger, three-by-three column?

A.    Yes.  It's going to look at a lot of -- it's going to look at everything at the

Page 106

same time.

Q.    Okay.  Okay.

So fair to say then -- you know, we have this indented code a bunch.  Fair to say that your responses regarding, you know, the parameters set and everything are the same for each of those as they were for the initial indented code we just talked about?

A.    I would agree with that.

Q.    Okay.  And -- yep.  I think that's everything I have on the code.

A.    Okay.  Everybody can now stop --

Q.    Everybody can tune back in.

A.    -- their eyes.

Q.    All right.

A.    Where are we going, sir?

Q.    We are going to go back to your report.

A.    Is that HB2?

Q.    HB2.

A.    Okay.

Q.    All right.  If we can scroll down to

Page 107

Page 15.

A.   Okay.  I'm there.

Q.   We are through methodology, both narrative portion and code portion.

A.   Okay.  I see B, findings.  That's where I am.

Q.   Okay.  Perfect.

Now, here you list all nine elections that you analyzed and state that -- well, first, let me ask you that.  You list all nine elections you analyzed here, correct?

A.   I -- in order to see that -- I think I'm on Page 17?  Are we talking about Table 1?

Q.   I was talking about the narrative portion.  You say:  "Between 2014 and 2024, there were seven general elections," and then --

A.   Okay.  Sorry.  Sorry.  Yes, reading the text.  Okay.

Q.   Yeah.

A.   I'm with you.  Seven general elections, one primary election, one special

Page 108

election.

Q.    Okay.  Great.

And you state that all of these elections are racially polarized, correct?

A.    That is what I wrote there, yes.

Q.    Okay.  Next you say that because all the statistical methods and robustness checks produced substantively identical results, I present only the results of my iterative EI analysis.  That's right there at the end of 15?

A.    Yes, it is.

Q.    What -- what kind of robustness checks did you perform?

A.    So when I talk about robustness checks, what I mean here is I am presenting EI as my sort of -- the -- the methodology that I think best fits the data that we have for the question at hand.  The robustness checks would be ecological regression and would be ecological inference row by column, RxC.  So one is my primary set.  The other two are my robustness checks.

Page 109

Q.    Okay.  And you say all these --
EI -- iterative EI, your EI RxC, and your
ecological regression?

A.    Correct.

Q.    And you characterize iterative EI as
the best suited for the kind of data in Houston
County; is that right?

A.    Yep, I did state that.

Q.    And can you just describe that type
of data real quick for me?

A.    The -- the data is the -- the
election returns that we have, right, the voter
demographics and the number of precincts that
Houston has, right, and the fact that we have
turnout data and not registration data.

Q.    Okay.  And while you present
(inaudible) in your substantive --

A.    I'm sorry.  You just -- you just
broke up.  I apologize.

Q.    Thank you.  Thank you.  I'm too far
away from the microphone.

While you present only iterative EI

Page 110

in the substance of your report, your appendices A and B include those other analyses you --

A.     They do, yes, for completeness.

Q.     Okay.  If we can look at Table 1 on Page 17.

A.     Okay.  Sounds good.

Q.     This contains only the point estimates of your iterative EI analysis, right?

A.     Correct.

Q.     And so, as we discussed, the confidence intervals would kind of span out in both directions from these point estimates?

A.     Which are listed in the appendix.

Q.     Okay.  So looking at the -- you know, this table here, the first contest that jumps out to me is 2020 CC Post 5, which, if we zoom in, is going to be the second --

A.     McCants, yes, I see that.

Q.     Yeah.  Where your point estimates show Black support -- Black support for McCants at 56 percent -- 56.1 percent?  Excuse me.

Page 111

A.    Correct.

Q.    And white support for that candidate is at 25, right?

A.    Correct.

Q.    And you determined that this election was racially polarized?

A.    Correct.

Q.    And this also satisfies the separate electorates test, right?

A.    Yes.

Q.    So then, in your opinion, this election satisfies both Gingles 2 and 3?

A.    Yes.  That -- although, to be clear, right, Gingles is that -- the minority group is usually cohesive, right, to support a candidate -- or sorry.  The minority group is cohesive to support a candidate and that the other group, white voters in this case, are, you know -- you know, vote as a bloc to usually defeat the candidate.

So, like, the Gingles is about -- 2 and 3 is about a set of elections.  You just

Page 112

asked me a question about one election.

Q.    Mm-hmm.

A.    I just want that clarity in there.

Q.    No.  That's good.  That's important.

So -- but you do agree that each election, I guess, displays a sort of sliding scale degree of cohesiveness, right?

A.    Each election has its own result. Each election is different in their own regards, right?  So it would be -- it would be very odd if all the elections showed the exact same thing.

Q.    Do you feel that the numbers in this particular election that we're talking about here, 2020 CC Post 5 -- do you feel that these point estimates reflect the requisite degree of cohesion in order to satisfy Gingles 2?

A.    I am not a lawyer.  I am asking -- I was -- I'm using the separate electorates test, right, which is clearly defined under Gingles, and I'm making the determination based on that separate electorates test.

Page 113

I leave the lawyer -- I leave the legal stuff to the lawyers.

Q.    So you don't have an opinion one way or the other as to whether 56.1 percent of Black support for a candidate is cohesive?

A.    I have -- the only opinion that I have is that this satisfies the separate electorates test.

Q.    And as we discussed, though, earlier, you stated that when the separates electorates test is satisfied, that you would opine that Gingles 2 and 3 have been satisfied?

A.    That you've shown for that particular election that Black voters voted together.  They were cohesive.

I am not aware of a standard in Gingles that defines the proportion that needs to -- that the proportion that's required to state cohesiveness, and that in that election white voters voted in a sufficient bloc to defeat the candidate choice of Black voters.

Q.    Okay.  And so can we -- I mean,

Page 114

you'd agree that cohesion is part of the analysis under Gingles 2 and 3, right?

A.    I think that's Gingles 2, yes, cohesion and then crossover support or insufficient crossover support is 3.

Q.    And insufficient crossover support could be characterized as a level of cohesion, right, among the white electorate?

A.    If we flipped it around, we could -- we could say that.

Q.    Okay.  So I kind of just want to -- again, as we did with racial polarization or racially polarized voting earlier, I kind of just want to try to establish a scale of cohesion for purpose of your opinions here, and I want to throw out a possible sort of definition.  I want to see if you would agree with me.

I'd say that a perfectly cohesive voting pattern in a two-person contest would show that 100 percent of voters of a race are voting for one candidate and zero percent of

Page 115

voters of that race are voting for the other. Is that a fair way to describe perfect cohesion?

A.    I don't think I'd describe it like that.

Q.    How would you describe it?

A.    I would describe cohesion as -- you know, because I think -- I think what you described is like the extreme of the extreme cases that probably never happens in reality.

I would say cohesion is, does -- do a majority of voters', across elections, support of a group support similar or the same candidates.  Then on -- so you can apply that to Black voters.  You can also apply that to white voters.

Q.    Okay.  Let me -- let me push back a little bit on that because I would say in a two-person contest, right, only two choices, just achieving a bare majority at least, let's say, 50.1 percent and then the other side of that same race votes 49.9 percent, that would

Page 116

seem to me to be as noncohesive as you can get

apart from a 50/50 split; is that fair?

A.   I think your analogy is missing the

confidence interval, right, which is not

included in that table in my text but is

included in my appendix, that shows that for

that election my confidence interval ranges --

and I'll just keep it simple here -- from 51

percent to 64 percent.  So the truth is

somewhere in there.

Q.   Well, I agree with that.  I do.  But

my -- my question is more attempting to isolate

a opinion on what constitutes cohesion, and it

doesn't have to be necessarily it's X percent,

but I do think that we've established that

Gingles 2 requires cohesive voting for the

Black -- Black voter electorate in order to

satisfy Gingles 2; is that fair?

A.   I mean, we've talked about what

Gingles 2 and 3 are, yes.

Q.   Yeah.

A.   But, again, I'm sorry.  I'm just

Page 117

going to restate, Bryan.  I'm not trying to be difficult.  But in my expert report, I'm very clear that I'm applying the separate electorates test to make my determinations.

Q.    I understand that.  I understand that, and I understand --

A.    And so -- and so if I don't offer -- if I don't in my report state anything else about that, I'm not going to offer any other opinions outside of that report, outside of my conclusion based on separate electorates test.

Q.    Okay.  But here's the thing, so your report at Footnote 8 references Gingles 2.  It references the word-for-word, you know, quote from the case, and it --

A.    Yes.

Q.    Gingles 2 says -- in Bullet Point 2, Footnote 8, says:  "Second, the minority group must be able to show that it is politically cohesive."

And this report attempts to establish that, but it avoids entirely and

Page 118

you're avoiding now entirely the question of whether the minority group is politically cohesive based on the results that you get. Is that --

A.    I don't think I'm -- I don't think I'm avoiding this at all, and I apologize. This -- this comes from sort of my background in, you know, being a researcher, being a scientist.

I have stated the requirement for my conclusion up front. I've stated my assumption, right? I've -- and my -- and my requirement up front before I even did any of this work was that it has to fulfill the separate electorates test.

And, thus, under that requirement, which has been my standard requirement both in my time at DOJ and in my outside consulting work, that if Black and white voters support -- have -- have levels of support, right, that show that they would elect different candidates if the election were held separately for each

Page 119

of those groups, then that meets the condition to conclude that voting is racially polarized.

Q.    And in that definition, there is no consideration as to the degree of cohesion of the minority voting bloc?

A.    The only consideration is can I make a determination that the -- that either bloc voted, you know, separately for a candidate of choice, right?  So can I conclude that McCants was supported by the majority of Black voters? In this case, I can conclude that because McCants was supported by 51 percent to 64 percent with the point estimate being 56 support of Black voters.

Q.    Okay.  Thank you.

You mentioned confidence intervals on the iterative EI table that you provided, and for that particular contest, if you scroll down to page 26 -- is it 26?  No.  That's the -- iterative EI is 24.

A.    Correct.

Q.    So this is the kind of blown-up

Page 120

table that contains not just the point estimates but the confidence intervals?

A.    Correct.

Q.    Okay.  And so for that one we were just discussing, which is McCants 2020 CC Post 5 --

A.    Mm-hmm.

Q.    -- that confidence interval does dip down to 51.1, right?

A.    It is 51 to 64, yep.

Q.    Okay.  If we look at your EI RxC, we do start to see confidence intervals kind of -- or at least in one case we see a confidence interval dip below the 50/50 threshold, right?

A.    That is correct.

Q.    And that would be 2016 County Commission Post 5?

A.    Correct.

Q.    And you still characterize this as a racially polarized election?

A.    I believe in my text I talked about the iterative EI results.

Page 121

Q.    That's true.

A.    And then I don't see anything in the other results that make me want to come off of that statement.  If I was analyzing that -- that specific result here, right, that would be one where voting would not be racially polarized with the point estimate of 40 -- the point estimate is 52.1.  The confidence interval goes below 50, right, and I'm crystal clear in acknowledging that.

Q.    Okay.  But you also characterize these sort of noniterative EI analyses, the ecological regression and the EI RxC, in your report as substantively identical to your iterative EI results; is that right?

A.    I -- I did.

Q.    And you feel that's still the case?  You still stand behind that opinion, given that you find an election that's not racially polarized in the EI RxC analysis but it is --

A.    I do.

Q.    -- racially polarized --

Page 122

A.    I do because, if you look at the confidence intervals, looking at McCants, for example, right, those confidence intervals are relatively the same, right?

And if I were to tell you your chances of it raining are between 51 and -- are between 50 and 60 percent or 50 and 65 percent and then the other one I say, it's 55 to 68 percent, I don't think that you update your prior on -- on the -- on whether you should have an umbrella.

Q.    Well, that sounds more like --

A.    I will also -- I will also note that the -- the election there that you pointed to, that 49.8 for the EI RxC, which I believe I stated was not my preferred estimate -- estimation strategy here, if you go to 2016 CC Post 5, Table A1, you will see that I do get a contest that is racially polarized.  I mean --

Q.    I'm sorry.  I -- I didn't hear that last part.

A.    That you -- you -- you -- if you

Page 123

look at the -- the answer for Table A1, right,

you see a confidence interval that's 76 to 90.

Q.    Right.

A.    And so when I am weighting my

robustness checks looking at my result, I had a

strong prior that I thought the iterative EI

would be the most accurate of my three

methodologies.  And so I'm looking at the other

two methodologies as I check to see, do I see

anything there that is compelling enough for me

to come off of what my baseline decision is,

and I do not in those situations looking at

both ER and EI RxC.

Q.    Okay.  So here's what I'm seeing,

though.  On the one hand, you say EI is the

most -- excuse me -- iterative EI is the most

reliable measurement for -- or analysis for

purposes of Houston County's data; is that

right?

A.    I did state that, yes.

Q.    But if I look at -- let's see.  So

EI on 2016 CC Post 5 gives you Black support

Page 124

for Hicks at a point estimate of 83.6, right?

A.    Correct.

Q.    Then the EI RxC, if you go down to
Table A3 just one page down --

A.    Mm-hmm.

Q.    -- that gives you Black support at
52.1?

A.    Correct.

Q.    Now, these are substantially
different point estimates, right?

A.    They are.

Q.    First, is that common for you when
you're doing this type of analysis that you
would see a 30-point or a 34-point swing on an
election?

A.    When we have elections where we
have, like in Houston, a number of precincts
that we have and the racial demographics of
those precincts, you're going to get -- you can
get very different estimates based on the
methodology that you choose.

So in this case, we have three

Page 125

methodologies.  It is important to note that, when looking at Houston's data before running any analysis, I determine based on just looking at the data what would be the, in my opinion, best-suited way to estimate voting behavior.

As per standard, I include the other two results that I would typically do as robustness.

Q.    Mm-hmm.  Now, if we go down to the next one, McCants, on the iterative EI, you get a 56.1 estimate, right?

A.    Yes.

Q.    But then on the EI RxC, you get a higher level of Black cohesion for McCants. You get 61.8, right?

A.    The point estimate is higher, correct.

Q.    Would you say the confidence intervals are higher?

A.    The confidence intervals overlap.

Q.    56 -- let me see.  56.1 to 68.7 on A3 and 51.1 to 64.1.  So the confidence

Page 126

intervals -- the bottom of the confidence interval is higher in EI RxC as is the top, right?

A.    Yes.

Q.    Okay.  So what that strikes me -- that strikes me as odd because in the EI -- iterative EI for Post 5 2016, you see a 34 percent decrease in Black cohesion depending on which model you use.  Then in McCants, you see a 5 percent increase in Black cohesion depending on which model you use, and so they're going opposite ways.

EI -- iterative EI in the first election is producing a much higher level of cohesion than is EI RxC, whereas iterative EI in the second election produces a lower level of cohesion than EI RxC.

So is that -- how do you -- how do you make an assessment as to racial polarization when these two models are ping-ponging this way?

A.    Two responses.  Number one, just as

Page 127

a correction, in the McCants election because those confidence intervals for EI, iterative EI, EI RxC do have significant overlap between the two methodologies, there is a number of possibilities that could be exactly the same, right?  Those overlap fairly significantly, and so your ground truth could be 57/57, right? Nothing changed.  That's the nature of the assessment.

Number two, the other point that I would make, again here I am not focused in on the degree to which things ping-pong around because of how I stated up front in my report I would determine racial polarization.  I would determine it under the separate electorates test, and so to the extent that we see shifts, those shifts are not material because I'm still looking at do Black and white voters, if they voted separately, would elect different candidates of choice, and the answer is yes, they usually would.

Q.    Okay.  With respect to those

Page 128

overlapping confidence intervals, did you do any statistical test to see if those overlapping intervals indicated any statistically significant difference between the estimates?

A.    I did not perform any analysis that's not contained in my expert report.

Q.    Okay.  So just so the record is clear, that's a no?

A.    That is no.

Q.    Okay.

A.    At this rate, one of you guys is going to owe me a new bag of throat lozenges.

Q.    Yeah.  Sorry to have you talking so much today, but we are getting closer to the end, if that helps.

A.    I like that.  I like that graphic there, Bryan.  All right.  Let's get real.

Q.    Okay.  Now, you've mentioned a number of times that you're concerned only and solely with the separate electorates test and the degree of cohesion and any individual

Page 129

election is somewhat immaterial provided that the separate electorates test is satisfied; is that right?

A.    I'm -- yeah.  I'm looking at the separate electorates test and then saying what happens with usually these contests, yeah.

Q.    Okay.  And I direct you to Page 21 of your report.

A.    Okay.  I'm there.

Q.    Okay.  Bullet Point 4 says:  "Black voters as a group were cohesive in all eight general special elections."

Do you see that?

A.    Yes.

Q.    Based on what we have seen in these elections that we've analyzed, are you still comfortable making that conclusion?

