Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

MACON DIVISION


COURTNEY DRIVER, et al.,

    Plaintiffs,

                              CIVIL ACTION FILE

    vs.

                              NO. 5:25-cv-0025-MTT

HOUSTON COUNTY BOARD OF

ELECTIONS, et al.,


    Defendants.


VIDEO DEPOSITION OF

STEPHEN J. POPICK, PhD

April 2, 2026

9:04 a.m.

TAKEN BY REMOTE VIDEOCONFERENCE

Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

Stephen J. Popick , Ph.D.                                       April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 2

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of deposition | 6 |
| Exhibit 2 | 3/13/26 deposition transcript | 7 |
| Exhibit 3 | 12/24/25 Original Expert Report | 7 |
| Exhibit 4 | 3/19/26 Corrected Expert Report | 8 |
| Exhibit 7 | An evaluation of the performance and suitability of R × C methods for ecological inference with known true values by Carolina Plescia and Lorenzo De Sio | 87 |
| Exhibit 8 | Corrected Code for 2026 County Commission Post 5 | 39 |
| Exhibit 9 | Barber original report | 75 |

INDEX TO EXAMINATION                                        PAGE

By Mr. Jacoutot                                               4

Veritext Legal Solutions
800.808.4958                                                 770.343.9696

Page 3

APPEARANCES OF COUNSEL:

On behalf of the Plaintiffs:

      BRYAN SELLS, ESQ.

      The Law Office of Bryan L. Sells, LLC

      Post Office Box 5493

      Atlanta, Georgia 31107

On behalf of the Defendants:

      BRYAN F. JACOUTOT, ESQ.

      DIANE LAROSS, ESQ.

      Clark Hill PLC

      3630 Peachtree Road, NE

      Suite 700

      Atlanta, Georgia 30326

ALSO PRESENT:

      Marlin David Rollins-Boyd, Esq.

      Michael Barber, PhD

      Samantha Heyward, Esq.

      Julie Houk, Esq.

      Grace Thomas, Esq.

      Krishan Patel, Videographer

Page 4

THE VIDEOGRAPHER:  Today's date is April 2nd, 2026, and the time is 9:04 a.m.  This will be the remote videotaped deposition of Dr. Stephen Popick.  Will counsel please introduce yourself for the record and state any objection to the doctor being sworn in remotely.

MR. JACOUTOT:  My name is Bryan Jacoutot. I'll be taking the deposition today on behalf of the Houston County defendants, and I have no objection to Dr. Popick being sworn in remotely.

MR. SELLS:  And, hey, this is Bryan Sells on behalf of the Driver plaintiffs.  No objection here to the deposition and Dr. Popick being sworn remotely.

THE VIDEOGRAPHER:  Would the court reporter please swear in the doctor.  Thank you.

STEPHEN J. POPICK, PhD, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. JACOUTOT:

Q    Good morning, Dr. Popick.

A    Hello.

Q    Since this is our second deposition in a couple weeks, I don't think we need to do

Page 5

introductions so much.  You've already been sworn in, and Bryan and I have put our names on the record.

So I know we recently went over the rules of the deposition as well, but just as a quick refresher, please speak clearly and loudly for the court reporter, especially because we're on Zoom. Try to keep your answers to an audible "yes" or "no" rather than saying "uh-huh" or nodding.

A    I understand.

Q    If you need a break at any time, just let me know.  I only ask if there's a question pending that you answer it before we go on the break.

A    Sounds fine to me.

MR. JACOUTOT:  Mr. Sells, can we agree that all objections except those going to form or privilege are reserved until trial or first use of the deposition?

MR. SELLS:  Yes, that's fine with me.

BY MR. JACOUTOT:

Q    Dr. Popick, I'm going to start with putting your deposition notice -- your supplemental deposition notice.  Should be populating in your area, but let me know if it isn't.

A    I see it.

Page 6

MR. JACOUTOT:  This is going to be Exhibit 1.

(Exhibit Number 1 was marked for identification.)

BY MR. JACOUTOT:

Q    I don't have any questions except I want to make sure that you did receive this.

A    Yes.

Q    Okay.

MR. JACOUTOT:  Now, if we can just go off record one second.  Sorry, a technical question.

THE VIDEOGRAPHER:  The time is 9:06 a.m. We are off the record.

(Recess 9:06-9:07 a.m.)

THE VIDEOGRAPHER:  The time is 9:07 a.m. We're on the record.

MR. JACOUTOT:  Thank you.  Sorry about that.

BY MR. JACOUTOT:

Q    So I'm just going to spend a few minutes here or maybe a minute just introducing a few exhibits up front.  The next one we'll mark as Exhibit 2, and this is your deposition transcript from your prior deposition of March 13th, 2026.  I'm going to put that in.

Page 7

(Exhibit Number 2 was marked for identification.)

BY MR. JACOUTOT:

Q    If you could just open that and take a look.

A    Populates for me.

Q    Okay.  Have you had a chance to review this transcript at all before today?

A    I reviewed it in the course of doing my post-deposition reviews, but I can't say that I read thoroughly all 190 pages.

Q    Okay.  Based on your review, though, is there anything that you wanted to change or that you believe was taken down incorrectly by the court reporter in that deposition besides just minor typos?

A    I didn't have anything on my mind except minor typos.  That's all that I spotted.

Q    Okay.  Next I'm going to mark as Exhibit 3 your original expert report.

A    Okay.

(Exhibit Number 3 was marked for identification.)

BY MR. JACOUTOT:

Q    This was separately marked in your other

Page 8

deposition, so I hope it doesn't create any confusion, but this is going to be Exhibit 3 for purposes of this deposition.  Just let me know when that's through.

A    I can see the report.

Q    Okay.  Can you open it up and just make sure that that is your December 24th, 2025, report?

A    Yeah, that's what it says.

Q    Okay.  Now I'm going to introduce your corrected expert report filed on March 19, 2026.

(Exhibit Number 4 was marked for identification.)

A    Okay.

BY MR. JACOUTOT:

Q    Can you please open that and make sure that's correct there?

A    Yep, that is correct.

Q    Great.

I'm going to direct you down to page 15 to look at footnote 22.

A    Which exhibit?

Q    For the one we were just looking at, the corrected expert report.

A    I just wanted to make sure I was on the right one.  Page 15?  Yes.

Page 9

Q    In this here you say that following your deposition on March 13, 2026:  I discovered a minor error in my statistical code.  Correcting that error does not change my original finding of racially polarized voting, but it does materially change some of the individual estimates of White and Black support for particular candidates in particular elections.  I report the estimates in the tables that follow and in the appendix.

Is that right?

A    That's the footnote, correct.

Q    So you identify that there's a minor error in your statistical code.  Did you identify any other errors besides that one?

A    No, the subject of my corrected report was the correction of the error that I discovered.

Q    Okay.  So why don't we just kind of begin with you telling me what happened after your deposition on March 13 that led you to finding this error.

A    So, Bryan, it's sort of a standard practice for me, both going all the way back to DOJ to what I do for FDIC today and also any of the outside work that I'm hired to do is to always after a big meeting think about what I was asked, think

Stephen J. Popick , Ph.D.                                         April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 10

about what the outcomes were, right, and reflect and take time to think if that motivates me to do any additional work.  So it's the same process that I've had for my whole career.

Q    Okay.  So no one came to talk to you and said, Dr. Popick, I think you made a mistake here?

A    Absolutely not.  The decision to issue a corrected report was mine and mine alone.

Q    Okay.  When you were doing this thought process where you reflected about what might need to be changed, what kind of led you to the realization that there was an error?

A    You asked questions on reliability, and so I noticed that I got a lot of questions on reliability, and so I stepped back, and I thought about why you might be asking those questions about reliability, just as I do pretty much for -- if it had been something else, sir, I would have done something else.

Q    Okay.  Did you make any other changes to your report aside from correcting the code and the accompanying sort of results in the tables?

A    I think I made some language changes because as I say in the footnote, right, the conclusion of racial polarization doesn't change,

Page 11

but the estimates and intervals around those
estimates changed, right, and so language was
updated generally to reflect the changes to be
consistent with what's in the tables.  Other than
that, I don't recall changing anything else.

Q    Okay.  Let's turn to your original report
then, which I have produced as Exhibit 3.

A    Okay.  I'm there.

Q    And let's first go to page 13 and look at
footnote 20.  I want to make sure I have these
right.

A    I relied on this methodology in my prior
expert reports.

Q    Yeah.  To be clear, you're referring to
the methodology of rolloff in calculating -- in
calculating the -- you're doing EI analysis using
the rolloff method you described?

A    That's correct, yes.

Q    And you say:  ...and my results were
accepted by the courts in each instance, see
footnotes 1 through 4 as examples, right?

A    Yes, I did.

Q    If we go -- if you will -- this is going
to be a little kind of back and forth because I
don't have a way to put both reports on the screen.

Page 12

A    I understand.

Q    But if we go to your corrected report and we go to footnote 20 on 13, you've removed the references to 1 through 4 and replaced it with footnote 5; is that correct?

A    That's correct.

Q    And why did you do that?

A    I did that because the original footnote, that was an incorrect characterization and a typo. That should have referred to footnote 5; it should not have referred to all the court cases.

Q    Okay.  Was it changed as a result of our conversation in your first deposition where we established that the courts in those cases did not, in fact, rely on your opinions at all?

A    I'm going to first disagree with the characterization that you just made that the courts didn't rely on it, at least the characterization of being directly.  I want to be mindful that I performed analyses to support cases to move forward in the Department of Justice before we retained outside experts who would testify in court.  That was a practice of DOJ.  So my work did materially impact the decision of DOJ to move forward on cases or in some cases to not move forward on cases

Page 13

because I did not find evidence to support a claim. My job there was to call balls and strikes.

So just to be -- to be clear on that, yes, I was the internal expert.  So it was -- you know, it was -- what I thought at the time was correct language, but to be crystal clear, I wanted to make sure that we were clear on it.

Q   Sure, but I do want to -- speaking of being clear, I do want to be clear that the court did not accept your opinions in each instance for those four cases that you subsequently removed following our deposition --

(Simultaneous speaking.)

A   I was not the testifying expert in those cases, I agree.

Q   So is it fair to say that you removed those cases as a result of your deposition testimony?

A   As I said, I reviewed everything after the testimony and thought about what needed to be changed and made those changes as appropriate.  I consider this a typo cleanup.

Q   Okay.  So because you thought it was -- consider it a typo cleanup, you didn't feel the need to call attention to the change?

Page 14

A    Correct.

Q    Okay.  Now, we did discuss kind of -- I'll just call it editorializing on the narrative portion of the report where seems like you just kind of added overwhelming in front of a lot of the discussion regarding bloc voting.  Is that fair?

A    I wouldn't call it editorializing.  I'm describing the results of my new analysis, and I'm trying to put it to language that is clear to the audience, which would be both plaintiff's counsel and defense counsel, but I added that language.

Q    Yeah, and just as an example, we don't have to go through it all --

A    That's fine.

Q    -- because it's in there a few times, on -- let's say go to page 18 of your corrected report.

A    Yes.

Q    Kind of in that first full paragraph right in the middle it says:  The overwhelming majority of Black voters, more than 83 percent, cast their votes for Hicks --

A    Hold on.  Okay.  Now I'm on page 18.  I apologize.

Q    No problem.  So that insertion of

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 15

"overwhelming" --

A    Yes.

Q    -- that was something that wasn't in the original report, right?

A    That's correct.

Q    Okay.  And is the modified characterization here based on the new point estimates derived from the change in your code that you reference in footnote 22?

A    The new point estimates and the new confidence intervals.

Q    If we go back to your original report, Exhibit 3, please.

A    Okay.  I'm there.

Q    I want to jump to your conclusions on page 21.

A    Okay.  Yes.

Q    Now, here you offered as one of your conclusions that there was no racial polarization in the Republican primary, right?

A    To be clear, I could not determine racial polarization in the Republican primary because in that one, as you recall, I think I said this in my deposition, Black voters were only 3 percent of the electorate in the Republican primary, plus I think I

Page 16

reference another article that says there's a cutoff of about 5 percent for rollup purposes, which we already talked about.  Since they were below that cutoff, I did not feel that it would be correct or accurate for me to describe the results for Black voters.  I only felt that it was appropriate to describe the results for White voters in that context.

Q    But your report does say here on bullet point 3 on page 21 that in a single Republican primary, voting was not racially polarized; is that right?

A    That is what my report says, yes.

Q    That is an opinion you offered?

A    Yes.

Q    Then we had our discussion in your deposition where I think I kind of pushed back on that a little bit, and if you will go to -- let me say, is it fair that I pushed back on that conclusion?

A    I recall you did.

Q    And so in your corrected report, did you change this conclusion?

A    Let me see.

Q    It's on Exhibit 4.

A    Uh-huh.  I did.  I changed it in -- exactly how I described it I believe in the deposition.

Q    Yeah, so you say -- now you say in a single Republican primary White voters did not prefer the Black candidate and that the candidate did not win.

A    That's right.

Q    Black voters were only 3 percent of the electorate, and I, therefore, did not review estimated voter preferences for Black voters.

A    That is correct.

Q    Did you make this change as a result of our discussion in your first deposition?

A    I recalled during our deposition that I made this claim, right, I made the statement in our deposition under oath, so I thought it appropriate to put that statement in here.

Q    And to be clear, you -- did you make these alterations without alerting counsel?

A    I made all the changes to my programs and then my estimations before I alerted counsel.  I alerted counsel that I needed to issue a corrected report, and then I told them here are my estimates results, then I would then submit a revised report

Page 18

coming out of that, then I submitted that revised report.

Q    Did you flag this particular change to anyone when you submitted the report, the revised report?

MR. SELLS:  Objection.  Bryan, you're calling for draft -- you're calling for materials protected by Rule 26(a)(3) and potentially attorney-client privilege.  You're asking for the substance of his conversations.

MR. JACOUTOT:  Well, I'm asking for something that he -- this is about as clear-cut as it gets this being one of his opinions.  It has materially changed since his --

MR. SELLS:  Yeah.  Yeah --

MR. JACOUTOT:  -- prior deposition.

MR. SELLS:  Right, and you can ask him about the opinions; you just can't ask him about what he talked about with me.

MR. JACOUTOT:  Well, I think if he talked to you about forming opinion that the attorney-client privilege doesn't protect that under the federal rules.

MR. SELLS:  No, but the attorney work product protection does under Rule 26.

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 19

MR. JACOUTOT:  So you're making the objection that a -- something that formed his expert opinion is not discoverable under the federal rules because it was --

MR. SELLS:  No, I'm making the objection that you're not entitled under Rule 26 to inquire into communications that my expert had with me in forming his reports.

I'll cite you the exact rule.  It is -- it's one of those new ones that came along after I went through law school, but it's 26(b) -- looks like it's -- where is it?  Such a long rule.  4.  It says, Rule 26:  Communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(b) regardless of the form of the communication except to the extent that the communications relate to compensation -- that's not what your question was about -- identified facts or data that the party's attorney provided to the expert -- your question wasn't about that -- or identifying any assumptions that the party's attorney provided and that the expert relied on. Your question wasn't about that either.

So that's the protection against inquiring into the communications between me and Dr. Popick

Stephen J. Popick , Ph.D.                             April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 20

here, and so I'm going to stand on that and instruct Dr. Popick not to answer that question.

Again, you can ask him about the opinions, but you just can't ask him about what he talked about with me.

MR. JACOUTOT:  I'll accept that for -- certainly for the time being, and thank you for walking through that.

BY MR. JACOUTOT:

Q    Dr. Popick, in light of that, did your counsel or -- did your counsel or anyone identify any facts or data that caused you to change the opinion that you made here regarding racial polarization in the Republican primary?

A    I identified the need to change my code. I did that on my own.  I then ran that code, saw the changes in my estimates, and made appropriate changes looking at both my past -- looking at a lot of my past consults, some of whom have went to court, and some of whom never went to court, and some are in the process of going to court, and tried to characterize the results in alignment with those.

Q    So did your -- did Mr. Sells provide you any facts or data that caused you to change your opinion --

Page 21

A    No.

Q    -- regarding racial polarization?

A    No.

Q    Okay.  Again, this is a material change to a conclusion that you made, and you didn't feel the need to kind of flag it for us in your corrected report?

A    The correction that I offered in my corrected report, the one that we're talking about here, is something that I think you agreed with me on that we talked about this during the deposition. I did not think then that this would be a new and novel statement to make since I am just being consistent with what I stated in my deposition.

Q    Yes, that's -- you're being consistent with what you stated in your deposition, but not with what you offered as your opinion in your original report.

A    Well, the facts changed.  My estimates changed.  The material conclusion that voting is racially polarized did not change, but the point estimates and the confidence intervals certainly did change, and changed, as I said, in material ways. That would I think logically, right, mean that I would change some of the language that I had, and I

Page 22

did.

Q    So is it your -- your testimony then that your change in your code is what led you to change this conclusion here in your original report?

A    I made corrections to the error that I noted, and those corrections changed the estimates from the elections that we analyzed.  I then -- I'm just tracing the logical path forward.  Since those estimates changed, I changed languages -- language that I used as well.

Q    Yeah, but those estimates didn't affect the underlying problems with your racial polarization conclusion in --

A    I'm sorry, what?

Q    Did those estimates that -- excuse me, let me strike that and rephrase.

You're stating here today that you didn't have sufficient data to determine whether the Republican primary was racially polarized; is that right?

A    So in my original report that is what I said, the Republican election was not racially polarized.  That was in my opinion a summarization of the results that lacked some nuance that then we discussed during the deposition.  Since we discussed

Page 23

that nuance in the deposition, I felt compelled to add that nuance that we discussed into my corrected report.

Q    Okay.  So then to be clear, it is not the change in your code that led you to alter your conclusion here, right?

MR. SELLS:  Objection as to form because, Bryan, what you're referring to as "here" I think is what has been tripping Dr. Popick up.

MR. JACOUTOT:  Okay.  I'll try to rephrase.

MR. SELLS:  Can you clarify that?  Yeah.

MR. JACOUTOT:  Yeah.

BY MR. JACOUTOT:

Q    To be clear, the change in your code that you -- that prompted your corrected report is not what prompted you to change your conclusion regarding racial polarization in the Republican primary; is that right?

A    I see now.  That is correct, what made my change here was our discussion in the deposition.

Q    Okay.

A    To be clear for the record, what I stated in my original report was a conclusion that lacked the necessary nuance to fully explain why I made

Page 24

that finding, and in the deposition, as we discussed, I explained that nuance.

Q    And you did not explain that nuance in your corrected report, right?

A    In my corrected report?  No, in the corrected report, I do take time to explain the nuance.

Q    Do you take time to explain why you change your conclusion from its previous -- from the previous conclusion?

A    I stated -- I'm looking at my bullet point right here -- that Black voters were only 3 percent of the electorate, and, therefore, I did not review estimated voting preferences for Black voters.

Q    Right.  So I'm just -- approaching this from the perspective --

A    I'm sorry, I'm trying to follow this, and I'm having a hard time following it.

Q    Approaching this from the perspective of a court, I see that third bullet point in a vacuum, it looks fine, but don't you think it's important for you, as the expert witness, to flag that that is a material change to a prior conclusion that you had and stated and put in your prior expert report?

A    I'm sorry, there was something that popped

Stephen J. Popick , Ph.D.                        April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 25

up on Bryan Sells's screen, and I don't know what that meant.

MR. SELLS:  On my screen?

THE WITNESS:  There was a hand or something floating above your head for a second. I'm sorry, Bryan.  I just saw that.  I don't know what that was.

MR. SELLS:  I don't know what that was either.

MR. JACOUTOT:  No problem.  Can the court reporter read that question back for me?

(The record was read by the reporter as follows:

"Q    Approaching this from the perspective of a court, I see that third bullet point in a vacuum, it looks fine, but don't you think it's important for you, as the expert witness, to flag that that is a material change to a prior conclusion that you had and stated and put in your prior expert report?")

A    When I issued my corrected report, the material change was the estimates that were corrected, then the language surrounding those estimates.  That's what I communicated.  That's what I thought the material change was.

Page 26

BY MR. JACOUTOT:

Q    Okay.  So it's your testimony then that changing a conclusion on racial polarization in your report does not constitute a material change in your expert opinion?

MR. SELLS:  Objection as to form.

BY MR. JACOUTOT:

Q    You can answer if you can.

A    Am I supposed to answer?  I'm sorry, I'm not a legal person.

MR. SELLS:  Yes, you can answer.

A    So I don't consider this a change, and let me explain why, right.  What I said originally in my original report that voting was not racially polarized, what I really meant by that statement and what I didn't explain very well in my original report was that I don't have that finding because I can't make that -- I can't ascertain what I believe about Black voters' voting behavior given they were such a small proportion.

That's on me for not fully nuancing that in my original report.  Here I am just trying to give the best explanation that I can about my viewpoint about that specific election.

