**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| COURTNEY DRIVER, *et al.*,<br><br>    *Plaintiffs,*<br><br>        v.<br><br>HOUSTON COUNTY BOARD OF<br>ELECTIONS, *et al.*,<br><br>    *Defendants.* | Civil Action No. 5:25-cv-0025-MTT |

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF
DR. STEPHEN J. POPICK**

Pursuant to Federal Rule of Evidence 702, Defendants Houston County

Board of Elections and Pamela Morgan, in her official capacity, submit this Motion

to Exclude the Testimony of Stephen Popick, Ph.D. This Motion seeks to exclude

Dr. Popick's testimony from both trial and from this Court's consideration of

Defendants' Motion for Summary Judgment (Doc. 63). *See Chapman v. Procter &*

*Gamble Distrib., LLC*, 766 F.3d 1296, 1313 (11th Cir. 2014) (citation omitted) (only

admissible evidence can be considered on a motion for summary judgment).

**I.      Introduction.**

Plaintiffs proffered Dr. Stephen J. Popick as an expert statistical analyst "to

determine whether voting in elections for the Houston County Commission is

racially polarized." Expert Report of Stephen J. Popick, Ph.D. dated December 24,

2025, p. 3 (the "Original Rep." filed at (Doc. 63-5)). Rule 702 of the Federal Rules of Evidence requires not only that the expert be qualified but also that the proffered testimony is "the product of reliable principles and methods" and that the expert's opinion reflects "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). As further explained below, Dr. Popick's analysis and testimony fail to satisfy the threshold requirements for admissibility of expert testimony under Rule 702 and *Daubert v. Merrill,* 509 U.S. 579 (1993).

## II.    Factual background.

Dr. Popick submitted three expert reports in this case between December 24, 2025 and March 19, 2026. His initial report and rebuttal report to Houston County's expert, Dr. Michael Barber, were filed prior to Dr. Popick's first deposition on March 13, 2026. Six days after that deposition, Dr. Popick unilaterally filed a "corrected report" on March 19, 2026, purportedly to correct a "minor statistical error" he uncovered upon "reflect[ing]" on the questions he received during his deposition. Deposition of Stephen Popick (Apr. 2, 2026) (Doc. 68) at 9:17-10:8 ("April Dep."). Dr. Popick gave a second deposition with counsel for Houston County on April 2, 2026, to explore the reasons for the corrected report and to discuss its effect on his analysis and conclusions.

### A.     Dr. Popick's original report (December 24, 2025).

On December 24, 2025, Dr. Popick served his opening expert report. (Doc. 63-5). The report analyzed eight at-large general and special elections in Houston County for various offices held between 2016 and 2024 and concluded that voting in each was racially polarized. *Id.* at 21. Dr. Popick used three statistical techniques—Ecological Regression (ER), Iterative Ecological Inference ("Iterative EI"), and Ecological Inference RxC ("EI RxC"). Dr. Popick identified in his report and confirmed in his deposition that iterative EI is "the best suited for the kind of data in Houston County." March 13, 2025 Deposition of Stephen Popick (Mar. 13, 2026) (Doc. 67) ("March Dep."). *See also* Original Rep. at 13–14. The "kind of data" Dr. Popick refers to here is important for purposes of understanding the problems with Dr. Popick's analysis.

Houston County is not a particularly large county in Georgia. It contains seventeen precincts and there are *zero* homogenous Black precincts. Dr. Popick conceded that each of the statistical methods he used to conduct his analysis of voting patterns "work better" when there are homogenous precincts. April Dep. at 67:21–68:4. He also conceded that the statistical methods he employed "work better" when there are more precincts to analyze. *Id.* These data limitations and the way in which Dr. Popick undertook his original analysis produced Iterative EI point estimates of Black voter support for Black-preferred candidates ranging

from 56.1% to 83.6%, with Confidence Intervals ranging from a 7-point spread to a 15-point spread.[1]

### B.    Dr. Barber's expert report (January 23, 2026).

Houston County retained Michael Barber, Ph.D., Associate Professor of Political Science at Brigham Young University, to evaluate Dr. Popick's analysis. Dr. Barber served his rebuttal expert report on January 23, 2026 (the "Barber Rep." attached as Exhibit A). In it, Dr. Barber critiqued the reliability of Dr. Popick's application of Ecological Inference to the Houston County data, observing that Dr. Popick's point estimates varied substantially and his confidence interval breadth both within and across estimation techniques "offer little meaningful information about the true underlying preferences of the population." Barber Rep. at 26.

