# EXHIBIT A

# Expert Report of Michael Barber, PhD

Dr. Michael Barber
Brigham Young University
724 Spencer W. Kimball Tower
Provo, UT 84604
barber@byu.edu

# Contents

**1  Introduction and Qualifications**                                      **3**

**2  Summary of Conclusions**                                               **4**

**3  Five-District Illustrative Maps**                                      **5**

    3.1  The Existing Structure of the Houston County Commission . . . . . . . . . .    6

    3.2  Five-District Plans Imply Structural Change . . . . . . . . . . . . . . . . . . .    7

    3.3  Failure of the Five-District Plans to Satisfy *Gingles I* . . . . . . . . . . . . .    7

**4  Evaluation of Plaintiffs' Four-District Illustrative Maps**           **10**

**5  Municipalities**                                                      **17**

**6  Precincts**                                                           **18**

**7  Electoral History in Houston County**                                 **23**

# 1   Introduction and Qualifications

I have been asked by counsel for the Defendants to respond to analysis by Plaintiffs' experts, Dr. Popick and Dr. Cervas, in Houston County, Georgia.

I am a professor of political science at Brigham Young University and director of the Center for the Study of Elections and Democracy in Provo, Utah. I received my PhD in political science from Princeton University in 2014 with emphases in American politics and quantitative methods/statistical analyses. In my position as a professor of political science, I have conducted research on a variety of election- and voting-related topics in American politics and public opinion. Much of this research has been published in my discipline's top peer-reviewed journals. I have published more than 20 peer-reviewed articles.

I have worked as an expert witness in a number of redistricting cases in which I have been asked to analyze and evaluate various political and geographic-related data and maps, including in New York, Ohio, Pennsylvania, Louisiana, Alabama, North Carolina, and Georgia. I also served as the court-appointed Mapping Special Master in Michigan to draw remedial districts for the Michigan House of Representatives. I have previously provided expert reports in several other cases related to voting rights, redistricting, and other election-related issues for groups representing both Republican and Democratic interests. Cases in which I have testified at trial or by deposition are listed in my CV, which is attached to the end of this report.

The analysis and opinions I provide below are consistent with my education, training in statistical analysis, and knowledge of the relevant academic literature. These skills are well-suited for this type of analysis in political science and quantitative analysis more generally. My conclusions stated herein are based upon my review of the information available to me at this time and sources have been cited throughout. I am being compensated at a rate of $500.00 per hour. My compensation does not depend in any way on the outcome of the case or on the opinions or testimony that I provide. My opinions expressed herein are my own and do not represent the opinions of Brigham Young University or the Center for

the Study of Elections and Democracy. I reserve the right to update and revise this report as new information becomes available.

# 2    Summary of Conclusions

Based on the evidence and analysis presented below, I draw several conclusions regarding voting and elections in Houston County, Georgia.

- The five-district illustrative maps are not a useful benchmark for evaluating a feasible district-based alternative because they would not preserve the County Commission's existing form of government in which one countywide official serves as the full-time Chair and Chief Executive Officer without increasing the size of the Commission.

- Even setting aside that institutional mismatch, the five-district maps fail on multiple, independent grounds as illustrative plans for *Gingles I*, including (in different maps) the absence of a majority-BVAP district, substantial population inequality, and boundary changes that are driven primarily by race rather than by a balance of traditional districting considerations.

- The four-district illustrative maps are, in principle, the more relevant alternatives because they allow for four single-member districts while retaining the existing countywide executive position. However, none of the three four-district maps contains a majority Black voting-age population district, meaning that none of them satisfies the first *Gingles* precondition as an illustrative plan.

- The race-conscious four-district map also raises additional concerns beyond the failure to reach a BVAP majority, including unusually configured districts that cannot readily be explained by traditional redistricting principles.

- Across all of the illustrative maps, precinct boundaries appear to have received limited weight, as a majority of the county's precincts are split in most maps and some precincts

4

are divided among three or even four districts despite precinct populations being well below an ideal district size.

- Dr. Popick's racially polarized voting estimates vary substantially across estimation strategies, which reduces confidence in any single set of point estimates and is consistent with the fact that Houston County has few precincts and no homogeneous Black precincts.

- Dr. Popick's selection of elections omits several recent countywide contests in which Black-preferred candidates were successful, including countywide Board of Education races and the 2025 Public Service Commission elections in which Black-preferred candidates carried Houston County.

- Dr. Popick also does not analyze contested Democratic primaries, which further limits what can be inferred about whether Black voters are able to translate their preferences into party nominations in elections.

# 3   Five-District Illustrative Maps

Plaintiffs rely on a set of illustrative districting plans prepared by Dr. Jonathan Cervas to support their claim that the existing at-large election system for the Houston County Commission violates Section 2 of the Voting Rights Act. These illustrative plans are offered to demonstrate that Black voters in Houston County are sufficiently numerous and geographically compact to form a majority in a reasonably configured single-member district, as required under the first *Gingles* precondition.

This section addresses the five-district illustrative plans submitted by Dr. Cervas. As explained below, these plans fail on multiple, independent grounds to meet the first *Gingles* precondition. Some defects arise from the legal limits of Section 2 remedies. Others arise from basic redistricting principles, including population equality. Others arise from issues

of racial predominance. Each of these deficiencies is independently sufficient to undermine the probative value of the five-district plans. Taken together, they demonstrate that these plans cannot be relied upon to establish a viable Section 2 claim or to define the scope of any permissible remedy.

## 3.1    The Existing Structure of the Houston County Commission

Any evaluation of an illustrative remedy must begin with an understanding of the governing institution at issue. The Houston County Commission consists of five elected officials chosen through county-wide elections. These five positions, however, are not identical in function or authority. One commissioner, elected from Post 1, serves as the full-time Chair and Chief Executive Officer of the County.[1] This position carries executive responsibilities that are distinct from those of the remaining commissioners and receives a different, much higher salary.[2] The other four commissioners serve in part-time roles and function primarily as members of a legislative body. This distinction reflects an institutional design in which executive authority is vested in a single, county-wide official, while policymaking authority is shared among the remaining members of the commission. That design has direct implications for what might constitute a permissible change under Section 2.

Based on my experience as an expert witness in Section 2 redistricting litigation, I am not aware of any case in which a court has required a jurisdiction to increase the size of a legislative body or to alter the internal structure of governmental authority, such as by reallocating executive and legislative powers among elected officials or increasing the overall size of the commission. The remedies in Section 2 cases with which I am familiar have focused on changing the method by which existing offices are elected, rather than changing the number of offices or the roles those offices perform.

---

[1] `https://www.houstoncountyga.gov/commissioner/contact-information.cms`

[2] `https://library.municode.com/ga/houston_county/codes/code_of_ordinances?nodeId=` `PTIRELA_ARTIBOCO_S1.8PODUCH`
`https://library.municode.com/ga/houston_county/codes/code_of_ordinances?nodeId=PTIRELA_` `ARTIBOCO_S1.3COME`

## 3.2    Five-District Plans Imply Structural Change

Dr. Cervas submits three illustrative plans that divide Houston County into five single-member districts. Each of these plans converts all five commission seats into districted positions. None retains a county-wide, at-large position corresponding to the full-time Chair and Chief Executive Officer. This creates an immediate problem. If the county were to adopt a five-district plan while retaining a county-wide executive, the result would be a six-member governing body rather than a five-member one. This alters the size of the governing body itself. If, instead, the county-wide executive position were eliminated, the structure of county government would fundamentally change.

