# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ~~United States of America~~, Courtney Driver, et al., | Case No. 5:25-cv-00025-MTT |
| ~~Plaintiff~~Plaintiffs, | |
| vs. | ~~Complaint-in-Intervention~~**First Amended Complaint** |
| Houston County Board of Elections, *et al.*, | |
| Defendants. | |

**Nature of the Case**

1.     This is an action challenging the method of electing members of the Houston County Board of Commissioners under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, ~~challenging the method of electing members of the Houston County Board of Commissioners~~and under 42 U.S.C. § 1983 for violation of the 14th and 15th Amendments to the Constitution.

2.     The ~~plaintiff-intervenors~~plaintiffs are Black voters, ~~and they~~who seek declaratory and injunctive relief prohibiting further use of the existing method of election on the ground that it dilutes Black voting strength in violation of Section 2.

3.     The plaintiffs also seek relief on the ground that the existing method of election was adopted and has been maintained, at least in part, for the purpose of diluting Black voting strength, in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

## Jurisdiction and Venue

4.     3. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343(a)(3)–(4), and 2201(a), 42 U.S.C. § 1983, and 52 U.S.C. § 10308(f).

5.     4. Venue is proper in this Court under 28 U.S.C. §§ 90(b)(2) and 1391(b).

## Parties

6.     5. Plaintiff-Intervenor Plaintiff Courtney Driver is a Black resident and registered voter in Houston County, Georgia.

7.     6. Plaintiff-Intervenor Plaintiff Michael C. Jones is a Black resident and registered voter in Houston County, Georgia.

8.     Plaintiff National Association for the Advancement of Colored People Georgia State Conference ("Georgia NAACP") is a non-partisan, multi-racial, nonprofit membership organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal

2

political, educational, social, and economic rights of all persons and in particular Black Georgians. The organization is headquartered in College Park, Georgia. It has approximately 10,000 members across approximately 180 local units in at least 120 counties in Georgia, including Houston County.

9.    The Georgia NAACP has members who (i) are at least 18 years of age, (ii) are registered to vote in Houston County, (iii) identify their race as Black, and (iv) live within an area of Houston County where their voting strength is being diluted by the at-large method of electing Houston County Commissioners.

7. Defendant Houston County is a political subdivision of the State of Georgia.

8. Defendants Dan Perdue, Shane Gottwals, Gail Robinson, Tal Talton, and Mark Byrd are elected members of the Houston County Board of Commissioners. They are sued in their official capacities.

10.    9. Defendant Houston County Board of Elections is responsible for conducting elections for members of the Houston County Board of Commissioners.

11.    10. Defendant Pamela MorganHenry Childs is the chair of the Houston County Board of Elections. SheHe is sued in herhis official capacity.

3

## Background

12.     11. The Houston County Board of Commissioners has five members, elected in staggered at-large contests for four-year terms. Each member is elected to a numbered Post, with the commissioner elected from Post 1 serving as chairman.

13.     The Houston County Board of Commissioners was created by an Act of the General Assembly of Georgia approved August 15, 1922 (the "1922 Act") (1922 Ga. Laws 372). That Act provided that the commissioners would be elected by the people of the county from the county at large. It replaced an earlier Board of Commissioners of Roads and Revenues, created in 1915 (1915 Ga. Laws 265) and abolished by a companion Act in 1922.

14.     As created in 1922, the Board consisted of three members, all elected at large to four-year terms. The 1922 Act did not divide the commissioners into numbered posts, did not stagger their terms, and did not require them to reside in any particular part of the county. The chairman was not separately elected; the commissioners chose one of their own number to serve as chairman for a one-year term.

15.     According to the 1920 Census, Houston County had a total population of 21,964, of whom 14,508—approximately 66%—were Black. Black residents thus constituted roughly two-thirds of the county's population when the at-large

4

method of election was adopted in 1922, but they were almost entirely excluded from the political process by the white primary, the poll tax, and other devices that denied them a meaningful opportunity to vote or to influence the election of county officers.

16.    The General Assembly has amended the 1922 Act on several occasions. On each occasion, it has retained the original at-large method of electing the commissioners.

17.    In 1953 and 1955, the General Assembly amended the Act only to increase the commissioners' compensation (1953 Ga. Laws 2575 (Jan.-Feb. Sess.); 1955 Ga. Laws 3217).

