# EXHIBIT A

**DRIVER V. HOUSTON COUNTY BOARD OF ELECTIONS**
**No. 5:25-cv-00025-MTT (M.D. Ga.)**
**DECLARATION OF DR. JOSEPH BAGLEY, PH. D**
**December 24, 2025**

## I. CREDENTIALS

I am an Associate Professor of History at Georgia State University, Perimeter College. I study United States constitutional and legal history, politics, and race relations, particularly in the Deep South. I earned a Ph.D. in 2013 from Georgia State and an M.A. (2007) and B.A. (2004) from Auburn University. My first book, *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools*, is an analysis of federal school desegregation litigation and political change. It was published in November 2018 by the University of Georgia Press in the *Politics and Culture of the Twentieth Century South* series. My second book, *Power, the Law, and the Franchise: The Long, Ongoing Voting Rights Struggle and Racial Politics in Alabama, 1865–2025*, is under contract with the University of Alabama Press and is set to be published next year (2026) in the *Modern South* series.

My work has been cited in the *Case Western Law Review*, the *Journal of Urban History*, *Rural Sociology*, the *Alabama Civil Rights and Civil Liberties Law Review*, on National Public Radio, in the *New York Times Magazine*, and in numerous scholarly monographs, including very recently (as reflected in my attached CV below).[1] I have written solicited book and manuscript reviews for the University Press of Kansas, *Law and History Review*, the *Journal of Southern History*, the *Alabama Review*, *Mississippi Historical Quarterly*, *Georgia Historical Quarterly*, *Urban History*, and *History of Education Quarterly.*[2]

[1] Regarding recent monographs, see, for example, Rebecca Coleen Retzlaff, *Planning White Supremacy: Civil Rights and City Planning in Montgomery, Alabama, 1920 – 1970* (Tuscaloosa: University of Alabama Press, 2026); and Dan T. Carter, *Unmasking the Klansman: The Double Life of Asa and Forrest Carter* (Montgomery: New South Books, 2023). Wendy Parker, "Why Alabama School Desegregation Succeeded (And Failed)," 67 *Case Western Law Review*, 1091 (2017); Rebecca Retzlaff, "Desegregation of City Parks and the Civil Rights Movement: The Case of Oak Park in Montgomery, Alabama," *Journal of Urban History* 47.4, 715 (2019); Erika Frankenberg, "The Impact and Limits of Implementing Brown: Reflections from Sixty-Five Years of School Segregation and Desegregation in Alabama's Largest School District," 11 *Alabama Civil Rights and Civil Liberties Law Review*, 33 (2019); Bryan Mann, "Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama," *Rural Sociology* 86.3, 523 (2021); Stephen Fowler, "Alabama may soon have a U.S. House delegation that more closely matches its diversity," *Morning Edition*, National Public Radio, April 15, 2024; Stephen Fowler, "In new congressional district, Black voters weigh what representation really means," National Public Radio online; Nikole Hannah-Jones, "The Resegregation of Jefferson County," *The New York Times Magazine*, Sept. 6, 2017.

[2] "The Beginning of the End' of Klan Terror: Joseph Bagley Reviews James Turner's Memoir of Three Trials," *Law and History Review*, *The Docket* (2019); Review of Camille Walsh, *Racial Taxation: Schools, Segregation, and Taxpayer Citizenship, 1869-1973*, *The Alabama Review* 74.4 (2021), pp. 340-43; Review of Leeann G. Reynolds, *Maintaining Segregation: Children and Racial Instruction in the South, 1920-1955*, *The Alabama Review* 72.2 (2019), pp. 154-57; Review of Tracy E. K'Meyer, *From* Brown *to* Meredith*: The Long Struggle for School Desegregation in Louisville, Kentucky, 1955—2007*, *The Journal of Southern History* 80.4 (2014), pp. 1019-2; Review of Stephanie Rolph, *Resisting Equality: The Citizens'*

Earlier this year, I testified for the second time in *Milligan v. Allen*. The trial Court in that case found that the State of Alabama violated Section 2 of the Voting Rights Act ("VRA") and acted with discriminatory intent in adopting post-2020-Census Congressional redistricting plans. I was "qualified without objection as an expert in Alabama history, political analysis, race relations, and historical methodology." Injunction and Order, Findings of Fact and Conclusions of Law, May 8, 2025 (N.D. Ala.), p. 128. I offered opinions relevant to the *Milligan* Plaintiffs' Section 2 and intent claims. The Court credited my testimony and cited to it extensively in its final ruling (p. 362 and *passim*). Prior to the trial in *Milligan*, I testified at trial in *Alabama State Conference of the NAACP v. Allen*, a case in which plaintiffs challenged state Senate districts in the Montgomery and Huntsville areas as violative of Section 2.[3] The Court cited favorably to my testimony and awarded relief in Huntsville.[4]

In 2023 I submitted an expert report and testified in a deposition in *NAACP v. Raffensperger*, a stayed case in which plaintiffs are challenged the State of Georgia's Congressional and state legislative redistricting plans.[5] Before that I testified at trial in *South Carolina State Conference of the NAACP v. Alexander*. The court therein tendered me as an expert in "American political history, southern legal history, political analysis, historical methods, the history of race discrimination and voting with a particular focus on South Carolina and southern race relations and southern politics and law."[6]

My attached CV lists in full my educational background, publications for the last 10 years, and prior testimony in the last four years. I am compensated at the rate of $250 per hour for my work preparing this report. This compensation is not dependent upon my findings. I reserve the right to revise my opinions as stated herein upon further research or findings.

## II. PURPOSE, METHODOLOGY, SUMMARY FINDINGS

I have been asked by Plaintiffs' counsel in this case to provide my opinion as to whether the political process is equally open to Black voters in Houston County, relevant particularly to the Houston County Board of Commissioners. I approach this question via the "totality of the circumstances" test, as applied using the factors set forth by the U.S. Senate Judiciary Committee during the amendment of Section 2 of the Voting Rights Act in 1982 and subsequently referenced by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986) ("*Gingles*") (the "Senate Factors").

---

*Council, 1954-1989*, *Journal of Mississippi History* 82.3, pp. 233-35; Review of Wayne and Shirley Weigand, *The Desegregation of Public Libraries in the Jim Crow South: Civil Rights and Local Activism*, *Georgia Historical Quarterly* 102.3, 2018, pp. 296-97.

[3] No.: 2:21-cv-01531-AMM (N.D. Ala. 2024).

[4] *Id*. at 180.

[5] No.: 23-civ-5338-ELB-SCJ-SDG (N.D. Ga. 2023).

[6] No.: 3:21-cv-03302 (D.S.C. 2022); Plaintiffs won at trial, but that decision was reversed as to their racial gerrymandering claim and remanded on their discriminatory intent claim, which was not further pursued. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. [1], 144 S. Ct. 1221 (2024).

As a historian, my analysis adheres to the standards of historiography, or the practice of researching and writing about history in the academic setting and seeking to understand how the past informs the present. This report draws upon relevant, well-regarded historiographical works, or secondary sources, including peer-reviewed academic journal articles and scholarly books. It relies as well upon primary sources in the form of historical and contemporaneous press coverage, U.S. Justice Department documents, Census data, and relevant caselaw. These represent common sources for scholars in the humanities and the social sciences to reference, and I weigh all of these, along with other reliable sources, against one another, objectively.

There are seven core Senate Factors and two "additional" factors that courts have indicated might be considered to the extent that they are appropriate. These include:

- The "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process" [Factor 1]
- The "extent to which voting in the elections of the state or political subdivision is racially polarized" [Factor 2]
- The "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group" [Factor 3]
- If "there is a candidate slating process, whether the members of the minority group have been denied access to that group" [Factor 4]
- The "extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process" [Factor 5]
- Whether "political campaigns have been characterized by overt or subtle racial appeals" [Factor 6]
- The "extent to which members of the minority group have been elected to public office in the jurisdiction" [Factor 7]
- Whether "there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" [Factor 8, Additional Factor]
- And "Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous" [Factor 9, Additional Factor].

These factors allow scholars and courts to undertake a "practical evaluation of the past and present realities" and to determine "whether the political process is equally open to minority

voters" (*Gingles* at 30). As the Court held in *Gingles*, other additional factors may be considered, and there is no requirement that all factors be considered or that any particular weight be assigned to any one factor.[7]

In my opinion, Senate Factors 1, 3, 5, and 7 are present in Houston County, especially as they relate to the county commission. I also discuss intent and proportionality. Factor 2 is typically analyzed by specially trained political scientists, though a Court has recently found that Factor 2 "heavily" weighed "in favor of a finding of a Section 2 violation" in Georgia. *Alpha Phi Alpha v. Raffensperger*, No.: 1:2021cv05337 – Doc. 333 (N.D. Ga. 2023), at 242. Factor 4 covers candidate slating, which is significantly less common than it was when the Senate Factors were enshrined. Factor 6 is difficult to analyze because white candidates have learned to mask their racial appeals under a veneer of other issues.[8]

## III. SENATE FACTORS 1 AND 3: A HISTORY OF DISCRIMINATION IMPACTING THE ABILITY TO FULLY PARTICIPATE IN THE POLITICAL PROCESS AND THE USE OF DISCRIMINATORY AT-LARGE SYSTEMS WITH ENHANCING DEVICES

Senate Factor 1 requires an examination of the "extent of any history of official discrimination in the state or political subdivision that has touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." Factor 3 involves the "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." In my experience, experts and courts often consider these factors together, and with good reason, as the use of at-large election schemes and vote-dilution enhancing devices are part of the recent history of voting discrimination.[9]

This is particularly true in this case in that the at-large system for electing members of the County Commission was put in place at a time of racial conflict in Houston County decidedly similar with those associated with the invalidation of hundreds of similar electoral systems in other parts of the South and in Georgia. As legendary voting rights attorney Laughlin McDonald wrote in his book, *A Voting Rights Odyssey: Black Enfranchisement in Georgia*, "Counties in Georgia with single-member district elections continued to switch to at-large voting after extension of the

---

[7] Report of the Committee on the Judiciary on S. 1992 (Voting Rights Act Extension), United States Senate, 97th Congress, 2nd Session, Report No. 97-417, "the Senate Factors Report," pp. 28-9.

[8] Joseph Bagley, *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools* (Athens: University of Georgia Press, 2018) pp. 6-10.

[9] See, for example, Alpha Phi Alpha v. Raffensperger, No.: 1:21-cv-05337-SCJ, Document 333, (Oct. 26, 2023, N.D. Ga.), at 430; and Alabama State Conference of the NAACP v. Allen, No.: 2:21-cv-1531-AMM, Injunction and Order, Findings of Fact and Conclusions of Law, Aug. 22, 2025 (M.D. Ala.), at 199.

Voting Rights Act in 1970."[10] That is the very year that Houston County switched to an at-large electoral scheme for its Board of Commissioners.

The reason counties and municipalities did this is to prevent the election of Black candidates of choice, anywhere there was at least a bare 50 percent white majority. At-large schemes had been used during Reconstruction but were abandoned for districted systems after the Redemption and the implementation of total Black disenfranchisement. After the passage and 1970 reauthorization of the Voting Rights Act, Black voting power became a reality once again. So white lawmakers readopted at-large schemes to prevent Black electoral success. In districted elections, cohesive Black communities in racially segregated areas, with the ability to register and vote, could potentially elect candidates of choice to local electoral bodies. When a county or city was, or in the case of Houston County *is*, operating under an at-large system, especially with "enhancing devices" like numbered posts and a majority vote requirement, a slim white majority electorate can defeat Black candidates of choice in every election for every post, assuming there is racial bloc voting. This has been the case in Houston County since the current system was adopted in 1970.

Regarding the State of Georgia more broadly, in an inquiry focused on regions of the state including Houston County in 2023, the District Court in *Alpha Phi Alpha v. Raffensperger* held, "[W]hile promising gains have been made in the State of Georgia, the political process is not currently equally open to Black Georgians. When evaluating the Senate Factors, the evidence shows that Black voters have *less* of opportunity to partake in the political process than white voters." No.: 1:2021cv05337 – Doc. 333 (N.D. Ga. 2023), at 428, emphasis in original.

A. <u>A History of Violence and Disenfranchisement: Reconstruction, Redemption, and the First Half of the 20th Century</u>

As Laughlin McDonald concluded in *A Voting Rights Odyssey*, "no state [besides Georgia] was more systematic and thorough in its efforts to deny or limit voting and officeholding by African Americans after the Civil War," with the state adopting "virtually every one of the traditional 'expedients' to obstruct the exercise of the franchise" by Black citizens.[11] Historian Morgan Kousser similarly observed, "The most comprehensive effort to undo Reconstruction . . . occurred in Georgia ...."[12] Black citizens of the state were also subject to complete disenfranchisement, and attendant violence for the first half of the 20th century.[13]

After passage of the Voting Rights Act in 1965, the State of Georgia unsuccessfully sued to block the act's implementation. Subsequently, according to McDonald, its "flouting of the act's preclearance requirement, and its adoption of new measures blunting the increases in black voter

---

[10] Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (New York: Cambridge University Press, 2003, 2009), pp. 143-44.

[11] McDonald, *A Voting Rights Odyssey*, pp. 2-3.

[12] Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1974), 209-221.

[13] McDonald, *A Voting Rights Odyssey*, pp. 45-79; Stephen G. N. Tuck, *Beyond Atlanta: The Struggle for Racial Equality in Georgia, 1940 – 1980* (Athens: University of Georgia Press, 2001), pp. 9-20.

registration, "were the equal of any such efforts in the South."[14] Between passage of the VRA and the end of "preclearance" in 2012, the State of Georgia and its counties and municipalities were subject to 195 Section 5 objections from the Civil Rights Division of the Justice Department.[15]

Just two years ago, the District Court in *Alpha Phi Alpha* observed, in reference to the reauthorization of the Voting Rights Act in 1982, "Georgia's history of discrimination against Black voters did not end in 1981." No.: 1:2021cv05337 – Doc. 333 (N.D. Ga. 2023), at 218. The Court continued, "When the VRA was reauthorized in 1982, the Senate Report specifically cited to Georgia's discriminatory practices that diminished the voting power of Black voters. *Id*. 218-19, citation omitted. The Court also noted that "During the 2006 reauthorization process of the Voting Rights Act, Georgia legislators 'took a leadership position in challenging the reauthorization of the [A]ct,' an action that, according to one the plaintiffs' experts, was "consistent with [the State's] history of resisting the expansion of voting rights to Black citizens at every turn." *Id*. 219, citation omitted.

The Court in *Alpha Phi Alpha* also concluded that "more recent practices in Georgia" had a disproportionate impact and discriminatory effect on Black voters, including polling place closures, voter purges, and the Exact Match requirement." *Id*. at 219-21. Finally, under the totality of the circumstances test, the Court found that the State's post-2020 redistricting plans for its state legislative districts violated Section 2 of the Voting Rights Act. The Court concluded that the "electoral system is not equally open to Black voters in these regions of the State." The regions in question included "Metro-Macon," including Houston County. The Court specifically found that "Senate Factors One, Two, Three, Five, and Seven weigh[ed] in favor of showing the present realities of a lack of opportunity for Black voters." *Id*. 220-221,

Houston County has been no outlier in Georgia's history of discrimination. It was among the Georgia counties that had a slave population greater than 40 percent on the eve of the Civil War and is, depending on the eye of the beholder, part of the state's Black Belt, wherein enslaved labor generated immense wealth for white landowners.[16] There was never a land redistribution program for Freedmen after the war, meaning former slaves rarely benefitted from the generational wealth the land that remained in white hands produced. Instead, they were subject to tenant farming, sharecropping, and convict labor. They were also subject to Black Codes and, after the dismantling of Reconstruction, white supremacy in the form of violence, lynching, disenfranchisement, and Jim Crow segregation.[17]

---

[14] McDonald, *A Voting Rights Odyssey*, pp. 3-4

[15] Civil Rights Division Section 5 Objection Letters by State, https://www.justice.gov/crt/voting-determination-letters-georgia.