A.    Yes.

Q.    What forms the basis for your conclusion that Black voters are cohesive in all eight general special elections?

A.    That conclusion is based on my

Page 130

application of the separate electorates test.

Q.    Okay.

A.    I --

Q.    Oh, sorry.  Go ahead.

A.    My -- my review of the methodologies that I employed:  Ecological regression, ecological inference, RxC, and iterative ecological inference.

Q.    Okay.  And lastly on this point, I want to talk to you about Bullet Point 3.  You state that in a single Republican primary voting was not racially polarized, but the Black candidate did not win; is that right?

A.    Yes.

Q.    Who was the Black-preferred candidate in this election?

A.    So that's an interesting question. The reason why this election is not racially polarized comes down to a methodological choice that I made and was clear about in my report. When groups are less than 5 percent of the electorate, right, you see that I rolled them

Page 131

up, and I don't analyze --

Q.    Mm-hmm.

A.    -- them.  That was true in EI RxC too.

Black voters in that election, according to the voter turnout rolls from the secretary of state, were 3 percent of the electorate.  In my opinion, it is not possible to estimate reliable racial Black voting analyses in the Republican primary for Black voters.

I was able and did conduct an analysis to understand how the 94 percent of white -- of voters who were white -- 3 percent were Hispanic and other -- voted.  And there I can see that the white -- that the white voters preferred -- oh, I'm blanking on who it is right now.  I'd have to go back to the report, but they -- they -- they look like they approved -- not approved, that they voted for one of the candidates with about just a little hair over 52 or 54 percent of their vote.

Page 132

Q.    Okay.  Yeah, I recall that.  We don't have to pull that up now.  We can check out that report later.

A.    Sure.

Q.    But -- so then your conclusion that the primary wasn't racially polarized is based on a lack of data --

A.    That --

Q.    -- rather than affirmative data demonstrating a lack of polarization?

A.    That would be correct, yes.  One could run an estimate on a group that's 3 percent, but I would advise against that, and I would not that purport that.

Q.    Does your report contain any other conclusions that are based on no data?

A.    I think that's an incorrect characterization.  I did have data for white voters, right.  I could make that, right.  I did have the data.  So to call my conclusion on one election based on no data --

Q.    But you'd agree with me --

Page 133

A.     (Inaudible) but --

Q.     Yeah.  I mean, you'd agree with me that -- I mean, it's in your conclusion -- concluding paragraph that you're saying this election was not racially polarized, right?

A.     Yes, because I did not analyze and rely upon estimates of Black voter behavior, so I don't know that.

Q.     Wouldn't it be more accurate to say that you don't know whether it's racially polarized or not?

A.     I suppose that's fair.

Q.     And so my question is:  Does your report contain any other conclusions that are based --

A.     No.

Q.     -- on not having the necessary data?

A.     No.  And, again, that is -- and -- and maybe I'm splitting hairs here, but it is -- when we do have all of the data that can be provided for that election, it is that because of assumptions that I have and

Page 134

guidelines that I have on how I conduct analyses that I do not have -- I do not have analysis for Black voters for that Republican primary.

Q.   And that's because you believe that -- or your analysis indicates that Black voters are less than 5 percent of the --

A.   That they are 3 percent of the electorate for the Republican primary.  That is correct.

Q.   And if they were higher than 5 percent, would -- would you still feel comfortable, sitting here today, saying that the election is not racially polarized without doing that analysis?

A.   My general approach that I've had throughout all of my things, the analysis that I do, right, is to look at it, look to consider candidate racial groups or candidates when they are over 5 percent.  I may or may not conclude that I can rely upon it.  The confidence intervals might be very large.

Page 135

MR. JACOUTOT: Okay. I'm ready to take a lunch break if you guys are.

THE WITNESS: Sure.

MR. JACOUTOT: And --

MR. SELLS: Yeah. Yeah. As you said earlier, Bryan, we're -- we're all at home, so we probably don't need a long lunch break. About how much do you have left?

MR. JACOUTOT: Let's see. We're nearing the end. We're -- we're about to hit the rebuttal report.

THE WITNESS: I mean, if you think we can get it done before one o'clock, I'm fine to continue on, but if people are hangry -- like, I'm not hangry right now but...

MR. SELLS: I'm not hangry either, but I think, most importantly, I don't want my witness to be hangry, and obviously, it's your deposition, so it's your call.

MR. JACOUTOT: Let's -- let's do -- let's do a 20-minute lunch --

MR. SELLS: Okay.

Page 136

MR. JACOUTOT:  -- because I don't think I could do it in 25 minutes.

THE WITNESS:  That's fine.

MR. JACOUTOT:  Or we might.  I mean, it's always so hard to tell, but we're not -- you know, there's not a huge amount left, but I think a 20-minute break would be good.

MR. SELLS:  All right.  You want to come back at 12:55?

MR. JACOUTOT:  Yeah.  That would be -- that'd be great.

MR. SELLS:  All right.  Let's do that.

THE WITNESS:  All right, folks.  Thank you.  Buh-bye.

THE VIDEOGRAPHER:  We're now off the record at 12:34 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  We're now back on the record at 12:54 p.m.

You may proceed.

BY MR. JACOUTOT:

Page 137

Q.    Thank you, Dr. Popick, and just to be clear, you know you're still under oath?

A.    Yes, I do.

Q.    Okay.  Great.

So I just have a little more I want to cover from your principal -- your principal report that we've been talking about today and then a little bit on your rebuttal report, and then --

A.    Okay.

Q.    -- we will be all done.

A.    Okay.  Let's get to it.

Q.    On the -- on the principal report, earlier today we were talking about the replication data that you all sent over, and I asked whether you could replicate the results that you -- that you produced in the report?

A.    Correct.

Q.    And you -- you said that the -- correct me if I'm wrong.  You said that the nature of the EI analysis is such that you're always going to get different results but

Page 138

they'll probably be somewhat similar?

A.    That's why you have the confidence interval.  Correct, yes.

Q.    Okay.  Will the confidence intervals be the same and you just get different point estimates?

A.    You will get different confidence intervals as well because it's an entirely new simulation.

Q.    Okay.  So then fair to say that, sitting here today, you couldn't replicate the tables -- you couldn't guarantee that you could replicate the tables by running that analysis again that you put in your report?

A.    That's not how EI RxC or iterative EI work.  You can replicate the material conclusion that you would make --

Q.    Mm-hmm.

A.    -- based on that.  But it would be shocking to me if you were able to rerun the simulation, which I believe is like 10,000 of them, you know, to get the same numbers --

Page 139

Q.    Okay.

A.    -- the exact same numbers.

Q.    Okay.  Gotcha.  Okay.

Let me go ahead, and I don't think I've marked your -- oh, I did mark your rebuttal report already.

A.    You did.

Q.    HB4.

A.    Okay.  We're moving to that.  We're done with HB2.  Okay.

Q.    I believe so.  You know, at the very end, I may still come back but --

A.    No take-backsies.

Q.    Okay.  So this is the report -- this is the report that you sent kind of in response to the defendants' experts reply to your report, correct?

A.    To Dr. Barber, yes, his reply to my report and, I believe, another expert for the plaintiffs.

Q.    Okay.  At a high level, you know, this really addresses Dr. Barber's critiques

Page 140

very, you know, nicely and neatly.  So, you know, you point out four main criticisms that he has, and you address them one by one, right?

A.    I appreciate you calling it nicely and neatly.  Thanks.

Q.    Yes.  We always -- yeah, we always enjoy having a bit of a direction when we're doing these.

So those four critiques that Dr. Barber leveled, as you described them, are -- if we look on Page 3 we see you kind of lay them out here.  Number one, that the estimate of racial polarization varies substantially across estimation methods?

A.    Correct.

Q.    That -- number two, that you did not analyze recent countywide board of education or statewide public service commission elections; is that right?

A.    Correct.

Q.    That I -- or excuse me.  That you did not analyze contested democratic primaries,

Page 141

correct?

A. Correct.

Q. And that you did not provide vote share and voting estimates for the other three candidates in the 2022 Republican primary for Houston County Commission --

A. Correct.

Q. -- District 2?

A. Correct.

Q. Okay. Great.

Now, I think we pretty much talked at length at 1 already. We talked about the varying point estimates and the confidence intervals.

A. We can put that aside. That's fine with me.

Q. Yeah. So the next one is that you did not analyze recent countywide board of education or statewide public service commissions?

A. Okay.

Q. And you go into some pretty good

Page 142

detail sort of responding to that, and just at a high level, if I make sure -- let me make sure I got kind of your overall conclusions right.

It seems to be that you -- your explanation for the fact that Black-preferred candidates got elected in those elections was the level -- the varying level of turnout -- of relative turnout of Black voters versus white voters as compared to a typical kind of November general election; is that fair?

A.    Typical November general election for when the Houston County Commission is being elected, yes.

Q.    Okay.  And what -- it seems like that you -- you would say that the November 2024 election constitutes a pretty good baseline turnout model.  Is that fair to say?

A.    I use the 2024 election for a baseline because it was sort of coincident -- that's the wrong word -- because the other elections that we're looking at were 2024 or

Page 143

2025, right?

Q.    Mm-hmm.

A.    So I use it solely because it's the closest at the point in time.

Q.    Okay.  But if there was an election, let's say, in 2022 that had a similar turnout to the November 2024 election in terms of proportional turnout, right -- let's say Black turnout was around 30 percent, as it was in November '24, and white turnout and the remaining other turnout occupied the rest of that turnout share.  You would expect the Black-preferred candidate to lose in that type of election; is that fair?

A.    In a November election, yes.

Q.    Well, irrespective of whether it's November, if the turnout shares kind of mirror that November election of 30 percent Black turnout, 70 percent other --

A.    So that's -- that's a hypothetical. I don't particularly like dealing in hypotheticals.  So, you know, when -- when I --

Page 144

when I see -- you know, and I did provide what the turnout share was for November of 2022, right, which was 29 percent.  And I did provide the turnout share November 2024, which was 30 percent.

Q.    So I understand the -- let me make sure I'm close to the mic by the way.

A.    Sure.

Q.    I understand the reticence to engage in hypotheticals, but is it fair to say that if a turnout in a Houston County Commission election or -- or any other countywide election mirrored those turnout figures, whether it's 29 percent share of Black electorate or 30 percent share of Black electorate, if we're getting in that neighborhood, your criticisms of sort of these elections as not being representative of a traditional commission election don't really apply anymore, do they?

A.    That particular criticism would not.

Q.    Okay.  Okay.  Okay.  I'm going to just pause for a few minutes and -- look, it's

Page 145

one o'clock, so I could've done it.

I'm going to pause for a few minutes and just check everything and make sure I've covered everything I want to cover so --

A.    If it's okay, I'm just going to go off video and camera while you're figuring out what you want to ask.

Q.    Sure.  That sounds great.

MR. JACOUTOT:  And we can go off the record.

THE VIDEOGRAPHER:  We're now off the record at 1:02 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  We're now back on the record at 1:06 p.m.

You may proceed.

MR. JACOUTOT:  We are now back on the record.  I do want to point out that this is not, in fact, my first deposition, so sorry for continually doing that.

I have no further questions.  Thank you very much, Dr. Popick, for your time.

Page 146

THE WITNESS:  You're welcome.

MR. SELLS:  And I have no questions for the witness.

THE VIDEOGRAPHER:  And we're now --

MR. ANDINO:  I also have no questions for the Rozier interest.

THE VIDEOGRAPHER:  We're now off the record at 1:06 p.m.

(Whereupon, the deposition was concluded at 1:06 p.m.)

Page 147

CERTIFICATE OF NOTARY PUBLIC

I, LINDSEY RUSSO, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to computerized transcription under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Notary Public in and for

the District of Columbia

My Commission expires:  February 28, 2029

Page 148

Stephen J. Popick , Ph.D.

RE:    Driver, Courtney, Et Al. v. Houston County Board Of
       Elections, Et Al.
       3/13/2026, Stephen J. Popick , Ph.D. (#7906093)
       The above-referenced transcript is available for
review.
       Within the applicable timeframe, the witness should
read the testimony to verify its accuracy. If there are
any changes, the witness should note those with the
reason, on the attached Errata Sheet.
       The witness should sign the Acknowledgment of
Deponent and Errata and return to the deposing attorney.
Copies should be sent to all counsel, and to Veritext at
litsup-ga@veritext.com
 Return completed errata within 30 days from
receipt of testimony.
   If the witness fails to do so within the time
allotted, the transcript may be used as if signed.


              Yours,
              Veritext Legal Solutions

Page 149

Driver, Courtney, Et Al. v. Houston County Board Of Elections, Et Al.

Stephen J. Popick , Ph.D. (#7906093)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Stephen J. Popick , Ph.D.                          Date

Page 150

Driver, Courtney, Et Al. v. Houston County Board Of Elections, Et Al.

Stephen J. Popick , Ph.D. (#7906093)

ACKNOWLEDGEMENT OF DEPONENT

I, Stephen J. Popick , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

Stephen J. Popick , Ph.D.                          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

**[& - 3/13/2026]**

Page 1

| & | | | |
|---|---|---|---|
| **&** 16:13 | **12:54** 136:20 | 112:17 113:12 | **2024** 107:15 |

**&**

**&** 16:13

**0**

**0025** 1:5 6:16
**07** 96:22

**1**

**1** 6:9 36:9
42:20 107:13
110:5 141:12
**1,000** 102:9
**10** 68:17
**10,000** 138:21
**100** 114:21
**10:01** 1:17 6:2
6:7
**10:13** 19:1
**10:19** 19:4
**11** 5:3 26:8
73:4
**1101** 3:11
**11:20** 76:10
77:13
**11:31** 77:16
**1220** 39:13
40:9
**1232** 42:15
**125** 92:3
**1250** 2:7
**126** 93:1 96:6
**12:30** 76:15
**12:34** 136:17

**12:54** 136:20
**12:55** 136:9
**13** 1:16 6:8
42:16
**132** 95:6,22
**134** 96:4
100:16
**135** 100:16
**137** 100:18
**15** 69:16 107:1
108:10
**16** 5:10,11
69:16
**162** 81:4
**166** 104:6,8
**17** 5:12 107:13
110:6
**17th** 3:11
**18** 5:13 40:12
**19** 5:14
**1997** 94:14
**1:02** 145:12
**1:06** 145:15
146:8,10
**1:30** 76:20

**2**

**2** 27:20 28:2
34:13 35:19
36:13 37:2,8,9
39:4 42:21
49:7 59:18
60:11 102:7
111:12,21

112:17 113:12
114:2,3 116:16
116:18,20
117:13,17,17
141:8
**20** 76:4 135:21
136:7 150:15
**2003** 20:12
21:7,7
**20036** 3:12
**2004** 21:8,18,21
24:14
**2005** 46:11
**2006** 21:14,19
21:21 23:9
24:7,11,17,19
25:1,8,15
39:14 40:13
41:1 45:10,18
45:19 96:21
**2008** 26:4
**2010** 49:12
66:3
**2012** 25:8,15,17
25:18
**2014** 107:15
**2016** 26:4
91:17,21
120:16 122:17
123:22 126:7
**2020** 110:17
112:15 120:5
**2022** 141:5
143:6 144:2

**2024** 107:15
142:17,19,22
143:7 144:4
**2025** 143:1
**2026** 1:16 5:14
6:8
**2029** 147:22
**21** 129:7
**22301** 14:10
**24** 119:20
143:10
**25** 111:3 136:2
**250** 29:19
**26** 119:19,19
**28** 20:10
147:22
**29** 24:3 144:3
144:13
**2d** 39:13 40:9
49:11

**3**

**3** 17:3 33:2,5
34:13 35:19
36:13 37:9
111:12,22
113:12 114:2,5
116:20 130:10
131:7,14
132:12 134:8
140:11
**3/13/2026**
148:5

Stephen J. Popick , Ph.D.                                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[30 - acknowledgment]**                                                    Page 2

**30**  124:14 143:9,18 144:4 144:14 148:16
**30326**  3:20
**31107**  3:6
**31944**  147:19
**34**  124:14 126:7
**3630**  3:19
**37**  21:11
**39**  5:15

**4**

**4**  17:18 37:16 49:4 86:3 102:7 129:10
**40**  121:7
**411**  49:11
**427**  50:14
**475**  39:12 40:9
**49**  5:17
**49.8**  122:15
**49.9**  115:22

**5**

**5**  62:3 65:22 91:17,21 92:15 110:17 112:15 120:6,17 122:18 123:22 126:7,10 130:21 134:7 134:11,20
**50**  121:9 122:7 122:7

**50.1**  115:21
**50/50**  116:2 120:14
**505**  14:8
**51**  116:8 119:12 120:10 122:6
**51.1**  120:9 125:22
**52**  131:22
**52.1**  124:7
**52.1.**  121:8
**54**  131:22
**5493**  3:5
**55**  122:8
**56**  110:22 119:13 125:21
**56.1**  110:22 113:4 125:11 125:21
**57/57**  127:7
**58**  5:18
**5:25**  1:5 6:16