BY MR. JACOUTOT:

Page 27

Q    Right.  And I understand that, but just a few minutes ago I asked you whether you made any changes to your narrative portion of your report, and you did not flag this one when I asked you, you did not flag it when you submitted your corrected report, and you see how that can be -- be viewed as a little misleading?

A    It was not my --

MR. SELLS:  Objection as to -- wait, wait, wait, wait.  Stephen, you got to let me object.

THE WITNESS:  I'm sorry.

MR. SELLS:  Form again.  You can answer if you -- if you can, but I just need to get the objection as to form on the record.

A    It's not my intent to be misleading.  I was cognizant of the changes that I was making to the numbers.  I did not consider taking a statement from my prior deposition and incorporating that here what should have been my original report as such a change.

BY MR. JACOUTOT:

Q    Is it fair to say you used the corrected report as an opportunity to clean up conclusions that you made in your original report?

A    In that case I used it to provide more

Page 28

detail around the conclusions that I'm making.

Q    Sitting here today, Dr. Popick, can you recall any other changes that you made to your report that we have not yet discussed --

A    I'm sure --

Q    -- outside of -- sorry, outside the context of the minor statistical error that you referenced?

A    So my recollection, right, is that all the changes that I made were in response to the error, the correction, and anything else that might be from the deposition that would cause me to need to change some language for clarity purposes.

In my opinion the big change that was made in this report was the figures, the corrected figures, right, and the tables, and the conclusions that we can draw from that.  So that's what I was focused on.  So --

(Simultaneous speaking.)

Q    Go ahead.

A    No, you go ahead.

Q    I guess I'm wondering why did you feel the need to reference a minor statistical error in your report but not the alteration of the material conclusion on racial polarization?

Page 29

A    I did not think I was making a material change on racial polarization given that the Republican primary election was not material to my findings, it was a primary, not the eight general and special elections that formed the core of my report, nor was it an election that was introduced by Dr. Barber in his -- in his rebuttal report that I responded to in my supplemental -- in my -- in his expert report, sorry, that I responded to in my rebuttal report.

Q    Okay.  You're being offered as an expert on racial polarization, right?

A    I don't know exactly what they're tendering me as, so I don't want to state for the record exactly what I'm tendered as.  I know in Rose v. Raffensperger I was being tendered as an expert in the statistical analysis of voting data.  Sorry, I'm not trying to be difficult here.  I'm just trying to be clear.  That's the whole point of all this.

Q    I understand that, and I will do so on my end as well.

Can you go to your original expert report in Exhibit 3?

A    Okay.

Page 30

Q    And go to page 3.

A    Sure, I'm on page 3.

Q    The first sentence under Introduction, Scope of Project reads, quote, I was retained by the plaintiffs' attorneys to determine whether voting in elections for Houston County commission was racially polarized, end quote; is that right?

A    Correct, that is the correct scope of the project.

Q    And the conclusion that you altered dealt with racial polarization in Republican primaries, right?

A    In a Republican primary, correct, it was about that one.

Q    So I understand that you don't characterize it as a material change, but isn't your opinion on whether something is racially polarized -- whether an election is racially polarized a material aspect of your capacity as an expert witness on racial polarization?

A    I was -- as you said, I'm prescribed to determine if voting is racially polarized.  That's my job, and that's what I'm doing.

Q    Okay.  So I want to talk about the minor statistical error now.

Stephen J. Popick , Ph.D.                          April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 31

A    Okay.  Sure.  No problem.  Let me get another cough drop.

Q    Sure.

A    What exhibit should I be going to?

Q    I don't have you on one yet.

A    Okay.

Q    Can you just explain to me generally what you changed in your code as a result of uncovering what you characterized as a minor statistical error?

A    Sure.  What happened here in this case -- I think it's important that I cover a bit more, right.

Q    Sure.

A    In Rose v. Raffensperger I relied on statistical packages from EI PAC to ZeligEI, which was developed by Gary King and cohort.  During my time in Rose, I became aware of a brand-new package called eiCompare, and as I made clear it was because of my work in Rose noting that eiCompare didn't have an analysis that I would typically want to use, that's the homogenous precinct analysis, that I worked with the package authors sharing my code on that -- on that particular analysis and building that into the eiCompare package.  I used eiCompare for a number of years after Rose for my consults.

Page 32

Now, when it came time for this -- this trial, this case -- let me just say this case, right --

Q    Sure.

A    -- when it came time for this case because I'm not touching this stuff every month, but I am periodically reviewing everything, I discovered that eiCompare was no longer listed on a website called CRAN, which is sort of like a body that vets statistical packages for R, which is the programming language that I use.  That means that something is wrong with the package, right.  Okay.

So given that there was something wrong with that, I had to go back to the underlying packages and rewrite code from scratch to do the analysis.

EiCompare makes it a lot easier to work with conducting voting -- conducting voting estimations, right.  Handles a lot of things that you don't have to deal with or see.  So going back to basics, I had to handle those things.  And it was because of this change because I had to change how I was doing my work because eiCompare wasn't available that the error that we're talking about occurred.

Q    Okay.  So eiCompare is what you were used

Page 33

to using for your statistical analysis?

A    Following Rose, yes, that is what I was using.

Q    And is this where you ended up using EI PAC instead?

A    EI PAC and EI are the two underlying packages that eiCompare calls.  They're two of the packages.  There's a few others too, but for these cases, they are the ones that are material.

Q    Okay.  So -- I'm sorry, you said it was after Rose that eiCompare -- I'm sorry, it was after Rose that you started using eiCompare?

A    Yes, because in Rose I started with Zelig, which is what I was using, right, and it's poor form to change a whole statistical package during the middle of my analysis, so I knew that I was going -- since they engaged with me in putting in the homogenous precinct analysis component into eiCompare, which I will say I've gotten a lot of plaudits from other experts for getting that included at that time, you know, I knew I was going to start using eiCompare for my case work, but, of course, at a point eiCompare was no longer available on the CRAN network, and so that meant that I had to go back and rewrite code from scratch.

Page 34

Q   You were rewriting code from scratch for purposes of this report?

A   That's right.

Q   And doing that is what created the statistical error you reference in footnote 22 --

A   Correct.

Q   -- of your corrected report?

So specifically, though, what changed between the two versions?

A   Okay.  That's a fair question to ask.

First change -- so when I say there was -- there was an error, right, the error is because of eiCompare, so there's two components.  Component 1, I was pulling data from the wrong set of columns to keep it simple.  That would have been handled by eiCompare, so that error would never have happened if I had eiCompare.

And then the second component was that the underlying default parameters in EI PAC are different than the parameters that eiCompare would pass through.  Those parameters that eiCompare changed over multiple iterations, and so I did not observe that those parameter value defaults had changed.

And so just to sum up and succinct, pulled

Page 35

data from the right column; used the right starting

parameters.

Q    So I'm just trying to remember these as

I'm typing them.

A    Okay.  I can repeat.

Q    Can you explain a little bit about pulling

data from the right column; what do you mean by

that?

A    So what I mean by that, so let's just

think of it like -- I'm going to try to make this

easy here, right.

You have -- you get a lot of -- when it

does the estimation there's a lot of data that's

created because it's a Monte Carlo Markov chain

simulation.  Some of those values are raw totals,

estimated raw totals, simulation raw totals, right;

some of those values are put into proportions,

right.  Instead of being totals they're proportions;

percentages instead of raw numbers.

Q    Okay.

A    I needed to be drawing from the

percentages, not from the raw totals.

Q    Okay.  Percentages not raw totals, okay.

That is very helpful.  Thank you.  I understand the

parameters that you're talking about because we

Page 36

actually went into those in the deposition --

A    Sure.  Okay.  Great.

Q    -- last time.

A    Good.

Q    What I saw from the parameter changes that jumped out to me were three in particular.

A    Okay.

Q    Burnin, is that right?

A    That is one of them, yep.

Q    Thin?

A    Uh-huh.

Q    And sample.

A    Sure, yeah, all three.

Q    Okay.  Before we talk about what changes you made to those three --

A    Okay.

Q    -- I want to make sure I don't lose this train of thought too, why is it better to use the percentages rather than the raw figures for the columns that you were pulling from?

A    So let me just try to keep it simple.  Okay.  So if I butcher it a bit because I know Michael Barber is listening, this is my attempt to try to make it simple for you, sir.  Okay?

Q    I love simple.

A    All right.  Great.

So you need to have adjustments for, like, the different precincts that are being estimated because, as you know, not every precinct is the same size, right, things like that, and so you basically take the -- what I was using was, like, just the raw counts that were unadjusted, right.

Q    Okay.

A    If I pulled another column -- think of a column that's the set of columns next to that column set, those are the adjusted ones, and they're adjusted, and then they're proportions, and that's what I should be drawing from, right.  So that's something that would have been handled automatically through eiCompare rather than having to do it manually with the other -- with the EI, EI PAC programs.

Q    And it's your position that it's better to have that ratio adjustment, the percentage adjustment, it creates a stronger likelihood of establishing correct true value of the thing you're estimating using --

(Simultaneous speaking.)

A    It's not just -- it is the right set of columns to pull from.

Page 38

Q    The right one, okay.

A    The right one, yes.  That was an error that I made having to write the code by scratch.

Q    Okay.  So I'm going to introduce your corrected code -- now, before we do that I just want to establish that the way we -- the way you did the code was a little different -- you did the code the same, but you split it up into different buckets for each election on the corrected report, whereas --

A    I did.

Q    -- yeah, in our last deposition --

A    Yeah, I was trying to make your life easier, so if I'm going to get dinged points for that, I'm going to start becoming a much more pissed-off witness, okay?

THE REPORTER:  Dr. Popick, you are cutting off the question.  Can you please --

THE WITNESS:  Oh.

THE REPORTER:  -- let him finish before you --

THE WITNESS:  Sure.

THE REPORTER:  -- answer?  I'm getting a lot of cross-talk here.

THE WITNESS:  I apologize to both of you.

BY MR. JACOUTOT:

Page 39

Q    Thank you.  No problem.  And no dinging on the points for that, but I did want to just point out that I'm only going to pull up one of those elections for purposes of our discussion today because it's fair to say that you ran election the same way -- you ran the analysis the same way for each election, right?

A    Correct.

Q    Okay.  So with that in mind, I'm going to introduce your corrected code for 2026 [sic] County Commission Post 5.

A    You mean 2016?

Q    Sorry.  Yes, it's 2016.  I have the headline and the title 2026.  That was probably just a split on my part, but it is for 2016.

A    If you're asking about a future election, I was going to have to say I haven't counted it.

Q    And this is a little out of order from my marked exhibits, but we'll mark it as Exhibit 8 because my prestamped exhibits I haven't gotten to yet.

(Exhibit Number 8 was marked for identification.)

A    I have it pulled up right now.

BY MR. JACOUTOT:

Page 40

Q    Okay.  Now, can you point out for me in this code where the change from raw numbers to percentages in the columns that you pulled would be expressed?

A    Sure.  I'm happy to do that.  Let's go to line 94 just to make sure that we're all here. Actually, let's go to line 93.  Maybe we'll just cover whole bunch of your questions at once.

Q    Sure.

A    93, sets a seed.  That allows someone to use that seed, and they should be able to reproduce my exact results.  Now, Monte Carlo Markov chains in some places will have very small differences even with the same seed.  That's like climbing to the top of the mountain and then spending, you know, 200 steps trying to get to the exact specific top of the mountain.  Like functionally you're at the top, but you get my -- okay.

So then you see I call the EI regression, I'm sure we'll go over the parameters in a little bit, I'm not going to bore you there.  Here you see the next part, which -- the comment there is trying to make it clear -- I added that comment to make it clear what was going on, pass all the candidates in the rolloff to get the full vote shares.  That's

Page 41

what's going on there.  That's that transformation.

Q    Okay.

A    Then -- if you want to ask about effective size, I'll talk about that, but then summarize, I then ask it to then, okay, let's summarize, that shares data to be able to get everything together to give me my actual estimates, and then you can see there the next comment that says get the estimates, right.  You're a smart man, you can probably figure out that the average estimate, the mean is the point estimate, and then you can see what some would call confidence intervals, but Bayesians would call credible intervals depending on which ones of those you want to be given the day, but your essentially, for simplistic terms, the range of possible values.

Q    Okay.

A    Then I merge them together to create a report.

Q    So which part of that is kind of the percentage versus the raw total?

A    So that's going to be that lambda.MD function.  That's what lambda.MD does.

Q    Okay.  All right.  Thank you for that.

A    Okay.

Q    So how -- like you mentioned that you just

Page 42

sort of reviewed your code after our deposition and came to these realizations.

A    Uh-huh.

Q    Did you do that just by reviewing the code, or did you review any secondary source materials to get to there, or how did you go from the way you had it before to the way you have it now?

A    So I reviewed the code, then I went back, and even though I couldn't run eiCompare, right, because it wasn't available for me, I could go look at its documentation, which is freely available online, and that allowed me to see that the defaults that eiCompare was using, which had changed since the last time I had used it when it was available for me, had changed again.

Okay.  So I could see there the defaults that are going into EI PAC, those are not the same defaults.  Okay.  That needs to change, right.

I think that answers your question, so...

Q    So these are all -- these lambda.MD command lines here, effective size, those are all in the default parameters now?

A    I'm sorry, I think -- I don't think you're asking a bad question, but I'm trying to get the

Page 43

question right.  Lambda.MD transforms the data, right, to get the actual vote shares that we want to have, right, that I could then summarize and create the actual point estimates and range of possible values.  So that's what that does.  So it's a little disconnect between what you asked me, so I just want to be clear.  Not trying to be difficult here.

Q    Yeah, sure, but you mentioned that you looked at the updated default figures and I guess came back with this; is that -- well, is that fair to say, that's what prompted you to come back with this?

A    So I noticed that they had changed, and I noticed that they changed within eiCompare, then I could see, Hey, these are not the same figures that are in the default package -- that are in the default package that I'm using.  In fact, those are quite low.

So then I say what's a good way to resolve this, what's a good way -- okay, there are a lot of questions about reliability.  What should I do to show these estimates are reliable.

Well, there is a package that comes with these other -- some of the packages have dependencies or things like that on others, and some

Page 44

packages come downloaded with other packages, right, and sometimes they're enabled, and sometimes they're not, right, and that's how these packages work.  So I'm looking at the documentation, and there's a package called coda.  Coda has a lot of diagnostic tools to help you know if you've climbed to the top of the mountain or not, right.  Effective size comes from the coda package.

What that tells you is how much truly independent sort of draws you have, right.  You can think of that as sample points, right, data points, right.  I mean, I don't -- I think even lawyers, both Bryans here have taken enough basic statistics to know that the more samples you have, the more reliable your inferences are going to be.

So what I do here in this code is you can see that I'm calling effective size, so that's going to actually appear in the log.  That's actually one of the few things that's going to actually appear physically in the log file.  And, you know, I have an understanding of what effective size should be because this is something that's been talked about for a few decades now.  I took a couple causal inference workshops up in Chicago back in the 2010s, and so, you know, even today, you know, like the

Page 45

numbers really haven't changed.  It's basically around 200 or so, like, tend to be on pretty good ground in a lot of different contexts.

So I wanted to start iterating on the values of sample thin and burnin so that in this election -- and I'm glad you brought up the 2016 election because that's actually the one that I used to set these parameters.  And I kept changing those parameters, iterating, you know, until I saw effective size, right, get to be above the needed threshold, and then once I had that, boom, I'm off to the races.

So I didn't take what eiCompare had done as given because they're giving an example about Gwinnett County, which I know you're familiar with because I'm familiar with that too.  I had a girlfriend from Gwinnett.  And Gwinnett's a little bit bigger than Houston County.  That's an understatement probably, right.  So probably makes sense that the values that I have here for Houston are a little bit different, little bit bigger than what the example showed for Gwinnett County.  Wasn't trying to drive at that.  I was just trying to get to values there that would allow me to pass threshold and therefore have reli- -- now meet the

Page 46

criteria for MCMC.

Q    Okay.  And this was not done at all in your initial report, right?

A    Correct, because I didn't catch that.  I had -- I didn't catch this issue in my original report.

Q    Do you recall testifying regarding parameters that -- to the effect of that they looked fine to you, and they didn't need to be changed?

A    So that's not exactly what I said, I believe.  I believe I said I inspected the underlying data, but I didn't see anything there that would say, Oh, this is weird data, there's something squirrely going on, I want to change the default parameters.  And, of course, I did not have those default parameters visible to me.

Q    You didn't have the default parameters visible to you?

A    So I don't think that I had -- no, that's right.  I apologize for that.  I didn't look at the default parameters because I looked at the underlying data, and I didn't change them.  I didn't change them, so in particular -- didn't change them because if I had been using eiCompare, I would have gotten some warning messages in all likelihood

Page 47

because in other consultations that I've done, even some in the state of Georgia for entirely different people and different teams, I would get warning messages from running eiCompare for various EI algorithms.  That would tip me off that there's a challenge.  Those warning messages are like -- remember I said we're trying to get to the top of the mountain to find the information?

Q    Uh-huh.

A    Those warning messages would be like, I'm having trouble getting to the top of the mountain. Going back to these base packages, I didn't get any of those warning messages.

Q    That's because it was the wrong package to use?

A    No.  These are the right packages to use because these are the underlying package that eiCompare uses.  EiCompare adds additional functionality and testing on top of that.  It's designed to be more generalizable to folks doing this sort of analysis.

Q    Okay.  So it's a package that you just weren't familiar with using?

A    No.  I had used -- well, okay.  I had used it a very long time ago, but I just didn't identify

Stephen J. Popick , Ph.D.                                April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 48

some of the additional features that eiCompare had
that weren't present in the underlying packages.

Q    When you say underlying --

A    So --

Q    Go ahead.

A    The underlying packages are EI, EI PAC.

Q    Okay.  And you rely somewhat extensively
on your experience at DOJ for your background using
these tools, though, right?

A    These tools have changed considerably
since my time at DOJ.  The underlying idea behind
them is the same, but these packages have changed
from the original EzI -- you probably never -- I bet
even Dr. Barber hasn't even heard of that one -- to
Zelig, which was Gary King's improvement on that,
right, which is what I used in Rose, to eiCompare,
which, when it was on and available for me, was a
superior package.

Q    And that package is no longer recommended,
though, right?

A    It's no longer available on the CRAN
website.  There are flags for it, and so since it's
not on the CRAN website, I just -- as a practice
it's probably not a good idea to use packages with
warnings attached to them.

Page 49

Q    Is this then the first time that you used the current version of EI PAC in your statistical analysis of ecological inference?

A    No, I used it in the past, but you said current version.

Q    Yes.

A    Right.  These versions -- I can't tell you the last version that I used on EI PAC because these things can change all the time, right.  So there's different versions that get updated every so often. Every time R as a programming language gets an update, right, it stands to reason there might be an update to the package itself.

Q    What about ei.MD.bayes, have you used that before?

A    Yes, I've used that in other cases. That's not a package.

Q    That's a command, right?

A    That's a command, a call, a regression command, something like that.

Q    Okay.

A    Ei.MD.bayes is the same call that eiCompare would use.

Q    When you used let's say in the past whatever version of EI PAC, did you use it in this

Page 50

very same way, or is this -- excuse me, not this very same way.  I'll strike that, and I'll ask it again.

When you used EI PAC in the past, did you use it in the same way that you did in your original report?

A    I didn't look at how long -- all the instances that I've used it in the past, right, so I bet my understanding has evolved a little bit, and I bet I used it differently at certain points in time, but I couldn't give you an honest answer, right --

Q    Okay.

A    -- so...

Q    So I want to talk -- on your original report, did you run the analysis more than once?

A    No.

Q    Is that the way you typically conduct your EI analyses?

A    Yes.  You try to set it up, make sure it runs, and then hit run for everything.  That's exactly the same system that I described to you about how I got the effective sample size, right.  There I was changing my levers to iterate to get an effective sample size to pass the threshold, not looking at anything else.  But once I met effective

Page 51

sample size, as you said, those values are the same for every election, and I ran with it.

Q    You didn't know whether your analysis would produce a different result the next time it was run before filing your report?

A    You mean my corrected report?

Q    No, your original report.

A    I have -- would have had no reason to suspect at that time that it would have produced different results.

Q    In the time after the deposition, did you try to rerun your original report?

A    After the deposition to rerun my original numbers, no, I changed my code and ran my changes on that new code.

Q    So you didn't even attempt to rerun it after the deposition then?

A    No.  Why would I rerun it when I was thinking about reliability and said, you know what, I want to change some things.

Q    Well, I suppose a reason why you might want to rerun it is to determine whether it would produce a substantially similar result?

A    That didn't cross my mind because my job was -- I try to apply the same philosophy I had at

Page 52

DOJ.  I call balls and strikes.  Not every time I'm hired by a client do I find evidence supportive of a claim.  Okay.