### C.    Dr. Popick's rebuttal report.

On February 6, 2026, Dr. Popick served a rebuttal report responding to Dr. Barber's criticisms ("Popick Rebuttal" attached as Exhibit B). Dr. Popick defended

---

[1] Confidence intervals, as used in Dr. Popick's analysis, are designed to present the likely range of outcomes of a true value of the thing or event being measured to a 95% certainty. So, as Dr. Popick put it, "[t]he use of confidence intervals along with point estimates provides courts with context on the possible range of voter behavior." Original Rep. at 11. "If your confidence interval is 75 [on the low end] to 80 [on the high end], I believe the answer is between 75 and 80." March Dep. at 72:1–3. Thus, all else being equal, even if a particular point estimate does not actually represent the true value of the thing being measured, confidence intervals should contain the correct answer (in theory) 95% of the time.

his original point estimates and confidence intervals, stating that "each of Dr. Barber's critiques of my opening report lacks merit," and reaffirmed his analysis and findings. *Id.* at 1–3, 17.

**D.     Dr. Popick's first deposition (March 13, 2026).**

Dr. Popick's first deposition was taken on March 13, 2026. Questioning principally revolved around three areas: (1) Dr. Popick's background as a statistician in voting rights cases; (2) the extent to which courts have accepted his opinion and the circumstances around that acceptance; and (3) the application of the three analytical techniques used to arrive at his conclusions. During that deposition, Dr. Popick admitted he had no way of reproducing the results he set forth in his expert report and that "it would be shocking to [him] if you were able to rerun the simulation… to get the same numbers[.]" March Dep. at 138:19–22. Dr. Popick also could not answer questions regarding the discrete parameters utilized in his analysis, saying "I'm going to have to back to my—to the manual there." *Id.* at 101:3–5. Dr. Popick's testified that the Republican primary he analyzed in his report was not racially polarized, but also that his conclusion was based on a complete lack of data rather than any affirmative data related to racial polarization. *Id.* at 132:5–11.

### E.    Dr. Popick's "corrected" report.

Six days after his deposition, on March 19, 2026, Dr. Popick served what he styled a "corrected" expert report. ("Popick Corrected Rep." filed at (Doc. 63-6)). He claimed that the corrected report made only a minor change from the original report appeared in a new footnote 22, which stated:

> Following my deposition on March 13, 2026, I discovered a minor error in my statistical code. . . . This correction does not change my original finding of racially polarized voting, but it does materially change some of the individual estimates of White and Black support for particular candidates in particular elections.

Popick Corrected Rep. at 8 n.22.

In this footnote, Dr. Popick identified some of the changes he made but not all of them. The revisions covered by Dr. Popick's footnote included acknowledging that the Iterative EI statistical results changed materially. The change also meant that point estimates for Black cohesion generally increased. And the confidence intervals widened substantially across every election analyzed, at times nearly tripling in width. The new Iterative EI point estimates for Black voter support showed that they were actually outside the 95% confidence intervals reported in the original analysis in seven of the eight elections. Popick Corrected Rep. at 14–20 & tbls.; April Dep. at 85–86.

In addition, Dr. Popick deleted the reference to footnotes 1–4 in footnote 20 of the original report—the four prior case citations from his time at DOJ that he

originally claimed represented instances of his methodological application having been previously "accepted by courts." He also removed his conclusion regarding racial polarization in the Republican primary, which he acknowledged in his first deposition was not based on any data. March Dep. 132:5–11.

**F.      Dr. Popick's second deposition (April 2, 2026).**

Based on agreement of counsel, Dr. Popick was deposed a second time on April 2, 2026, following service of the corrected report. During that deposition, Dr. Popick confirmed that he had not attempted to re-run his original statistical code before replacing it. *See* April Dep. 51:18–20 ("Why would I rerun it when I was thinking about reliability and said, you know what, I want to change some things.") Despite concluding that his original report needed to be corrected without rerunning the analysis to check if anything was wrong with it, Dr. Popick maintained in his deposition the position that his original report was still credible.