Dr. Cervas relies on the Houston County Board of Education districts as a benchmark for his five-district plans. That reliance does not cure the structural changes described above. The Board of Education does not consist solely of five districted members. It also includes two at-large members. Moreover, the Board does not include a full-time elected executive analogous to the County Commission Chair. Thus, even if one were to accept the Board of Education as an appropriate comparator, its structure underscores rather than resolves the problem with the five-district commission plans. Mirroring the Board of Education would require a mixed system of districted and at-large seats, which would again, under a five-district plan, expand or restructure the County Commission.

## 3.3    Failure of the Five-District Plans to Satisfy *Gingles I*

Even setting aside the structural defects discussed above, the five-district plans fail to satisfy the requirements of *Gingles I* in several important respects. The first *Gingles* precondition requires that the minority group be sufficiently large and geographically compact to form a majority in a single-member district. This requirement is not satisfied by a district that merely approaches 50 percent or that contains a large minority plurality. In my experience working in Section 2 cases, it requires an actual majority of the voting-age population. Illustrative plans that fail to produce a majority-minority (in this case, Black)

7

district cannot, in my experience, demonstrate *Gingles I* feasibility.

**The Board of Education-Based Plan**

This plan produces a district with a majority Black voting-age population, reported at approximately 53.7 percent (see Table 1 below for population and racial statistics for each map).

**The Race-Blind Five-District Plan**

Dr. Cervas's race-blind five-district plan does not contain a single district with a majority Black voting-age population. According to his own reported figures, the district with the highest Black voting-age population reaches only 43.9 percent (see Table 1 below). That fact alone disqualifies the plan as a valid *Gingles I* comparison. In my experience, a plan that does not produce a majority-BVAP district cannot be used as a valid *Gingles I* illustrative map.

**Race-Conscious Five-District Plan**

The race-conscious five-district plan includes a district with a majority Black voting-age population, at 52.02%. However, it fails to satisfy basic population equality requirements. Two districts exhibit extreme population deviations. District 4 is underpopulated by approximately 18 percent, while District 5 is overpopulated by approximately 18 percent (see Table 1 below). These deviations are far outside any acceptable range for local redistricting and are not explained or justified in the report. Population equality is a foundational redistricting principle. A plan that violates population equality to this extent cannot be considered reasonably configured.

Dr. Cervas describes the race-conscious plan as having been created by taking the race-blind plan and then modifying it using race to achieve a majority Black district. He does not identify any additional traditional redistricting principles guiding these modifications.

8

On its face, race was the predominant factor driving the configuration of district boundaries. The plan is not described as balancing race against respect for precinct boundaries, political subdivisions, communities of interest, or any other traditional redistricting principle. Race is presented as the operative criterion. Even in the Section 2 context, in my experience, race cannot be the sole or overriding factor in drawing district boundaries.

Figure 1 shows the areas that were altered from the five district race/party blind map to the race conscious map in order to make District 1 a majority-BVAP district. The area of District 1 that remains in both versions of the map are colored Blue and noted '1-1'. As can be seen in the map, District 1 sheds the area on the southern side of the district to District 4 (indicated by 1-4 on the map). These areas are colored red in the map and have a collective 2020 population of 11,556 and a BVAP of 21.5%. Then, the district adds territory on the western side of the district from Districts 2 and 3. These areas are colored green in the map and have a collective population of 11,244 and a BVAP of 43.9%.

Each of the five-district plans suffers from at least one fatal defect. The Race/Party blind map fails to satisfy *Gingles I* majority BVAP requirement. The race conscious map violates population equality and relies predominantly on race without reference to any other traditional districting principles. All three maps require a restructuring of the County Commission to either 1) increase the size of the commission from five to six to have five districts and an at-large full-time member, or 2) if keeping the commission at five members, reassign this executive authority from a full-time, at-large member to one that would represent only a portion of the county.

Because of these issues, any valid Section 2 analysis must therefore focus on the proposed four-district plans that convert the four part-time at-large seats into single-member districts while preserving the existing county-wide executive position.

9

Figure 1: Cervas 5-District Plan: Changes to District 1 from Race/Party Blind to Race Conscious Map



Changes to District 1 from Race/Party–Blind to Race–Conscious Plan
Annotations show 'old district–new district'

# 4    Evaluation of Plaintiffs' Four-District Illustrative Maps

Unlike the five-district illustrative plans discussed above, the four-district plans submitted by Dr. Cervas are, in principle, more plausible alternatives from an institutional standpoint. A four-district configuration would allow Houston County to retain its existing governmental structure, with four commissioners elected from single-member districts and one commissioner elected countywide to serve as the full-time Chair and Chief Executive Officer.

For that reason, the four-district plans do not raise the same concern about altering

the form of government by changing the size of the governing body or reallocating executive authority. Instead, the relevant question for these plans is whether they satisfy the requirements of *Gingles I* and whether they are reasonably configured according to traditional redistricting principles.

As explained below, all three four-district plans fail at the first step of the *Gingles I* inquiry because none creates a district with a majority Black voting-age population. In addition, the race-conscious four-district plan exhibits the same types of defects present in the five-district race-conscious plans, including racial predominance and configuration problems.

The first *Gingles* precondition requires that the minority group be sufficiently large and geographically compact to constitute a majority in a reasonably configured single-member district. In my experience, a district that falls short of an outright majority Black voting-age population does not satisfy this requirement and cannot serve as a valid illustrative plan for purposes of *Gingles I*.

**Board of Education-Based Four-District Plan**

The first four-district plan that Dr. Cervas presents is based on the Houston County Board of Education districts. This plan does not contain a district with a majority Black voting-age population. According to Dr. Cervas' report, the district with the highest Black voting-age population (District 4) reaches only 47.2 percent (see Table 1 below). Because this plan does not produce a majority-BVAP district, it fails to satisfy *Gingles I* and cannot be used to demonstrate that Black voters are sufficiently numerous and geographically compact to form a majority in a single-member district under a four-district framework.

**Race-Blind Four-District Plan**

The second four-district plan is described as having been drawn without consideration of race or party. This plan likewise fails to produce a majority Black voting-age population

district. The district with the highest Black voting-age population (District 1) in this plan reaches only 45.65 percent (see Table 1 below). The race-blind plan does not contain a majority-BVAP district and therefore cannot establish *Gingles I.*

**Race-Conscious Four-District Plan**

The final four-district plan is explicitly race-conscious. Dr. Cervas reports that District 1 in this plan has a Black voting-age population of 50 percent. However, this number is rounded up. When examined more precisely, the Black voting-age population of District 1 is approximately 49.97 percent (see Table 1 below). This distinction is important because the district in question is also not majority BVAP. Even accepting the race-conscious design of this plan, it fails to produce a majority Black district. As a result, none of the four-district plans submitted by Plaintiffs satisfies the first *Gingles* precondition.

In addition to failing to produce a majority-BVAP district, the four-district race-conscious plan raises additional concerns that further limit its probative value. Dr. Cervas does not describe any traditional redistricting principles that guided the drawing of the four-district race-conscious plan aside from race. He does not explain how considerations such as respect for political subdivisions, preservation of communities of interest, or any other traditional redistricting criteria were balanced against the use of race. As with the five-district race-conscious plan, the absence of any articulated non-racial criteria suggests that race predominated in the drawing of this plan. From the perspective of an expert evaluating illustrative maps, this limits the usefulness of the plan as a demonstration of reasonably configured districts.