18.    According to the Census, Black residents constituted approximately 35% of Houston County's population in 1950 (7,380 of 20,964) and approximately 22% in 1960 (8,761 of 39,154). Although Black citizens remained substantially underrepresented among registered voters throughout this period because of the devices that had long suppressed Black political participation, the Black share of the county's population at both points was large enough that, in an at-large election without numbered posts, Black voters who concentrated their votes on a single candidate could have influenced or determined the outcome of an individual seat.

5

19.    In 1958, the General Assembly substantially revised the structure of the Board (1958 Ga. Laws 2574). It increased the number of commissioners from three to five; for the first time required each commissioner to be elected to a numbered post; for the first time staggered the commissioners' terms; and required candidates for each post to reside in specified militia districts of the county.

20.    The numbered posts and staggered terms first imposed in 1958 are, in combination with at-large election and the majority-vote requirement, features that enhance the opportunity for discrimination against Black voters and that minimize their ability to elect candidates of their choice. By requiring each commissioner to be elected to a separate numbered post, the 1958 amendment eliminated the ability of Black voters to concentrate their votes on a single candidate—a practice known as single-shot voting that, in an at-large election without numbered posts, can enable a cohesive minority to elect one candidate of its choice.

21.    In the years immediately preceding the 1970 amendment, Black residents of Houston County gained substantially greater access to the ballot. According to a 1968 report of the United States Commission on Civil Rights, which used the contemporaneous category "nonwhite," the number of registered nonwhite voters in Houston County rose from approximately 413 in 1962 to 2,318 by 1968 — a more than fivefold increase. Measured against the county's 1960 nonwhite

6

voting-age population of 4,228, registered nonwhite voters increased from roughly 9.8% to roughly 54.8% over that period.

22.    This increase in registration was accompanied by growing Black participation in local electoral politics. In December 1969, a Black candidate, Connie Jones, ran for a seat on the Perry City Council, receiving 891 votes to his opponent's 1,256 in a contested election. Within weeks of that election, members of Houston County's local legislative delegation announced their intention to amend the method of electing the Board of Commissioners; notice of the proposed legislation was published in January 1970, and the 1970 Act was approved on March 21, 1970. In June 1970, shortly after the Act's passage, the Houston Home Journal reported that eight Black candidates had qualified for county offices—described as the largest number in the county's history.

23.    In 1970, after the Voting Rights Act of 1965 had restored the ability of Black citizens to register and vote, the General Assembly again amended the 1922 Act (1970 Ga. Laws 2962). It abolished the residency requirements for the posts and renumbered the posts, so that all five commissioners would be elected at large from the entire county without any requirement that any commissioner reside in, or be chosen by the voters of, any particular part of the county.

24.     During the same 1970 session, the General Assembly enacted separate local legislation abolishing the geographic districts and candidate-residency requirements used to elect members of the Houston County Board of Education, permitting candidates for each school board post to reside anywhere in the county while continuing to require countywide election. 1970 Ga. Laws 2965. The General Assembly thus acted in a single session to eliminate geographic-representation requirements from both of Houston County's principal elected governing bodies.

25.     The 1970 abolition of the residency requirements removed the only feature of the system that connected any commissioner to a geographic part of the county and made the method of electing the Board a wholly at-large one.

26.     Following the enactment of the Voting Rights Act of 1965 and prior to 2013, the State of Georgia was a covered jurisdiction in its entirety for purposes of Section 5 of the Voting Rights Act of 1965.

27.     The 1970 amendment of the 1922 Act by the General Assembly was made without seeking preclearance from the Department of Justice as required by a covered jurisdiction under Section 5 of the Voting Rights Act of 1965.

28.     In 1990, also after the enactment of the Voting Rights Act, the General Assembly again amended the 1922 Act (1990 Ga. Laws 3510). It provided that, beginning with the 1990 general election, Post 1 would be designated the

8

Chairman Post and that the candidate elected to Post 1 from the county at large would serve as chairman of the Board. Before 1990, the commissioners had chosen the chairman from among their own number; the 1990 amendment made the chairmanship an office filled by countywide at-large election.

29.    According to the 2020 Census, Black residents now constitute approximately 33% of Houston County's population. The at-large method of election adopted in 1922 thus continues in effect, without material change to its at-large character, and continues to operate to deny Houston County's present Black population an equal opportunity to elect candidates of its choice.

30.    Through each of these amendments, and notwithstanding the restoration of Black citizens' access to the ballot after 1965, the General Assembly and the County have retained the at-large method of electing the Board of Commissioners; have added and reinforced features of that method, including numbered posts and staggered terms, that minimize the ability of Black voters to elect candidates of their choice; and, in 1990, designated the most powerful office on the Board—the elected chairman—as a separate countywide post beyond the reach of any district-based method of election.