[16] Plaintiffs' expert Dr. Maxwell Palmer included parts of Houston in his Black Belt region when testifying in Alpha Phi Alpha v. Raffensperger in 2023, at 152.

[17] McDonald, *A Voting Rights Odyssey*, pp. 29-41; Eric Foner, *Reconstruction: America's Unfinished Revolution* (New York: 1999, 2002), pp. 590-99; Vernon Burton, *The Age of Lincoln* (New York: Hill and Wang, 2007), pp. 274-76, 304-5; Laughlin McDonald, Michael B. Binford, and Ken Johnson, "Georgia," in Chandler Davidson and Bernard Grofman, Eds, *Quiet Revolution in the South: the Impact of the Voting Rights Act, 1965-1990* (Princeton: Princeton University Press, 1994), pp. 67-102. Kousser, *Shaping of Southern Politics*, pp. 217-21.

There were at least four lynchings in Houston County between the end of Reconstruction and 1923.[18] In October 1900 Frank Hardeman was lynched near Wellston (now Warner Robins) for allegedly attempting to sexually assault a white woman, "the crime that always brings speedy death to the perpetrator," according to the *Houston Home Journal*. The *Journal* reported, "The body of the negro was discovered hanging to a tree . . . with five bullet holes in the body, dead." The lynching had been carried out "by a party, or parties, unknown."[19]

John Shake was lynched in July 1913 for allegedly shooting and wounding a white man while attempting to rob a store in Dunbar. The storeowner supposedly recognized Shake, and a posse of upwards of 100 men, "aroused to a high pitch of indignation," assembled and were "bent on running the negro down and avenging the attempt on the life of their friend and neighbor." After he was captured, Shake "confessed that it was he who had done the shooting and without further ado he was strung up."[20]

Lee Green was lynched for allegedly assaulting a "prominent" Houston County woman in May of 1923. He was apprehended but, according to the *Butler Herald*, he was taken from officers at Echeconee by "a Houston County mob" to which he purportedly confessed. A team of search dogs had initially looked for the supposed suspect after the woman was allegedly attacked in her home, but the trail went cold. After that, "searches were made for the negro, though no definite description was given at that time."[21]

B. Limited Change through Concerted Effort, World War II to 1970

Complete disenfranchisement and total segregation for Black residents of Houston County remained the rule for the first half of the 20th century. White Houstonians reinvigorated the Ku Klux Klan after World War II to meet any challenges to these facts. Throughout the South, Black veterans helped spark a renewed nonviolent and litigious assault on Jim Crow and disenfranchisement which was met with violent resistance and economic reprisal. In that milieu, white citizens in Perry in Houston County formed a local "klavern" and began holding meetings and posting signage and literature throughout town.[22] A principal goal of this iteration of the Klan was intimidating Black citizens such that they would not seek to register to vote.[23]

Jim Crow and its many humiliations and limitations remained the reality for Black residents in Houston County during this time and into the 1960s and 1970s. Just last year, 2024, a long-time Black Houston County resident explained to the all-white county commission that members of her family lived in dismal conditions during her childhood and were forced to forgo school for farm work. She said, "African Americans were punished for not saying 'yes, sir,' and 'no, sir.' Men

---

[18] Equal Justice Initiative, *Lynching in America*, Georgia, https://lynchinginamerica.eji.org/explore/georgia.

[19] "Negro lynched near Wellston," *Houston Home Journal*, Oct. 18, 1900.

[20] "Lynch negro who fired on merchant," *Macon Telegraph*, July 28, 2013.

[21] "Two put to death for atrocious crimes," *Butler Herald*, Aug. 23, 1923.

[22] "Klan activity in Perry this week," *Houston Home Journal*, July 22, 1948.

[23] Jonathan M. Bryant. "The Ku Klux Klan in the Reconstruction Era," *New Georgia Encyclopedia*, Aug. 12, 2020, https://www.georgiaencyclopedia.org/articles/history-archaeology/ku-klux-klan-in-the-reconstruction-era/.

were thought as 'good negroes' when doing as they were told and asked no questions. No African Americans [were] allowed in any establishments from 1955 to 1970."[24]

Commissioner Shane Gottwals responded, saying, "It feels like we are so far removed from Jim Crow and so far removed from the days of segregation. But we're not. It is not that far in the past, and people alive today had first hand experience with so much of this."[25] This latter point is crucial in that a current commissioner on the all-white board has acknowledged that past discrimination has had an effect on current political participation in Houston County, one of the lynchpins of a Senate Factors analysis.

In October 1963, after SNCC and SCLC's campaign in Albany, local Houston County NAACP activists, including students from Fort Valley State College in nearby Peach County, launched a nonviolent resistance campaign targeting Jim Crow laws that were so thoroughgoing that the Macon *Telegraph* later explained that such laws "legally segregated schools, bathrooms, faucets, bus seating and even jail cells."[26]

The students, many of them involved with the Houston County NAACP, resolved to stage sit-ins at Liggett's Drug Store, which had a segregated lunch counter. Groups of four went in, certain of arrest, and asked to be served. The response was typical – a server refuses, a manager is called, the counter is closed, the police come and arrest the protestors, and more sit down. When the students were convicted at trial of trespassing and disorderly conduct, one told the Court, in reference to the courthouse's segregated water fountains, "The only colored water I drink is sweet, and this water ain't sweet. So I'm going to drink the white water." A "mini-brawl" ensued in the lobby of the courthouse, as described by the *Telegraph*, between white police officers and the children's parents.[27]

In the spring of 1965, following the passage of Civil Rights Act of 1964, pressure from the U.S. Department of Health, Education, and Welfare (HEW), along with local and national activist groups, began to break the barriers of formal, Jim Crow segregation in Houston County. In March alone, HEW notified the Houston County Housing Authority that it could no longer operate segregated public housing; Atlanta attorney Donald Lee Hollowell began to pressure the county to desegregate facilities in the county courthouse; and members of the local Voters Committee and NAACP held voter registration drives, canvassing Black neighborhoods in the county and offering to provide transportation to the courthouse to register.[28]

One month later, local NAACP president Oscar Thomie partnered with Hollowell in bringing a school desegregation lawsuit in federal court against the county school board on behalf

---

[24] Brieanna Smith, "Commissioners talk Black history, election integrity at latest meeting," *Houston Home Journal*, Feb. 24, 2024, https://hhjonline.com/commissioners-talk-black-history-election-integrity-at-latest-meeting/.

[25] *Id.*

[26] Christina Wright, "Sit In, Stand Up," *Macon Telegraph*, Feb. 2, 2011.

[27] *Id.*

[28] "Negro Registration Drive Conducted in Houston," *Macon Telegraph*, March 17, 1965; "Integration Order Given," *Macon Telegraph*, March 17, 1965; "Referendum in Houston Set on Tax Resolution," *Macon Telegraph*, March 17, 1965.

of Thomie's children and several dozen others. Houston County had already been under pressure from HEW to submit a desegregation plan or face the loss of federal funding, which in Houston County's case would have been crippling – nearly a quarter of the system's funding was federal. But the token nature of the plan initially adopted by the county the previous fall, which had resulted in zero desegregation, prompted Thomie and Hollowell to bring suit with the support of the NAACP Legal Defense Fund's Jack Greenberg and Derick Bell.[29]

Plaintiffs described the plan put forth by the school board to HEW as "wholly inadequate." In May the District Court ordered the implementation of a stairstep, freedom of choice plan whereby the county would have to desegregate the 1st, 9th, 10th, 11th, and 12th grades that fall, allowing Black students, in practice, to apply for admission to all-white schools. The plan called for freedom of choice for all grades by the fall of 1968. Hollowell had asked for more in terms of transportation and facilities integration, but Judge W.A. Bootle denied that relief for the time being, and HEW approved the plan. Schools opened that fall with 75 Black students admitted to previously all-white schools.[30]

Following the Fifth Circuit's ruling in *U.S. v. Jefferson County Board of Education* in 1966, plaintiffs filed new motions in *Thomie v. Houston County Board of Education* seeking faculty desegregation, remedial education opportunities for Black students, and all-grade pupil integration, with each student being sent a form and required to make a choice of their school assignment, in the fall of 1967.[31] The District Court granted partial relief for the plaintiffs but denied it as to the forms, the required-choice provisions, faculty desegregation, facilities, and student activities. The Fifth Circuit reversed and remanded while consolidating the Houston case with that of neighboring Bibb County.[32]

Two years later, after the Supreme Court's decisions in *Alexander v. Holmes County Board of Education* and *Carter v. West Feliciana Parish*, Houston County was compelled by the Fifth Circuit, again reversing the District Court, to adopt a compulsory assignment plan.[33] White parents in Perry attended a mass meeting and peppered the school board with questions about possible defiance of the courts and predicted that integration would "destroy" public education in the southern part of the county because white parents would refuse to send their children to schools where white students were not in the majority.[34]

---

[29] "Houston Named in Desegregation Suit," *Macon News*, April 9, 1965; "Houston Desegregation Plan Challenged in Court," *Macon Telegraph*, April 10, 1965.

[30] *Id*,; "Houston School's Integration OKed," *Macon Telegraph*, May 22, 1965; "Bibb Schools Open Doors for 38,000," *Macon Telegraph*, Sept. 1, 1965.

[31] United States and Stout v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966).

[32] George Doss, "Negroes File New Action to End Dual Schools in Bibb, Houston," *Macon News*, March 21, 1967; "School Suits to be Unified," *Atlanta Journal*, May 27, 1967.

[33] Carter v. West Feliciana Parish School Board, 396 U.S. 290 (1970).

[34] Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1970); "Over 1,000 Attend Mass School Rally Here Sunday," *Houston Home Journal*, Jan 15, 1970.

Judge Bootle attempted in early 1970 to delay full pupil integration but was yet again reversed in February. The Houston County system was finally forced to integrate, immediately.[35] Eight days later, the members of the all-white Perry United Methodist Church voted 232-36 to make their facilities available for a "day school" to open in September. They were joined soon thereafter by the local, all-white First Baptist Church. The Houston *Home Journal* encouraged white parents to 'stay calm' but lamented, "We can't be a hypocrite and say that the [integration] plan should be accepted by those who can't afford to send their children to a private school"[36]

Houston County white parents organized, ironically, considering their earlier resistance to any desegregation, and rallied around freedom of choice. They engaged in what became known as "non-conformity," or refusing compulsory assignments and instead taking their children to the school they had been attending under freedom of choice. Speakers at a Houston County Citizens for Freedom rally told parents that they would "probably be within their legal rights" in taking their children to those schools, "as long as they did not disrupt the operation of the schools."[37] Judge Bootle subsequently enjoined anyone from interfering with, or encouraging others to interfere with, his pupil integration order.[38] That fall, according to the Macon *Telegraph*, 500 students enrolled at "the all-white Perry Christian Day School."[39]

Current voting-age citizens in Houston County came of age during this time and were educated in these schools and in this milieu. Also, change in Houston County only came during this time through a combination of federal administrative pressure, sacrifice on the part of Black parents and students and communities, the efforts of local and national Black organizations, and litigation in federal courts.

C. The At-Large System and the 1980s

This was the situation facing white citizens of Houston County in the winter of 1970: Black voter registration was increasing thanks to enforcement of the Voting Rights Act, which was reauthorized that year, and the efforts of local Black organizations; those same local forces had begun to effect the end of Jim Crow under the auspices of the Civil Rights Act; NAACP leaders were pushing for Black representation on myriad local governmental and bureaucratic bodies; and federal courts were ordering the immediate integration of public schools, with a focus in the public discourse on the geographical concentration of Black residents of the county.

---

[35] Bivins v. Bibb County Board of Education and Thomie v. Houston County Board of Education, 424 F.2d 97 (5th Cir. 1970).

[36] Bobby Branch, "Perryans Must Stay Calm," *Houston Home Journal*, Jan. 15, 1970; "Perry Methodists Plan Day School," Macon News, Feb. 17, 1970.

[37] "Citizens for Freedom Hold Rally Here Monday," *Houston Home Journal*, Feb. 26, 1970.

[38] "Maddox Blasts Judge Bootle For His Enforcement Order, *Macon News*, March 5, 1970.

[39] "Houston School Board Files Integration Plan Tuesday, *Houston Home Journal*, Jan. 15, 1970; Phil Gailey, "Two Sides of 'Choice Plan Exhibited in Sandersville," *Atlanta Constitution*, Feb. 8, 1970; Cooper Etheridge, "Houston Schools Work to Meet Deadline," *Macon News*, Feb. 9, 1970; "History," https://www.westfieldschool.org/history; "Increase in Students Likely in Houston County," *Macon Telegraph*, Sept. 1, 1970; in 2007 the segregation academy changed its name to the Westfield School.

The 1970 session of the Georgia General Assembly convened on January 12. The all-white delegation from Houston County quickly introduced a bill that would eliminate residency requirements for the election of members of the County Commission, which functioned as *de facto* districts despite countywide voting, and which would establish instead a county-wide, at-large system with numbered posts and staggered terms. Members of the Houston delegation argued that the change, eliminating the old "Mossy Creek Line" dividing the county north-south, with multi-member districts, was intended to address what was described by the Houston *Home Journal* as "a confrontation of interests between the Perry area and the Warner Robins area." At that time, the majority of the county's Black population lived in the southern/Perry area, unlike today.[40]

An initial notification to the public of the introduction of the bill was published in the Houston *Home Journal* on January 15, the day of the mass meeting of white parents regarding integration of the county's schools. The bill's chief sponsor, Senator Stanley E. Smith, on February 4, one day before the 5th Circuit's mandate to the District Court in *Singleton*, following *Carter v. West Feliciana Parish*, certified that such notices had been published. The General Assembly passed the bill on March 21, 1970.[41]

At the same time, the Houston County delegation introduced into the General Assembly a bill calling for a referendum regarding the electoral system for the county Board of Education. The bill, if approved in the referendum, would "abolish the education districts into which Houston County has been divided" and establish instead an at-large system with numbered posts and a majority vote requirement.[42]

In late April, more than 600 Black protestors in Perry marched to the county Board of Education offices and demanded the removal of a Black administrator said to be an ambitious "Uncle Tom" and protested the removal of a Black teacher thought to have been unfairly targeted. Oscar Thomie told protestors, "We want to see more black police officers on the Perry Police Dept., and we want to see some black clerks working in Perry City Hall. He added that there needed to be Black representation on the tax, welfare, and sheriff's offices. He called for the paving of streets in Black neighborhoods in Perry and other basic services like recreation facilities. Thomie declared, "We want these things now and we're going to march and demonstrate in Perry until we get the things we want." Black students simultaneously staged protests at Perry High School, prompting white students to leave campus *en masse*.[43] Houston County voters approved the referendum in May, with the decisive votes coming from then-largely white Warner Robins,

---

[40] *Local and special acts and resolutions of the General Assembly of the state of Georgia 1970* [volume 2], Georgia Legislative Documents , Digital Library of Georgia, https://dlg.usg.edu/record/dlg_zlgl_314857457?utm_source=chatgpt.com#metadata, p. 2962 – 64; "Houston Delegation Pushes to Abolish Mossy Creek Line," *Houston Home Journal*, Jan. 15, 1970; "Light Vote Here Tuesday Ends Election Districts," *Houston Home Journal*, May 14, 1970.

[41] *Houston Home Journal*, Jan. 15, 22, 29, 1970.

[42] *Local and special acts and resolutions of the General Assembly of the state of Georgia 1970* [volume 2], pp. 296-97.

[43] "Negro March Here; Issue List of Demands," *Houston Home Journal*, April 30, 1970; "Black Student Demonstrations Disrupt Schools as Whites Leave," *Houston Home Journal*, April 30, 1970.

and the Board then adopted an at-large system.[44] Community events soon demonstrated the stakes of both changes and their connection.