**6**

**6**  33:14,15 68:1
**60**  122:7
**61.8**  125:15
**64**  116:9 119:12 120:10
**64.1.**  125:22
**65**  122:7
**68**  122:8

**68.7**  125:21

**7**

**7**  33:14 60:6,11
**70**  71:22 72:1 143:19
**700**  3:19
**704**  49:10
**75**  72:2,3
**76**  123:2
**78**  5:20
**7906093**  1:22 148:5 149:2 150:2

**8**

**8**  34:18 117:13 117:18
**80**  71:22 72:1,2 72:3
**83.6**  124:1
**86**  94:16

**9**

**9**  21:12 68:13
**90**  123:2
**94**  131:13
**95**  72:7 92:14
**99**  91:16

**a**

**a.m.**  1:17 6:2,7 19:1,4 77:13 77:16
**a1**  122:18 123:1

**a3**  124:4 125:22
**able**  13:1 81:1 85:21 117:19 131:12 138:20
**above**  148:6 150:7
**absolutely**  75:15 86:2
**academic**  66:1 66:8 73:7
**accepted**  21:6
**access**  78:22
**accompanying**  32:9
**account**  67:13
**accounted**  31:17
**accounts**  72:18
**accuracy**  70:8 72:9 148:9
**accurate**  74:3 123:7 133:9
**achieved**  25:22
**achieving**  115:20
**acknowledge**  8:15,19
**acknowledge...**  150:3
**acknowledging**  121:10
**acknowledg...**  148:12

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

[act - anticipate]

Page 3

act 39:5
action 1:4 10:9
  46:1,4 48:18
  147:12,17
active 41:11
actual 71:9
  98:7
actuality 88:9
actually 12:19
  27:6 43:4
  62:16 70:17
  78:21 80:13
  101:21 102:18
added 50:2
  78:17 100:4
addition 70:6
additional
  41:15,16 48:14
  49:15 70:7
additions 150:6
address 140:3
addresses
  139:22
adjudged 59:20
adjust 75:2
adjusted 31:14
adjusting 54:21
administer
  8:21
administered
  8:20
administration
  45:12,14,14

adopting 93:13
advancement
  7:22 8:5
advise 132:13
affirmative
  132:9
ago 16:4 31:13
  94:13
agree 8:22
  11:13 12:17
  106:9 112:5
  114:1,17
  116:11 132:22
  133:2
agreeable
  10:17 12:16
agreed 54:1
ah 17:10 18:18
ahead 12:15
  14:2 79:20
  130:4 139:4
ai 54:20 55:2
  55:10,12 56:13
  56:14 87:8
al 1:5,8 6:13,14
  148:4,4 149:1
  149:1 150:1,1
alexandria
  14:9
allotted 148:19
allow 47:3
  84:18
allowed 10:10
  87:6

allows 89:11
allude 69:6
alter 74:18
alteration
  79:10
amount 136:6
analogy 116:3
analyses 42:8
  48:14 51:16
  53:3,4 56:17
  80:6 110:3
  121:12 131:10
  134:2
analysis 22:3,4
  22:4,5 35:10
  36:10 37:7
  41:13,18,20,21
  42:1,6 43:15
  44:2,2,4 46:20
  47:6,13,16,17
  47:19,22,22
  48:1,17 51:7
  51:14 52:9,14
  53:17 54:3
  56:21 57:4
  61:18 63:9
  64:2 66:4,21
  66:21 67:10
  69:8 74:20
  80:16 82:1
  84:12,18 89:17
  89:17,18 90:7
  90:14 92:7,10
  93:6,15 96:1

  96:12 98:7
  99:19 102:20
  104:7 105:16
  108:10 110:9
  114:2 121:20
  123:17 124:13
  125:3 128:6
  131:13 134:3,6
  134:15,17
  137:21 138:13
analytic 73:9
analytical
  73:13
analyze 44:19
  60:22 61:10
  85:4 104:22
  131:1 133:6
  140:17,22
  141:18
analyzed 38:11
  65:10,15 107:9
  107:11 129:16
analyzing 32:1
  121:4
andino 3:9 7:15
  7:15 10:20
  146:5
answer 10:15
  62:1 71:17,22
  72:2 81:10
  123:1 127:20
answers 84:4
anticipate
  76:10

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[antitrust - back]**                    Page 4

**antitrust** 21:19 21:21 22:21 23:2,6 24:14 25:2
**anybody** 15:6 90:22
**anymore** 144:19
**anyway** 104:4
**apart** 116:2
**apologies** 100:18
**apologize** 75:10 109:19 118:6
**appear** 18:12 50:7
**appearance** 8:7 8:9
**appearances** 3:1 4:1
**appears** 72:8 72:13 147:5
**appended** 150:7
**appendices** 110:2
**appendix** 20:10 26:7,8 110:14 116:6
**applicable** 55:7 148:8
**application** 130:1

**apply** 115:14 115:15 144:19
**applying** 117:3
**appreciate** 95:5 95:21 140:4
**approach** 83:16 134:16
**approached** 28:7
**approved** 131:20,20
**approximate** 46:12
**approximately** 23:13 24:17
**area** 66:4
**argued** 40:21
**argument** 41:7
**arrested** 14:19
**arrington** 43:5 43:7,14 48:4
**arrington's** 48:17
**article** 66:1,9 66:11,16 67:3 67:20
**ascertain** 29:8 34:5
**aside** 29:14 55:1 84:10 141:15
**asked** 42:4,5 47:1 52:6,13 61:9,10 112:1

137:16
**asking** 15:14 81:10 112:18
**aspects** 88:17
**assess** 63:3,8
**assessment** 126:19 127:9
**assist** 44:13
**assistant** 45:7 45:10
**assisted** 55:12
**assisting** 44:10
**association** 7:21 8:5
**assume** 8:10 32:19 61:3
**assuming** 56:6
**assumption** 75:17 118:12
**assumptions** 73:9,18 74:6,8 74:9,13,17,18 74:22 75:3,13 75:22 133:22
**atlanta** 3:6,20
**attached** 148:11
**attempting** 83:21 116:12
**attempts** 117:21
**attention** 50:14 65:22 78:1 85:14

**attorney** 28:10 45:7,11 147:15 148:13
**attorneys** 8:14 33:7 41:14 44:1,3,5,10,20 45:22 51:11 103:21
**audible** 22:16
**audibly** 12:8
**audience** 104:4
**authored** 66:9
**authors** 86:17
**available** 90:10 96:17 148:6
**avenue** 14:9
**avoiding** 118:1 118:6
**avoids** 117:22
**aware** 15:19 90:17 113:16

**b**

**b** 7:8,12 20:10 26:7 107:5 110:2
**back** 9:22 19:3 24:2 29:6 37:16 46:7 49:4 54:18 57:7,20 62:2 77:15,19 90:13 93:17 94:11 96:21 101:4

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[back - brinegar]**                                                     Page 5

102:14 106:13
106:17 115:17
131:18 136:9
136:19 139:12
145:14,17
**background**
20:6 37:20
118:7
**backsies**
139:13
**bag** 128:13
**ballot** 65:15
83:11
**ballots** 65:9
70:11
**barber** 4:7 5:12
5:14 17:10,22
18:6 19:11
90:20 139:18
140:10
**barber's** 17:20
18:17 139:22
**bare** 115:20
**barely** 40:10
**based** 45:3 46:1
80:18 81:15,22
112:21 117:11
118:3 124:20
125:3 129:15
129:22 132:6
132:16,21
133:15 138:19
**baseline** 74:22
123:11 142:18

142:20
**basic** 98:17
**basically** 16:10
75:4
**basis** 74:19
75:4,14,19
86:22 129:19
**bayesian** 98:4
**bearings** 12:22
**began** 24:9
**beginnings**
93:21
**begins** 21:14
95:22
**behalf** 2:18 3:2
3:15 10:20
27:19 28:1
**behavior** 73:15
73:20 125:5
133:7
**believe** 26:19
27:1,11 28:20
30:2,9 32:11
34:15 36:20
41:20 45:10
46:2 47:19
54:8 58:5
62:12,13 63:5
66:22 67:22
71:22 72:2
75:21 84:14
85:3,4 86:17
89:1 92:6
93:10,16

120:21 122:15
134:5 138:21
139:11,19
**best** 11:18
108:17 109:6
125:5
**better** 11:22
87:8
**beyond** 48:20
**big** 59:9
**bigger** 40:8
**bill** 30:7
**billed** 30:4,7,9
**bills** 30:12
**bisg** 17:14 18:9
**bit** 9:22 11:21
25:5 37:11
60:5 62:4
105:19 115:18
137:8 140:7
**bjacoutot** 3:21
**black** 35:3
81:11 82:14
83:8 92:19
98:20 104:18
105:1,8,8
110:21,21
113:5,14,21
115:15 116:17
116:17 118:19
119:10,14
123:22 124:6
125:14 126:8
126:10 127:18

129:10,20
130:13,15
131:5,9,10
133:7 134:3,6
142:6,9 143:8
143:13,18
144:14,15
**blanking**
131:17
**bloc** 34:8 50:19
111:19 113:20
119:5,7
**blown** 119:22
**blue** 60:11
**board** 1:8 6:13
7:18 16:18
140:17 141:18
148:4 149:1
150:1
**bob** 82:20 83:9
**bold** 59:9
**bottom** 33:15
40:2 59:17
126:1
**box** 3:5
**boyd** 4:5 8:2,3
**break** 12:11
76:5,11 77:1,4
77:5,7 135:2,8
136:7
**brey** 4:11 6:19
**briefs** 51:17
**brinegar** 66:22

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o
March 13, 2026

**[bring - challenging]**

Page 6

**bring** 48:13
53:5,6 64:16
**broader** 9:19
72:11
**broke** 13:16
109:19
**brought** 39:4
**browser** 101:7
**bryan** 3:3,4,7
3:16,17 7:7,11
7:12 10:22
11:8 13:16
18:16 117:1
128:18 135:6
**bryans** 29:1,2
**bryansellsla...**
3:7
**btyson** 3:22
**buh** 136:15
**built** 74:7,10
75:1 88:10,11
93:22
**bulk** 66:20
**bullet** 42:20
117:17 129:10
130:10
**bunch** 98:11
106:4
**burnin** 102:8
**bush** 45:12
**business** 46:8
**businesses**
22:14

**button** 60:6
**bye** 136:15

**c**

**c** 6:1
**call** 74:1 99:16
132:20 135:19
**called** 26:19
87:7 91:12
92:12 98:3
100:4
**calling** 140:4
**camera** 13:5
145:6
**candidate**
105:11 111:2
111:16,17,20
113:5,21
114:22 119:8
130:13,16
134:19 143:13
**candidates**
34:9 89:14
98:13 104:16
115:14 118:21
127:20 131:21
134:19 141:5
142:7
**capacity** 45:21
87:9
**caption** 40:3
**carlos** 3:9 7:15
**carlos.andino**
3:13

**cartography**
66:6
**case** 6:16 15:8
15:9,16,19,20
16:4,21 22:8
22:11 26:17,19
26:20,22 27:3
27:6,10,20
28:5,6,17 29:6
29:13 30:1,3,8
31:8 32:6,15
32:17,20 33:17
34:1 36:16
39:17 40:3,4,9
40:11,20,22
41:2,7 43:15
44:7,7,10,21
45:5 46:15,16
47:18,20 48:5
48:14,15 49:1
49:10,14 50:1
50:1,3,6 51:6
51:11,16,20
52:5,20 53:5,6
53:8,14 54:3
56:22 57:4,16
58:2,5,8,15
59:4 60:17
61:6 62:17
63:22 64:16
65:4 68:18
73:8 88:22
99:7 111:18
117:15 119:11

120:13 121:17
124:22
**cases** 26:10
31:20 32:2,4
38:13,18,20,22
39:3,4 48:10
61:7,16,21
64:8,12,18
69:20,22
115:10
**cast** 65:10,14
**category** 105:3
105:7,9
**cc** 110:17
112:15 120:5
122:17 123:22
**census** 47:7
**center** 3:10
**certain** 71:3,8
**certainty** 71:16
72:5
**certificate**
147:1
**certify** 147:4
**cervas** 18:8
**cetera** 53:4
83:10,10
**chadha** 4:8
**chain** 61:13
**challenge** 60:17
61:17,20
**challenging**
28:2

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

[chance - comfortable]                                      Page 7

chance   13:14
  13:19 39:22
chances   122:6
change   74:16
  75:12,15 87:12
  99:18 149:4,7
  149:10,13,16
  149:19
changed   75:18
  86:14 127:8
changes   47:2
  100:5 148:10
  150:6
changing   74:22
  101:18
characterizati...
  132:18
characterize
  39:2 109:5
  120:19 121:11
characterized
  31:19 114:7
characterizing
  48:19
check   123:9
  132:2 145:3
checked   57:10
checks   108:7
  108:13,15,18
  108:22 123:5
chester   5:17
  49:2,10 56:22
  57:12

choice   113:21
  119:9 127:20
  130:19
choices   115:19
choose   124:21
chose   92:17
circumstances
  11:18
citation   49:10
  59:5
cite   40:9 50:1
  58:4 61:16
cited   58:17
civil   1:4 4:6,9
  7:20 8:4 10:11
  23:10,15 24:10
  38:5,8,10
  40:17,18 43:18
  45:8 48:8
claim   32:3
clarity   88:4
  112:3
clarity's   97:9
clark   3:18 4:4,8
clarkhill.com
  3:21,22
classic   82:8
claude   55:10,12
  55:18 56:4,11
clear   20:11
  25:16 55:15
  56:7 73:8
  74:12 86:10
  89:7 97:10

111:13 117:3
  121:10 128:9
  130:20 137:2
clearly   11:19
  14:4 112:20
click   13:15,19
close   94:16
  144:7
closer   128:15
closest   143:4
coauthor   66:12
code   5:20 54:16
  55:10,18 78:11
  79:8,19 80:4,8
  80:11,13,20
  84:10,11 88:5
  93:3,7,20
  97:21 104:10
  106:4,8,11
  107:4
cohesion   36:1
  112:17 114:1,4
  114:7,15 115:3
  115:7,11
  116:13 119:4
  125:14 126:8
  126:10,15,17
  128:22
cohesive   34:6
  50:18 111:15
  111:17 113:5
  113:15 114:19
  116:16 117:20
  118:3 129:11

129:20
cohesiveness
  112:7 113:19
coincident
  142:20
collapsed   105:3
  105:3,7,9
collapsing
  104:21
colleague   27:14
colleagues
  86:18
collingwood
  16:1 90:3
colored   7:22
  8:6
columbia
  147:21
column   43:4
  82:18 83:2
  99:14 105:20
  108:20
columns   83:1
combines   89:21
come   93:10
  121:3 123:11
  136:9 139:12
comes   17:7
  49:19 55:13
  118:7 130:19
comfortable
  79:19 129:17
  134:13

**[coming - contests]**                                    Page 8

| | | | |
|---|---|---|---|
| **coming** 84:17 | **completed** 26:4 | **conclusions** | **consider** |
| **command** 94:3 | 148:16 | 62:15 132:16 | 134:18 |
| 94:8 96:4,5,9 | **completely** | 133:14 142:3 | **consideration** |
| 96:18 | 48:22 95:20 | **condition** 14:15 | 119:4,6 |
| **commands** | **completeness** | 119:1 | **considered** |
| 91:10,12 92:3 | 110:4 | **conduct** 48:14 | 32:14,16 |
| **comment** 95:6 | **components** | 89:16 131:12 | **consistent** 50:4 |
| 95:11,13 | 90:3 | 134:1 | 50:10 73:21 |
| **commission** | **compound** 75:5 | **conducting** | **constitute** 34:6 |
| 29:10 33:8 | **compoundy** | 41:15 | **constitutes** |
| 64:5 91:16,21 | 75:8 | **conference** 8:1 | 116:13 142:17 |
| 120:17 140:18 | **comprehensive** | 8:6 9:20 | **consultant** |
| 141:6 142:13 | 75:3 | **confidence** | 23:20 24:13,15 |
| 144:11,18 | **compute** 87:7 | 70:10,20 71:1 | 24:22 45:18 |
| 147:22 | **computer** 9:21 | 71:2,10,12,18 | **consulting** |
| **commissions** | **computerized** | 71:19,21 72:1 | 41:22 46:8,10 |
| 141:20 | 147:8 | 72:7,10,14,17 | 53:11 118:18 |
| **committee** 4:5 | **computers** 87:8 | 72:22 110:12 | **contain** 132:15 |
| 4:9 7:20 8:4 | **computing** | 116:4,7 119:16 | 133:14 |
| **common** | 87:4 | 120:2,8,12,13 | **contained** |
| 124:12 | **concerned** | 121:8 122:2,3 | 128:7 |
| **comparative** | 128:20 | 123:2 125:18 | **contains** 69:2 |
| 66:4 | **conclude** 35:19 | 125:20,22 | 110:8 120:1 |
| **compare** 63:14 | 119:2,9,11 | 126:1 127:2 | **contention** |
| **compared** 79:7 | 134:20 | 128:1 134:21 | 60:18 |
| 142:10 | **concluded** | 138:2,4,7 | **contest** 64:3 |
| **comparison** | 146:10 | 141:13 | 65:7 110:16 |
| 63:17 | **concluding** | **confirm** 49:22 | 114:20 115:19 |
| **compelling** | 133:4 | **confuse** 11:11 | 119:18 122:19 |
| 123:10 | **conclusion** | **conjection** 52:3 | **contested** 85:5 |
| **compensated** | 117:11 118:11 | **consent** 59:9,19 | 140:22 |
| 29:19 | 129:17,20,22 | **consented** | **contests** 67:14 |
| **complete** 12:14 | 132:5,20 133:3 | 59:13 | 129:6 |
| 95:20 150:8 | 138:17 | | |