So when I got back I said, I need to make some changes after doing some research and thinking about reading the package notes, identified through my knowledge what changes should be made, notified counsel -- I did this within like 24 hours, right. So I think that speaks to the fact that I have some familiarity with this stuff and some experience in my background, and I notified my counsel within 24 hours that I need to issue a corrected report.

I didn't know at that time like what the actual new figures would show, right, because I hadn't run them.  I said, I need to do this correction.  I figured out what I needed to do on Friday, and I ran it on Saturday, and I notified counsel I think on Friday or early Saturday morning, something like that, very early.

Q     Okay.

A     Then again, just to complete the loop here, right, I spent the time on 2016 here focusing on effective sample size not seeing any other results, and once I passed the threshold in the literature, which I went and checked papers from

Page 53

2025 to see, yes, we all -- people are still agreeing that this threshold 200 is about the right number to use, okay, great.  And once I had that value, changed everything, put it into those individual election files that you saw to make it easier on everybody to track and follow, ran it, saved the output, done.

Q    And did you check whether you could replicate the results you created in your corrected report?

A    So because I used the set.seed, I think as I mentioned that is how you introduce complete reproducibility.  And as I mentioned, right, there could be limited circumstances where you will get almost to the very tippy top of that mountain, right, but you spend a lot of time trying to get the exact right step, but we're talking differences that are immaterial, like very immaterial differences.

Q    I'm sorry, just so I'm clear, when you're saying we're talking about differences that are immaterial, are you referring to differences without the seed?

A    So I'm talking about at the seed when you reset seed 12345, which is the code on my luggage too as you know -- everyone who gets that reference

Page 54

is too old -- in most circumstances you're going to
get the perfectly exact same output down to like 10
decimal points or whatever, right.  In some
circumstances, because it's a simulation, you'll get
a write-up down to four or five decimal points.
That's what I'm referring to.

Q    Okay.  So that's with the set.seed --

A    Yes.

Q    -- applied?

A    Yes.

Q    You mentioned some papers that you read to
get that effective size limit of around 200; is that
right?

A    Sure.  Yeah.

Q    What papers were those, do you recall?

A    I could pull it up.  The names I'm going
to butcher because a lot of them are foreign names,
but there was a paper from Gelman -- not Gelman, he
was a co-author, but Gelman is like -- he was doing
this work back in the '90s.  He's been around the
block a few times.  His co-author, Vehtari --
Vehtari -- again, I'm not looking at anything, I'm
just trying to remember the name here, you know,
they had a paper, they were like 200, maybe 400, you
know.  Then I found another paper from 2025.  And

Stephen J. Popick , Ph.D.                          April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 55

I'm happy to provide the papers that I looked at. That's not a problem.

Q    I think you've given me enough information to find them myself.

A    There's a 2025 paper on MCMC that found that 200 was an appropriate threshold.  There's the -- you know, package itself notes written by Plummer line up how to use effective size.  There's another paper in the middle of that.  I'm just blanking on it, like, because I don't have everything in front of me right now --

Q    Right.

A    -- but it also found 200.

Then, like, those are papers, and you could also if you did a Google search and you look for MCMC thresholds effective size or something of that, don't use AI mode because that's weird, use Google search, you'll find packages that are out there like one called BEAST, which is for a different -- it's the same idea but just a different field, right, and its documentation has similar -- has the same threshold, right.  So you'll find a lot of that.

Q    Okay.  Let's go back to your corrected code if you're still on it.

Page 56

A    I'm still on my code, yes.

Q    And just to be clear, you did not use the seed command in your original analysis, right?

A    I did not.  Again, this is me trying to be helpful to you guys.

Q    Well, why did you not use it in your original analysis?

A    Didn't see a need to.  Didn't have any expectations that I would get wide -- that there would be variations in my output.

Q    Do you know whether there is large variations in your original report's output?

A    So, again, you asked me what was my standard practice.  I want to go back to that.  I run it once.  I don't run it 20 billion times and pick the most favorable result.

Q    You run it two times?

A    No.

Q    Did you know what a seed was before submitting your original report?

A    I've used it in the past.  I use it in my current -- I use it in my work sometimes at FDIC.

Q    Do you recall testifying that you would be -- it would be shocking if you could reproduce an EI analysis a second time?

Page 57

A    Without a seed, yes, because I didn't have a seed.

Q    Did you --

A    But you would get -- functionally you should get functionally the same answers.

Q    You should get functionally the same answers.  What might cause you to not get functionally the same answers?

A    Well, like I said, drawing from the wrong column like I did.

Q    Would the parameter sizes that you altered in your corrected code also contribute to that issue?

A    They help you get to the most informative part of the information.  That's a double -- that's a terrible sentence.  Please just let me restate that.

Those allow the model more time to get to the information that's most probative, right.  So if you don't give yourself enough runway, it's hard to have the plane take off.  This is just giving it more runway to find the answer.

Q    Okay.  So to be clear, though, you were aware of what a set.seed command did, right?

A    Correct.

Page 58

Q    You chose not to implement a set.seed command in your original analysis?

A    I was, again, having to reconstruct all this manually because eiCompare wasn't available.

Q    Did you assume that EI PAC just provided a seed?

A    I think that's a fair statement.

Q    And you didn't check to see if it was there, though, in your code?

A    It wasn't one of the things that I can recall checking.

Q    Okay.  I'm just trying to square your response here that you assumed that the seed was set by PAC -- by EI PAC, but then in your first deposition you testified that you would be shocked if you'd be able to replicate the results.

A    When I say shocked to replicate the results, what I'm talking about is getting that -- because it's a simulation, so I think you're mincing my words here a little bit.  I don't think you're being mean about it; I think you're just being a lawyer.  Okay.

So -- but if you run a simulation and you just let it naturally work, right, you're going to get slightly different answers, right.  I think

Page 59

that's generally what I said, that you'll get --
you'll get similar answers, but they're not always
going to be the same, right.

So thinking about that, what would be
helpful if I was Dr. Barber was to have a report
that had a seed.  So I said, Let me just go ahead
and put that in there.  That would make sense.

Q    Okay.  We've covered a lot, so I'm
checking off things on my outline.

A    Okay.  That's fine.

Q    Can you go to line 133.  I'm sorry.  Hold
on.  I might have the wrong one.  131 on your
corrected 2016 CC Post 5 code.

A    Sure.

Q    I want to direct your attention to the
indented parameters.

A    Okay.

Q    So can you tell me what -- on line 137
what burnin does?

A    Burnin, certainly.  Happy to.  So burnin
means -- so I'm going to -- I'm going to do a lot of
simulations, right, okay, but it's going to take me
a bit of time to get to the top of the mountain,
right.  And I don't want to start figuring out what
my answer is, right, until I get close to the top of

Page 60

the mountain.

So I said burnin, so it's going to run -- in this case it's going to run 10 million times, that's the sample times the thin --

Q    Okay.

A    -- and it's going -- it's going to just basically chop off the first 500,000, I'm just trying to keep it simple, because often in that phase it's trying to figure out where to start, and it might bounce around just like you're hiking a trial, Bryan.  You got Stone Mountain there in Georgia.  I can use an example.  Sometimes you got to take a little bit of path away from the path in order to get around something to go back to go up the mountain, right?  That's what we're trying to do here.

Q    Okay.  Why did you choose 500,000 for burnin?

A    Well, remember how I said I iterated with sample thin and burnin to have an effective sample size that met the thresholds?

Q    So you tried different versions of the amounts?

A    I did.  And I'm only looking at what effective size is.  I'm not looking at any of the

Page 61

results.  The results don't appear in my log.
They're sloughed off, hidden from me.

Q    Okay.  And why do you not look at the
results?

A    Because that would bias.  That would bias
things.  As a practitioner, I shouldn't be looking
at the results.  I should be figuring out what my
setup is, agreeing that's the setup, and then
running the analysis and living with the results.

Q    So how many times did you iterate to get
the effective sample size that you were looking for?

A    I mean, I can't give you a specific
number.  I want to say maybe 10 runs, maybe 15
because I tried to move in big chunks.

Q    Okay.  Is that true also for your sample
size and your thin size values?

A    So I'm iterating on all three levers,
right.  So I might move one lever, then move the
other and think about that, look at where my
effective sample size is across all the parameters
that I'm trying to estimate and say, Okay, do I
still need to climb; what do I need to do here.

Q    Okay.  Do you know what chain convergence
is?

A    That's when you get to the most

Stephen J. Popick , Ph.D.                         April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 62

informative part of the chain.

Q   Is that an elementary question to ask you?

A   No, it's a fair question, but that -- you want your chain to converge.  So what I've said, get to the top of the mountain, that's what I'm talking about.

Q   Okay.

A   I'm trying to use analogies here.

Q   Sure.  Did you check to see if your chain converged in any way --

A   That's the whole point of effective size.

Q   That wasn't present in your original code, right?

A   That was not present in my original code.

Q   So fair to say for the first analysis, you didn't check to see if the chain converged?

A   That would be fair to say.  Again, that was something that might have been -- not might have been, would have been handled with eiCompare had it been available to me.

Q   Do you think the first chain conversion, do you have any reason to believe it was converged?

A   I don't know what you're referencing now. This chain here?

Q   No.  I'm sorry, I don't want to talk over

Page 63

you for the court reporter.  I'll ask it again.

For your original report and the original analysis, you said you didn't check to see if it converged.  Did anything -- first of all, I'll stop there, is that correct you didn't check to see if the chain converged?

A     That would be correct.

Q     Okay.  Is there anything that would suggest to you in your reports results that it did not converge?

A     No.  There were no warning logs or anything to tell me that.

Q     Okay.  So is it your assumption then that that chain converged?

A     I didn't get any warning messages, so that's what I would have thought.

Q     Okay.

A     Or I wouldn't have any thoughts, you know.

Q     Did anyone besides you alter the corrected code that you provided with your corrected report?

A     No, sir.  It was all me.

Q     Did you have a conversation with any other statisticians about your original code or the corrected code?

A     Only after I had made my corrections and

Page 64

written my corrected report.

Q    Who did you talk to?

A    I talked to Lisa Handley.

Q    What did you and Lisa Handley talk about?

A    I just said, Hey, have you ever encountered this problem before, and she says yes. And I said, Well, here's how I did it; here's how I corrected it.  She goes, That's a really good idea.

Q    Always good to have Dr. Handley supporting your work.

A    You know, and then we talked about other things and other cases.  Dr. Handley and I talk on a semi-regular basis.  She calls me with questions about her cases; I'll call her on, you know, on mine.  We've had a deep professional relationship for almost 20 years.

Q    And in your discussions with her, did she offer you any sort of advice on whether to change your corrected code at all?

A    No, she said, yeah, that what I was doing here seemed very reasonable; that I had a good approach.  I didn't give her specifics.  I talked about my general thinking, and she was like, that -- that's in line with what she would be doing, so that was good.

Page 65

Q    Did you have her look at your old code at all?

A    No, I did not.

Q    Did you ask her any questions about your old code?

A    No, I did not.

Q    Anyone else that you talked to in the sort of statistical analysis community about this?

A    No.  Lisa is the one that I reach out to from time to time.  She is the one I have the closest relationship with.

Q    Okay.

A    Just to be clear, I reached out to her after I completed everything.  So I was done.

Q    Right.  So nothing was changed in your corrected code as a result of any conversation with her?

A    Correct.

Q    Okay.  Out of curiosity --

A    I'm sorry, is this off the record because "out of curiosity"?

MR. SELLS:  We're still on the record.

THE WITNESS:  Okay.

BY MR. JACOUTOT:

Q    -- did you ask Lisa Handley to review your

Stephen J. Popick , Ph.D.                        April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 66

prior code after you submitted that report?

A    No.

Q    So what caused you to reach out to her for confirmation in this situation?

A    Professional due diligence.

Q    And why did you not do that then in the first instance?

A    I think I covered that.  I was working on writing the code because eiCompare wasn't available, right, at the time.  I didn't have any reason personally to think there was any issues, any errors that needed to be corrected, so there was no reason for me to reach out to her.  As far as I was concerned it was bog standard.

Q    It was only after our deposition that you realized it wasn't standard?

A    It was only after the deposition I had -- where I went back and said let me correct those two issues that I mentioned before that were result of me not having eiCompare available, right, and then I said, Let me just see if Lisa -- let me -- this is how -- this is how I made adjustments to some of the parameters; let me just see if Lisa has any thoughts on, you know, the general methodology of doing the adjustments, and it was really great to hear that

Page 67

she didn't.  She thought I had a pretty good system set up on how to make those adjustments.

Q    You feel that your original analysis was a credible analysis?

A    I do.

Q    So you'd be happy to resubmit that report again?

A    I would not resubmit that report again because there are corrections that I made.

Q    But nevertheless you stand behind the credibility of your initial analysis?

A    You know, nothing -- none of my conclusions materially changed, right.  I concluded in that report that voting was racially polarized; I conclude in this report that voting was racially polarized.

One thing that you and I haven't really spent any time talking about is nothing changed with ecological regression, right, and that's -- that's the method cited in Gingles v. Thornburg, so --

Q    You agree with me that ecological regression works better when there's homogenous precincts available, right?

A    Everything works better, not just --

(Simultaneous speaking.)

Page 68

Q    You agree with me that ecological regression works better when you have more than 17 precincts available, right?

A    I would say that everything works better.

Q    And to be clear, we have no homogenous precincts in Houston County, right?

A    You have one precinct that is 66 percent or so Black --

Q    Which --

A    -- that would not be considered homogenous.

Q    Right.  Do you know what the threshold for homogenous precincts are?

A    Ask 10 different political scientists, and you'll get 11 different answers.

Would you care to reframe your question to me?

Q    No.

A    Okay.  For the record, I will state that generally acceptable thresholds that I've seen consistently are 80, 85, and 90 percent.

Q    Uh-huh.

So in this updated report, you're using effective size to determine whether the chain is converged; is that fair?

Page 69

A    Following the literature, yes, that says that you want to have a certain set of effective size to draw conclusions from.

Q    Now, is that -- does effective size actually measure the degree of chain convergence, or is it measuring something else?

A    It's not measuring chain convergence --

Q    Okay.

A    -- it's measuring what are your number of effective samples that you have in your data, and I'm following the academic literature and the statistical literature to establish the threshold that you need to meet.  You could follow chain convergence any number of ways.  This is the method that I chose.

Q    So you didn't run any other chain convergence methods besides --

A    No, I did not.

Q    Okay.  Where were we?

A    I don't know.

Q    We have significantly jumped around from my outline, so --

A    Okay.

Q    -- that is why I am asking where are we.  And if we could actually just pause for a moment and

Page 70

go off the record.

A    If we're going to do that, I'm just going to go use the restroom.  Okay?

Q    Yeah, that's fine.  That's fine.

THE VIDEOGRAPHER:  The time is 10:35 a.m. We're off the record.

(Recess 10:35-10:43 a.m.)

THE VIDEOGRAPHER:  The time is 10:43 a.m. We're on the record.

BY MR. JACOUTOT:

Q    Okay.  Dr. Popick, for -- as you know, we've been looking at just the 2016 County Commission Post 5 code for your election analysis; is that right?

A    That's correct.

Q    Is it fair to say that you made the same alterations to the parameters in your other election analyses?

A    Yes, I believe so.

Q    And fair to say that you included the same seed in your other analyses?

A    Yes.

Q    Okay.  So they're all -- all the changes that you made in Houston County County Commission Post 5 were included in the other races, right?

Stephen J. Popick , Ph.D.                     April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 71

A    That's my understanding, yep.

Q    Okay.  And all for the same rationale that we've talked about, right?

A    Correct.

Q    Okay.  So let's move to the narrative portion of your corrected expert report --

A    Okay.

Q    -- which is again --

A    I'm there.  Exhibit 4, sounds good.  I'm there.

Q    So on page 21 we have your -- excuse me, not 21.  Page 15 we have your footnote explaining your code corrections that we just talked about, right?

A    Correct.

Q    First, do you still characterize these as minor statistical changes?

A    So when I say "minor," my conclusions did not change, right, so I would characterize these as minor.  There are errors, and I fixed them, but because the conclusions did not change, I don't change my underlying conclusion that voting is racially polarized in Houston County, right, and that Black voters are cohesive and White voters fail to provide sufficient crossover votes.  My

Page 72

conclusion doesn't change.

Q    Okay.  In that footnote you also say that the new code materially changes some of the individual estimates of White and Black support for particular candidates in particular elections, right?

A    That it does, yes, I communicate that.

Q    When you say individual estimates, you're referring to the point estimates that we've talked about?

A    I am referring to point estimates, and, of course, the confidence intervals or credible intervals, or whatever you want to call them, the range of possible values, those change too.

Q    Okay.

A    So let's just take a holistic approach.

Q    Sure.  So individual estimates includes the breadth of the confidence interval and specific point estimates?

A    Yes.

Q    Let's go to your iterative EI analysis on page 17.

A    Okay.  I'm there.

Q    This is your preferred calculation, right?

A    Yes, I'm using EI here, iterative EI, yes.

Stephen J. Popick , Ph.D.                                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 73

It remains my preferred method.

Q    Okay.  So looking at this table, Table 1, it looks like support by Black voters of the Black-preferred candidate ranges from a low of 78.8 to a high of 83.9.  Is that what you're seeing?

A    No, you're missing the 2024 sheriff election, which is at 85.3.

Q    85.3.  Thank you.

Many of these point estimates differ pretty substantially from the original report, right?

A    They do.

Q    And correct me if I'm wrong, but I think it's just one exception in the first race with -- featuring Hicks as the Black-preferred candidate. Apart from that contest, the Black support increases substantially for the Black-preferred candidate you identify; is that right?

A    It does.

Q    So we talked a little bit about cohesion in our last deposition.  Is it your opinion that these new point estimates increase or decrease the degree of Black cohesion in the contests you analyzed?

A    So what we saw from our prior estimates

Page 74

was lower levels of cohesion, and now we see higher levels of cohesion, and the range of possible values -- I'm just going to use that because otherwise I'm going to piss off every Bayesian frequentist that ever existed -- and so the range of values shifted as well.  Some results shifted more than others.

Q    Okay.  So I do want to go down to your appendix now because that does include the confidence intervals/credible intervals/range of values.

A    Okay.  Sure.  Let's just call it range of values and make our lives easier.  Okay?

Q    Sure.

Now, before we get into this Appendix A1, is it fair to say that the defendants' expert Dr. Barber in this case criticized your original analysis of Houston County elections in part because your ecological inference results contained very wide confidence intervals?

A    I thought he characterized it because the point estimates varied quite a bit.

Q    Okay.  I'll pull up his report just to make sure we're on the same page.  Make sure it's the right one.  Last time I had the wrong one.

Page 75

(Exhibit Number 9 was marked for identification.)

BY MR. JACOUTOT:

Q     Should be populated there as Exhibit 9, Barber original report.

A     Yes.

Q     If you'll go to page 23.

A     Okay.  There's no table there, just text.

Q     Right.  It says here at the very bottom, the last paragraph, this is I think what you were talking about, second sentence says:  For several elections, point estimates of Black voter support for Black-preferred candidates differ by more than 40 percentage points depending on whether iterative ecological inference, ecological regression or --

A     That's what I'm referencing, correct.

Q     Let me just finish for the court reporter.

A     I apologize.

Q     -- or EI R x C is used, and that's what you're referencing, correct?

A     That is what I was referencing.

Q     If we go to the next sentence, he says: When confidence intervals are taken into account, the full range of possible values often spans an even wider interval?

Page 76

A    He does say that.

Q    Okay.  So, yeah, my question was, was your analysis criticized at least in part due to the breadth of your confidence intervals?

A    Yes, by Dr. Barber.  I disagree with some of the methods Dr. Barber used here, for the record.

Q    Okay.  And we can turn back to your corrected report that we were on.

A    Okay.

Q    And return to Table A1 on page 24.

A    Okay.

Q    Now, if I'm not mistaken, it appears that for every single election you analyzed under this iterative EI metric in your corrected report, the confidence intervals substantially widen under your analysis; is that right?

A    It does -- yeah.  I would say that's a general characterization.  The confidence intervals appear to cover a broader range of possibilities, and the point estimates appear to have moved to stronger elements -- a stronger claim of Black cohesion.

Q    Okay.  If we'll -- unfortunately we have to do this on a screen so we're popping back and forth, but if we go to your original report --

Page 77

A    Okay.  Exhibit 3.

Q    -- and we go to Appendix 1 --

A    Uh-huh.

Q    -- your confidence intervals went from 76 -- excuse me, for -- okay.  Yeah, for Hicks 2016 CC Post 5, your confidence intervals went from 76.7 to 90.4; is that right?

A    Yeah, I see that, 76 -- 77 to 90, we'll keep that.

Q    Range of about 13.7 points?

A    Sounds about right.

Q    And your corrected report shows that election going -- confidence intervals of 60.3 to 95.7, right?