Q. You feel that your original analysis was a credible analysis?

A. I do.

*Id.* at 67:3–5. He further acknowledged that his corrected report included a "set-seed" command which would allow a third party to reproduce the corrected results. *Id.* at 53:11–13. He then conceded that he had arrived at the chosen parameter values by running the 2016 election analysis ten to fifteen times, varying one parameter at a time, until the "effective sample size" crossed the threshold he

7

was targeting. *Id.* at 45:8–12 ("I kept changing those parameters, iterating, you know, until I saw effective size, right, get to be above the needed threshold, and then once I had that, boom, I'm off to the races."). He further conceded that "effective sample size" does not in fact measure whether the simulation has converged on an accurate model. "It's not measuring chain convergence… it's measuring what are your number of effective samples that you have in your data." *Id.* at 69:7–10. These are two different concepts, *id.* at 69:4–7, and Dr. Popick admitted he had run no separate chain-convergence diagnostic in either the original or the corrected analysis. *Id.* 85:21–86:13.

On the statistical premises underlying his reports, Dr. Popick agreed that a 95% confidence interval is understood to contain the true value of the quantity being estimated, and that the point estimate represents the most likely true value. *Id.* at 83:15–85:3. Counsel then presented Dr. Popick with his report showing his corrected point estimates fall outside the original confidence intervals in seven of the eight elections analyzed. *Id.* at 84:24–86:14. His only explanation was that he had been "drawing from the wrong column of data" in the original analysis and had tweaked the parameters. *Id.* at 85:4–20.

Dr. Popick also acknowledged the increasing width of the corrected confidence intervals. For example, the corrected 95% confidence interval for Black voter support in the 2020 District Attorney contest runs from 52.2% to 95.5%. *Id.*

76:7–80:2. Dr. Popick conceded that the lower bound of 52.2% is only 2.2 percentage points above the 50% level, and that the upper bound of 95.5% is "butting up against 100 percent support." *Id*. Similar ranges characterize the corrected confidence intervals for every election analyzed, each spanning roughly 34 to 43 percentage points. *Id.*; Popick Corrected Rep. at 14–20 & tbls.

When presented with peer-reviewed literature, Dr. Popick confirmed that he relies on an article from Plescia & De Sio, entitled An Evaluation of the Performance and Suitability of R×C Methods for Ecological Inference with Known True Values, in the Journal of Quality & Quantity (2018), for the proposition that rolling up candidates with vote shares under 5% improves EI estimation. Popick Corrected Rep. at 7 n.17; April Dep. at 86:21–87:4. When questions about how a portion of the very same article revealed Confidence Intervals very often fail to contain the true value of the thing being measured, Dr. Popick responded that the article was "a little old" and noted that the underlying data were "far from ideal." *Id*. at 88:16-92:7. Dr. Popick refused to concede that the cited literature calls into question the reliability of 95% confidence intervals produced by Ecological Inference. April Dep. at 92:1–7.

### III.   Argument and citation to authority.

### A.   The requirements for expert evidence under *Daubert.*

Rule 702 of the Federal Rules of Evidence and the standards set forth in *Daubert v. Merrill*, 509 U.S. 579 (1993) govern the admission of testimony by experts. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if it is "more likely than not" that:

> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or data;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Civ. P. 702 (as amended Dec. 1, 2023). The recent amendment, adding the "more likely than not" language, was adopted because the "Committee concluded that emphasizing the preponderance standard in Rule 702 was made necessary by the courts that have failed to apply correctly the reliability requirements of that rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

The *Daubert* framework, expands on Rule 702 with a non-exhaustive list for courts to consider prior to admitting expert testimony:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication;

10

(3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (per curiam) (citing *Daubert*, 509 U.S. at 593–94). At issue in this motion are factors (1) and (3).

A central component of reliability under the *Daubert* framework is whether the expert's methodology can be tested and, critically, whether it can be replicated. The Supreme Court in *Daubert* identified "testability" as a key indicator of scientific validity, and as the Ninth Circuit observed on remand from the Supreme Court, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert*, 509 U.S. at 593–94 (1993); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).

Lower courts have recognized that this inquiry encompasses whether a methodology can be independently replicated or verified, including whether an independent analyst following the same methodology would obtain materially similar results. Consistent with these principles, courts routinely exclude expert testimony where the methodology cannot be replicated or independently verified. For example, in *Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 666 (M.D. Fla. 2012), the court excluded experimental testing where the expert failed to document the procedures and conditions sufficiently to

11

allow replication, rendering the results unverifiable. And in *United States v. Cloud*, 576 F.Supp.3d 827, 840-41 (E.D. Wash. 2021), the court found that the inability to replicate or validate the expert's analysis as weighing against admissibility.