The four-district race-conscious plan also exhibits configuration problems that are apparent from the shape of the districts themselves. Figure 2 shows the districts' unusual shapes. For example, District 3 wraps almost entirely around District 1, creating a backwards "C" shape. District 1 is nearly embedded within District 3 and contains its own donut hole where territory has been removed from its interior. District 2 includes an appendage that

extends eastward into the center of District 1 in a manner that is difficult to explain via any traditional districting principles.

Figure 2: Cervas 4-District Race Conscious Plan



These shapes reflect tentacles, appendages, and irregular boundaries that are immediately apparent upon visual inspection and are not readily explained by adherence to other traditional criteria like preservation of precinct or municipal boundaries. Such features are precisely the types of characteristics the Supreme Court has identified as indicators that a proposed illustrative district is not reasonably configured. In *Allen v. Milligan*, the Court explained that signs of an unreasonably configured district include the presence of "tenta-

cles, appendages, bizarre shapes, or any other obvious irregularities".[3]  The race-conscious four-district plan exhibits multiple such features.

Figure 3 shows the areas that were altered from the four district race/party blind map to the race conscious map in order to make District 1 a majority-BVAP district. The area of District 1 that remains in both versions of the map are colored Blue and noted '1-1'. As can be seen in the map, District 1 sheds the area on the northern, eastern, and southern edges of the district to District 3 (indicated by 1-3 on the map) as well as a small chunk of territory in the center of the district to District 2 (indicated by 1-2 on the map). These areas are colored red in the map and have a collective 2020 population of 8,420 and a BVAP of 21.4%. Then, the district adds two 'earmuffs' of territory on the western side of the district. These areas are colored green in the map and have a collective population of 7,375 and a BVAP of 40.5%.

Figure 4 shows a block-level BVAP map overlaid with Dr. Cervas's race-conscious four-district plan. This map provides additional context for how the districts were configured. As shown in the map, District 1 closely tracks the spatial distribution of majority-Black census blocks (shown in purple). The resulting district assembles a near majority-Black population by selectively incorporating high-BVAP blocks and leaving nearby lower-BVAP blocks outside the district.

The same map also highlights a configuration concern with District 3. With District 1 targeting the heavily black population in the northeast corner of the county, District 3 then appears to consist of two populated areas that are connected primarily through a large, unpopulated area corresponding to the military base in the northeastern portion of the county, shown in gray on the map. These populated areas are geographically separated and would not naturally be joined in a single district absent the intervening unpopulated territory. From a traditional redistricting perspective, the linkage of these areas through a very narrow gap at the top of the county and then the unpopulated military base does not reflect a shared

---

[3] https://www.supremecourt.gov/opinions/22pdf/21-1086_1co6.pdf, pg 12

Figure 3: Cervas 4-District Plan: Changes to District 1 from Race/Party Blind to Race Conscious Map



community of interest or a coherent population center. Instead, the district's configuration suggests that the unpopulated area is being used as a corridor to connect otherwise separate communities while avoiding the heavily Black areas of the county. This further contributes to the irregular structure of the plan.

Taken together, the map reinforces Dr. Cervas' own statements that he relied heavily on racial considerations in drawing District 1, and that the downstream effects of those choices are the unconventional shapes and connections in Districts 2 and 3, rather than the map being guided primarily by non-racial geographic or community-based considerations.

15

Figure 4: Cervas 4-District Plan: Racial Composition of Census Blocks



Black Voting–Age Population (BVAP) by Census Block
Race–conscious four–district plan overlaid

All three four-district illustrative plans fail to satisfy the requirements of *Gingles I* because none produces a district with a majority Black voting-age population. In addition, the race-conscious four-district plan exhibits signs of racial predominance and configuration problems, further undermining its value. The plan's district shapes display the very types of irregularities that courts have cautioned against when evaluating whether an illustrative district is reasonably configured. For these reasons, the four-district plans do not provide evidence that Black voters in Houston County are sufficiently numerous and geographically compact to form a majority in a reasonably configured single-member district.

Table 1: Population Deviation and Highest-District BVAP, by Map

| Map | Population Deviation Smallest | Largest | BVAP of Highest-BVAP District |
|---|---|---|---|
| *Five-District Maps* | | | |
| Board of Education | -0.54% | 1.11% | 53.73% |
| Race/Party Blind | -3.76% | 4.03% | 43.89% |
| Race Conscious | -17.97% | 17.6% | 52.02% |
| *Four-District Maps* | | | |
| Board of Education | -1.65% | 2.25% | 47.20% |
| Race/Party Blind | -1.07% | 1.64% | 45.65% |
| Race Conscious | -1.07% | 1.75% | 49.97% |

# 5    Municipalities

A potential traditional redistricting criteria that Dr. Cervas could have considered is preservation of municipal boundaries. It is often the case that legislators and other map-drawing bodies attempt to align the boundaries of the map in question with other political units, including counties, townships, and municipalities. The alignment of boundaries often has the effect of keeping a municipality as whole as possible within the fewest number of districts, while recognizing that cities are often larger than a single district or have boundaries that are quite irregular. Nevertheless, a map drawer might strive to keep municipal retention as high as possible, given these constraints. Dr. Cervas does not report the degree to which his maps adhere to this criteria. There are three incorporated cities in Houston County: Centerville, Perry, and Warner Robins.[4] In addition to these three cities, there is the Robins Air Force Base that, while not a municipality, is a community of interest that has strong reasons for being kept together in any districting plan. Below I report the share of each of these four municipalities that are contained within each of the districts across the six maps put forward by Dr. Cervas. Table 2 shows these statistics.

In a five-district plan, the ideal district population is 32,727 people. In a four-district

---

[4]https://dca.georgia.gov/document/publications/alphabetical-listing-all-cities-fips-and-resident-county-fips/download

17

plan, the ideal district population is 40,908 people, according to the 2020 US Census population statistics. This means that all of the municipalities but Warner Robins are small enough to potentially be contained within a single county commissioner district in either a five or four district configuration. Warner Robins, with a 2020 population of 80,308 is too large to be contained within a single district, but could be confined to two districts in a four-district plan and three districts in a five-district plan.

The five-district Board of Education map divides Robins AFB and Perry into two districts and Warner Robins is divided across all five districts. Centerville is kept whole.

The five-district race/party blind map divides Perry across two districts and Warner Robins is divided across four of the five districts. Robins AFB and Centerville are kept whole.

The five-district race-conscious map divides Perry across two districts and Warner Robins is divided across all five districts. Robins AFB and Centerville are kept whole.

The four-district Board of Education map divides Warner Robins across all four districts. Robins AFB and Perry are kept whole while a very small piece of Centerville is split into a second district.

The four-district race/party blind map divides Perry across two districts and Warner Robins is divided across all four districts. Robins AFB and Centerville are kept whole.

Finally, the four-district race-conscious map divides Centerville across three districts and Warner Robins is divided across all four districts. Robins AFB is kept whole and a very small piece of Perry is split into a second district.