31.    After this litigation began, members of the Board of Commissioners held one or more public meetings at which Black residents of Houston County,

including members of the Georgia NAACP, told the commissioners that the at-large method of election prevents Black voters from electing candidates of their choice and asked the County to adopt single-member districts. The County has continued to use the at-large method notwithstanding these requests.

32.    The at-large method of electing the Board of Commissioners was adopted in 1922, and has been retained and reinforced since, at least in part for the purpose of diluting Black voting strength and preserving White control of the Board.

33.    The totality of the circumstances—including the adoption of the at-large method in 1922, when Black residents were a majority of the county's population but were excluded from the political process; the addition of numbered posts and staggered terms in 1958; the abolition of residency requirements in 1970; the conversion of the chairmanship to a countywide at-large office in 1990; the repeated decisions of the General Assembly to retain the at-large method after the Voting Rights Act restored Black citizens' access to the ballot; and other indicia of present-day discrimination—gives rise to a strong inference that the at-large method of election has been adopted and maintained intentionally to afford Black voters less opportunity than other members of the electorate to elect representatives of their choice on account of race.

10

34.    ~~12.~~ Elections for the Houston County Board of Commissioners are held in November of even-numbered years and are preceded by partisan primaries in May. If no candidate obtains a majority in a primary or the general election, the top two finishers advance to a runoff election four weeks later. Voters may cast one vote for a candidate running for election to each numbered Post.

35.    ~~13.~~ According to the 2020 Census, Houston County has a population of 163,633, including 86,211 non-Hispanic White persons (52.7%) and 54,148 non-Hispanic Black persons (33.1%). Houston County also has a voting-age population of 122,118, including 68,018 non-Hispanic White persons (55.7%) and 38,329 non-Hispanic Black persons (31.4%).

36.    ~~14.~~ The ~~2018-2022~~ 2018–22 American Community Survey estimated that Houston County had a citizen voting-age population of 118,735, including 69,195 non-Hispanic White persons (58.3%) and 37,405 non-Hispanic Black persons (31.5%).

37.    ~~15.~~ There are approximately 105,000 active registered voters in Houston County, including approximately 58,000 White registered voters (55%) and approximately 32,000 Black registered voters (30%).

38.    ~~16.~~ White registered voters in Houston County turn out to vote at higher rates than Black registered voters in Houston County.

11

39.    ~~17.~~ The Black population of Houston County is sufficiently numerous and geographically compact to constitute a majority of the voting-age population and the citizen voting-age population in a single-member district for the Houston County Board of Commissioners under a five-district plan.

40.    ~~18.~~ The Black population of Houston County is also sufficiently numerous and geographically compact to constitute a majority of the voting-age population and citizen voting-age population in a single-member district for the Houston County Board of Commissioners under a four-district plan.

41.    A single-member district plan for the Board of Commissioners drawn without using race as a districting criterion, and applying only race-neutral districting principles such as population equality, contiguity, compactness, and respect for political subdivisions and communities of interest, would include at least one district in which Black residents constitute a majority of the relevant population.

42.    A majority-Black district results from the application of these race-neutral districting principles because the Black population of Houston County is geographically concentrated, including in and around the City of Warner Robins.

43.    Because the existing at-large method of election uses no districts, no district lines, and no district-based political goals, no legitimate districting objective

12

of the State or the County would be left unmet by any of the illustrative single-member district plans or alternative countywide remedies described in this complaint.

44.    ~~19.~~ There are also numerous remedies that could be adopted within the confines of a countywide system of elections for four or five members of the Houston County Board of Commissioners. These remedies include, but are not limited to, cumulative voting, limited voting, and ranked-choice or single transferable voting. Black voters in Houston County would have a meaningful opportunity to elect at least one member of the Board of Commissioners under each of these countywide remedies.

45.    ~~20.~~ Since Reconstruction, only one Black candidate~~, Houston Porter,~~ has been elected to the Houston County Board of Commissioners, and no Black candidate has been elected to the Houston County Board of Commissioners since the 1990 amendment to the 1922 Act.

~~21. After an unsuccessful campaign in 1978, Porter was elected to the Houston County Board of Commissioners in 1980. Porter defeated an incumbent in a primary runoff election by only 49 votes and was uncontested in the general election. Porter was reelected in 1984 and 1988 and declined to seek reelection in 1992.~~

46.     ~~22.~~ Black candidates ran for the Houston County Board of Commissioners in 1992, 1994, 2002, 2016, 2020, and 2022. During this period, Black candidates have run as Democrats, as a Republican, and as an independent. All were defeated in partisan primaries or general elections.