Nearly 300 Black protestors were, according to a statement issued by Hosea Williams and the Southern Christian Leadership Conference, and as reported in the *News*, arrested and "jailed in a condemned prison camp, transported like cattle, flogged, and given other 'inhumane' treatment."[45] In response, Black protestors, under SCLC and NAACP leadership, marched from Perry to Atlanta with caskets drawn by mules in opposition to "government sponsored suppression of dissent and freedom of assembly." White parents and their children were encouraged to engage in 'nonconformity' as well, refusing to allow their children to attend the schools to which they were assigned. That fall, all three Black candidates for county office, including commission and school board, were defeated.[46]

As discussed above, and as acknowledged in the Senate Factors Report and in myriad decisions of federal courts since, at-large systems with enhancing devices like numbered posts, majority vote requirements, and staggered terms have historically (and recently) been used for the expressed purpose of limiting or entirely blocking minorities from electing candidates of choice. In single-member district elections, with a likely or ongoing increase in Black voter registration, Black voters in majority-Black areas would have an opportunity to elect candidates of their choice.[47]

In the late 1960s and in the 1970s, white lawmakers across Georgia switched to at-large elections with numbered posts and majority-vote requirements to avoid that possibility. Numbered posts enhanced the dilutive and discriminatory nature of such schemes. In a pure at-large system, all candidates would compete with one another for the seats up in each election, and all voters could cast as many votes as there were seats at issue. They were not required to cast all their available votes. If five seats were open, for example, the five candidates with the most votes won. This allowed a group of voters to engage in "single-shot" voting, or casting one vote for the same candidate and not casting any of their remaining votes for candidates competing with that preferred candidate. Numbered posts precluded single-shot voting, since each contest was head-to-head. Numerous counties across the state were able to pass such plans through the General Assembly and implement them either shortly before or after the VRA's passage, when the Johnson administration was focused on voter registration.[48]

---

[44] "A Letter from Home," weekly news summary, *Macon News*, May 18, 1970.

[45] Cooper Etheridge, "Casket March to Begin in Perry, Go to Atlanta," *Macon Telegraph*, May 19, 1970; "Citizens for Freedom Hold Rally Here Monday," *Houston Home Journal*, Feb. 26, 1970; "Maddox Blasts Judge Bootle For His Enforcement Order, *Macon News*, March 5, 1970.

[46] Cooper Etheridge, "Casket March to Begin in Perry, Go to Atlanta," *Macon Telegraph*, May 19, 1970; Cooper Etheridge, "Houston Favors Carter, Bentley," *Macon Telegraph*, Sept. 10, 1970 .

[47] Thornberg v. Gingles, 478 U.S. 30 (1986); Dillard v. Crenshaw County, 640 F. Supp. 1347 (M.D. Ala. 1986); Alpha Phi Alpha v. Raffensperger, No.: 1:21-cv-05337-SCJ, Document 333 (Oct. 26, 2023, N.D. Ga.), at 437-40.

[48] McDonald, *A Voting Rights Odyssey*, pp. 131-32; McDonald et al., "Georgia," in *Quiet Revolution in the South*, pp. 81-82.

Many of these systems were invalidated via preclearance under the auspices of the now-defunct Section 5 of the VRA. The Houston County law seems to have fallen through the cracks. The Justice Department reviewed the system in 1990, when the county finally submitted a Section 5 petition in order to establish a permanent chairmanship within the existing at-large system. The Civil Rights Division cleared the law belatedly and under the then-current standard for Section 5 review – non-retrogression. It stands to reason that there could be no retrogression in Black voting strength in Houston County when there were no Black members of the commission.[49]

There is, then, historical evidence to suggest that the 1970 bill passed to alter the electoral system for the Houston County Board of Commissioners was enacted with the intent to prevent the election of Black preferred candidates to the County Commission. Black citizens in the county were using federal law and local activism to gain local and statewide political power and access to better public schools. White citizens were voicing their opposition, including by dismissing calls for districted electoral systems and by immediately forming a segregation academy. The Voting Rights Act was reauthorized, which scholars have indicated was an impetus for local governments in Georgia to make such changes. White lawmakers in Houston County, as elsewhere in Georgia, perhaps responded in order to limit the damage in terms of actual Black office-holding and policy-making. The results support this conclusion as well, as no Black candidate has won a seat on the commission since the change, with the lone exception of Houston Porter in the 1980s. And Commissioner Porter, as discussed below, advocated for a change to a districted system to no avail.[50]

A lack of responsiveness to the needs of the Black community of Houston County by the all-white county commission was demonstrated shortly after the adoption of the at-large system (having of course been evident prior in the form of Jim Crow segregation and disenfranchisement). For example, during World War II, the Army Air Corps had directed the building of what would become Robins Air Force Base in Houston. A community known as Jody Town was built adjacent to the base to house Black civilian personnel. Despite being described as "deprived" and comprised of "shanties," Jody Town became, according to the Georgia Historical Society "a cultural hub for residents and Black military personnel, with churches, businesses, organizations, and recreation leagues and teams, such as the Warner Robins Jets …."[51]

During an "urban renewal" project in 1972, however, the community was dismantled and its residents relocated throughout the county. Almost all of the Black residents of Jody Town were renters, and it was white landowners who benefited from the "Canon Road Urban Renewal Project." Most Black residents could not afford to move back into their community. A developer working on the project told residents at a community meeting, "What ever happened in Jodytown,

---

[49] Mitch Clarke, "Feds reviewing Houston at-large voting measure," *Macon Telegraph*, Aug. 5, 1990; Beer v. United States, 425 U.S. 130 (1976).

[50] McDonald, *A Voting Rights Odyssey*, pp. 143-44.

[51] "The Jody Town Community," Georgia Historical Society, https://www.georgiahistory.com/ghmi_marker_updated/the-jody-town-community/; Jan Ackerman, "Lack of County Services Cripples Elberta Citizens," *Macon Telegraph*, Aug. 17, 1975.

the citizens of Warner Robins let it happen." Of course, the voting citizenry of Warner Robins at the time was overwhelmingly white, as were their elected representatives.[52]

In 1973 the U.S. Justice Department's Civil Rights Division interposed an objection to the General Assembly's attempt to adopt a majority vote requirement for the Perry City Council and for the mayor's office. The Assistant Attorney General for Civil Rights explained that "where, as in the City of Perry, there is significant participation in the political process by the black community, a majority vote requirement has the practical effect of decreasing the potential for minority voters to elect candidates of their choice." They added that imposing such a requirement under a pre-existing numbered-post system, which Perry had adopted in the 1960s, "similarly reduces the potential voting strength of minority groups."[53]

In 1974 Black citizens of Houston, representing a new organization called the Citizens' Action Movement, delivered a letter to the Board of Commissioners asking why there were no Black members of the county hospital board south of state highway 96, when at that time, the majority of Black Houstonians lived in that part of the county. A Black member had been appointed recently, but from Warner Robins, which at that time did not have the Black population profile that it does today. The group asked for input in any future Black appointments to county boards.[54]

Earlier that year, Houston state representative Larry Walker proposed plans to return to residency requirements and to perhaps reinstate the old "Mossy Creek Line," which had divided the county north-south prior to the switch to an at-large system. Other members of the county delegation pushed back to the point that Walker dropped the proposal, as local delegations typically submitted local changes unitarily in order to get approval in the General Assembly, under local courtesy. Walker's preferred plan would have created a southern district centered around Perry that would have been roughly 40 percent Black.[55]

In 1975 residents of another extremely poor Black community in Houston County, Elberta, petitioned the all-white county-commission – newly elected at-large – for funding for community development. Community members including local NAACP president Oscar Thomie explained to the commission that many of Elberta's 2,000 or so residents lacked running water, electricity, and indoor plumbing. Some even lacked an outhouse. Residents "paid exorbitantly [for] shanties" in the community.[56]

The following year, Oscar Thomie and others again beseeched the Board of Commissioners for a districted electoral system. Representing a group of 26 Black citizens, Thomie told the board,

---

[52] "Urban Renewal: Whom Does it Help," *Macon News*, Jan. 19, 1972.

[53] J. Stanley Pottinger to Lawrence C. Walker Jr., Aug 14, 1973, Civil Rights Division Section 5 Objection Letters by State, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1280.pdf; "Local Bills Put into State Senate," *Houston Home Journal*, Aug. 14, 1973.

[54] "Blacks Confront Commissioners," *Houston Home Journal*, Dec. 12, 1974.

[55] "Rep. Walker's Election Zones Bill Finsd Little Support Here," *Houston Home Journal*, Jan. 10. 1974.

[56] Jan Ackerman, "Lack of County Services Cripples Elberta Citizens," *Macon Telegraph*, Aug. 17, 1975.

"We feel there are enough black people in the county that we should be represented. This is our first step, to come to you, and see if we can work together." According to the Houston *Home Journal*, the Black citizens insisted that "they want the county divided into voting wards, and want an opportunity to elect a man with voting done only on a ward or district basis." The white commissioners deferred to the county electoral delegation and told the Black citizens, "There are five commissioners. If you can only vote for one, there would be four you couldn't vote for." Thomie demurred, saying, "At least with one Black commissioner we'd know what went on in the commission meetings."[57]

By the 1980s, there were still no Black members of the county commission or school board. As mentioned above, Houston Porter managed to win a seat on the commission that year with a margin of fewer than 50 votes. Porter won reelection in 1984 and 1988, though no Black candidate has successfully run for the commission since. Also in the 1980s, the local NAACP, then led by Larry Holmes, resolved in 1984 to run a candidate for the school board. Black leaders noted that, at that time, the county's population was approximately 20 percent Black and that the "time [was] ripe" for Black representation on the board. Reverend Josh Kirvin was subsequently appointed as the first Black member of the board in 1984, when a white member resigned. Kirvin lost a reelection bid in 1988 to a white challenger in the Democratic primary. Local Black leadership continued to petition the board for such changes as the hiring of more Black teachers, administrators, coaches, counselors, and staff, and augmenting transportation arrangements that disproportionately affected Black pupils. Houston County's NAACP president told school board members at a meeting in the summer of 1985 that Black students in county schools had "no one they [could] identify with."[58]

The Houston County delegation in the Georgia General Assembly remained all-white in the 1980s. Members of the delegation voted for a Congressional redistricting plan that was deemed by the Department of Justice and federal courts to be violative of the Voting Rights Act and the product of out-and-out racism. As the Court in *Busbee v. Smith* found, "The only reason the Georgia General Assembly failed to enlarge the black population in the Fifth District more than it did and failed to unite black neighborhoods was solely because the population was of the black race." 549 F. Supp. 494, 514-15 (D.D.C. 1982). The Court reiterated, "The Fifth District was drawn to suppress black voting strength in Georgia." *Id*. at 515.[59]

---

[57] "Blacks Seeking New Voting Districts for County Boards," *Houston Home Journal*, May 13, 1976.

[58] Katherine Knott, "NAACP working to get black on Houston school board," *Macon Telegraph*, Feb. 26, 1984; Katherine Knott, "Fill vacancy with black, board told," *Macon Telegraph*, Feb. 29, 1984; Suzanne Carswell, "Houston officials sworn in," *Macon Telegraph*, Dec. 28,1984; Eric Velasco, "Hire more blacks, NAACP asks school board," *Macon Telegraph and News*," July 10, 1985; "Here are primary election results for Houston/Peach counties," *Macon Telegraph and News*, Aug. 11, 1988.

[59] See also, "Journal of the Senate of the State of Georgia at the extraordinary session, commenced at Atlanta, Monday, August 24, 1981 and adjourned Friday, September 18, 1981," and Journal of the House of Representatives of the State of Georgia at the extraordinary session, commenced at Atlanta, Monday, August 24, 1981 and adjourned Friday, September 18, 1981"; Digital Library of Georgia. Also, Charles Bullock, "The History of Redistricting in Georgia," *Georgia Law Review* 52.4 (2018): 1057-1104, pp. 1069-70.

In 1989, when the Houston delegation in the General Assembly sought to establish a full-time chairmanship for the Board of Commissioners, some members and citizens supported implementing some sort of districting scheme to replace the at-large system. This was the impetus for the belated submission of the 1970 law to the Civil Rights Division for preclearance. Houston Porter and Josh Kirvin were among them, with Porter arguing that maintaining at-large electoral system would "hinder the goal of strengthening the 'minority vote." Porter noted that the General Assembly's Reapportionment Services Unit could not produce a district map with a majority-minority district, though one was drawn with 47 percent Black voters. He also told the Justice Department, regarding the permanent chairmanship, "I think the new office might discriminate against blacks and minorities." A member of the Houston County Planning and Zoning Committee, but also candidate for state Senator, Sonny Purdue, argued that the Justice Department was "screwing up" election in the county. When the law was amended, the at-large scheme was maintained, with only the role of the chairman adjusted.[60]

D. Most Recently

There is more recent evidence of discrimination and racism in Georgia and in Houston County. For example, in 2012 the State of Georgia was subject to a Section 5 objection from the Justice Department relative to a scheme to electorally unite Augusta and Richmond County. This was the final Section 5 objection issued to Georgia prior to *Shelby County*.[61]

In 2015, during adjudication of a case filed by a former Black member of the Houston County Sheriff's Department, it was found that a white supervisor, Major Charles Holt, who fired the plaintiff, had a history of racist behavior in his official capacity. The Court determined:

> [T]here were other employees who had filed charges of discrimination against Holt. Major Holt admitted that he had called someone a "nigger" in the past. There is evidence that, on one occasion, Holt asked a white female officer if she was "sleeping with that nigger" (referring to an African-American supervisor). Holt likewise told another white female officer that, as long as she was dating Plaintiff, she would not be promoted.
>
> Major Holt also admitted to viewing racist websites and discussion forums. Holt used his HCSD computer and email account to forward a link for the website *www.niggermania.net* to his personal account and looked at both that web page and *www.niggermania.com* when he got home. "Niggermania" is a website "dedicated to spreading the truth and presenting facts about niggers," and has "many pages of nigger jokes and racist humor." Holt looked through the website and some of its forums. He also, on numerous occasions, viewed a website entitled "Stuff Black People Don't Like," which similarly disparages African Americans.

[60] "Public View is Sought on Districts," *Houston Home Journal*, Feb. 8, 1989; Rob Collins, "Districting is Doubted," *Houston Home Journal*, Feb. 18, 1989.

[61] Thomas E. Perez to Dennis R. Dunn, Dec. 21, 2012, Civil Rights Division Section 5 Objection Letters by State.

After his termination, Plaintiff filed a charge of discrimination, and the EEOC found reasonable cause to believe that Plaintiff was subjected to race discrimination. *West v. Houston County, Georgia et al.*, No.: 5:2013cv00338 – Document 56 (M.D. Ga. 2015).

In 2017, Wesleyan College in nearby Macon, in Bibb County, was compelled to apologize for its past links to the Ku Klux Klan, and the lingering effects thereof, after the Atlanta *Journal-Constitution* published a series of articles revealing that "For more than a century, the nation's oldest college chartered for women has had historical links to the Ku Klux Klan that have never been formally acknowledged."[62] The newspaper's investigation was occasioned by an incident earlier in the year in which "racist graffiti," including the N-word was found spray-painted on dorm walls.[63]

The AJC reached out to alumnae from the school, who revealed that they were still "haunted" by memories of racist hazing. Reporter Brad Schrade wrote, "The stories of nooses and hooded riders from Morton and others in the early 1990s suggest that scores of black women were subjected to similar rituals during the roughly 25 years after black students were first admitted to the college in the late 1960s."[64] When the college updated its official history on its website, Black alumnae argued that the new version "was offensive and glossed over more recent racism on campus."[65]

While Wesleyan is in Bibb County, Bibb and Houston are together in the Macon – Bibb County – Warner Robins Combined Statistical Area, as designated by the U.S. Census, and as recognized by the Court in *Alpha Phi Alpha*. Relatedly, just last year a video went viral showing white members of the Houston County High School baseball team dressed up as Klan members, prompting the local NAACP to press the school as to potential disciplinary action.[66]

Also last year, the Houston County School District entered into a resolution agreement with the U.S. Department of Education's Office for Civil Rights, after two parents alleged that a cheerleading coach at Veterans High School engaged in a pattern of racist behavior, including the use of racial slurs, towards the only two Black members of the team. The parents bringing the complaint insisted that they repeatedly attempted to get some kind of resolution from the school system but that school officials 'swept the issue under the rug' and that their girls were subjected to retaliation for reporting the harassment. One coach, who reportedly admitted to using the racial slurs, also, according to the complaints and as reported in the Macon *Telegraph*, had a "history of bringing up negative race topics with their daughters, such as comments about dark skin or

---

[62] Brad Schrade, "Macon women's college seeks to atone for Ku Klux Klan's legacy," *Atlanta Journal-Constitution*, June 22, 2017.