Stephen J. Popick , Ph.D.                                      March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[context - cutting]**                                      Page 9

context  33:13
continually
  145:20
continue
  135:14
continued  4:1
contract  23:8
  23:12 41:22
  45:17 46:10
contributions
  48:20
contributor
  90:1
conversations
  15:12
convicted
  14:21
copies  148:14
copy  78:17
corollary  35:16
  35:17
corporation
  25:19
correct  18:7,20
  20:14 24:8
  25:3 27:21
  28:11,11,20
  29:21 32:7
  33:10 35:4,6,9
  37:3,22 38:14
  38:16,17 39:14
  40:6 45:1 46:3
  49:13 50:9
  52:18 54:5

57:2,2 59:13
60:20 62:9
63:5 64:14,17
65:2,8 66:11
66:13 68:19,20
69:1,4 71:17
72:6,12 95:12
96:2,2 107:11
108:4 109:4
110:10 111:1,4
111:7 119:21
120:3,15,18
124:2,8 125:17
132:11 134:10
137:18,20
138:3 139:17
140:15,20
141:1,2,7,9
150:8
correction
  127:1
corrections
  150:6
corresponds
  42:15 91:20
could've  145:1
counsel  6:11
  7:2,8,12 8:3
  10:18 11:5
  15:15,16 16:7
  27:6 28:17,19
  32:12,18 44:14
  45:6 46:21,22
  48:9 78:12

147:11,15
148:14
counsel's  44:11
county  1:8 5:16
  6:13 7:9,13,17
  11:9 26:14
  29:10,10 33:8
  39:10,12 41:17
  42:7 43:8 47:3
  50:6 62:6 63:6
  63:12,15 65:16
  69:14 91:16,21
  109:7 120:16
  141:6 142:13
  144:11 148:4
  149:1 150:1
county's  46:21
  123:18
countywide
  140:17 141:18
  144:12
course  44:9
  63:19 97:6
court  1:2 6:14
  6:21 8:12,14
  9:7,15 11:16
  33:17 34:1
  48:3,16 50:12
  50:22 51:21
  52:16 58:9
  60:22 62:11,14
  63:2 64:13,16
  64:17

court's  50:7
courtney  1:5
  6:12 148:4
  149:1 150:1
covariable
  99:21
covariant
  98:22 100:9
cover  36:18
  37:12 137:6
  145:4
covered  96:19
  145:4
covers  37:18
create  70:7
credibility  63:8
crime  14:21
crisp  26:14
  62:6 63:6,12
critical  52:4
criticism
  144:20
criticisms
  140:2 144:16
critiques  18:1
  139:22 140:9
crossover
  114:4,5,6
crystal  121:9
curious  55:21
current  14:5
currently  14:7
cutting  56:1,2

**[cv - determined]**    Page 10

| | | | |
|---|---|---|---|
| **cv** 1:5 6:16 20:5 21:17 | **deal** 22:14 | **definition** 33:12 36:6 68:10 114:17 119:3 | 8:18 10:8,16 11:11 12:20 13:12 14:2,17 15:7 16:7 19:17,20 26:21 27:14 78:19 90:19 135:19 145:19 146:9 147:3,5,9,13 |
| **d** | **dealing** 29:1 143:21 | | |
| **d** 5:1 6:1 14:9 | **decide** 44:21 45:3,22 | **degree** 20:13 36:1 43:9 71:16 72:4 112:7,16 119:4 127:12 128:22 | |
| **d.c.** 2:8 3:12 | **decided** 61:13 101:7 | | |
| **data** 22:4 32:5 32:7,9,13 42:6 44:1,19,19 47:7,7 51:12 54:22 74:2 78:13 89:13 92:21 93:4 96:14 99:14 102:20 103:3 108:17 109:6 109:10,11,15 109:15 123:18 125:2,4 132:7 132:9,16,18,20 132:21 133:17 133:20 137:15 | **decision** 44:6 75:19 102:5 123:11 | **democrat** 45:13 | **depositions** 12:19 |
| | **declare** 150:4 | **democratic** 140:22 | **describe** 109:9 115:2,4,6,7 |
| | **decrease** 126:8 | **demographics** 84:17 109:13 124:18 | **described** 45:22 115:9 140:10 |
| | **decree** 59:10,18 | | |
| | **decreed** 59:20 | | |
| | **deemed** 150:6 | **demonstrating** 132:10 | **description** 71:4,5 |
| | **deep** 76:12,14 76:20 | **department** 21:6,7,13,20 23:10 31:11 38:6 44:20 48:8 51:2 58:13 | **detail** 68:11 142:1 |
| | **defeat** 34:8 111:20 113:21 | | **details** 74:15 |
| **database** 82:19 92:20 | **defendant** 6:12 39:9 | | **determination** 112:21 119:7 |
| | **defendants** 1:9 3:15 7:13 10:9 11:5,9 60:16 62:17 139:16 | **depending** 35:1 69:15 126:8,11 | **determinations** 117:4 |
| **date** 149:24 150:12 | | **deployed** 57:6 | **determine** 29:15 33:7 34:7,12 53:5 58:14 61:11 125:3 127:14 127:15 |
| **dates** 46:6 | **defending** 27:19 | **deponent** 148:13 150:3 | |
| **dave** 82:20 83:10 | **define** 33:5 76:14 | **deposing** 148:13 | |
| **david** 4:5 8:2 | **defined** 112:20 | **deposit** 25:19 | |
| **day** 54:18 95:4 150:15 | **defines** 113:17 | **deposition** 1:14 2:1 5:10 6:10 6:17 8:15,17 | **determined** 51:20 53:6 111:5 |
| **days** 55:22 148:16 | **definitely** 73:2 76:22 | | |

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

[deterministic - ecological]

Page 11

**deterministic** 81:3

**diane** 4:4

**difference** 97:7 128:4

**different** 33:21 35:1 51:15 78:20 84:4 87:13 91:9,12 96:5 97:1 99:9 100:15 112:9 118:21 124:10 124:20 127:19 137:22 138:5,7

**differently** 52:7

**difficult** 117:2

**dip** 120:8,14

**direct** 35:7 50:13 59:17 60:10 65:22 77:22 85:13 129:7

**direction** 140:7 147:9

**directions** 110:13

**dirichlet** 98:4

**disagree** 48:22 51:9 52:3,11

**discovery** 10:10 41:11 42:2

**discuss** 15:8 16:6 20:6 38:2

**discussed** 15:9 36:6 64:9,20 68:9 110:11 113:9

**discussing** 68:14 120:5

**discussion** 17:14 18:8 50:5,8 68:5

**discussions** 15:22 16:3,5 104:3

**displays** 112:6

**district** 1:2,2 6:14,15 26:14 26:15 39:13 47:4 49:11 62:7 91:17 141:8 147:21

**districts** 36:11

**divided** 66:19

**division** 1:3 6:15 21:19,22 22:22 23:2,11 23:15,17 24:10 25:2 38:9,10 40:18 43:19 48:9,12 66:15

**doctorate** 25:7 26:1,2

**document** 20:11 21:11 24:3 42:16 58:17

**documents** 19:16 84:14

**doing** 11:21 47:6 67:17 75:5 90:6 93:2 96:10 97:11 104:14 124:13 134:15 140:8 145:20

**doj** 23:6 24:10 24:13 25:8,12 31:22 37:22 43:18 45:22 50:11 51:10 52:19 57:8 58:18 61:15 64:13,15 69:21 70:1 86:9,11 86:16 87:16,20 88:18 93:8,9 93:12 96:17,18 118:18

**doj's** 24:16

**dr** 6:10 10:8 11:2,10 19:9 43:5,7,14 48:4 48:17 51:2,22 52:17,21 53:11 53:12,16,19 66:22 77:19 90:20 137:1 139:18,22 140:10 145:22

**drawing** 47:3

**drawn** 36:11

**driver** 1:5 6:12 7:9 15:20 148:4 149:1 150:1

**duly** 9:11 147:5

**e**

**e** 5:1 6:1,1 7:8 149:3,3,3

**earlier** 11:7 33:4 90:18 113:10 114:13 135:6 137:14

**early** 40:16,16 41:21 45:18

**ease** 78:18

**easier** 12:7 89:9

**east** 14:8

**ecological** 22:6 22:7,12,20 47:12,19,21 51:15 53:3 54:2,7,9,11,13 56:21 67:4,11 67:11,17,18,21 67:21 68:21,22 69:2 74:10,11 80:5,17 82:8 83:4,5,16 86:13 89:16,17 93:13,14 94:9 96:11 97:11

**[ecological - equals]**

108:19,20
109:3 121:13
130:6,7,8
**econometric**
104:2
**economic** 22:3
**economics**
20:13 24:6
25:7 26:1,2
**edge** 56:1,3
**education** 24:2
140:17 141:19
**educational**
20:6
**effect** 73:3
100:5,7
**ei** 69:3,3 73:11
81:14 82:1
86:21,21 88:14
89:6,8 90:1
93:10 95:9
96:4 97:13
98:1,7 99:18
101:6 104:7,15
105:16,17,18
108:9,15 109:2
109:2,2,5,22
110:9 119:17
119:20 120:11
120:22 121:12
121:13,15,20
122:15 123:6
123:13,15,16
123:22 124:3

125:10,13
126:2,6,7,13,13
126:15,15,17
127:2,3,3
131:3 137:21
138:15,16
**ei.md.bayes**
97:16
**ei.reg.** 92:4
**eicompare** 89:6
89:7,11 90:1,7
**eight** 129:11,21
**eipack** 86:3,18
86:21 87:15,20
88:5,9,10,21
89:6,9 91:8
**eires** 96:4 97:6
97:12 101:10
**either** 32:8
119:7 135:16
**elect** 118:21
127:19
**elected** 64:6
142:7,14
**election** 34:22
65:6,20 69:15
69:16 73:21,22
74:19,19 81:12
83:7 85:8
89:13 107:22
108:1 109:12
111:6,12 112:1
112:6,8,9,14
113:14,19

116:7 118:22
120:20 121:19
122:14 124:15
126:14,16
127:1 129:1
130:16,18
131:5 132:21
133:5,21
134:14 142:11
142:12,17,19
143:5,7,14,15
143:18 144:12
144:12,18
**elections** 1:8
6:13 7:18
29:11 33:8
38:12 43:8
51:13 61:10
65:10,15 84:18
107:9,11,16,22
108:4 111:22
112:11 115:12
124:16 129:12
129:16,21
140:18 142:7
142:22 144:17
148:4 149:1
150:1
**electorate** 36:1
114:8 116:17
130:22 131:8
134:9 144:14
144:15

**electorates**
34:19 35:13,18
111:9 112:19
112:22 113:8
113:11 117:4
117:11 118:15
127:15 128:21
129:2,5 130:1
**elements** 93:5
**employed** 21:5
24:13,15 26:3
31:3 130:6
147:12,15
**employee**
147:14
**employment**
24:19
**encountered**
75:20
**engage** 28:12
29:3 53:9
144:9
**engaged** 28:15
**enjoy** 140:7
**entail** 22:2
**entirely** 52:22
61:12 117:22
118:1 138:8
**entitled** 59:7
66:3
**entity** 30:11,17
30:19,21 31:7
**equals** 98:22
100:9,11,11

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[equals - extent]**                                Page 13

102:7,7,8,8
**equation** 54:11
**er** 73:11 95:22
  123:13
**errata** 148:11
  148:13,16
**erres** 93:2 96:5
  97:4,9
**especially**
  11:17
**esquire** 3:3,9
  3:16,17
**essence** 32:3
**essentially**
  102:2
**establish** 60:13
  114:14 117:22
**established**
  116:15
**estimate** 71:1,4
  72:9,14,16,17
  91:10 105:16
  119:13 121:7,8
  122:16 124:1
  125:5,11,16
  131:9 132:12
  140:13
**estimates** 70:8
  73:14 81:15
  83:6 110:9,13
  110:20 112:16
  120:2 124:10
  124:20 128:5
  133:7 138:6

141:4,13
**estimation** 66:5
  83:15 98:2
  122:17 140:14
**et** 1:5,8 6:12,14
  53:4 83:10,10
  148:4,4 149:1
  149:1 150:1,1
**ethnically** 43:9
**everybody**
  33:20 106:12
  106:13
**everybody's**
  77:7
**evidence** 10:12
  61:1,4
**exact** 57:14
  80:20 112:11
  139:2
**exactly** 79:9
  80:21 127:5
**examination**
  5:2 11:5
**examine** 36:2
**examined**
  27:15 57:13
**examining**
  27:11 36:5
**example** 64:8
  81:4 104:22
  122:3
**examples** 38:16
**exceedingly**
  21:17

**except** 10:13
**exclusively**
  28:1
**excuse** 17:2
  25:11 38:4
  45:17 57:19
  70:21 87:16
  91:17 100:21
  110:22 123:16
  140:21
**exhibit** 5:10,11
  5:12,13,14,15
  5:17,18,20
  13:1,7,10,11,18
  13:21 14:2
  16:13,16 17:3
  17:4,18 18:3
  19:6,10,11
  39:17,18 49:15
  49:16 50:2
  58:20 59:2,3
  62:20 78:1,5
**exhibits** 5:9
  16:10
**exist** 86:11,16
  87:21
**existence** 34:3
  87:15
**expect** 143:12
**expectation**
  80:22
**experience**
  21:18 31:17
  37:21 64:9

**expert** 4:7 5:11
  5:12,13,14
  15:10 16:20
  17:14,19 23:14
  26:11,18 27:22
  28:8 31:9,10
  31:19,21 32:1
  32:4 43:17
  44:8,12 45:4
  48:12 50:11
  51:1,22 53:10
  53:19 55:13
  56:12,15 61:21
  62:5,11 63:19
  64:13,15,19
  90:17 117:2
  128:7 139:19
**expert's** 17:2
  53:8
**experts** 44:22
  60:19 139:16
**expires** 147:22
**explain** 69:8
  70:16 82:4
  92:8 93:2
  97:16 100:3
  102:16
**explanation**
  91:3 142:6
**explanatory**
  99:5
**explicitly** 36:17
**extent** 29:16
  51:21 127:16

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[extraordinarily - fulfill]**                    Page 14

**extraordinarily** 43:10
**extreme** 115:9 115:9
**extremely** 55:19
**eyes** 106:14

**f**

**f** 3:16 39:12 40:9 49:10
**fact** 50:10 52:12 75:20 79:19 93:11 109:14 142:6 145:19
**factor** 37:2,8 42:20
**factors** 34:13 36:15,19,21 37:9 60:14
**facts** 32:7,13
**fades** 10:1
**fails** 148:18
**fair** 34:14 35:11,17 36:7 45:20 48:2,18 51:5 52:7 53:16 65:18 68:6 71:4,5 72:19 80:4 87:19 88:12 90:5 91:9 106:3,4 115:2

116:2,18 133:12 138:10 142:11,18 143:14 144:10
**fairly** 13:2 56:2 127:6
**familiar** 54:12
**family** 15:1
**far** 28:4 30:5 30:12 109:20
**fashion** 12:9
**fdic** 25:22 55:2 56:4
**february** 147:22
**federal** 10:11 10:12 25:19
**feel** 10:2 37:7 112:13,15 121:17 134:12
**field** 70:17
**figures** 85:6 102:6,10,11 144:13
**figuring** 145:6
**file** 15:4 78:2 78:11,16 80:3 89:13
**filed** 6:14 15:2 46:5
**files** 84:18
**fill** 23:9
**final** 58:1 65:4

**finalize** 58:18
**finally** 57:18
**financially** 147:16
**find** 35:11 83:22 101:10 121:19
**findings** 107:5
**fine** 37:4 76:7 98:9 135:13 136:3 141:15
**finished** 24:5
**firm** 6:22
**first** 7:5 9:11 10:16 16:16 20:9 26:13 28:6 39:8 40:3 41:2 46:6 52:12 64:20 67:16 73:6,17 85:22 91:13,15 92:3 104:13 107:10 110:16 124:12 126:13 145:19
**fits** 108:17
**five** 64:8
**flipped** 114:9
**florida** 5:16,19 39:13
**focused** 36:22 127:11
**folks** 28:3 82:5 99:6 136:14