A    It's about 35, yes.

Q    About 35.  Almost triple the original range?

A    Yes, it seems.

Q    And this -- I think you sort of already testified to this, but this pattern keeps up for every election, right, that you analyzed?

A    I'm sorry, I need for you to state the pattern that I would be agreeing to.

Q    This pattern of substantially increased width of confidence intervals or range of values

Page 78

increases -- continues with each election you have analyzed, right?

    A    So if I look at other intervals that I have in my prior corrected report, yes, that would be correct.

    Q    In fact, in one here, one election if you look at your corrected report Black-preferred candidate for 2020 district attorney, that's the third contest, that has a range of 52.2 to 95.5; is that right?

    A    Correct.

    Q    And that's basically every possible range of outcomes for Black voters supporting the preferred candidate if it's Williams, right?

    A    For them to express a majority preference, correct.

    Q    So if you go any higher you're going to be butting up against 100 percent support of Williams.

    A    I agree.

    Q    1.2 points lower you're reaching conclusion that includes Black support for the other candidate, right?

    A    Well, keep in mind that I would have to -- and I think I do -- yeah, we have Table B1, which will list the possible ranges for the others.  So I

Stephen J. Popick , Ph.D.                                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 79

think I do cover that, but yes.  But those are the possible ranges of values, not the most likely value, which is the point estimate.

Q    So this effectively tells us that Black voters supported Williams probably, but really can't know to what degree; is that fair?

A    I disagree with that characterization.

Q    Okay.  So very wide confidence intervals in your updated analysis, already fairly wide confidence intervals in your original analysis; is that fair?

A    Sure.

Q    In your original report you had confidence intervals of around between 7 and 15 points for the elections you analyzed; is that right?

A    That sounds right.  I can go back and look at it to confirm, but that sounds reasonable.

Q    Okay.  And then in the corrected report as we were looking at it now, these have broadened to between around 35 points to up to 45 points, I believe?

A    We'll just call it mid 30s or mid to high 30s and call it a day there, sure.

Q    And mid to high 40s on the top end?

A    I think there's one --

Page 80

Q    Low 40s on the top end?

A    Low -- yeah, low 40s, sure.

Q    In the context of the changes that you made to your code, what do these expanding confidence intervals tell you?

A    Well, I mean, what they tell me is that there's a larger range of possible values likely because of the fact that we have a limited number of precincts, right, and I'm drawing from the correct columns for the proportional vote totals now.

Q    Did it make you pause to consider -- excuse me.  Did the expanding confidence intervals give you any cause for concern regarding your analysis or methodology?

A    None at all, and here's why.  Under my original report I was clear in stating that I was considering the separate electorates test, right, did Black voters support Bob, and did White voters provide insufficient crossover support to get Bob elected, right.  They voted for Dave, right.

          That pattern doesn't change here.  What we see is a larger set of possible values, but the most likely values we see increased for Black voters. Those are the point estimates.

          So under the separate electorates test

Page 81

it's the same material finding, voting is racially
polarized.

Q    Doesn't the larger set of possible values
create more uncertainty around your analysis,
though?

A    I would disagree with that because I use
the separate electorates test.  Indeed, under my new
set of -- my corrected set there is no longer an
election where the confidence interval dips below
50 percent in any of the three methods that I use.

So, yes, we continue talking about EI, but
I think it's also worth stepping back.  When you
look at the report I choose to present one because I
don't think anyone wants to have to read three
tables side by side at one time in the report, but I
choose that because that's sort of what my preferred
model is, but the other two models are also
informative on my conclusion of whether voting is
racially polarized.

Q    Sure.  We've talked a bit about the
limitations of those models given our sample --
given our election data that we have, right?

A    I have mentioned two limitations, correct,
or two things that could cause some trouble, but I
have a clear signal from all three models.

Stephen J. Popick , Ph.D.                          April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 82

Q    Okay.  Why do you think that increasing the burnin as you did in your corrected report, why do you think that that did not produce more narrow confidence intervals?

A    I didn't have a prescription on what the confidence intervals were going to be.  You know, burnin is not related to that functionally, right. Burnin is just dropping the first N runs, draws, right, because it's still trying to find where it thinks the most likely answer is and what those range of likely answers is, right.

Q    What about sample size, why do you think that produced -- despite increasing the sample size as you did, why do you think it produced broader confidence intervals?

A    It's just -- again, I made my -- because I made the changes at the same time, right, in the sense of correcting the column that I was drawing from and at the same time changing the parameters, right, I can't tell you which one is most responsible for the patterns that we're seeing here.

Q    Didn't you say earlier today that the more samples you have, the more reliable your results are going to be?

A    Which is why you want to have a lot of

Page 83

samples.

Q    And -- sorry, go ahead.

A    I apologize.  I interrupted you, and I'm sorry for that.

Q    No problem.

A    Yes, I did increase them, and what I would say to this is it's just being more accurate.

Q    I might have covered this, but do you recall testifying in your first deposition that, quote, the uncertainty in the size of the confidence -- uncertainty appears in the size of the confidence interval around the point estimate; do you recall testifying to that?

A    That sounds right.

Q    So on the one hand you're saying more samples gives you more reliable results, but on the other hand you've now increased your samples, and you're getting increasingly uncertain figures?

A    I think that's conflating two different concepts.  And I don't think you're trying to trick me here, right, I think you're just trying to understand.

So when you increase the -- so the sample size, what that's going to do, right, is help identify what the correct answer is, the correct

Page 84

answer being both a point estimate and the confidence intervals, right.  And so that's a difference in saying what's the reliability.

I think I'm getting a very strong signal here that Black-aligned voters support different candidates, and that signal is saying there's a little bit more uncertainty in where these numbers lie because the range of possible values as you mentioned is higher, but, as I mentioned, the most likely outcome, right, that's increased.  That cohesion and also that drop in White support, right, both of those changes happened, right.

So that's your most likely answer, but the range of possible values around it, right, that accounts for a little bit more of that uncertainty. But nowhere here does this give me any lack of confidence in saying the voting is racially polarized.

Q    So you feel that when those confidence intervals are established that somewhere within those confidence intervals is the true value?

A    I think that's the -- that's how it would be commonly understood.

Q    And a point estimate represents the most likely true value based on the analysis?

Page 85

A     I think that's a way to explain that to a
lay audience, sure.  Yeah, that's how I've explained
it here.

Q     Why -- if that's the case, why are your
point estimates in your updated corrected code, why
do they all fall outside your prior confidence
intervals despite -- with the exception of one
election of the eight?

A     Because I was drawing from the wrong
column of data.

Q     That's your only explanation for why that
might be?

A     Well, I said I made two changes.  One was
to make it draw from the correct column of data, and
two is to change the default parameters.  I can't
tell you which one of those it was because, as I
stated, I made the changes, got to an effective
sample size that met the threshold in the
literature, and then ran the sucker.  I didn't go
back and run it 20 more times.

Q     You didn't check for chain convergence,
right?

A     I used effective sample size to guide me
on chain convergence.

Q     But effective sample size is not a

Stephen J. Popick , Ph.D.                          April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 86

diagnostic for chain convergence, right?

A    It is something that goes part and parcel with it, but it's not a direct diagnostic.  It's recommended in the literature as a -- it's recommended in the literature like as a diagnostic tool to use to ensure that you have a valid sample to draw inferences from.  So the literature says if you're above 200, you can draw reliable inferences.  That's what it says.

Q    Is it possible that these confidence intervals are widening notwithstanding your changes to the parameters because the chain has not converged?

A    I don't have any information on that.

Q    Is it possible in your experience?

A    I would doubt it because I have met the accepted scientific threshold here for effective sample size, right, that's in the literature, right, and I can -- got that from Gelman in '92 all the way up to 2025.  I don't have any reason to doubt that.

Q    Okay.  Speaking of academic literature, in footnote 17 of your corrected report you reference an article in the Journal of Quality and Quantity co-authored by Carolina Plescia and Lorenzo De Sio?

A    Yes.

Page 87

Q    I think you rely on it for the proposition that rolling up votes for candidates with less than 5 percent of total turn out to improve estimates?

A    That's correct.

Q    I'm going to put that article in the exhibit list.

(Exhibit Number 7 was marked for identification.)

BY MR. JACOUTOT:

Q    Should be Exhibit 7.

A    Okay.

Q    As you are very aware, I am not an academic in this area.  I read through this, and I didn't see anything about rolloff improving estimates.  Do you know where in that article it discusses that?

MR. SELLS:  Before you answer that, Bryan, this has nothing to do with the corrections to his report.  You could have asked these questions in his initial report.  I'm not going to cut you off or instruct Dr. Popick not to answer, but this is I think going beyond what this deposition is supposed to be about.

MR. JACOUTOT:  I'll take your -- I note your objection.  I would push back somewhat in that

Page 88

I've already established that there have been changes to the expert report that were not referenced in footnote 22, that this article is in his corrected expert report, which is what we're exploring, and then I think I have -- especially it being an expert, I have pretty good latitude to discuss its contents, particularly because it deals with what we've been talking a lot about which resulted from his corrections, which were wider confidence intervals.  But we can explore it, and we can have that objection fight at another time.

     A     Are we done?  Could you restate the question so --

          MR. SELLS:  There's no question pending.

BY MR. JACOUTOT:

     Q     The question that I asked was can you point to me anywhere in this report that talks about rolloff or rollup improving voter estimates for ecological inference?

     A     So I'm just going to say it talks about combining candidates, combining proportions where there are less than 5 percent.  It supports that.  I think that one is buried in a footnote somewhere, but I'd have to go and read this whole report --

     Q     Okay.

Page 89

A     -- to find that.

Q     Okay.  No problem.

A     This is the same methodology that I used in Rose v. Raffensperger.  Nobody seemed to have a problem with that.

Q     Sure.  Can I direct you to page 677?  This doesn't have to do with the rolloff question.

A     Okay.  That's fine.

Q     If you go to the bottom of that page, last paragraph, it states that:  In the most optimistic scenario -- I'm going to not read that i.e. part there.

A     Okay.

Q     -- in the most optimistic scenario, EI-MD full yields reliable estimates only about -- in only about 53 percent of the cases.

You see that?

A     I do.

Q     Given that, on the grounds of model assumptions, and with no apparent major violation of model assumptions in our data, we should instead expect to see estimated confidence intervals to include true values roughly 95 percent of the cases.

Right?

A     That is what's said, yeah.

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 90

Q     What does that say about the reliability in your opinion of confidence intervals to actually capture the true value?

A     So if you read further in that paragraph, it sort of addresses that issue, which will also explain why I chose iterative EI.

So they say:  It must be said, of course -- this is 678 -- it must be said, of course, that our conditions are far from ideal.  Most of the turnover tables we estimate are large in size, leading to the necessity of estimating a large number of coefficients despite the limited number of polling stations.

They're not talking about a Houston County issue; they're talking about something even more problematic than Houston County.  All right.  So this justifies why I'm using iterative EI. Iterative EI reduces further the number of parameters that are needed to estimate compared to EI R by C.  So I think I'm following this article exactly.

Q     Well, does it give you any pause to the reliability of the 95 percent confidence intervals that you have in either your EI -- iterative EI analysis or your EI R x C?

Page 91

A     No, because these methodologies have been accepted by courts across the US for a significant period of time.  I have no reason to doubt them, neither do, as far as I'm concerned, all the major testifying experts that I have a relationship with.

Q     So it's been accepted by courts but clearly up for dispute in the academic arena, wouldn't you say?

A     Well, this article is a little old, and nothing's changed.  But they're talking about a very different -- they're talking about very different issues.  They're talking about a very different electorate and very different system.

If you go to Table 2, right, they're not referring to US elections.

Q     Sorry, Table 2 of what?

A     Of the article that we've been on.

Q     Okay.

A     They're referring to New Zealand, right, Scotland elections.  This is very -- the elections that are held there are not our style of elections.

So it's useful information, and what I drew from this is we should collapse low proportion candidate shares together.  Experts agree on that, and courts have accepted that.  There you go.

Page 92

Q    Is it fair to say that the literature surrounding ecological inference draws into question the reliability of the 95 percent confidence interval to identify a true value of what it's estimating?

A    I'm not going to say that it calls into question.

Q    Okay.  We can take a five-minute break.

A    Okay.

THE VIDEOGRAPHER:  Time is 11:15 a.m.  We're off the record.

(Recess 11:15-11:22 a.m.)

THE VIDEOGRAPHER:  The time is 11:22 a.m.  We're on the record.

BY MR. JACOUTOT:

Q    Dr. Popick, you stated that after you finalized your corrected report that you spoke with Dr. Handley to kind of go over her opinion on the report, that right?

A    Not on the report; on the method that I used for the correction.

Q    So on the code then?

A    She didn't see the code.  We just talked about the problem generally.

Q    Okay.  She didn't see the code.  Okay.

Page 93

In your conversation with her, do you know whether she's been engaged by any of the plaintiffs in this action?

A    I have no knowledge that she's been engaged.  It would be our professional courtesy whenever we talk to each other to identify immediately if she's been engaged by anybody, right. And that has happened in the past, and we don't have a conversation at that point.

Q    Okay.  Okay.  Good to know.

I think that's all the questions I have, so I think it was smart to just push through.

A    Well, my meeting at 11:00 was canceled, Bryan, because I wasn't the only one out of the office, so that made it easier, but that didn't become knowledge until 10:00 today.

Q    Great.  Glad we could get it all done in one swoop.

A    I am glad too as well.

MR. JACOUTOT:  Bryan, did you have anything you wanted to add to the record?

MR. SELLS:  No, I don't have any cleanup for Dr. Popick.

MR. JACOUTOT:  Okay.

THE VIDEOGRAPHER:  This concludes today's

Page 94

deposition.  The time is 11:23 a.m., and we're off the video record.

(Deposition concluded at 11:23 a.m.)

(Signature reserved.)

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 95

        The following reporter and firm disclosures
were presented by me at this proceeding for review
by counsel:
                REPORTER DISCLOSURES
        The following representations and
disclosures are made in compliance with Georgia Law,
more specifically:
            Article 10 (B) of the Rules and
Regulations of the Board of Court Reporting
(disclosure forms)
            OCGA Section 9-11-28 (c) (disqualification
of reporter for financial interest)
            OCGA Sections 15-14-37 (a) and (b)
(prohibitions against contracts except on a
case-by-case basis).
- I am a certified court reporter in the State of
Georgia.
- I am a subcontractor for Veritext.
- I have been assigned to make a complete and
accurate record of these proceedings.
- I have no relationship of interest in the matter
on which I am about to report which would disqualify
me from making a verbatim record or maintaining my
obligation of impartiality in compliance with the
Code of Professional Ethics.
- I have no direct contract with any party in this
action, and my compensation is determined solely by
the terms of my subcontractor agreement.

                FIRM DISCLOSURES
- Veritext was contacted to provide reporting
services by the noticing or taking attorney in this
matter.
- There is no agreement in place that is prohibited
by OCGA 15-14-37 (a) and (b).  Any case-specific
discounts are automatically applied to all parties,
at such time as any party receives a discount.
- Transcripts:  The transcript of this proceeding as
produced will be a true, correct, and complete
record of the colloquies, questions, and answers as
submitted by the certified court reporter.
- Exhibits:  No changes will be made to the exhibits
as submitted by the reporter, attorneys, or
witnesses.

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Page 96

- Password-Protected Access:  Transcripts and exhibits relating to this proceeding will be uploaded to a password-protected repository, to which all ordering parties will have access.

Stephen J. Popick , Ph.D.                         April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 97

                           CERTIFICATE
STATE OF GEORGIA:
COUNTY OF FULTON:


          I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

          I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

          I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

          I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

          Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.


          This the 16th day of April, 2026.


          _____

          ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138

Stephen J. Popick , Ph.D.                                April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 98

To: Bryan Sells, Esq.

Re: Signature of Deponent Stephen Popick, PhD

Date Errata due back at our offices: 30 days

Greetings:

This deposition has been requested for read and sign by the deponent.  It is the deponent's responsibility to review the transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript.  We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please send completed Errata to:

Veritext Production Facility

20 Mansell Court, Suite 300

Roswell, GA 30076

(770) 343-9696

Page 99

ERRATA for ASSIGNMENT #

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___  There are no changes noted.

___  The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.  To assist you in making any such corrections, please use the form below.  If additional pages are necessary, please furnish same and attach.

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

Page 100

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____

Page No._____Line No._____Change to_____

_____

Reason for change_____


_____

DEPONENT'S SIGNATURE

Sworn to and subscribed before me this____day of

_____, 20__.


_____

NOTARY PUBLIC


My Commission Expires:_____

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[0025 - 60.3]**                                    Page 1

| **0** | **137** 59:18 | 86:20 | **31107** 3:6 |
|---|---|---|---|

**0**

**0025**   1:6

**1**

**1**   2:3 6:2,3
11:21 12:4
34:13 73:2
77:2
**1.2**   78:20
**10**   54:2 60:3
61:13 68:14
95:5
**100**   78:18
**10:00**   93:16
**10:35**   70:5
**10:35-10:43**
70:7
**10:43**   70:8
**11**   68:15
**11:00**   93:13
**11:15**   92:10
**11:15-11:22**
92:12
**11:22**   92:13
**11:23**   94:1,3
**12/24/25**   2:5
**12345**   53:24
**13**   9:2,19 11:9
12:3
**13.7**   77:10
**131**   59:12
**133**   59:11
**13609**   97:17

**137**   59:18
**13th**   6:24
**15**   8:19,25
61:13 71:12
79:14
**15-14-37**   95:8
95:21
**16th**   97:15
**17**   68:2 72:22
86:22
**18**   14:16,23
**19**   8:10
**190**   7:11

**2**

**2**   1:12 2:4 6:23
7:1 19:15
91:14,16
**20**   11:10 12:3
56:15 64:16
85:20 98:19
100:21
**200**   40:15 45:2
53:2 54:12,24
55:6,13 86:8
**2010s**   44:24
**2016**   39:12,13
39:15 45:6
52:22 59:13
70:12 77:5
**2020**   78:8
**2024**   73:6
**2025**   8:7 53:1
54:25 55:5

86:20
**2026**   1:12 2:15
4:2 6:24 8:10
9:2 39:10,14
97:15
**21**   15:16 16:10
71:11,12
**2138**   1:15
97:19
**22**   8:20 15:9
34:5 88:3
**23**   75:7
**24**   52:8,11
76:10
**24th**   8:7
**26**   18:8,25 19:6
19:11,13,15
**2nd**   4:2

**3**

**3**   2:5 7:19,22
8:2 11:7 15:13
15:24 16:10
17:9 18:8
24:12 29:24
30:1,2 77:1
**3/13/26**   2:4
**3/19/26**   2:7
**30**   98:3 99:6
**300**   98:19
**30076**   98:20
**30326**   3:13
**30s**   79:22,23

**31107**   3:6
**343-9696**   98:21
**35**   77:15,16
79:20
**3630**   3:11
**39**   2:15

**4**

**4**   2:7,20 8:11
11:21 12:4
16:25 19:12
71:9
**40**   75:14
**400**   54:24
**40s**   79:24 80:1
80:2
**45**   79:20

**5**

**5**   2:16 12:5,10
16:2 39:11
59:13 70:13,25
77:6 87:3
88:22
**50**   81:10
**500,000**   60:7,17
**52.2**   78:9
**53**   89:16
**5493**   3:5
**5:25**   1:6

**6**

**6**   2:3
**60.3**   77:13

**[66 - amounts]**    Page 2

**66** 68:7
**677** 89:6
**678** 90:8

**7**

**7** 2:4,5,9 79:14 87:7,10 99:6
**700** 3:12
**75** 2:17
**76** 77:5,8
**76.7** 77:6
**77** 77:8
**770** 98:21
**78.8** 73:4

**8**

**8** 2:7,15 39:19 39:22
**80** 68:21
**83** 14:21
**83.9.** 73:5
**85** 68:21
**85.3.** 73:7,8
**87** 2:9

**9**

**9** 2:17 75:1,4
**9-11-28** 95:7
**9-11-30** 99:7
**90** 68:21 77:8
**90.4** 77:7
**90s** 54:20
**92** 86:19
**93** 40:7,10

**94** 40:6
**95** 89:23 90:23 92:3
**95.5** 78:9
**95.7** 77:14
**9:04** 1:13 4:2
**9:06** 6:12
**9:06-9:07** 6:14
**9:07** 6:15

**a**

**a.m.** 1:13 4:2 6:12,14,15 70:5,7,8 92:10 92:12,13 94:1 94:3
**a1** 74:15 76:10
**able** 40:11 41:6 58:16
**above** 25:5 45:10 86:8 98:14
**absolute** 97:13
**absolutely** 10:7
**academic** 69:11 86:21 87:13 91:7
**accept** 13:10 20:6
**acceptable** 68:20
**accepted** 11:20 86:17 91:2,6 91:25