When a methodology yields results that cannot be consistently reproduced, the problem is not a dispute over competing interpretations, it is a failure to satisfy the foundational requirement that expert testimony be grounded in reliable methods. *See Rembrandt Vision*, 282 F.R.D. at 666 ("*Daubert*, however, does not ask courts to evaluate whether an expert's opinion is correct; instead, it requires courts to determine whether the expert has used a reliable *methodology*." (emphasis in original)).

Likewise, the Supreme Court has instructed that, "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error[.]" *Daubert,* 509 U.S. at 594. Thus, exclusion is proper when the court concludes "that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

Ultimately, the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert*. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). As the gatekeepers of expert testimony, district courts are obliged to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. That is

particularly true in light of the 2023 amendment to Rule 702. The "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595; *see also Rink v. Cheminove, Inc.*, 400 F.3d 1286, 1290 (11th Cir. 2005) (the methodology by which an expert arrives at his ultimate conclusion is fundamentally flawed if it is not based on sufficiently reliable data or facts). In other words, expert evidence must be "genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Alsip v. Wal-Mart Stores East, LP*, 658 Fed. Appx. 944, 948 (2016). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert[.]" *Allison v. McGhan Medical Corp.*, 184 F. 3d 1300, 1306 (11th Cir. 1999).

**B.    Dr. Popick's analysis is not reproducible, rendering it untestable under *Daubert*.**

Dr. Popick produced two separate analyses that obtained different results with respect to the question of Black voter behavior in Houston County elections. Neither of these analyses can be adequately reproduced. And, ordinarily "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert,* 509 U.S. at 593. As to his first report, Dr. Popick admitted that his original analysis cannot be reproduced and was not created in a manner that permits reproduction. March Dep. 138:15–22. And his corrected analysis ultimately fares no better. Though structurally designed to be reproducible by

13

including a "seed" command that the original report omitted, it was produced by an iterative, ad hoc process that is itself not reproducible.

1. *The original analysis cannot be reproduced.*

Dr. Popick's first analysis fails *Daubert* out of the gate. Dr. Popick admitted he had no way of reproducing the results he set forth in his original expert report and stated that "it would be shocking to me if you were able to rerun the simulation… to get the same numbers[.]" March Dep. 138:20–22. The primary reason for this is because he failed to set a seed before running his calculations, which is a standard technique that allows for reproducibility, as he later realized. April Dep. at 53:11–13. Instead, Dr. Popick just assumed the code package he was using would provide a seed for him. *Id.* at 58:5–7.

Surprisingly, Dr. Popick decided to "correct" his original report without ever rerunning his original code to see if his results were acceptable. "Why would I rerun [the original code] when I was thinking about reliability and said, you know what, I want to change some things." *Id.* at 51:18–20. It appears Dr. Popick attempted to remedy this lack of testability in his corrected report by setting a seed, but he revealed in his deposition other ways in which he produced an overall analysis that cannot be replicated or adequately tested.

### 2.    *The corrected report analysis cannot be entirely replicated.*

Dr. Popick's corrected report includes a "seed" that allows his analysis to be reproduced in the narrow sense that running the exact same code again should yield almost the exact same numbers. But the question for purposes of admissibility is whether the methodology itself—the choices the expert made in constructing the analysis—can be replicated by another expert applying the same principles to the same data. This standard is still not met in the corrected report.

Dr. Popick testified that that when he undertook his second analysis, he "had to go back to the underlying packages and rewrite code from scratch[.] April. Dep. at 32:13–16. And instead of selecting adequate parameters, running the analysis and reporting the results, Dr. Popick testified, "I was changing my levers to iterate to get an effective sample size to pass the threshold, not looking at anything else." *Id.* at 50:19–51:2. Dr. Popick's decision not to look at anything else results in an inability to reproduce his results, which calls his methodology directly into question.

Because he continually iterated and "pulled levers" to reach a desired threshold parameter, and then discarded all the prior iterations, his exact methodology cannot be produced and neither he nor anyone else can determine the results of all the various permutations of analysis he carried out. As he

15

explained, "I'm not looking at any of the results. The results don't appear in my log. They are sloughed off, hidden from me." *Id* at 60:22–61:2.