# 6   Precincts

Another core principle of traditional redistricting practice is the minimization of precinct splits. Election precincts are the fundamental administrative units through which elections are conducted. They are designed to be small enough to allow efficient and stable

18

Table 2: Percent of Each Municipality Assigned to Each District, by Map

| | Robins AFB | Warner Robins | Centerville | Perry |
|---|---|---|---|---|
| City 2020 Population: | 1,061 | 80,308 | 8,228 | 20,624 |
| Map–District | *Five-District Maps* | | | |
| Board of Education – 1 | 0 | 15.2 | 100.0 | 0 |
| Board of Education – 2 | 0 | 27.6 | 0 | 0 |
| Board of Education – 3 | 0 | 1.2 | 0 | 80.0 |
| Board of Education – 4 | 40.2 | 39.0 | 0 | 0 |
| Board of Education – 5 | 59.8 | 17.0 | 0 | 20.0 |
| Race/Party Blind – 1 | 100.0 | 27.5 | 0 | 0 |
| Race/Party Blind – 2 | 0 | 20.6 | 100.0 | 0 |
| Race/Party Blind – 3 | 0 | 30.4 | 0 | 0 |
| Race/Party Blind – 4 | 0 | 21.6 | 0 | 7.1 |
| Race/Party Blind – 5 | 0 | 0.0 | 0 | 92.9 |
| Race Conscious – 1 | 100.0 | 37.7 | 0 | 0 |
| Race Conscious – 2 | 0 | 19.8 | 100.0 | 0 |
| Race Conscious – 3 | 0 | 28.9 | 0 | 0 |
| Race Conscious – 4 | 0 | 9.9 | 0 | 7.1 |
| Race Conscious – 5 | 0 | 3.7 | 0 | 92.9 |
| Map–District | *Four-District Maps* | | | |
| Board of Education – 1 | 0 | 22.2 | 99.9 | 0 |
| Board of Education – 2 | 0 | 28.0 | 0 | 0 |
| Board of Education – 3 | 0 | 1.5 | 0 | 100.0 |
| Board of Education – 4 | 100.0 | 48.2 | 0.1 | 0 |
| Race/Party Blind – 1 | 100.0 | 46.2 | 0 | 0 |
| Race/Party Blind – 2 | 0 | 23.4 | 100.0 | 0 |
| Race/Party Blind – 3 | 0 | 26.7 | 0 | 7.1 |
| Race/Party Blind – 4 | 0 | 3.7 | 0 | 92.9 |
| Race Conscious – 1 | 0 | 48.1 | 2.1 | 0 |
| Race Conscious – 2 | 0 | 32.6 | 46.9 | 0 |
| Race Conscious – 3 | 100.0 | 15.3 | 51.0 | 0.1 |
| Race Conscious – 4 | 0 | 4.0 | 0 | 99.9 |

administration on Election Day. For these reasons, in my experience, map drawers who adhere to traditional redistricting principles generally seek to keep precincts whole whenever possible and to minimize the number of precincts that are divided across districts.

There are several reasons why minimizing precinct splits is widely understood to be a legitimate and important redistricting objective. These reasons relate to election administra-

tion, voter experience, data integrity, and transparency. Although there are circumstances in which splitting a precinct may be unavoidable, those circumstances are limited.

From the perspective of election administration, splitting precincts imposes substantial burdens on election officials. When a precinct is wholly contained within a single district, election workers need to administer/program only one ballot at that precinct location. Voters check in, see the ballot associated with that precinct and district, and cast their votes. The process is straightforward and minimizes the risk of error.

When a precinct is split across districts, however, election workers must administer/program multiple ballot styles at the same polling place. This requires election workers to determine which portion of the precinct a voter resides in and to program the correct ballot accordingly into the electronic voting machine. In practice, this often involves additional training and more complex pre-election programming process as voters are entered into the system and programmed to receive a certain ballot when they arrive at the polls. Issuing a voter the incorrect ballot can disenfranchise that voter, require the use of provisional ballots, cause uncertainty in close elections, and decrease trust in the electoral process.

These burdens scale quickly as the number of splits increases. A precinct split between two districts requires two ballot styles. A precinct split among three districts requires three ballot styles. In the most extreme case observed in the maps at issue here, a single precinct is split across four districts, requiring four distinct ballots to be designed, stored, managed, and correctly distributed at one polling place. This is further complicated by the fact that ballots have to not only consider precinct splits in the County Commission districts, but also State House and Senate districts, as well as Congressional districts. From an administrative standpoint, this represents an unnecessary and avoidable complication.

When precincts are kept whole, voters within the same precinct receive the same ballot and vote in the same races for the same offices. Furthermore, scholars have found a direct connection between voters' confidence in the election outcome and their experience at

the polls and with poll workers.[5] While poll worker and voter education efforts can mitigate some of this confusion, those efforts impose additional costs and are not always fully effective.

Some degree of precinct splitting may be a necessary byproduct of achieving population equality across districts. That can be true in jurisdictions where precincts are extremely large or where population is unevenly distributed such that whole precincts cannot be assembled into districts of roughly equal size. That is not the case here. The largest precinct in the county has a population of approximately 20,854 people. No precinct in the county is anywhere near the size of an ideal district. As a result, it is mathematically possible to construct districts that achieve population equality while keeping the vast majority of precincts whole.

Houston County currently contains only 17 precincts. In each of the illustrative plans, at least seven of those 17 precincts are split across multiple districts. In most of the plans, nine of the 17 precincts are split. Table 3 shows each precinct and the number of districts it spans across each map. This means that, in some maps, a majority of all precincts in the county are divided. That is inconsistent with what one would expect from a map drawn with attention to traditional administrative boundaries. Moreover, the fact that some precincts are split not merely between two districts but among three or four districts is particularly striking. From the perspective of election administration, these are among the most disruptive types of splits. From the perspective of redistricting practice, they are also the hardest to justify absent a compelling and clearly articulated reason.

In my experience drawing and reviewing redistricting plans, a map drawer adhering to traditional principles might split a small number of precincts once in order to achieve population equality or to follow a municipal boundary. A pattern in which many precincts are split, and some are split multiple times, suggests that precinct boundaries were not

[5]Hall, Thad E., J. Quin Monson, and Kelly D. Patterson. "The human dimension of elections: How poll workers shape public confidence in elections." Political Research Quarterly 62, no. 3 (2009): 507-522.
Hall, Thad, J. Quin Monson, and Kelly D. Patterson. "Poll workers and the vitality of democracy: An early assessment." PS: Political Science & Politics 40, no. 4 (2007): 647-654.
Atkeson, Lonna Rae, and Kyle L. Saunders. "The effect of election administration on voter confidence: A local matter?." PS: Political Science & Politics 40, no. 4 (2007): 655-660.

Table 3: Number of Districts Each Precinct Is Split Across, by Map

| Precinct | Five-District Maps | | | Four-District Maps | | |
|---|---|---|---|---|---|---|
| | BOE | Race/Party Blind | Race Conscious | BOE | Race/Party Blind | Race Conscious |
| ANNX | 1 | 1 | 2 | 1 | 1 | 3 |
| BMS | 1 | 2 | 1 | 2 | 3 | 1 |
| CENT | 1 | 1 | 1 | 2 | 1 | 3 |
| CGTC | 2 | 2 | 2 | 2 | 2 | 2 |
| FMMS | 1 | 2 | 1 | 2 | 2 | 2 |
| HAFS | 1 | 1 | 1 | 1 | 1 | 1 |
| HEFS | 1 | 1 | 1 | 1 | 1 | 1 |
| HHPC | 2 | 3 | 2 | 1 | 2 | 1 |
| MCMS | 2 | 3 | 2 | 2 | 2 | 2 |
| NHSC | 1 | 1 | 2 | 1 | 2 | 1 |
| PEC | 1 | 1 | 1 | 1 | 1 | 1 |
| ROZR | 1 | 1 | 1 | 1 | 1 | 1 |
| TMS | 2 | 2 | 3 | 1 | 2 | 2 |
| TWPK | 3 | 3 | 2 | 2 | 1 | 1 |
| VFW | 3 | 1 | 4 | 2 | 2 | 3 |
| VHS | 2 | 2 | 2 | 1 | 2 | 2 |
| WELL | 2 | 2 | 1 | 1 | 1 | 2 |
| Precincts Split: | 8 | 9 | 9 | 7 | 9 | 9 |
| Precinct Pieces: | 27 | 29 | 29 | 24 | 27 | 29 |
| Precincts Split across more than 2 districts: | 2 | 3 | 2 | 0 | 1 | 3 |

treated as a constraint at all.