47.     ~~23.~~ In elections for the Houston County Board of Commissioners, the Black population of Houston County is politically cohesive, and the White population votes sufficiently as a bloc to usually defeat the preferred candidate of Black voters.

48.     ~~24.~~ Black voters consistently vote for Black candidates for the Houston County Board of Commissioners.

49.     ~~25.~~ Since 2002, at least 85% of Black voters have supported Black candidates in general elections for the Houston County Board of Commissioners.

50.     ~~26.~~ Although relatively few Black voters have participated in Republican primaries, most of the Black voters who did participate in the 2022 Republican primary supported a Black Republican candidate for the Houston County Board of Commissioners.

51.     The divergence between the candidate preferences of Black voters and white voters in elections for the Board of Commissioners is not explained by partisan affiliation.

14

52.    27. In contests between Black candidates and White candidates for the Houston County Board of Commissioners, White voters cast their ballots sufficiently as a bloc to defeat Black voters' preferred candidate.

53.    28. Since 2002, fewer than one-fourth of White voters supported Black-preferred Black candidates in general elections for the Board of Commissioners. Since 2016, fewer than one in ten White voters have supported Black-preferred Black candidates in general elections for the Board of Commissioners. As a result, each Black-preferred Black candidate was defeated.

54.    29. Even when a Black candidate has run as a Republican and received majority support from participating Black voters in the primary election, less than one-fourth of White voters supported that candidate in that primary. As a result, this Black-preferred Black candidate was defeated.

55.    30. Houston County and the State of Georgia have a long and extensive history of voting discrimination against Black voters.

56.    31. Voting in elections for members of the Houston County Board of Commissioners is polarized along racial lines., including in recent elections. This racial bloc voting cannot be explained by partisan affiliation.

57.    Georgia's majority-vote requirement, under which a candidate must receive more than 50% of the vote to be elected and the top two candidates

15

otherwise advance to a runoff, applies to elections for the Board of Commissioners. O.C.G.A. § 21-2-501(a). The requirement was enacted in 1964 as part of a comprehensive revision of Georgia's election laws adopted during a period in which the State was responding to the expansion of Black voter registration and the dismantling of the county-unit system. Majority-vote and runoff requirements of this kind were widely understood to disadvantage cohesive minority voters, who might elect a candidate of choice with a plurality in a single election but be defeated by a consolidated majority in a head-to-head runoff. In combination with at-large election and numbered posts, the majority-vote requirement enhances the dilutive effect of the at-large method used to elect the Houston County Board of Commissioners.

32. Elections for members of the Houston County Board of Commissioners feature voting practices that enhance the opportunity for discrimination against Black voters, including staggered terms, numbered posts, and a majority-vote requirement.

58. 33. The at-large method of election, together with the use of numbered posts, staggered terms, and a majority-vote requirement, continues to operate at the present time to deny Black voters in Houston County an equal opportunity to participate in the political process and to elect representatives of their

16

choice.Black residents of Houston County bear the effects of discrimination in such areas as housing, employment, and health, which hinder their ability to participate effectively in the political process.

59.    ~~34. The~~Because of the existing at-large method of electing members of the

Houston County Board of Commissioners ~~lacks proportionality in that~~, the percentage of districts in which Black voters constitute an effective majority is less than the Black percentage of Houston County's voting-age population. That disparity, a natural and foreseeable consequence of the existing at-large method, along with the unequal distribution of resources by and within Houston County, the lack of adequate attention to the needs of the Black community in Houston County, and other factors, supports is an inference of intentional discrimination.

## Count I
## Section 2 of the Voting Rights Act

60.    The existing at-large method of electing members of the Houston County Board of Commissioners results in Black voters in Houston County having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the

Voting Rights Act, 52 U.S.C. § 10301, as enforced by 52 U.S.C. § 10308 and 42 U.S.C. § 1983.

## Count II
## Fourteenth and Fifteenth Amendments

61.     The State of Georgia adopted the at-large method of electing the Board of Commissioners in 1922, and has maintained and reinforced it since, up to and including the present day, at least in part for the purpose of diluting Black voting strength and denying Black voters an equal opportunity to participate in the political process and to elect representatives of their choice.