[63] Id.

[64] Brade Schrade, "College's reckoning stirs memories of nooses, hazing and a painful past," *Atlanta Journal-Constitution*, July 31, 2017.

[65] Brad Schrade, "Under pressure to reconcile racist past, Wesleyan College joins slavery study group," *Atlanta Journal-Constitution*, Aug. 4, 2017.

[66] Sandra Hernandez, "NAACP reacts to recently viral video of teenagers imitating the Ku Klux Klan," *Houston Home Journal*, March 2, 2024.

Walker's daughter's 'ghetto' name." That coach's wife, the head coach, then kicked the girls off the team, allegedly as retaliation.[67]

According to the *Telegraph*, the Office of Civil Rights found that multiple teachers who were interviewed about the incident were later found to have lied. The Office also "said that although the district issued a letter addressing their cheer head coach's professionalism and responsibility for the cheer team's well-being, there was no evidence that showed an initiation of 'any corrective action or dialogue that focused on the head coach providing a nondiscriminatory environment...." School officials subsequently agreed to a resolution with Office. Per the *Telegraph*, the terms of that agreement declare that the school system will:

> Issue an anti-harassment statement to the public and district community regarding the district's prohibition against racial harassment Confirm its duty to promptly investigate and take action to end any harassment creating a racially hostile environment Conduct training for all school staff, district administrators and all district staff who provide athletics, or other extracurricular activity coaching services, on Title VI's prohibition against discrimination and harassment based on race Conduct student-focused remedies that provide school level age-appropriate training regarding racial harassment and its impact on school environments, as well as how to report such harassment and discrimination. Contact the complainants and issue a letter acknowledging their raised racial harassment and retaliation concerns with the district related to the student's experiences in the cheerleading program and including a copy of the district's anti-harassment statement.[68]

Regarding the coaches, one of whom continued to teach in county schools, a parent said, "The fact that they're allowed to teach Black and brown kids is even more unsettling because, to me, their behavior was overlooked."[69]

## IV. SENATE FACTOR 5: THE EFFECTS OF PAST DISCRIMINATION IN AREAS TOUCHING THE RIGHT TO VOTE

Black people in Houston County currently experience the effects of the history of discrimination recounted above as evidenced by socioeconomic factors that are inexplicable, historically, absent consideration of that history. According to the U.S. Census Bureau's *American Community Survey* 5-Year Estimates, as of 2021, Black residents of Houston County are very nearly twice as likely as their white counterparts to experience poverty. They are over three times more likely to rely on the Supplemental Nutritional Assistance program for their food needs. They are slightly less likely to obtain a bachelor's degree. They are three times more likely to lack access to a vehicle. They have less income. They are twice as likely to be unemployed. Tables from *Data.Census.gov* showing these disparities are listed in an appendix to this report.[70]

---

[67] Id.
[68] Id.
[69] Id.
[70] I include therein the tables with highlights and calculations I performed in Excel in order to see the relevant percentages for each socioeconomic factor. I include, as well, the links to the raw data as well as the Excel spreadsheets.

The U.S. Senate Judiciary Committee report that enumerated the "Senate Factors" in 1982 reads:

> The courts have recognized that disproportionate educational, employment, income level, and living conditions rising from past discrimination tend to depress minority political participation . . . . Where these conditions are shown, and where the level of Black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.[71]

The Eleventh Circuit acknowledged this in *Wright v. Sumter County Board of Elections and Registration* in 2020, as did the M.D. Ga. District Court in *Alpha Phi Alpha* in 2023.[72]

According to the Georgia Secretary of State's office, Black voter turnout in Houston County continues to be significantly lower than white voter turnout, demonstrating a depressed level of Black political participation as referenced in the Senate Factors Report. In the November 2024 election, Black voter turnout was 20.6 percent compared to white voter turnout at 40.1 percent, a difference of 51.4 percent. In the primary elections earlier that year, Black voter turnout (4.4 percent) trailed white turnout (10.9 percent) at a rate of 40.4 percent.[73]

In addition to the incidents of racial discrimination detailed above under Factors 1 and 3, Black students continue to face discriminatory conditions in Houston County in education. According to *ProPublica*'s "Miseducation" Project, Black students in the Houston County School District, as of 2015 – admittedly 10 years ago, but also indicative of students who have since entered, or attempted to enter, the workforce and who are now squarely among the Voting Age Population of the county – white students were 2.3 times more likely to be enrolled in at least one Advanced Placement course. Black students were 3.5 times as likely to be suspended. And Black students were, on average, 1.7 grades behind their white counterparts.[74]

More recently, according to the U.S. Department of Education's Office for Civil Rights, as of 2021, these disparities remained. White students were roughly twice as likely to be enrolled inn A.P. courses – 55.1 percent to 23.1 percent. Black students were nearly twice as likely to have to repeat a grade – 51.9 percent to 29.4 percent. They were also nearly twice as likely to be referred to law enforcement and be subject to school-related arrest – 58.5 percent to 33.3 percent.[75] Though it is unclear, given available information, whether Houston County is still under a school desegregation order stemming from the *Thomie* litigation or when it was released therefrom, these

---

[71] Report of the Committee on the Judiciary on S. 1992 (Voting Rights Act Extension), United States Senate, 97th Congress, 2nd Session, Report No. 97-417, at 216, FN 114.

[72] Alpha Phi Alpha v. Raffensperger, No:21-cv-05337-SCJ242-43 (Oct. 26, 2023, M.D. Ga.), at 242-43, quoting Marengo et al.

[73] Office of the Georgia Secretary of State, Brad Raffensperger, Election Data Hub, Houston County, https://sos.ga.gov/page/election-data-hub-turnout.

[74] "Miseducation," *ProPublica*, Houston County School District, https://projects.propublica.org/miseducation/district/1302880.

[75] "Houston County," Civil Rights Data Collection, Office of Civil Rights, Department of Education, https://civilrightsdata.ed.gov/profile/us/ga/houston_county?surveyYear=2020&nces=1302880.

are among the *Green* factors that would prevent the district from attaining Unitary Status if it were.[76]

Houston County's premiere segregation academy remains overwhelmingly white in its student body, faculty, and administration. According to *ProPublica*'s "Private Schools Demographics" database, in 2021, the Westfield School's student body was 95 percent white, 2 percent Black. The school is actually more segregated than it was ten years ago, when Black enrollment peaked at 11 percent. Warner Robins Christian Academy has followed a similar trajectory. In 2016 its student body was 71.4 percent white and 14.3 percent Black. But in 2020 it was 96.7 percent white and 3.3 percent Black. This is possibly related to the "tipping-point" phenomenon. Historically, when white enrollment in public school systems has dropped below 50 percent, white flight increases. The Houston County School District had dipped below 50 percent by 2013 – 2014.[77]

Black farmers in Houston County continue to face discrimination reminiscent of the Redemption Era described above. Earl Rawls' family was one of the few to obtain and maintain ownership of land in Georgia, including in Houston County. Veronica Womack, Executive Director of the Rural Studies Institute at Georgia College and State University explained, "Many lynchings were connected to economic situations, and land was a part of that. Many African-Americans simply had to leave the rural south, some in the dead of night, because someone wanted their property." Despite this, the Rawls family was among those Black families to maintain ownership of their land in the 1990s.[78]

A class action lawsuit was filed at that time alleging that the United States Department of Agriculture, between 1981 and 1997, discriminated against Black farmers in the distribution of federal aid, exacerbating the inability of Black Georgians to benefit from generational wealth that white families enjoyed. A $1 billion dollar settlement was supposed to be a boon, but Georgia's Black farmers insisted that they had not received any benefit. Professor Womack explained, "You find yourself in a situation where you can't get credit. You have prior debt that you can't pay, and then you can't produce." And that threatened more land loss. "Folks worked really hard to get the land, and once it's gone," Womack said, "the likelihood of you being able to get that amount of acres in the future is very slim." She added, "When you lose your family property of 150 acres, in some places that could be a million dollars worth of property that's gone, depending on the land quality. Where do you find another million dollars?"[79]

---

[76] Green v. County School Board of New Kent County, 391 U.S. 430 (1968).

[77] Westfield School, ProPublica "Private School Demographics," https://projects.propublica.org/private-school-demographics/schools/westfield-school-00298514/; Warner Robins Christian Academy, ProPublica "Private School Demographics," https://projects.propublica.org/private-school-demographics/schools/warner-robins-christian-academy-AA890283.

[78] Eryn Rogers, "I was forced out of farming': Central Georgia's black farmers still face struggles today," 13WMAZ, Feb. 26, 2020, https://www.13wmaz.com/article/news/local/pulaski-history-of-black-farmers-and-land-loss-in-the-south/93-25d6de64-4d31-4e88-8cbe-3b71c5ca92b8.

[79] Id.

Finally, a fact witness in *Alpha Phi Alpha*, a lifelong resident of Houston County, Ms. Fenika Miller, credited by the Court in that case in 2023, testified about the lingering effects of discrimination and a lack of responsiveness to Houston County's Black residents' needs. The Court wrote, "Ms. Miller observed that North Houston County and South Bibb County both lack certain public services and accommodations. North Houston County has one grocery store, no public transportation, and lacks parks and recreation services." No.: 1:2021cv05337, at 388.

## V. FACTOR 7: THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP HAVE BEEN ELECTED TO OFFICE

There are currently no Black members of the Houston County Board of Commissioners. Commissioner Porter, despite the county's Black population being over 30 percent. If proportionality is a consideration, as it may be under the totality test, then this is a very important fact. As described above, is the only Black citizen of Houston to be elected to the Commission, and his tenure ended over 30 years ago. Also as discussed above, Josh Kirvin was appointed to the Board of Education in the county but subsequently lost an election. There are currently two Black members of the county Board of Education. Mark Ivory was elected to an at-large seat in a non-partisan spring election in 2022. Clyde Jackson was disqualified from running last year because, according to the county board of elections, his wife was "an administrator" in the school district. Traci Jackson indicated that she was, in fact, only a retired principal and part-time employee involved in teacher development. Clyde Jackson was subsequently restored to the ballot and won election to an at-large seat.[80]

David Lucas was elected in 2012 and currently represents S.D. 26 as a Black Senator, and Anissa Monique Jones was elected in 2024 and represents H.D. 143 as a Black representative. The remaining members of the Houston County delegation are white. Black candidates have had some success recently running for municipal positions within the county.[81]

Generally, in Georgia, whether statewide or locally, it has taken litigation, federal government intervention, and local activism for Black candidates to get elected to any office.

## VI. CONCLUSION

In my opinion, Senate Factors 1, 3, 5, and 7 are strongly present in Houston County, as they relate to the Board of Commissioners in particular.

---

[80] Anthony Montalto, "We're ready': Houston County couple ready for runoff after elections board reinstates Clyde Jackson," 13 WMAZ, https://www.13wmaz.com/article/news/politics/houston-county-couple-ready-for-runoff-after-elections-board-reinstates-clyde-jackson/93-c49e6cb4-c09e-422c-a8b0-4f0644970598; Lars Lonnroth, "Houston County Board of Elections reverses course on BOE candidate disqualification. Here's why," 13 WMAZ, https://www.13wmaz.com/article/news/local/warner-robins/houston-county-board-education-candidate-reinstated-unanimous-vote/93-5a31e1b3-a83b-4f0d-b87f-4806c3efa4a9.

[81] For example, the Perry City Council and Warner Robbins City Council, and the Mayor of Warner Robbins.

Pursuant to 28 U.S.C. § 1746, the above is true and correct to the best of my knowledge.




/s/________________________________________

**APPENDIX I – CENSUS DATA**

**Links to Raw Data Online:**

- **https://data.census.gov/table/ACSDT5YSPT2021.B17001?q=houston+county,+georgia&t=002:004:Poverty**
- **https://data.census.gov/table/ACSDT5YSPT2021.B22001?t=002:004:SNAP/Food+Stamps&g=050XX00US13153**
- **https://data.census.gov/table/ACSDP5YSPT2021.DP02?q=houston+county,+georgia&t=002:004:Educational+Attainment**
- **https://data.census.gov/table/ACSDT5YSPT2021.B25044?t=002:004:Transportation&g=050XX00US13153**
- **https://data.census.gov/table/ACSDT5YSPT2021.B19001?t=002:004:Income+and+Earnings&g=050XX00US13153**
- **https://data.census.gov/table/ACSDT5YSPT2021.B23025?t=002:004:Employment+and+Labor+Force+Status&g=050XX00US1**

**Continues on the Following Page …**

# POVERTY STATUS IN THE PAST 12 MONTHS BY SEX BY AGE

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | B17001 |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2021 |
| DATASET: | ACSDT5YSPT2021 |
| PRODUCT: | ACS 5-Year Estimates Selected Population Detailed Tables |
| UNIVERSE: | Population for whom poverty status is determined |
| MLA: | U.S. Census Bureau. "POVERTY STATUS IN THE PAST 12 MONTHS BY SEX BY AGE." American Community Survey, ACS 5-Year Estimates Selected Population Detailed Tables, Table B17001, |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2021/acs/acs5/spt |
| | |
| **USER SELECTIONS** | |
| GEOS | Houston County, Georgia |
| TOPICS | White alone; Black or African American alone; Poverty |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |
| | |
| **PIVOT & GROUPING** | |
| PIVOT COLUMNS | None |
| PIVOT MODE | Off |

| | |
|---|---|
| ROW GROUPS | None |
| VALUE COLUMNS | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/table/ACSDT5YSPT2021.B17001?q=houston+county,+georgia&t=002:004:Poverty |
| | |
| **TABLE NOTES** | |
| | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities, and towns and estimates of housing units for states and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2017-2021 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented in these tables. |
| | The 2017-2021 American Community Survey (ACS) data generally reflect the March 2020 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of |

| | |
|---|---|
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution. For a 5-year median estimate, the margin of error associated with a median was larger than the median itself.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the margin of error may be treated as zero. |
| | |
| **COLUMN NOTES** | None |
| | |

Table: ACSDT5YSPT2021.B17001

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | Black or African American alone | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Total: | 92,467 | ±1,115 | 50,119 | ±1,136 |
| Income in the past 12 months below poverty level: | 6,759 | ±1,177 | 6,995 | ±1,233 |
| Male: | 2,854 | ±608 | 3,416 | ±740 |
| Under 5 years | 255 | ±177 | 234 | ±158 |
| 5 years | 32 | ±36 | 9 | ±14 |
| 6 to 11 years | 327 | ±170 | 747 | ±322 |
| 12 to 14 years | 218 | ±112 | 104 | ±71 |
| 15 years | 61 | ±64 | 64 | ±67 |
| 16 and 17 years | 68 | ±63 | 165 | ±139 |
| 18 to 24 years | 323 | ±162 | 472 | ±228 |
| 25 to 34 years | 365 | ±189 | 446 | ±210 |
| 35 to 44 years | 357 | ±194 | 228 | ±175 |
| 45 to 54 years | 208 | ±126 | 354 | ±246 |
| 55 to 64 years | 446 | ±186 | 320 | ±157 |
| 65 to 74 years | 94 | ±100 | 269 | ±144 |
| 75 years and over | 100 | ±63 | 4 | ±10 |
| Female: | 3,905 | ±719 | 3,579 | ±683 |
| Under 5 years | 28 | ±33 | 218 | ±113 |
| 5 years | 65 | ±56 | 46 | ±74 |
| 6 to 11 years | 277 | ±159 | 416 | ±243 |
| 12 to 14 years | 87 | ±78 | 174 | ±107 |
| 15 years | 49 | ±63 | 0 | ±34 |
| 16 and 17 years | 62 | ±66 | 101 | ±71 |
| 18 to 24 years | 339 | ±201 | 369 | ±206 |
| 25 to 34 years | 822 | ±253 | 661 | ±275 |
| 35 to 44 years | 766 | ±379 | 467 | ±182 |
| 45 to 54 years | 447 | ±186 | 475 | ±229 |