**follow** 42:14 56:11
**following** 34:18
**follows** 9:13
**font** 60:11
**footnote** 49:7 117:13,18
**foregoing** 147:3,5 150:5
**forgive** 39:8
**forgot** 90:19
**form** 10:14 81:12
**forming** 32:6 32:15,16,20 53:17
**forms** 129:19
**formulaic** 33:1
**formulation** 54:14
**forward** 61:14
**found** 43:7 55:9,18 58:6 74:21
**foundational** 86:22
**four** 140:2,9
**frame** 93:4 96:14
**free** 10:2
**front** 118:11,13 127:13
**fulfill** 118:14

Stephen J. Popick , Ph.D.                                March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[full - great]**                                              Page 15

| | | | |
|---|---|---|---|
| **full** 14:12 21:3 23:14,16,19,20 24:9,13,14,19 45:17,18 73:6 | **getting** 12:22 82:2 128:15 144:15 | 46:7 49:3 57:7 57:20 62:2 68:10 74:14 76:11,12,19,21 | 106:16,17 110:18 117:1,9 124:19 126:12 128:13 137:22 |
| **fully** 14:16 | **gingles** 33:18 | 77:5,11 79:5 | 144:21 145:2,5 |
| **further** 8:19,22 54:15 145:21 147:13 | 33:19,19,20 34:2,12 35:8 35:19 36:9,13 | 79:13,20 85:18 89:15 93:17 94:11,19 97:5 | **good** 6:6 11:21 55:16 61:22 67:2 80:1 |
| **fuzzy** 10:1 | 36:16,20 37:9 50:17 60:14 | 97:20 101:4 102:14 103:15 | 103:12,13,14 110:7 112:4 |
| **g** | 111:12,14,21 112:17,20 | 105:11 106:17 122:17 124:3 | 136:7 141:22 142:17 |
| **g** 6:1 | 113:12,17 | 125:9 130:4 | **goodman** 54:10 |
| **ga** 148:15 | 114:2,3 116:16 | 131:18 139:4 | **gotcha** 139:3 |
| **gap** 25:5 | 116:18,20 | 141:22 145:5,9 | **govern** 101:12 |
| **gary** 54:13,15 86:19 87:1 88:6,11,14 | 117:13,17 | **god** 62:22 94:22 103:17 | **government** 23:11,12 24:18 |
| **geeks** 82:6 | **give** 16:11 26:21 37:11 39:17 65:20 | **goes** 48:19 90:9 121:9 | 30:19,21 31:3 31:6 46:9 |
| **gemini** 56:8 | 83:21 | **going** 6:7 9:20 | **graduated** 20:12 |
| **general** 45:7,11 65:19 73:19 85:7 107:16,21 | **given** 48:16 58:8,11 69:12 69:17 71:1 | 10:13 12:18 16:9 37:15 39:16 49:3,14 | **graduating** 20:20,22 |
| 129:12,21 134:16 142:11 142:12 | 74:19 75:16 101:20 103:11 121:18 147:10 | 56:8 58:16 62:14 63:20 75:6 76:4 | **graphic** 128:17 |
| **geographic** 66:6 | 150:9 | 77:22 81:16 85:13 87:17 | **great** 10:22 12:2 14:11 19:15,19 24:1 |
| **george** 20:18 21:2 24:6 | **gives** 123:22 124:6 | 88:5 91:5 92:2 94:19 95:1,16 | 25:4 59:21 68:16 84:6 |
| **georgia** 1:2 3:6 3:20 6:15 7:22 8:6 20:15,22 26:15 | **glasses** 59:22 **go** 7:5 12:15,15 12:21 18:19 19:22 20:19 24:2 26:8 33:2 43:4 45:2,6 | 96:12,13 97:19 97:20 100:22 101:4 105:1,19 105:21,22 | 85:9 88:20 90:15 97:14 102:12 108:2 136:11 137:4 141:10 145:8 |

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[greater - hmm]**                                        Page 16

| | | | |
|---|---|---|---|
| **greater** 72:22 | **hairs** 133:19 | 139:10 | **helps** 101:21 |
| **ground** 41:16 | **halfway** 68:14 | **hb3** 5:12 17:4 | 128:16 |
| 127:7 | **hand** 108:18 | 18:8,17 | **hereto** 147:16 |
| **group** 34:5 | 123:15 | **hb4** 5:13 18:3 | 150:7 |
| 50:18 73:14 | **handbook** | 19:18 139:8 | **hesitating** |
| 111:14,16,18 | 94:12 | **hb5** 5:14 19:6 | 46:18 |
| 115:13 117:18 | **handed** 40:11 | 19:11,18 | **heyward** 4:9 |
| 118:2 129:11 | 40:12 45:19 | **hb6** 5:15 39:17 | 7:19,19 |
| 132:12 | **handful** 16:10 | 39:18 | **hicks** 92:12,15 |
| **groups** 89:14 | **handle** 11:1 | **hb7** 5:17 49:16 | 98:19 104:17 |
| 92:19 98:15 | **handled** 53:14 | 50:2 | 105:11,12 |
| 99:8,9 104:18 | **handley** 51:2 | **hb8** 5:18 58:20 | 124:1 |
| 104:21 119:1 | 52:21 53:11,16 | 59:2,3 | **high** 38:20 |
| 130:21 134:19 | 53:19 | **hb9** 5:20 78:1,5 | 43:10 139:21 |
| **guarantee** | **handley's** 52:1 | **head** 12:6 37:4 | 142:2 |
| 138:12 | 52:17 53:12 | **headset** 11:20 | **higher** 125:14 |
| **guess** 23:17 | **hangry** 77:2 | **hear** 10:4 11:20 | 125:16,19 |
| 56:10 58:4 | 135:14,15,16 | 12:2 28:6 | 126:2,14 |
| 71:14 76:18 | 135:18 | 122:20 | 134:11 |
| 79:6 86:7,15 | **happened** 41:8 | **hearing** 8:11 | **hill** 3:18 4:4,8 |
| 87:14,16 94:2 | **happens** 10:2 | 9:7 | **hire** 48:9 |
| 97:3 112:6 | 83:1 115:10 | **heart** 65:8 | **hired** 23:13 |
| **guesses** 101:15 | 129:6 | **held** 2:2 6:17 | 28:3 29:7,8 |
| **guessing** | **happy** 7:6 | 35:2 118:22 | 31:6 |
| 101:14 | 97:10 | **help** 42:6 48:13 | **hires** 30:19 |
| **guidelines** | **hard** 76:18 | 53:4 95:15 | **hispanic** |
| 134:1 | 94:5 136:5 | 101:10 | 131:15 |
| **guys** 128:12 | **hb** 16:17 | **helped** 93:12 | **hit** 135:10 |
| 135:2 | **hb1** 5:10 16:13 | **helpful** 42:11 | **hitting** 76:9 |
| **h** | **hb2** 5:11 16:13 | 43:16 44:16 | **hmm** 27:5 |
| **h** 149:3 | 16:17 19:18 | 84:7 | 53:15 64:22 |
| **hair** 131:22 | 20:3 49:4,7 | **helping** 44:11 | 66:7 71:14 |
| | 57:20 62:2 | 53:7 55:10 | 81:8 82:12,21 |
| | 106:19,20 | | 83:3,13 86:4 |

Veritext Legal Solutions

800.808.4958                                        770.343.9696

86:20 87:3,11 89:20 92:5 99:1 103:1 112:2 120:7 124:5 125:9 131:2 138:18 143:2

**hold** 56:19 75:17,22 84:9 100:14

**home** 135:7

**homes** 77:8

**homogenous** 57:3,9 69:7,10 70:2,5 72:21 89:18 93:15

**hopefully** 40:7

**hopeless** 95:20

**host** 67:18

**hot** 55:22

**hour** 29:20 76:4

**hourly** 30:19

**house** 32:1,3 43:17 50:11

**houston** 1:8 5:14 6:13 7:9 7:13,17 11:8 16:17 29:10 33:8 63:15 65:15 69:14 109:6,14 123:18 124:17 141:6 142:13

144:11 148:4 149:1 150:1

**houston's** 125:2

**huge** 136:6

**huh** 12:6 16:19

**hundred** 65:19 92:13

**hypothetical** 143:20

**hypotheticals** 143:22 144:10

**i**

**identical** 108:8 121:14

**identification** 16:14 17:5 18:4 19:7 39:19 49:17 58:21 78:6

**identified** 51:12

**identify** 44:1 83:5

**immaterial** 129:1

**immediately** 20:19,22 96:3

**important** 102:21 112:4 125:1

**importantly** 135:17

**inaudible** 17:17 20:2 27:8 47:9 97:2 109:17 133:1

**include** 110:2 125:6

**included** 116:5 116:6

**includes** 51:1

**incorrect** 132:17

**increase** 70:10 126:10

**incredibly** 80:18

**indented** 101:1 104:10 106:4,8

**independent** 53:12,13,15

**indicate** 29:18

**indicated** 128:3

**indicates** 134:6

**indirect** 67:6

**individual** 51:6 128:22

**individually** 103:16

**inference** 22:7 22:12,20 47:13 51:15 54:3,7,9 54:13 56:21 67:4,11,18,21 68:22 69:2 74:11 80:5,17

82:8 83:5 86:13 89:17 93:13 94:10 108:20 130:7,8

**inflation** 31:14

**inform** 44:3

**information** 66:6

**informs** 36:21

**initial** 30:8 47:14 85:1,4 102:19 105:15 106:7

**initially** 28:15 53:2

**inquiring** 34:3

**inquiry** 34:11 37:8,10

**inside** 83:1

**inspect** 103:3

**institute** 20:16

**instruct** 49:3

**instrumental** 39:3 48:19

**insufficient** 114:5,6

**insurance** 25:19

**interaction** 15:18

**interest** 146:6

**interested** 76:5 99:8 105:2 147:16

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

[interesting - know]

Page 18

**interesting**
55:20 130:17
**internal** 45:4
46:19 48:12
**interrupt** 10:2
**interval** 71:10
71:22 72:2,7
72:14,17 116:4
116:7 120:8,14
121:9 123:2
126:2 138:3
**intervals** 70:11
70:12,21 71:1
71:2,12,18,20
72:10 73:1
110:12 119:16
120:2,12 122:2
122:3 125:19
125:20 126:1
127:2 128:1,3
134:22 138:4,8
141:14
**introduce** 7:2
13:2,10 16:9
17:1
**involve** 47:12
53:11
**involved** 45:21
47:6,15
**involving** 64:4
66:9
**irrespective**
143:16

**isolate** 116:12
**issue** 22:13
**it'd** 53:15
**item** 92:20
**items** 30:10
47:8 81:3
**iterative** 69:3
104:7,14,20
105:17 108:9
109:2,5,22
110:9 119:17
119:20 120:22
121:15 123:6
123:16 125:10
126:7,13,15
127:2 130:7
138:15

**j**

**j** 1:15 6:10 9:10
148:1,5 149:2
149:24 150:2,4
150:12
**jacoutot** 3:16
5:3 7:4,11,12
8:8 9:14 10:22
11:4,6,8 13:9
16:15 17:6
18:5,18 19:8
39:20 49:18
58:22 76:3,8
76:16 77:3,10
77:18 78:7
90:16 91:1

135:1,4,9,20
136:1,4,10,22
145:9,17
**january** 21:8
23:9,22 24:16
24:22
**job** 1:22 22:21
53:2 103:19
**jobs** 21:4
**joined** 21:7
25:18 90:18
**joseph** 14:13
**journal** 66:5
**judgment**
59:10
**jumps** 110:17
**june** 23:18,22
24:11,17,19,22
25:1
**jurisdiction**
27:19 57:13
63:12 81:12
**jurisdictions**
28:2 67:15
**justice** 21:6,8
21:13,20 23:10
31:11 38:6
44:20 48:8
51:2 58:13
**justify** 74:22

**k**

**keep** 14:15
75:10 95:4

116:8
**kind** 9:21 22:1
22:19 33:14
42:18 44:17
47:17 54:6
55:22 59:8
68:9 69:6,18
70:15 77:7
82:1 85:14
96:16 102:16
108:12 109:6
110:12 114:11
114:13 119:22
120:12 139:15
140:11 142:3
142:10 143:17
**king** 86:19 88:6
88:11,14
**king's** 54:13,15
87:1 93:18,19
94:12
**know** 9:17
11:13 12:12
13:13,18 17:7
25:7 29:17
30:16 31:14
33:19 37:4,6
39:21 40:22
42:1,8 49:5,19
50:4 51:14
53:8 55:2,16
57:8,14 61:9
61:19 63:10
65:9,14 67:2,9

Stephen J. Popick , Ph.D.                          March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[know - look]**                                          Page 19

73:19 74:5,18
76:8,9,11 78:8
79:18 81:11
82:2,9,10,13,16
82:19,22 83:7
83:9,11 85:20
86:7,8 87:6
90:17 93:22
94:7,7,21
95:16 97:4,7
99:17,17
100:21 102:8,9
103:18 106:3,5
110:16 111:19
111:19 115:8
117:14 118:8
119:8 133:8,10
136:6 137:2
138:22 139:11
139:21 140:1,2
143:22 144:1

**l**

**l** 3:3 7:8,8
**labor** 66:15,18
**lack** 70:5 72:20
  132:7,10
**lake** 5:19 57:22
**lambda** 102:2
  102:13
**lambda1** 102:7
**lambda2** 102:7
**lamda1** 101:3

**language** 96:20
**languages** 87:5
**laptop** 60:3
**large** 134:22
**larger** 63:15
  70:20,22 71:19
  105:19
**laross** 4:4
**lastly** 130:9
**late** 21:7 46:11
**lauren** 15:22
**law** 3:4,10 4:6
  4:10 7:21 8:4
  73:8
**lawyer** 42:4,5
  59:14 112:18
  113:1
**lawyers** 4:5,9
  7:20 8:3 113:2
**lay** 140:12
**lean** 9:22
**leave** 113:1,1
**led** 41:14
**left** 135:8 136:6
**legal** 2:6 6:20
  6:22 113:2
  148:23
**length** 141:12
**letters** 59:9
**level** 73:14
  84:20 114:7
  125:14 126:14
  126:16 139:21
  142:2,8,8

**leveled** 140:10
**levels** 118:20
**libraries** 85:15
**library** 86:1
**lies** 72:1
**lieu** 8:20
**limited** 36:5
**linchpin** 93:21
**lindsey** 1:22
  6:21 147:2
**line** 33:22
  78:18 79:7,11
  79:13,21 81:4
  86:3 91:16
  92:3 94:3,8,19
  95:6,22 96:3
  97:21 100:15
  100:17,18
  103:21 104:6,8
  149:4,7,10,13
  149:16,19
**linear** 74:6
  83:17
**lines** 93:7 97:1
  97:1
**link** 90:19
**lisa** 51:2
**list** 26:10
  100:10,11
  102:8 107:8,10
**listed** 32:7,13
  101:12 110:14
**literally** 41:1

**literature** 73:8
  74:12 87:1
**litigation** 15:2
  15:4 41:12
**litsup** 148:15
**little** 9:22 10:1
  11:21 22:18
  33:11 37:11
  48:20 60:7
  62:4 75:8
  76:12,17 77:6
  105:19 115:18
  131:21 137:5,8
**live** 102:21
**llc** 3:4
**locate** 17:22
  18:20
**located** 14:7
**location** 14:4,6
**long** 21:17
  28:22 31:12
  94:6,13 135:7
**longer** 25:1
**look** 39:7 46:10
  47:1 57:7
  79:16,17 92:11
  93:18 105:21
  105:22 110:5
  120:11 122:1
  123:1,21
  131:19 134:18
  134:18 140:11
  144:22

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

**[looked - methodologies]**

Page 20

looked  36:12
  96:5,21
looking  17:21
  73:22 76:2
  81:4 104:15
  105:7,8 110:15
  122:2 123:5,8
  123:12 125:2,3
  127:18 129:4
  142:22
looks  40:6 59:6
  79:22 104:6
loren  90:3
lose  143:13
lost  56:18
  95:19
lot  12:7 46:19
  54:18,21 65:11
  66:22 88:9
  93:19 104:11
  105:21
louder  22:18
loudly  11:19
love  103:19
lower  126:16
lozenges
  128:13
lunch  76:10,12
  77:1,7 85:20
  135:2,7,21