**access** 96:1,2
**accompanying** 10:22
**account** 75:23
**accounts** 84:15
**accurate** 16:5 83:7 95:12
**action** 1:5 93:3 95:15 97:8,11
**actual** 41:7 43:2,4 52:14
**actually** 36:1 40:7 44:18,18 44:19 45:7 69:5,25 90:2
**add** 23:2 93:21
**added** 14:5,11 40:23
**additional** 10:3 47:18 48:1 99:9
**addresses** 90:5
**adds** 47:18
**adjusted** 37:11 37:12
**adjustment** 37:19,20
**adjustments** 37:2 66:22,25 67:2
**advice** 64:18
**affect** 22:11
**ago** 27:2 47:25

**agree** 5:15 13:15 67:21 68:1 78:19 91:24
**agreed** 21:10
**agreeing** 53:2 61:8 77:23
**agreement** 95:16,20 97:12
**ahead** 28:20,21 48:5 59:6 83:2
**ai** 55:17
**al** 1:4,7
**alerted** 17:22 17:23
**alerting** 17:20
**algorithms** 47:5
**aligned** 84:5
**alignment** 20:22
**allow** 45:24 57:18
**allowed** 42:13
**allows** 40:10
**alter** 23:5 63:19
**alteration** 28:24
**alterations** 17:20 70:17
**altered** 30:10 57:11
**amounts** 60:23

Stephen J. Popick , Ph.D.　　　　　　　April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

[analogies - back]　　　　　　　　　　　　　　　　　　　Page 3

analogies  62:8
analyses  12:20
  50:18 70:18,21
analysis  11:16
  14:8 29:17
  31:20,21,23
  32:16 33:1,16
  33:18 39:6
  47:21 49:3
  50:15 51:3
  56:3,7,25 58:2
  61:9 62:15
  63:3 65:8 67:3
  67:4,11 70:13
  72:21 74:18
  76:3,16 79:9
  79:10 80:14
  81:4 84:25
  90:25
analyzed  22:7
  73:24 76:13
  77:21 78:2
  79:15
answer  5:13
  20:2 26:8,9,11
  27:12 38:22
  50:11 57:22
  59:25 82:10
  83:25 84:1,13
  87:17,21
answers  5:8
  42:20 57:5,7,8
  58:25 59:2
  68:15 82:11

95:23 97:5
anybody  93:7
apart  73:16
apologize  14:24
  38:24 46:20
  75:18 83:3
apparent  89:20
appear  44:18
  44:19 61:1
  76:19,20
appearances
  3:1
appears  76:12
  83:11
appendix  9:9
  74:9,15 77:2
applied  54:9
  95:21
apply  51:25
approach
  64:22 72:16
approaching
  24:15,19 25:14
appropriate
  13:21 16:6
  17:17 20:17
  55:6
april  1:12 4:1
  97:15
area  5:24 87:13
arena  91:7
arrangements
  97:12

article  16:1
  86:23 87:5,15
  88:3 90:20
  91:9,17 95:5
ascertain  26:18
aside  10:21
asked  9:25
  10:13 27:2,4
  43:6 56:13
  87:19 88:16
asking  10:16
  18:9,11 39:16
  42:25 69:24
aspect  30:19
assigned  95:11
assignment
  99:1
assist  99:9
assume  58:5
assumed  58:13
assumption
  63:13
assumptions
  19:21 89:20,21
atlanta  3:6,13
attach  99:10
attached  48:25
  98:7
attempt  36:23
  51:16
attention  13:25
  59:15
attorney  18:9
  18:22,24 19:14

19:19,22 78:8
  95:19 97:7
  98:12
attorneys  30:5
  95:25
audible  5:8
audience  14:10
  85:2
author  54:19
  54:21
authored  86:24
authors  31:22
automatically
  37:14 95:21
available  32:23
  33:23 42:11,12
  42:15 48:17,21
  58:4 62:20
  66:9,20 67:23
  68:3
average  41:10
aware  31:17
  57:24 87:12

b

b  1:15 19:11,15
  95:5,8,21
  97:19
b1  78:24
back  9:22
  10:15 11:24
  15:12 16:17,19
  25:11 32:14,20
  33:25 42:9

Veritext Legal Solutions
800.808.4958　　　　　　　　　　　　　　　　　　770.343.9696

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[back - called]**                          Page 4

43:10,11 44:24 47:12 52:4 54:20 55:24 56:14 60:14 66:18 76:7,24 79:16 81:12 85:20 87:25 98:3
**background** 48:8 52:11
**bad** 42:25
**balls** 13:2 52:1
**barber** 2:17 3:17 29:7 36:23 48:14 59:5 74:17 75:5 76:5,6
**base** 47:12
**based** 7:12 15:7 84:25 97:11
**basic** 44:13
**basically** 37:5 45:1 60:7 78:12
**basics** 32:21
**basis** 64:13 95:9
**bayesian** 74:4
**bayesians** 41:12
**beast** 55:19
**becoming** 38:14

**behalf** 3:2,7 4:8 4:12
**behavior** 26:19
**believe** 7:14 17:2 26:18 46:11,11 62:22 70:19 79:21
**best** 26:23
**bet** 48:13 50:9 50:10
**better** 36:18 37:18 67:22,24 68:2,4
**beyond** 87:22
**bias** 61:5,5
**big** 9:25 28:14 61:14
**bigger** 45:18,21
**billion** 56:15
**bit** 16:18 31:11 35:6 36:22 40:21 45:18,21 45:21 50:9 58:20 59:23 60:13 73:20 74:22 81:20 84:7,15
**black** 9:6 14:21 15:24 16:5 17:6,9,11 24:12,14 26:19 68:8 71:24 72:4 73:3,4,15 73:16,17,23

75:12,13 76:21 78:7,13,21 79:4 80:18,23 84:5
**blanking** 55:10
**bloc** 14:6
**block** 54:21
**board** 1:7 95:6
**bob** 80:18,19
**body** 32:9
**bog** 66:14
**boom** 45:11
**bore** 40:21
**bosworth** 1:15 97:19
**bottom** 75:9 89:9
**bounce** 60:10
**box** 3:5
**boyd** 3:16
**brand** 31:17
**breadth** 72:18 76:4
**break** 5:11,13 92:8
**broadened** 79:19
**broader** 76:19 82:14
**brought** 45:6
**bryan** 3:3,4,8 4:7,11 5:2 9:21 18:6 23:8 25:1 25:6 60:11

87:17 93:14,20 98:1
**bryans** 44:13
**buckets** 38:8
**building** 31:23
**bullet** 16:9 24:11,20 25:15
**bunch** 40:8
**buried** 88:23
**burnin** 36:8 45:5 59:19,20 59:20 60:2,18 60:20 82:2,7,8
**butcher** 36:22 54:17
**butting** 78:18

**c**

**c** 2:11 75:19 90:20,25 95:7
**calculating** 11:15,16
**calculation** 72:24
**call** 13:2,25 14:3,7 40:19 41:11,12 49:19 49:22 52:1 64:14 72:13 74:12 79:22,23
**called** 31:18 32:8 44:5 55:19

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[calling - choose]**                    Page 5

calling  18:7,7
  44:17
calls  33:7 64:13
  92:6
canceled  93:13
candidate  17:6
  17:6 73:4,15
  73:17 78:8,14
  78:22 91:24
candidates  9:7
  40:24 72:5
  75:13 84:6
  87:2 88:21
capacity  30:19
caption  97:4
capture  90:3
care  68:16
career  10:4
carlo  35:14
  40:12
carolina  2:13
  86:24
case  27:25
  31:10 32:2,2,5
  33:22 60:3
  74:17 85:4
  95:9,9,21
cases  12:11,14
  12:20,24,25,25
  13:11,15,17
  33:9 49:16
  64:12,14 89:16
  89:23

cast  14:21
catch  46:4,5
causal  44:23
cause  28:12
  57:7 80:13
  81:24
caused  20:12
  20:24 66:3
cc  59:13 77:6
ccr  1:15 97:19
certain  50:10
  69:2
certainly  20:7
  21:22 59:20
certificate  97:1
certified  95:10
  95:24
certify  97:4,7
  99:2
chain  35:14
  61:23 62:1,4,9
  62:16,21,24
  63:6,14 68:24
  69:5,7,13,16
  85:21,24 86:1
  86:12
chains  40:12
challenge  47:6
chance  7:7
change  7:13 9:4
  9:5 10:25
  13:25 15:8
  16:23 17:13
  18:3 20:12,15

20:24 21:4,21
21:23,25 22:3
22:3 23:5,15
23:17,21 24:8
24:23 25:18,22
25:25 26:4,12
27:20 28:12,14
29:2 30:16
32:22,22 33:15
34:11 40:2
42:19 46:14,22
46:23,23 49:9
51:20 64:18
71:19,21,22
72:1,14 80:21
85:15 99:11,13
99:14,16,17,19
99:20,22,23,25
100:1,3,4,6,7,9
100:10,12,13
100:15,16,18
changed  10:11
  11:2 12:12
  13:21 17:1
  18:14 21:19,20
  21:23 22:6,9,9
  31:8 34:8,22
  34:24 42:14,16
  43:13,14 45:1
  46:9 48:10,12
  51:14 53:4
  65:15 67:13,18
  91:10

changes  10:20
  10:23 11:3
  13:21 17:21
  20:17,18 27:3
  27:16 28:3,10
  36:5,14 51:14
  52:5,7 70:23
  71:17 72:3
  80:3 82:17
  84:12 85:13,17
  86:11 88:2
  95:24 98:7
  99:4,5,7
changing  11:5
  26:3 45:8
  50:23 82:19
characterizati...
  12:9,17,18
  15:7 76:18
  79:7
characterize
  20:22 30:16
  71:16,19
characterized
  31:9 74:21
check  53:8 58:8
  62:9,16 63:3,5
  85:21
checked  52:25
checking  58:11
  59:9
chicago  44:24
choose  60:17
  81:13,16

**[chop - concludes]**                                    Page 6

chop   60:7
chose   58:1
    69:15 90:6
chunks   61:14
circumstances
    53:14 54:1,4
cite   19:9
cited   67:20
civil   1:5 99:7
claim   13:1
    17:16 52:3
    76:21
clarify   23:12
clarity   28:13
clark   3:10
clean   27:23
cleanup   13:22
    13:24 93:22
clear   11:14
    13:3,6,7,9,9
    14:9 15:21
    17:19 18:12
    23:4,15,23
    29:19 31:18
    40:23,24 43:7
    53:19 56:2
    57:23 65:13
    68:5 80:16
    81:25
clearly   5:6 91:7
client   18:9,22
    52:2
climb   61:22

climbed   44:6
climbing   40:14
close   59:25
closest   65:11
coda   44:5,5,8
code   2:15 9:3
    9:13 10:21
    15:8 20:15,16
    22:3 23:5,15
    31:8,22 32:15
    33:25 34:1
    38:3,5,7,7
    39:10 40:2
    42:1,5,9 44:16
    51:14,15 53:24
    55:25 56:1
    57:12 58:9
    59:13 62:12,14
    63:20,23,24
    64:19 65:1,5
    65:16 66:1,9
    70:13 71:13
    72:3 80:4 85:5
    92:22,23,25
    95:14 97:10
coefficients
    90:12
cognizant
    27:16
cohesion   73:20
    73:23 74:1,2
    76:22 84:11
cohesive   71:24

cohort   31:16
collapse   91:23
colloquies
    95:23 97:5
column   35:1,7
    37:9,10,10
    57:10 82:18
    85:10,14
columns   34:14
    36:20 37:10,25
    40:3 80:10
combining
    88:21,21
come   43:11
    44:1
comes   43:23
    44:7
coming   18:1
command
    42:22 49:18,19
    49:20 56:3
    57:24 58:2
comment   40:22
    40:23 41:8
commission
    2:16 30:6
    39:11 70:13,24
    100:25
commitment
    97:13
commonly
    84:23
communicate
    72:7

communicated
    25:24
communication
    19:16
communicati...
    19:7,13,17,25
community
    65:8
compared
    90:19
compelled   23:1
compensation
    19:17 95:15
    97:11
complete   52:21
    53:12 95:11,23
completed
    65:14 98:17
compliance
    95:4,14 97:10
component
    33:18 34:13,18
components
    34:13
concepts   83:20
concern   80:13
concerned
    66:14 91:4
conclude   67:15
concluded
    67:13 94:3
concludes
    93:25

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[conclusion - correction]**                                   Page 7

**conclusion**
10:25 16:20,23
21:5,20 22:4
22:13 23:6,17
23:24 24:9,10
24:23 25:19
26:3 28:25
30:10 71:22
72:1 78:21
81:18
**conclusions**
15:15,19 27:23
28:1,16 67:13
69:3 71:18,21
**conditions**  90:9
**conduct**  50:17
**conducting**
32:18,18
**confidence**
15:11 21:22
41:12 72:12,18
74:10,20 75:23
76:4,15,18
77:4,6,13,25
79:8,10,13
80:5,12 81:9
82:4,6,15
83:11,12 84:2
84:17,19,21
85:6 86:10
88:10 89:22
90:2,23 92:3
**confirm**  79:17

**confirmation**
66:4
**conflating**
83:19
**confusion**  8:2
**consider**  13:22
13:24 26:12
27:17 80:11
**considerably**
48:10
**considered**
68:10
**considering**
80:17
**consistent**  11:4
21:14,15
**consistently**
68:21
**constitute**  26:4
**consultations**
47:1
**consults**  20:19
31:25
**contacted**
95:19
**contained**
74:19
**contents**  88:7
**contest**  73:16
78:9
**contests**  73:23
**context**  16:8
28:7 80:3

**contexts**  45:3
**continue**  81:11
**continues**  78:1
**contract**  95:15
97:11
**contracts**  95:8
**contribute**
57:12
**converge**  62:4
63:10
**converged**
62:10,16,22
63:4,6,14
68:25 86:13
**convergence**
61:23 69:5,7
69:14,17 85:21
85:24 86:1
**conversation**
12:13 63:22
65:16 93:1,9
**conversations**
18:10
**conversion**
62:21
**copies**  98:12
**core**  29:5
**correct**  8:16,17
9:11 11:18
12:5,6 13:5
14:1 15:5 16:4
17:12 23:20
30:8,8,13 34:6
37:21 39:8

46:4 57:25
63:5,7 65:18
66:18 70:15
71:4,15 73:13
75:16,20 78:5
78:11,16 80:9
81:23 83:25,25
85:14 87:4
95:23 97:6
**corrected**  2:7
2:15 8:10,23
9:15 10:8 12:2
14:16 16:22
17:23 21:6,9
23:2,16 24:4,5
24:6 25:21,23
27:5,22 28:15
34:7 38:5,9
39:10 51:6
52:12 53:9
55:24 57:12
59:13 63:19,20
63:24 64:1,8
64:19 65:16
66:12 71:6
76:8,14 77:12
78:4,7 79:18
81:8 82:2 85:5
86:22 88:4
92:17
**correcting**  9:3
10:21 82:18
**correction**  9:16
21:8 28:11

Stephen J. Popick , Ph.D.                                April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[correction - deposition]**                                          Page 8

| | | | |
|---|---|---|---|
| 52:16 92:21 | **courtesy** 93:5 | **curiosity** 65:19 | **decrease** 73:22 |
| **corrections** | **courtney** 1:4 | 65:21 | **deep** 64:15 |
| 22:5,6 63:25 | **courts** 11:20 | **current** 49:2,5 | **default** 34:19 |
| 67:9 71:13 | 12:14,17 91:2 | 56:22 | 42:23 43:9,16 |
| 87:18 88:9 | 91:6,25 | **cut** 18:12 87:20 | 43:17 46:15,16 |
| 98:7 99:9 | **cover** 31:11 | **cutoff** 16:1,4 | 46:17,21 85:15 |
| **cough** 31:2 | 40:8 76:19 | **cutting** 38:16 | **defaults** 34:23 |
| **counsel** 3:1 4:4 | 79:1 | **cv** 1:6 | 42:13,17,19 |
| 14:10,11 17:20 | **covered** 59:8 | | **defendants** 1:8 |
| 17:22,23 20:11 | 66:8 83:8 | **d** | 3:7 4:9 74:16 |
| 20:11 52:8,11 | **cran** 32:9 33:24 | **data** 19:19 | **defense** 14:11 |
| 52:18 95:2 | 48:21,23 | 20:12,24 22:18 | **degree** 69:5 |
| **counted** 39:17 | **crc** 1:15 97:19 | 29:17 34:14 | 73:23 79:6 |
| **counts** 37:7 | **create** 8:1 | 35:1,7,13 41:6 | **department** |
| **county** 1:7 2:15 | 41:17 43:3 | 43:1 44:11 | 12:21 |
| 4:9 30:6 39:10 | 81:4 | 46:12,13,22 | **dependencies** |
| 45:15,18,22 | **created** 34:4 | 69:10 81:22 | 43:25 |
| 68:6 70:12,24 | 35:14 53:9 | 85:10,14 89:21 | **depending** |
| 70:24 71:23 | **creates** 37:20 | **date** 4:1 98:3 | 41:13 75:14 |
| 74:18 90:14,16 | **credibility** | **dave** 80:20 | **deponent** 98:2 |
| 97:2 | 67:11 | **david** 3:16 | 98:6,8,9,15 |
| **couple** 4:25 | **credible** 41:13 | **day** 41:14 | **deponent's** |
| 44:23 | 67:4 72:12 | 79:23 97:15 | 98:6 100:20 |
| **course** 7:9 | 74:10 | 100:21 | **deposition** 1:10 |
| 33:23 46:15 | **criteria** 46:1 | **days** 98:3 | 2:3,4 4:3,8,13 |
| 72:12 90:8,8 | **criticized** 74:17 | **de** 2:14 86:24 | 4:24 5:5,18,22 |
| **court** 1:1 4:15 | 76:3 | **deal** 32:20 | 5:23 6:23,24 |
| 5:7 7:14 12:11 | **cross** 38:23 | **deals** 88:7 | 7:10,15 8:1,3 |
| 12:22 13:9 | 51:24 | **dealt** 30:10 | 9:2,19 12:13 |
| 20:20,20,21 | **crossover** | **decades** 44:23 | 13:12,17 15:24 |
| 24:20 25:10,15 | 71:25 80:19 | **december** 8:7 | 16:17 17:3,14 |
| 63:1 75:17 | **crr** 1:15 97:19 | **decimal** 54:3,5 | 17:15,17 18:16 |
| 95:6,10,24 | **crystal** 13:6 | **decision** 10:7 | 21:11,14,16 |
| 97:13 98:15,19 | | 12:24 | 22:25 23:1,21 |

Stephen J. Popick , Ph.D.                              April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[deposition - dropping]**                                    Page 9

24:1 27:18
28:12 36:1
38:11 42:1
51:11,13,17
58:15 66:15,17
73:21 83:9
87:22 94:1,3
98:6 99:8
**derived**  15:8
**describe**  16:5,7
**described**
  11:17 17:2
  50:21
**describing**  14:8
**description**  2:2
**designed**  47:20
**desire**  99:7
**despite**  82:13
  85:7 90:12
**detail**  28:1
**determine**
  15:21 22:18
  30:5,22 51:22
  68:24
**determined**
  95:15
**developed**
  31:16
**diagnostic**  44:5
  86:1,3,5
**diane**  3:9
**differ**  73:9
  75:13

**difference**  84:3
**differences**
  40:13 53:17,18
  53:20,21
**different**  34:20
  37:3 38:7,8
  45:3,21 47:2,3
  49:10 51:4,10
  55:20,20 58:25
  60:22 68:14,15
  83:19 84:5
  91:11,11,12,13
**differently**
  50:10
**difficult**  29:18
  43:7
**diligence**  66:5
**dinged**  38:13
**dinging**  39:1
**dips**  81:9
**direct**  8:19
  59:15 86:3
  89:6 95:15
  97:11
**direction**  97:5
**directly**  12:19
**disagree**  12:16
  76:5 79:7 81:6
**disclosure**  95:6
**disclosures**
  95:1,3,4,18
**disconnect**  43:6
**discount**  95:22

**discounts**  95:21
**discoverable**
  19:3
**discovered**  9:2
  9:16 32:7
**discuss**  14:2
  88:7
**discussed**  22:25
  22:25 23:2
  24:2 28:4
**discusses**  87:16
**discussion**  14:6
  16:16 17:14
  23:21 39:4
**discussions**
  64:17
**dispute**  91:7
**disqualificati...**
  95:7
**disqualify**
  95:13 97:9
**district**  1:1,1
  78:8
**division**  1:2
**doctor**  4:5,16
**documentation**
  42:12 44:4
  55:21
**doing**  7:9 10:9
  11:16 30:23
  32:23 34:4
  47:20 52:5
  54:19 64:20,24
  66:24