Not only does this methodology hide results that potentially conflict with his conclusions, if such results exist it renders the Court and Dr. Popick himself unable to determine whether those conflicting analyses are actually *superior* to the analysis Dr. Popick ultimately produced. This is particularly problematic because Dr. Popick used "effective sample size" in his parameters to determine whether his analysis was sufficiently reliable, but declined to actually test the chain using scientific methods to determine chain convergence. *See, e.g. id.* at 68:23–69:18. Because it is not possible to reproduce the entire iterative process Dr. Popick engaged in, the Court cannot assess the reliability of the estimations presented in Dr. Popick's corrected report nor determine whether his analysis included results that contradict his conclusions. Dr. Popick is essentially asking us to take him at his word. "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

### C. The known-error rate undermines reliability and Dr. Popick's own cited authority confirms it.

The third *Daubert* factor directs the Court to consider "the known or potential rate of error" of the technique utilized. 509 U.S. at 594. Dr. Popick's two reports considered together highlight the propensity for error when using

Ecological Inference analysis in a data environment like that present in Houston County, Georgia. As an example, the Court may look at the confidence intervals and point estimates for Black voter behavior using Dr. Popick's preferred metric, Iterative EI. His original report contained wide confidence intervals and point estimates that showed relatively low cohesion for the Black electorate in the elections analyzed. Original Rep. at tbl. A1. His corrected report pushed the point estimates higher on the cohesion scale, but they were altered to such a degree that they actually fell *outside* the already wide confidence intervals present in the original report in seven out of eight elections. *Compare id. with* Corrected Rep. at tbl A1. That raises questions regarding the application of Dr. Popick's methodology.

Indeed, when pressed on whether he still found his original report to be a credible analysis, Dr. Popick responded, "I do." *Id.* at 67:3–5. But if the original report was still credible, then Dr. Popick's corrected analysis should contain point estimates that fall *within* the confidence intervals of the original report. Yet in seven out of eight elections measuring Black voter behavior, they do not. This does not trouble Dr. Popick, *id.* at 80:12–15, but it should trouble this Court.

When Dr. Popick was presented with academic literature suggesting that confidence intervals in Ecological Inference analysis often do not contain the true value of the event being measured, he dismissed it as "a little old." *Id*. at 88:16–

17

92:7. That may be, but it was recent enough for Dr. Popick to cite the same article in his report. Corrected Rep. 12, n. 17. Between the academic literature and the results presented in Dr. Popick's two reports, is the fact that the known error rate of the methodologies selected by Dr. Popick, compounded by his own errors in applying them, renders his opinion inadmissible under Fed. R. Evid. 702.

**D.      The corrected confidence intervals are so wide as to be unhelpful to the trier of fact.**

Finally, the extremely wide confidence intervals contained in Dr. Popick's corrected report render the analysis unhelpful to the trier of fact. The second *Gingles* precondition requires Plaintiffs to demonstrate not merely that Black and White voters vote differently, but that Black voters are politically cohesive. *Thornburg v. Gingles,* 478 U.S. 30, 51 (1986). As the Supreme Court explained, "the *degree* of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Id.* at 55–56.

The trouble with Dr. Popick's analysis is that it hardly informs the Court about this issue. In some cases, like the 2020 election for district attorney, he agreed that the confidence intervals covered "basically every possible range of outcomes for Black voters supporting" a particular candidate. April Dep. 78:6–16. On one end of the confidence interval, Black voters barely favor Williams. And on the other, their support for Williams is almost unanimous. Corrected Rep. tbl. A1. That does little to inform the trier of fact of the critical issue of the degree of Black

18

cohesion around a particular preferred candidate. And it is still less informative when considering the fact that Dr. Popick's own analysis shows that a simple tweak of his parameters could lead (and has led) to results outside the supposed confidence intervals.

Because Dr. Popick has been tendered to provide evidence on the threshold *Gingles* factors and has produced analysis that does not assist the trier of fact on that issue, this Court should exclude his opinions and testimony at trial and from this Court's consideration of Defendants' motion for summary judgment.

## IV. Conclusion.

In light of the foregoing, this Court should exclude Dr. Popick's expert reports and testimony from this Court's consideration of Defendants' motion for summary judgment and at trial.

Respectfully submitted this 24th day of April, 2026.

> */s/Bryan P. Tyson*
> Bryan P. Tyson
> Georgia Bar No. 515411
> btyson@clarkhill.com
> Bryan F. Jacoutot
> Georgia Bar No. 668272
> bjacoutot@clarkhill.com
> Diane Festin LaRoss
> Georgia Bar No. 430830
> dlaross@clarkhill.com
> **Clark Hill PLC**

3630 Peachtree Road NE
Suite 700
Atlanta, Georgia 30326
678.370.4377 (phone)

*Counsel for Defendants*