From the standpoint of evaluating illustrative plans under Section 2, courts and experts often look to traditional redistricting principles as a benchmark for whether a proposed district is reasonably configured. Minimizing precinct splits is one such principle. When a proposed plan repeatedly violates that principle without explanation, it undermines the plan's value as an illustrative alternative.

# 7    Electoral History in Houston County

Another important consideration in evaluating Section 2 claims is the extent to which minority-preferred candidates have been able to win elections under the existing electoral system. While this consideration does not by itself resolve the question of vote dilution, it provides relevant context for assessing whether the challenged system operates to deny minority voters an equal opportunity to elect candidates of choice. Courts and experts routinely examine evidence of minority electoral success as part of the broader factual record in Section 2 cases.

Dr. Cervas does not conduct an analysis of countywide electoral performance. His analysis is limited to hypothetical performance under the districted plans he proposes. As a result, his report does not address whether Black-preferred candidates have been able to win elections under the current at-large system used by Houston County. That analysis appears in the report of Dr. Popick.

Dr. Popick estimates racial voting behavior in Houston County using three different ecological methods: iterative ecological inference (EI), ecological regression (ER), and EI R×C. He reports results from all three approaches in the appendices to his report, with iterative EI results highlighted in the main text. A comparison of these estimates, however, reveals substantial variation across methods. This variation is apparent when comparing Tables A1, A2, and A3, which report estimates of support for Black-preferred candidates using iterative EI, ER, and EI R×C respectively, as well as Tables B1, B2, and B3, which report analogous estimates for White-preferred candidates.

The racial polarization estimates reported by Dr. Popick, when summarized across estimation strategies as shown in Tables 4 and 5, display a striking degree of variation. For several elections, the point estimates of Black voter support for Black-preferred candidates differ by more than forty percentage points depending on whether iterative ecological inference, ecological regression, or EI RxC is used. When confidence intervals are taken into account, the full range of possible values often spans an even wider interval. A similar

23

pattern appears in the estimates of White voter support for White-preferred candidates, where point estimates and uncertainty bounds likewise vary substantially across elections and across estimation methods.

Dr. Popick acknowledges one important source of this instability. As he notes in footnote 12 of his report, Houston County lacks racially homogeneous precincts, and contains only a small number of precincts overall.[6] Figure 5 shows the BVAP of each of Houston County's 17 precincts using the 2020 US Census data. Only one precinct, WELL, contains a majority-BVAP population, and even in that precinct, the BVAP is only 61.4%. The absence of homogeneous or near-homogeneous precincts increases reliance on extrapolation beyond the observed data and widens the range of plausible estimates, particularly for minority voting behavior.

In other cases that I have been involved with, there have been many more precincts and many more precincts with heavily Black populations, which reduces the error and uncertainty in ecological inference models. For example, in a case in North Carolina in 2023, this kind of analysis used with more than 200 precincts, of which many had a BVAP greater than 80%.[7] In a case in Jefferson County Alabama the ecological analysis was conducted across more than 150 precincts, of which there were dozens with BVAPs in excess of 90%.[8] Similar large groups of precincts with multiple homogeneous Black precincts were used for this analysis in a recent case in Louisiana.[10]

For ease of reference, Tables 4 and 5 show the estimates of Black and White voters' support in the eight elections that Dr. Popick analyzed in his report. These numbers suggest that Black voter cohesion is often modest rather than overwhelming, and that conclusion is

---

[6]Typically, a precinct is considered racially "homogenous" when it contains upwards of 90 or 95% of a single racial group. Brace, Kimball, Lisa Handley, Richard G. Niemi, and Harold W. Stanley. "Minority turnout and the creation of majority-minority districts." American Politics Quarterly 23, no. 2 (1995): 190-203. de Benedictis-Kessner, Justin. "Evidence in voting rights act litigation: Producing accurate estimates of racial voting patterns." Election Law Journal 14, no. 4 (2015): 361-381.

[7]*Williams v. Hall*, 1:23-CV-1057

[8,9], No. 2:23-cv-00443-MHH

[10]The expert in this case divided the state into various smaller regions, but even here the smallest region contained nearly 100 precincts, with several in excess of 80% BVAP. *Nairve, et al. v. Ardoin*, No. 3:22-cv000178SDD-SDJ

Figure 5



especially apparent in the Iterative EI and EI RxC columns. In many contests, those two models place estimated Black support in the 50s and low 60s, with only a minority of cases moving into the 70s or 80s, which is not the sort of consistently high within-group support that one would expect under strong cohesion.

The ER estimates of Black voter cohesion are often substantially higher, but the magnitude of the divergence across methods, sometimes exceeding 40 percentage points, raises a basic interpretive question about which estimates should be treated as credible. The last two columns of Tables 4 and 5 underscore how variable any cohesion claim would be. The "Range Across Methods" column shows the range of the estimates from the three different estimation strategies (Iterative EI, ER, and EI RxC), which often span several dozen points. The "Full Uncertainty Range" column considers the range from the lowest point of the associated confidence intervals to the highest point of those confidence intervals. This range is wider still, frequently stretching from the mid 50s (or even lower) to values that exceed 100%, due to the statistical limitations of the ER estimation method. Taken at face value, these ranges encompass outcomes consistent with near complete division in the electorate, on the order of a near-50 percent split, as well as outcomes consistent with perfect unanimity of 100 percent support. When this large a spectrum of support is possible with these estimates, the results offer little meaningful information about the true underlying preferences of the population.

When the results are viewed at a higher level of abstraction, they largely reinforce a conclusion that is already well established and not in serious dispute. Across the elections analyzed, Black voters tend to support Democratic candidates, while White voters in Georgia tend to support Republican candidates. Dr. Popick does not explicitly incorporate candidate partisanship into his discussion of racially polarized voting, but in every election included in his analysis, party affiliation is aligned with the observed racial voting patterns. Tables 4 and 5 contain the party affiliation of each candidate. As a result, the estimates do not clearly distinguish between racial polarization and partisan polarization as explanatory mechanisms.

This point is underscored by the fact that at least one White candidate analyzed in Dr. Popick's tables was identified as the Black-preferred candidate (Riley, 2022 CC Post 2) and received levels of Black voter support comparable to those received by Black candidates in other contests. That result is difficult to reconcile with a purely racial account of voting

26

behavior. Instead, it suggests that candidate partisanship and policy alignment play a central role in structuring voter preferences, independent of candidate race.

Taken together, the tables indicate that the estimates provided by Dr. Popick add limited new information beyond confirming the well-known relationship between race, party, and vote choice in Georgia. The wide range of estimates across methods, combined with the alignment between race and party across all contests, suggests that partisan polarization is at least as important as racial polarization in explaining the observed voting patterns.