62.     The totality of the circumstances alleged in this complaint gives rise to a strong inference that the at-large method of election has been adopted and maintained intentionally to afford Black voters in Houston County less opportunity than other members of the electorate to elect representatives of their choice on account of race.

63.     The adoption and maintenance of the at-large method of election for the purpose of diluting Black voting strength violates the Fourteenth and Fifteenth Amendments to the United States Constitution and is actionable under 42 U.S.C. § 1983.

18

## Relief

64. ~~35.~~ A real and actual controversy exists between the parties.

65. ~~36.~~ The plaintiffs have no adequate remedy at law other than this action for declaratory and equitable relief.

66. ~~37.~~ The plaintiffs are suffering irreparable harm as a result of the violation complained of herein, and that harm will continue unless declared unlawful and enjoined by this Court.

WHEREFORE, the ~~plaintiff-intervenors~~plaintiffs respectfully pray that this Court:

(1) enter a declaratory judgment that the current method of electing members of the Houston County Board of Commissioners dilutes ~~black~~Black voting strength in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and that the adoption and maintenance of that method of election violates the Fourteenth and Fifteenth Amendments to the United States Constitution;

(2) enjoin the defendants from administering any future elections for members of the Houston County Board of Commissioners using the current method of election;

(3) order the defendants to administer future elections for members of the Houston County Board of Commissioners using a method of election that complies with Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution;

(4) award the ~~plaintiff-intervenors~~plaintiffs the costs of this action together with their reasonable attorneys' fees and expenses under 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988; and

(5) retain jurisdiction of this action and grant the

~~plaintiff-intervenors~~plaintiffs any further relief which may in the discretion

of the Court be necessary and proper.

Respectfully submitted this ~~5th~~6th day of ~~March~~July, ~~2025~~2026.

*/s/ David Newmann*_____
David Newmann (*Admitted Pro Hac Vice)*
HOGAN LOVELLS CADWALADER US LLP
1735 Market St., 23rd Floor
Philadelphia, Pennsylvania 19103
Tel. (267) 675-4600
Fax (267) 675-4601
david.newmann@hlc.com

~~/s/~~ Bryan L. Sells_____
~~Georgia Bar No. 635562~~
Georgia Bar No. 635562
~~The Law Office of Bryan~~THE LAW OFFICE OF BRYAN L. ~~Sells, LLC~~SELLS
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212 (voice/fax)
bryan@bryansellslaw.com

Lynsey Barron
**/s/ Lynsey Morris Barron**
Georgia Bar No. 661005
~~Barron Law~~BARRON WARD LLC
1800 Peachtree St. NE, Suite 300
Atlanta, Georgia 30309
404-276-3261
lynsey@~~barron~~barronward.~~law~~
com

21

Arielle Anderson (*Admitted Pro Hac Vice)*
HOGAN LOVELLS CADWALADER US LLP
609 Main St., Suite 4200
Houston, Texas 77002
Tel. (713) 632-1400
Fax (713) 632-1401
arielle.anderson@hlc.com

**Attorneys for the** ~~Plaintiff-Intervenors~~**Driver Plaintiffs**

Robert N. Weiner*
Julie M. Houk *(Admitted Pro Hac Vice)*
Grace Thomas *(Admitted Pro Hac Vice)*
Samantha Heyward *(Admitted Pro Hac Vice)*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
rweiner@lawyerscommittee.org
jhouk@lawyerscommittee.org
gthomas@lawyerscommittee.org
sheyward@lawyerscommittee.org

Stacey M. Mohr
Georgia Bar No. 619207
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street NE
Atlanta, GA 30309
(404) 853-8000
staceymohr@eversheds-sutherland.com

22

Harmony L. Jones*
Maria L. Stratienko*
John Coffron*
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
(202) 383-0100
harmonyjones@eversheds-sutherland.com
mariastratienko@eversheds-sutherland.com
johncoffron@eversheds-sutherland.com

John H. Fleming
Georgia Bar No. 263250
John H. Fleming Law LLC
1066 Springdale Rd., N.E.
Atlanta, GA  30306
(404) 285-5084
john@jhflaw.org

***Attorneys for the National Association for the Advancement of Colored People Georgia State Conference***

*\* Motion for admission Pro Hac Vice forthcoming*

23

| Summary report: Litera Compare for Word 11.12.0.83 Document comparison done on 7/6/2026 7:11:13 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2025-03-05 - complaint-in-intervention.docx | |
| **Modified filename:** first amended complaint for redline.docx | |
| **Changes:** | |
| Add | 192 |
| Delete | 75 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 1 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 268 |