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | **White alone** | | **Black or African American alone** | |
| **Label** | **Estimate** | **Margin of Error** | **Estimate** | **Margin of Error** |
| 55 to 64 years | 615 | ±236 | 336 | ±134 |
| 65 to 74 years | 103 | ±62 | 260 | ±156 |
| 75 years and over | 245 | ±115 | 56 | ±47 |
| Income in the past 12 months at or above poverty level: | 85,708 | ±1,533 | 43,124 | ±1,638 |
| Male: | 42,888 | ±756 | 20,104 | ±940 |
| Under 5 years | 2,411 | ±219 | 1,433 | ±289 |
| 5 years | 612 | ±314 | 360 | ±252 |
| 6 to 11 years | 3,141 | ±452 | 2,036 | ±318 |
| 12 to 14 years | 1,983 | ±489 | 776 | ±243 |
| 15 years | 541 | ±211 | 297 | ±170 |
| 16 and 17 years | 1,197 | ±200 | 798 | ±190 |
| 18 to 24 years | 3,115 | ±211 | 2,032 | ±228 |
| 25 to 34 years | 6,030 | ±235 | 3,168 | ±255 |
| 35 to 44 years | 5,739 | ±218 | 2,733 | ±300 |
| 45 to 54 years | 5,842 | ±182 | 2,393 | ±249 |
| 55 to 64 years | 5,984 | ±228 | 2,340 | ±179 |
| 65 to 74 years | 4,024 | ±101 | 1,200 | ±150 |
| 75 years and over | 2,269 | ±68 | 538 | ±16 |
| Female: | 42,820 | ±953 | 23,020 | ±1,013 |
| Under 5 years | 2,393 | ±201 | 1,007 | ±416 |
| 5 years | 163 | ±106 | 356 | ±320 |
| 6 to 11 years | 3,364 | ±350 | 1,805 | ±398 |
| 12 to 14 years | 1,971 | ±351 | 1,188 | ±355 |
| 15 years | 448 | ±207 | 668 | ±217 |
| 16 and 17 years | 1,294 | ±248 | 606 | ±217 |
| 18 to 24 years | 2,968 | ±226 | 2,115 | ±264 |
| 25 to 34 years | 5,502 | ±281 | 3,630 | ±388 |

Table: ACSDT5YSPT2021.B17001

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | Black or African American alone | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| 35 to 44 years | 5,553 | ±431 | 3,665 | ±201 |
| 45 to 54 years | 5,475 | ±205 | 3,095 | ±201 |
| 55 to 64 years | 6,110 | ±289 | 2,824 | ±157 |
| 65 to 74 years | 4,394 | ±105 | 1,320 | ±229 |
| 75 years and over | 3,185 | ±172 | 741 | ±71 |
| | | | | |
| **White Alone:** | 7.31% | | | |
| **Black or African American Alone:** | 13.96% | | | |

# RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY PRESENCE OF PEOPLE 60 YEARS AND OVER FOR HOUSEHOLDS

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | B22001 |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2021 |
| DATASET: | ACSDT5YSPT2021 |
| PRODUCT: | ACS 5-Year Estimates Selected Population Detailed Tables |
| UNIVERSE: | Households |
| MLA: | U.S. Census Bureau. "RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY PRESENCE OF PEOPLE 60 YEARS AND OVER FOR HOUSEHOLDS." American Community Survey, ACS 5-Year Estimates Selected Population Detailed Tables, Table B22001, https://data.census.gov/table/ACSDT5YSPT2021.B22001?t=002:004:SNAP/Food+Stamps&g=050XX00US13153 |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2021/acs/acs5/spt |
| | |
| **USER SELECTIONS** | |
| GEOS | Houston County, Georgia |
| TOPICS | SNAP/Food Stamps; Black or African American alone; White alone |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |
| | |
| **PIVOT & GROUPING** | |
| PIVOT COLUMNS | None |

Table: ACSDT5YSPT2021.B22001

| | |
|---|---|
| PIVOT MODE | Off |
| ROW GROUPS | None |
| VALUE COLUMNS | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/table/ACSDT5YSPT2021.B22001?t=002:004:SNAP/Food+Stamps&g=050XX00US13153 |
| | |
| **TABLE NOTES** | |
| | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities, and towns and estimates of housing units for states and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2017-2021 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented in these tables. |
| | The 2017-2021 American Community Survey (ACS) data generally reflect the March 2020 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |

| | |
|---|---|
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization. |
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution. For a 5-year median estimate, the margin of error associated with a median was larger than the median itself.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the margin of error may be treated as zero. |
| | |
| **COLUMN NOTES** | None |
| | |

Table: ACSDT5YSPT2021.B22001

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | Black or African American alone | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Total: | 36,099 | ±850 | 19,035 | ±666 |
| Household received Food Stamps/SNAP in the past 12 months: | 2,189 | ±419 | 3,721 | ±616 |
| At least one person in household 60 years or over | 901 | ±266 | 971 | ±247 |
| No people in household 60 years or over | 1,288 | ±347 | 2,750 | ±579 |
| Household did not receive Food Stamps/SNAP in the past 12 months: | 33,910 | ±911 | 15,314 | ±850 |
| At least one person in household 60 years or over | 13,349 | ±727 | 4,252 | ±390 |
| No people in household 60 years or over | 20,561 | ±836 | 11,062 | ±816 |

Table: ACSDT5YSPT2021.B22001

| | | |
|---|---|---|
| | | |
| | | |
| **Label** | | |
| Total: | | |
| Household received Food Stamps/SNAP in the past 12 months: | | |
| At least one person in household 60 years or over | **White Alone** | 6.06% |
| No people in household 60 years or over | **Black or AA Alone** | 19.55% |
| Household did not receive Food Stamps/SNAP in the past 12 months: | | |
| At least one person in household 60 years or over | | |
| No people in household 60 years or over | | |

# SELECTED SOCIAL CHARACTERISTICS IN THE UNITED STATES

United States® Census Bureau

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | DP02 |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2021 |
| DATASET: | ACSDP5YSPT2021 |
| PRODUCT: | ACS 5-Year Estimates Selected Population Data Profiles |
| UNIVERSE: | None |
| MLA: | U.S. Census Bureau. "SELECTED SOCIAL CHARACTERISTICS IN THE UNITED STATES." American Community Survey, ACS 5-Year Estimates Selected Population Data Profiles, Table DP02, https://data.census.gov/table/ACSDP5YSPT2021.DP02?q=houston+county,+georgia&t=002:004:Educational+Attainment. Accessed on 19 Nov 2025. |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2021/acs/acs5/sptprofile |
| | |
| **USER SELECTIONS** | |
| GEOS | Houston County, Georgia |
| TOPICS | White alone; Black or African American alone; Educational Attainment |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |
| | |
| **PIVOT & GROUPING** | |
| PIVOT COLUMNS | None |
| PIVOT MODE | Off |

| | |
|---|---|
| ROW GROUPS | None |
| VALUE COLUMNS | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/table/ACSDP5YSPT2021.DP02?q=houston+county,+georgia&t=002:004:Educational+Attainment |
| | |
| **TABLE NOTES** | |
| | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities, and towns and estimates of housing units for states and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2017-2021 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented |
| | Ancestry listed in this table refers to the total number of people who responded with a particular ancestry; for example, the estimate given for Russian represents the number of people who listed Russian as either their first or second ancestry. This table lists only the largest ancestry groups; see the Detailed Tables for more categories. Race and Hispanic origin groups are not included in this table because official data for those groups come from the Race and Hispanic origin questions rather than the ancestry question (see Demographic Table). |

| | |
|---|---|
| | Data for year of entry of the native population reflect the year of entry into the U.S. by people who were born in Puerto Rico or U.S. Island Areas or born outside the U.S. to a U.S. citizen parent and who subsequently moved to the U.S. |
| | Methodological changes to citizenship edits may have affected citizenship data for those born in American Samoa. Users should be aware of these changes when using 2018 data or multi-year data containing data from 2018. For more |
| | The Census Bureau introduced a new set of disability questions in the 2008 ACS questionnaire. Accordingly, comparisons of disability data from 2008 or later with data from prior years are not recommended. For more information on these questions and their evaluation in the 2006 ACS Content Test, see the Evaluation Report Covering Disability. |
| | Data about computer and Internet use were collected by asking respondents to select "Yes" or "No" to each type of computer and each type of Internet subscription. Therefore, respondents were able to select more than one type of computer and more than one type of Internet subscription. |
| | The category "with a broadband Internet subscription" refers to those who said "Yes" to at least one of the following types of Internet subscriptions: Broadband such as cable, fiber optic, or DSL; a cellular data plan; satellite; a fixed wireless subscription; or other non-dial up subscription types. |
| | An Internet "subscription" refers to a type of service that someone pays for to access the Internet such as a cellular data plan, broadband such as cable, fiber optic or DSL, or other type of service. This will normally refer to a service that someone is billed for directly for Internet alone or sometimes as part of a bundle. |
| | With a computer includes those who said "Yes" to at least one of the following types of computers: Desktop or laptop; smartphone; tablet or other portable wireless computer; or some other type of computer. |
| | The "children of the householder" and "own children of the householder" concepts are combined in these estimates. For more information, please the following User Note . |

| | |
|---|---|
| | The 2017-2021 American Community Survey (ACS) data generally reflect the March 2020 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization. |
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution. For a 5-year median estimate, the margin of error associated with a median was larger than the median itself.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing |
| | |
| **COLUMN NOTES** | None |
| | |

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | | |
| Label | Estimate | Margin of Error | Percent | Percent Margin of Error |
| HOUSEHOLDS BY TYPE | | | | |
| Total households | 36,099 | ±850 | 36,099 | (X) |
| Married-couple household | 20,614 | ±941 | 57.1% | ±2.5 |
| With children of the householder under 18 years | 8,371 | ±742 | 23.2% | ±1.9 |
| Cohabiting couple household | 1,472 | ±485 | 4.1% | ±1.4 |
| With children of the householder under 18 years | 597 | ±373 | 1.7% | ±1.0 |
| Male householder, no spouse/partner present | 6,359 | ±689 | 17.6% | ±1.8 |
| With children of the householder under 18 years | 692 | ±293 | 1.9% | ±0.8 |
| Householder living alone | 4,593 | ±632 | 12.7% | ±1.7 |
| 65 years and over | 1,167 | ±281 | 3.2% | ±0.8 |
| Female householder, no spouse/partner present | 7,654 | ±783 | 21.2% | ±2.0 |
| With children of the householder under 18 years | 1,245 | ±322 | 3.4% | ±0.9 |
| Householder living alone | 4,633 | ±594 | 12.8% | ±1.5 |
| 65 years and over | 2,418 | ±369 | 6.7% | ±1.0 |
| Households with one or more people under 18 years | 12,021 | ±772 | 33.3% | ±2.1 |
| Households with one or more people 65 years and over | 10,308 | ±405 | 28.6% | ±1.0 |
| Average household size | 2.57 | ±0.06 | (X) | (X) |
| Average family size | 3.08 | ±0.09 | (X) | (X) |
| RELATIONSHIP | | | | |
| Population in households | 92,734 | ±1,107 | 92,734 | (X) |

Table: ACSDP5YSPT2021.DP02

| | | | | |
|---|---|---|---|---|
| | **Black or African American alone** | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| HOUSEHOLDS BY TYPE | | | | |
| Total households | 19,035 | ±666 | 19,035 | (X) |
| Married-couple household | 7,209 | ±860 | 37.9% | ±4.4 |
| With children of the householder under 18 years | 2,989 | ±628 | 15.7% | ±3.2 |
| Cohabiting couple household | 1,466 | ±528 | 7.7% | ±2.7 |
| With children of the householder under 18 years | 579 | ±259 | 3.0% | ±1.4 |
| Male householder, no spouse/partner present | 3,307 | ±662 | 17.4% | ±3.4 |
| With children of the householder under 18 years | 511 | ±278 | 2.7% | ±1.5 |
| Householder living alone | 2,188 | ±544 | 11.5% | ±2.8 |
| 65 years and over | 618 | ±299 | 3.2% | ±1.6 |
| Female householder, no spouse/partner present | 7,053 | ±717 | 37.1% | ±3.7 |
| With children of the householder under 18 years | 2,354 | ±490 | 12.4% | ±2.5 |
| Householder living alone | 2,956 | ±572 | 15.5% | ±2.9 |
| 65 years and over | 605 | ±219 | 3.2% | ±1.1 |
| Households with one or more people under 18 years | 7,304 | ±834 | 38.4% | ±4.0 |
| Households with one or more people 65 years and over | 3,360 | ±320 | 17.7% | ±1.6 |
| Average household size | 2.64 | ±0.08 | (X) | (X) |
| Average family size | 3.22 | ±0.15 | (X) | (X) |
| RELATIONSHIP | | | | |
| Population in households | 50,317 | ±1,107 | 50,317 | (X) |

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | **White alone** | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| Householder | 36,099 | ±850 | 38.9% | ±0.9 |
| Spouse | 20,961 | ±955 | 22.6% | ±1.0 |
| Unmarried partner | 1,133 | ±363 | 1.2% | ±0.4 |
| Child | 27,367 | ±1,234 | 29.5% | ±1.2 |
| Other relatives | 4,440 | ±581 | 4.8% | ±0.6 |
| Other nonrelatives | 2,734 | ±662 | 2.9% | ±0.7 |
| MARITAL STATUS | | | | |
| Males 15 years and over | 37,348 | ±416 | 37,348 | (X) |
| Never married | 10,281 | ±626 | 27.5% | ±1.6 |
| Now married, except separated | 21,619 | ±999 | 57.9% | ±2.6 |
| Separated | 615 | ±208 | 1.6% | ±0.6 |
| Widowed | 673 | ±215 | 1.8% | ±0.6 |
| Divorced | 4,160 | ±763 | 11.1% | ±2.1 |
| Females 15 years and over | 38,762 | ±371 | 38,762 | (X) |
| Never married | 8,129 | ±678 | 21.0% | ±1.7 |
| Now married, except separated | 21,337 | ±1,063 | 55.0% | ±2.6 |
| Separated | 962 | ±321 | 2.5% | ±0.8 |
| Widowed | 3,291 | ±486 | 8.5% | ±1.3 |
| Divorced | 5,043 | ±657 | 13.0% | ±1.7 |
| FERTILITY | | | | |
| Number of women 15 to 50 years old who had a birth in the past 12 months | 1,186 | ±369 | 1,186 | (X) |
| Unmarried women (widowed, divorced, and never married) | 235 | ±151 | 19.8% | ±10.4 |
| Per 1,000 unmarried women | 24 | ±16 | (X) | (X) |
| Per 1,000 women 15 to 50 years old | 56 | ±17 | (X) | (X) |

Table: ACSDP5YSPT2021.DP02

| | | | | |
|---|---|---|---|---|
| | Black or African American alone | | | |
| Label | Estimate | Margin of Error | Percent | Percent Margin of Error |
| Householder | 19,035 | ±666 | 37.8% | ±1.1 |
| Spouse | 7,302 | ±716 | 14.5% | ±1.5 |
| Unmarried partner | 1,042 | ±396 | 2.1% | ±0.8 |
| Child | 17,547 | ±1,072 | 34.9% | ±1.9 |
| Other relatives | 4,186 | ±682 | 8.3% | ±1.3 |
| Other nonrelatives | 1,205 | ±436 | 2.4% | ±0.9 |
| MARITAL STATUS | | | | |
| Males 15 years and over | 18,215 | ±391 | 18,215 | (X) |
| Never married | 7,942 | ±685 | 43.6% | ±3.7 |
| Now married, except separated | 7,818 | ±768 | 42.9% | ±4.0 |
| Separated | 316 | ±163 | 1.7% | ±0.9 |
| Widowed | 293 | ±162 | 1.6% | ±0.9 |
| Divorced | 1,846 | ±459 | 10.1% | ±2.5 |
| Females 15 years and over | 21,449 | ±465 | 21,449 | (X) |
| Never married | 8,752 | ±710 | 40.8% | ±3.0 |
| Now married, except separated | 7,442 | ±835 | 34.7% | ±3.9 |
| Separated | 668 | ±293 | 3.1% | ±1.4 |
| Widowed | 1,218 | ±337 | 5.7% | ±1.5 |
| Divorced | 3,369 | ±753 | 15.7% | ±3.5 |
| FERTILITY | | | | |
| Number of women 15 to 50 years old who had a birth in the past 12 months | 459 | ±285 | 459 | (X) |
| Unmarried women (widowed, divorced, and never married) | 280 | ±230 | 61.0% | ±27.1 |
| Per 1,000 unmarried women | 29 | ±24 | (X) | (X) |
| Per 1,000 women 15 to 50 years old | 32 | ±20 | (X) | (X) |