**m**

macon  1:3 6:15

made  74:13
  130:20 150:5
main  140:2
majority
  115:12,20
  119:10
make  8:9 12:7
  23:5 44:5
  70:14 75:19
  81:4 89:9
  103:5 117:4
  119:6 121:3
  126:19 127:11
  132:19 138:17
  142:2,2 144:6
  145:3
makes  12:7
  92:22 98:19,20
making  8:7
  112:21 129:17
management
  51:18,19 53:4
mann  4:8
manner  9:5
manual  101:5
  102:15
map  17:14
mapping  36:10
march  1:16 6:8
mark  12:18
  39:16 49:14
  139:5
marked  16:13
  17:4 18:3 19:6

39:18 49:16
  58:20 78:1,5
  139:5
marking  16:16
marlin  4:5 8:2
mason  20:18
  21:3 24:6
master's  24:6
  25:6
match  79:8
material
  127:17 138:16
materially
  46:15
matrix  104:19
  104:19
matter  6:12
  7:10,14,17
  28:13,15 42:9
  48:21 65:8
matters  28:16
mccants  110:19
  110:21 119:9
  119:12 120:5
  122:2 125:10
  125:14 126:9
  127:1
mcmichael
  92:12,15 98:19
  104:17 105:11
  105:12
mean  25:14
  30:22 60:6
  71:21 73:19

94:12 102:18
  108:15 113:22
  116:19 122:19
  133:2,3 135:12
  136:4
means  59:12
  60:16
measurement
  123:17
media  6:9
medical  14:15
medication
  14:14
meets  119:1
member  15:1
members  34:5
  41:15
mention  67:20
mentioned  9:16
  11:7,16 15:22
  34:17 36:15
  52:16 56:11
  63:1 72:20
  74:17 119:16
  128:19
mentions  37:2
method  54:9
  70:12
methodologi...
  130:19
methodologies
  73:13 123:8,9
  125:1 127:4
  130:5

**[methodology - noncohesive]**                                    Page 21

**methodology** 61:17 68:14 107:3 108:16 124:21

**methods** 51:15 61:12 66:5 68:18 73:10 80:17 83:5 86:13 108:7 140:14

**mic** 144:7

**michael** 4:7

**microphone** 12:1 109:21

**middle** 1:2 6:15 26:14 39:13 42:19 59:8

**might've** 18:14 91:14

**millions** 65:12 65:17

**mind** 10:7 18:19 97:19

**mindful** 80:17

**mine** 40:8 53:13 54:1

**minimum** 75:11

**minority** 34:5 50:18 111:14 111:16 117:18 118:2 119:5

**minority's** 34:8

**minute** 76:5 77:5 135:21 136:7

**minutes** 76:4 136:2 144:22 145:2

**mirror** 143:17

**mirrored** 144:13

**misnomer** 88:8

**mispronounce** 39:9

**missing** 21:15 116:3

**mm** 27:5 53:15 64:22 66:7 71:14 81:8 82:12,21 83:3 83:13 86:4,20 87:3,11 89:20 92:5 99:1 103:1 112:2 120:7 124:5 125:9 131:2 138:18 143:2

**mmd** 18:8

**model** 89:12 98:5 126:9,11 142:18

**models** 75:1 93:19 126:20

**moment** 16:11 39:17

**monitor** 13:4,5 13:6

**month** 23:7

**months** 23:13 23:18

**morning** 6:6

**motivated** 93:12

**move** 23:5 61:14

**moved** 25:11

**moving** 139:9

**mtt** 1:5 6:16

**multinomial** 98:4

**municipalities** 18:9

**n**

**n** 5:1 6:1 7:8,12 14:9

**n.e.** 3:19

**n.w.** 2:7 3:11

**name** 6:19 7:11 7:15 11:7 14:12 50:6

**narrative** 68:4 107:4,14

**national** 7:21 8:5

**nature** 31:7 82:1 127:8 137:21

**navigation** 78:18

**nearing** 135:10

**neatly** 140:1,5

**necessarily** 81:16 116:14

**necessary** 100:13 133:17 150:6

**need** 12:11 29:17 44:1 46:7 51:13 67:9 68:10 75:18 77:1 99:10 135:7

**needs** 113:17

**neighborhood** 144:16

**neither** 15:6 147:11

**never** 27:18 33:19 75:2 97:5 115:10

**new** 19:10 49:11 128:13 138:8

**nicely** 140:1,4

**nine** 104:19 107:8,11

**nod** 22:19

**nodding** 12:6

**noncohesive** 116:1

**[nonexpert - okay]**    Page 22

**nonexpert** 55:17

**noniterative** 121:12

**nonstandard** 103:5

**noon** 77:6

**normally** 10:6

**notary** 9:2,3 147:1,20 150:13,19

**note** 14:3 122:13 125:1 148:10

**noted** 150:7

**notepad** 78:16

**notes** 91:5

**notice** 2:18 5:10 12:20 13:12

**november** 85:7 142:11,12,16 143:7,10,15,17 143:18 144:2,4

**null** 98:22 100:9,11,11 102:8

**number** 6:16 42:20,21 46:14 46:14 55:11 57:15 69:13,17 70:1,6 72:21 81:11 82:6,13 82:15,17 99:12

109:13 124:17 126:22 127:4 127:10 128:20 140:12,16

**numbers** 42:14 78:18 79:7,11 81:2 84:20 112:13 138:22 139:2

**o**

**o** 6:1 14:9

**o'clock** 135:13 145:1

**oath** 8:20,21 77:20 137:2

**obama** 45:14

**object** 75:6

**objection** 9:4

**objections** 10:13

**observe** 83:2

**observing** 8:7 90:20

**obvious** 29:14

**obviously** 15:14 55:21 58:7 74:5 88:13 100:6 135:18

**occasion** 60:22 63:3,7

**occupied** 143:11

**occurred** 16:3 41:21 42:2

**october** 40:12 45:19

**odd** 112:11 126:6

**offer** 21:6 63:20 117:7,9

**offered** 64:8,19

**office** 3:4 64:6

**officer** 147:2

**officials** 58:14

**oh** 30:6 49:3 56:20 60:10 70:4 84:10 86:12 94:22 95:3 97:5,6 100:14,17 130:4 131:17 139:5

**okay** 11:4 12:3 12:18 13:10,11 14:1,14 15:5,7 15:21 16:6,9 16:12 17:1,9 17:10,12 18:11 18:14,18 19:15 19:22 20:4 21:2,9,21 22:12,15,17 23:1,16 24:1,1 24:4,21 25:4 25:18,21 26:5 27:3,18,22

28:5,9,18 29:6 29:18,22 30:11 30:15,18 31:18 32:5,18,22 33:16 36:4,14 37:14,17 38:1 39:2,7,21 40:2 40:11,15 41:4 41:10 42:10,13 42:17 43:3 44:15 45:2,9 45:16 46:13 47:5,17 48:16 49:1,22 50:4 50:13,15 52:2 52:20 53:21 55:8,14,20 56:16,18,20 57:11,17,17,21 58:7,16,19 59:1,7,16,21,22 60:4 61:5,15 61:19,22 63:14 63:22 64:7,18 65:21 67:2,20 68:1,12 69:5 69:12 70:5 71:7 72:4,15 72:19 73:5 74:16 76:1,3,8 77:19,22 78:4 78:10 79:1,3 79:10,15 80:2 80:12 81:1,5

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

**[okay - page]**

Page 23

81:13,18,20
82:13 84:6,6
84:22 85:9,12
86:3,15 87:14
87:22 88:3,12
88:12,20 89:2
90:12,15 91:2
91:7,19,19
92:2,22,22
93:7 94:2,18
95:14 96:3,15
97:2,14 98:6
98:10,18,18
99:11,15,18
100:8,19,21
101:17,21
102:5,12
103:12,12
104:5 105:13
105:18 106:2,2
106:10,12,21
107:2,5,7,18,19
108:2,6 109:1
109:16 110:5,7
110:15 113:22
114:11 115:17
117:12 119:15
120:4,11
121:11 123:14
126:5 127:22
128:8,11,19
129:7,9,10
130:2,9 132:1
135:1,22 137:4

137:10,12
138:4,10 139:1
139:3,3,9,10,14
139:21 141:10
141:21 142:15
143:5 144:21
144:21,21
145:5
**older** 28:16
94:4
**once** 79:20
94:20 101:1
**ones** 104:11
**open** 13:14
78:21
**openai** 56:8
**opened** 78:16
**opening** 79:1
**opine** 113:12
**opining** 36:9,14
**opinion** 40:12
45:19 50:14
52:17 63:21
111:11 113:3,6
116:13 121:18
125:4 131:8
**opinions** 32:6
32:15,17,20
48:3 53:18
54:1 58:10,12
114:15 117:10
**opposed** 12:5
**opposing** 44:11
46:21,22 53:8

53:10
**opposite**
126:12
**order** 67:10
79:9 83:14
107:12 112:17
116:17
**ordered** 59:20
**ordinarily**
30:18
**original** 54:14
88:14
**originally**
83:15
**osceola** 5:15
39:10,11,12
41:16 42:7
46:20 47:3
50:6 53:2
**outcome** 59:13
147:17
**output** 80:20
80:21 93:4
**outside** 23:11
44:8,14,22
45:5 46:9,9
48:9 70:12
117:10,10
118:18
**overall** 20:10
21:11 24:3
142:3
**overlap** 125:20
127:3,6

**overlapping**
128:1,3
**owe** 128:13
**own** 53:19 87:1
112:8,9

**p**

**p** 3:17 6:1
**p.m.** 136:17,20
145:12,15
146:8,10
**pack** 101:10
**package** 86:8
86:10 90:4,7,9
**packages** 85:15
90:2
**page** 5:2 20:9
20:10 21:11,12
24:3 26:8 33:2
33:5,14,15
34:18,18 37:16
40:3 42:14,14
42:16,19 49:4
50:14 56:19
59:8,17 60:11
62:3 65:22
68:1,13,17
73:4 107:1,13
110:6 119:19
124:4 129:7
140:11 149:4,7
149:10,13,16
149:19

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[paid - point]**                                        Page 24

| | | | |
|---|---|---|---|
| **paid** 29:22 30:17 31:13 | **particularly** 143:21 | **perfect** 17:16 26:5 49:8 107:7 115:2 | **ping** 126:21 127:12 |
| **pain** 85:18 | **parties** 2:19 8:22 59:12,19 60:12 65:2 147:12,15 | **perfectly** 12:2 56:7 79:8 114:19 | **plaintiff's** 60:18 |
| **paragraph** 73:7 133:4 | **party** 9:4 61:16 61:20 | **perform** 31:7 42:7 43:14 61:10 108:13 128:6 | **plaintiffs** 1:6 3:2 7:4,9,16 10:21 28:1 29:13 32:12,18 33:6 51:1,8 52:10,13 139:20 |
| **parameter** 83:21 99:2,4 | **pasted** 78:17 | | |
| **parameters** 68:9 98:16,17 100:12 102:2 102:13 103:11 106:6 | **pattern** 75:21 114:20 | **performed** 41:13 46:20 63:19 66:20 | **plc** 3:18 4:4,8 |
| | **pause** 9:6 33:21 144:22 145:2 | **performing** 31:8 | **please** 7:2 8:12 9:5 10:2 11:3 11:18 14:11 76:6 82:7 |
| **parentheses** 73:10 81:7 96:13 | **peachtree** 3:19 | **period** 23:2,12 42:2 | |
| **park** 5:19 57:22 | **pending** 12:13 | **person** 8:20 52:8,12 93:11 114:20 115:19 | **po** 3:5 |
| **part** 21:3 22:21 30:2 37:6 41:21 44:18 47:14,20 53:9 53:10 78:12 80:2 105:15 114:1 122:21 | **people** 7:22 8:6 82:10,14,15,17 83:11 92:15 99:8 135:14 | **persons** 81:11 | **point** 38:15 42:20 60:6,11 63:8 71:3,14 72:9,16,16 94:10 101:13 101:14 105:16 110:8,13,20 112:16 117:17 119:13 120:1 121:7,8 124:1 124:10,14,14 125:16 127:10 129:10 130:9 130:10 138:5 140:2 141:13 143:4 145:18 |
| | **percent** 72:7 110:22,22 113:4 114:21 114:22 115:21 115:22 116:9,9 116:14 119:12 119:13 122:7,7 122:9 126:8,10 130:21 131:7 131:13,14,22 132:13 134:7,8 134:12,20 143:9,18,19 144:3,5,14,14 | **perspective** 71:15 | |
| | | **ph.d.** 1:15 2:2 6:11 9:10 148:1,5 149:2 149:24 150:2,4 150:12 | |
| **participated** 39:1 | | | |
| **participating** 8:15 14:16 | | **phrase** 81:21 | |
| **particular** 38:19 48:21 54:3 94:3 112:14 113:14 119:18 144:20 | | **physical** 32:4 **physically** 8:16 **piece** 66:3,22 **pieces** 54:17 | |

**pointed** 122:14
**polarization**
34:12 37:1,3,8
37:10 43:1,10
43:15 48:5,17
50:8 51:7 52:9
60:18 61:11
114:12 126:20
127:14 132:10
140:13
**polarized** 29:9
29:16 33:9,13
34:4 35:12
36:5 43:9 68:5
108:4 111:6
114:13 119:2
120:20 121:7
121:20,22
122:19 130:12
130:19 132:6
133:5,11
134:14
**policy** 48:7,11
50:11 51:10
52:14,19
**politically** 34:6
50:18 117:19
118:2
**pong** 127:12
**ponging** 126:21
**poor** 103:20
**popick** 1:15 2:1
5:2,11,13,20
6:11 9:10 10:8

11:2,10 14:13
19:9 77:19
137:1 145:22
148:1,5 149:2
149:24 150:2,4
150:12
**populate** 78:2
**populated**
13:19
**populating**
13:13
**population**
47:2 66:4 67:9
**port** 5:17 49:2
49:10 56:22
57:12
**portion** 22:5
50:16 58:18
101:1 104:10
107:4,4,15
**position** 23:8
23:16,19 43:21
**possibilities**
127:5
**possible** 114:16
131:8
**post** 25:15,15
25:17 91:17,21
110:17 112:15
120:5,17
122:18 123:22
126:7
**potential** 36:12

**pound** 95:10
**poverty** 3:10
**precinct** 57:3
69:7 82:10,19
84:19,20 89:18
93:15
**precincts** 57:9
57:15 67:8,13
67:16 69:11,14
69:18 70:2,3,6
70:7 72:21,22
109:13 124:17
124:19
**precondition**
50:17
**predictions**
100:5,6
**preexisting**
89:8
**preferred** 34:8
122:16 130:15
131:17 142:6
143:13
**prefix** 16:17
**preloaded**
102:3,9,11
**preparation**
15:10 57:16
**prepare** 19:17
19:20
**preparing**
15:12
**present** 2:18
4:3 8:16 44:19

49:1 70:9
108:9 109:16
109:22
**presenting**
108:15
**pretty** 40:15
60:7 76:12
141:11,22
142:17
**prevents** 82:1
**primaries**
140:22
**primarily**
36:22
**primary** 51:6
52:8 54:9 85:5
85:6 107:22
108:21 130:11
131:10 132:6
134:4,9 141:5
**principal** 16:20
19:12 20:1
26:7 137:6,6
137:13
**prior** 15:2
93:14 122:10
123:6
**probable** 83:6
**probably** 31:14
92:6 96:22
104:3 115:10
135:7 138:1
**problem** 13:8
37:14 79:15

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

[problem - racial]