**doj**  9:22 12:23
  12:24 48:8,11
  52:1
**double**  57:15
**doubt**  86:16,20
  91:3
**downloaded**
  44:1
**dr**  4:3,10,13,22
  5:21 10:6
  19:25 20:2,10
  23:9 28:2 29:7
  38:16 48:14
  59:5 64:9,12
  70:11 74:17
  76:5,6 87:21
  92:16,18 93:23
**draft**  18:7
**draw**  28:17
  69:3 85:14
  86:7,8
**drawing**  35:21
  37:13 57:9
  80:9 82:18
  85:9
**draws**  44:10
  82:8 92:2
**drew**  91:23
**drive**  45:23
**driver**  1:4 4:12
**drop**  31:2
  84:11
**dropping**  82:8

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[due - estimates]**                                      Page 10

due  66:5 76:3 98:3
duly  4:18

**e**

e  99:6,7
earlier  82:22
early  52:18,19
easier  32:17 38:13 53:6 74:13 93:15
easy  35:11
ecological  2:11 49:3 67:19,21 68:1 74:19 75:15,15 88:19 92:2
editorializing 14:3,7
effect  46:8
effective  41:3 42:22 44:7,17 44:21 45:10 50:22,24,25 52:23 54:12 55:8,16 60:20 60:25 61:11,20 62:11 68:24 69:2,4,10 85:17,23,25 86:17
effectively  79:4
ei  11:16 31:15 33:4,6,6 34:19

37:16,16 40:19 42:18 47:4 48:6,6 49:2,8 49:25 50:4,18 56:25 58:5,14 72:21,25,25 75:19 76:14 81:11 89:14 90:6,17,18,20 90:24,24,25
ei.md.bayes 49:14,22
eicompare 31:18,19,24,24 32:8,17,23,25 33:7,11,12,19 33:22,23 34:13 34:16,17,20,21 37:15 42:10,14 43:14 45:13 46:24 47:4,18 47:18 48:1,16 49:23 58:4 62:19 66:9,20
eight  29:4 85:8
either  19:23 25:9 90:24
elected  80:20
election  22:22 26:24 29:3,6 30:18 38:9 39:5,7,16 45:6 45:7 51:2 53:5 70:13,17 73:7

76:13 77:13,21 78:1,6 81:9,22 85:8
elections  1:7 9:8 22:7 29:5 30:6 39:4 72:5 74:18 75:12 79:15 91:15,20 91:20,21
electorate 15:25 17:10 24:13 91:13
electorates 80:17,25 81:7
electronically 98:8
elementary 62:2
elements  76:21
employee  97:7
enabled  44:2
encountered 64:6
ended  33:4
engaged  33:17 93:2,5,7
ensure  86:6
entered  99:8
entirely  47:2
entitled  19:6
errata  98:3,7,8 98:9,11,13,14 98:17 99:1

error  9:3,3,12 9:16,20 10:12 22:5 28:7,10 28:23 30:25 31:9 32:24 34:5,12,12,16 38:2
errors  9:14 66:11 71:20
especially  5:7 88:5
esq  3:3,8,9,16 3:18,19,20 98:1
essentially 41:14
establish  38:6 69:12
established 12:14 84:20 88:1
establishing 37:21
estimate  41:10 41:11 61:21 79:3 83:12 84:1,24 90:10 90:19
estimated 17:11 24:14 35:16 37:3 89:22
estimates  9:6,8 11:1,2 15:8,10

**[estimates - feel]**    Page 11

17:24 20:17 21:19,22 22:6 22:9,11,15 25:22,24 41:7 41:8 43:4,22 72:4,8,9,11,17 72:19 73:9,22 73:25 74:22 75:12 76:20 80:24 85:5 87:3,15 88:18 89:15

**estimating** 37:22 90:11 92:5

**estimation** 35:13

**estimations** 17:22 32:19

**et** 1:4,7

**ethics** 95:14 97:10

**evaluation** 2:9

**everybody** 53:6

**evidence** 13:1 52:2 97:6

**evolved** 50:9

**exact** 19:9 40:12,16 53:17 54:2

**exactly** 17:2 29:13,15 46:10 50:21 90:21

**examination** 2:19 4:20

**examined** 4:18

**example** 14:12 45:14,22 60:12

**examples** 11:21

**except** 5:16 6:6 7:17 19:16 95:8

**exception** 73:14 85:7

**excuse** 22:15 50:1 71:11 77:5 80:12

**exhibit** 2:2,3,4 2:5,7,9,15,17 6:2,3,23 7:1,19 7:22 8:2,11,21 11:7 15:13 16:25 29:24 31:4 39:19,22 71:9 75:1,4 77:1 87:6,7,10

**exhibits** 2:1 6:22 39:19,20 95:24,24 96:1

**existed** 74:5

**expanding** 80:4 80:12

**expect** 89:22

**expectations** 56:9

**experience** 48:8 52:10 86:15

**expert** 2:5,7 7:20 8:10,23 11:13 13:4,14 19:2,7,20,22 24:22,24 25:17 25:20 26:5 29:9,11,16,23 30:20 71:6 74:16 88:2,4,6

**experts** 12:22 33:20 91:5,24

**expires** 100:25

**explain** 23:25 24:3,6,8 26:13 26:16 31:7 35:6 85:1 90:6

**explained** 24:2 85:2

**explaining** 71:12

**explanation** 26:23 85:11

**explore** 88:10

**exploring** 88:5

**express** 78:15

**expressed** 40:4

**extensively** 48:7

**extent** 19:16

**ezi** 48:13

**f**

**f** 3:8

**facility** 98:18

**fact** 12:15 43:17 52:9 78:6 80:8

**facts** 19:18 20:12,24 21:19

**fail** 71:24

**fair** 13:16 14:6 16:19 27:22 34:10 39:5 43:10 58:7 62:3,15,17 68:25 70:16,20 74:16 79:6,11 92:1

**fairly** 79:9

**fall** 85:6

**familiar** 45:15 45:16 47:23

**familiarity** 52:10

**far** 66:13 90:9 91:4

**favorable** 56:16

**fdic** 9:23 56:22

**features** 48:1

**featuring** 73:15

**federal** 18:23 19:3 99:6

**feel** 13:24 16:4 21:5 28:22 67:3 84:19

**[felt - getting]**    Page 12

**felt** 16:6 23:1
**field** 55:21
**fight** 88:11
**figure** 41:9
  60:9
**figured** 52:16
**figures** 28:15
  28:16 36:19
  43:9,15 52:14
  83:18
**figuring** 59:24
  61:7
**file** 1:5 44:20
  98:12
**filed** 8:10 98:14
**files** 53:5
**filing** 51:5
**fill** 98:8,8
**finalized** 92:17
**financial** 95:7
**financially** 97:8
**find** 13:1 47:8
  52:2 55:4,18
  55:22 57:22
  82:9 89:1
**finding** 9:4,19
  24:1 26:17
  81:1
**findings** 29:4
**fine** 5:14,19
  14:14 24:21
  25:16 46:9
  59:10 70:4,4
  89:8

**finish** 38:19
  75:17
**firm** 95:1,18
**first** 4:18 5:17
  11:9 12:13,16
  14:19 17:14
  30:3 34:11
  49:1 58:14
  60:7 62:15,21
  63:4 66:7
  71:16 73:14
  82:8 83:9
**five** 54:5 92:8
**fixed** 71:20
**flag** 18:3 21:6
  24:22 25:18
  27:4,5
**flags** 48:22
**floating** 25:5
**focused** 28:18
**focusing** 52:22
**folks** 47:20
**follow** 9:9
  24:17 53:6
  69:13
**following** 9:1
  13:12 24:18
  33:2 69:1,11
  90:20 95:1,4
  99:5
**follows** 4:19
  25:13
**footnote** 8:20
  9:11 10:24

  11:10 12:3,5,8
  12:10 15:9
  34:5 71:12
  72:2 86:22
  88:3,23
**footnotes** 11:21
**foregoing** 97:4
**foreign** 54:17
**form** 5:16
  19:15 23:7
  26:6 27:12,14
  33:14 99:7,9
**formed** 19:2
  29:5
**forming** 18:21
  19:8
**forms** 95:6
**forth** 11:24
  76:25
**forward** 12:20
  12:24,25 22:8
  98:12
**found** 54:25
  55:5,13
**four** 13:11 54:5
**freely** 42:12
**frequentist**
  74:5
**friday** 52:17,18
**front** 6:22 14:5
  55:11
**full** 14:19 40:25
  75:24 89:15

**fully** 23:25
  26:21
**fulton** 97:2
**function** 41:22
**functionality**
  47:19
**functionally**
  40:17 57:4,5,6
  57:8 82:7
**furnish** 99:10
**further** 90:4,18
  97:7
**future** 39:16

**g**

**ga** 98:20
**gary** 31:16
  48:15
**gelman** 54:18
  54:18,19 86:19
**general** 29:4
  64:23 66:24
  76:18
**generalizable**
  47:20
**generally** 11:3
  31:7 59:1
  68:20 92:24
**georgia** 1:1 3:6
  3:13 47:2
  60:12 95:4,10
  97:2
**getting** 33:20
  38:22 47:11

Stephen J. Popick , Ph.D.                               April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[getting - homogenous]**                                          Page 13

58:18 83:18
84:4
**gingles** 67:20
**girlfriend**
45:17
**give** 26:23 41:7
50:11 57:20
61:12 64:22
80:13 84:16
90:22
**given** 26:19
29:2 32:13
41:14 45:14
55:3 81:21,22
89:19 97:6
99:8
**gives** 83:16
**giving** 45:14
57:21
**glad** 45:6 93:17
93:19
**go** 5:13 6:10
11:9,23 12:2,3
14:13,16 15:12
16:18 28:20,21
29:23 30:1
32:14 33:25
40:5,7,20 42:6
42:11 48:5
55:24 56:14
59:6,11 60:14
60:14 70:1,3
72:21 74:8
75:7,22 76:25

77:2 78:17
79:16 83:2
85:19 88:24
89:9 91:14,25
92:18
**goes** 64:8 86:2
**going** 5:16,21
6:1,20,25 7:19
8:2,9,19 9:22
11:23 12:16
20:1,21 31:4
32:20 33:16,21
35:10 38:4,13
38:14 39:3,9
39:17 40:21,24
41:1,21 42:18
44:15,17,19
46:14 47:12
54:1,16 58:24
59:3,21,21,22
60:2,3,6,6 70:2
70:2 74:3,4
77:13 78:17
82:6,24 83:24
87:5,20,22
88:20 89:11
92:6
**good** 4:22 36:4
43:19,20 45:2
48:24 64:8,9
64:21,25 67:1
71:9 88:6
93:10

**google** 55:15,18
**gotten** 33:19
39:20 46:25
**grace** 3:20
**great** 8:18 36:2
37:1 53:3
66:25 93:17
**greetings** 98:5
**ground** 45:3
**grounds** 89:19
**guess** 28:22
43:9
**guide** 85:23
**guys** 56:5
**gwinnett** 45:15
45:17,22
**gwinnett's**
45:17

**h**

**hand** 25:4
83:15,17
**handle** 32:21
**handled** 34:15
37:14 62:19
**handles** 32:19
**handley** 64:3,4
64:9,12 65:25
92:18
**happened** 9:18
31:10 34:16
84:12 93:8
**happy** 40:5
55:1 59:20

67:6
**hard** 24:18
57:20
**head** 25:5
**headline** 39:14
**hear** 66:25
**heard** 48:14
**held** 91:21
**hello** 4:23
**help** 44:6 57:14
83:24
**helpful** 35:24
56:5 59:5
**hey** 4:11 43:15
64:5
**heyward** 3:18
**hicks** 14:22
73:15 77:5
**hidden** 61:2
**high** 73:5 79:22
79:24
**higher** 74:1
78:17 84:9
**hiking** 60:10
**hill** 3:10
**hired** 9:24 52:2
**hit** 50:20
**hold** 14:23
59:11
**holistic** 72:16
**homogenous**
31:21 33:18
67:22 68:5,11
68:13

**honest** 50:11
**hope** 8:1
**houk** 3:19
**hours** 52:8,12
**houston** 1:7 4:9
   30:6 45:18,20
   68:6 70:24
   71:23 74:18
   90:14,16
**huh** 5:9 17:1
   36:11 42:3
   47:9 68:22
   77:3

**i**

**i.e.** 89:11
**idea** 48:11,24
   55:20 64:8
**ideal** 90:9
**identification**
   6:4 7:2,23 8:12
   39:23 75:2
   87:8
**identified**
   19:18 20:15
   52:6
**identify** 9:12
   9:13 20:11
   47:25 73:18
   83:25 92:4
   93:6
**identifying**
   19:21

**immaterial**
   53:18,18,21
**immediately**
   93:7
**impact** 12:24
**impacts** 97:13
**impartial** 97:13
**impartiality**
   95:14 97:10
**implement** 58:1
**important**
   24:21 25:17
   31:11
**improve** 87:3
**improvement**
   48:15
**improving**
   87:14 88:18
**include** 74:9
   89:23
**included** 33:21
   70:20,25
**includes** 72:17
   78:21
**incorporating**
   27:18
**incorrect** 12:9
**incorrectly**
   7:14
**increase** 73:22
   83:6,23
**increased**
   77:24 80:23
   83:17 84:10

**increases** 73:16
   78:1
**increasing** 82:1
   82:13
**increasingly**
   83:18
**indented** 59:16
**independent**
   44:10
**index** 2:1,19
**individual** 9:6
   53:5 72:4,8,17
**inference** 2:12
   44:24 49:3
   74:19 75:15
   88:19 92:2
**inferences**
   44:15 86:7,8
**information**
   47:8 55:3
   57:15,19 86:14
   91:22
**informative**
   57:14 62:1
   81:18
**initial** 46:3
   67:11 87:20
**inquire** 19:6
**inquiring** 19:24
**insertion** 14:25
**inspected** 46:11
**instance** 11:20
   13:10 66:7

**instances** 50:8
**instruct** 20:1
   87:21
**insufficient**
   80:19
**intent** 27:15
**interest** 95:7,12
   97:9
**interested** 97:8
**internal** 13:4
**interrupted**
   83:3
**interval** 72:18
   75:25 81:9
   83:12 92:4
**intervals** 11:1
   15:11 21:22
   41:12,13 72:12
   72:13 74:10,10
   74:20 75:23
   76:4,15,18
   77:4,6,13,25
   78:3 79:8,10
   79:14 80:5,12
   82:4,6,15 84:2
   84:20,21 85:7
   86:11 88:10
   89:22 90:2,23
**introduce** 4:4
   8:9 38:4 39:10
   53:12
**introduced**
   29:6

**introducing** 6:21

**introduction** 30:3

**introductions** 5:1

**issue** 10:7 17:23 46:5 52:12 57:13 90:5,15

**issued** 25:21

**issues** 66:11,19 91:12

**iterate** 50:23 61:10

**iterated** 60:19

**iterating** 45:4,9 61:17

**iterations** 34:22

**iterative** 72:21 72:25 75:14 76:14 90:6,17 90:18,24

**j**

**j** 1:11 4:17

**jacoutot** 2:20 3:8 4:7,7,21 5:15,20 6:1,5 6:10,17,19 7:3 7:24 8:14 18:11,16,20 19:1 20:6,9

23:10,13,14 25:10 26:1,7 26:25 27:21 38:25 39:25 65:24 70:10 75:3 87:9,24 88:15 92:15 93:20,24

**job** 13:2 30:23 51:24

**journal** 86:23

**julie** 3:19

**jump** 15:15

**jumped** 36:6 69:21

**justice** 12:21

**justifies** 90:17

**k**

**keep** 5:8 34:15 36:21 60:8 77:9 78:23

**keeps** 77:20

**kept** 45:8

**kind** 9:17 10:11 11:24 14:2,4 14:19 16:17 21:6 41:19 92:18

**king** 31:16

**king's** 48:15

**knew** 33:16,21

**know** 5:4,12,24 8:3 13:4 25:1,6

25:8 29:13,15 33:21 36:22 37:4 40:15 44:6,14,20,25 44:25 45:9,15 51:3,19 52:13 53:25 54:23,25 55:7 56:11,19 61:23 62:23 63:18 64:11,14 66:24 67:12 68:12 69:20 70:11 79:6 82:6 87:15 93:1,10

**knowledge** 52:7 93:4,16

**known** 2:12

**krishan** 3:21

**l**

**l** 3:4

**lack** 84:16

**lacked** 22:24 23:24

**lambda.md** 41:21,22 42:21 43:1

**language** 10:23 11:2 13:6 14:9 14:11 21:25 22:9 25:23 28:13 32:11 49:11

**languages** 22:9

**large** 56:11 90:10,11

**larger** 80:7,22 81:3

**laross** 3:9

**latitude** 88:6

**law** 3:4 19:11 95:4

**lawyer** 58:22

**lawyers** 44:12

**lay** 85:2

**leading** 90:11

**led** 9:19 10:11 22:3 23:5

**legal** 26:10

**levels** 74:1,2

**lever** 61:18

**levers** 50:23 61:17

**lie** 84:8

**life** 38:12

**light** 20:10

**likelihood** 37:20 46:25

**likely** 79:2 80:7 80:23 82:10,11 84:10,13,25

**limit** 54:12

**limitations** 81:21,23

**limited** 53:14 80:8 90:12

**[line - material]**                                                    Page 16

line   40:6,7 55:8
   59:11,18 64:24
   99:11,14,17,20
   99:23 100:1,4
   100:7,10,13,16
lines   42:22
lisa   64:3,4 65:9
   65:25 66:21,23
list   78:25 87:6
listed   32:8
listening   36:23
literature
   52:25 69:1,11
   69:12 85:19
   86:4,5,7,18,21
   92:1
little   11:24
   16:18 27:7
   35:6 38:7
   39:18 40:20
   43:5 45:17,21
   45:21 50:9
   58:20 60:13
   73:20 84:7,15
   91:9
lives   74:13
living   61:9
llc   3:4
log   44:18,20
   61:1
logical   22:8
logically   21:24
logs   63:11

long   19:12
   47:25 50:7
longer   32:8
   33:23 48:19,21
   81:8
look   7:5 8:20
   11:9 42:11
   46:20 50:7
   55:15 61:3,19
   65:1 78:3,7
   79:16 81:13
looked   43:9
   46:8,21 55:1
looking   8:22
   20:18,18 24:11
   44:4 50:25
   54:22 60:24,25
   61:6,11 70:12
   73:2 79:19
looks   19:11
   24:21 25:16
   73:3
loop   52:21
lorenzo   2:14
   86:24
lose   36:17
lot   10:14 14:5
   20:18 32:17,19
   33:19 35:12,13
   38:23 43:20
   44:5 45:3
   53:16 54:17
   55:22 59:8,21
   82:25 88:8

loudly   5:6
love   36:25
low   43:18 73:4
   80:1,2,2 91:23
lower   74:1
   78:20
luggage   53:24

**m**

macon   1:2
made   10:6,23
   12:17 13:21
   17:16,16,21
   20:13,17 21:5
   22:5 23:20,25
   27:2,24 28:3
   28:10,14 31:18
   36:15 38:3
   52:7 63:25
   66:22 67:9
   70:16,24 80:4
   82:16,17 85:13
   85:17 93:15
   95:4,24 97:12
mail   98:10
maintaining
   95:13 97:9
major   89:20
   91:4
majority   14:20
   78:15
make   6:7 8:6
   8:15,24 10:20
   11:10 13:6

17:13,19 21:13
   26:18 35:10
   36:17,24 38:12
   40:6,23,23
   50:19 52:4
   53:5 59:7 67:2
   74:13,24,24
   80:11 85:14
   95:11 99:7
makes   32:17
   45:19
making   19:1,5
   27:16 28:1
   29:1 95:13
   99:8,9
man   41:9
mansell   98:19
manually   37:16
   58:4 98:8
march   6:24
   8:10 9:2,19
mark   6:22 7:19
   39:19
marked   6:3 7:1
   7:22,25 8:11
   39:19,22 75:1
   87:7
markov   35:14
   40:12
marlin   3:16
material   21:4
   21:20,23 24:23
   25:18,22,25
   26:4 28:24