Table 4: Black Voting Support Across Estimation Methods (Popick Appendix Tables A1–A3)

| Election (Black-Preferred Candidate) | Party | Iterative EI | ER | EI RxC | Range Across Methods | Full Uncertainty Range |
|---|---|---|---|---|---|---|
| 2016 CC Post 5 (Hicks) | D | 83.6 | 98.7 | 52.1 | 52.1–98.7 | 49.8–106.3 |
| 2020 CC Post 5 (McCants) | D | 56.1 | 101.4 | 61.8 | 56.1–101.4 | 51.1–110.2 |
| 2020 District Attorney (Williams) | D | 63.0 | 100.0 | 68.3 | 63.0–100.0 | 57.0–106.4 |
| 2020 Clerk (Anderson) | D | 64.1 | 101.7 | 67.3 | 64.1–101.7 | 58.7–110.1 |
| 2022 CC Post 2 (Riley) | D | 62.4 | 102.6 | 60.4 | 60.4–102.6 | 53.1–114.0 |
| 2022 CC Post 4 (Rozier) | NP | 75.1 | 96.6 | 81.8 | 75.1–96.6 | 67.5–102.5 |
| 2024 Sheriff (Harris) | D | 72.9 | 96.9 | 55.8 | 55.8–96.9 | 52.6–106.6 |
| 2024 Clerk (Anderson) | D | 59.0 | 98.9 | 65.1 | 59.0–98.9 | 55.2–108.4 |

Table 5: White Voting Support Across Estimation Methods (Popick Appendix Tables B1–B3)

| Election (White-Preferred Candidate) | Party | Iterative EI | ER | EI RxC | Range Across Methods | Full Uncertainty Range |
|---|---|---|---|---|---|---|
| 2016 CC Post 5 (McMichael) | R | 96.8 | 93.8 | 75.4 | 75.4–93.8 | 74.5–98.8 |
| 2020 CC Post 5 (Byrd) | R | 75.0 | 96.2 | 71.6 | 71.6–96.2 | 69.4–105.0 |
| 2020 District Attorney (Hartwig) | R | 64.9 | 84.7 | 63.2 | 63.2–84.7 | 61.2–91.1 |
| 2020 Clerk (Sullivan) | R | 67.4 | 96.1 | 74.0 | 67.4–96.1 | 64.1–104.5 |
| 2022 CC Post 2 (Gottwals) | R | 66.1 | 98.3 | 69.5 | 66.1–98.3 | 63.6–109.8 |
| 2022 CC Post 4 (Talton) | R | 89.5 | 105.4 | 85.2 | 85.2–105.4 | 80.4–116.6 |
| 2024 Sheriff (Moulton) | R | 62.2 | 99.5 | 70.3 | 62.2–99.5 | 55.1–109.2 |
| 2024 Clerk (Childers) | R | 68.7 | 96.6 | 68.3 | 68.7–96.6 | 65.4–106.0 |

In his report, Dr. Popick analyzes eight partisan countywide elections. Four of these are elections for county commissioner seats, and four are elections for other countywide offices, specifically district attorney, county clerk, and county sheriff. While these elections are relevant, there are important limitations in the way this set of elections is constructed and interpreted.

Most notably, Dr. Popick's analysis omits several recent countywide elections in which Black-preferred candidates were successful in Houston County. These omissions materially

27

affect the picture of minority electoral opportunity under the existing system. First, Dr. Popick does not include recent elections for the Houston County Board of Education in which Black candidates were elected in countywide races. In particular, Mark Ivory (June 2022) and Clyde Jackson, Jr. (May 2024 general and June 2024 runoff) were both elected to the Board of Education in countywide at-large elections. These victories demonstrate that Black-preferred candidates can and have won countywide elections in Houston County.[11] Because Board of Education elections are conducted countywide and involve the same electorate as other countywide offices, they provide directly relevant evidence regarding minority electoral success.

Second, Dr. Popick omits the recent 2025 elections for the Georgia Public Service Commission. In both of those elections, the Democratic candidates received a majority of the vote in Houston County.[12] Given the well-established relationship between race and party preference in Georgia, these outcomes provide additional evidence that Black-preferred candidates are capable of winning countywide elections in Houston County. Their exclusion from Dr. Popick's analysis results in an incomplete and potentially misleading characterization of electoral outcomes under the current system.

The omitted elections are also informative because they span different electoral contexts. The Board of Education elections are nonpartisan, while the Public Service Commission elections are partisan. The success of Black-preferred candidates in both settings suggests that minority electoral success in Houston County is not confined to a single type of election or institutional arrangement.

An additional limitation of Dr. Popick's racial polarization analysis is the absence of any examination of Democratic primary elections.[13] If, as his results suggest, Black voters

---

[11] https://www.facebook.com/share/p/176S7QNDNP/ https://www.facebook.com/share/p/1H7eJCfdWf/ show that while the elections are non-partisan, the county Democratic Committee appeared to endorse both Ivory and Jackson.

[12] https://results.sos.ga.gov/results/public/houston-county-ga/elections/MunicipalGeneralSpecialElectionPSC11042025

[13] Dr. Popick does include analysis of a single Republican primary election. However, this election provides little insight for several reasons. First, Dr. Popick only presents estimated vote shares for one of the three candidates (Williams) for one racial group (White Republican voters). We therefore do not know how Williams estimated vote share among White Republicans compares to the two other candidates. Second, we

28

in Houston County generally prefer Democratic candidates, then a complete assessment of electoral opportunity would also consider whether Black voters are able to nominate their preferred candidates at the primary stage of the electoral process. It is important to examine whether Black Democratic voters are able to influence nomination outcomes, or whether preferences diverge between Black Democrats and White Democrats in ways that limit Black voters' ability to secure their candidates of choice.

This inquiry is especially relevant where the number of Black Democratic voters may be insufficient on its own to determine primary outcomes, or where crossover support from White Democratic voters may be limited. Despite the relevance of these questions, Dr. Popick does not analyze any contested Democratic primaries, even though several such primaries have occurred in recent years, including contests for the Public Service Commission, statewide executive offices, and presidential nominations in 2022, 2024, and 2025. The omission of primary election analysis further constrains the conclusions that can be drawn from his report, as it leaves unanswered whether Black voters' preferences are reflected at the nomination stage of the electoral process, where electoral outcomes in partisan contests are often effectively decided.

---

do not know anything about the preferences of non-White primary voters in this contest, including whether or not Williams was their candidate of choice, or if there was any degree of polarization between groups of voters.

29

Table 6: Recent Contested Democratic Primary Elections in Georgia

| Election Date | Office |
|---|---|
| July 2025 | Public Service Commission, District 3 |
| June 2025 | Public Service Commission, District 3 |
| March 2024 | President |
| June 2022 | Lieutenant Governor |
| June 2022 | Secretary of State |
| June 2022 | Insurance Commissioner |
| June 2022 | Labor Commissioner |
| May 2022 | Public Service Commission, District 3 |
| May 2022 | United States Senator |
| May 2022 | Lieutenant Governor |
| May 2022 | Secretary of State |
| May 2022 | Attorney General |
| May 2022 | Agriculture Commissioner |
| May 2022 | Insurance Commissioner |
| May 2022 | State School Superintendent |
| May 2022 | Labor Commissioner |
| May 2022 | Public Service Commission, District 2 |

Pursuant to 28 U.S.C. § 1746, the above is true and correct to the best of my knowledge.