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | | |
| Label | Estimate | Margin of Error | Percent | Percent Margin of Error |
| Per 1,000 women 15 to 19 years old | 7 | ±12 | (X) | (X) |
| Per 1,000 women 20 to 34 years old | 110 | ±37 | (X) | (X) |
| Per 1,000 women 35 to 50 years old | 20 | ±14 | (X) | (X) |
| GRANDPARENTS | | | | |
| Number of grandparents living with own grandchildren under 18 years | 1,887 | ±519 | 1,887 | (X) |
| Grandparents responsible for grandchildren | 824 | ±336 | 43.7% | ±13.8 |
| Years responsible for grandchildren | | | | |
| Less than 1 year | 92 | ±90 | 4.9% | ±4.7 |
| 1 or 2 years | 234 | ±168 | 12.4% | ±8.4 |
| 3 or 4 years | 221 | ±172 | 11.7% | ±8.9 |
| 5 or more years | 277 | ±249 | 14.7% | ±12.7 |
| Number of grandparents responsible for own grandchildren under 18 years | 824 | ±336 | 824 | (X) |
| Who are female | 431 | ±204 | 52.3% | ±9.7 |
| Who are married | 636 | ±302 | 77.2% | ±13.9 |
| SCHOOL ENROLLMENT | | | | |
| Population 3 years and over enrolled in school | 22,497 | ±845 | 22,497 | (X) |
| Nursery school, preschool | 977 | ±320 | 4.3% | ±1.4 |
| Kindergarten | 1,202 | ±398 | 5.3% | ±1.8 |

| | | | | |
|---|---|---|---|---|
| | Black or African American alone | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| Per 1,000 women 15 to 19 years old | 0 | ±23 | (X) | (X) |
| Per 1,000 women 20 to 34 years old | 68 | ±45 | (X) | (X) |
| Per 1,000 women 35 to 50 years old | 7 | ±9 | (X) | (X) |
| GRANDPARENTS | | | | |
| Number of grandparents living with own grandchildren under 18 years | 1,305 | ±408 | 1,305 | (X) |
| Grandparents responsible for grandchildren | 658 | ±283 | 50.4% | ±14.4 |
| Years responsible for grandchildren | | | | |
| Less than 1 year | 65 | ±91 | 5.0% | ±6.7 |
| 1 or 2 years | 148 | ±95 | 11.3% | ±7.5 |
| 3 or 4 years | 38 | ±59 | 2.9% | ±4.4 |
| 5 or more years | 407 | ±238 | 31.2% | ±13.9 |
| Number of grandparents responsible for own grandchildren under 18 years | 658 | ±283 | 658 | (X) |
| Who are female | 320 | ±161 | 48.6% | ±13.4 |
| Who are married | 356 | ±224 | 54.1% | ±22.4 |
| SCHOOL ENROLLMENT | | | | |
| Population 3 years and over enrolled in school | 16,005 | ±931 | 16,005 | (X) |
| Nursery school, preschool | 809 | ±344 | 5.1% | ±2.0 |
| Kindergarten | 907 | ±388 | 5.7% | ±2.4 |

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | | |
| Label | Estimate | Margin of Error | Percent | Percent Margin of Error |
| Elementary school (grades 1-8) | 10,003 | ±643 | 44.5% | ±3.0 |
| High school (grades 9-12) | 5,202 | ±441 | 23.1% | ±1.8 |
| College or graduate school | 5,113 | ±643 | 22.7% | ±2.3 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 65,323 | ±526 | 65,323 | (X) |
| Less than 9th grade | 985 | ±289 | 1.5% | ±0.4 |
| 9th to 12th grade, no diploma | 2,640 | ±523 | 4.0% | ±0.8 |
| High school graduate (includes equivalency) | 17,482 | ±1,327 | 26.8% | ±2.0 |
| Some college, no degree | 15,886 | ±1,005 | 24.3% | ±1.5 |
| Associate's degree | 7,444 | ±818 | 11.4% | ±1.3 |
| Bachelor's degree | 12,507 | ±934 | 19.1% | ±1.4 |
| Graduate or professional degree | 8,379 | ±1,042 | 12.8% | ±1.6 |
| High school graduate or higher | 61,698 | ±728 | 94.5% | ±0.9 |
| Bachelor's degree or higher | 20,886 | ±1,310 | 32.0% | ±2.0 |
| VETERAN STATUS | | | | |
| Civilian population 18 years and over | 69,597 | ±1,007 | 69,597 | (X) |
| Civilian veterans | 11,817 | ±900 | 17.0% | ±1.3 |
| DISABILITY STATUS OF THE CIVILIAN NONINSTITUTIONALIZED POPULATION | | | | |
| Total Civilian Noninstitutionalized Population | 90,288 | ±1,389 | 90,288 | (X) |
| With a disability | 12,126 | ±965 | 13.4% | ±1.1 |
| Under 18 years | 21,365 | ±624 | 21,365 | (X) |
| With a disability | 1,079 | ±346 | 5.1% | ±1.6 |

Table: ACSDP5YSPT2021.DP02

| | | | | |
|---|---|---|---|---|
| | Black or African American alone | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| Elementary school (grades 1-8) | 6,750 | ±693 | 42.2% | ±4.1 |
| High school (grades 9-12) | 3,400 | ±429 | 21.2% | ±2.7 |
| College or graduate school | 4,139 | ±607 | 25.9% | ±3.2 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 31,736 | ±477 | 31,736 | (X) |
| Less than 9th grade | 750 | ±288 | 2.4% | ±0.9 |
| 9th to 12th grade, no diploma | 2,049 | ±512 | 6.5% | ±1.6 |
| High school graduate (includes equivalency) | 9,864 | ±982 | 31.1% | ±3.1 |
| Some college, no degree | 5,918 | ±802 | 18.6% | ±2.5 |
| Associate's degree | 3,209 | ±661 | 10.1% | ±2.1 |
| Bachelor's degree | 4,962 | ±810 | 15.6% | ±2.5 |
| Graduate or professional degree | 4,984 | ±794 | 15.7% | ±2.4 |
| High school graduate or higher | 28,937 | ±842 | 91.2% | ±2.1 |
| Bachelor's degree or higher | 9,946 | ±1,118 | 31.3% | ±3.3 |
| VETERAN STATUS | | | | |
| Civilian population 18 years and over | 35,651 | ±770 | 35,651 | (X) |
| Civilian veterans | 5,407 | ±604 | 15.2% | ±1.8 |
| DISABILITY STATUS OF THE CIVILIAN NONINSTITUTIONALIZED POPULATION | | | | |
| Total Civilian Noninstitutionalized Population | 49,139 | ±1,197 | 49,139 | (X) |
| With a disability | 6,278 | ±788 | 12.8% | ±1.6 |
| Under 18 years | 13,851 | ±773 | 13,851 | (X) |
| With a disability | 643 | ±353 | 4.6% | ±2.6 |

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | | |
| Label | Estimate | Margin of Error | Percent | Percent Margin of Error |
| 18 to 64 years | 54,509 | ±1,037 | 54,509 | (X) |
| With a disability | 6,077 | ±817 | 11.1% | ±1.6 |
| 65 years and over | 14,414 | ±155 | 14,414 | (X) |
| With a disability | 4,970 | ±509 | 34.5% | ±3.5 |
| RESIDENCE 1 YEAR AGO | | | | |
| Population 1 year and over | 92,747 | ±1,070 | 92,747 | (X) |
| Same house | 80,750 | ±1,675 | 87.1% | ±1.6 |
| Different house (in the U.S. or abroad) | 11,997 | ±1,493 | 12.9% | ±1.6 |
| Different house in the U.S. | 11,680 | ±1,426 | 12.6% | ±1.5 |
| Same county | 6,251 | ±973 | 6.7% | ±1.0 |
| Different county | 5,429 | ±1,033 | 5.9% | ±1.1 |
| Same state | 2,959 | ±777 | 3.2% | ±0.8 |
| Different state | 2,470 | ±711 | 2.7% | ±0.8 |
| Abroad | 317 | ±279 | 0.3% | ±0.3 |
| PLACE OF BIRTH | | | | |
| Total population | 93,757 | ±1,047 | 93,757 | (X) |
| Native | 91,259 | ±1,013 | 97.3% | ±0.6 |
| Born in United States | 88,573 | ±996 | 94.5% | ±0.8 |
| State of residence | 48,238 | ±2,001 | 51.5% | ±2.0 |
| Different state | 40,335 | ±2,027 | 43.0% | ±2.2 |
| Born in Puerto Rico, U.S. Island areas, or born abroad to American parent(s) | 2,686 | ±639 | 2.9% | ±0.7 |
| Foreign born | 2,498 | ±546 | 2.7% | ±0.6 |
| U.S. CITIZENSHIP STATUS | | | | |
| Foreign-born population | 2,498 | ±546 | 2,498 | (X) |
| Naturalized U.S. citizen | 1,404 | ±340 | 56.2% | ±8.9 |

Table: ACSDP5YSPT2021.DP02

| | | | | |
|---|---|---|---|---|
| | Black or African American alone | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| 18 to 64 years | 30,900 | ±715 | 30,900 | (X) |
| With a disability | 3,494 | ±539 | 11.3% | ±1.8 |
| 65 years and over | 4,388 | ±270 | 4,388 | (X) |
| With a disability | 2,141 | ±357 | 48.8% | ±7.7 |
| RESIDENCE 1 YEAR AGO | | | | |
| Population 1 year and over | 50,400 | ±1,088 | 50,400 | (X) |
| Same house | 42,476 | ±1,513 | 84.3% | ±2.7 |
| Different house (in the U.S. or abroad) | 7,924 | ±1,418 | 15.7% | ±2.7 |
| Different house in the U.S. | 7,747 | ±1,400 | 15.4% | ±2.7 |
| Same county | 3,358 | ±844 | 6.7% | ±1.6 |
| Different county | 4,389 | ±1,168 | 8.7% | ±2.3 |
| Same state | 3,052 | ±1,060 | 6.1% | ±2.1 |
| Different state | 1,337 | ±534 | 2.7% | ±1.0 |
| Abroad | 177 | ±226 | 0.4% | ±0.4 |
| PLACE OF BIRTH | | | | |
| Total population | 50,818 | ±1,075 | 50,818 | (X) |
| Native | 48,201 | ±1,346 | 94.9% | ±1.8 |
| Born in United States | 47,279 | ±1,346 | 93.0% | ±1.8 |
| State of residence | 31,632 | ±2,215 | 62.2% | ±4.0 |
| Different state | 15,647 | ±1,616 | 30.8% | ±3.2 |
| Born in Puerto Rico, U.S. Island areas, or born abroad to American parent(s) | 922 | ±361 | 1.8% | ±0.7 |
| Foreign born | 2,617 | ±896 | 5.1% | ±1.8 |
| U.S. CITIZENSHIP STATUS | | | | |
| Foreign-born population | 2,617 | ±896 | 2,617 | (X) |
| Naturalized U.S. citizen | 1,400 | ±541 | 53.5% | ±14.5 |

Table: ACSDP5YSPT2021.DP02

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | | |
| Label | Estimate | Margin of Error | Percent | Percent Margin of Error |
| Not a U.S. citizen | 1,094 | ±361 | 43.8% | ±8.9 |
| YEAR OF ENTRY | | | | |
| Population born outside the United States | 5,184 | ±753 | 5,184 | (X) |
| Native | 2,686 | ±639 | 2,686 | (X) |
| Entered 2010 or later | 429 | ±296 | 16.0% | ±9.2 |
| Entered before 2010 | 2,257 | ±536 | 84.0% | ±9.2 |
| Foreign born | 2,498 | ±546 | 2,498 | (X) |
| Entered 2010 or later | 347 | ±168 | 13.9% | ±5.9 |
| Entered before 2010 | 2,151 | ±496 | 86.1% | ±5.9 |
| WORLD REGION OF BIRTH OF FOREIGN BORN | | | | |
| Foreign-born population, excluding population born at sea | 2,498 | ±546 | 2,498 | (X) |
| Europe | 990 | ±289 | 39.6% | ±10.5 |
| Asia | 117 | ±99 | 4.7% | ±4.0 |
| Africa | 36 | ±47 | 1.4% | ±1.8 |
| Oceania | 41 | ±46 | 1.6% | ±1.8 |
| Latin America | 1,079 | ±424 | 43.2% | ±11.9 |
| Northern America | 235 | ±179 | 9.4% | ±6.7 |
| LANGUAGE SPOKEN AT HOME | | | | |
| Population 5 years and over | 88,517 | ±938 | 88,517 | (X) |
| English only | 84,934 | ±971 | 96.0% | ±1.0 |
| Language other than English | 3,583 | ±869 | 4.0% | ±1.0 |
| Speak English less than "very well" | 1,179 | ±444 | 1.3% | ±0.5 |
| Spanish | 2,419 | ±744 | 2.7% | ±0.8 |

Table: ACSDP5YSPT2021.DP02

| | | | | |
|---|---|---|---|---|
| | **Black or African American alone** | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| Not a U.S. citizen | 1,217 | ±607 | 46.5% | ±14.5 |
| YEAR OF ENTRY | | | | |
| Population born outside the United States | 3,539 | ±926 | 3,539 | (X) |
| Native | 922 | ±361 | 922 | (X) |
| Entered 2010 or later | 291 | ±192 | 31.6% | ±16.0 |
| Entered before 2010 | 631 | ±284 | 68.4% | ±16.0 |
| Foreign born | 2,617 | ±896 | 2,617 | (X) |
| Entered 2010 or later | 1,276 | ±661 | 48.8% | ±15.2 |
| Entered before 2010 | 1,341 | ±482 | 51.2% | ±15.2 |
| WORLD REGION OF BIRTH OF FOREIGN BORN | | | | |
| Foreign-born population, excluding population born at sea | 2,617 | ±896 | 2,617 | (X) |
| Europe | 9 | ±17 | 0.3% | ±0.6 |
| Asia | 0 | ±34 | 0.0% | ±1.8 |
| Africa | 1,276 | ±574 | 48.8% | ±17.4 |
| Oceania | 0 | ±34 | 0.0% | ±1.8 |
| Latin America | 1,332 | ±672 | 50.9% | ±17.5 |
| Northern America | 0 | ±34 | 0.0% | ±1.8 |
| LANGUAGE SPOKEN AT HOME | | | | |
| Population 5 years and over | 47,926 | ±849 | 47,926 | (X) |
| English only | 46,165 | ±1,159 | 96.3% | ±1.4 |
| Language other than English | 1,761 | ±670 | 3.7% | ±1.4 |
| Speak English less than "very well" | 343 | ±149 | 0.7% | ±0.3 |
| Spanish | 497 | ±243 | 1.0% | ±0.5 |