Page 26

82:9

**procedure** 10:11 61:8 98:2,2

**proceed** 9:8 19:5 67:17 77:17 136:21 145:16

**process** 45:15 104:15

**produce** 72:22 73:14 80:5 89:15,18

**produced** 51:17 108:8 137:17

**produces** 126:16

**producing** 126:14

**product** 46:19 57:8

**professional** 37:20

**profile** 38:20

**program** 74:11 79:2 87:12 89:7 92:11 93:16 96:20

**programmer** 78:15

**programming** 87:5

**programs** 54:16 86:1 89:8 93:22

**pronunciation** 33:21

**property** 47:7

**proportion** 113:17,18

**proportional** 143:8

**prove** 29:13

**provide** 32:12 141:3 144:1,3

**provided** 31:21 78:12 84:11 119:17 129:1 133:21

**public** 38:21 64:5 140:18 141:19 147:1 147:20 150:19

**published** 87:2

**pull** 39:22 58:16 93:5 132:2

**pulling** 92:21

**purport** 132:14

**purpose** 11:10 34:3 96:8 114:15

**purposes** 10:9 10:10 22:8 35:10 47:18 48:4 56:12

78:19 84:12 93:6 123:18

**pursuant** 2:18

**pursue** 44:6,7 44:21 45:5 46:1 51:20 58:14

**pursuing** 48:10

**pursuit** 46:16

**push** 115:17

**put** 41:1 54:17 54:19 90:21 99:5 100:12 138:14 141:15

**putting** 93:4

**q**

**qualifications** 63:3

**qualified** 62:11 62:12

**quality** 61:1

**question** 10:14 11:12 12:13,15 31:1,4 55:5 75:5 85:22 87:18 102:1,1 104:5 108:18 112:1 116:12 118:1 130:17 133:13

**questioning** 33:22 79:21

**questions** 12:5 12:21 15:15 33:1 103:3 145:21 146:2,6

**quick** 76:19 79:16 109:10

**quickly** 13:2

**quite** 31:1 40:16 45:1 65:11 72:12

**quote** 33:17 34:1,2,10,22,22 35:7 39:3 43:12 59:18 62:5 117:14

**r**

**r** 6:1 7:8,12 14:9 78:11,21 93:16,22 94:8 94:9 96:21 149:3,3

**race** 84:21 85:6 114:21 115:1 115:22

**racial** 34:11 36:22 37:2,8 37:10 43:1,15 48:4,17 50:8 51:7 52:9 60:17 61:11 89:14 92:18 98:15 99:8,9 104:18 114:12

Stephen J. Popick , Ph.D.                                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[racial - relevant]**                                          Page 27

| | | | |
|---|---|---|---|
| 124:18 126:19 127:14 131:9 134:19 140:13 | 150:5 | 85:11 96:20 132:1 | **referencing** 40:5 |
| **racially** 29:9,15 33:9,12 34:4 35:11 36:5 68:5 108:4 111:6 114:13 119:2 120:20 121:6,19,22 122:19 130:12 130:18 132:6 133:5,10 134:14 | **reading** 107:18 | **receipt** 148:17 | **referring** 73:10 99:3 |
| | **reads** 50:17 | **receive** 14:1 | **reflect** 112:16 |
| | **ready** 135:1 | **received** 42:7 | **regarding** 32:5 70:8 106:5 |
| | **real** 109:10 128:18 | **recent** 140:17 141:18 | **regardless** 35:22 72:5 |
| | **reality** 115:10 | **recess** 19:2 77:14 136:18 145:13 | **regards** 112:10 |
| | **really** 59:22 63:20 79:12 86:12 98:6 104:1,1 139:22 144:18 | **record** 6:7 7:3 7:7 8:10 12:7,8 12:16 13:3 14:12 18:19 19:1,4,10 22:18 23:20 24:12 55:4,5,6 69:8 77:11,13 77:16 97:3 128:8 136:17 136:20 145:10 145:12,15,18 146:8 147:10 | **registration** 18:10 109:15 |
| **raffensperger** 16:4 27:4 62:7 64:1 65:5 | | | **regression** 22:7 22:10 54:11 67:12,18,21 68:21 74:6,7 74:10 80:6 83:4,16,17 89:16 92:7,10 93:5,14 96:11 97:11 100:2 108:19 109:3 121:13 130:6 |
| **raining** 122:6 | **reason** 74:21 75:16 94:11 101:7 104:12 130:18 148:11 149:6,9,12,15 149:18,21 | | |
| **ran** 51:13,15 54:2 80:4,12 90:14 93:8 101:5 | | | |
| | **reasonable** 73:9,17 74:17 75:13 | | |
| **range** 71:10,13 | | **recorded** 6:10 | **regressions** 99:7 |
| **ranges** 116:7 | **reasons** 9:19 | **records** 47:7 | **related** 15:2 32:2 92:7,9 147:11 |
| **rappor** 89:7 | **rebuttal** 5:13 17:15,19,21 19:12 30:9 135:11 137:8 139:6 | **reduced** 147:8 | |
| **rate** 29:19 30:19 31:13 128:12 | | **reentered** 24:18 | **relative** 142:9 147:14 |
| **rates** 91:10 | **recall** 19:21 26:18 27:7,7,9 28:14 40:20 41:5,10,13,18 54:6,15 57:12 57:14 62:14 63:11 66:15 | **reference** 59:5 66:1 68:17 | |
| **rather** 85:20 132:9 | | **referenced** 148:6 | **relatively** 63:13 122:4 |
| **rbv** 44:2 | | **references** 16:5 86:3 117:13,14 | |
| **read** 11:2 87:7 95:16 148:9 | | | **relevant** 46:15 |

Stephen J. Popick , Ph.D.                                      March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[reliable - rest]**                                                    Page 28

| | | | |
|---|---|---|---|
| **reliable** 73:14 74:3 123:17 131:9 | **report** 5:11,12 5:13,14,20 15:21 16:21 17:2,11,19,20 17:21 18:1,1,6 18:12,13,20 19:11,12,12 20:1 26:7,18 30:9 32:10 33:2,5,14 34:16 36:4,13 36:18,21 37:12 40:1 42:20 44:12,14 49:5 50:1 51:22 53:20 56:12 59:5 62:16 63:20 64:7 69:6 70:9,11 75:4,14,14,16 75:19,19 80:6 80:15 85:4 91:21 106:18 110:1 117:2,8 117:10,13,21 121:14 127:13 128:7 129:8 130:20 131:18 132:3,15 133:14 135:11 137:7,8,13,17 138:14 139:6 139:14,15,17 139:19 | **report's** 78:13 **reported** 1:22 61:12 **reporter** 6:21 8:12,14 9:7,16 11:16 **reporting** 8:17 9:5 93:6 **reports** 15:10 15:13 16:11 32:8,14 51:17 53:8,10,12 56:15 85:1 **represent** 7:16 11:8 38:21 78:10 **representation** 7:16 **representative** 38:22 144:17 **represented** 15:16 **representing** 6:19 7:21 99:14 **reproduce** 80:13 **republican** 45:11 85:5 130:11 131:10 134:3,9 141:5 **request** 43:22 **requested** 28:7 | **requests** 44:12 **required** 113:18 150:13 **requirement** 118:10,13,16 118:17 **requires** 116:16 **requisite** 112:16 **rerun** 138:20 **research** 41:16 **researcher** 118:8 **reserved** 10:15 **residence** 14:8 **respect** 127:22 **respective** 2:19 **respond** 12:5,8 **responding** 142:1 **response** 12:14 17:2 22:16 53:1 139:15 **responses** 106:5 126:22 **responsibility** 43:20,22 **responsive** 17:20 18:13 **responsiveness** 10:15 **rest** 143:11 |
| **relied** 32:19 48:3,16 51:22 52:17 58:12 64:14,15 | | | |
| **rely** 48:12 51:21 53:16 58:9 88:5 133:7 134:21 | | | |
| **remain** 71:15 | | | |
| **remained** 44:13 | | | |
| **remaining** 143:11 | | | |
| **remedial** 47:4 | | | |
| **remedy** 36:12 | | | |
| **remember** 94:7 | | | |
| **remote** 1:14 2:1 | | | |
| **remotely** 8:18 8:21 | | | |
| **repetitive** 97:2 | | | |
| **rephrase** 11:14 31:5 87:17 | | | |
| **replicate** 80:14 137:16 138:11 138:13,16 | | | |
| **replication** 32:8 78:13 80:3,9 84:10 137:15 | | | |
| **replies** 19:13 | | | |
| **reply** 17:19 139:16,18 | | | |

Stephen J. Popick , Ph.D.                                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[restate - rozier]**                                              Page 29

| | | | |
|---|---|---|---|
| **restate**  25:14 | 26:6,11,15 | 98:12,22 100:4 | 24:16 26:3 |
| 117:1 | 27:10,16,17,20 | 101:10 102:20 | 31:11 38:3,5,8 |
| **result**  81:17 | 28:10,19 31:20 | 103:2,6,6,7,7 | 38:10 39:5 |
| 82:2 102:22 | 33:9 34:9 35:5 | 103:10,19 | 40:17,18 43:18 |
| 112:8 121:5 | 35:8 37:5,15 | 104:7,16,20 | 43:18 45:8 |
| 123:5 | 37:19,21 38:7 | 105:6,10 | 48:8 66:10 |
| **results**  44:3 | 38:8,13 39:15 | 106:15,22 | **road**  3:19 |
| 57:10 65:1 | 39:16 40:13,14 | 108:10 109:7 | **robust**  87:5 |
| 80:14 96:14 | 40:18 41:2 | 109:12,14 | **robustness** |
| 108:8,9 118:3 | 43:4 46:10,12 | 110:9 111:3,9 | 108:7,12,14,18 |
| 120:22 121:3 | 47:4,18 48:6 | 111:14,15 | 108:22 123:5 |
| 121:15 125:7 | 49:12 51:3 | 112:7,10,20 | 125:8 |
| 137:16,22 | 53:10 54:4 | 114:2,8 115:19 | **role**  43:17 |
| **resume**  21:10 | 55:3 56:5 57:1 | 116:4 118:12 | 44:18 48:19 |
| 21:12,14,16 | 58:3,10 59:10 | 118:20 119:9 | 50:5 53:7 56:1 |
| 55:3 | 60:19 61:2 | 120:9,14 121:5 | 58:7 61:5 |
| **retain**  44:8 | 62:8,17,19 | 121:9,15 122:3 | **roles**  55:17 |
| 45:5 | 63:4,7 64:3,10 | 122:4 123:1,3 | **roll**  92:13,16 |
| **retained**  15:15 | 64:21 65:6,13 | 123:19 124:1 | 98:19 104:17 |
| 15:20 33:6 | 66:10 67:10 | 124:10 125:11 | 105:12,12 |
| **reticence**  144:9 | 68:22 69:3 | 125:15 126:3 | **rolled**  130:22 |
| **return**  148:13 | 70:15 71:10 | 127:6,7 128:18 | **rollins**  4:5 8:2,3 |
| 148:16 | 72:8 73:1,15 | 129:3 130:13 | **rolls**  131:6 |
| **returns**  109:12 | 74:7,11 75:14 | 130:22 131:18 | **room**  8:17 9:20 |
| **review**  19:16 | 75:18 80:8 | 132:19,19 | 82:6 |
| 19:19 45:4,6 | 82:6,11,16,17 | 133:5 134:18 | **rose**  16:3 27:3 |
| 57:16 61:3 | 82:18,22 83:17 | 135:15 136:8 | 28:19 29:4 |
| 90:8,10 94:11 | 85:12,17 86:22 | 136:12,14 | 62:7 63:22 |
| 130:5 148:7 | 87:8 88:5,6,7,9 | 140:3,19 142:4 | 65:5,10 89:4,5 |
| **reviewed**  19:18 | 89:15 91:8,18 | 143:1,8 144:3 | **row**  82:9 83:2 |
| **right**  10:3 12:1 | 91:22 92:16,16 | **rights**  4:6,10 | 108:20 |
| 13:17,21 14:5 | 93:1,9 94:18 | 7:20 8:4 15:3 | **rows**  83:1 |
| 16:21 17:20,22 | 95:11 96:1,6 | 23:3,6,10,15,15 | **rozier**  7:17 |
| 24:7 25:8 26:1 | 96:12 97:15 | 23:17,21 24:10 | 10:20 15:19 |

Veritext Legal Solutions
800.808.4958                                                770.343.9696

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[rozier - senior]**                                    Page 30

146:6
**rules** 10:11,12
  61:8 74:1
**run** 44:2,2 51:7
  51:13 52:8,13
  53:3 54:7
  80:16,19 81:17
  83:14 84:11
  90:11 94:9
  96:12 102:21
  103:2 104:15
  132:12
**running** 35:15
  80:8 93:3
  100:2 125:2
  138:13
**runs** 98:7
**russo** 1:22 6:22
  147:2
**rxc** 69:3 96:1
  97:13 104:15
  104:19 105:18
  108:20 109:2
  120:11 121:13
  121:20 122:15
  123:13 124:3
  125:13 126:2
  126:15,17
  127:3 130:7
  131:3 138:15

**s**

**s** 6:1 7:8,8 14:9
  149:3

**sake** 97:10
**samantha** 4:9
  7:19
**satisfied** 34:13
  34:22 35:13,18
  35:20 113:11
  113:12 129:2
**satisfies** 111:8
  111:12 113:7
**satisfy** 112:17
  116:18
**saves** 62:20
**saw** 69:20
  102:19
**saying** 10:4
  34:2 95:9
  129:5 133:4
  134:13
**says** 26:16
  42:19 43:3,7
  59:9,18 60:11
  81:6 98:21
  117:17,18
  129:10
**scale** 112:7
  114:14
**school** 26:14
  62:6
**science** 66:6
**scientist** 118:9
**scope** 33:5
**screen** 40:8
  60:3

**scroll** 20:7
  21:10,11 33:13
  37:15 42:13,15
  60:5 62:3 73:4
  106:22 119:18
**second** 18:20
  50:17 54:12
  60:13 110:18
  117:18 126:16
**secret** 83:12
**secretary** 84:20
  131:7
**section** 23:15
  23:21 24:16
  26:4 27:20
  28:2 31:12
  38:5,5,8 39:4
  40:17 43:18
**see** 11:20 13:5
  13:21 17:10,13
  18:2,7,8 21:9
  21:12 34:19
  40:1,2,7,8
  42:18,22 43:2
  43:11,13 46:7
  49:21 50:20
  59:3,8 60:15
  68:7,21 69:5,7
  69:19,22 78:9
  81:6 91:13,16
  92:3,4 96:4
  97:4,5 98:18
  103:4,9 104:9
  104:10 105:5

105:10 107:5
  107:12 110:19
  114:17 120:12
  120:13 121:2
  122:18 123:2,9
  123:9,21
  124:14 125:21
  126:7,9 127:16
  128:2 129:13
  130:22 131:16
  135:9 140:11
  144:1
**seeing** 100:15
  123:14
**seem** 116:1
**seems** 27:17
  33:20 43:12
  62:19 64:11
  65:13 142:5,15
**seen** 129:15
**select** 38:18
**sells** 3:3,4 7:6,7
  10:19 11:2
  15:17 18:16,21
  28:8,9,18
  30:14 76:6
  77:9 135:5,16
  135:22 136:8
  136:12 146:2
**senate** 36:15,21
  37:2,7 42:20
**send** 90:19
**senior** 51:17,19
  53:4 58:13

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

[sense - sort]                                      Page 31

| | | | |
|---|---|---|---|
| **sense** 92:22 98:19,20 104:17 | **several** 16:4 | **signed** 148:19 | **smaller** 71:12 71:13 |
| **sent** 30:12,13 32:9 80:3 84:14 137:15 139:15 148:14 | **share** 13:1,7,11 19:10 91:11 141:4 143:12 144:2,4,14,15 | **significant** 127:3 128:4 | **sneakily** 90:21 |
| **separate** 34:18 35:12,18 52:22 111:8 112:19 112:22 113:7 117:3,11 118:15 127:15 128:21 129:2,5 130:1 | **shares** 92:11 143:17 | **significantly** 127:6 | **software** 78:21 88:15 |
| | **sheet** 148:11 | **silence** 8:10 | **solely** 128:21 143:3 |
| | **shift** 53:7 | **similar** 61:6 80:21 100:9 115:13 138:1 143:6 | **solution** 84:1 |
| | **shifts** 127:16 127:17 | | **solutions** 2:6 6:20 7:1 148:23 |
| | **shocking** 138:20 | **simple** 116:8 | |
| | **short** 19:2 77:14 136:18 145:13 | **simply** 15:19 | **somewhat** 52:6 55:7 129:1 138:1 |
| **separately** 118:22 119:8 127:19 | | **simulation** 80:18 81:15,19 81:22 83:19,20 98:4 101:15 138:9,21 | **sooner** 91:15 |
| **separates** 113:10 | **shorter** 77:6 | **single** 130:11 | **sorry** 13:16 17:10 22:17 25:13 30:22 46:8,18 49:3 59:21 75:5 77:10 100:14 100:17 101:6 107:18,18 109:18 111:16 116:22 122:20 128:14 130:4 145:19 |
| | **shorthand** 147:7 | **sir** 106:16 | |
| **served** 31:22 38:2 62:5 | **show** 62:20 110:21 114:21 117:19 118:21 | **site** 58:2 | |
| **service** 64:5 140:18 141:19 | **showed** 82:10 82:14,15 92:14 112:11 | **sitting** 42:2 134:13 138:11 | |
| **set** 89:12 106:6 108:21 111:22 | | **situations** 123:12 | |
| **setting** 104:14 | **shown** 113:13 | **six** 23:13,18 | |
| **settled** 58:5 | **shows** 116:6 | **size** 57:13,15 63:11,15 72:5 72:13 | |
| **setup** 74:2 101:19 103:6,7 | **sic** 30:18 52:4 | | **sort** 17:19 25:22 44:21 54:13 64:8 72:17 83:15 94:3 101:12,13 102:15 104:9 108:16 112:6 |
| | **side** 13:6 115:21 | **sliding** 112:6 | |
| **setups** 74:4 | **sign** 11:3 148:12 | **slightly** 84:3 | |
| **seven** 107:16 107:21 | **signature** 11:1 147:19 | **small** 60:8 63:13 66:4 69:12,17 70:1 70:6 72:21 | |

Stephen J. Popick , Ph.D.                                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[sort - subsection]**                                        Page 32