**[material - never]**                Page 17

29:1,3 30:16 30:19 33:9 81:1

**materially** 9:5 12:23 18:14 67:13 72:3

**materials** 18:7 42:6

**matter** 95:12 95:20 97:9

**mcmc** 46:1 55:5,16

**md** 89:14

**mean** 21:24 35:7,9 39:12 41:10 44:12 51:6 58:21 61:12 80:6

**means** 32:11 59:21

**meant** 25:2 26:15 33:24

**measure** 69:5

**measuring** 69:6 69:7,9

**meet** 45:25 69:13

**meeting** 9:25 93:13

**mentioned** 41:25 43:8 53:12,13 54:11 66:19 81:23 84:9,9

**merge** 41:17

**messages** 46:25 47:4,6,10,13 63:15

**met** 50:25 60:21 85:18 86:16

**method** 11:17 67:20 69:14 73:1 92:20

**methodologies** 91:1

**methodology** 11:12,15 66:24 80:14 89:3

**methods** 2:11 69:17 76:6 81:10

**metric** 76:14

**michael** 3:17 36:23

**mid** 79:22,22 79:24

**middle** 1:1 14:20 33:16 55:9

**million** 60:3

**mincing** 58:19

**mind** 7:17 39:9 51:24 78:23

**mindful** 12:19

**mine** 10:8,8 64:15

**minor** 7:15,18 9:2,12 28:7,23 30:24 31:9 71:17,18,20

**minute** 6:21 92:8

**minutes** 6:20 27:2

**misleading** 27:7,15

**missing** 73:6

**mistake** 10:6

**mistaken** 76:12

**mode** 55:17

**model** 57:18 81:17 89:19,21

**models** 81:17 81:21,25

**modified** 15:6

**moment** 69:25

**monte** 35:14 40:12

**month** 32:6

**morning** 4:22 52:18

**motivates** 10:2

**mountain** 40:15,17 44:7 47:8,11 53:15 59:23 60:1,11 60:15 62:5

**move** 12:20,24 12:25 61:14,18 61:18 71:5

**moved** 76:20

**mtt** 1:6

**multiple** 34:22

**n**

**n** 82:8

**name** 4:7 54:23

**names** 5:2 54:16,17

**narrative** 14:3 27:3 71:5

**narrow** 82:3

**naturally** 58:24

**ne** 3:11

**necessary** 23:25 99:10

**necessity** 90:11

**need** 4:25 5:11 10:10 13:24 20:15 21:6 27:13 28:12,23 37:2 46:9 52:4 52:12,15 56:8 61:22,22 69:13 77:22

**needed** 13:20 17:23 35:21 45:10 52:16 66:12 90:19

**needs** 42:19

**neither** 91:4

**network** 33:24

**never** 20:20 34:16 48:13

**nevertheless** 67:10

**new** 14:8 15:7 15:10,10 19:10 21:12 31:17 51:15 52:14 72:3 73:22 81:7 91:19

**nodding** 5:9

**notarized** 98:10

**notary** 100:23

**note** 87:24

**noted** 22:6 99:4 99:5

**notes** 52:6 55:7

**nothing's** 91:10

**notice** 2:3 5:22 5:23

**noticed** 10:14 43:13,14

**noticing** 95:19

**notified** 52:7 52:11,17

**noting** 31:19 98:7

**notwithstandi...** 86:11

**novel** 21:13

**nuance** 22:24 23:1,2,25 24:2 24:3,7

**nuancing** 26:21

**number** 6:3 7:1 7:22 8:11 31:25 39:22 53:3 61:13 69:9,14 75:1 80:8 87:7 90:12,12,18

**numbers** 27:17 35:19 40:2 45:1 51:14 84:7

**o**

**oath** 17:17

**object** 27:10

**objection** 4:5,9 4:12 18:6 19:2 19:5 23:7 26:6 27:9,14 87:25 88:11

**objections** 5:16

**obligation** 95:14 97:10

**observe** 34:23

**occurred** 32:24

**ocga** 95:7,8,21 99:7

**offer** 64:18

**offered** 15:18 16:14 21:8,17 29:11

**office** 3:4,5 93:15

**officer** 97:13

**offices** 98:3,10

**oh** 38:18 46:13

**okay** 6:9 7:7,12 7:19,21 8:6,9 8:13 9:17 10:5 10:9,20 11:6,8 12:12 13:23 14:2,23 15:6 15:14,17 21:4 23:4,10,22 26:2 29:11,25 30:24 31:1,6 32:12,25 33:10 34:10 35:5,20 35:23,23 36:2 36:7,14,16,22 36:24 37:8 38:1,4,15 39:9 40:1,18 41:2,5 41:16,23,24 42:17,19 43:20 46:2 47:22,24 48:7 49:21 50:12 52:3,20 53:3 54:7 55:24 57:23 58:12,22 59:8 59:10,17,22 60:5,17 61:3 61:15,21,23 62:7 63:8,13 63:17 65:12,19 65:23 68:19

69:8,19,23 70:3,11,23 71:2,5,7 72:2 72:15,23 73:2 74:8,12,13,23 75:8 76:2,7,9 76:11,23 77:1 77:5 79:8,18 82:1 86:21 87:11 88:25 89:2,8,13 91:18 92:8,9 92:25,25 93:10 93:10,24

**old** 54:1 65:1,5 91:9

**once** 40:8 45:11 50:15,25 52:24 53:3 56:15 98:9

**ones** 19:10 33:9 37:11 41:13

**online** 42:13

**open** 7:4 8:6,15

**opinion** 16:14 18:21 19:3 20:13,25 21:17 22:23 26:5 28:14 30:17 73:21 90:2 92:18

**opinions** 12:15 13:10 18:13,18 20:3

**opportunity** 27:23

**optimistic** 89:10,14

**order** 39:18 60:14

**ordering** 96:2 98:13

**original** 2:5,17 7:20 9:4 11:6 12:8 15:4,12 21:18 22:4,21 23:24 26:14,16 26:22 27:19,24 29:23 46:5 48:13 50:5,14 51:7,12,13 56:3,7,12,20 58:2 62:12,14 63:2,2,23 67:3 73:10 74:17 75:5 76:25 77:16 79:10,13 80:16 98:12,14

**originally** 26:13

**outcome** 84:10 97:8

**outcomes** 10:1 78:13

**outline** 59:9 69:22

**output** 53:7 54:2 56:10,12

**outside** 9:24 12:22 28:6,6 85:6

**overwhelming** 14:5,20 15:1

**own** 20:16

**p**

**pac** 31:15 33:5 33:6 34:19 37:16 42:18 48:6 49:2,8,25 50:4 58:5,14 58:14

**package** 31:17 31:22,24 32:12 33:15 43:16,17 43:23 44:5,8 47:14,17,22 48:18,19 49:13 49:17 52:6 55:7

**packages** 31:15 32:10,15 33:7 33:8 43:24 44:1,1,3 47:12 47:16 48:2,6 48:12,24 55:18

**page** 2:2,19 8:19,25 11:9 14:16,23 15:15 16:10 30:1,2 71:11,12 72:22 74:24 75:7

76:10 89:6,9 99:11,14,17,20 99:23 100:1,4 100:7,10,13,16

**pages** 7:11 99:9

**paper** 54:18,24 54:25 55:5,9

**papers** 52:25 54:11,15 55:1 55:14

**paragraph** 14:19 75:10 89:10 90:4

**parameter** 34:23 36:5 57:11

**parameters** 34:19,20,21 35:2,25 40:20 42:23 45:8,9 46:8,15,16,17 46:21 59:16 61:20 66:23 70:17 82:19 85:15 86:12 90:19

**parcel** 86:2

**part** 39:15 40:22 41:19 57:15 62:1 74:18 76:3 86:2 89:11

**particular** 9:7 9:7 18:3 31:23

36:6 46:23 72:5,5

**particularly** 88:7

**parties** 95:21 96:2 97:13 98:13

**party** 95:15,22 97:7,11

**party's** 19:13 19:19,21

**pass** 34:21 40:24 45:24 50:24

**passed** 52:24

**password** 96:1 96:2

**past** 20:18,19 49:4,24 50:4,8 56:21 93:8

**patel** 3:21

**path** 22:8 60:13 60:13

**pattern** 77:20 77:23,24 80:21

**patterns** 82:21

**pause** 69:25 80:11 90:22

**pdf** 98:7

**peachtree** 3:11

**pending** 5:12 88:14

**people** 47:3 53:1

**[percent - precincts]**  Page 20

**percent** 14:21 15:24 16:2 17:9 24:12 68:7,21 78:18 81:10 87:3 88:22 89:16,23 90:23 92:3

**percentage** 37:19 41:20 75:14

**percentages** 35:19,22,23 36:19 40:3

**perfectly** 54:2

**performance** 2:10

**performed** 12:20

**period** 91:3

**periodically** 32:7

**person** 26:10

**personally** 66:11

**perspective** 24:16,19 25:14

**phase** 60:9

**phd** 1:11 3:17 4:17 98:2

**philosophy** 51:25

**physically** 44:20

**pick** 56:16

**piss** 74:4

**pissed** 38:15

**place** 95:20

**places** 40:13

**plaintiff's** 14:10

**plaintiffs** 1:5 3:2 4:12 30:5 93:2

**plane** 57:21

**plaudits** 33:20

**plc** 3:10

**please** 4:4,16 5:6 8:15 15:13 38:17 57:16 98:10,17 99:9 99:10

**plescia** 2:13 86:24

**plummer** 55:8

**plus** 15:25

**point** 15:7,10 16:10 21:21 24:11,20 25:15 29:19 33:23 39:2 40:1 41:10 43:4 62:11 72:9,11 72:19 73:9,22 74:22 75:12 76:20 79:3 80:24 83:12 84:1,24 85:5

88:17 93:9

**points** 38:13 39:2 44:11,11 50:10 54:3,5 75:14 77:10 78:20 79:14,20 79:20

**polarization** 10:25 15:19,22 20:14 21:2 22:13 23:18 26:3 28:25 29:2,12 30:11 30:20

**polarized** 9:5 16:11 21:21 22:19,23 26:15 30:7,18,19,22 67:14,16 71:23 81:2,19 84:18

**political** 68:14

**polling** 90:13

**poor** 33:14

**popick** 1:11 4:4 4:10,13,17,22 5:21 10:6 19:25 20:2,10 23:9 28:2 38:16 70:11 87:21 92:16 93:23 98:2

**popped** 24:25

**popping** 76:24

**populated** 75:4

**populates** 7:6

**populating** 5:23

**portion** 14:3 27:3 71:6

**position** 37:18

**possibilities** 76:19

**possible** 41:15 43:4 72:14 74:2 75:24 78:12,25 79:2 80:7,22 81:3 84:8,14 86:10 86:15

**post** 2:16 3:5 7:10 39:11 59:13 70:13,25 77:6

**potentially** 18:8

**practice** 9:22 12:23 48:23 56:14

**practitioner** 61:6

**precinct** 31:21 33:18 37:4 68:7

**precincts** 37:3 67:23 68:3,6 68:13 80:9

**[prefer - question]**    Page 21

**prefer** 17:6
**preference** 78:15
**preferences** 17:11 24:14
**preferred** 72:24 73:1,4 73:15,17 75:13 78:7,14 81:16
**prescribed** 30:21
**prescription** 82:5
**present** 3:15 48:2 62:12,14 81:13
**presented** 95:1
**prestamped** 39:20
**pretty** 10:17 45:2 67:1 73:10 88:6
**previous** 24:9 24:10
**primaries** 30:11
**primary** 15:20 15:22,25 16:11 17:5 20:14 22:19 23:19 29:3,4 30:13
**print** 98:8
**prior** 6:24 11:12 18:16

24:23,24 25:18 25:20 27:18 66:1 73:25 78:4 85:6
**privilege** 5:17 18:9,22
**probably** 39:14 41:9 45:19,19 48:13,24 79:5
**probative** 57:19
**problem** 14:25 25:10 31:1 39:1 55:2 64:6 83:5 89:2,5 92:24
**problematic** 90:16
**problems** 22:12
**procedure** 99:7
**proceeding** 95:1,22 96:1 97:6,13
**proceedings** 95:12
**process** 10:3,10 20:21
**produce** 51:4 51:23 82:3
**produced** 11:7 51:9 82:13,14 95:23
**product** 18:25

**production** 98:18
**professional** 64:15 66:5 93:5 95:14 97:10
**programming** 32:10 49:11
**programs** 17:21 37:17
**prohibited** 95:20
**prohibitions** 95:8
**project** 30:4,9
**prompted** 23:16,17 43:11
**proportion** 26:20 91:23
**proportional** 80:10
**proportions** 35:17,18 37:12 88:21
**proposition** 87:1
**protect** 18:22
**protected** 18:8 96:1,2
**protection** 18:25 19:24
**provide** 19:14 20:23 27:25 55:1 71:25

80:19 95:19
**provided** 19:19 19:22 58:5 63:20
**public** 100:23
**pull** 37:25 39:3 54:16 74:23
**pulled** 34:25 37:9 39:24 40:3
**pulling** 34:14 35:6 36:20
**purposes** 8:3 16:2 28:13 34:2 39:4
**pursuant** 99:6
**push** 87:25 93:12
**pushed** 16:17 16:19
**put** 5:2 6:25 11:25 14:9 17:18 24:24 25:19 35:17 53:4 59:7 87:5
**putting** 5:22 33:17

**q**

**quality** 86:23
**quantity** 86:23
**question** 5:12 6:11 19:18,20 19:23 20:2

Stephen J. Popick , Ph.D.                                                April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[question - referring]**                                              Page 22

| | | | |
|---|---|---|---|
| 25:11 34:10 38:17 42:20,25 43:1 62:2,3 68:16 76:2 88:13,14,16 89:7 92:2,7 | 30:6,17,18,22 67:14,15 71:23 81:1,19 84:17 | 88:24 89:11 90:4 98:6 99:2 | **recently** 5:4 **recess** 6:14 70:7 92:12 **recollection** 28:9 |
| **questions** 6:6 10:13,14,16 40:8 43:21 64:13 65:4 87:19 93:11 95:23 97:5 | **raffensperger** 29:16 31:14 89:4 | **reading** 52:6 **reads** 30:4 **realization** 10:11 | **recommended** 48:19 86:4,5 **reconstruct** 58:3 |
| **quick** 5:5 | **ran** 20:16 39:5 39:6 51:2,14 52:17 53:6 85:19 | **realizations** 42:2 | **record** 4:5 5:3 6:11,13,16 23:23 25:12 27:14 29:15 65:20,22 68:19 70:1,6,9 76:6 92:11,14 93:21 94:2 95:12,13 95:23 97:6 |
| **quite** 43:18 74:22 | | **realized** 66:16 | |
| **quote** 30:4,7 83:10 | **range** 41:15 43:4 72:14 74:2,5,10,12 75:24 76:19 77:10,17,25 78:9,12 80:7 82:11 84:8,14 | **really** 26:15 45:1 64:8 66:25 67:17 79:5 | |
| **r** | **ranges** 73:4 78:25 79:2 | **reason** 49:12 51:8,21 62:22 66:10,12 86:20 91:3 99:13,16 99:19,22,25 100:3,6,9,12,15 100:18 | **reduced** 97:5 |
| **r** 2:11 32:10 49:11 75:19 90:20,25 | **rather** 5:9 36:19 37:15 | | **reduces** 90:18 **reference** 15:9 16:1 28:23 34:5 53:25 86:22 |
| **race** 73:14 | **ratio** 37:19 | **reasonable** 64:21 79:17 | |
| **races** 45:12 70:25 | **rationale** 71:2 **raw** 35:15,16 35:16,19,22,23 36:19 37:6 40:2 41:20 | **reasons** 99:8 **rebuttal** 29:7 29:10 | **referenced** 28:8 88:3 |
| **racial** 10:25 15:19,21 20:13 21:2 22:12 23:18 26:3 28:25 29:2,12 30:11,20 | | **recall** 11:5 15:23 16:21 28:3 46:7 54:15 56:23 58:11 83:9,13 | **references** 12:4 **referencing** 62:23 75:16,20 75:21 |
| | **reach** 65:9 66:3 66:13 | | |
| | **reached** 65:13 | | **referred** 12:10 12:11 |
| **racially** 9:4 16:11 21:21 22:19,22 26:14 | **reaching** 78:20 **read** 7:10 25:11 25:12 54:11 81:14 87:13 | **recalled** 17:15 **receive** 6:7 **receives** 95:22 | **referring** 11:14 23:8 53:21 |

Veritext Legal Solutions

800.808.4958                                                             770.343.9696

Stephen J. Popick , Ph.D.                                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[referring - responsibility]**                                    Page 23

54:6 72:9,11
91:15,19
**reflect** 10:1
11:3
**reflected** 10:10
**reframe** 68:16
**refresher** 5:6
**regarding** 14:6
20:13 21:2
23:18 46:7
80:13
**regardless**
19:15
**regression**
40:19 49:19
67:19,22 68:2
75:15
**regular** 64:13
**regulations**
95:6
**relate** 19:17
**related** 82:7
**relating** 96:1
**relationship**
64:15 65:11
91:5 95:12
97:9
**relative** 97:7
**reli** 45:25
**reliability**
10:13,15,17
43:21 51:19
84:3 90:1,23
92:3

**reliable** 43:22
44:15 82:23
83:16 86:8
89:15
**relied** 11:12
19:22 31:14
**rely** 12:15,18
48:7 87:1
**remains** 73:1
**remember** 35:3
47:7 54:23
60:19
**remote** 1:14 4:3
**remotely** 4:6,10
4:14
**removed** 12:3
13:11,16
**repeat** 35:5
**rephrase** 22:16
23:11
**replaced** 12:4
**replicate** 53:9
58:16,17
**report** 2:6,8,17
7:20 8:5,7,10
8:23 9:8,15
10:8,21 11:6
12:2 14:4,17
15:4,12 16:9
16:13,22 17:24
17:25 18:2,4,5
19:15 21:7,9
21:18 22:4,21
23:3,16,24

24:4,5,6,24
25:20,21 26:4
26:14,17,22
27:3,6,19,23,24
28:4,15,24
29:6,7,9,10,23
34:2,7 38:9
41:18 46:3,6
50:6,15 51:5,6
51:7,12 52:12
53:10 56:20
59:5 63:2,20
64:1 66:1 67:6
67:8,14,15
68:23 71:6
73:10 74:23
75:5 76:8,14
76:25 77:12
78:4,7 79:13
79:18 80:16
81:13,15 82:2
86:22 87:19,20
88:2,4,17,24
92:17,19,20
95:13
**report's** 56:12
**reporter** 4:16
5:7 7:15 25:11
25:12 38:16,19
38:22 63:1
75:17 95:1,3,7
95:10,24,25
**reporting** 95:6
95:19

**reports** 11:13
11:25 19:8
63:9
**repository** 96:2
**representations**
95:4
**represents**
84:24
**reproduce**
40:11 56:24
**reproducibility**
53:13
**republican**
15:20,22,25
16:10 17:5
20:14 22:19,22
23:18 29:3
30:11,13
**requested** 98:6
**required** 19:14
**rerun** 51:12,13
51:16,18,22
**research** 52:5
**reserved** 5:17
94:4
**reset** 53:24
**resolve** 43:19
**responded** 29:8
29:9
**response** 28:10
58:13
**responsibility**
98:7