Michael Barber

January 23, 2026

# Michael Jay Barber

| | | |
|---|---|---|
| CONTACT INFORMATION | Brigham Young University<br>Department of Political Science<br>724 KMBL<br>Provo, UT 84602 | barber@byu.edu<br>http://michaeljaybarber.com<br>Ph: (801) 422-7492 |

ACADEMIC APPOINTMENTS

**Brigham Young University**, Provo, UT

August 2025 - present    Professor, Department of Political Science
August 2020 - July 2025    Associate Professor, Department of Political Science
Jan 2023 - present    Director, Center for the Study of Elections and Democracy
2014 - July 2020    Assistant Professor, Department of Political Science
2014 - Jan 2023    Faculty Scholar, Center for the Study of Elections and Democracy

EDUCATION

**Princeton University Department of Politics**, Princeton, NJ

Ph.D., Politics, July 2014

- Advisors: Brandice Canes-Wrone, Nolan McCarty, and Kosuke Imai

- Dissertation: "Buying Representation: the Incentives, Ideology, and Influence of Campaign Contributions on American Politics"

- 2015 Carl Albert Award for Best Dissertation, Legislative Studies Section, American Political Science Association (APSA)

M.A., Politics, December 2011

**Brigham Young University**, Provo, UT

B.A., International Relations - Political Economy Focus, April, 2008

- *Cum Laude*

RESEARCH INTERESTS

American politics, congressional polarization, political ideology, campaign finance, survey research

PUBLICATIONS

29. **"Donations and Dollars: Characterizing the Policy Views of Donors and the Affluent"**
with Brandice Canes-Wrone, Greg Huber, and Josh Clinton, forthcoming, *Journal of Politics*

28. **"Illiberalism among American State Legislative Candidates"**
with Hans Hassell and Michael Miller, *Nature Humanities and Social Science Communications*

27. **"Which Republican Constituencies Support Restrictive Abortion Laws? Comparisons among donors, wealthy, and mass publics**, with Brandice Canes-Wrone, Joshua Clinton, and Greg Huber Forthcoming at *Public Opinion Quarterly*

26. **"The Crucial Role of Race in 21st Century U.S. Political Realignment**, with Jeremy Pope, *Public Opinion Quarterly* (2024): 1-10.

25. **"Misclassification and Bias in Predictions of Individual Ethnicity from Administrative Records"**, with Lisa Argyle, *American Political Science Review* (2023): 1-9.

24. **"Partisanship and Trolleyology"**, with Ryan Davis
*Research & Politics*

23. **"Does Issue Importance Attenuate Partisan Cue-Taking"**, with Jeremy Pope, *Political Science Research and Methods* (2024): 1-9.

22. **"A Revolution of Rights in American Founding Documents"**, with Scott Abramson and Jeremy Pope
*Journal of Political Institutions and Political Economy*

21. **"Groups, Behaviors, and Issues as Cues of Partisan Attachments in the Public"**, with Jeremy Pope
*American Politics Research*

20. **"Ideological Disagreement and Pre-emption in Municipal Policymaking"**, with Adam Dynes, *American Journal of Political Science*, no. 1 (2023): 119-136.

19. **"400 million voting records show profound racial and geographic disparities in voter turnout in the United States"**, with John Holbein
*PloS One*, 2022, Vol. 17, no. 6: e0268134

18. **"Comparing Campaign Finance and Vote Based Measures of Ideology"**
*Journal of Politics*, 2022. Vol. 84, no. 1 (2022): 613-619.

17. **"The Participatory and Partisan Impacts of Mandatory Vote-by-Mail"**, with John Holbein
*Science Advances*, 2020. Vol. 6, no. 35, DOI: 10.1126/sciadv.abc7685

16. **"Issue Politicization and Interest Group Campaign Contribution Strategies"**, with Mandi Eatough
*Journal of Politics*, 2020. Vol. 82: No. 3, pp. 1008-1025

15. **"Campaign Contributions and Donors' Policy Agreement with Presidential Candidates"**, with Brandice Canes-Wrone and Sharece Thrower
*Presidential Studies Quarterly*, 2019, 49 (4) 770–797

14. **"Conservatism in the Era of Trump"**, with Jeremy Pope
*Perspectives on Politics*, 2019, 17 (3) 719–736

13. **"Legislative Constraints on Executive Unilateralism in Separation of Powers Systems"**, with Alex Bolton and Sharece Thrower
*Legislative Studies Quarterly*, 2019, 44 (3) 515–548
Awarded the Jewell-Loewenberg Award for best article in the area of subnational politics published in *Legislative Studies Quarterly* in 2019

12. **"Electoral Competitiveness and Legislative Productivity"**, with Soren Schmidt
*American Politics Research*, 2019, 47 (4) 683–708

11. **"Does Party Trump Ideology? Disentangling Party and Ideology in America"**, with Jeremy Pope
*American Political Science Review*, 2019, 113 (1) 38–54

10. **"The Evolution of National Constitutions"**, with Scott Abramson
*Quarterly Journal of Political Science*, 2019, 14 (1) 89–114

9. **"Who is Ideological? Measuring Ideological Responses to Policy Questions in the American Public"**, with Jeremy Pope
*The Forum: A Journal of Applied Research in Contemporary Politics*, 2018, 16 (1) 97–122

2

8. **"Status Quo Bias in Ballot Wording"**, with David Gordon, Ryan Hill, and Joe Price
*The Journal of Experimental Political Science*, 2017, 4 (2) 151–160.

7. **"Ideologically Sophisticated Donors: Which Candidates Do Individual Contributors Finance?"**, with Brandice Canes-Wrone and Sharece Thrower
*American Journal of Political Science*, 2017, 61 (2) 271–288.

6. **"Gender Inequalities in Campaign Finance: A Regression Discontinuity Design"**, with Daniel Butler and Jessica Preece
*Quarterly Journal of Political Science*, 2016, Vol. 11, No. 2: 219–248.

5. **"Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"**
*Public Opinion Quarterly*, 2016, 80: 225–249.

4. **"Donation Motivations: Testing Theories of Access and Ideology"**
*Political Research Quarterly*, 2016, 69 (1) 148–160.

3. **"Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"**
*Journal of Politics*, 2016, 78 (1) 296–310.

2. **"Online Polls and Registration Based Sampling: A New Method for Pre-Election Polling"** with Quin Monson, Kelly Patterson and Chris Mann.
*Political Analysis* 2014, 22 (3) 321–335.

1. **"Causes and Consequences of Political Polarization"** In *Negotiating Agreement in Politics*. Jane Mansbridge and Cathie Jo Martin, eds., Washington, DC: American Political Science Association: 19–53. with Nolan McCarty. 2013.

   - Reprinted in *Solutions to Political Polarization in America*, Cambridge University Press. Nate Persily, eds. 2015
   - Reprinted in *Political Negotiation: A Handbook*, Brookings Institution Press. Jane Mansbridge and Cathie Jo Martin, eds. 2015

AVAILABLE WORKING PAPERS/ONGOING PROJECTS

**"Donations and Dollars: Characterizing the Policy Views of Donors and the Affluent"**
with Brandice Canes-Wrone, Gregory Huber, and Joshua Clinton (Revise and Resubmit at *Journal of Politics*)

**"Preferences for Representational Styles in the American Public"**
with Ryan Davis and Adam Dynes *(under review)*

**"Illiberalism among American State Legislative Candidates'**
with Hans Hassell and Michael Miller *(under review)*

INVITED PRESENTATIONS

"Are Mormons Breaking Up with Republicanism? The Unique Political Behavior of Mormons in the 2016 Presidential Election"

   - Ivy League LDS Student Association Conference - Princeton University, November 2018, Princeton, NJ

"Issue Politicization and Access-Oriented Giving: A Theory of PAC Contribution Behavior"

   - Vanderbilt University, May 2017, Nashville, TN

3

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"

- Yale University, April 2016, New Haven, CT

"The Incentives, Ideology, and Influence of Campaign Donors in American Politics"

- University of Oklahoma, April 2016, Norman, OK

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"

- University of Wisconsin - Madison, February 2016, Madison, WI

"Polarization and Campaign Contributors: Motivations, Ideology, and Policy"