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | | |
| Label | Estimate | Margin of Error | Percent | Percent Margin of Error |
| Speak English less than "very well" | 1,009 | ±427 | 1.1% | ±0.5 |
| Other Indo-European languages | 950 | ±355 | 1.1% | ±0.4 |
| Speak English less than "very well" | 147 | ±105 | 0.2% | ±0.1 |
| Asian and Pacific Islander languages | 61 | ±71 | 0.1% | ±0.1 |
| Speak English less than "very well" | 0 | ±34 | 0.0% | ±0.1 |
| Other languages | 153 | ±202 | 0.2% | ±0.2 |
| Speak English less than "very well" | 23 | ±34 | 0.0% | ±0.1 |
| ANCESTRY | | | | |
| Total population | (X) | (X) | (X) | (X) |
| American | (X) | (X) | (X) | (X) |
| Arab | (X) | (X) | (X) | (X) |
| Czech | (X) | (X) | (X) | (X) |
| Danish | (X) | (X) | (X) | (X) |
| Dutch | (X) | (X) | (X) | (X) |
| English | (X) | (X) | (X) | (X) |
| French (except Basque) | (X) | (X) | (X) | (X) |
| French Canadian | (X) | (X) | (X) | (X) |
| German | (X) | (X) | (X) | (X) |
| Greek | (X) | (X) | (X) | (X) |
| Hungarian | (X) | (X) | (X) | (X) |
| Irish | (X) | (X) | (X) | (X) |
| Italian | (X) | (X) | (X) | (X) |
| Lithuanian | (X) | (X) | (X) | (X) |

| | | | | |
|---|---|---|---|---|
| | Black or African American alone | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| Speak English less than "very well" | 16 | ±20 | 0.0% | ±0.1 |
| Other Indo-European languages | 324 | ±272 | 0.7% | ±0.6 |
| Speak English less than "very well" | 8 | ±13 | 0.0% | ±0.1 |
| Asian and Pacific Islander languages | 466 | ±400 | 1.0% | ±0.8 |
| Speak English less than "very well" | 0 | ±34 | 0.0% | ±0.1 |
| Other languages | 474 | ±209 | 1.0% | ±0.4 |
| Speak English less than "very well" | 319 | ±148 | 0.7% | ±0.3 |
| ANCESTRY | | | | |
| Total population | (X) | (X) | (X) | (X) |
| American | (X) | (X) | (X) | (X) |
| Arab | (X) | (X) | (X) | (X) |
| Czech | (X) | (X) | (X) | (X) |
| Danish | (X) | (X) | (X) | (X) |
| Dutch | (X) | (X) | (X) | (X) |
| English | (X) | (X) | (X) | (X) |
| French (except Basque) | (X) | (X) | (X) | (X) |
| French Canadian | (X) | (X) | (X) | (X) |
| German | (X) | (X) | (X) | (X) |
| Greek | (X) | (X) | (X) | (X) |
| Hungarian | (X) | (X) | (X) | (X) |
| Irish | (X) | (X) | (X) | (X) |
| Italian | (X) | (X) | (X) | (X) |
| Lithuanian | (X) | (X) | (X) | (X) |

| | **Houston County, Georgia** | | | |
|---|---|---|---|---|
| | **White alone** | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| Norwegian | (X) | (X) | (X) | (X) |
| Polish | (X) | (X) | (X) | (X) |
| Portuguese | (X) | (X) | (X) | (X) |
| Russian | (X) | (X) | (X) | (X) |
| Scotch-Irish | (X) | (X) | (X) | (X) |
| Scottish | (X) | (X) | (X) | (X) |
| Slovak | (X) | (X) | (X) | (X) |
| Subsaharan African | (X) | (X) | (X) | (X) |
| Swedish | (X) | (X) | (X) | (X) |
| Swiss | (X) | (X) | (X) | (X) |
| Ukrainian | (X) | (X) | (X) | (X) |
| Welsh | (X) | (X) | (X) | (X) |
| West Indian (excluding Hispanic origin groups) | (X) | (X) | (X) | (X) |
| COMPUTERS AND INTERNET USE | | | | |
| Total households | 36,099 | ±850 | 36,099 | (X) |
| With a computer | 34,584 | ±895 | 95.8% | ±0.9 |
| With a broadband Internet subscription | 33,205 | ±966 | 92.0% | ±1.4 |

Table: ACSDP5YSPT2021.DP02

| | | | | |
|---|---|---|---|---|
| | Black or African American alone | | | |
| **Label** | **Estimate** | **Margin of Error** | **Percent** | **Percent Margin of Error** |
| Norwegian | (X) | (X) | (X) | (X) |
| Polish | (X) | (X) | (X) | (X) |
| Portuguese | (X) | (X) | (X) | (X) |
| Russian | (X) | (X) | (X) | (X) |
| Scotch-Irish | (X) | (X) | (X) | (X) |
| Scottish | (X) | (X) | (X) | (X) |
| Slovak | (X) | (X) | (X) | (X) |
| Subsaharan African | (X) | (X) | (X) | (X) |
| Swedish | (X) | (X) | (X) | (X) |
| Swiss | (X) | (X) | (X) | (X) |
| Ukrainian | (X) | (X) | (X) | (X) |
| Welsh | (X) | (X) | (X) | (X) |
| West Indian (excluding Hispanic origin groups) | (X) | (X) | (X) | (X) |
| COMPUTERS AND INTERNET USE | | | | |
| Total households | 19,035 | ±666 | 19,035 | (X) |
| With a computer | 17,354 | ±692 | 91.2% | ±2.1 |
| With a broadband Internet subscription | 16,010 | ±808 | 84.1% | ±2.8 |

# TENURE BY VEHICLES AVAILABLE

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | B25044 |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2021 |
| DATASET: | ACSDT5YSPT2021 |
| PRODUCT: | ACS 5-Year Estimates Selected Population Detailed Tables |
| UNIVERSE: | Occupied housing units |
| MLA: | U.S. Census Bureau. "TENURE BY VEHICLES AVAILABLE." American Community Survey, ACS 5-Year Estimates Selected Population Detailed Tables, Table B25044, https://data.census.gov/table/ACSDT5YSPT2021.B25044?t=002:004:Transportation&g=050XX00US13153. Accessed on 20 |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2021/acs/acs5/spt |
| | |
| **USER SELECTIONS** | |
| GEOS | Houston County, Georgia |
| TOPICS | White alone; Black or African American alone; Transportation |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |
| | |
| **PIVOT & GROUPING** | |
| PIVOT COLUMNS | None |

Table: ACSDT5YSPT2021.B25044

| | |
|---|---|
| PIVOT MODE | Off |
| ROW GROUPS | None |
| VALUE COLUMNS | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/table/ACSDT5YSPT2021.B25044?t=002:004:Transportation&g=050XX00US13153 |
| | |
| **TABLE NOTES** | |
| | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities, and towns and estimates of housing units for states and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2017-2021 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented in these tables. |
| | The 2017-2021 American Community Survey (ACS) data generally reflect the March 2020 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |

| | |
|---|---|
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization. |
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution. For a 5-year median estimate, the margin of error associated with a median was larger than the median itself.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the margin of error may be treated as zero. |
| | |
| **COLUMN NOTES** | None |
| | |

Table: ACSDT5YSPT2021.B25044

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | Black or African American alone | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Total: | 36,099 | ±850 | 19,035 | ±666 |
| Owner occupied: | 27,577 | ±980 | 8,911 | ±754 |
| No vehicle available | 359 | ±147 | 252 | ±152 |
| 1 vehicle available | 6,343 | ±820 | 2,250 | ±520 |
| 2 vehicles available | 12,152 | ±839 | 3,112 | ±604 |
| 3 vehicles available | 5,652 | ±773 | 1,970 | ±446 |
| 4 vehicles available | 2,253 | ±391 | 873 | ±352 |
| 5 or more vehicles available | 818 | ±274 | 454 | ±224 |
| Renter occupied: | 8,522 | ±802 | 10,124 | ±739 |
| No vehicle available | 520 | ±271 | 1,119 | ±366 |
| 1 vehicle available | 3,807 | ±606 | 4,774 | ±768 |
| 2 vehicles available | 3,098 | ±517 | 2,846 | ±619 |
| 3 vehicles available | 742 | ±301 | 744 | ±273 |
| 4 vehicles available | 339 | ±185 | 505 | ±250 |
| 5 or more vehicles available | 16 | ±27 | 136 | ±118 |
| | | | | |
| Owner Occupied: | **White Alone:** | 1.30% | | |
| | **Black or African American Alone:** | 2.83% | | |
| | | | | |
| Renter Occupied: | **White Alone:** | 6.10% | | |
| | **Black or African American Alone:** | 11.05% | | |
| | | | | |
| Regardless of Owning or Renting | | | | |
| **White Alone:** | 2.43% | | | |
| **Black or African American Alone:** | 7.20% | | | |

# HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2021 INFLATION-ADJUSTED DOLLARS)

United States Census Bureau

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | B19001 |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2021 |
| DATASET: | ACSDT5YSPT2021 |
| PRODUCT: | ACS 5-Year Estimates Selected Population Detailed Tables |
| UNIVERSE: | Households |
| MLA: | U.S. Census Bureau. "HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2021 INFLATION-ADJUSTED DOLLARS)." American Community Survey, ACS 5-Year Estimates Selected Population Detailed Tables, Table B19001, https://data.census.gov/table/ACSDT5YSPT2021.B19001?t=002:004:Income+and+Earnings&g=050XX00US13153. Accessed on 20 Nov 2025. |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2021/acs/acs5/spt |
| | |
| **USER SELECTIONS** | |
| GEOS | Houston County, Georgia |
| TOPICS | Income and Earnings; White alone; Black or African American alone |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |
| | |
| **PIVOT & GROUPING** | |

| | |
|---|---|
| PIVOT COLUMNS | None |
| PIVOT MODE | Off |
| ROW GROUPS | None |
| VALUE COLUMNS | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/table/ACSDT5YSPT2021.B19001?t=002:004:Income+and+Earnings&g=050XX00US13153 |
| | |
| **TABLE NOTES** | |
| | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities, and towns and estimates of housing units for states and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2017-2021 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented in these tables. |

| | |
|---|---|
| | Between 2018 and 2019 the American Community Survey retirement income question changed. These changes resulted in an increase in both the number of households reporting retirement income and higher aggregate retirement income at the national level. For more information see Changes to the Retirement Income Question . |
| | The 2017-2021 American Community Survey (ACS) data generally reflect the March 2020 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization. |
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution. For a 5-year median estimate, the margin of error associated with a median was larger than the median itself.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the margin of error may be treated as zero. |
| | |
| **COLUMN NOTES** | None |
| | |

Table: ACSDT5YSPT2021.B19001

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | White alone | | Black or African American alone | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Total: | 36,099 | ±850 | 19,035 | ±666 |
| Less than $10,000 | 1,078 | ±292 | 1,512 | ±384 |
| $10,000 to $14,999 | 640 | ±211 | 1,028 | ±347 |
| $15,000 to $19,999 | 1,440 | ±483 | 644 | ±234 |
| $20,000 to $24,999 | 1,532 | ±356 | 1,074 | ±369 |
| $25,000 to $29,999 | 1,418 | ±338 | 1,086 | ±352 |
| $30,000 to $34,999 | 1,476 | ±353 | 848 | ±359 |
| $35,000 to $39,999 | 1,285 | ±358 | 858 | ±330 |
| $40,000 to $44,999 | 1,081 | ±282 | 899 | ±362 |
| $45,000 to $49,999 | 1,171 | ±275 | 548 | ±244 |
| $50,000 to $59,999 | 2,676 | ±517 | 1,778 | ±338 |
| $60,000 to $74,999 | 3,414 | ±474 | 1,798 | ±485 |
| $75,000 to $99,999 | 5,806 | ±630 | 2,073 | ±486 |
| $100,000 to $124,999 | 4,204 | ±598 | 2,015 | ±431 |
| $125,000 to $149,999 | 3,551 | ±631 | 1,118 | ±375 |
| $150,000 to $199,999 | 3,230 | ±613 | 1,303 | ±514 |
| $200,000 or more | 2,097 | ±379 | 453 | ±225 |

Table: ACSDT5YSPT2021.B19001

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| **Label** | | | | |
| Total: | | | | |
| Less than $10,000 | | | | |
| $10,000 to $14,999 | | | | |
| $15,000 to $19,999 | | | | |
| $20,000 to $24,999 | **White Above Median:** | 26149.00 | **Percentage of Total:** | 72.44% |
| $25,000 to $29,999 | | | | |
| $30,000 to $34,999 | **Black Above Median:** | 11086.00 | **Percentage of Total:** | 58.24% |
| $35,000 to $39,999 | | | | |
| $40,000 to $44,999 | | | | |
| $45,000 to $49,999 | | | | |
| $50,000 to $59,999 | | | | |
| $60,000 to $74,999 | | | | |
| $75,000 to $99,999 | | | | |
| $100,000 to $124,999 | | | | |
| $125,000 to $149,999 | | | | |
| $150,000 to $199,999 | | | | |
| $200,000 or more | | | | |

# EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER

**Note: The table shown may have been modified by user selections. Some information may be missing.**

| | |
|---|---|
| **DATA NOTES** | |
| TABLE ID: | B23025 |
| SURVEY/PROGRAM: | American Community Survey |
| VINTAGE: | 2021 |
| DATASET: | ACSDT5YSPT2021 |
| PRODUCT: | ACS 5-Year Estimates Selected Population Detailed Tables |
| UNIVERSE: | Population 16 years and over |
| MLA: | U.S. Census Bureau. "EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER." American Community Survey, ACS 5-Year Estimates Selected Population Detailed Tables, Table B23025, https://data.census.gov/table/ACSDT5YSPT2021.B23025?t=002:004:Employment+and+Labor+Force+Status&g=050XX00US13153. Accessed on 23 Dec 2025. |
| FTP URL: | None |
| API URL: | https://api.census.gov/data/2021/acs/acs5/spt |
| | |
| **USER SELECTIONS** | |
| TOPICS | White alone; Black or African American alone; Employment and Labor Force Status |
| GEOS | Houston County, Georgia |
| | |
| **EXCLUDED COLUMNS** | None |
| | |
| **APPLIED FILTERS** | None |
| | |
| **APPLIED SORTS** | None |

| | |
|---|---|
| **PIVOT & GROUPING** | |
| PIVOT COLUMNS | None |
| PIVOT MODE | Off |
| ROW GROUPS | None |
| VALUE COLUMNS | None |
| | |
| **WEB ADDRESS** | https://data.census.gov/table/ACSDT5YSPT2021.B23025?t=002:004:Employment+and+Labor+Force+Status&g=050XX00US1 |
| | |
| **TABLE NOTES** | |
| | Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities, and towns and estimates of housing units for states and counties. |
| | Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.<br><br>Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section. |
| | Source: U.S. Census Bureau, 2017-2021 American Community Survey 5-Year Estimates |
| | Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentation). The effect of nonsampling error is not represented in these tables. |

| | |
|---|---|
| | The 2017-2021 American Community Survey (ACS) data generally reflect the March 2020 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain instances, the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities. |
| | Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization. |
| | Explanation of Symbols:- The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or highest interval of an open-ended distribution. For a 5-year median estimate, the margin of error associated with a median was larger than the median itself.N The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area. (X) The estimate or margin of error is not applicable or not available.median- The median falls in the lowest interval of an open-ended distribution (for example "2,500-")median+ The median falls in the highest interval of an open-ended distribution (for example "250,000+").** The margin of error could not be computed because there were an insufficient number of sample observations.*** The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.***** A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the margin of error may be treated as zero. |
| | |
| **COLUMN NOTES** | None |
| | |

Table: ACSDT5YSPT2021.B23025

| | Houston County, Georgia | | | |
|---|---|---|---|---|
| | **White alone** | | **Black or African American alone** | |
| **Label** | **Estimate** | **Margin of Error** | **Estimate** | **Margin of Error** |
| Total: | 75,011 | ±759 | 38,633 | ±713 |
| In labor force: | 48,279 | ±1,291 | 26,942 | ±888 |
| Civilian labor force: | 45,488 | ±1,431 | 25,632 | ±913 |
| Employed | 43,511 | ±1,417 | 23,515 | ±1,136 |
| Unemployed | 1,977 | ±467 | 2,117 | ±594 |
| Armed Forces | 2,791 | ±691 | 1,310 | ±520 |
| Not in labor force | 26,732 | ±1,234 | 11,691 | ±816 |
| | | | | |
| | | | | |
| | 2.64% | | 5.48% | |

**APPENDIX II – CV**

**Begins on the Following Page …**

# Joseph Bagley, PhD, Curriculum Vitae

Associate Professor of History
Perimeter College, Newton Campus
Georgia State University
239 Cedar Lane, Covington GA, 30014

Email: jbagley3@gsu.edu
Home: 191 Walker Street SW
Atlanta, GA 30304
Cell: 770-815-3771, Office: 404-413-6364

## EDUCATION

- PhD, History, 2013, Georgia State University
  - "School Desegregation, Law and Order, and Litigating Social Justice in Alabama, 1954-1974"
    - Winner of the John M. Matthews Distinguished Dissertation Award, 2013
- MA, History, Auburn University, 2008
- BA, History, Auburn University, 2004

## MAJOR PUBLICATIONS AND GRANTS

- *Power, the Law, and the Franchise: The Long, Ongoing Voting Rights Struggle and Racial Politics in Alabama, 1865-2025* (University of Alabama Press, The Modern South series, 2026)

- *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools* (University of Georgia Press, Politics and Culture in the 20th Century South series, 2018)
  - *History of Education Quarterly* 59, No. 4 (November 2019): 528 – 530
  - *Alabama Review* 75, No. 3 (Fall, 2022): 267-270
  - Held in nearly 1,000 libraries worldwide

- **"Terminus 1973? Atlanta Fifty Years Later"** (2022), Awarded a Georgia Humanities Grant, $2500 for a public humanities lecture and town hall at historic Ebenezer Baptist Church discussing the pivotal year 1973 and its implication for voting rights and equal educational opportunity.