114:16 118:7
121:12 142:1
142:20 144:16
**sorts**  38:22
  42:8 51:14
**sounds**  40:14
  110:7 122:12
  145:8
**southern**  3:10
  49:11
**span**  110:12
**speak**  11:19
  98:8
**speaking**  9:22
  10:5
**special**  107:22
  129:12,21
**specific**  38:15
  47:20 121:5
**specifically**
  28:14 36:19
  64:19
**specified**  96:12
**specify**  89:11
**spelled**  7:12
**spend**  33:11
**splcenter.org**
  3:13
**split**  67:8,9,13
  67:15 116:2
**splitting**  133:19
**spoke**  61:7
**staff**  41:14

**stamp**  13:10
**stand**  121:18
**standard**  54:10
  63:18 74:1,1,4
  74:8 90:8 98:3
  101:9,11,19
  102:11 103:7
  103:11 113:16
  118:17 125:6
**start**  11:21
  12:19 20:5
  33:22 75:9
  79:21 93:12
  100:11 104:6
  120:12
**started**  9:20
  26:2 45:16
  46:5,8,11 84:2
**starting**  24:14
  83:21 101:13
  101:14
**starts**  43:5
**state**  7:22 8:6
  9:1,3,5 14:11
  38:11 62:4
  73:6,7 84:17
  84:21 102:21
  107:9 108:3
  109:8 113:19
  117:8 123:20
  130:11 131:7
**stated**  53:1
  103:10 113:10
  118:10,11

122:16 127:13
**statement**
  51:10 121:4
**states**  1:2 5:18
  21:20 38:6
  39:10 48:8
  49:2,9 57:22
  58:13 60:13
**statewide**  64:2
  64:6 65:5,7
  140:18 141:19
**statistical**  22:3
  22:5 23:14
  42:8 43:17
  47:15,22 48:1
  53:3,17 61:1,4
  61:17 66:21
  108:7 128:2
**statistically**
  128:4
**statistician**
  38:3,4
**stefanie**  4:8
**stephen**  1:15
  2:1 5:2 6:10
  9:10 10:8
  14:13 148:1,5
  149:2,24 150:2
  150:4,12
**sticking**  96:16
**stipulate**  60:12
**stipulated**
  60:21 62:16
  63:2 65:2

**stipulations**
  10:17
**stop**  10:3 48:6
  106:12
**store**  96:13
**storing**  97:13
**straight**  76:13
**strategy**  83:15
  122:17
**streamline**
  101:22
**streamlined**
  103:13
**street**  2:7 3:11
**strike**  87:16
**strikes**  126:5,6
**strong**  123:6
**struggle**  10:4
  70:16
**struggling**  60:2
**stuff**  56:9 81:6
  93:22 98:11
  113:2
**stupid**  101:8
**subcompone...**
  90:14
**subject**  51:3
  105:1
**submitted**  30:7
**subscribed**
  150:14
**subsection**
  50:16

| | | | |
|---|---|---|---|
| **substance** 110:1 | **suppose** 72:10 133:12 | **tacky** 74:14 | 101:3 103:18 122:5 136:5 |
| **substantially** 124:9 140:14 | **supreme** 33:17 34:1 | **take** 39:7 43:22 59:14 62:18 | **telling** 90:22 92:10 |
| **substantive** 109:17 | **sure** 7:6 12:4 | 65:20 77:4,6 79:16 100:22 | **tells** 98:12 |
| **substantively** 108:8 121:14 | 20:8 27:2 33:3 59:6,21 70:14 | 101:19 103:11 135:2 139:13 | **ten** 76:5 77:5 **tens** 65:20 |
| **successful** 39:4 | 80:10 88:16,19 88:19 91:4 | **taken** 6:11 9:16 10:8 11:17 | **tenure** 40:16,17 |
| **sufficient** 113:20 | 132:4 135:3 142:2,3 144:7 | 19:2 77:14 136:18 145:13 | **terminology** 70:15 80:9 |
| **sufficiently** 34:7 68:8 79:18 | 144:8 145:3,8 **surprise** 53:22 | 147:3,7,13 **talk** 108:14 | **terms** 143:7 **test** 34:19,21 |
| **suite** 3:19 | **surprising** 80:19 | 130:10 **talked** 38:1 | 35:13,14,18 111:9 112:19 |
| **suited** 109:6 125:5 | **surreply** 18:17 | 62:3 106:8 116:19 120:21 | 112:22 113:8 113:11 117:4 |
| **sum** 81:6,10 | **suspect** 75:17 **sustained** 75:7 | 141:11,12 | 117:11 118:15 127:16 128:2 |
| **summarize** 61:9 | **swear** 8:12 9:8 **swing** 124:14 | **talking** 47:21 56:20 73:20,21 | 128:21 129:2,5 130:1 |
| **summer** 21:1 | **sworn** 9:2,11 147:6 150:14 | 75:9 76:15 79:13 107:13 | **testified** 9:13 27:18 |
| **supp** 39:13 40:9 49:11 | **symbol** 95:10 | 107:14 112:14 128:14 137:7 | **testify** 26:17,20 50:12 |
| **support** 48:15 51:16 110:21 | **t** | 137:14 **talks** 50:22 | **testifying** 9:1 27:9 61:21 |
| 110:21 111:2 111:15,17 | **t** 149:3,3 **table** 89:16,19 | **tech** 21:1 | 64:17 **testimony** |
| 113:5 114:4,5 114:6 115:13 | 107:13 110:5 110:16 116:5 | **technique** 57:6 **techniques** | 27:22 30:10 55:13 58:9,11 |
| 115:13 118:19 118:20 119:14 | 119:17 120:1 122:18 123:1 | 22:9,10 **technology** | 147:4,6,10 148:9,17 150:8 |
| 123:22 124:6 **supported** | 124:4 **tables** 138:12 | 20:16 55:12 **tell** 9:11 30:6 | **text** 59:22 107:19 116:5 |
| 119:10,12 | 138:13 | 30:16 32:18 | |

Stephen J. Popick , Ph.D.                    March 13, 2026
Driver, Courtney, et al. v. Houston County Board o

**[text - truthfully]**                                Page 34

120:21
**thank**  9:14 26:5
  38:10 49:8
  56:16 62:21,22
  84:6 91:2
  94:22 95:3
  97:14 103:17
  109:20,20
  119:15 136:15
  137:1 145:21
**thanks**  55:21
  140:5
**that'd**  136:11
**thereabouts**
  24:20
**thing**  12:12
  47:20 83:19
  87:7 96:10
  104:13 105:5
  112:12 117:12
**things**  54:19
  55:11 67:19
  87:6,10,13
  101:15,22
  103:13 127:12
  134:17
**think**  13:1 14:3
  15:21 18:16
  21:1,8 27:13
  28:22 29:19
  30:7,13 32:22
  36:17,17 37:5
  43:16 55:7
  68:8 76:11,16

76:17 82:3,4
82:19 84:7,13
88:7,9 90:21
93:18 94:8,14
96:19 98:9
101:22 102:20
103:5,10
105:13 106:10
107:12 108:17
114:3 115:4,8
115:8 116:3,15
118:5,5 122:9
132:17 135:12
135:17 136:2,7
139:4 141:11
**thinking**
  103:20
**third**  60:14
**thornburg**
  33:18 34:2
**thought**  37:12
  97:18 123:6
**thousand**  65:19
**thousands**
  38:12 65:20
**three**  38:15
  61:15 64:12
  104:16,18
  105:20,20
  123:7 124:22
  141:4
**threshold**
  34:13 120:14

**throat**  128:13
**throw**  114:16
**tight**  71:2,19
**till**  77:5
**time**  12:11
  20:20 21:3,3
  23:2,14,16,19
  23:20 24:9,13
  24:14,19 25:6
  25:12 31:12
  32:2 33:11
  41:2 45:17,18
  46:5 54:8
  64:12 69:20
  81:10 83:18
  84:3 86:9,14
  87:4,7 88:18
  90:6 93:17,20
  93:21 94:6,10
  94:13 96:17,18
  97:20 106:1
  118:18 143:4
  145:22 148:18
**timeframe**
  148:8
**timeline**  46:12
**times**  128:20
**tiny**  59:22
**today**  14:17
  19:17,20 31:4
  42:3 54:20
  94:1 128:15
  134:13 137:7
  137:14 138:11

**together**  28:22
  54:17,19 72:22
  104:21 113:15
**told**  29:7,12
**took**  21:1 23:8
**tool**  55:10
  56:13
**top**  37:4 85:14
  126:2
**topic**  55:22
**total**  82:16
  100:8
**totals**  82:9 83:2
**touched**  33:4
**town**  5:18
  57:22
**traditional**
  144:18
**transcript**
  148:6,19 150:5
  150:8
**transcription**
  147:8
**trial**  10:16
  27:15 46:16
**true**  35:22 50:6
  99:22 103:22
  121:1 131:3
  147:9 150:8
**truth**  9:11,12
  9:12 71:9,13
  116:9 127:7
**truthfully**
  14:16

800.808.4958                                      770.343.9696

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

**[try - vast]**

Page 35

try 11:13 75:10
  82:3 83:22
  114:14
trying 9:19
  17:22 70:16
  74:14 95:16
  100:3 117:1
tune 100:10
  102:8 106:13
turn 57:18
turned 13:6
turning 28:5
  29:6
turnout 84:21
  85:6 91:10
  109:15 131:6
  142:8,9,18
  143:6,8,9,10,11
  143:12,17,19
  144:2,4,11,13
two 26:10
  46:14 54:10
  55:11,17 61:6
  64:18 68:18
  84:13 105:3
  108:21 114:20
  115:19,19
  123:9 125:7
  126:20,22
  127:4,10
  140:16
twofold 34:4
type 31:7 109:9
  124:13 143:13

types 56:21
typical 69:18
  142:10,12
typically 125:7
typo 21:15,16
tyson 3:17

**u**

u.s. 5:15,17
  6:14 21:5,13
  31:3
uh 12:6,6,6
  16:19
umbrella
  122:11
uncertainty
  70:7,20,22
  71:11 72:8,13
  72:18
under 4:6,10
  7:20 8:4 10:10
  28:2 39:4
  45:12,13 73:8
  74:5 77:20
  90:7 112:20
  114:2 118:16
  127:15 137:2
  147:8
undergrad
  20:13
understand
  11:12 36:11
  42:6 43:16
  44:11 48:13

53:7 77:20
  117:5,5,6
  131:13 144:6,9
understanding
  33:12 53:9
undertaken
  99:19
undertook
  61:17
unit 6:9 34:6
united 1:2 5:18
  21:20 38:6
  39:9 48:8 49:2
  49:9 57:22
  58:13 60:13
university
  20:19
unpublished
  58:2
update 88:19
  90:8,9 122:9
updated 86:8
  88:14
uploaded 19:10
use 10:16 22:11
  22:20 55:12
  56:4,8,11,13,14
  56:14 86:16
  87:20 88:1,8
  88:18 126:9,11
  142:19 143:3
used 29:9 32:5
  57:10 68:18
  79:20 86:1,5

88:7,21 91:9
  97:5,6 148:19
useful 55:19
user 89:10
uses 36:6 89:8
using 44:21
  47:12 54:15,16
  61:12 89:5,6
  89:22,22 93:13
  112:19
usually 34:8
  111:15,19
  127:21 129:6
utilized 86:21

**v**

v 1:7 5:15,17
  5:18 33:18
  34:2 148:4
  149:1 150:1
vacancy 23:9
values 97:13
  101:11,19
variable 99:6
  99:12 100:1,4
variables 101:9
varies 140:13
variety 38:12
various 42:8
  61:12 80:5
varying 141:13
  142:8
vast 66:20

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

**[verify - went]**

Page 36

verify 148:9

veritext 2:6
6:20,22 78:2
148:14,23

veritext.com
148:15

version 94:9

versions 94:4

versus 6:13 7:9
7:17 26:13
27:4 39:10
49:2,9 57:22
62:6,7 64:1
65:5 142:9

verus 63:6

video 6:10
145:6

videoconfere...
6:18 90:22

videographer
4:11 6:6,21
8:11 13:4,8
18:22 19:3
77:12,15
136:16,19
145:11,14
146:4,7

videotaped
1:14 2:1

view 70:19,22

village 5:17
49:2,10 56:22
57:11,12

virginia 14:9

vote 34:7 50:19
83:8,10 91:10
92:11,14,15,17
111:19 131:22
141:3

voted 82:11,14
82:16,17 83:11
99:8 113:14,20
119:8 127:19
131:15,20

voter 18:9
73:20 84:17,17
84:21 109:12
116:17 131:6
133:7

voters 35:2,3
65:14 83:6,8
83:10 92:13
111:18 113:14
113:20,21
114:21 115:1
115:12,15,16
118:19 119:10
119:14 127:18
129:11,20
131:5,11,14,16
132:19 134:3,7
142:9,10

votes 82:20
92:14 115:22

voting 15:3
23:3,6,15,17,21
24:16 26:3

29:9,15 31:11
32:2,4 33:7
34:4 35:12
36:5 38:3,4,8
38:13 39:5
43:18 66:9
68:5 73:15
114:13,20,22
115:1 116:16
119:2,5 121:6
125:5 130:12
131:9 141:4

**w**

w 14:9

wait 100:14

walk 85:14

want 7:5 8:9
9:17 10:3 20:5
20:11 25:13,15
33:11 39:7
55:15 56:7
57:19 65:22
70:14 77:3
85:17 88:4
90:21 92:11,18
94:16 95:4
97:3 104:1,2
104:22,22
112:3 114:11
114:14,16,17
121:3 130:10
135:17 136:8
137:5 145:4,7

145:18

wanted 29:13
45:4 58:14
99:5 100:12

wanting 76:10
99:16

warren 4:11
6:19

washington 2:8
3:12

way 33:1,20
42:19 45:6
46:17 61:13
64:11 82:4
84:3 86:9
90:14 113:3
115:2 125:5
126:21 144:7

ways 126:12

we've 28:21,21
36:6 64:9 76:3
96:19 116:15
116:19 129:16
137:7

weather 99:17

web 101:7

weeds 75:9
104:2

weighting
123:4

welcome 77:19
146:1

went 20:18
66:16 90:13

Stephen J. Popick , Ph.D.
Driver, Courtney, et al. v. Houston County Board o

March 13, 2026

**[went - zoomed]**

Page 37

100:18
**westlaw** 58:2
  59:4
**whatnot** 55:18
  96:22
**white** 35:2
  82:15 83:9,9,9
  92:19 98:20
  104:18 105:7,9
  111:2,18
  113:20 114:8
  115:16 118:19
  127:18 131:14
  131:14,16,16
  132:18 142:9
  143:10
**whites** 34:7
**whitest** 26:13
  28:10 62:6,10
  63:5 64:21
  88:22
**wide** 38:12
**win** 130:13
**windsor** 14:8
**wish** 11:1
**witness** 8:13
  9:1,2,9 26:11
  31:19 55:13,17
  56:15 62:6
  64:20 76:7,14
  76:22 135:3,12
  135:18 136:3
  136:14 146:1,3
  147:4,6,10

148:8,10,12,18
**word** 59:15
  62:18 78:17
  99:12,13
  117:14,14
  142:21
**words** 89:12
**work** 21:3 22:1
  22:6,7 23:3
  24:5,10 30:2,8
  31:8,9,21 39:3
  40:22 41:15
  45:16,20 46:1
  46:14,19 47:14
  52:4,15,21,22
  53:13 54:18,21
  55:2 57:8
  67:16 69:19
  83:22 84:5,16
  87:1 88:6
  93:18,19 103:8
  118:14,19
  138:16
**worked** 40:4
  41:10 45:13
  86:18
**works** 88:6
**would've** 15:14
  40:15 51:22
  52:17 85:3,21
  96:21
**writing** 26:18
  63:19 67:1

**written** 54:16
**wrong** 14:4
  18:14 46:7
  91:14 137:20
  142:21
**wrote** 53:19
  90:2 108:5

**x**

**x** 5:1 79:13
  100:3,5 116:14

**y**

**y** 7:8,12 100:3
**yeah** 12:10
  18:16 20:3
  25:17 27:13,17
  29:3 31:16
  47:11 48:6
  55:20 56:6,10
  56:18 57:11
  60:2 72:19
  77:4,9 79:3,12
  79:12,22,22
  85:19 86:6
  88:19 94:16
  97:2 98:14,18
  105:17 107:20
  110:20 116:21
  128:14 129:4,6
  132:1 133:2
  135:5,5 136:10
  140:6 141:17
**year** 21:14
  69:16

**years** 16:4
**yep** 26:16
  34:16 43:12
  50:3 64:11
  66:2 68:7,7
  77:21 78:14
  88:2 95:8
  106:10 109:8
  120:10
**york** 49:11

**z**

**z** 100:4,7
**zero** 114:22
**zoom** 6:18 8:9
  9:17 11:17
  60:6 110:18
**zoomed** 60:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.