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

Stephen J. Popick , Ph.D.                                      April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[responsible - samantha]**                                      Page 24

| | | | |
|---|---|---|---|
| **responsible** 82:21 | **reviewing** 32:7 42:4 | 53:2,13,16,17 54:3,13 55:11 | **rollins** 3:16 |
| **restate** 57:16 88:12 | **reviews** 7:10 | 55:12,21,22 | **rolloff** 11:15,17 40:25 87:14 |
| **restroom** 70:3 | **revised** 17:25 18:1,4 | 56:3 57:19,24 58:24,25 59:3 | 88:18 89:7 |
| **resubmit** 67:6 67:8 | **rewrite** 32:15 33:25 | 59:22,24,25 60:15 61:18 | **rollup** 16:2 88:18 |
| **result** 12:12 13:17 17:13 | **rewriting** 34:1 | 62:13 65:15 66:10,20 67:13 | **rose** 29:15 31:14,17,19,25 |
| 31:8 51:4,23 56:16 65:16 | **right** 8:25 9:10 10:1,24 11:2 | 67:19,23 68:3 68:6,12 70:14 | 33:2,11,12,13 48:16 89:4 |
| 66:19 | 11:11,21 14:19 15:4,20 16:12 | 70:25 71:3,14 71:19,23 72:6 | **roswell** 98:20 |
| **resulted** 88:9 | 17:8,16 18:17 21:24 22:20 | 72:24 73:11,18 74:25 75:9 | **roughly** 89:23 |
| **results** 10:22 11:19 14:8 | 23:6,19 24:4 24:12,15 26:13 | 76:16 77:7,11 77:14,21 78:2 | **rpr** 1:15 97:19 |
| 16:5,7 17:25 20:22 22:24 | 27:1 28:9,16 29:12 30:7,12 | 78:10,14,22 79:15,16 80:9 | **rule** 18:8,25 19:6,9,12,13,15 |
| 40:12 51:10 52:24 53:9 | 31:12 32:3,12 32:19 33:14 | 80:17,20,20 81:22 82:7,9 | 99:6 |
| 58:16,18 61:1 61:1,4,7,9 63:9 | 34:3,12 35:1,1 35:7,11,16,18 | 82:11,17,20 83:14,21,24 | **rules** 5:4 18:23 19:3 95:5 99:6 |
| 74:6,19 82:23 83:16 | 36:8 37:1,5,7 37:13,24 38:1 | 84:2,10,11,12 84:14 85:22 | **run** 42:10 50:15,20 51:5 |
| **retained** 12:21 30:4 | 38:2 39:7,24 41:9,23 42:10 | 86:1,18,18 89:24 90:16 | 52:15 56:15,15 56:17 58:23 |
| **return** 76:10 | 42:19 43:1,2,3 44:1,3,7,10,11 | 91:14,19 92:19 93:7 | 60:2,3 69:16 85:20 |
| **returned** 98:11 98:14 | 44:12 45:10,19 46:3,20 47:16 | **road** 3:11 | **running** 47:4 61:9 |
| **review** 7:7,12 17:10 24:13 | 48:9,16,20 49:7,9,12,18 | **robyn** 1:15 97:19 | **runs** 50:20 61:13 82:8 |
| 42:5 65:25 95:1 98:7 | 50:8,11,22 52:8,14,22 | **rolling** 87:2 | **runway** 57:20 57:22 |
| **reviewed** 7:9 13:19 42:1,9 | | | |

| | | | |
|---|---|---|---|
| | | | **s** |
| | | | **samantha** 3:18 |

Veritext Legal Solutions

800.808.4958                                                      770.343.9696

Stephen J. Popick , Ph.D.                                April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[sample - similar]**                                                    Page 25

| | | | |
|---|---|---|---|
| **sample** 36:12 44:11 45:5 50:22,24 51:1 52:23 60:4,20 60:20 61:11,15 61:20 81:21 82:12,13 83:23 85:18,23,25 86:6,18 | **scratch** 32:15 33:25 34:1 38:3 | **seeing** 52:23 73:5 82:21 | **set.seed** 53:11 54:7 57:24 58:1 |
| | **screen** 11:25 25:1,3 76:24 | **seemed** 64:21 89:4 | **sets** 40:10 |
| | **seal** 98:12 | **seems** 14:4 77:18 | **setup** 61:8,8 |
| | **search** 55:15,18 | **seen** 68:20 | **several** 75:11 |
| | **second** 4:24 6:11 25:5 34:18 56:25 75:11 | **sells** 3:3,4 4:11 4:11 5:15,19 18:6,15,17,24 19:5 20:23 23:7,12 25:3,8 26:6,11 27:9 27:12 65:22 87:17 88:14 93:22 98:1 | **shares** 40:25 41:6 43:2 91:24 |
| **samples** 44:14 69:10 82:23 83:1,16,17 | | | **sharing** 31:22 |
| **saturday** 52:17 52:18 | **secondary** 42:5 | | **sheriff** 73:6 |
| | **section** 95:7 | | **shifted** 74:6,6 |
| **saved** 53:7 | **sections** 95:8 | | **shocked** 58:15 58:17 |
| **saw** 20:16 25:6 36:5 45:9 53:5 73:25 | **see** 5:25 8:5 11:20 16:24 23:20 24:20 25:15 27:6 32:20 40:19,21 41:7,11 42:13 42:17 43:15 44:17 46:12 53:1 56:8 58:8 62:9,16 63:3,5 66:21,23 74:1 77:8 80:22,23 87:14 89:17,22 92:23,25 | **sells's** 25:1 | **shocking** 56:24 |
| | | **semi** 64:13 | **show** 43:22 52:14 |
| **saying** 5:9 53:20 83:15 84:3,6,17 | | **send** 98:12,17 | **showed** 45:22 |
| | | **sense** 45:20 59:7 82:18 | **shows** 77:12 |
| **says** 8:8 14:20 16:1,13 19:13 41:8 64:6 69:1 75:9,11,22 86:7,9 | | **sentence** 30:3 57:16 75:11,22 | **sic** 39:10 |
| | | | **side** 81:15,15 |
| | | **separate** 80:17 80:25 81:7 | **sign** 98:6 |
| | | | **signal** 81:25 84:4,6 |
| **scenario** 89:11 89:14 | | **separately** 7:25 | **signature** 94:4 97:17 98:2,15 100:20 |
| | **seed** 40:10,11 40:14 53:22,23 53:24 56:3,19 57:1,2 58:6,13 59:6 70:21 | **serve** 97:13 | |
| **school** 19:11 | | **services** 95:19 | **signed** 98:9,11 98:14 |
| **scientific** 86:17 | | **set** 34:14 37:10 37:11,24 45:8 50:19 58:13 67:2 69:2 80:22 81:3,8,8 | |
| **scientists** 68:14 | | | **significant** 91:2 |
| **scope** 30:4,8 | | | **significantly** 69:21 |
| **scotland** 91:20 | | | **similar** 51:23 55:21 59:2 |

**[simple - stepping]**                                Page 26

**simple** 34:15 36:21,24,25 60:8

**simplistic** 41:15

**simulation** 35:15,16 54:4 58:19,23

**simulations** 59:22

**simultaneous** 13:13 28:19 37:23 67:25

**single** 16:10 17:5 76:13

**sio** 2:14 86:24

**sir** 10:18 36:24 63:21

**sitting** 28:2

**situation** 66:4

**size** 37:5 41:4 42:22 44:7,17 44:21 45:10 50:22,24 51:1 52:23 54:12 55:8,16 60:21 60:25 61:11,16 61:16,20 62:11 68:24 69:3,4 82:12,13 83:10 83:11,24 85:18 85:23,25 86:18 90:10

**sizes** 57:11

**slightly** 58:25

**sloughed** 61:2

**small** 26:20 40:13

**smart** 41:9 93:12

**solely** 95:15 97:11

**somewhat** 48:7 87:25

**sorry** 6:11,17 22:14 24:17,25 25:6 26:9 27:11 28:6 29:9,17 33:10 33:11 39:13 42:24 53:19 59:11 62:25 65:20 77:22 83:2,4 91:16

**sort** 9:21 10:22 32:9 42:1 44:10 47:21 64:18 65:7 77:19 81:16 90:5

**sounds** 5:14 71:9 77:11 79:16,17 83:14

**source** 42:5

**spans** 75:24

**speak** 5:6

**speaking** 13:8 13:13 28:19 37:23 67:25 86:21

**speaks** 52:9

**special** 29:5

**specific** 26:24 40:16 61:12 72:18 95:21

**specifically** 34:8 95:5

**specifics** 64:22

**spend** 6:20 53:16

**spending** 40:15

**spent** 52:22 67:18

**split** 38:8 39:15

**spoke** 92:17

**spotted** 7:18

**square** 58:12

**squirrely** 46:14

**stand** 20:1 67:10

**standard** 9:21 56:14 66:14,16

**stands** 49:12

**start** 5:21 33:22 38:14 45:4 59:24 60:9

**started** 33:12 33:13

**starting** 35:1

**state** 4:5 29:14 47:2 68:19 77:22 95:10 97:2

**stated** 21:14,16 23:23 24:11,24 25:19 85:17 92:16 97:4

**statement** 17:16,18 21:13 26:15 27:17 58:7 99:8

**states** 1:1 89:10

**stating** 22:17 80:16

**stations** 90:13

**statistical** 9:3 9:13 28:7,23 29:17 30:25 31:9,15 32:10 33:1,15 34:5 49:2 65:8 69:12 71:17

**statisticians** 63:23

**statistics** 44:13

**step** 53:17

**stephen** 1:11 4:3,17 27:10 98:2

**stepped** 10:15

**stepping** 81:12

Stephen J. Popick , Ph.D.                                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[steps - tendered]**                                              Page 27

steps   40:16
stone   60:11
stop   63:4
strike   22:16
  50:2
strikes   13:2
  52:1
strong   84:4
stronger   37:20
  76:21,21
stuff   32:6 52:10
style   91:21
subcontractor
  95:11,16 97:12
subject   9:15
submit   17:25
submitted   18:1
  18:4 27:5 66:1
  95:24,25
submitting
  56:20
subscribed
  100:21
subsequently
  13:11
substance
  18:10 99:7
substantially
  51:23 73:10,17
  76:15 77:24
succinct   34:25
sucker   85:19
sufficient   22:18
  71:25

suggest   63:9
suitability   2:10
suite   3:12
  98:19
sum   34:25
summarization
  22:23
summarize
  41:4,5 43:3
superior   48:18
supplemental
  5:22 29:8
support   9:7
  12:20 13:1
  72:4 73:3,16
  75:12 78:18,21
  80:18,19 84:5
  84:11
supported   79:5
supporting
  64:9 78:13
supportive
  52:2
supports   88:22
suppose   51:21
supposed   26:9
  87:22
sure   6:7 8:7,15
  8:24 11:10
  13:7,8 28:5
  30:2 31:1,3,10
  31:13 32:4
  36:2,13,17
  38:21 40:5,6,9

40:20 43:8
50:19 54:14
59:14 62:9
72:17 74:12,14
74:24,24 79:12
79:23 80:2
81:20 85:2
89:6
surrounding
  25:23 92:2
suspect   51:9
swear   4:16
swoop   93:18
sworn   4:6,10
  4:13,18 5:1
  100:21
system   50:21
  67:1 91:13

**t**

table   73:2,2
  75:8 76:10
  78:24 91:14,16
tables   9:8
  10:22 11:4
  28:16 81:15
  90:10
take   7:4 10:2
  24:6,8 37:6
  45:13 57:21
  59:22 60:13
  72:16 87:24
  92:8

taken   1:14 7:14
  44:13 75:23
  97:4
talk   10:5 30:24
  36:14 38:23
  41:4 50:14
  62:25 64:2,4
  64:12 93:6
talked   16:3
  18:19,20 20:4
  21:11 44:22
  64:3,11,22
  65:7 71:3,13
  72:9 73:20
  81:20 92:23
talking   21:9
  32:24 35:25
  53:17,20,23
  58:18 62:5
  67:18 75:11
  81:11 88:8
  90:14,15 91:10
  91:11,12
talks   88:17,20
teams   47:3
technical   6:11
tell   49:7 59:18
  63:12 80:5,6
  82:20 85:16
telling   9:18
tells   44:9 79:4
tend   45:2
tendered   29:15
  29:16

**tendering** 29:14

**terms** 41:15 95:16 97:12

**terrible** 57:16

**test** 80:17,25 81:7

**testified** 4:19 58:15 77:20

**testify** 12:22

**testifying** 13:14 46:7 56:23 83:9,13 91:5

**testimony** 13:18,20 22:2 26:2 99:2,8

**testing** 47:19

**text** 75:8

**thank** 4:16 6:17 20:7 35:24 39:1 41:23 73:8

**thin** 36:10 45:5 60:4,20 61:16

**thing** 37:21 67:17

**things** 32:19,21 37:5 43:25 44:19 49:9 51:20 58:10 59:9 61:6 64:12 81:24

**think** 4:25 9:25 9:25 10:2,6,23

15:23,25 16:17 18:20 21:10,12 21:24 23:8 24:21 25:16 29:1 31:11 35:10 37:9 42:20,24,24 44:11,12 46:19 52:9,18 53:11 55:3 58:7,19 58:20,21,25 61:19 62:21 66:8,11 73:13 75:10 77:19 78:24 79:1,25 81:12,14 82:1 82:3,12,14 83:19,20,21 84:4,22 85:1 87:1,22 88:5 88:23 90:20 93:11,12

**thinking** 51:19 52:5 59:4 64:23

**thinks** 82:10

**third** 24:20 25:15 78:9

**thomas** 3:20

**thornburg** 67:20

**thoroughly** 7:11

**thought** 10:9 10:15 13:5,20 13:23 17:17 25:25 36:18 63:16 67:1 74:21

**thoughts** 63:18 66:23

**three** 36:6,13 36:15 61:17 81:10,14,25

**threshold** 45:11,25 50:24 52:24 53:2 55:6,22 68:12 69:12 85:18 86:17

**thresholds** 55:16 60:21 68:20

**time** 4:2 5:11 6:12,15 10:2 13:5 20:7 24:6 24:8,18 31:17 32:1,5 33:21 36:3 42:15 47:25 48:11 49:1,9,11 50:10 51:4,9 51:11 52:1,13 52:22 53:16 56:25 57:18 59:23 65:10,10 66:10 67:18

70:5,8 74:25 81:15 82:17,19 88:11 91:3 92:10,13 94:1 95:22 98:14

**times** 14:15 54:21 56:15,17 60:3,4 61:10 85:20

**tip** 47:5

**tippy** 53:15

**title** 39:14

**today** 4:8 7:8 9:23 22:17 28:2 39:4 44:25 82:22 93:16

**today's** 4:1 93:25

**together** 41:6 41:17 91:24

**told** 17:24

**took** 44:23

**tool** 86:6

**tools** 44:6 48:9 48:10

**top** 40:14,16,17 44:6 47:7,11 47:19 53:15 59:23,25 62:5 79:24 80:1

**total** 41:20 87:3

**totals** 35:15,16 35:16,18,22,23

Stephen J. Popick , Ph.D.                    April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[totals - useful]**                              Page 29

| | | | |
|---|---|---|---|
| 80:10 | trying   14:9 | unadjusted | unfortunately |
| **touching**   32:6 | 24:17 26:22 | 37:7 | 76:23 |
| **tracing**   22:8 | 29:18,19 35:3 | **uncertain** | **united**   1:1 |
| **track**   53:6 | 38:12 40:16,22 | 83:18 | **update**   49:12 |
| **train**   36:18 | 42:25 43:7 | **uncertainty** | 49:13 |
| **transcript**   2:4 | 45:23,23 47:7 | 81:4 83:10,11 | **updated**   11:3 |
| 6:23 7:8 95:22 | 53:16 54:23 | 84:7,15 | 43:9 49:10 |
| 97:4,6 98:7,12 | 56:4 58:12 | **uncovering** | 68:23 79:9 |
| 98:14 99:2 | 60:8,9,15 | 31:8 | 85:5 |
| **transcripts** | 61:21 62:8 | **under**   17:17 | **uploaded**   96:2 |
| 95:22 96:1 | 82:9 83:20,21 | 18:22,25 19:3 | **use**   5:17 31:20 |
| **transformation** | **turn**   11:6 76:7 | 19:6,15 30:3 | 32:11 36:18 |
| 41:1 | 87:3 | 76:13,15 80:15 | 40:11 47:15,16 |
| **transforms** | **turnover**   90:10 | 80:25 81:7 | 48:24 49:23,25 |
| 43:1 | **two**   33:6,7 34:9 | 97:5 | 50:5 53:3 55:8 |
| **trial**   5:17 32:2 | 34:13 56:17 | **underlying** | 55:17,17 56:2 |
| 60:11 | 66:18 81:17,23 | 22:12 32:14 | 56:6,21,22 |
| **trick**   83:20 | 81:24 83:19 | 33:6 34:19 | 60:12 62:8 |
| **tried**   20:21 | 85:13,15 | 46:12,22 47:17 | 70:3 74:3 81:6 |
| 60:22 61:14 | **typewriting** | 48:2,3,6,11 | 81:10 86:6 |
| **triple**   77:16 | 97:5 | 71:22 | 99:9 |
| **tripping**   23:9 | **typically**   31:20 | **undersigned** | **used**   22:10 |
| **trouble**   47:11 | 50:17 | 99:2 | 27:22,25 31:24 |
| 81:24 | **typing**   35:4 | **understand** | 32:25 35:1 |
| **true**   2:12 37:21 | **typo**   12:9 13:22 | 5:10 12:1 27:1 | 42:15 45:7 |
| 61:15 84:21,25 | 13:24 | 29:21 30:15 | 47:24,24 48:16 |
| 89:23 90:3 | **typos**   7:16,18 | 35:24 83:22 | 49:1,4,8,14,16 |
| 92:4 95:23 | **u** | **understanding** | 49:24 50:4,8 |
| 97:6 | | 44:21 50:9 | 50:10 53:11 |
| **truly**   44:9 | **uh**   5:9 17:1 | 71:1 | 56:21 75:19 |
| **try**   5:8 23:10 | 36:11 42:3 | **understatement** | 76:6 85:23 |
| 35:10 36:21,24 | 47:9 68:22 | 45:19 | 89:3 92:21 |
| 50:19 51:12,25 | 77:3 | **understood** | **useful**   91:22 |
| | | 84:23 | |

Veritext Legal Solutions
800.808.4958                                      770.343.9696

**[uses - wide]**                                                    Page 30

uses  47:18
using  11:16
  33:1,3,4,12,14
  33:22 37:6,22
  42:14 43:17
  46:24 47:23
  48:8 68:23
  72:25 90:17

**v**

v  29:16 31:14
  67:20 89:4
vacuum  24:20
  25:16
valid  86:6
value  34:23
  37:21 53:4
  79:3 84:21,25
  90:3 92:4
values  2:13
  35:15,17 41:15
  43:5 45:5,20
  45:24 51:1
  61:16 72:14
  74:3,6,11,13
  75:24 77:25
  79:2 80:7,22
  80:23 81:3
  84:8,14 89:23
variations
  56:10,12
varied  74:22
various  47:4

vehtari  54:21
  54:22
verbatim  95:13
veritext  95:11
  95:19 98:10,18
version  49:2,5
  49:8,25
versions  34:9
  49:7,10 60:22
versus  41:20
vets  32:9
video  1:10 94:2
videoconfere...
  1:14
videographer
  3:21 4:1,15
  6:12,15 70:5,8
  92:10,13 93:25
videotaped  4:3
viewed  27:6
viewpoint
  26:24
violation  89:20
visible  46:16,18
vote  40:25 43:2
  80:10
voted  80:20
voter  17:11
  75:12 88:18
voters  14:21
  15:24 16:6,7
  17:5,9,11
  24:12,14 26:19
  71:24,24 73:3

78:13 79:5
  80:18,18,23
  84:5
votes  14:21
  71:25 87:2
voting  9:5 14:6
  16:11 21:20
  24:14 26:14,19
  29:17 30:5,22
  32:18,18 67:14
  67:15 71:22
  81:1,18 84:17
vs  1:6

**w**

wait  27:9,9,10
  27:10
walking  20:8
want  6:6 11:10
  12:19 13:8,9
  15:15 29:14
  30:24 31:20
  36:17 38:5
  39:2 41:3,14
  43:2,6 46:14
  50:14 51:20,22
  56:14 59:15,24
  61:13 62:4,25
  69:2 72:13
  74:8 82:25
wanted  7:13
  8:24 13:6 45:4
  93:21

wants  81:14
warning  46:25
  47:3,6,10,13
  63:11,15
warnings  48:25
way  9:22 11:25
  38:6,6 39:6,6
  42:7,7 43:19
  43:20 50:1,2,5
  50:17 62:10
  85:1 86:19
ways  21:23
  69:14
we've  59:8
  64:15 70:12
  71:3 72:9
  81:20 88:8
  91:17
website  32:8
  48:22,23
weeks  4:25
weird  46:13
  55:17
went  5:4 19:11
  20:19,20 36:1
  42:9 52:25
  66:18 77:4,6
white  9:6 16:7
  17:5 71:24
  72:4 80:18
  84:11
wide  56:9
  74:20 79:8,9

Stephen J. Popick , Ph.D.                                April 2, 2026
Driver, Courtney, et al. v. Houston County Board of Elections, et al

**[widen - ×]**                                                   Page 31

| | | |
|---|---|---|
| **widen**  76:15 | **wrong**  32:12,13 | × |
| **widening**  86:11 | 34:14 47:14 | × 2:11 |
| **wider**  75:25 | 57:9 59:12 | |
| 88:9 | 73:13 74:25 | |
| **width**  77:25 | 85:9 | |
| **williams**  78:14 | **x** | |
| 78:18 79:5 | **x**  75:19 90:25 | |
| **win**  17:7 | **y** | |
| **witness**  19:14 | **yeah**  8:8 11:14 | |
| 24:22 25:4,17 | 14:12 17:4 | |
| 27:11 30:20 | 18:15,15 22:11 | |
| 38:15,18,21,24 | 23:12,13 36:13 | |
| 65:23 | 38:11,12 43:8 | |
| **witnesses**  95:25 | 54:14 64:20 | |
| **wondering** | 70:4 76:2,17 | |
| 28:22 | 77:5,8 78:24 | |
| **words**  58:20 | 80:2 85:2 | |
| **work**  9:24 10:3 | 89:25 | |
| 12:23 18:24 | **years**  31:25 | |
| 31:19 32:17,23 | 64:16 | |
| 33:22 44:3 | **yep**  8:17 36:9 | |
| 54:20 56:22 | 71:1 | |
| 58:24 64:10 | **yields**  89:15 | |
| **worked**  31:22 | **z** | |
| **working**  66:8 | **zealand**  91:19 | |
| **works**  67:22,24 | **zelig**  33:13 | |
| 68:2,4 | 48:15 | |
| **workshops** | **zeligei**  31:15 | |
| 44:24 | **zoom**  5:7 | |
| **worth**  81:12 | | |
| **write**  38:3 54:5 | | |
| **writing**  66:9 | | |
| **written**  55:7 | | |
| 64:1 | | |

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.