- Hewlett Foundation Conference on Lobbying and Campaign Finance, October 2014, Palo Alto, CA

"Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"

- Bipartisan Policy Center Meeting on Party Polarization and Campaign Finance, September 2014, Washington, DC

"Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"

- Yale Center for the Study of American Politics Conference, May 2014, New Haven, CT

CONFERENCE PRESENTATIONS

Money in Politics APSA Pre-Conference:

- Founder (2020) and organizing committee (2020, 2021, 2022, 2023)

Washington D.C. Political Economy Conference (PECO):

- 2017 discussant

American Political Science Association (APSA) Annual Meeting:

- 2014 participant and discussant, 2015 participant, 2016 participant, 2017 participant, 2018 participant

Midwest Political Science Association (MPSA) Annual Meeting:

- 2015 participant and discussant, 2016 participant and discussant, 2018 participant

Southern Political Science Association (SPSA) Annual Meeting:

- 2015 participant and discussant, 2016 participant and discussant, 2017 participant

TEACHING EXPERIENCE

Poli 301: Data Visualization

- Summer 2022, Fall 2022, Winter 2023, Winter 2024

Poli 315: Congress and the Legislative Process

- Fall 2014, Winter 2015, Fall 2015, Winter 2016, Summer 2017, Fall 2018, Spring 2019, Fall 2022

4

Poli 328: Quantitative Analysis

- Winter 2017, Fall 2017, Fall 2019, Winter 2020, Fall 2020, Winter 2021, Fall 2023

Poli 410: Undergraduate Research Seminar in American Politics

- Fall 2014, Winter 2015, Fall 2015, Winter 2016,Summer 2017, Fall 2018, Winter 2024

AWARDS AND GRANTS

2024 BYU Early Career Scholarship Award

2021 BYU FHSS Research Grant, $6,500

2020 BYU FHSS Young Scholar Award

2019 BYU Mentored Environment Grant (MEG), Ideology in America Project, $35,000

2017 BYU Political Science Teacher of the Year Award

2017 BYU Mentored Environment Grant (MEG), Funding American Democracy Project, $20,000

2016 BYU Political Science Department, Political Ideology and President Trump (with Jeremy Pope), $7,500

2016 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3

- Hayden Galloway, Jennica Peterson, Rebecca Shuel

2015 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3

- Michael-Sean Covey, Hayden Galloway, Sean Stephenson

2015 BYU Student Experiential Learning Grant, American Founding Comparative Constitutions Project (with Jeremy Pope), $9,000

2015 BYU FHSS Research Grant, $5,000

2014 BYU Political Science Department, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU FHSS Award, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU Center for the Study of Elections and Democracy, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $2,000

2012 Princeton Center for the Study of Democratic Politics Dissertation Improvement Grant, $5,000

2011 Princeton Mamdouha S. Bobst Center for Peace and Justice Dissertation Research Grant, $5,000

2011 Princeton Political Economy Research Grant, $1,500

OTHER SCHOLARLY ACTIVITIES

Expert Witness in Nancy Carola Jacobson, et al., Plaintiffs, vs. Laurel M. Lee, et al., De-

5

fendants. Case No. 4:18-cv-00262 MW-CAS (U.S. District Court for the Northern District of Florida)

Expert Witness in Common Cause, et al., Plaintiffs, vs. Lewis, et al., Defendants. Case No. 18-CVS-14001 (Wake County, North Carolina)

Expert Witness in Kelvin Jones, et al., Plaintiffs, v. Ron DeSantis, et al., Defendants, Consolidated Case No. 4:19-cv-300 (U.S. District Court for the Northern District of Florida)

Expert Witness in Community Success Initiative, et al., Plaintiffs, v. Timothy K. Moore, et al., Defendants, Case No. 19-cv-15941 (Wake County, North Carolina)

Expert Witness in Richard Rose et al., Plaintiffs, v. Brad Raffensperger, Defendant, Civil Action No. 1:20-cv-02921-SDG (U.S. District Court for the Northern District of Georgia)

Expert Witness in Georgia Coalition for the People's Agenda, Inc., et. al., Plaintiffs, v. Brad Raffensberger, Defendant. Civil Action No. 1:18-cv-04727-ELR (U.S. District Court for the Northern District of Georgia)

Expert Witness in Alabama, et al., Plaintiffs, v. United States Department of Commerce; Gina Raimondo, et al., Defendants. Case No. CASE No. 3:21-cv-00211-RAH-ECM-KCN (U.S. District Court for the Middle District of Alabama Eastern Division)

Expert Witness in League of Women Voters of Ohio, et al., Relators, v. Ohio Redistricting Commission, et al., Respondents. Case No. 2021-1193 (Supreme Court of Ohio)

Expert Witness in Regina Adams, et al., Relators, v. Governor Mike DeWine, et al., Respondents. Case No. 2021-1428 (Supreme Court of Ohio)

Expert Witness in Rebecca Harper, et al., Plaintiffs, v. Representative Destin Hall, et al., Defendants (Consolidated Case). Case No. 21 CVS 500085 (Wake County, North Carolina)

Expert Witness in Carter, et al., Petitioners, v. Degraffenreid et al., Respondents (Consolidated Case). Case No. 464 M.D. 2021 (Commonwealth Court of Pennsylvania)

Expert Witness in Harkenrider, et al., Petitioners, v. Hochel et al., Respondents. Case No. E2022-0116CV (State of New York Supreme Court: County of Steuben)

Expert Witness in Our City Action Buffalo, Inc., et al., v. Common Council of the City of Buffalo (State of New York Supreme Court: County of Erie)

Expert Witness in Citizens Project, et al., v. City of Colorado Springs, et al. Case No. 22-cv-1365-CNS-MDB (U.S. District Court for the District of Colorado)

Expert report filed in League of Women Voters of Ohio v. Ohio Redistricting Comm., 172 Ohio St.3d 597, 2023-Ohio-4271 (Supreme Court of Ohio)

Expert Witness in Dr. Dorothy Nairne, et al., Plaintiffs, v. R. Yle Ardoin, Defendant, Case No. 3:22-cv-00178 (U.S. District Court for the Middle District of Louisiana)

Court Appointed Mapping Special Master in Donald Agee, et al., Plaintiffs, v. Jocelyn Benson, in her official capacity as the Secretary of State of Michigan, et al., Defendants., No. 1:22-cv-272 Three-Judge Court (U.S. District Court for the Western District of Michigan)

6

Expert report filed in remedial phase in Alpha Phi Alpha, et al., Plaintiffs, v. Brad Raffensperger, in his official capacity as the Secretary of State of Georgia, et al., Defendants., Case No. 1:21-cv-5337 (U.S. District Court for the Northern District of Georgia)

Expert Witness in McClure, et al. and Addoh-Kondi, et al., Plaintiffs, v. Jefferson County Commission, et al., Defendant, Case No. Case No.: 2:23-cv-00503-MHH (U.S. District Court for the Northern District of Alabama)

Expert Witness in Williams, et al. and North Carolina NAACP v. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, et al. Case Nos: 1:23-CV-1057, 1:23-CV-1104 (U.S. District Court for the Middle District of North Carolina)

Expert Witness in League of Women Voters of Utah, et al., v. Utah State Legislature, et al., Civil Action No. 220901712 (Third Judicial District Court in and for Salt Lake County, Utah)

ADDITIONAL
TRAINING

EITM 2012 at Princeton University - Participant and Graduate Student Coordinator

COMPUTER
SKILLS

Statistical Programs: R, Stata, SPSS, parallel computing

Updated January 23, 2026

7