## EXPERT WITNESS IN VOTING RIGHTS LITIGATION

- Recognized as a 'University Expert' by Georgia State University.

- ***McClure v. Jefferson County Commission*** (N.D. Ala., 2025): Submitted a report in remedial phase of litigation on behalf of plaintiffs seeking redrawing of commission lines.

- ***Curtis-Richie v. Madison County Commission*** (N.D. Ala. 2025): Submitted a report on behalf of plaintiffs in support of a Voting Rights Act vote dilution claim.

- ***North Carolina State Conf. of the NAACP v. Berger*** (M.D. NC 2025): Submitted a report, rebuttal report, and supplemental report, testified in two depositions and at trial in support of plaintiffs' claims that state's Senate redistricting violated § 2 of the Voting Rights Act.

- ***Alabama State Conf. of the NAACP v. Marshall*** (N.D. Ala. 2024): Submitted report in support of plaintiffs' motion for preliminary injunction, challenging Senate Bill 1 (2024), limiting assistance to illiterate voters.

- ***Alabama State Conf. of the NAACP v. Allen*** (N.D. Ala. 2024): challenge to state legislative redistricting as violative of § 2 of the Voting Rights Act. Submitted report and testified in deposition and at trial.

**EXPERT WITNESS IN VOTING RIGHTS LITIGATION Cont.**

- ***Georgia State Conf. of the NAACP v. State of Georgia*** (N.D. Ga., 2023): challenge to the General Assembly's state legislative and congressional redistricting plans as violative of § 2 of the Voting Rights Act and the Constitution. Submitted a report and testified in deposition.

- ***South Carolina State Conf. of the NAACP v. Alexander*** (D.S.C., 2023): challenge to General Assembly's congressional redistricting plan as a racial gerrymander and as intentionally discriminatory. Submitted an expert report and rebuttal report; testified in deposition and at trial.

- ***South Carolina State Conf. of the NAACP v. McMaster*** (D.S.C., 2022): challenge to General Assembly's redistricting plan for state House of Representatives. Submitted an expert report and rebuttal report; testified in deposition (Case settled).

- ***Milligan v. Merrill*** (N.D., Ala. 2022), *aff'd sub nom* ***Allen v. Milligan*** (499 U.S. 1, 2023): challenge to Alabama legislature's congressional redistricting plan as a violation of § 2 of the Voting Rights Act. Submitted an expert report and rebuttal report; testified in deposition and at hearing for preliminary injunction; findings adopted by the court in ruling granting preliminary injunction. Submitted report in support of amended complaint adding discriminatory intent claim (2024). Testified at trial (2025). Findings credited and cited to by the Court.

- ***People First of Alabama v. Merrill*** (N.D., Ala. 2020): challenge to Covid-related voting restrictions. Submitted an expert report; testified in deposition and at trial; findings adopted by Court (479 F.Supp. 3d 1200).

- ***Jones v. Jefferson County*** (N.D. Ala., 2019): conducted research into 1970s law establishing districting scheme for county board of education; submitted a discriminatory intent report (Consent Decree entered).

**TEACHING AND ADMINSTRATIVE EXPERIENCE**

- Associate (2023), Assistant Professor, Perimeter College, Georgia State University, 2017 – Present
  - HIST 1111, Survey of World History to 1500 (also as Honors)
  - HIST 1112, Survey of World History since 1500 (also as Honors)
  - HIST 2110, Survey of United States History (also as Honors)
  - HON 1000, Honors Seminar
  - HIST 1142, African American History since 1865
  - AAS 2010, Introduction to Africana Studies
  - HON PERS 2001, Perspectives on Peace: Nobel Laureates in Historical Perspective
    - GSU is 1 of 16 schools selected internationally to receive the elite Partners in Peace (PiP) designation, in collaboration with the National Collegiate Honors Council and the Nobel Peace Center in Oslo, Norway. Culminates in Study Abroad to Oslo, 2026
- Honors Program Coordinator, 2019 – 2025
- Study Abroad, Paris, Summer 2025
    - HIST 3220 – The 20th Century World, from the Franco-Prussian War to the War on Terror
- Study Abroad, Ireland, Summer 2024
    - HIST 2110 – U.S. History from an Irish Perspective
    - HIST 3990 – Human Rights Abuses in Historical Context: Human Rights in Irish History
- Study Away, Washington, D.C., May 2024, 2025
    - HON HIST 2110 – United States History in the Nation's Capital

## TEACHING AND ADMINSTRATIVE EXPERIENCE Cont.

- Lecturer, Georgia Perimeter College, 2015 – 2017
  - HIST 1112, Survey of World History since 1500
  - HIST 2111, Survey of U.S. History to 1865
  - HIST 2112, Survey of U.S. History since 1865
  - HIST 2110, Survey of U.S. History
- Visiting Lecturer, Georgia State University, 2013 – 2015
  - HIST 2110, Survey of United States History
- Graduate Instructor of Record, Georgia State University, 2009 – 2013
  - HIST 1112, Survey of World History since 1500
  - HIST 2110, Survey of United States History

## INVITED TALKS/MEDIA

- The United Nations Association, Atlanta Chapter, "U.N. 80" Celebration, "Partners in Peace – Teaching the Nobel Peace Prize," Oct. 24, 2025
- GSU Constitution Day Event, Sept. 16, 2025, "The Rise and Demise of the Voting Rights Act"
- Lee County, Alabama NAACP Annual Freedom Fund event, "School Desegregation in Lee County," May 31, 2025, *Remembering Lee County Trailblazers*
- GSU Constitution Day Event, Sept. 17, 2024, "The Civil Rights Act of 1965: The Lesser-Known Titles"
- Stephen Fowler, "In new congressional district, Black voters weigh what representation really means," *National Public Radio*, April 15, 2024, national broadcast.
- Madison County GA Daughters of the Am. Rev., "The Constitution and Voting Rights," Sept. 26, 2024
- Georgia Alliance of African American Attorneys, Winter Conference, Jan. 2024, "The Voting Rights Act, Now"
- Sarah Larson Lecture Series, Remarks on *Monument: The Untold Story of Stone Mountain*, Perimeter College Dunwoody Campus, March 26, 2024
- Kiwanis Club of Covington, Georgia, March 16, 2023, "The Voting Rights Act – Then and Now."
- Rotary Club of Covington, Georgia, April 25, 2023, "The Voting Rights Act – Then and Now"
- Documentary, WSFA Montgomery, Alabama, "1963: Integration of Alabama Schools," Feb. 21, 2023
- Symposium on the Struggle for Black Freedom, Georgia State University, Perimeter College, Keynote Address, February 11, 2020, "The Struggle for Black Voting Rights: from Reconstruction to *Right Now*"
- Georgia State University Constitution Day Event, September 18, 2019, "'To Abridge and Deny': Vote Dilution, Section 5 Preclearance, and Undermining the 15th Amendment"
- Auburn University Critical Studies Working Group, College of Education, April 12, 2019, "*Teach Us All*, The Little Rock Nine, and Contemporary School Segregation"
- League of Women Voters of Greater Jefferson County, February 21, 2019, "School Desegregation in Alabama."
- Auburn University Caroline Marshall Draughon Center for the Arts and Humanities, January 29, 2019, Book Talk for *The Politics of White Rights*
- Alabama Department of Archives and History, *Alabama in the Age of Aquarius* Symposium, August 19, 2016, "Desegregating Alabama's Schools: the Montgomery Experience," with Federal Magistrate Judge Delores Boyd and Peggy Wallace (daughter of George Wallace)
- Alabama Department of Archives and History, Monthly Lecture Series, May 15, 2014, "Now a Single Shot Can Do It": *Lee v. Macon County Board of Education* and School Desegregation in Alabama"

## NOTABLE AND RECENT CITATIONS

- Nikole Hannah-Jones, "The Resegregation of Jefferson County," *The New York Times Magazine*, Sept. 6, 2017
- Rebecca Retzlaff, *Planning White Supremacy: Civil Rights and City Planning in Montgomery, Alabama, 1920 – 1970* (University of Alabama Press, 2025).
- James Baldwin and Joe Feagin, "Weaving the Web of Domination: Unpacking Systemic Racism and Privilege in America," in Maurice Mangum, Ed., *The Routledge Handbook of Marginalized Groups in the United States and their Challenges* (Routledge, 2025).
- D.T. Marshall et al., D. T., "Parental School Choice Architecture in Segregated Communities: The Case of Two Racially Integrated Charter Schools, *Journal of School Choice* 19.4 (Sept. 29, 2025): pp. 1–11.
- Madison W. Cates, "Homeplace Politics on the New River: Rural Environmentalism in Southern Appalachia, 1962–1976," *Journal of Southern History* 91.3 (2025): 481-518.
- Annah Rogers and Bryan Mann, "Inherently Flawed? An Analysis of Private School Opt-Outs in a Statewide Educational Scholarship Program," *Education Policy Analysis Archives* 33 (June 2025).
- Hannah Durkin, *The Survivors of the Clotilda: The Lost Stories of the Last Captives of the American Slave Trade* (Harper Collins, 2024).
- Dan Carter, *Unmasking the Klansman: The Double Life of Asa and Forrest Carter* (University of Georgia Press, New South Books, 2023).
- Garth E. Pauley, Garth E. "John F. Kennedy, Report to the American People on Civil Rights (11 June 1963)," *Voices of Democracy* 16 (2021).
- Bryan Mann, "Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama," *Rural Sociology* 86.3, 523 (2021).
- Erika Frankenberg, "The Impact and Limits of Implementing *Brown*: Reflections from Sixty-Five Years of School Segregation and Desegregation in Alabama's Largest School District," 11 *Alabama Civil Rights and Civil Liberties Law Review*, 33 (2019).
- Wendy Parker, "Why Alabama School Desegregation Succeeded (And Failed)," 67 *Case Western Law Review*,1091 (2017).

## RECENT SERVICE

- Social Sciences Symposium Roundtable – "Careers in Social Science," 2025
- Social Sciences Executive Committee, 2024 – Present
- GSU Presidential and PC Scholarship Review Committees, 2023 – 2025
- Search Committee, Two Tenure-track Positions in History, 2024
- Faculty Advisor for Phi Theta Kappa, Beta Eta Chapter, 2020 – 2024
- Faculty Advisor for Newton Honors Society Club, 2023 – 2025
- Newton Campus Honors Program Coordinator, 2019 – 2024
- History and Political Science Honors and Awards Committee, 2023
- Newton Campus Mario Bennekin Symposium Committee, 2019 – 2023
- Faculty Development Day, "Building a Research Community," Spring 2022
- Newton Academic Community Engagement (ACE) Committee, 2019 – 2023
- Chair, Search Committee, Lecturer in History, Fall 2019
- Perimeter College Scholarship Selection Committee, 2019
- Search Committee, Adjunct Faculty in African American Studies, Summer 2019
- Search Committee, Faculty Associates to Center for Excellence in Teaching and Learning, Summer 2018
- Search Committee, Lecturers in History, Spring 2018
- 'Panthers Vote' Presidential Election Panel, Fall 2016
- History 2110 Assessment Committee for the Georgia State-Georgia Perimeter Consolidation, 2016 - 2017

## CONFERENCE PRESENTATIONS

- "Enhancing Engagement: Strategies for Student Success," Georgia Historical Association Annual Conference, Savannah, Georgia, Jan. 7, 2026
- "New Directions in Southern Politics and Culture," Georgia Historical Association Annual Conference, Savannah, Georgia, Jan. 7, 2026
- "'We Have Had a Dream, Too': School Desegregation Litigation, Racial Innocence, and Politics in Alabama," Organization of American Historians Annual Conference, St. Louis, Missouri, April 16, 2015.
- "'Life, Liberty, and the Pursuit of Alabama's Happiness': School Desegregation, the 'Law and Order' Narrative,and Litigating Social Change in Alabama, 1954-75," Midwest Political Science Association Annual Conference, Chicago, Illinois, April 12, 2013
- "Black Alabamians' Efforts to Desegregate Schools, 1954-1963: Civil Rights, Litigation, and the Road to *Lee. v. Macon,*" presented at the University of Alabama History Department's Graduate Conference on Powerand Struggle, March 3, 2012

## EXAMINATION FIELDS

- 19th-20th Century United States History
- United States Legal/Constitutional History
- History of South Africa

## PROFESSIONAL ORGANIZATIONS

- Organization of American Historians
- American Historical Association
- American Society for Legal History
- Southern Historical Association
- Alabama Historical Association
- Georgia Historical Association

## SOLICITED BOOK AND MANUSCRIPT REVIEWS

- Outside Reader for *Alabama Review*, Document Feature, "'The Legalistic Southerns Are About to Feel the Judgment of Our Code': Milo B. Howard Jr.'s 1965 Account of the Selma to Montgomery March's Final Day," Spring 2025.
- Outside Reader for Book Manuscript, Brian K. Landsberg, *Revolution by Law: The Federal Government and the Desegregation of Alabama Schools*, University of Kansas Press (Spring 2021). Blurb on jacket.
- Camille Walsh, *Racial Taxation: Schools, Segregation, and Taxpayer Citizenship, 1869-1973* (UNC Press, 2018), *The Alabama Review* (Spring 2021).
- Outside Reader for Essay Manuscript for *Urban History* (Fall, 2019), Anonymous.
- Stephanie R. Rolph, *Resisting Equality: The Citizens' Council, 1954-1989* (LSU Press, 2018), in *The Journal of Mississippi History* (Fall, 2019).
- Wayne A. Weigand and Shirley A. Weigand, *The Desegregation of Public Libraries in Jim Crow South: Civil Rightsand Local Activism* (LSU Press, 2018), in *Georgia Historical Quarterly* (Summer, 2019).
- Leeann G. Reynolds, *Maintaining Segregation: Children and Racial Instruction in the South, 1920-1955* (LSU Press, 2018), in *The Alabama Review* (Summer, 2019).
- Outside Reader for Essay Manuscript for *History of Education Quarterly* (Fall, 2018), Anonymous.
- James Turner, *Selma and the Liuzzo Murders: The First Modern Civil Rights Convictions* (University of MichiganPress, 2018), in *Law and History Review*, *The Docket*, Vol. 1, Issue 2 (August 2018).
- Tracy E. K'Meyer, *From* Brown *to* Meredith*: The Long Struggle for School Desegregation in Louisville, Kentucky, 1955—2007* (University of North Carolina Press, 2013), in *The Journal of Southern History* 80, No. 4 (Nov. 2014): pp. 1019-20.